

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WAYNE BERRY, a Hawaii citizen; | ) Civ. No. CV03 00385 SOM-LEK |
| | ) (Copyright) |
| Plaintiff, | ) |
| | ) DECLARATION OF THOMAS T. |
| vs. | ) UENO; EXHIBITS "A" & "B" |
| | ) |
| HAWAIIAN EXPRESS SERVICE, | ) |
| INC., a California corporation; et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF THOMAS T. UENO

I, Thomas T. Ueno, make this declaration under the penalty of perjury. All the statements herein are true and correct to the best of my knowledge, information and belief. If called upon to testify regarding these matters, I am competent and willing to do so.

1. I have been asked by Timothy J. Hogan to comment upon the Motion for Partial Summary Judgment on Damages and Motion for Summary Judgment on Damages filed by the Fleming Companies, Inc.'s Post Confirmation Trust ("PCT") and the Fleming Employees, respectively.

EXHIBIT "A"

## Cost Savings

2.    Fleming's use of Berry's FCS reduced its logistics costs for handling vendor merchandise from the vendor's delivery point to Fleming's customers. Fleming's charge to its customers remained the same whether it paid the higher amounts reflected in "prepaid" shipping vendor invoices or if it paid the lower "freight collect" rates by using the Berry's FCS. Lower costs through the use of Berry's FCS therefore translated into increased operating profits to Fleming.

3.    Berry's FCS produced significant cost savings for Fleming. Fleming was able to ship its purchases at a cost lower than the allowances provided by its suppliers. Prior to its use of Berry's FCS, API was only able to handle a small number of containers for Fleming on a "freight collect" basis. These shipments required that API handle numerous paper transactions that made it impossible to ship more than a few containers per week to obtain savings. API was able to ship product "freight collect" for less than the allowances for shipping provided by the vendors and did this work for Fleming and shared in the savings with Fleming. These savings increased profits and/or reduced losses.

4.    Berry's copyrighted FCS, which Fleming infringed, is the primary driver of the cost savings or the Logistic Department's profits for handing the larger volumes that have been historically evident from 1996 to the present. The profits

are derived from Fleming's use of Berry's FCS, which processed the multitude of critical shipping tasks that cannot be done efficiently by employees operating manually. These tasks include receiving at the terminals, pick ups by truckers, completed and missed appointments, container bookings, in-gate tickets when the container arrives at the port, load plans for the container, container movement at the port, move tickets at the port, arrival notice in Honolulu, sailing charts, container pick up schedules, out-gate tickets when it leaves the port, detention and demurrage charges, claims, shipper invoices, and stop-in-transit ("SIT") where additional items are loaded into partially filled containers. Berry's FCS performs these tasks reliably, consistently, with minimum labor, and efficiently. In particular the SIT was used by Fleming to keep its two biggest customers Foodland and Kmart shipping with Fleming when they chose to move goods on their own.

5. In 2002, Fleming's Freight Profit/Loss Report disclosed a profit of ███████. These profits are attributed directly to Berry's FCS. Teresa Noa identified the expenses of the Logistics Department that were incurred in the production of these profits. She estimated ███ a month or ███ for the year. Deducting the expense from the profit yields a net profit of ███ that Fleming earned directly from the use of Berry's FCS in 2002.

6. If the number of containers shipped to Hawaii remained constant

3

(instead of increasing as it has), the annual direct profit from the use of Berry's FCS would be $▮▮▮▮.  Over the last five years, that would total to $▮▮▮▮ of savings for shipping containers to Hawaii. Based on the period of April 1 to June 9 or 70 days, this amount of direct profit would be $▮▮▮▮ for the period relevant to the this case as the Court has previously ordered. This figure is not the total of profits that are attributable to the Berry FCS during this period, but those that are directly attributable to its use by the logistics department that Fleming treated as a separate profit center based on the profit loss report and the Noa prepaid analysis.

