IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | |
|---|---|
| IN RE FLEMING COMPANIES SECURITIES LITIGATION<br><br>This Document Relates to All Actions | § Civil Action No.<br>§       05-03-1530 (TJW)<br>§<br>§ Case No. MDL- 1530<br>§<br>§       Judge T. John Ward |

## CROSS-COMPLAINT AND ORIGINAL COMPLAINT OF THE POST-CONFIRMATION TRUST AND ORIGINAL ANSWER OF DEFENDANTS THE FLEMING COMPANIES, THE POST-CONFIRMATION TRUST AND CORE-MARK

1. Pursuant to Fed. R. Civ. P. 13, the Post-Confirmation Trust ("PCT") as third party plaintiff, files this cross-complaint against Defendants Deloitte & Touche, LLC, Mark Hansen, Neal Rider, and Mark Shapiro.

2. In addition, pursuant to Fed. R. Civ. P. 18 and 20, the PCT files this original complaint against Defendants Thomas Dahlen, Jim Thatcher, Steven Davis, Albert "Al" Abbood, Scott Northcutt, Charles Myers and Phillip Murphy, each of whom is a former employee of Fleming Foods[1]; and Defendants James Green, President of Marigold Foods LLC; Christopher Thorpe, Vice-President of Marigold Foods LLC; John Kenneth Adams, Regional Manager of Kraft Foods; Rosario Coniglio, majority owner of Digital Exchange Systems, Inc.; Steven Schmidt, President of Digital Exchange Systems, Inc.; Bruce Keith Jensen, Director of National Accounts for Frito-Lay, Inc.; John D. Robinson, Senior Vice President of Sales and Marketing for Dean Dairy Group, a division of Dean Foods Company; Peter Frank, Chief Financial Officer of Daymon Worldwide and Daymon

---

[1] Messrs. Hansen, Rider, Shapiro, Northcutt, Dahlen, Abbood, Murphy, Thatcher, Davis and Myers may be referred to collectively as the "Fleming Officer Defendants."



EXHIBIT "C"

37. Non-Party Dole Food Company, Inc. ("DFC") is the parent company of Defendant Dole.

38. Non-party Fleming Foods was an Oklahoma corporation with its principal place of business at 1945 Lakepoint Drive, in Lewisville, Texas. It was–before it collapsed into bankruptcy–the nation's leading wholesale distributor of consumable goods. It was destroyed as a result of the events recited in this Complaint.

### III. Factual Background

39. Before it collapsed, Fleming was the nation's leading distributor of grocery and consumer products. It held a dominant market position and generated revenues in excess of $16 billion per year. Before the events recited in this Complaint, Fleming was a viable, valuable and legitimate business. After and as a result of the wrongful and negligent acts of the defendants, however, Fleming was rendered massively insolvent, collapsed into bankruptcy and was destroyed.

40. The Fleming Post Confirmation Trust, the PCT, was created under Fleming's confirmed bankruptcy plan. Its task is to recover for Fleming's creditors the damages that were caused, and the value of the business that was lost as a result of the wrongful conduct of those who caused Fleming's collapse.

41. It is important to note that, as a legitimate business, Fleming had no interest in manipulating its own financial statements. To the contrary, Fleming had an independent board–which was ignorant of the wrong perpetrated on Fleming–that had put in place procedures to ensure that Fleming's business transactions were controlled, were in its best interests and were reported accurately to its shareholders and creditors. Fleming's senior management, a number of whom participated in the scheme to defraud and injure Fleming, had fiduciary obligations to act

7

solely in Fleming's best interest and additionally had duties of candor to the Fleming Board and Fleming's shareholders–duties that they repeatedly breached in order to enrich themselves at Fleming's expense.

