# Exhibit 6

1    IN THE UNITED STATES BANKRUPTCY COURT

2    FOR THE DISTRICT OF DELAWARE

3    - - - - - - - - - - - - - - - - - - - - - - - - - - -

4    In re:                              ) Chapter 11

5    Fleming Companies, Inc., et al.,    )

6         Debtors,                       ) Case No.

7                                        ) 03-10945 (MFW)

8    - - - - - - - - - - - - - - - - - - - - - - - - - - -

9

10                DEPOSITION OF WAYNE BERRY

11

12

13   Taken on behalf of the Debtors at the offices of

14   Kobayashi, Sugita & Goda, First Hawaiian Center,

15   26th Floor, 999 Bishop Street, Honolulu, Hawaii,

16   commencing at 9:11 a.m., Thursday, July 1, 2004.

17

18

19

20

21

22

23   BEFORE:   CHARI L. POSSELL, CSR NO. 414

24             Certified Shorthand Reporter

25

Exhibit 6

2

```
 1    APPEARANCES:

 2    For Debtors:

 3                    ERIC C. LIEBELER, ESQ.

 4                    DAMIAN D. CAPOZZOLA, ESQ.

 5                    Kirkland & Ellis

 6                    777 South Figueroa Street

 7                    Los Angeles, California 90017

 8

 9    For Official Committee of Unsecured Creditors:

10                    JULIE M. SKIDMORE, ESQ.

11                    Pepper Hamilton, LLP

12                    36th Floor

13                    100 Renaissance Center

14                    Detroit, Michigan 48243-1157

15

16    For Deponent:

17                    TIMOTHY J. HOGAN, ESQ.

18                    Lynch Ichida Thompson

19                    Kim & Hirota

20                    1132 Bishop Street

21                    Suite 1405

22                    Honolulu, Hawaii 96813

23

24    Also Present:   JUSTIN LANGLAIS, Videographer

25                      -oOo-
```

28

1    Q.    Have you written any specific software for
2    Y. Hata?
3    A.    What do you mean by specific software?
4    Q.    You know what specific software is, don't
5    you, sir?
6    A.    I am looking for your definition so I can
7    answer your question.
8    Q.    Have you written any software at all for
9    Y. Hata?
10   A.    To give you the -- my strict take on it, I
11   don't write software for anyone other than myself.
12   Q.    Have you licensed any software that you own
13   to Y. Hata?
14   A.    Yes, I have.
15   Q.    Does that license -- strike that.
16   Withdrawn.
17        Is that an oral or a written license?
18   A.    It is a written license.
19   Q.    How many written license agreements are
20   there between you on the one hand and Y. Hata & Co.
21   Ltd. on the other?
22   A.    One.
23   Q.    And what is the subject of that written
24   license agreement and how would you describe the
25   software that you have licensed to Y. Hata?

1    A.    It is a freight control system.

2    Q.    Is it the same or a different freight

3  control system than the one at issue in your claim

4  against the estate?

5    A.    By same or different, are you talking

6  functionality, code, design, structures?  Help me a

7  little bit.

8    Q.    Sure.  On any basis that you are

9  comfortable asking the question, on the assumption

10  that you are explaining it to a lawyer who's not a

11  software expert.

12          MR. HOGAN:  I would object on the

13  grounds of vagueness.  Answer if you can.

14          THE WITNESS:  Some of the -- some of

15  the elements are similar.  Some expressions are

16  similar.  But it's radically different in many ways

17  and much improved than the one that was left with

18  Fleming in October of 1999.

19  BY MR. LIEBELER:

20    Q.    Does Y. Hata pay you a license fee for the

21  use of the freight control system?

22    A.    Yes.

23    Q.    And how much is that license fee?

24    A.    I think I would consider that confidential

25  information at this point.  I would like to -- I

1  think I would like to get their permission to -- for

2  me to repeat that.

