# Exhibit 17

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3                                  )
    WAYNE BERRY, a Hawaii citizen,   )   CV 03-00385 SOM-LEK
 4                                   )
              Plaintiff,             )   Honolulu, Hawaii
 5       vs.                         )   September 28, 2004
                                     )   9:00 A.M.
 6  HAWAII EXPRESS SERVICE, INC.,    )
    a California corporation,        )   Continued Hearing on
 7  et al.,                          )   Plaintiff's Motion for
                                     )   Issuance of Preliminary
 8            Defendants.            )   Injunction
                                     )
 9  _____)

10              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE SUSAN OKI MOLLWAY
11             UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiff:            TIMOTHY J. HOGAN, ESQ.
                                  Lynch Ichida Thompson Kim
14                                 & Hirota
                                  First Hawaiian Tower
15                                1132 Bishop St., Ste. 1405
                                  Honolulu, HI 96813
16
    For the Defendant             ERIC C. LIEBELER, ESQ.
17  Fleming Companies, Inc.:      MELISSA M. DULAC, ESQ.
                                  Kirkland & Ellis LLP
18                                777 South Figueroa St.
                                  Los Angeles, CA 90017
19
    For the Defendants            LEX R. SMITH, ESQ.
20  Fleming Companies, Inc.,      Kobayashi Sugita & Goda
    C&S Wholesale Grocers,        First Hawaiian Center
21  C&S Acquisitions,             999 Bishop St., Ste. 2600
    C&S Logistics:                Honolulu, HI 96813
22
    For the Defendants            LYLE S. HOSODA, ESQ.
23  Mark Dillon, Brian            345 Queen St., Ste. 804
    Christensen, Teresa Noa:      Honolulu, HI 96813
24

25
```

Exhibit 17

```
 1   APPEARANCES (Continued):

 2   For the Defendants              EMILY REBER PORTER, ESQ.
     Hawaiian Express Service,       Goodsill Anderson Quinn
 3   Inc., HES Transportation           & Stifel LLP
     Services, Inc.,                 Alii Place
 4   California Pacific              1099 Alakea St., Ste. 1800
     Consolidators, Jeffrey          Honolulu, HI 96813
 5   Graham, Peter Schaul:

 6   For the Defendant               JULIA M. MORGAN, ESQ.
     Hawaii Transfer Company,        Fukunaga Matayoshi Hershey
 7   Limited:                           & Ching
                                     Davies Pacific Center
 8                                   841 Bishop St., Ste. 1200
                                     Honolulu, HI 96813
 9
     For the Defendant               LEROY E. COLOMBE, ESQ.
10   Foodland Super Market,          Chun-Kerr Dodd Beaman
     Limited:                           & Wong LLLC
11                                   Topa Financial Ctr.
                                     Fort St. Twr.
12                                   745 Fort St., Fl. 9
                                     Honolulu, HI 96813
13
     Official Court Reporter:        Debra Kekuna Chun, RPR, CRR
14                                   United States District Court
                                     300 Ala Moana Blvd. Ste. C285
15                                   Honolulu, HI 96850
                                     (808) 534-0667
16

