# Exhibit 25

Ueno, Thomas                              7/22/2005

1                    IN THE UNITED STATES DISTRICT COURT

                     FOR THE DISTRICT OF HAWAII

2

3

4       WAYNE BERRY, a Hawaii        :

        citizen,                     :

5                                    :

                                     :

6       Plaintiff,                   :   CIVIL      CV03-00385

                                     :   NO.:       SOM LEK

7           vs.                      :

                                     :

8                                    :

        HAWAIIAN EXPRESS             :

9       SERVICE, INC., a             :

        California corporation;      :

10      et al.,                      :

                                     :

11                                   :

        Defendants.                  :

12      -------------------------->  .

13

14

15      Deposition noticed by:  Lex Smith, Esq.

16

17

                   VIDEOTAPED DEPOSITION OF THOMAS UENO

18

19

20      Taken on behalf of Defendant at the Law Offices of

        Kobayashi, Sugita & Goda, 999 Bishop Street, Suite

21      2600, Honolulu, Hawaii, commencing at 9:00 a.m. on July

        22, 2005.

22

23

24

25          REPORTED BY:    LYNANN NICELY, RPR/RMR/CSR #354

Exhibit 25

**Ueno, Thomas**                                                          7/22/2005

```
 1                    A P P E A R A N C E S
 2
        For the Plaintiff:
 3
 4             TIMOTHY J. HOGAN, ESQ.
               Lynch Ichida Thompson Kim & Hirota
 5             1132 Bishop Street
               Suite 1405
 6             Honolulu, Hawaii 96813
 7
 8   For the Defendant Post-Confirmation Trust:
 9
               LEX R. SMITH, ESQ.
10             Kobayashi, Sugita & Goda
               First Hawaiian Center
11             999 Bishop Street, Suite 2600
               Honolulu, Hawaii 96813
12
                       and
13
               ERIC C. LIEBELER, ESQ.
14             Kirkland & Ellis LLP
               777 South Figueroa Street
15             Los Angeles, California  90017
               (Appearing via telephone)
16
17
     For the Defendants Mark Dillon, Teresa Noa and Brian
18   Christensen, et al.:
19             LYLE S. HOSODA, ESQ.
               Lyle S. Hosoda & Associates
20             345 Queen Street, Suite 804
               Honolulu, Hawaii  96813
21
22
     ALSO PRESENT:
23
               Rob Whitman, Videographer
24             Certified Legal Video
25
```

                                                            Page **2**

**Ueno, Thomas**                                        7/22/2005

1   value established between a willing buyer and a willing

2   seller, both who have been properly informed of all the

3   necessary information to make the determination of

4   value and who are neither under compulsion to buy or

5   sell.  That's what I believe fair market value is.

6   Q    Okay.  And what -- what's the difference between

7   that and a reasonable license fee?

8   A    Well, under -- what I'm looking at is is there a

9   reasonable fee that one should pay for the use of this

10  software.  I'm not sure whether it was negotiated.

11  See, I don't believe that we have negotiations taking

12  place between a buyer and a seller.

13  Q    You clearly do not.  What I'm asking is how did

14  you determine what the -- what are the criteria for

15  determining what a reasonable license fee is?

16  A    What I looked at is what I felt was being paid or

17  given by Fleming for the use of this software.

18  Q    Okay.  I'm trying to understand what you mean --

19  you said a reasonable license fee is the amount that

20  one should pay.  Can you explain what that -- in the

21  work that you do as a professional CPA who does

22  consulting and forensic work, what does that mean, the

23  amount that one should pay?

24  A    I don't know.  You mean how do they pay it,

25  whether they pay in cash or check?  Is that what you're

**Ueno, Thomas**                                      7/22/2005

1   asking?  I don't understand your question.

2   Q    You've given an opinion of what a reasonable

3   license fee is.

4   A    That's correct.

5   Q    Is there any treatise that discusses how one

6   calculates a reasonable license fee?

7   A    Well, we as -- myself as a CPA, we need to do our

8   work in accordance with the consulting standards of the

9   American Institute of CPAs and we do our calculations

10  and all of our work in accordance with those standards.

11  Q    You've testified that a reasonable license fee is

12  different than fair market value.

13  A    Well, I don't believe that in this particular

14  situation, okay, that they were the same.

