# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

777 South Figueroa Street
Los Angeles, California 90017

Damian D. Capozzola
To Call Writer Directly:
213 680-8653
dcapozzola@kirkland.com

213 680-8400

www.kirkland.com

Facsimile:
213 680-8500

August 16, 2005

**VIA E-MAIL ONLY**
cmatsui@triallawhawaii.com

Clyde W. Matsui, Esq.
Matsui Chung Sumida & Tsuchiyama
Pacific Guardian Center, Mauka Tower
737 Bishop St., Ste. 1400
Honolulu, HI 96813

        Re:    Wayne Berry v. Hawaiian Express Service, et al.,
                  Civ. No. CV-03-00385-SOM-LEK

Dear Mr. Matsui:

      On August 10, Judge Mollway denied Berry's request to reconsider her grant of summary judgment against the bulk of Berry's case. Ex. A. The only remaining issue is the extent to which Fleming profited from its use of the Berry database between April 1 and June 9, 2003. Exs. B, C (excerpts from summary judgment order and operative complaint). One day after the Court denied reconsideration, Berry's counsel sent an e-mail demanding production of documents related to Fleming's F-1 project. Ex. D. But the F-1 project never involved his software in the first place and was never completed. Berry's demand is not reasonably calculated to seek admissible evidence, and the Master should deny Berry's request to compel production. Even though Berry has taken numerous frivolous positions in this case, the Master has thus far refused to grant the PCT sanctions. It is clear that Berry will continue to raise irrelevant, distracting, meritless disputes unless and until the Master sanctions him for his conduct.

      As Fleming consolidated its national operations throughout the early years of this decade, Fleming undertook to replace its existing hardware and software with best of breed replacements in each of the functional areas of the wholesale division of the company (such as purchasing, inventory management, accounts receivable, etc.), and to link them to one another through use of a "middleware" system. This was the F-1 project. Berry claims that the project is somehow linked to the 1993 FCS. But the two had nothing to do with one another. The 1993 FCS never was and was never intended to be part of the F-1 project, a fact that Berry has argued himself and that is central to his expert's damages analysis. Exs. E (excerpt from Berry brief to Ninth Circuit dated July 20, 2005), F (Ueno Report) at p. 5.

Chicago       London       Munich       New York       San Francisco       Washington, D.C.


EXHIBIT "3"

## KIRKLAND & ELLIS LLP

Clyde Wm. Matsui, Esq.
August 16, 2005
Page 2

Moreover, Berry's complaint in this case turns exclusively on actions occurring after April 1, 2003, and as noted the only window of time that now matters is April 1, 2003 to June 9, 2003. Exs. B, C. But the F-1 project had effectively terminated well before that. As Fleming found itself in increasingly difficult financial straits prior to its April 1, 2003 bankruptcy filing, integrating software systems understandably took a back seat to more pressing matters, such as closing divisions and the ultimately unsuccessful effort to maintain sufficient cash to avoid liquidating the wholesale division entirely. Fleming's F-1 project was shut down for lack of capital prior to Fleming's bankruptcy and was therefore inactive between April 1 and June 9; the files on the F-1 project are not therefore reasonably calculated to lead to the discovery of admissible evidence.

Relatedly, the Court here has found that Fleming was using an infringing derivative version of Berry's software in its Hawaii facility between April 1, 2003 and June 9, 2003, but there is no evidence and no reason to think there will be evidence that Fleming was using the Berry software elsewhere, either during that period or at any other time. In fact, the very "evidence" that Berry uses to support his request actually shows that Fleming was concerned about respecting the fact that it "Cannot copy some pieces of existing system due to licensing issues." Berry Request Ex. C; *see also* Berry Request Ex. D ("There may be some licensing issues to consider."). These notes are wholly consistent with Fleming's intention -- argued by Berry and assumed by his expert -- to stop using Berry's software and move the data to integrated systems. As for SAP, that was Fleming's company-wide accounting software. The fact that Berry found evidence of this in the Guidance file listings is entirely unremarkable and has nothing to do with Berry's software.

Berry also offers testimony from his damages expert, Thomas Ueno, that the Berry system was allegedly an "integral part" of the Fleming operations. By raising this testimony in the context of his demand for F-1 project files, Berry apparently suggests that this broad and baseless statement means that Fleming had integrated Berry's software nationwide. But Ueno's report pertains only to the Hawaii operations and makes no reference to Fleming operations anywhere else. Ex. F (Ueno Report) at p. 4 (alleging "Berry's freight control system became a cornerstone of Fleming's logistics business **in Hawaii**." (emphasis added), pp. 5-10 (exclusively analyzing data pertaining to Hawaii facility).

