# LiveNote | World Service[SM]

## A new perspective on court reporting.

**In United States District Court**
**For the District of Hawaii**

Deposition of

CERTIFIED

COPY

Wayne Berry
Volume I

May 18, 2005

Wayne Berry

v.

Hawaiian Express Service, Inc.

*A LiveNote World Service Transcript. Reported by CLSP, Ali'i Court Reporting*
*LiveNote Inc. 221 Main Street, Suite # 1250, San Francisco, California 94105*
*1-800-LIVENOTE*

Exhibit 45

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF HAWAII

3

4   WAYNE BERRY, a Hawaii        ) CIVIL NO. CV03-00385 SOM LEK
    citizen;                     ) (Copyright)
5                                )
                                 )
6                 Plaintiff,     )
                                 )
                                 )
7        vs.                     )
                                 )   Volume 1
8   HAWAIIAN EXPRESS SERVICE,    )
    INC., a California           )
9   corporation; et al.,         )
                                 )
10               Defendants.     )
    _____)

11

12

13           DEPOSITION OF WAYNE BERRY,

14   taken on behalf of the Defendant, Post-Confirmation

15   Trust, at the Law Offices of Kobayashi, Sugita & Goda,

16   999 Bishop Street, Suite 2600, Honolulu, Hawaii,

17   96813, commencing at 8:59 a.m., on Wednesday, May 18,

18   2005, pursuant to Notice.

19

20

    BEFORE:    Julie A. Peterson, CSR #361, CRR, RMR
21             Registered Professional Reporter
               Notary Public, State of Hawaii
22

23

             Ali'i Court Reporting
24         2355 Ala Wai Blvd., Suite 306
             Honolulu, Hawaii  96815
25              (808) 926-1719

                                                              1

1  APPEARANCES:

2

3

4  For the Plaintiff:    TIMOTHY J. HOGAN, ESQ.
                         Lynch Ichida Thompson Kim & Hirota
5                        1132 Bishop Street, Suite 1405
                         Honolulu, Hawaii  96813
6

7

8  For the Defendant Post-Confirmation Trust:

9                        LEX R. SMITH, ESQ.
                         ANNE E. LOPEZ, ESQ.
10                       Kobayashi, Sugita & Goda
                         First Hawaiian Center
11                       999 Bishop Street, Suite 2600
                         Honolulu, Hawaii  96813
12
                                  and
13
                         ERIC C. LIEBELER, ESQ.
14                       DAMIAN D. CAPOZZOLA, ESQ.
                         Kirkland & Ellis LLP
15                       777 South Figueroa Street
                         Los Angeles, California  90017
16

17

18
   For the Defendants Mark Dillon, Teresa Noa and Brian
19 Christensen, et al:

20                       LYLE S. HOSODA, ESQ.
                         RAINA P.B. MEAD, ESQ.
21                       Lyle S. Hosoda & Associates
                         345 Queen Street, Suite 804
22                       Honolulu, Hawaii  96813

23

24

25

                                                                 2

```
 1    APPEARANCES:      (cont'd)

 2


 3    For the Defendants Hawaiian Express Service, Inc.,
      H.E.S. Transportation Services, Inc., California
 4    Pacific Consolidators, Inc., Jeffrey P. Graham; Peter
      Schaul and Patrick Hirayama:
 5
                         ROY J. TJIOE, ESQ.
 6                       Goodsill Anderson Quinn & Stifel
                         Alii Place, Suite 1800
 7                       1099 Alakea Street
                         Honolulu, Hawaii  96813
 8

 9
      For the Defendant Alix Partners, LLC:
10
                         GREGORY Y.P. TOM, ESQ.
11                       JOHN T. KOMEIJI, ESQ.
                         Watanabe Ing Kawashima & Komeiji
12                       First Hawaiian Center
                         999 Bishop Street, Suite 2300
13                       Honolulu, Hawaii   96813

14


15
      For the Defendants Guidance Software, Inc., and
16    Michael Gurzi:

17                       REX Y. FUJICHAKU, ESQ.
                         Bronster Crabtree & Hoshibata
18                       Pauahi Tower, Suite 2300
                         1001 Bishop Street
19                       Honolulu, Hawaii  96813

20


21    Also present:      Martin G. Walker, Ph.D.

22
      Videographer:      Justin Langlais
23                       Certified Legal Video Services
                         1000 Bishop Street, Suite 410
24                       Honolulu, Hawaii   96813
                         (808) 530-2587
25
```

3

1  A      Yes.

2  Q      Was Fleming in business as of February 15th of

3  this year, sir?