### Additional Allowances

8.   Vendor shipping allowances were not limited to shipments to Hawaii. Fleming was able to negotiate shipping allowances that were similar to those it received for its Hawaii purchases for certain West Coast purchases. As stated above, Fleming's profits from its use of Berry's FCS are not limited to the profits of its Logistics Department of its Hawaii operations.

9.   Prior to Fleming's use of API's services, Fleming purchased goods on a prepaid basis. After it engaged API, it began purchasing goods net of freight, plus a negotiated freight allowance on a "freight collect" basis.

10.  Berry's FCS created significant freight cost savings for Fleming in Hawaii and lower merchandise costs.  It also created price breaks (or savings) in its

non-Hawaii business by allowing Fleming to secure freight allowances on non-Hawaii business by pretending it was going to Hawaii.

### Reasonable License Fee

11.  Actual damages often looks at the effect of the infringement on the copyright owner's market. In this case, this is a custom software product. The infringement by Fleming essentially deprived Mr. Berry of his entire market for this custom work. To arrive at a fair and reasonable actual damage calculation, I approached this issue by first accepting that Wayne Berry is entitled to a fair license fee from the users of his software. Software fees are established on several bases. One acceptable industry basis for license fees is the per unit basis. For example, LexisNexis is offered on pay as you go or a per search basis; KnowX, which provides access to public records, also charges on a per search basis.

12.  I calculated the reasonable license fee that Fleming paid for its use of Berry's copyrighted FCS. Fleming forgave its $1,295,000 loan that it gave to Jack Borja, president of API, in exchange for the use of the Berry FCS.

13.  I computed the usage fee per container to be $1,772, using an estimate of 55 containers per week being processed by the Hawaii division from October 9, 1999 (during the period from the date Fleming acquired the assets of API) to January 10, 2000 (the date Fleming converted to its new freight management



system from Manugistics). Fleming was updating its software to address the Y2K date issues and needed to install these updates by 2000. One of the updates that Fleming made was an infringing update to FCS that meant that Fleming stopped using the FCS by January 1, 2000. I chose to use the Manugistics conversion date as the target date for the completion of the updating of Berry's FCS that was ten days later.

14. Dave Badten of Fleming documented Fleming's progress in updating the Berry FCS on November 19, 1999. He discusses creating a new version or partner labeled "Hawaii API" for Mark Dillion at Fleming Hawaii Logistics.[1] He was generating a test file for Mark to use to test the current version and see how it would deal with the 8 digit dates (Y2K).

## Disgorgement of Profits

*Unreliable Supporting Sources for Analysis*

15. Kinrich uses unreliable and unsupported financial statements as the basis for his arguments. He uses internal reports prepared by management that have yet to be corrected for misstatements of revenue and expense items. These internal reports do not provide a reliable basis for Kinrich's conclusions. These are management reports that have not been corrected for the numerous types of errors

---

[1] Email from Dave Badten to MarkD@FlemingLogistics.com dated November 19, 1999.

such as duplicate postings, erroneous charges, missing accruals, and normal adjustments. Revenue items could be underreported because of improper accruals, posting sales in the wrong periods (cut-off errors), or missing and unposted sales. Expenses could be overstated for a number of reasons such as duplicate postings, erroneous charges to the Hawaii division, and simple coding errors.

16. The company's external auditors did not audit the reports. There is no indication that the reports or the system used to generate the reports were reviewed by the company's internal auditors.

*Management Manipulated Financial Reports*

17. Fleming's management installed poor internal controls that allowed them to artificially change financial results. Management misstated the financial statements to artificially inflate Fleming's financial results so as to generate large, but unearned, performance bonuses for themselves. Fleming's financial statements were not in accordance with Generally Accepted Accounting Principles. There were issues involving Fleming's up-front revenue recognition policies that were not in accordance with GAAP 2 and internal control weaknesses within the financial reporting process.