42. The scheme described below was short in duration, but its consequences were permanent. Beginning in the latter half of 2001, and continuing through 2002, Fleming's officers embarked upon a scheme to accelerate Fleming's recognition of revenue and income. The purpose of this scheme was to artificially inflate Fleming's financial results, so as to generate large–but unearned–performance bonuses for themselves. As a result of its artificially inflated income, these officers then caused Fleming to incur over $500 million in public, trade and bank debt that Fleming could and would not have incurred had its financial results been reported accurately. The incurrence of this debt first rendered Fleming insolvent, and then deepened its insolvency beyond repair, so that what was one of the nation's largest grocery wholesalers was plunged into bankruptcy and dismembered–leaving its creditors with unpaid, unsecured debts that exceed $3 billion.

43. The scheme of these officers was a breach of their fiduciary obligations to Fleming–but they could not have wreaked this havoc alone. As the Securities and Exchange Commission has observed:

> It takes two to tango. Without suppliers providing or agreeing to false transaction documents, Fleming could not have misled investors as it did.

See SEC Press Release dated September 14, 2004. This case however, is not about two dancers: it is about a willing orchestra of reckless accountants, venal Fleming officers and corrupt vendors and vendor officers who–acting "in concert"–played a siren song that caused Fleming to founder on the rocks of debt it should never have incurred, and that it ultimately could not pay.

8

## IV. Deloitte Failed to Perform a Competent Audit and Breached its Professional Obligations to Fleming

44. Fleming's financial statements could not, and would not, have been misstated had Defendant Deloitte & Touche performed its professional duties as Fleming's auditor in conformity with Generally Accepted Auditing Standards (GAAS) and assured that Fleming's financial statements conformed to Generally Accepted Accounting Principals (GAAP). Deloitte was the outside auditor for Fleming for a number of years, including during 2000, 2001 and 2002. In that capacity, Deloitte issued unqualified audit opinions for Fleming for the years 2000 and 2001, and unqualified review reports for the first three quarters of 2002. The 2000 audit opinion was issued on or about February 14, 2001 (except for certain information relating to long-term debt and contingencies, which was dated March 22, 2001). The 2001 audit opinion was issued on or about February 23, 2002. In addition to its audit and review work, Deloitte issued comfort letters in connection with Fleming's debt issuances in 2001 and 2002. There is, therefore, no argument that Deloitte did not intend (or could not foresee) that Fleming would incur additional debt in reliance upon Deloitte's audit opinion and comfort letters.

45. The audit opinions issued by Deloitte for the years 2000 and 2001 each reported that Deloitte had performed its audits in accordance with GAAS, and represented that the financial statements they were engaged to audit were in conformity with GAAP. The unqualified review reports issued by Deloitte for the first three quarters of 2002 were also purportedly performed in accordance with AICPA standards, and provided assurances that no material modifications needed to be made to Fleming's financial statements for them to be in accordance with GAAP. Each opinion and report was "unqualified." Deloitte never reported: any departures from GAAS; any

9

exceptions to GAAP; any required disclosures that were missing or inadequate; or that the audited financial statements failed, in any way, to fully and fairly depict the financial position results of operations or cash flows of Fleming.

46. In reality, however, the audit and review work that Deloitte performed for Fleming fell far short of the professional standards required of an auditor. Deloitte's audits and quarterly reviews were not performed in accordance with GAAS, and Deloitte failed to report that Fleming's financial statements were not in conformance with GAAP. In performing its work and issuing its unqualified audit opinions and review reports, Deloitte breached its professional obligations as Fleming's auditor by:

- Pursuing grossly negligent audit plans, considering material one-time nonrecurring or unusual transactions and vendor discount practices in violation of AU 230 (due professional care in the performance of work), 311 (planning and supervision), 316 (consideration of fraud), and 319 (consideration of internal control).

- Turning a blind eye to wrongful and fraudulent vendor deductions that had been called to its attention in several ways, including by Fleming's internal auditor, Ernst & Young, and by Fleming's vendors, in violation of at least AU 312 (consideration of audit risk and materiality), 316 (consideration of fraud), 319 (consideration of internal controls), 325 (communication of internal control matters), 326 (evidential matter) and 333 (management representation).