3     Q.    I don't believe that's the basis for not

4  answering in this deposition, sir.  And it is -- it

5  will be my contention that that will be relevant

6  testimony for purposes of what we are doing here now.

7  So I would ask you to answer that question, sir.

8     A.    You may be correct in that, but I don't

9  want to violate a nondisclosure.

10    Q.    Are you refusing to answer my question,

11 sir?

12    A.    At this point.

13    Q.    For your information -- and I can pull the

14 document and we may do it a little bit later -- your

15 counsel has indicated to either me or my compatriot,

16 Mr. Capozzola, that you currently receive $115 per

17 container for something.  I don't want to

18 characterize what it is because I don't have the

19 exact detail in front of me.  Are you familiar with

20 that?

21    A.    Yes.  There's a formula for a calculation

22 like that, yes.

23    Q.    Is that with respect to your relationship

24 with Y. Hata?

25    A.    Yes.

78

1  beginning of the second full paragraph that you,

2  Mr. Berry, had some desire to market your software

3  commercially, correct?

4      A.    Yes.

5      Q.    And the software that this addendum refers

6  to is the three separate pieces that you articulated

7  in the complaint you filed before the petition,

8  right?

9      A.    It includes those three, but the software

10  we are discussing here is thousands of program files.

11      Q.    That's why I said "includes."

12      A.    Yes.

13      Q.    For nomenclature purposes, what should I

14  call that group of software, that group of programs

15  and that software that you are referring to in the --

16  strike that -- that the second addendum refers to,

17  your Freight Control System?  I don't want to use

18  that as a term of art, because that's a separate term

19  of art in the complaint.  What nomenclature should I

20  use to describe the software that you intended to

21  market?

22      A.    The entire collection, I have referred to

23  it as FCS 1993.

24      Q.    Back to the nomenclature we talked about

25  earlier?

1    A.    Right.

2    Q.    At least according to the second addendum,

3    you intended to market the FCS 1993 commercially; is

4    that right?

5    A.    Yes.

6    Q.    Did you ever succeed in licensing FCS 1993

7    to anyone other than Fleming?

8    A.    No.

9    Q.    Did you ever enter into substantial

10   negotiations with any other entity to license FCS

11   1993 to them?

12   A.    What do you mean by substantial

13   negotiations?

14   Q.    What I mean is negotiations that were sort

15   of past the very initial steps of saying to someone,

16   "Hey, do you want this stuff?"  And they say yes, and

17   you have to sit down and negotiate the terms.

18   Substantial negotiation would be past just the

19   initial expression of interest.

20   A.    I am trying to remember.  We had -- I

21   should say I had -- during that period of time, I

22   don't know if you characterize it as substantial

23   negotiations, but in -- prior to 1999 and again in

24   1999, it was sort of an ongoing thing, I did have

25   lengthy discussions with K-Mart regarding it.  And

80

1    that had been over a period of years stretching back

2    to 1996.

3         And the last time I -- in this time frame

4    you are referring to, in that -- up through like a

5    year or two after these agreements, I had -- the last

6    discussion I had with them was I think early 2000,

7    late 1999 or early 2000.  And that's -- I think that

8    was the Foodland in 2000 -- 2001.  I was working on

9    FCS 2003.  Of course, we hadn't even hit the date

10   yet, so that software wasn't even born yet.  But I

11   was in detailed negotiations with Foodland, and my

12   intention was to start with FCS 1993 and migrate to

13   the 2003 version as I completed it.  So that -- those

14   are the only two I can recall at this point.

15        Q.   All right.  Just so the record is clear,

16   then, you were engaged in some level of discussion

17   with both K-Mart and Foodland with respect to a

18   potential license agreement for FCS 1993; is that

19   right?

20        A.   Yes.

21        Q.   And neither of those agreements ended up

22   coming to fruition; is that true?

23        A.   That's correct.

24        Q.   And neither K-Mart nor Foodland ever paid

25   you money in exchange for a license of FCS 1993; is

1  that right?