17

18

19

20

21

22

23

24
     Proceedings recorded by machine shorthand, transcript
25   produced with computer-aided transcription (CAT).
```

1  A    Yes, I did.

2  Q    So in March 21st, sir, before the bankruptcy you were

3  telling Mr. Christensen that you shouldn't be the one to

4  create the replacement; is that correct?

5           MR. LIEBELER:  Objection.  Mischaracterizes the

6  document, Your Honor.

7           THE COURT:  Okay.  You want to rephrase that.

8  I don't know if he was actually saying don't use me.

9  BY MR. HOGAN:

10 Q    Mr. Dillon, isn't it true that you told your bosses

11 that you shouldn't be the one to replace Mr. Berry's

12 software?

13          MR. LIEBELER:  Same objection, Your Honor.  The

14 document only says there might be an easier or a different

15 way.

16          THE COURT:  I'm going to let this happen since

17 at this point he's not purporting to characterize the

18 document alone.  Go ahead.

19          MR. LIEBELER:  Very well.

20          THE WITNESS:  What do I say here?  I say I

21 believe it is easier to convince a judge in a motion for

22 summary judgment.  In that context.  I don't believe -- it

23 makes no sense for me to be involved with creating a

24 replacement database.  Now, are you referring -- I take it

25 you're implying that the spreadsheets --

1       THE COURT: Hold on. I'm going to let him ask
2  another question, okay. We don't have to guess.
3       Go ahead.
4  BY MR. HOGAN:
5  Q    Mr. Dillon, and it is true, sir, that you actually
6  did create a program -- you call it spreadsheets, but it
7  is a program -- that replaced the Berry database; is that
8  correct?
9  A    I created a document within Excel. Excel is a
10 program. It's an application. I don't know of anybody
11 that calls a workbook a program, especially one that has
12 no automation whatsoever. It's simply rows and columns of
13 data.
14 Q    Is that the program that is presently running at C&S
15 today to the best of your knowledge?
16 A    Since we dumped our data into spreadsheets we've
17 added some elements to it to help users navigate the
18 spreadsheets and to provide some of the functions that --
19 well, just to make them viable as a data -- because
20 spreadsheets are not a database, and yet we have -- our
21 need is for a database. We cannot use Mr. Berry's; so
22 we've put our data somewhere where hopefully we can use
23 it. And we -- well, we limp along using it in -- using
24 our data in an application that's not really suited for
25 that volume of data and that volume of users. We've made

1  some changes to, you know, help the users get along. But
2  what we originally did was simply take the data out of
3  Mr. Berry's database and put it into raw spreadsheets.
4  It's a document within Excel. There's nothing added at
5  that time.
6  Q   Isn't it true, sir, that one of the changes that you
7  made is that you're currently running it as a table or
8  series of tables running against your Queries.mdb Access
9  database?
10 A   Could you repeat that question.
11 Q   Isn't it true that your spreadsheets that you've
12 referred to are currently acting as tables within a
13 Queries.mdb database that you are presently running at
14 C&S?
15 A   I don't think that's a correct characterization.
16 Queries.mdb is used simply to run queries against the
17 spreadsheets. Within -- to do that within an Access
18 database you have to give it some information about
19 where -- what data sources it's going to use for those
20 queries. We have done that. We have pointers -- there
21 are pointers within -- let's use that terminology --
22 within Queries.mdb that point to the spreadsheets.
23 They're not tables within Queries.mdb.
24 Q   But it is operating within Queries.mdb, which is a
25 database; correct?

```
 1   A    What is operating within?
 2   Q    Your spreadsheets.
 3   A    No.  How do you mean they are operating within?
 4   Q    When you execute -- make table queries in the
 5   Queries.mdb environment I'll call it, isn't it true, sir,
 6   that the spreadsheets become Access tables, fields, parts
 7   of Access at that time?
 8   A    You're referring to a make table query.
 9   Q    Correct.
10   A    We use a make table queries.  These are temporary
11   queries that create temporary tables.  None of those
12   tables are any of the spreadsheet -- worksheets within the
13   spreadsheets.
14   Q    But, when you execute your make table queries, are
15   you saying that the spreadsheets are not impacted at all
16   by the make table queries?
17   A    No.  We're simply creating a selection of data so
18   that we can run a report to publish that data.  That's all
19   they're used for.
20   Q    Right.  Through an Access database; correct?
21   A    Yes, we use Access to create the queries and to run
22   the query.
23   Q    Now, in regard to your statement that you intended to
24   do anything required to comply with the jury verdict,
25   which is in paragraph 11 of your declaration as corrected,
```

1   isn't it true, sir, that what you actually did was to take
2   Mr. -- a version of Mr. Berry's software that you renamed
3   Original Logistics Data.mdb?  Isn't that true that's one
4   of the things you did?
5   A    When we reverted to -- attempted to revert to
6   Mr. Berry's database in its licensed form, we took the
7   oldest archive copy of that piece of software that we had.
8   I had made a change.  I had added a feature to help us
9   compensate for a Y2K failure in Mr. Berry's update program
10  named FlemingPO.exe.  I took that change out -- I removed
11  that feature, and in it had essentially Mr. Berry's
12  database in its licensed form.
13  Q    Isn't it true, sir, that you've just corrected your
14  declaration to say there were other changes in that
15  database?
16  A    That ScratchName field, I remember that, and I
17  believe that was there and I should have deleted it when I
18  went back to, you know, to arrive at Mr. Berry's database
19  in its licensed form.  What we're trying to do is to go
20  back to what we did have a right to and what Mr. Berry
21  granted us a right to, and by an inadvertence I did not
22  delete that field.
23       The other fields may have been renamed -- those
24  two fields, Voucher Number Old and Voucher ID Old, they
25  may have been named in preparation to -- I may have done

1  that trying to figure a way to combine certain tables that
2  needed to be combined to make the spreadsheets.
3  Q    When you combine tables that way, sir, wouldn't you
4  have to have made a change in the database to do that?
5  A    I may have -- yes, I may have had to temporarily add
6  a field so that I could, you know, I don't remember what I
7  was doing there.  I remember I had a concern about the
8  Voucher ID and Voucher Number fields.  These fields --
9  Mr. Berry would at different times replicate his database.
10 And, when you replicate an Access database, these fields
11 called auto number fields, which automatically give the
12 next number in sequence to every new record, all of a
13 sudden stop giving numbers in sequence and they pick
14 random numbers and assign those to every new record.  So
15 your next new record may have four digits in it.  The next
16 record after that may have 15 digits in it and may be a
17 negative number.
18      So we had a problem with that.  It was very
19 confusing to use it; so I may have attempted -- my
20 recollection is I wanted to straighten that out when I
21 went to the spreadsheets and remove these kinds of random
22 numbers.
23      So I may have tried to add a temporary field to
24 straighten that out.  In the end it looks like I abandoned
25 the effort, but I perhaps left the label change