15  Q    I'm not talking about this particular situation.

16  I'm talking as a matter of expert inquiry into

17  financial matters that you're an expert on, what's the

18  difference between fair market value and reasonable

19  license fee?

20  A    Well, if you're asking me are there occasions in

21  which the reasonable license fee would be equal to the

22  fair market value, and there would be occasions when

23  they would be the same because it is negotiated and the

24  fees, you know, between a willing buyer and willing

25  seller they establish a fee and they both feel it's

**Ueno, Thomas**                                              7/22/2005

1  reasonable and that would be a reasonable license fee.

2      In this particular situation, as I explained, I

3  don't think there was a negotiations taking place

4  between a buyer and a seller.  So that's why I think

5  that in this case, okay, there may be -- it may not be

6  the same.

7  Q    But have you ever provided an opinion on the fair

8  market value of something?

9  A    Yes, I have.

10 Q    And have you ever provided an opinion on fair

11 market value in a situation where the asset was

12 actually not sold?

13 A    Yes.

14 Q    Okay.  And in those cases, there was no buyer and

15 seller, correct?

16 A    No, there was a willing buyer and a willing

17 seller, okay.  It's just that the transaction didn't go

18 through.

19 Q    Okay.  Well, let's talk about situations where

20 there wasn't a willing buyer and willing seller.  Have

21 you ever worked on a divorce?

22 A    Yes, I have.

23 Q    Have you ever provided an opinion about assets

24 that weren't actually being sold, but on what their

25 value was in a divorce?

1  that.

2  Q    I want to know what you determined here.  At one

3  point you said it's the amount that one should pay.

4  And then later you seem like you are now saying that

5  reasonable license fee is the equivalent of the amount

6  that a willing buyer would pay a willing seller, both

7  being fully informed and not under compulsion.

8  A    No.  I'm not trying to -- what I'm trying to do

9  here is just to say what, you know, we did, okay, and I

10  think what you're doing at this stage here, and I know

11  it's in your interests to try to understand this, but I

12  feel that you're trying to -- that we're not talking

13  about the same thing any more.  Okay.  That that is

14  what I said earlier is what a reasonable -- what I did,

15  okay, and it's not going beyond that.  All we did was a

16  reasonable license fee that's a fee for the use of the

17  software by Fleming, okay, with Mr. Berry.  And that's

18  all we did.

19  Q    Okay.

20  A    Okay.  So that's why -- when you say fair market

21  value, you know, I'm not sure -- that's why -- and we

22  talked about the definitions and we have all these

23  points about the definitions and how they apply.  I'm

24  not -- I'm just not comfortable when -- and then you're

25  trying to expand the application of what I'm saying and

**Ueno, Thomas**                                                                    7/22/2005

1    I'm saying that's not what I did, okay. You're going

2    beyond what I did. Okay.

3    Q    Okay. Okay. So in the work that you did, you

4    didn't attempt to determine what the fair market value

5    would be of a license to use their software?

6    A    No, I didn't do a fair market value analysis even

7    as the way that you tried to explain it. That wasn't

8    what we were trying to do, okay. We just came up with

9    what I've characterized or I have termed as a

10   reasonable license fee.

11   Q    Now, is the reasonable license fee that you have

12   opined on more or less than the fair market value of a

13   license to use the software, if you know?

14   A    More or less? Well, being that I've not, you

15   know, determined what the -- I guess what you've

16   characterized as the fair market value, and I'm

17   assuming that what you're looking at is fair market

18   value if you put it on the marketplace and sell it to

19   anybody.

20   Q    That's right.

21   A    That's what I thought you were doing, okay. And

22   that's not the definition of fair market value, okay.

23   Just by the definition of it, it doesn't say that if we

24   just put it on the marketplace, this is what it is,

25   okay. It said between a willing buyer and a willing

**Ueno, Thomas**                                      7/22/2005

1  seller.  So it gets very specific.

2  Q    If you put it on the marketplace, aren't you

3  assuming that the person who's going to buy it is a

4  willing buyer?

5  A    That's right.  Well, but then if I have one buyer,

6  I'm negotiating with one buyer, I can set up a

7  reasonable license fee for that one buyer.  Between he

8  and I, we can discuss this, we can arrive at a fee and

9  maybe the fee, the terms, and whatever else that makes

10 up the value, right?  Then I can turn to someone else

11 and based on maybe different conditions or whatever,

12 okay, I can negotiate with them a different fee for

13 basically similar or maybe parts of it or whatever that

14 he needs to use or wants to use, I may have a different

15 fee, which is a reasonable fee.