Ueno, an accountant-for-hire, is not a fact witness, and has no foundation whatsoever to testify about software implementation issues. Furthermore, Ueno's comments about the software are irrelevant because he did not even examine the system, let alone attempt to determine what part -- if any -- of Fleming's profits were attributable to the infringement. Ex. G (Ueno deposition transcript) at 112:24-112:25, 113:20-114:1. In fact, when asked to relate the software to the operations, Ueno said that he felt the examiner was "talking a different language." Ex. G at 108:3-108:7. In short, the Ueno testimony Berry offers is limited to the Hawaii facility and

## KIRKLAND & ELLIS LLP

Clyde Wm. Matsui, Esq.
August 16, 2005
Page 3

simply regurgitates information Berry provided him. Ex. F at pp. 4-10; Ex. G at 106:16-107:24. It shows no causal link justifying production of the F-1 project materials.

The Master should conclude that the F-1 project files are irrelevant. The Discovery Master should deny Berry's request and sanction him appropriately for harassing the PCT with an obvious act of frustration in response to Judge Mollway's reconsideration order.

By signing this letter I affirm under penalty of perjury that my billing rate exceeds $400/hr. and I spent at least three hours reviewing Mr. Hogan's August 12, 2005 letter, drafting and editing this letter, selecting and compiling the exhibits, and discussing these issues with other PCT counsel. Pursuant to Local Rule 7.6 I further so affirm that the factual contentions stated in this letter are true.

Thank you for your prompt attention to these matters.

Very Truly Yours,

*[signature]*

Damian D. Capozzola

cc: Counsel of record

Encl.

# EXHIBIT A

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

???  1 0 2005

at 8 o'clock and 10 min. A M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WAYNE BERRY, a Hawaii citizen, | Civ. No. 03-00385 SOM/LEK |
| Plaintiff, | ORDER DENYING MOTION FOR RECONSIDERATION |
| vs. | |
| HAWAII EXPRESS SERVICE, INC., a California corporation, et al., | |
| Defendants. | |

## ORDER DENYING MOTION FOR RECONSIDERATION

I.     INTRODUCTION.

Plaintiff Wayne Berry requests reconsideration of this court's June 27, 2005 order. Berry seeks reconsideration on the grounds that (1) newly discovered evidence justifies reconsideration; and (2) the court committed manifest errors of law. The court disagrees and denies Berry's motion.

II.    LEGAL STANDARD.

A successful motion for reconsideration must accomplish two goals. First, a motion for reconsideration must demonstrate some reason that the court should reconsider its prior decision. Second, a motion for reconsideration must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision. Na Mamo O 'Aha 'Ino v. Galiher, 60 F. Supp. 2d 1058, 1059 (D. Haw. 1999). The District of Hawaii has implemented these standards in Local Rule 60.1. See id.

AUG 1 1 2005

Courts have established three grounds justifying reconsideration of interlocutory orders: (i) an intervening change in controlling law, (ii) the availability of new evidence, and (iii) the need to correct clear error or prevent manifest injustice. Id.; see also In re Pacific Adventures, Inc., 27 F. Supp. 2d 1223, 1224 (D. Haw. 1998).

III.   ANALYSIS.

Berry claims that newly discovered evidence and errors of law merit reconsideration of this court's June 27, 2005, order. However, Berry identifies no new evidence or legal point justifying reconsideration.

    A.   Berry's "Newly Discovered Evidence" Does Not Show Further Copyright Infringement.

Berry cites "newly discovered evidence" as one ground for reconsideration. To support such a motion, Berry must show not only that the evidence was newly discovered or unknown to him until after the hearing on the underlying motion, but also that he could not with reasonable diligence have discovered and produced such evidence at the hearing. See Engelhard Indus., Inc. v. Research Instr. Corp., 324 F.2d 347, 352 (9th Cir. 1963).

Berry satisfies this requirement. In the June 27, 2005, order, this court recognized that Guidance Software had not produced all documents requested by Berry. Accordingly, the court granted Berry leave to file a motion for reconsideration if

2

these documents so warranted. The present motion is based in part on the documents turned over by Guidance Software.