4          MR. HOGAN:  Objection, calls for speculation,

5  assumes facts not in evidence.

6  A      Was Mr. Fleming in business?  That's debatable.

7  They still seem to be selling milk here.  They've got

8  business licenses all over the country and their

9  corporations are still active, a lot of their, you

10 know, entities.  I thought they should have been all

11 closed up.  So if I hadn't found all that, I might

12 agree with you.

13 Q      (By Mr. Liebeler):  What entities of Fleming do

14 you believe were still in operation as of February of

15 2005, sir?

16         MR. HOGAN:  Objection, vague as to the term

17 "entities of Fleming."

18 Q      (By Mr. Liebeler):  You just used the term

19 "entities of Fleming" in your testimony; did you not,

20 sir?

21 A      Yes.

22 Q      I mean it in that exact sense.

23 A      I can't recall all of them, but, as an example,

24 there's one I like to check on, just out of curiosity

25 I looked at a few weeks ago.  Fleming Foods in

40

1  Florida.

2  Q        Here you've written you have personal knowledge

3  that Fleming sells to restaurants.  Does that Fleming

4  as used in your declaration refer to Fleming Foods

5  Florida?

6  A        No.

7  Q        What is the personal knowledge that you had as

8  of February of 2005 that Fleming sells, present tense,

9  to restaurants, sir?

10 A        Well, the idea that they're a bankrupt entity

11 and they still seem to be going live and strong across

12 the country.  My personal knowledge, seems that

13 they're still active here.

14 Q        What is your personal knowledge that they are

15 still live and strong across the country, sir?

16 A        I just gave you an example.

17 Q        Repeat it for me, because I didn't understand

18 it as such, sir.

19 A        Well, at the -- at some point in Fleming's

20 bankruptcy -- Who's the Oklahoma attorneys?  McAfee &

21 Taft I think, for Fleming?  Am I remembering this

22 correctly?

23 Q        There is a law firm called McAfee & Taft in

24 Oklahoma, yes.

25 A        That's what I'm trying -- I'm trying to

41

1    remember who they were.

2        I think they went, according to what I

3    read on the internet, they went through and they made

4    deliberate efforts to close or shut down all these

5    entities, as I refer to them, across the country.  I

6    believe it was in their time records and it was also,

7    when you followed the time records and you looked at

8    that state's Department of Commerce, you saw that they

9    indeed did shut down the entities, but others they

10    made no attempt, even though a year prior to that they

11    made this monumental attempt to file, you know, things

12    that were late that hadn't been kept up-to-date as far

13    as state filings.

14        So first they make this monumental effort

15    and then later they make this deliberate effort to

16    shut down the entities, but it was sporadic.

17   Q     So you infer from McAfee's activity, with

18    respect to either shutting down or not shutting down

19    various corporate entities, that some of those

20    corporate entities continue to actually operate; is

21    that your testimony, sir?

22   A     Yes.

23   Q     Other than looking at the McAfee & Taft time

24    records, what other personal knowledge do you have of

25    the fact that those companies continue to operate,

42

1  sir?

2  A       The -- Well, again, that was my personal

3  research, that's my personal knowledge, so I think

4  that qualifies.  But beyond that, looking at the --

5  and, again, I'm not qualified to do this -- but my

6  interpretation of some of the things that were filed

7  in the bankruptcy as far as Fleming's financial

8  activities, it looked to me as though they were still

9  receiving royalties or some kind of ongoing -- it was

10  some kind of activity where there was new revenue

11  coming in.

12  Q       That is your interpretation of records that you

13  looked at in the bankruptcy, correct?

14  A       Exactly, and that may not be correct.

15  Q       What records are those?

16  A       BMC records.

17  Q       What specific BMC records?

18  A       I don't recall the exact docket numbers.

19  Q       Did you retain copies of them?

20  A       No, because they're always on BMC.

21  Q       Did you retain a list of those BMC docket

22  numbers so that someone following around could try to

23  figure out what exactly you meant?