18. This artificially inflated income caused Fleming to incur over $500

7

million in public, trade and bank debt and deepened Fleming's insolvency beyond repair, leaving its creditors with unpaid, unsecured debts that exceeded $3 billion.3

19. The company's poor internal controls allowed such manipulations to occur. Kinrich has not established the reliability of the internal financial statements on which he based his conclusions.

*Report Differs from Supporting Sources*

20. Kindrich's Exhibit 5 is not supported by the supporting financial information he provided for periods 4 to 9 for the 2003 fiscal year, after the mid-period adjustment is made for period 4. A detailed comparison with the financial information he provided is contained in the attachment Exhibit "A."

21. Kinrich's Exhibit 5 includes an account that is not in the source material he referred to in his report. He added the account ▓▓▓▓▓▓ of ▓▓▓ that is not on the Period Income Statement summaries he quoted.

22. The Period reports provided by Kinrich show that Fleming's Gross Margin from All Ops was ▓▓▓▓▓ for the period April 1, 2003 to August 23, 2003. Kenrich's Exhibt 5 shows that Fleming had a loss before taxes of ▓▓▓▓▓ whereas his source (Period Reports) shows a loss of ▓▓▓▓▓.

---

2 2 Cross-Complaint and Original Complaint of the Post-Confirmation Trust and Original Answer of Defendants the Fleming Companies, the Post Confirmation Trust and Core-Mark; page 12.
3 Cross-Complaint and Original Complaint of the Post-Confirmation Trust and Original Answer of Defendants the Fleming Companies, the Post Confirmation Trust and Core-Mark; III. Factual Background, pages 7 – 8.

Kenrich increased the loss by $████████ in contradiction with his supporting sources.

*Expense Deductions Not Substantiated*

23. Kinrich's analysis of Fleming Hawaii's financial performance as shown in his Exhibit 5 does not disclose, explain, and substantiate the costs he deducted to reduce the sales for the period from April 1, 2003 to August 23, 2003 to result in a loss.

24. Kinrich deducted ████████ of costs from his estimated sales without disclosing and substantiating the deduction. He did not explain the deduction and did not disclose the composition of the deduction. Approximately 92% of Kinrich's deductions have not been explained and supported.

25. The total sales for the periods 4 to 9 in 2003 are $████████. There is no explanation or disclosure of the ████████ of costs that reduced the sales to gross margins totaling ████████. These unidentified costs equate to 92 percent of sales.

26. Kinrich analyzed a partial 2003-year, from April 1, 2003 to August 23, 2003. He did not analyze the full year and the preceding and succeeding years.

*Deducted Unrelated Costs*

27. Only costs of performance or costs necessarily incurred in making the

9

sales from the use of Berry's FCS can be deducted. These are the costs that had to be expended to produce the sales.

28. Implicitly, costs of performance should include only direct costs attributable to the sales. These statements show that Kenrich is erroneously deducting all costs, variable or direct and fixed, including remote costs, overhead or otherwise, in his computation of profits. Fixed costs neither increase nor decrease as a consequence of the sales and are improper deductions as a cost of performance.

29. Kinrich deducts overhead type fixed expenses such as overhead burden, working capital charges, and interest income from operating earnings without explaining how these items were needed in the production of sales.

30. Kinrich does not explain whether he applied the 9/28 adjustments he made for Period 4 to all sales and expenses.

31. Teresa Noa's (of Fleming's Logistic Department) methodology to compute the departmental profits earned from the use of Berry's FCS only deducted direct costs. She did not deduct overhead and allocated costs.

32. Mr. Kinrich does not even address the logistics department's separate profit as set forth in the profit-loss report nor does he address Ms. Noa's profit loss report where she describes the effect on Fleming's profit if freight reverts to "prepaid" that would result if Fleming stopped using the Berry FCS.

33. Attached hereto as Exhibit "B" is a true and correct copy of my Expert Report dated March 21, 2005.

Dated, Honolulu, Hawaii     SEP 1 2 2005     .

*[signature]*
Thomas T. Ueno, CPA