- Failing to demand adequate reserves for wrongful vendor deductions, in violation of AU 326 (evidential matter) and 342 (accounting estimates).

- Failing to perform competent additional procedures that should have been performed in light of the unusual transactions with the Vendors, as required by AU 230 (due professional care), 312 (audit risk and materiality), 316 (consideration of fraud), 326 (evidential matter) and 342 (accounting estimates).

- Failing to critically evaluate significant unexpected differences in the relationships among Fleming's financial data from one period to the next, and failing to corroborate

10

management responses explaining those unexpected differences with other evidence, as required by AU 329 (analytical procedures).

- Failing to pursue sufficient audit confirmations concerning transactions with the Vendors–particularly when none were provided or resulted in conflicting evidence and or adequate alternative procedures and the transactions were significant to Fleming's income statement–in violation of AU 316 (consideration of fraud), 326 (evidential matter), and 330 (confirmation process).

- Preparing and pursuing an audit plan that did not properly consider material one-time transactions and Fleming's vendor discount practices, in violation of AU 311 (planning and supervision).

- Failing to plan and execute its review procedures in 2002 in light of the unusual transactions, allegations of fraud prior audit issues, and internal control weaknesses within the financial reporting process that Deloitte was aware of through its work in preceding years and quarters, in violation of U 722 (interim financial information).

- Failing to maintain an independent and skeptical mindset in the planning and performance of the audit, in violation of AU 230 (due professional care in the performance of work), 311 (planning and supervision), 312 (consideration of audit risk and materiality), and relying excessively and without sufficient evidence on management representations, in violation of AU 316 (consideration of fraud) and 333 (management representations).

- Failing to require and demand that the company properly disclose its significant accounting policies, principles and methods, including revenue recognition, inventory pricing, reserve determination, lending activities and supply contracts as required by APB No. 22 and changes in those accounting policies, principles and methods as required by APB No. 20.

- Failing to require the company to recognize revenue in the manner required by SAB 101.

- Failure to require proper disclosure in accordance with GAAP of purchase obligations, significant contingencies and equity method investees among others.

- Failure to accurately report that the financial statements were not in accordance with GAAP on a consistent basis in violation of AU 410 (adherence to GAAP) and 420 (consistency of GAAP).

11

- Failure to accurately report the inadequacy of disclosures in violation of AU 431. (adequacy of disclosure).

47. Deloitte's most egregious failures occurred in connection with its 2001 audit and 2002 quarterly reviews. In that time period, Deloitte was aware of a number of issues and irregularities involving Fleming's up-front revenue recognition policies and internal controls. It also knew that certain indicators of potential for fraud existed. Despite its awareness of numerous red flags, however, Deloitte proceeded with a lack of skepticism and a lack of due care in the planning phase of their audit work, and the audit procedures Deloitte implemented were woefully inadequate as a result. Deloitte's failure to properly plan its audit process in light of the issues, problems and unusual transactions at Fleming that came to its attention violated GAAS accounting standards, including those identified above. Furthermore, Deloitte was also negligent in its performance of those audit procedures that it did put in place and in the preparation of its financial statement opinion under GAAP–all which permitted Fleming's officers to manipulate Fleming's financial statements and caused Fleming to slide into insolvency and then worsen that insolvency by issuing additional debt.

48. For example, as alleged in more detail below, in the fourth quarter of 2001 Fleming's officers engaged in a number of large and unusual transactions with Fleming vendors involving significant up-front payments. Applicable accounting rules required that these payments be amortized ratably; instead, they were immediately reflected in full as revenue on Fleming's financial statements. Deloitte recognized the problems associated with these transactions. In one instance, Deloitte discovered that Fleming had inappropriately recognized up-front vendor revenue as income, in violation of SAB 101, and had Fleming change that accounting. In another instance, however,