2      A.    That's correct.

3      Q.    And under the EULA and the first addendum

4  and the second addendum, Fleming did not pay you any

5  money to license FCS 1993 either, did it?

6      A.    No, they did not.

7      Q.    That's because under the terms of the

8  agreement, it was a free license, right?

9      A.    It was a temporary fix for them because

10  they were going to get software from the Mainland,

11  most likely from Manugistics, and I was trying

12  accommodate them.

13      Q.    I understand they might have been getting

14  software elsewhere, but this was a free license, was

15  it not?

16      A.    A limited free license.  There was no

17  intent for this -- you can even read what Mr. Stussi

18  wrote here about how it was going to be used for a

19  while and they were going to destroy the copies.

20      Q.    I understand there are limitations on the

21  license, but that's another question.

22          Regardless of how limited it is and how

23  broad it is -- and I understand your contention it is

24  limited --

25      A.    Yes.

1    Q.    -- it was a free license; is that right?

2    A.    For its stated purpose, yes.

3    Q.    So Fleming did not even pay you so much as

4  a dime for this license, whatever its terms; isn't

5  that right?

6    A.    Not that I am aware of, no.

7    Q.    It is correct, sir, is it not, that Fleming

8  did not even pay you so much as a dime?

9    A.    I don't remember receiving any money from

10  this.  I believe you are correct.

11    Q.    Very good.

12         Now, in your view, do you have any current

13  obligations under either the EULA or the first

14  addendum or second addendum?

15              MR. HOGAN:  Objection.  Calls for a

16  legal conclusion.

17         You can answer if you can.

18              THE WITNESS:  First, I would have to

19  ask you your position.  Is this something that you

20  lost at the end of the trial when your client was

21  found to be a willful infringer?  Do you consider

22  these collection of documents to be the license?  Are

23  you going to pick one of them as a license or are

24  they -- I don't know how to answer your question.  I

25  would love to know your position.

1          I have seen it in your time records all

2    these rejections and you keep staring at this thing,

3    but where are you going with it?

4    BY MR. LIEBELER:

5          Q.    You know what, Mr. Berry, it is a

6    deposition, and I get to ask you questions.  That's

7    the way the process works.

8          A.    But you have to give me the foundation.

9          Q.    And I have.  You signed this agreement of

10   your own free will, and in fact, you drafted 5/7 of

11   it.

12         A.    Right.

13         Q.    In your businessman's understanding, as you

14   sit here today, do you have any current obligations

15   under this set of documents?

16              MR. HOGAN:  Objection.  Calls for a

17   legal conclusion.

18              You can answer.

19              THE WITNESS:  Until I know your

20   position, I have no idea.

21   BY MR. LIEBELER:

22         Q.    You can't answer that one way or the other;

23   is that fair?

24         A.    I don't know.

25         Q.    I understand the testimony.  I just want to

191

1               C E R T I F I C A T E

2    STATE OF HAWAII              )
                                  )   SS:
3    CITY AND COUNTY OF HONOLULU  )

4          I, CHARI L. POSSELL, Notary Public, State

5    of Hawaii, do hereby certify:

6          That on Thursday, July 1, 2004, at

7    9:11 a.m., appeared before me WAYNE BERRY, the

8    witness whose deposition is contained herein; that

9    prior to being examined he/she was by me duly sworn;

10         That the deposition was taken down by me in

11   machine shorthand and was thereafter reduced to

12   typewriting under my supervision; that the foregoing

13   represents, to the best of my ability, a true and

14   correct transcript of the proceedings had in the

15   foregoing matter.

16         I further certify that I am not attorney

17   for any of the parties hereto, nor in any way

18   concerned with the cause.

19         DATED this 1st day of July, 2004, in

20   Honolulu, Hawaii.

21

22

23   CHARI L. POSSELL, CSR NO. 414
     Notary Public, State of Hawaii
24   My Commission Exp:  7-25-2007

25