```
 1    inadvertently; so you have a Voucher Number Old and a
 2    Voucher ID Old.
 3    Q    So is it fair to say that these attempts to remedy
 4    these problems that were being created were occurring
 5    after the jury verdict, sir?
 6    A    This would have been something -- this was -- what
 7    I'm referring to is something I was contemplating doing at
 8    the time that we were going to abandon Mr. Berry's
 9    database and put our data in spreadsheets.
10    Q    So that would have been sometime in May of 2003
11    approximately?
12    A    Yes.  Late May.
13    Q    Did Mr. Berry give you permission to make those
14    changes in his database, sir?
15    A    Change the labels?  No.
16    Q    Now, you also created sometime after the jury verdict
17    a database that you entitled -- let me stop.  I didn't get
18    an answer to my question.  Did you change the name of his
19    database to original logistics mdb?
20    A    The name of the file?
21    Q    Correct.
22    A    Yeah, I think I did.  Is that -- yes, I think I did
23    to distinguish it from anything the user shouldn't be
24    using.
25    Q    And when do you think you did that, sir?
```

32

```
 1            MR. LIEBELER:  Your Honor, I'm going to object
 2    to this line of questioning as being something that's
 3    simply not relevant to any injunction that the court can
 4    issue.
 5            THE COURT:  I'll allow the answer.
 6            MR. LIEBELER:  May I make a brief record on it,
 7    Your Honor?
 8            THE COURT:  Yeah.
 9            MR. LIEBELER:  The only issue is that what we're
10    talking about now that are purported changes that may or
11    may not have been made to the database in order to comply
12    with the jury verdict, there's no contention that that
13    version is still being used.  In fact, Mr. Dillon has
14    testified he's now using spreadsheets, which is something
15    different.  This looks like discovery that's for purposes
16    of trial to me that may go to a separate issue, but I
17    don't think the court could issue an injunction based on
18    this testimony.
19            THE COURT:  Okay.  I think this is being
20    presented as background; so go ahead.
21    BY MR. HOGAN:
22    Q    Mr. Dillon, do you recall when you made the change of
23    the name of Mr. Berry's database to Original Logistics
24    Data.mdb?
25    A    I don't recall precisely.  I assume I made that
```

1   change after the jury verdict when we reverted to
2   Mr. Berry's database in its original form and had to
3   distinguish that file from any other Access file that we
4   were to no longer use.
5   Q   Now, in regard to this attempt to revert to something
6   that would comply with the jury verdict isn't it true,
7   sir, that you also created another Access database around
8   this same time of March 2003 entitled Auxiliary Logistics
9   Data.mdb?
10  A   Yes, I did.
11  Q   And isn't it true, sir, that what Auxiliary Logistics
12  Data.mdb was was all the changes that had been placed in
13  Mr. Berry's database that you believe the jury had found
14  were infringing.  You removed those and put them in
15  Auxiliary Logistics dot-mdb?
16  A   No, that's not correct.
17  Q   Correct me then, sir.  What was your understanding of
18  what was Auxiliary Logistics Data.mdb?
19  A   They were four tables I created entirely original to
20  me that Mr. Berry did not -- objected to my incorporating
21  in his Access file; so I removed them from his Access file
22  and I put them elsewhere.
23  Q   But they were in the copy of the Access file that was