16     It's the same where I provide services to someone,

17 okay, sometimes, like for example we provide work or we

18 do work in very complex things that's going to require

19 a lot of analyses and a lot of special work and

20 everything else, we may charge our full rates or we may

21 charge a premium rate for what we do.  Okay.  And the

22 person feels that he's getting a good value for what we

23 do.

24     On other situations, maybe a little divorce or

25 something like that, and -- or maybe a friend of the

**Ueno, Thomas**                                                    7/22/2005

1   information, to assume that there is under no

2   compulsion, then under that circumstances in this

3   particular area, I would say yes, we have. Okay. And

4   I think that's appropriate because now -- that's why

5   I'm having this problem where I think what -- maybe not

6   -- I'm sorry about, I'm just not clear, but I'm trying

7   to be as clear as I can with you and I just want to

8   tell you what we did. And I feel that sometimes you're

9   asking me to tell you about what we didn't do. Okay.

10  And you're trying to tell me -- to get me to something

11  say something which I didn't do and that's why I'm

12  trying to make it clear as to what we did. And I'm

13  having this problem, okay, that we're trying to

14  mischaracterize things and you are trying to use a

15  specific term of art that may or may not apply. And so

16  that's why I'm saying well -- that's what's putting me

17  on my guard when you start doing that, okay.

18  Q    Did I understand your testimony correctly that in

19  these circumstances and defining fair market value as

20  being an opinion as to what a willing buyer and a

21  willing seller would agree to, that your reasonable

22  license fee is the same thing as fair market value?

23  A    Okay. As I answered to you under the conditions

24  that you have used into how we define fair market

25  value, the answer is yes.

Page 54

Ueno, Thomas                           7/22/2005

1  Q      Okay.  Let's take a break.

2         VIDEOGRAPHER:  Time is 10:26 and we're going off

3  the record.

4                    (Brief recess.)

5         VIDEOGRAPHER:  This is start of tape number two.

6  Time is now 10:41 a.m. and we are back on the record.

7  BY MR. SMITH:

8  Q    Mr. Ueno, in determining the reasonable license

9  fee, what facts did you take into consideration?

10 A    Well, I looked at the amount that was paid or the

11 amount that was given up by Fleming in relationship --

12 as it relates to the use of the software.  And we

13 looked at the period of time that would be covered for

14 the use of this software for that fee and the estimated

15 number of containers processed at that time.

16 Q    Any other facts that you considered in coming to

17 your opinion of a reasonable license fee?

18 A    Well, the fact that the -- I guess that Mr. Berry

19 had the copyright and just the general information.

20 Q    Have you ever testified in a copyright case

21 before?

22 A    Not in a copyright case.

23 Q    Have you ever provided an opinion in a copyright

24 case?

25 A    Not in a copyright case, no.

**Ueno, Thomas**                                                  7/22/2005

1   Q     Have you ever done any work on any intellectual

2   property case at all?

3   A     Yes, I have.

4   Q     What cases?

5   A     Let's see.  I've done one for -- in fact, two of

6   them for the same company, Hilo Fish.

7   Q     Any others?

8   A     I can't recall right now.  I don't know.

9   Q     You can't recall any intellectual property matter

10  that you've worked for other than two of them for Hilo

11  Fish?

12  A     Yes.  As it relates to damages, I guess.

13  Q     Okay.  Can you recall any intellectual property

14  matter that you've worked on, regardless of whether it

15  relates to damages, other than the two that you did for

16  Hilo Fish?

17  A     No, I can't recall right now.

18  Q     And what was the issue in the two Hilo Fish

19  matters?

20  A     Patent infringement.

21  Q     Who was the defendant in those cases?

22  A     Hilo Fish was the defendant.

23  Q     Who was the plaintiff?

24  A     I don't remember his name.  I don't remember his

25  name.

**Ueno, Thomas**                                               7/22/2005

1    value of -- or the reasonable license fee assume that

2    Mr. Berry's license terminated at some time?

3    A    I don't believe so.

4    Q    Okay.  So explain to me the significance of the --

5    of your testimony that Fleming had targeted January of

6    2000 to use new software?