Defendants claim that this evidence could have been uncovered earlier, and that Berry should therefore be barred from claiming that the evidence is "newly discovered." Based on the June 27, 2005, order, however, the court accepts Berry's characterization of the evidence cited in this motion as "newly discovered." What the court does not accept, however, is Berry's argument as to the impact that evidence has on this court's earlier ruling.

Berry claims that the newly discovered evidence shows that Fleming was using FCS after June 9, 2003, and further indicates that the court erred in earlier concluding that Fleming and its employees had ceased use of Berry's software on April 1, 2003. Berry's evidence, however, is insufficient to show the alleged error.

Berry first cites to evidence showing that Fleming was using a file called "Auxiliary Logistics Data.mdb," which in turn gave Fleming access to a file called "MsysObjects." Berry presents evidence that Msysobjects was "linked" to "FCSlogistics.data.mdb" on June 17, 2003. Berry contends that, because a screen shot of MDB Files shows that the "Auxiliary Logistics Data.mdb" file was last modified in July 1, 2003,

3

Fleming must have been illegally using FCS after April 1, 2003.[1] Berry also presents evidence that the "Tariff 60 Bill of Lading" and "FHL Data Screens" files linked to FCS files.

Berry, however, fails to establish that evidence of links between Fleming's files and FCS files establish any copyright violation. Direct copyright infringement requires a showing by a plaintiff (1) that the plaintiff owns the copyright, and (2) "that the defendant himself violated one or more of the plaintiff's exclusive rights under the Copyright Act." Ellison v. Robertson, 357 F.3d 1072, 1076 (9th Cir. 2004). A plaintiff may show a violation through direct copying, or through the defendant's access to the infringed work, and a substantial similarity between the infringed and infringing works. Pasillas v. McDonald's Corp., 927 F.2d 440, 442 (9th Cir. 1991).

Even assuming the reliability of the dates in the "last modified" column, Berry's evidence only establishes that files Fleming used were linked to FCSlogistics.data.mdb after April 1, 2003. There is no evidence that having links between files means that Fleming copied Berry's work or otherwise violated his

---

[1] Berry contends that the date identified as the last "modified" date of a file accurately identifies when the file was accessed. Defendants contend that this date is inherently unreliable, as evidenced by Berry's own statement that "there's no way to tell anything" based on system dates. Berry testimony, Feb. 5, 2003, attached as Ex. L. The court need not decide the issue, as, even accepting the validity of the evidence, Berry's motion fails.

4

copyright. The linking of files could have other explanations. The links could, for example, indicate extraction of data, a permissible use. See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991) (copying of factual data is not copyright infringement).

Berry presents a declaration from Dr. Philip Johnson that offers no more evidence of infringement than the rest of Berry's submissions. Dr. Johnson states:

> Based on the evidence that I have reviewed, and my knowledge and expertise in the field of computer science, I conclude that Fleming continued to link to a copy of FCS Logistics Data.mdb up to and including June 30, 2003 when the file evidenced by Exhibit "B" was last saved. In addition, Fleming linked to the file named "FHL Data.mdb" after June 9, 2003 and at least up to July 4, 2003 as evidenced by Exhibits "E "F" and "G."

Significantly, Dr. Johnson does not state that the links demonstrate any illegal copying or infringement of Berry's software. Lacking any evidence that linking constitutes infringement, the court concludes that Berry has not met his burden of establishing a copyright violation. Accordingly, Berry does not establish that any newly discovered evidence justifies reconsideration of this court's prior order.

B. The Court Did Not Err in Rejecting Berry's Calculation of Damages.

Berry claims that this court erred by failing to accept his calculation of damages for infringement between March 7,

5

2003, and June 9, 2003. Berry contends that, because the June 27, 2005, order makes no distinction between the right to reasonable license fees as "actual damages" and the right to profits, the court committed clear error. Berry further argues that, because Defendants failed to rebut his calculation of a reasonable license fee, the court should have accepted the value that he asserted.

Regardless of whether Berry sought actual damages or the right to profits, the Ninth Circuit requires a causal link between the infringement and the claimed damage amount. See Mackie v. Rieser, 296 F.3d 909, 915-16 (9th Cir. 2002), cert denied, 537 U.S. 1189 (2003). Berry showed no such causal link. Even if a party does not rebut an opponent's damage claim, the claimant must satisfy his burden. Because there were significant questions regarding damages, the court determined that the best course was to allow further discovery and briefing on the issue. The court fails to see any manifest error in its exercise of caution, given the state of the record.