24          MR. HOGAN:  Beg your pardon, Counsel.  Someone

25  following you around?

43

1        MR. LIEBELER:  Someone reading his declaration

2   after the fact could figure out exactly what you mean

3   by Fleming continuing to operate.

4   A       No.  I hadn't thought of that, no.

5   Q       (By Mr. Liebeler):  Other than unspecified BMC

6   records and records from McAfee & Taft, what other

7   personal knowledge do you have that Fleming continued

8   to operate in February of 2005, sir?

9        MR. HOGAN:  I'm going to object as to the term

10  "Fleming."  I've objected before, as it is collection

11  of entities in a bankruptcy.  Are you referring to

12  Fleming Companies, Inc.?

13       MR. LIEBELER:  I'm referring to Fleming in the

14  exact way in which your client has used it in a

15  declaration that he has submitted to the court in this

16  litigation, sir.

17       MR. HOGAN:  Very good.

18  A       I think one of the best examples is, as I was

19  walking down the street to this deposition this

20  morning, I saw one of those big 53-foot vans cross in

21  front of me at the street corner and it said "Fleming

22  Foods" on the side.

23  Q       (By Mr. Liebeler):  Do you have personal

24  knowledge as to who owns that van, sir?

25  A       No, but I can read "Fleming."

44

1  Q       Do you have personal knowledge as to who

2  operates that van, sir?

3  A       No.

4  Q       The fact that it just says "Fleming" on the

5  side of it, does that mean to you, sir, that it

6  necessarily means that Fleming is continuing to

7  operate?

8  A       I don't think it infers to me that they're not

9  operating.

10  Q       That's not my question, sir.  Just because you

11  see a van with the word "Fleming" on it driving down

12  the road, do you conclude from that that Fleming is

13  necessarily operating?

14  A       It's a good indication.

15  Q       Other than McAfee & Taft records, other than

16  the BMC records that you can't tell us any more

17  specifics about, and other than seeing a 53-foot van

18  driving down the street, do you have any other

19  indications that Fleming continued to operate in

20  February of 2005, sir?

21  A       I called the phone number on the milk carton

22  where it had "Fleming Foods," and that was just this

23  year.

24  Q       And when you called the phone number on the

25  side of the milk carton, who answered the phone, sir?

45

1    A        Some sort of a service. And I asked if it was

2    Fleming and they got real evasive about it. And I was

3    trying to identify -- I said, well, it says "Fleming"

4    on the carton and I'm calling the phone number

5    associated with that. And they kind of went round

6    and round, and then they said they had to get a

7    supervisor, and the conversation really didn't go

8    anywhere.

9    Q        Did the person -- Can you identify the person

10   on the other end of the telephone?

11   A        I tried to. I tried to ask for identification,

12   and they said that they basically just answer the

13   phone and, you know, some kind of a consumer line or

14   something like that.

15   Q        Do you, as you sit here today, have the ability

16   to identify who that individual was?

17   A        No, and it wasn't Archie Dykes answering the

18   phone, so, you know.

19   Q        I would presume not, Mr. Berry, but you never

20   know with Archie.

21   A        That's right.

22   Q        Do you know what company -- Strike that.

23   Withdrawn.

24            Did that individual tell you what company

25   that individual worked for?

46

1    A        I believe I asked that question or something

2    like it, and there was not a, there was not a company

3    named as a response.  It was just more like, you know,

4    we're answering, you know, on behalf of a Best Yet

5    label or something like that.

6    Q        I take it that -- Well, first of all, was the

7    person who answered the phone male or female, just so

8    I can get my pronouns in my questions right?

9             MR. HOGAN:  Objection, calls for speculation.

10   A        It sounded female.  I hope I'm not wrong on

11   that.

12            MR. HOGAN:  Just protecting the record,

13   Counsel.

14            MR. LIEBELER:  Let's take five minutes, please.

15   Off the record, please.

16            THE VIDEOGRAPHER:  The time is 10:06 a.m. and

17   we are off the record.

18            ( Break.)

19            THE VIDEOGRAPHER:  The time is 10:14 a.m. and

20   we're back on the record.