24  known as FCS Logistics Data.mdb.  Is that a fair
25  statement, sir?

1   Q   Just so you're clear on the text of it, that's the
2   one in which you wrote an e-mail that talks about
3   possibilities of summary judgment. Do you see that?
4   A   Yes.
5   Q   Are you a lawyer, Mr. Dillon?
6   A   No.
7   Q   Are your views with respect to the possibilities of
8   summary judgment, depending on which actions Fleming
9   takes, speculation, sir?
10  A   Yes, they are. From a laymen's perspective.
11  Q   Do you believe that your spreadsheets respect
12  Mr. Berry's rights?
13          MR. HOGAN: Objection, Your Honor. Calls for an
14  opinion.
15          THE COURT: Well, we're going -- you've gone to
16  some degree into his intent. I'm going to let him answer
17  this.
18          THE WITNESS: Yes. That was certainly our
19  intention.
20  BY MR. LIEBELER:
21  Q   And does anything in this e-mail contradict that view
22  on your part, sir?
23  A   I don't believe so. I don't see anything.
24  Q   And then reflect -- looking, excuse me, at numbered
25  paragraph 1 in your e-mail, the language there says,

1   "Mr. Berry has a grudge against Fleming, which he himself
2   told me in so many words while I was still with API." You
3   see that?
4   A   Yes, I do.
5   Q   Does that properly reflect a conversation you had
6   with Mr. Berry at some point in the past?
7   A   Yes, it does.
8   Q   If you were ordered, Mr. Dillon, to stop using
9   spreadsheets, what impact would that have on the
10  operations out at Kapolei?
11  A   I don't see how we could work. It wouldn't be
12  possible from what I -- we have to have something to
13  handle that volume of data. I just don't know what else
14  we could use.
15  Q   Is it fair to say, sir, if you're ordered to stop
16  using the spreadsheets, that running the logistics
17  operation out at Kapolei would become much more difficult?
18  A   Much more --
19  Q   Difficult. Difficult, sir.
20  A   I'd say impossible. But, yeah, I can't conceive of
21  it. I don't know how we would carry on.
22          MR. LIEBELER: No further questions, Your
23  Honor.
24          THE COURT: Okay. Recross.
25          MR. HOGAN: Briefly, Your Honor.

```
 1                    RECROSS EXAMINATION
 2   BY MR. HOGAN:
 3   Q    Mr. Dillon, isn't it true that one of the things that
 4   Mr. Berry got when he licensed Fleming the use of his
 5   software was to get you a job for one year?
 6            MR. LIEBELER:  Objection.  Past the scope of
 7   redirect, Your Honor.
 8            MR. HOSODA:  I join that, Your Honor.
 9            THE COURT:  It is beyond the scope.
10            MR. HOGAN:  Your Honor, he's talking about
11   Mr. Berry's world of having a grudge and what Mr. Berry's
12   motives are, and I think it's relevant to at least be able
13   to rebut that to say what Mr. Berry's motives really
14   were.
15            THE COURT:  All that came up was reading this
16   and asking if this was accurate.  This was a document that
17   you offered.  I don't think they went beyond that.  I
18   think it's beyond the scope.
19   BY MR. HOGAN:
20   Q    In regard to your testimony that you couldn't operate
21   if -- without this system, the spreadsheet system, sir,
22   isn't it true that prior to Mr. Berry coming into Fleming
23   they didn't have an automated system of freight control?
24   At Fleming?
25   A    Fleming outsourced its --
```

# COURT REPORTER'S CERTIFICATE

I, Debra Kekuna Chun, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATED at Honolulu, Hawaii, October 27, 2004.

*[signature]*

DEBRA KEKUNA CHUN

RPR, CRR