7    A    The significance of that?

8    Q    Yes.

9    A    Because when you convert into new software, then

10   you would get off of your old.

11   Q    Right.

12   A    Right.  And so wouldn't that be the end --

13   Q    Why --

14   A    I'm sorry, but I'm not -- again I think I'm not

15   communicating properly.  Because when they convert,

16   they will be getting off of it, okay.

17   Q    Okay.

18   A    And that was -- and they're doing this conversion

19   and that's why I said also that they knew that

20   Mr. Berry's software was copyrighted, right, so

21   obviously when you're in a situation like that, you

22   know, you don't want to -- if they can get off of it

23   and put into something else, you're much better off.

24   Okay.  And I think that's what they -- that's what I

25   entered as why they would try to get off of it.

**Ueno, Thomas**                                          7/22/2005

1   Q      Okay --

2   A      Because they had a system that they were

3   converting into, okay, apparently was something that

4   they -- and I'm just assuming -- that Fleming felt was

5   a good system, you know, that the system that they

6   purchased, okay, that they were converting to, that

7   they felt it was a good system.  So I felt that it was

8   probably capable, if they're saying, you know, to do

9   what they wanted to do, to do the functions necessary,

10  you know, for them -- for Fleming to do what it wanted

11  to do.

12  Q      What is the basis of your opinion that Fleming

13  intended to stop using Berry's software in January of

14  2000?

15  A      My opinion simply is that it was based on the

16  assumption I made that Fleming understood that it was

17  copyrighted software, okay, and would want to get off

18  of it as soon as they could.

19  Q      Okay.  Why does the fact that software is

20  copyrighted mean that somebody would want to stop using

21  it as soon as they could?

22  A      Well, because, one thing, it's not yours, okay.

23  And knowing that they are converting into another

24  system, okay, and see, again, I use the term robust, I

25  would assume that this new system is more robust than

**Ueno, Thomas**                                                7/22/2005

1  the system that they had in place at that time.  Okay.

2  So why then would one operate a system -- I'm sorry,

3  you want to ask another question?

4  Q    Well, you use Quickbooks at your office, right?

5  A    I use that.

6  Q    And you don't own the copyright to Quickbooks.

7  A    That's correct.

8  Q    Are you trying to get off of it as quick as you

9  can?

10  A    Well, I look for the new versions of it all the

11  time because I want to update it.  Or, or, or, okay, we

12  always go to new releases and we go to -- you know, new

13  releases of software other than Quickbooks and we do

14  evaluations of that because sometimes we'll find

15  systems that are more robust, right, and we want to

16  move into that --

17  Q    But the fact that somebody else owns the copyright

18  to it doesn't mean that you want to move off of it,

19  does it?

20  A    For me, in the case of my use of Quickbooks?

21  Q    Yeah.

22  A    No, it doesn't.

23  Q    That's right.  And that's true for anybody who

24  uses any commercially sold software, somebody else owns

25  the copyright to it but that doesn't mean they're

**Ueno, Thomas**                                        **7/22/2005**

1    trying to stop using it, does it?

2    A    Okay, however -- let me just answer your question.

3    It may or may not.

4    Q    Okay.  So why are you assuming that because Berry

5    owned the copyright to the software that's the subject

6    of this case, that Fleming was trying to stop using it

7    by January of 2000?

8    A    I understand your question.  Okay.  So the point

9    I'm making is that when you're converting into a new

10   system, the new system is far more robust than your old

11   system, right, so you would want to get off of your old

12   system to move into your new.  Now, that's what we

13   normally do.  And if you use the example of Quickbooks,

14   say that I'm using a Quickbooks, say, I don't know, the

15   last one we had was about say it's 2000, 2001, and you

16   see a better program in Peachtree, right, I'm going to

17   move all my functions that I had in Quickbooks and I

18   may even add things, for example, payroll, and throw

19   that into Peachtree.  You know, that's how we do when

20   we, you know, when we try to upgrade systems and we,

21   you know, move -- and we convert into new systems.  And

22   I think that's typical, okay, of what people do when

23   they get into new systems.  You don't do less.  Okay.

24   You want to do -- you're actually targeting to do more

25   and you want to have more efficiency and those things.

**Ueno, Thomas**                                                    7/22/2005

1  Q     Okay.  Explain how you -- the period -- I take it

2  the relevant period of time to your calculation of the

3  reasonable license fee is October 1999 to January of

4  2000; is that correct?