    C.    <u>Sanctions Are Not Awarded on this Motion.</u>

Defendants seek sanctions, alleging that Berry's attorney has "surreptitiously created evidence." Defendants rely on an email exchange in which Berry's attorney stated that he had moved files into working directories to create screen prints. See Ex. E to Walker Decl. Just as Berry's evidence of "linking"

6

was insufficient to prove infringement, Defendants' proof of "moving" is insufficient to establish the surreptitious creation of evidence. Defendants' request for sanctions is denied.

IV. CONCLUSION.

Berry has not met the high burden of showing either that newly discovered evidence merits reconsideration of the court's order, or that the court has committed any manifest error of fact or law. Berry's motion for reconsideration is denied. The court also denies Defendants' request for sanctions.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 10, 2005.

/s/ Susan Oki Mollway
SUSAN OKI MOLLWAY
UNITED STATES DISTRICT JUDGE

Wayne Berry v. Hawaiian Express Service, Inc., et. al., Civil No. 03-00385 SOM/LEK; ORDER DENYING MOTION FOR RECONSIDERATION.

# LYNCH ICHIDA THOMPSON KIM & HIROTA
### A LAW CORPORATION

MAILE M. HIROTA
WESLEY W. ICHIDA
ANN C. KEMP
STEVEN J. KIM
PAUL A. LYNCH
WILLIAM "Buzz" THOMPSON III

1132 BISHOP STREET, SUITE 1405
HONOLULU, HAWAII 96813
TELEPHONE (808) 528-0100
FACSIMILE (808) 528-4997

*Counsel*
TIMOTHY J. HOGAN

*Of Counsel*
GREG TURNBULL, Psy.D

August 17, 2005

Clyde W. Matsui, Esq.
Matsui Chung Sumida & Tsuchiyama
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 1400
Honolulu, Hawaii 96813

VIA PDF EMAIL

    Re:    Wayne Berry v. Hawaiian Express Service, et al.,
              Civ. No. CV03-00385 SOM-LEK

Dear Mr. Matsui:

      I am on the mainland and am submitting this under the "/S/" signature. Should the Master or counsel require, I will request that an attorney in our office sign on my behalf.

      I am writing regarding the Fleming Companies, Inc.'s PCT's opposition to Mr. Berry Letter Motion compelling the production of discovery of the Fleming F-1 program materials that have been outstanding since late 2003. The materials that were submitted in support of Mr. Berry's letter brief clearly evidence, contrary to the PCT's Opposition, that the F-1 Project did involve Mr. Berry's copyrighted works. Whether these F-1 initiatives went so far as to incorporate this materials in company-wide software development is not relevant to the fact that the evidence Mr. Berry has submitted shows that it was incorporated in the Fleming F-1 solution applied to Hawaii and directly relevant to the issues in this case regarding the value of this work to Fleming's overall profitability in the Hawaii division. Notably, Mr. Berry's letter brief made no claim that his works were incorporated company wide. This issue was raised by the PCT in what appears to be a *Freudian* admission.

      Claming that the F-1 Program had been shut down prior to April 1, 2003, the PCT argues that the materials are not relevant and therefore not discoverable. First, the PCT offers no admissible evidence of the fact that Fleming shut the F-1 Project down prior to April 2003. Counsel's un-sworn statement is not evidence and violates the Masters earlier order. In rebuttal, in a filing in the Fleming Bankruptcy In re Fleming Companies, Inc., Bk. No. 03-10945 MFW (Bankr. Del.) at Court Docket No. 11438, Fleming admitted, contrary to the un-sworn conjecture of the PCT's counsel, that the F-1 project was not terminated until May 2003. See Exhibit "A" at Para. 106. By its own admission, the PCT concedes that these materials are relevant because

# EXHIBIT "4"

the F-1 was in operation during the period of time that the Court has determined that Fleming and its employees were engaged in infringing use of the Berry system. *See* Exhibit "A" that is a true and correct excerpt of the Declaration of Timothy Kreatschman filed by the PCT in the Fleming Bankruptcy as Docket No. 11438-2 at paragraphs 106 to 110 that evidence that the factual premise of the PCT's opposition is false. On that basis alone the Master should grant the Berry Motion to Compel.

Even if the PCT were correct that the F-1 Program was terminated prior to April 2003 (and the evidence is otherwise) the evidence in the Ernst & Young teleconference notes appended to Mr. Berry's letter brief show the importance that Mr. Berry's system had to the Fleming operations. This evidence is relevant to the remaining issue of causation and the connection between the unlicensed use of Mr. Berry's work and the profitability of the Fleming Hawaii operations. That relevance does not change even if the F-1 project was terminated because the Berry component of the F-1 program discussed in the Telephone Conference notes, his database, continued to operate and the Court has so ruled in granting Mr. Berry's motion for summary judgment against the employee defendants and Fleming.