21   Q        (By Mr. Liebeler):  Mr. Berry, turning to

22   paragraph 8 of your declaration, it is written there,

23   and I quote, "I believe that Fleming-C&S through their

24   concurrent attorneys are attempting to destroy my

25   relationship Y. Hata," and then it goes on.

47

# LiveNote | World Service[SM]

## *A new perspective on court reporting.*

### In United States District Court
### For the District of Hawaii

Deposition of

CERTIFIED

COPY

Wayne Berry
Volume 2

May 19, 2005

Wayne Berry

v.

Hawaiian Express Service, Inc.

*A LiveNote World Service Transcript.  Reported by CLSP, Ali'i Court Reporting*
*LiveNote Inc. 221 Main Street, Suite # 1250, San Francisco, California 94105*
*1-800-LIVENOTE*

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3

 4   WAYNE BERRY, a Hawaii       CIVIL NO. CV03-00385 SOM LEK
     citizen,                        (Copyright)
 5

 6                   Plaintiff,

     vs.
 7

     HAWAIIAN EXPRESS SERVICE,
 8   INC., a California corporation,     VOLUME II
     et al.,
 9                   Defendants.

10   _____

11                     VIDEOTAPED

12              DEPOSITION OF WAYNE BERRY

13

14        Taken on behalf of Defendants,

15   at the Law Offices of Kobayashi, Sugita & Goda,

16   Suite 2600, 999 Bishop Street, Honolulu, Hawaii,

17              commencing at 1:11 p.m.,

18   on Thursday, May 19, 2005, pursuant to Notice.

19

20   BEFORE:        HEDY COLEMAN,  CSR #116, RPR, CRR, CM
                    Notary Public, State of Hawaii
21                  Certified Shorthand Reporter