5  A     I think so.

6  Q     How does that period of time impact the license

7  fee?  What's the significance of it?

8  A     How does the period of time --

9  Q     Explain what that period of time has to do with

10 calculations of the license fee.

11 A     Okay.  That period of time then, what we have done

12 is computed the -- or estimated the amount of

13 containers processed, okay, using the software during

14 that period of time, okay.  That was the significance

15 of that period of time.

16 Q     Okay.  If Fleming had actually intended to use the

17 software for a longer period of time, then that would

18 be -- then that longer period would need to be inserted

19 into your formula in order to determine the reasonable

20 license fee. .

21 A     If Fleming had intended to use the software for a

22 longer period of time for the consideration that it

23 gave, okay, and that was the agreed upon, you know,

24 with Mr. Berry, then that would certainly impact our

25 calculation of the reasonable license fee.

**Ueno, Thomas**                                              7/22/2005

1    definitions which would mean that we would understand

2    -- would talk to management to understand what the

3    overall objectives of the systems were.

4        We then go and review the current systems that

5    they have in place, working -- talking to all of the

6    people who are using the system, finding out how

7    they're using it, what features they like about the

8    current system.  We find out what things they are

9    looking for in addition to what the current system is

10   doing.  We then document that into a requirements

11   document.

12       We then go through and design the features.  We

13   also pick up information about volumes that are being

14   processed by the systems.  We look at frequencies that

15   is it's processed by the systems, like you may have

16   peak frequencies at certain times when you have a large

17   amount being processed through your system.

18       We look at how the system must interface with

19   other systems so we understand all the other

20   applications currently in place.  We understand things

21   that they do not want to include in the system for

22   various reasons.  Sometimes confidentiality.

23       Once we understand all of this, we then develop a

24   requirements document which can be used then to specify

25   what the system must do.

**Ueno, Thomas**                                                    7/22/2005

1  Q     Are you done?

2  A     I am done about the requirement side.  Do you want

3  me to go further into systems design as to what we do

4  in that --

5  Q     No.  Did you also write the software then?  Did

6  you code the software, too?

7  A     Although I'm trained to code, I did not do

8  specific coding itself.  But what we did was we got

9  involved in the system tests.  So I would be involved

10 in the tests of the specific module, the shrink tests.

11 We do the unit testing, the shrink testing.  Then we do

12 the module testing.  We also get involved in the

13 overall system testing.  We then do the evaluations

14 related to that, working with the client to evaluate

15 how the system is running.

16 Q     Did you ever look at the software that's the

17 subject of this case?

18 A     I did not.

19 Q     Given your tremendous knowledge of programming and

20 of software, why didn't you look at it?

21 A     One thing I don't think I have a tremendous

22 knowledge of, you know, programming and I think you

23 mischaracterize what I'm saying.  You know, I think I

24 understand what is involved in the systems development

25 process, okay, design, maintenance of systems.  But I

**Ueno, Thomas**                                                    7/22/2005

1   did not look at the software itself.

2   Q    Okay.  I would like you to take a look at your

3   report, please.  Could you turn to page six.  It says

4   net sales and gross profits in the middle of the page,

5   right?

6   A    Yes.

7   Q    And it's a fact that you don't know what Fleming's

8   net sales were for any time after October of 1999,

9   right?

10  A    After October of 1999?  No, I don't think so.

11  Q    And you don't know what Fleming's gross profits

12  were for any period after 1999.

13  A    Gross profits?  We did not have the financial

14  information that we requested and as a result, that

15  information was not provided to us.

16  Q    And the same is true for CNS net sales and CNS

17  gross profits, you don't know what they were, do you?

18  A    That information was not provided to us by you.

19  Q    Okay.  If as a matter of fact Fleming's books and

20  records show that Fleming lost money at all -- in

21  Hawaii at all relevant time periods, that would pretty

22  much moot any discussion of profit, right?

23  A    Okay.  If at any time Fleming lost money, you

24  know, they lost money, and so you're asking me does

25  Fleming have a profit.  If Fleming lost money, Fleming

**Ueno, Thomas**                                                7/22/2005

1   A    I did not do that.

2   Q    Okay.  Now, the profit analysis that you've done

3   starting on page six of your report is based on sales

4   of groceries; is that right?