The PCT has made no claim that the production is burdensome. It concedes that it is no longer doing any business and can claim no prejudice of any kind for having to produce these materials. In contrast, by falsely claiming that the F-1 Project has nothing to do with Mr. Berry's works, the PCT has wrongfully withheld discoverable materials for going on two years. Its conduct is indefensible.

The PCT has wrongfully withheld these materials falsely saying first that they had nothing to do with Mr. Berry and now saying that the F-1 Program terminated prior to April 2003. Both of these positions have been proven false and the PCT should be sanctioned for needlessly increasing the costs of this case by positions that do not stand the truth test. By its false statements made in its correspondence regarding the connection between the Berry system and F-1 (proven false by the Teleconference Notes) and the false statement that the program terminated prior to April 2003 (proven false by its own admissions in the Bankruptcy case) the PCT's conduct warrants a significant sanction not only for the obvious prejudice to Mr. Berry but for the clear lack of candor to the Master.

For these reasons, Mr. Berry request that the Master order the production on an expedited basis so that Mr. Berry will not be further prejudiced by the PCT's gamesmanship.

Clyde Matsui, Esq.
Page 3
8/17/2005

        Very truly yours,

        LYNCH ICHIDA THOMPSON KIM & HIROTA

        /S/Timothy J. Hogan

TJH

Enclosure: Exhibit "A"
cc    Counsel (via e-mail).

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Fleming Companies, Inc., et al.,[1] | ) | Case No. 03-10945 (MFW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**AFFIDAVIT OF TIMOTHY KREATSCHMAN IN SUPPORT OF THE PCT'S
THIRTY-EIGHTH OMNIBUS OBJECTION TO CLAIMS (SUBSTANTIVE)**

TIMOTHY KREATSCHMAN, being duly sworn, testifies as follows:

1. I am a director in the Turnaround and Restructuring Services business unit at AP Services, LLC ("APS"). APS maintains offices at 2000 Town Center, Suite 2400, Southfield, Michigan 48075 and 2100 McKinney Ave., Suite 800, Dallas, Texas 75201. APS specializes in, among other things, assisting financially troubled companies in preparing their Schedules and Statements, reviewing their Proofs of Claim, and assisting in the claims objection and reconciliation process. APS is an affiliate of AlixPartners LLC, a nationally recognized restructuring and turnaround advisory and consulting firm. On June 25, 2003, the Court entered an order authorizing the Debtors to retain APS Services LLC as their crisis managers in these cases [Docket No. 1698]. During its representation of the Debtors, APS professionals became very familiar with the Debtors' business operations, capital structure, financing arrangements and other material obligations. Subsequent to the effective date of the Debtors' confirmed plan

---

[1] The former Debtors whose cases are still open are: Core-Mark International, Inc.; Fleming Companies, Inc.; ASI Office Automation, Inc.; C/M Products, Inc.; Core-Mark Interrelated Companies, Inc.; Core-Mark Mid-Continent, Inc.; General Acceptance Corporation; Head Distributing Company; Marquise Ventures Company, Inc.; and Minter-Weisman Co.

and because Ms. Koehne has not provided sufficient information to establish even a *prima facie* basis for her claim, Ms. Koehne's claim should be disallowed.

*Sheila Lehnert*

104.  The PCT objects to Sheila Lehnert's claim on <u>Exhibit G</u> to the Thirty-Eighth Omnibus Objection. Ms. Lehnert filed claim number 11822 as an unsecured priority claim in the amount of $585.00 for unpaid wages. According to Ms. Lehnert's proof of claim, she put together posters and brochures for the Debtors relating to one of their employee incentive programs. My review of the Debtors' books and records revealed that Ms. Lehnert did not perform these services as a full or part time employee of the Debtors. Rather, Ms. Lehnert performed these services on a contract basis.

105.  As an independent contractor, Ms. Lehnert's claim can only qualify for priority treatment if she was acting as an independent contractor for the Debtors *in the sale of goods or services on their behalf.* Because Ms. Lehnert, who was performing what appears to be graphic-design related services targeted at the Debtors' employees, does not satisfy this requirement, her claim should be reclassified and allowed as a general unsecured claim.