22

23

24              Ali'i Court Reporting
         2355 Ala Wai Boulevard, Suite 306
25              Honolulu, Hawaii 96815
```

                                                         261

1    APPEARANCES:

2    For the Plaintiff:

3                              TIMOTHY J. HOGAN, ESQ.
                              Lynch, Ichida, Thompson & Kim
                              1132 Bishop Street, Suite 1405
4                              Honolulu, Hawaii 96813

5

6    For the Defendant Post-Confirmation Trust:

7                              LEX R. SMITH, ESQ.
                              ANNE E. LOPEZ, ESQ.
8                              Kobayashi, Sugita & Goda
                              First Hawaiian Center, Suite 2600
9                              999 Bishop Street
                              Honolulu, Hawaii 96813
10

11                                and

12

                              ERIC C. LIEBELER, ESQ.
13                              DAMIAN D. CAPOZZOLA, ESQ.
                              Kirkland & Ellis
14                              777 South Figueroa Street
                              Los Angeles, California 90017
15

16        For the Defendants Mark Dillon, Teresa Noa and Brian

17   Christensen, et al:

18                              LYLE HOSODA, ESQ.
                              RAINA P.B. MEAD, ESQ.
19                              Lyle Hosoda & Associates
                              345 Queen Street, Suite 804
20                              Honolulu, Hawaii 96813

21

          For the Defendants Hawaiian Express Service, Inc.,
22   H.E.S. Transportation Services, Inc.,et al.:

23                              ROY J. TJIOE, ESQ.
                              Goodsill Anderson Quinn & Stifel
24                              Alii Place, Suite 1800
                              1099 Alakea Street
25                              Honolulu, Hawaii 96813

                                                              262

1      For the Defendant Guidance Software, Inc. and Michael

2  Gurzi:

3                              REX Y. FUJICHAKU, ESQ.
                             Bronster Crabtree & Hoshibata
4                              Suite 2300, Pauahi Tower
                             1001 Bishop Street
5                              Honolulu, Hawaii 96813

6

7      For Defendant Alix Partners, LLC:

8                              GREGORY Y.P. TOM, ESQ.
                             Watanabe Ing Kawashima & Komeiji
9                              999 Bishop Street
                             23rd Floor
10                             Honolulu, Hawaii 96813

11

12

13         Also present:     Wayne Berry

14                              Martin Walker, Ph.D.

15

16         Videographer:      Robert Whitman

17

18

19

20

21

22

23

24

25

263

1    products.

2         Q    Did you discuss anything else with the Department

3    of Agriculture, other than the concern about diversions?

4         A    No.

5         Q    How long ago did you have that communication?

6         A    Whenever we had that mad cow was in the news.

7         Q    Now, yesterday you mentioned that you have a

8    concern in connection with milk cartons that have Fleming's

9    name on them, and that you had done some investigation

10   relating to that.  Do you remember?

11        A    Yes.

12        Q    Have you contacted the Department of Agriculture

13   or any other entity in connection with the milk labeling

14   that you brought up yesterday?

15        A    The Department of Health in Honolulu.

16        Q    Okay.  So there is a state agency that you have

17   communicated with regarding Fleming, or I guess this would

18   be C&S?

19        A    I don't -- I think Fleming -- yeah, you're

20   probably right.  The only time Fleming's name was mentioned

21   was the name on the carton.  It was more regarding the --

22   the bad milk, and the fact that the shelf life is no good

23   and it all comes over here in one large container.  And

24   we're probably the only state where we have double

25   pasteurized milk.

349

1      Q     Okay.  So did the Department of Agriculture to

2   your knowledge find any wrongdoing by Fleming or C&S in

3   connection with diversions?

4      MR. HOGAN:  Objection; vague as to just -- just

5   Department of Agriculture?

6      MR. SMITH:  Correct.

7      A     They don't report back to me.  I have no

8   knowledge.

9   BY MR. SMITH:

10     Q     Okay.  And did the State of Hawaii Department of

11  Health have any -- come to any conclusions that anybody had

12  acted improperly in connection with the milk cartons that

13  you found with Fleming's name on them?  I apologize.

14          Did the Department of Health come to any

15  conclusion that any wrongdoing had been engaged in

16  with respect to the milk cartons that you had found?

17     A     They don't report back to me, either.  I have no

18  knowledge.

19     Q     You have no knowledge of that.  Now, you -- your

20  investigation of those milk cartons, you must have bought

21  some of the milk, is that right?

22     A     From time to time, yes.

23     Q     And then you scanned the package, the label on the

24  carton in order to get an image of it?

25     A     I think at one point Mr. Capozzola, didn't you get

1    a copy of the milk?

2        Q    That's why I'm asking.  So is that what happened,

3    you scanned the milk carton?

4        A    I don't know if I personally did it, but, yes, the

5    milk carton was scanned and sent.

6        Q    If you didn't, who did that, Mr. Hogan or Mr.

7    Hogan's office?

8        A    It may have been, yes.

9        Q    Okay.  And then you named the file Moo, or was

10   that Mr. Hogan's office?

11       A    I think that was a communication between Mr. Hogan

12   and Mr. Capozzola.  I don't -- I don't e-mail Mr. Capozzola

13   directly.

14       Q    So the file wasn't named Moo until Mr. Hogan sent

15   it to Mr. Capozzola, is that it?

16       A    I don't know that.  I may have named it.  I don't

17   know who named it.

18       Q    Okay.  Now, we've remembered the State of Hawaii

19   Department of Health and another entity that you've

20   communicate with.  Are there any other state agencies that

21   you've communicated with regarding Fleming or its officers

22   or employees?

23       A    That's all I can remember.

24       Q    Okay.  How about C&S Hawaii, have you communicated

25   with -- other than State Department of Health, have you

351

1   communicated with any government entities regarding C&S

2   Hawaii?

3       A    I'm not sure.  They kind of lump together after

4   the asset purchase.

5       Q    Okay.

6       A    I don't know.

7       Q    Well, I'm certainly not looking for you to

8   duplicate anything you told me about already.  I guess what

9   I'm asking is, is there anything else -- any other

10  communication you've had with a government entity relating

11  to C&S Hawaii that you haven't already described?

12      A    Not that I can recall.

13      Q    Okay.  Now, is it correct that by reviewing API's

14  business records, one could learn a significant amount about

15  the database that you created for API?

16      MR. HOGAN:  Objection; vague as to what significant

17  amount about the database means.

18      MR. SMITH:  You may answer.

19      A    I'm not sure.  They're two separate things.

20  Very -- they're -- there's not much in common between the

21  two.

22  BY MR. SMITH:

23      Q    Okay.  So -- but if one were to look at all of

24  the -- all of the paper records of API, would that not

25  reveal what data is in the database and something about the

352