5   A    The profit analysis that I have done is not based

6   on sales of groceries.  What they are based on are the

7   sales generated by Fleming in terms of what it has as

8   sales and allowances.

9   Q    Okay.  What did Fleming sell?

10  A    Fleming -- I don't know all the things that it

11  sold.  Okay.  I'm assuming that it is in groceries,

12  primarily I would think that they're in more of the

13  hard goods together with -- I don't think they're into

14  the produce area.

15  Q    And Fleming did not sell software, right?

16  A    I don't know.

17       MR. HOGAN:  Objection; assumes facts not in

18  evidence.

19  A    I really don't know whether Fleming sold software

20  or not.

21  Q    Fleming did not sell the software authored by

22  Wayne Berry, correct?

23  A    I don't know that.

24  Q    Does your report include any component of profit

25  resulting from the sale of software authored by Wayne

Ueno, Thomas                                              7/22/2005

1  Berry?

2      MR. HOGAN:  Objection; vague as to the term sale.

3  A   I don't think so.

4  Q   Okay.  Your report assumes that Fleming sold other

5  products -- hard goods I think you called them.

6  A   That's right.

7  Q   And your report assumes that they made -- that

8  17 percent of their sales were profits, correct?

9  A   Seventeen percent of gross sales is equal to gross

10  profits, correct.

11  Q   And you did not do any analysis to determine the

12  role, if any, that the software played in generating

13  the profits that you calculated.

14  A   I did.

15  Q   What analysis did you do?

16  A   Okay.  I gained an understanding from Mr. Berry as

17  to the role or the function that software was

18  performing for the company.

19  Q   What did Mr. Berry tell you the software did?

20  A   That it is a logistics system or freight control

21  system, I guess, and --

22  Q   I want to withdraw that question.

23      What is the relationship that you determined the

24  software has to the profits that you opined on

25  beginning at page six of your report?

Page 115

**Ueno, Thomas**                                                    7/22/2005

1   A    That the software has an integral function within

2   the company's operations.

3   Q    Okay.  And is there any portion of the profit of

4   the company that you opined on here that is not

5   attributable to the software authored by Wayne Berry?

6   A    I think all of the items that we've considered to

7   be lost gross profits are attributable, okay, to what

8   Mr. Berry's system can do.

9   Q    So your opinion is that a hundred percent of the

10  profit made from selling hard goods is attributable to

11  the software that Wayne Berry created?

12  A    Well, I can answer that yes and I can give you a

13  reason for that.

14  Q    Okay.  Go ahead, what's the reason?  I take it

15  your answer is yes?

16  A    Yes.

17  Q    What's the reason?

18  A    The reason is that Mr. Berry's system, the freight

19  control system, is an integral part of the operations

20  of the company, it's a necessary part for the company

21  to operate with.  As necessary as the company needs

22  management, as the company needs, for example,

23  financing.  And without any one of these components,

24  the company stops.

25  Q    Okay.

**Ueno, Thomas**                                          7/22/2005

1  A    Okay.  And so this function was critical to the

2  operations of the company.  And I'm not saying that,

3  you know, by itself, okay, it made all the profits by

4  itself.  But without it, you couldn't make any profits.

5  Without management you can't make any profits.  Without

6  financing you can't make any profits.  They're integral

7  and essential components of the business.  It's not

8  something that you allocate things to.  Each one, okay,

9  is critical to the company's operations.

10  Q    Did you make any effort to apportion the profit

11  among the software and the other factors that you

12  identified such as management and financing?

13  A    I think I just did.

14  Q    You just said -- I think you just said you didn't,

15  didn't you?

16  A    I said I did and that's why I said that a hundred

17  percent of it, okay, can be attributable to Mr. Berry's

18  software as much as I said that because it's such a

19  critical function in the company.  If you pull that

20  out, there is -- the company doesn't operate.  Okay.

21  So that makes it critical.

22      So when you're saying that if, you know, can I

23  attribute the gross profits to that software.  If you

24  pull the software out, there will be no gross profits.

25  So that's why I attributed it, okay, to that function.

**Page  117**

**Ueno, Thomas**                                      7/22/2005

1   I said similarly if you pull out management and you

2   have the software in there, there would still be no

3   gross profits.

4        Each one of these things are critical components.

5   It's not allocable, you don't allocate among them.  But

6   that software is a critical element for the operations

7   of the company.