*Joseph T. Locke*

106.  The PCT objects to Joseph T. Locke's claims on <u>Exhibit D</u> and <u>Exhibit E</u> to the Thirty-Eighth Omnibus Objection. Mr. Locke filed a number of claims in the Debtors' bankruptcy cases, including claim numbers 15689, 17758 and 11000. Each of these claims asserts a right to payment under a September 2002 contract between the Debtors and Mr. Locke. In late the summer of 2002, the Debtors decided to implement new technology that would eliminate the need to maintain Mr. Locke's position with the company. Rather than outright terminate his employment, the Debtors offered Mr. Locke the opportunity to continue working with the Debtors on a contract basis through the implementation of this technology (i.e., the "F1

project"). The contract between the Debtors and Mr. Locke provides, among other things, that (i) Mr. Locke would be employed on a project-basis to develop and implement the "F1 project"; (ii) Mr. Locke would receive normal severance upon his anticipated termination at the conclusion of the F1 project, which amount would be forfeited if he remained employed with Fleming once the project ended and (iii) Mr. Locke would receive a lump sum stay bonus equal to 1% of his salary for each month of service beginning in September 2000 and ending at the conclusion of the project. The project was terminated in May of 2003. Mr. Locke remained employed with the Debtors until June 14, 2004.

107. In claim number 15689 (listed on Exhibit E), Mr. Locke seeks $20,561.54 in severance that he claims arises under the September 2000 contract. Pursuant to the plain terms of the contract, however, Mr. Locke waived his right to receive this severance payment by remaining employed with the Debtors after the conclusion of the F1 project. Accordingly, claim number 15689 for severance must be disallowed.

108. In claim number 17758 (listed on Exhibit D), Mr. Locke claims additional, post-petition severance and bonus accrual in the amount of $9,982.38. Mr. Locke's severance must be disallowed for the reasons set forth above. Accordingly, this portion of claim number 17758 should be disallowed.

109. Additionally, the post-petition bonus accrual component of claim number 17758 should be reduced and allowed. Mr. Locke claims he is entitled to continued payment of his bonus through January 2004. The contract between the Debtors and Mr. Locke, however, provided that he would only continue to earn a bonus through *the end of the project*. The project ended in May of 2003 (as set forth in Mr. Locke's June 19, 2003, letter to the Court). His bonus ceased accruing at that time. At most, therefore, Mr. Locke earned a $1,782.00 bonus during the

39

post-petition period ($891.00/month for services rendered during April and May of 2003). Thus, the PCT requests that this portion of claim number 17758 be reduced and allowed as an administrative claim for the months of April and May of 2003 in the amount of $1,782.00.

110.   Finally, Mr. Locke filed claim number 11100 (listed on <u>Exhibit D</u>) as a general unsecured claim in the amount of $27,621.00 and as an unsecured priority claim in the amount of $5,346.00 for his F1 project stay bonus. The PCT does not disagree that Mr. Locke is entitled to receive the unsecured amount of his claim. The PCT does believe, however, that the asserted "priority" portion of his claim – by which Mr. Locke asserts a right to recover a post-petition bonus for the months spanning from April 2003 through October of 2003 -- should be disallowed because (i) at most, Mr. Locke is entitled to an administrative claim for the months of April and May 2003 and (ii) Mr. Locke will receive administrative payment for the months of April and May when the PCT satisfies claim number 17758 (as set forth above). Accordingly, claim number 11100 should be reduced, reclassified and allowed as general unsecured claim in the amount of $27,621.00.

*Eugene Lotts*

111.   The PCT objects to Eugene Lotts' claim on <u>Exhibit D</u> to the Thirty-Eighth Omnibus Objection. Mr. Lotts filed claim number 10574 as an unsecured priority claim in the amount of $9,016.00 for an unpaid retail retention bonus. As explained in paragraph 30 above, in November of 2002, the Debtors instituted a retail retention program for certain of their store directors. Pursuant to this program, one store director from each location was selected to participate in the retail retention program. If these store directors met certain goals during November and December of 2002, they became become eligible for a bonus. To receive that bonus, eligible employees had to remain employed by the Debtors until the Debtors' consummated the sale of their particular location.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 28th, 2005

_____
Timothy Kreatschman

STATE OF TX )
COUNTY OF Dallas ) ss:

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 28th DAY OF July, 2005.

_____
Notary Public

SHANNON OUTLAND
Notary Public, State of Texas
My Commission Expires
May 26, 2009

K&E 10834598.4