8   Q    Okay.  Now, I want to make sure I understand --

9   and I've written down your words, so let me make sure

10  -- confirm with you first that I have them.  It is your

11  testimony that if you pull the software that Wayne

12  Berry authored out, there would be no gross profit.

13  A    That's what I would say.

14  Q    Okay.  I want to know every reason that you have

15  determined that to be true, the first one of which I

16  think I've already written down is your testimony that

17  the software is an integral part for the company to

18  operate.

19  A    That's it.

20  Q    Is there any other?

21  A    No, that's my reason.

22  Q    Okay.  And what are the facts on which you based

23  your opinion that the software is an integral part for

24  the company to operate?

25  A    Okay.  The first thing is that the software is

**Ueno, Thomas**                                                    7/22/2005

1    feature rich.  Okay.  And I guess the second thing is

2    that Fleming won't give it up.

3  Q    What is the basis for your statement that Fleming

4    won't give it up?

5  A    Because as I understand it, it's still being used.

6  Q    Other than your understanding that the software

7    authored by Wayne Berry is still being used, do you

8    have any other reason or basis for your statement that

9    Fleming won't give it up?

10  A    No.

11  Q    Okay.  With all of your experience in the software

12    industry, have you ever been called upon before to give

13    an opinion on the amount of profit that resulted from

14    the use of software?

15  A    From the use of software?  Amount of profits?  I

16    can't remember.  I don't think I remember.

17  Q    Was API profitable?

18  A    I don't know.  I just don't remember.  I remember

19    looking at some things, but I don't remember offhand

20    whether they were profitable.

21  Q    You know that they owed Fleming $1.300 million.

22  A    I know that there was a debt guaranteed for that

23    $1.295 million.

24  Q    Right.

25  A    Okay.  There was also some payables that they had

**Ueno, Thomas**                                                  7/22/2005

1  owed to Fleming.

2  Q    Why is it that API had this valuable software and

3  they couldn't make a profit?

4       MR. HOGAN:  Objection; misstates testimony.

5  A    I did not evaluate API as to, you know, it's

6  operations and things like that, as to what, you know,

7  would make them profitable and, you know, things like

8  that.  So I have not done that analysis.

9       VIDEOGRAPHER:  Time is now 1:49, we're going off

10  the record.

11              (Brief recess.)

12       VIDEOGRAPHER:  The time is now 2:05 p.m. and we

13  are back on the record.

14  BY MR. SMITH:

15  Q    Mr. Ueno, the opinions that you've been giving

16  relate to the time period October 1999 to present; is

17  that right?

18  A    That's correct.  Well, it's October 1999 -- I'm

19  giving my opinions as of today, I guess, as of the

20  March 25th, 2005, right.

21  Q    Okay.  As of March of 2005.

22  A    That was the date of our report was March 25th,

23  2005.

24  Q    Is there a difference between March of 2005 and

25  today?

1                    C E R T I F I C A T E

2        I, LYNANN NICELY, C.S.R., do hereby certify:

3        That I was acting as shorthand reporter in the
     foregoing matter on July 22, 2005;
4

5        That the witness, whose testimony is contained
     herein, prior to being examined and pursuant to
     stipulation was by me duly sworn or affirmed, that the
6    proceedings were taken by me in machine shorthand and
     were thereafter reduced to print under my supervision
7    by means of computer-assisted transcription; that the
     foregoing represents, to my best ability, a true and
8    accurate transcript of the proceedings had in the
     foregoing matter;

9
         That, if applicable, the witness was notified
10   through counsel, by mail, or by telephone to appear and
     sign; that if the deposition is not signed, either the
11   reading and signing were waived by the witness and all
     parties, or the witness failed to appear and the
12   original has been sealed unsigned;

13       That pursuant to HRCP 30(f)(1) the original will
     be forward to noticing counsel for retention.
14

15       I further certify that I am not attorney for any
     of the parties hereto, nor in any way interested in the
16   outcome of the cause named in the caption.  Dated on
     07/22/2005.

17

18                    _Lynann Nicely_
                      LYNANN NICELY, RPR
19                    Notary Public, State of Hawaii
                      My commission expires:  1/24/06

20

21

22

23

24

25

CARNAZZO COURT REPORTING COMPANY, LTD.    (808) 532-0222