IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Fleming Companies, Inc., et al.,[1] | ) | Case No. 03-10945 (MFW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| | ) | |
| ———————————————————— | ) | |
| | ) | |
| FLEMING COMPANIES, INC., *et al.* | ) | Adversary Proceeding |
| Plaintiffs, | ) | Case No. 03-_____ |
| | ) | |
| v. | ) | |
| | ) | |
| WAYNE BERRY, an individual | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**FLEMING'S COMPLAINT FOR DECLARATORY**
**RELIEF AND AN INJUNCTION PROHIBITING HARRASSMENT**

---

[1] The Debtors (referred to collectively in this Complaint as "Fleming") are the following entities: Core-Mark International, Inc.; Fleming Companies, Inc.; ABCO Food Group, Inc.; ABCO Markets, Inc.; ABCO Realty Corp.; ASI Office Automation, Inc.; C/M Products, Inc.; Core-Mark Interrelated Companies, Inc.; Core-Mark Mid-Continent, Inc.; Dunigan Fuels, Inc.; Favar Concepts, Ltd.; Fleming Foods Management Co., L.L.C., Fleming Foods of Texas, L.P.; Fleming International, Ltd.; Fleming Supermarkets of Florida, Inc.; Fleming Transportation Service, Inc.; Food 4 Less Beverage Company, Inc.; Fuelserv, Inc.; General Acceptance Corporation; Head Distributing Company; Marquise Ventures Company, Inc.; Minter-Weisman Co.; Piggly Wiggly Company; Progressive Realty, Inc.; Rainbow Food Group, Inc.; Retail Investments, Inc.; Retail Supermarkets, Inc.; RFS Marketing Services, Inc.; and Richmar Foods, Inc.

Exhibit 46

## INTRODUCTION

Fleming brings this Complaint seeking declaratory relief and an injunction to put a stop to Hawaiian software designer Wayne Berry ("Berry") and the incessant campaign of harassment which he and his counsel have inflicted upon Fleming and its counsel. Fleming is concurrently filing papers requesting that this Court issue a temporary restraining order and preliminary injunction in its favor as well.

On an almost daily basis, Berry (through his counsel) spins out conspiracy theory after conspiracy theory. Responding to this parade of imaginary horribles drains Fleming's legal resources away from constructive reorganization efforts and bleeds unnecessary legal fees from the estate. Fleming therefore seeks a determination in its favor on the merits of the underlying issues (which involve claims of copyright infringement) as well as interim injunctive relief prohibiting the initiation of actions anywhere other than before this Court so that this Court can monitor his litigation activity relative to the overall bankruptcy proceedings, and otherwise directing Berry not to harass Fleming and its counsel.

## PARTIES

1.      Plaintiffs Fleming Companies, Inc, et al. ("Fleming") filed voluntary petitions for bankruptcy under Chapter 11, Title 11 of the United States Bankruptcy Code ("Bankruptcy Code") on April 1, 2003. Fleming has continued to manage and operate its business and properties as a Debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. Fleming Companies, Inc. is an Oklahoma corporation with its headquarters and principal place of business located at 1945 Lakepointe Drive, Lewisville, Texas. Fleming is in the business of wholesale and retail distribution of consumable goods.

2.      Defendant Wayne Berry ("Berry") is a computer software programmer who is a resident and citizen of the State of Hawaii. Berry authored a computer program previously used by Fleming's Hawaii facility located in Kapolei, Hawaii.

## JURISDICTION AND VENUE

3.      Jurisdiction of this Court is founded upon Sections 157 and 1334 of Title 28 of the United States Code in that this action constitutes a civil proceeding arising out of or related to Fleming's Chapter 11 case under the Bankruptcy Code, which is now pending in the United States Bankruptcy Court for the District of Delaware.

4.      This civil proceeding qualifies as a core proceeding under Sections 157(b)(2)(A) and (O) of Title 28 of the United States Code.

5.      Venue is appropriate under 28 U.S.C. § 1409(a). Additionally, venue in the Bankruptcy Court for the District of Delaware is proper because this Court has exclusive jurisdiction over the property of the estate, including the intellectual property of the estate at issue in this matter. 28 U.S.C. § 1334(e).

## STATEMENT OF FACTS

A.      **Prepetition Background: The Acrimonious Relationship Between Fleming and Berry, and Berry's Prepetition Copyright Infringement Lawsuit.**

6.      During the middle of the 1990s Fleming's Hawaii Division began doing business with Atlantic Pacific International Inc. ("API"). API acted on Fleming's behalf, coordinating the shipment of grocery products from the West Coast to Fleming's Distribution Center in Hawaii. API's responsibilities, also on Fleming's behalf, included contracting with and paying the steamship companies for the freight to be delivered to Fleming's Hawaii division.

7.      Berry became involved with API sometime after API started doing business with Fleming. He had no ownership interest in API but became Vice President

of API in 1996 and President in 1997. Mr. Berry created software that API used to keep track of Fleming's purchase orders and shipments from the West Coast.

8.    In 1998, Fleming learned API had failed to pay approximately $3 million in ocean freight charges to the steamship companies, although Fleming had already paid API for these services. As API did not have assets to satisfy these obligations, Fleming was ultimately held liable to pay API's bills to the ocean carriers due to the fact that Fleming was the consignee on the shipments.

9.    In 1999, following the problems with the unpaid shipping bills, Fleming elected to terminate its relationship with API. Fleming agreed to purchase some of API's assets and hired API's employees. One of the assets that Fleming agreed to buy was the computer system (designed by Berry) for keeping track of the freight. However, shortly before the asset purchase was to close, API told Fleming that Mr. Berry, not API, owned the software used on that system. Mr. Berry, however, agreed to license Fleming to use of the software, and a memorandum summarizing the understanding between Mr. Berry and Fleming was written and signed by the parties. On that basis, Fleming completed the asset purchase in 1999.

10.    The relationship between Mr. Berry and Fleming has been highly acrimonious ever since the acquisition of API. For example, in 2000, Mr. Berry and his counsel went to the local newspaper (the *Honolulu Advertiser*), claiming that Fleming was overcharging for groceries sold in Hawaii. The newspaper published several derogatory articles. Eventually, the newspaper's management understood that Berry and Hogan did not have any evidence to support their claim of "overcharging" and the newspaper quietly stopped publishing these negative accusations.

11.    In 2001, Mr. Berry began claiming that Fleming was infringing his software. Mr. Berry's accusations were far ranging and included all of the following: (1) Fleming was using the software all over the Mainland United States and in the Caribbean;

DOCS_DE:76309.1

(2) Fleming had installed the software on its mainframe computer and had made the software available to thousands of people; (3) Fleming was allowing Pillsbury, K-mart and many others to use the software; and (4) Fleming conspired with a national software firm, Manugistics, to steal the software and incorporate it into software that Manugistics created for Fleming. He further claimed that he had a cause of action against the United States as a vicarious infringer. Ex. CCC.[2] Mr. Berry even claimed that Fleming and/or Fleming's counsel had dispatched armed gunmen to Mr. Berry's home in order to injure him. *See* Exhibit ZZ, 7:10-20:17.

12.     Fleming denied, and continues to deny, these charges. Mr. Berry ultimately filed a copyright infringement lawsuit against Fleming. He claimed he was statutorily entitled to many millions of dollars in damages. Exs. AAA, BBB. The case went to trial in February of 2003. The jury returned a verdict on March 6, 2003, expressly finding that Fleming has a license authorizing the use of the software that Mr. Berry had created. Additionally, the jury ruled in Fleming's favor on all of Berry's claims that were presented to the jury, except one. The jury ruled that some of Fleming's changes to the software were not authorized by the license that Fleming and Berry had agreed upon. The jury found that Fleming's infringement in this regard was willful, and awarded statutory damages of $98,500, less than the amount offered to settle the vexing litigation. Ex. BBB, p.3. A true and correct copy of the jury verdict is attached as Exhibit A.

**B.** **Berry's Postpetition Campaign of Harassment: Threats to Sue Fleming's DIP Financiers and Employees As Individuals, Allegations That Fleming and**

---

[2] All "Ex." or "Exhibit" references are to the Exhibits submitted with the Affidavit of Damian D. Capozzola in Support of Fleming's Complaint for Declaratory Relief and an Injunction Prohibiting Harassment, Fleming's Motion for Immediate and Preliminary Injunctive Relief, and Fleming's Memorandum of Points and Authorities in Support of Fleming's Motion for Immediate and Preliminary Injunctive Relief.

**Its Counsel Have Conspired to Conceal Information From the Government, Contentions That Fleming Has Ties to Terrorist Groups, Has Violated Antitrust Laws and Is Subject to RICO Claims, Berry's Sale Objection, and Random Acts of Harassment.**

13.    Post-trial motions were pending before the court at the time Fleming filed its Chapter 11 petition on April 1, 2003, staying the entire matter. Prior to Fleming's April 1, 2003 bankruptcy filing, Fleming's Hawaii division had ceased all use of the changed software which the jury had found infringing. Fleming continued to use Berry's software as originally configured, which the jury had expressly found Fleming had a license to use. Ex. A, p. 2, #2.

14.    Berry's counsel first contacted Fleming's bankruptcy counsel in April, and during late April and early May Berry's counsel attempted to persuade Fleming's counsel of the merits of Berry's position. As part of these communications, Berry's counsel threatened Fleming with a RICO action and threatened to pursue Fleming's DIP financiers. Exhibit B contains e-mail traffic documenting these threats. Exhibit C contains letters sent by Mr. Berry to various financial institutions.

15.    On May 13, Berry's counsel copied to the United States Trustee and the Defense Commissary Agency Inspector General a letter which blatantly misrepresented conversations he had with Fleming's counsel and baselessly accused Fleming of destroying data which may be relevant to auditing the Inspector General may wish to perform. Ex. D. Fleming's counsel immediately denied the allegations and determined that all future communications with Berry's counsel would have to be in writing. Exhibits E through G contain copies of the relevant correspondence.

16.    On May 20, Berry's counsel demanded Rule 2004 discovery on "whether the software is still being used, by whom and in what version." Ex. H. On May 29, he

6

threatened to file a motion to have the Court order such discovery. Exs. I, J. He never followed through on this threat.

17.    On June 6, Berry's counsel impliedly threatened to inform SuperValu, Fleming's competitor but potential purchaser, of Berry's position that Fleming had an "infringement problem." Ex. K.

18.    On June 9, Berry's counsel contacted Fleming's Delaware counsel directly to discuss these issues, notwithstanding that Fleming's Delaware counsel was entirely unfamiliar with the situation and notwithstanding that twelve days earlier Berry's counsel had received specific instructions to deal with Fleming's adversary proceeding counsel in Los Angeles. Exs. I, L

19.    Also on June 9, Fleming completely abandoned any and all use of Berry's software, even under the originally configured program which the Hawaii jury expressly found that Fleming had a license to use. Ex. A (jury verdict) at p.2, #2. Fleming converted to using a combination of Microsoft Excel spreadsheets and Crystal Reports, which is made by Crystal Decisions, Inc. The Microsoft Excel and Crystal Reports software applications Fleming is now using are "off the shelf" products available to the public over the Internet or any of numerous retail stores. Ex. TT.

20.    On June 11, Berry's counsel requested that Fleming's counsel clarify that they were not simultaneously representing a creditor named Bradley Operating Limited Partnership. Ex. M. The portion of hearing transcript which contained the information which allegedly confused Berry's counsel was an obvious typographical error. Ex. N.

21.    On June 13, Berry's counsel asked Fleming's counsel for a copy of his pro hac vice order in the Fleming case. Ex. O. Berry's need for this document has never been explained.

22.    Also on June 13, Berry's counsel wrote to the unsecured creditors committee, Ex. P, and based on his allegations of criminal activity and wrongdoing urged

7

"the appointment of a trustee or conversion of this case immediately into a case under Chapter 7." He also stated -- incorrectly -- that "Fleming continues to use Mr. Berry's software. This constitutes criminal conduct pursuant to the Copyright Act."

23.    While Berry's counsel claimed criminal conduct by Fleming to the unsecured creditors committee, Mr. Berry himself was writing to no fewer than eight Fleming employees as individuals (including one in Texas and one in Tennessee) and accusing them of willful infringement of his software. Examples of these letters are contained in Exhibit Q. He demanded that they respond to what amounted to unauthorized written discovery and document demands no later than July 11.

24.    On June 26, Fleming retained Guidance Software of Pasadena, California to wipe its drives clean of Berry's software or any derivatives. Ex. R. Specifically, Guidance was asked to take an image of the existing network for preservation purposes, wipe the network clean, and then take another image to preserve evidence so any necessary "before" and "after" comparisons could be done. Guidance was also asked to write a report.

25.    By June 28, Berry and his counsel had apparently heard industry rumors that Fleming was contemplating selling part of its wholesale business. With no factual basis, Berry assumed incorrectly that Fleming was still using his software, and he threatened to "act promptly to put them [the potential buyer] on notice of their potential liability and barring their unqualified compliance, sue them immediately in the U.S. District Court seeking to restrain them." Ex. S. Berry's counsel then went on to baselessly accuse Fleming's counsel and executives of concealing infringement extending beyond Hawaii to other distribution centers:

> Had *Kirkland & Ellis not chosen to conceal the extent of the infringement* that we now know, and can prove, extends to [distribution centers] other than Hawai'i, we might have been able to work through all of these liquidation issues in an amicable fashion. *The Debtor-in-Possession's decision to conceal the post-petition willful infringement apparently with the knowledge of its General*

*Counsel and Corporate Secretary*, makes any action other than promptly seeking a restraining order impossible.

Ex. S (emphasis added). Berry never sought such a restraining order.

26.    On June 30, Fleming's counsel sent Berry's counsel a letter certifying that "Fleming is not using Mr. Berry's software, nor is Fleming allowing anyone else to do so." Ex. T. Fleming's counsel also requested proof of the scandalous allegations in the June 28 letter, Ex. T, but Berry's counsel refused to provide any. Instead, he repeated his assertions regarding "your firm's involvement in willful infringing conduct and the disastrous administration of this Estate" but refused to provide specifics: "As to the proof you request, I will hold that for now." Ex. U.

27.    On July 2, Fleming's counsel again denied Berry's baseless allegations of misconduct. Ex. V. This prompted an e-mail on July 3 from Berry's counsel, Ex. W, in which he demanded that Fleming's counsel confirm the signature on the July 2 letter (signed by his secretary while he was out of town) was binding. Also, he claimed that "We know Mr. Berry's system is used for [shipments into Hawai'i]. . . . Mr. Berry intends to contact the vendor and the United States to advise them of the infringement and to preserve Mr. Berry's rights." Finally, he again claimed that "I am about to file my 2004 motion to establish the extent of ongoing infringement for claims purposes." He asserted that he would be seeking attorney-client communications "under the crime-fraud exception. These will include correspondence between Kirkland & Ellis and in-house counsel for Fleming including Carlos Hernandez." No such motion was filed.

28.    On July 7, Berry's counsel requested a copy of the Asset Purchase Agreement ("APA") with C&S, which by this time was offered to the public. Ex X. Fleming complied the next day. Ex. X. When he reviewed the Asset Purchase Agreement, Berry's counsel misconstrued the language in the Asset Purchase Agreement and impliedly threatened to try to derail the sale to C&S by informing C&S and the U.S. Trustee that Fleming had committed a fraud: "Unless you have satisfied me that the

debtor in possession is not engage [sic] in what appears to be a fraud, I will contact C&S and the OUST without delay, your [tortuous interference] threats against my client notwithstanding." Ex Y.

29.     Berry's construction of the APA was flawed, since Berry's software did not fit within the definitions of "Company Used Intellectual Property" "used in connection with the Acquired Assets" being transferred to C&S. Ex. CC. As Berry's counsel had been informed on June 30, Fleming was no longer using Berry's software, nor allowing anyone else to do so. Exs. T, Z, CC.

30.     Also on July 8, Berry's counsel sent an e-mail raising an alleged discrepancy between the sellers listed on the initial Asset Purchase Agreement and the associated entities listed in the footnote accompanying many of Fleming's filings. Ex. AA. In particular, Mr. Berry's counsel inquired as to why Fleming Foreign Sales Corporation was listed as a seller in the APA when it did not appear in the footnote and when other of Fleming's schedules stated that Fleming Foreign Sales Corporation was not in Chapter 11.

31.     The very simple answer to this is that Fleming Foreign Sales Corporation is a non-debtor in these proceedings and accordingly has no standing to be a moving party under the motion. Moreover, it is contemplated by the parties to the APA that this entity will be removed as a "Seller" based on an amendment to the APA.

32.     However, Mr. Berry's counsel drew the inflammatory and bizarre conclusion that the discrepancy regarding Fleming Foreign Sales Corporation was evidence of *cigarette smuggling*:

> *We have always believed that Fleming had off-shore accounts to handle the cigarette smuggling revenue that we have proof it was making in Hawaii. Again, using Mr. Berry's software.* Are these the guys? Already two Bankruptcy fraud convictions connected to all this. Because Fleming Foreign Sales Corporation is not in bankruptcy, does your firm represent them too? It appears you do. Let me know, we need to send them something.

Ex. AA (emphasis added). He concluded this message with the threatening aside that his client was perfecting a claim against Fleming for alleged overcharging which would be worth "about eight figures" and that a company related to those activities had seen "their long time attorney indicted recently." Ex. AA.

33.    On July 10, Berry and his counsel repeated their beliefs that "the Asset Purchase Agreement is a materially false document containing that false entry. Under 18 U.S.C. § 152(8), the false statement that there has been no claims of infringement against any company owned or used intellectual property constitutes additional RICO predicates and Mr. Berry reserves all rights." Ex. BB. Not only was this an improper construction of the language of the Asset Purchase Agreement (based necessarily in part upon Mr. Berry's conjecture regarding schedules which he had never seen), but in fact Fleming's litigation with Berry had already been disclosed to C&S. Ex. CC (schedules)

34.    That same day, Berry's counsel e-mailed Fleming's counsel a letter which Berry's counsel had received from Fleming's local trial counsel prior to the original copyright infringement trial. Ex. DD. Berry's counsel mischaracterized the letter as conceding that Fleming could not create an in-house replacement for Mr. Berry's software without committing infringement, when in fact all the letter did was propose that one possible (and exceptionally conservative) path to settlement would be to install replacement software authored by someone with no exposure to Berry's software.

35.    The July 10 e-mail also demanded all information regarding the author of whatever software Fleming was using to perform the functions formerly performed by Berry's software and that unless Fleming provided that information "we must proceed under the confirmed belief that Fleming, as the Fleming-in-Possession, has committed a new infringements [sic] and take action in Hawaii immediately to protect Mr. Berry's rights." Ex. DD.

36.    The following day, in his fifth communication that week, Berry's counsel again raised the Fleming Foreign Sales Corporation issues and stated that in the absence of a response on the issue he would presume that he was correct that Fleming Foreign Sales Corporation was not actually one of the Debtor entities. He then alleged that "this raises serious subject matter jurisdictional issues" which threatened the July 17 sale procedures hearing. Ex. EE.

37.    Fleming's counsel responded that day (July 11) to part of the barrage of e-mails and faxes sent by Berry's counsel that week, denying his request for attorney-client privileged materials and reminding Berry's counsel that the cigarette smuggling and overcharging allegations had been determined to be frivolous long ago. Ex. FF.

38.    No more than two hours elapsed before Berry's counsel responded with his sixth communication of the week, a scathing, stream-of consciousness letter in which Berry's counsel rambled about "two high profile convictions regarding this [cigarette trafficking] scheme," how "[c]alling Mr. Berry a liar" is something Fleming's local trial counsel "seems to take great joy in," and referring Fleming's counsel to stayed litigation to examine "allegations of overcharge based on vendor collusion and Fleming's alleged monopoly in Hawaii." Ex. GG.

39.    On July 14 Berry's counsel requested authorization from Fleming to object to the sale to C&S. Ex.HH. Fleming expressed no opinion. Ex. II. In the same July 15 letter, Fleming's counsel confirmed that Fleming Foreign Sales Corporation is a subsidiary of Fleming Companies, Inc. and that any correspondence pertaining to Fleming Foreign Sales Corporation should be directed to Fleming's counsel. Ex. II. Fleming also informed Berry's counsel on July 15 that it would soon be able to inform him of developments which would bear significantly on his alleged need for discovery regarding the extent to which Fleming was still using Berry's software, a point first raised

DOCS_DE:76309.1

on July 11. Exs. FF, II. By this point Guidance Software had wiped Fleming's systems clean of Berry's software and any derivatives, and was in the process of writing its report.

40.    Berry's counsel also again raised the cigarette trafficking allegations on July 15, in the process raising the outlandish accusation that Fleming and/or one of the preeminent bankruptcy lawyers in the United States was involved in a massive cigarette smuggling conspiracy and/or with a terrorist organization "with a propensity for decapitating missionaries":

> [W]e have been doing a bit of research and have found another interesting anomaly that I though we might share with you.

> In Mr. Sprayregen's Declaration Exhibit "A" at Docket 190-3, Mr. Sprayregen lists non-Fleming entities including FCI Holdings Corporation and EA Morris Distributors, LTD. We believe that EA Morris is Canadian cigarette related.

> Then the schedules list the non-Fleming affiliates as Fleming Foreign Sales Corp (a Barbados corp.) and EA Morris. Docket 1797 at page 25. FCI Holdings has disappeared??? Then the APA at page 1 says that one of the "Debtors" is Fleming Foreign Sales Corp. a fact that we have challenged.

> *We have always wondered where Fleming was laundering the cigarette trafficking revenues that, by our estimate, are measured in the hundreds of million if not billions of dollars.* A little research has hit upon FCI Holdings Corporation as a "blocked" entity under the Treasury Department Office of Foreign Asset Control. ("OFAC") compare

>> http://www.triacnet.com/hottopic/ofac2.htm
>> <http://www.triacnet.com/hottopic/ofac2.htm>

> and Mr. Sprayregen's Declaration Docket 190-3. *Because we have knowledge that Fleming's surprise witness in the infringement trial has had connections with a foreign terrorist organization (with a propensity for decapitating missionaries)* we remain justifiably concerned by your silence interspersed with threats.

> I'm sure that this must be a quirky coincidence but your failure to respond leaves that nagging suspicion that we may be on to something....

Ex. JJ (emphasis added).

41.    The very next day, Berry's counsel sent yet another letter demanding to know "the full extent of the infringement" and stating that if this was not disclosed by July 22 "we will commence litigation in the District of Hawaii to enjoin Fleming's purchaser from the ongoing willful infringement that we know is occurring on a daily basis." Ex. KK. He made these contentions notwithstanding that almost a month had passed since Fleming's counsel informed him that Fleming was not using Berry's software at all. Ex. T. He also threatened to sue other alleged infringers who had been involved with Fleming in the past. Even though these entities had assured him "that they no longer use Mr. Berry's software" he intended to seek a temporary restraining order "just be make sure [sic]." Ex. KK.

42.    On July 17, Berry's counsel demanded a copy of Fleming's contract with Hawaii Express Transportation Services. Ex. LL. Fleming believed that Berry's counsel intended to use this contract as evidence in what would be a frivolous restraining order action. Having no obligation to comply, Fleming therefore did not.

43.    Unsatisfied with Fleming's response regarding the replacement of Berry's software, Berry's counsel concluded all of the following in a July 22 e-mail:

--    that Fleming must be using a pirated derivative of Berry's software because Fleming's own employees could never be sufficiently resourceful to get by without Berry's software or otherwise design a noninfringing replacement.

--    That Kirkland & Ellis, through "certain responsible attorneys," directed this conduct or had knowledge of it and acquiesced by agreement and committing certain overt acts: "Your firm and all of the attorneys who participated are liable to my client for full damages for infringement as provided by law and because the conduct occurred post petition, can't rely on the automatic stay to protect them in this."

--    That the conduct "violates federal criminal statutes and each act is a separate RICO predicate and together they entitle Mr. Berry to treble damages and the costs of collection."

--    That Berry intended to contact "all prospective purchasers of the Hawaii facilities and put them on notice of the infringement."

--    Berry would be "commencing an action against certain admitted previous infringers for damages and to enjoin any further infringements, including the use of any derivatives."

Ex. MM. Fleming's counsel denied the charges globally. Ex. NN.

    44.     Berry did in fact commence an action that day in the District Court of Hawaii against Hawaiian Express Service, Inc. et al. Ex. OO. He sought a temporary restraining order against Hawaiian Express to prohibit future alleged infringements. The District Court of Hawaii promptly denied this request, ruling in relevant part that "At most, Berry's counsel represented at the hearing that Defendants had to have used the software in dealing with Fleming and that, as Fleming's use was infringing, Defendants' use must have been. ***That is not evidence.***" Ex. PP at 6 (emphasis added).

    45.     On July 23, Fleming's counsel provided to Berry's counsel the Affidavit of Michael D. Gurzi of Guidance Software, and attached exhibits. Ex. QQ. Mr. Gurzi is a highly specialized computer technician with a background in law enforcement. From July 3 to July 7 he examined the computers at Fleming's Hawaii location and wiped them of Mr. Berry's software. In his sworn affidavit he stated that "the drives of [Fleming's computers] have been wiped of all data to include any software created by Mr. Wayne Berry, and any derivative thereof, and that as of July 7, 2003, such software no longer resided on the subject computers." Ex. QQ.

    46.     Berry's counsel acknowledged receipt on the same day and asked to know "what replaced Mr. Berry's software?". Ex. RR.

47.    Berry's counsel did not wait for a response, but instead the next day sent Fleming's counsel the following e-mail:

> We're interested in hearing your side, but the document you sent answered my question as to where the new one came from. Look at pg. 21 of Exhibit "D." Seven lines down, on the right it says "Original Logistics Database." Ooops!!!!!
>
> Also, you didn't' have authority to make the copy. That's infringement. Oooops!!!!!
>
> Also, on Page 36 Fleming still has the API entries, some gong [sic] back to 1999 regarding "Wayne." Oooops!!!!!
>
> Also, why was Kraft's attorney directing the new infringement? How does Kraft fit in to all of this? Is it the cigarettes? Aren't they a cigarette company too? Which one of the two, Kraft or Fleming, is going to tell the SEC that you guys scrubbed the data?
>
> By the way, on a serious note, Mr. Berry is concerned about who else got this absurd report. It shows what appears to be a fictitious infringement action of Fleming v. Berry. To a software developer this is clearly defamatory and defamation per se. Just a heads up in case you are thinking about a reckless subsequent publication. So you don't make it any worse, let us know who else got this and put a stop to any further publication.

Ex. SS.

48.    On that same day, July 24, Berry sent Guidance Software a notice of copyright infringement. Ex. FFF.

49.    On July 28, Fleming responded to the question posed by Berry's counsel about what had replaced Berry's software. Fleming provided the Declaration of Mark Dillon, Fleming's Logistics LAN Administrator at its Hawaii Division. He declared under oath that Berry's software had been replaced by generic products:

> *Functions formerly performed by Wayne Berry's software have since been performed using* a combination of Microsoft Excel spreadsheets and Crystal Reports, which is made by Crystal Decisions, Inc. The Microsoft Excel and Crystal Reports software applications Fleming is now using are *"off the shelf"*

*products available to the public over the Internet or any of numerous retail stores.* Any reports currently used by the Logistics Department of Fleming's Hawaii Division developed by means of the Crystal Reports software have been created from scratch by me or one of my co-workers.

Ex. TT (emphasis added).

50.     Also on July 28, Fleming sent Berry's counsel a lengthy and substantive response (Ex. UU) to his July 24 allegation that Fleming and Guidance Software "didn't" have authority to make the copy. *That's infringement. Oooops!!!!!*" Ex. S (emphasis added). For the reasons detailed in that letter, what Guidance did fell squarely within the "fair use" protections of 17 U.S.C. § 107, which permits the duplication of intellectual property for the purposes of preserving evidence to be submitted in connection with pending or probable legal proceedings. Ex. UU.

51.     Berry's counsel sent back a derisive response which contained in relevant part the following text:

> Fleming is just preparing for what it hopes is the last chapter in the Berry saga. I hate to break it to you, but *the bone-headed work of the past month has opened up an entire new universe of infringements* to address. . . .
>
> Fleming intends to hold the Guidance activities, that included the illegal copy, up to either mislead potential purchasers in regard to the status of the infringement (by showing them the report and claiming that Fleming is "clean" of the Berry system) or providing the willful infringing purchaser with a "giggle test" proof of their innocent infringement. *The charade allows Fleming to sell its business, infected by the infringing work, and then leave it to Mr. Berry to once again pursue the infringers after Fleming and its crew of lawyers and bankers have left the scene.* . . .
>
> I really got a kick out of the statement that: "[t]he purpose of the use is only defensive, with no economic motivations." Wouldn't a $400,000,000 sale be just a little bit of an "economic motivation?" *Maybe not in L.A., but here in Hawaii, where the RICO jury will reside, that's a pretty big motive. As far as the cite to the U.S. Constitution, I almost cried.*
>
> Let's stop fooling around. We both know that the infringement has spread beyond the Kapolei facility and the report will have no effect on that ongoing infringement or the liability created by the new Dillon derivative that will be immediately brought to bear *on any ill-advised Fleming purchaser and the crew that planned and executed the post-petition Berry caper.*

Ex. VV (emphasis added).

52.    July 28 was also the day that the Court filed Berry's July 24 Objection to Fleming's motion to approve the sale to C&S. Ex. WW. The objection is based upon two invalid assumptions. The first is that Fleming has reinstalled infringing software onto its systems. But as demonstrated by Mark Dillon's Declaration, nothing but "off the shelf" software in which Berry may not conceivably claim a copyright has been installed. Ex. TT. The second is that a stray K&E time record dated May 2, 2003 from Michael Fatall, referencing an internal conference call with Peter Spingola "re Berry software infringement re SLC sale of assets," somehow constitutes the lynchpin holding together all Berry's theories. Ex. XX

53.    This myopic reading of the time records ignores Mr. Spingola's record right above it, in which Mr. Spingola records that on the same day Mr. Hogan spoke with Mr. Spingola (an intellectual property lawyer in Chicago) to discuss the Berry issues notwithstanding the fact that Mr. Hogan had already been dealing with Fleming's litigation counsel in Los Angeles, Damian Capozzola. Exs. B, XX. Mr. Spingola, unaware of Mr. Capozzola's interactions with Mr. Hogan, inquired with his client contacts, Charles Mooney and Mike Carey, about these issues during the course of a call in which sale of the Salt Lake City asset sale was also discussed. Ex. XX. However, just because the issues were discussed in the same call does not make them related, and indeed they are in no way related, as the Salt Lake City division has never had any interaction with Berry's software whatsoever. Ex. EEE.

54.    Mr. Spingola's records reference a twenty-four minute conference he had with Mr. Fatall, another intellectual property lawyer, "re all of the foregoing," which included the Salt Lake City issues as well as the Berry software issues. Ex. XX. Thus, it is entirely unsurprising and innocent that Mr. Fatall's records also show a twenty-four minute conference about those issues. Ex. XX. At most, Mr. Fatall's records would have

been better written as "Internal conference with P. Spingola re Berry software infringement *and* re SLC sale of assets." But the fact that the word "and" was omitted does not support Berry's contention that Fleming or its counsel have concealed the "transferring [of] pirated copies of Mr. Berry's original work to other distribution centers." *Compare* Berry Objection (Ex. WW) at p.6, ¶ 16.

55.    Finally, on July 30, 2003, Berry's counsel sent a three page letter in which he did all of the following:

--     *Threatened to sue three Fleming employees as individuals* for post-petition, willful infringement.

--     Claimed that there is no possible way Fleming's employees could have created a noninfringing replacement for Berry's software. In other words, Berry and his counsel *assume that simply because Fleming's employees have had access to Berry's source code, they must still be using it in one form or another.*

--     Claimed that *C&S* is "already infected with the Dillon software derivative bacillus."

--     Claimed that *Foodland and Kmart* are direct and/or vicarious infringers.

--     Claimed that "*Fleming has somehow created a under-the-table entity* called "Fleming-Logistics" that is not being reported in the Bankruptcy and that continues to funnel money to the old guard through the network of trucking-logistics companies. . . . Is that why you can't file the operating reports's?"

--     Claimed that *Fleming has violated antitrust laws*: "I thought for a while that the reasons that the vendors didn't terminate Hawaii military contracts was because of the monopoly and the bad press you get from hungry military dependents in time of war. *Now I feel pretty confident*

> *that the reason is that the contacts [sic] are so toxic as per se violations of the Sherman Act §§ 1 & 2, that nobody's got the guts to file them in court not even you guys* except, Pictsweet goofed."

Ex. YY (emphasis added).

## COUNT ONE: DECLARATORY RELIEF

56.     Fleming incorporates Paragraphs 1 through 55 of this Complaint as if fully set forth.

57.     Fleming has committed no post-petition infringement of Berry's copyright.

58.     Any and all claims Berry has against Fleming are pre-petition claims which must be handled through the appropriate administrative procedures.  Fleming has communicated its positions in this regard to Berry numerous times.

59.     Berry nonetheless repeatedly continues to claim that Fleming is liable for post-petition infringement, all of which Fleming denies.  Dealing with Berry's assertions distracts Fleming's counsel from constructive reorganization activities and bleeds unnecessary legal fees from Fleming's estate.

60.     There exists an actual controversy of a justiciable issue between Fleming and Berry as to whether Fleming is liable for any post-petition infringement of Berry's copyright in certain freight tracking software formerly used by Fleming.

WHEREFORE, Fleming requests that this Court enter an order:

A.     Declaring that Fleming is not liable for any post-petition infringement of any copyright owned by Berry;

B.     Directing Berry, his counsel, and all other agents to cease and desist communications with Fleming or any other entity alleging that Fleming is liable for any post-petition infringement of any copyright owned by Berry;

C.    Awarding Fleming its costs, expenses, and attorneys' fees incurred in connection with this action to the maximum extent permitted by law; and

D.    Granting Fleming such other and further relief as is just and appropriate under the circumstances.

## COUNT TWO: INJUNCTIVE RELIEF

61.    Fleming incorporates Paragraphs 1 through 55 as if fully set forth.

62.    Fleming has committed no post-petition infringement of Berry's copyright.

63.    Any and all claims Berry has against Fleming are pre-petition claims which must be handled through the appropriate administrative procedures. Fleming has communicated its positions in this regard to Berry numerous times.

64.    Berry nonetheless repeatedly continues to claim that Fleming is liable for post-petition infringement, all of which Fleming denies. Dealing with Berry's assertions distracts Fleming's counsel from constructive reorganization activities and bleeds unnecessary legal fees from Fleming's estate, thereby causing Fleming substantial, immediate, and irreparable injury.

65.    Fleming will continue to suffer substantial, immediate, and irreparable injury if Berry, his counsel, and all his agents are not immediately restrained and enjoined from communications with Fleming or any other entity alleging that Fleming is liable for any post-petition infringement of any copyright owned by Berry.

66.    Fleming reasonably believes that absent the injunctive relief requested here, Berry will continue to assert that Fleming is liable for post-petition infringement of Berry's copyright in certain freight tracking software, which may interfere with Fleming's attempts to reorganize and/or to generate income by selling parts of its business, the effects of which would be devastating to Fleming but are not calculable in monetary figures. Fleming therefore has no adequate remedy at law.

67.     Berry has no legitimate claim that Fleming is liable for post-petition infringement of his copyright, and therefore has no legitimate harm for the Court to concern itself with in ordering the requested injunctive relief.

68.     It is likely that Fleming will succeed on the merits and demonstrate that Berry has no claim against Fleming for post-petition copyright infringement.

69.     The relief sought is in the public interest because the public interest supports giving companies a reasonable opportunity to reorganize, free from the harassment of creditors such as Berry.

70.     It is therefore reasonable in scope, effect, and duration for this Court to direct Berry, his counsel, and all other agents to cease and desist communications with Fleming, its employees, its counsel or agents, the United States government, or any other entity alleging that Fleming is liable for any post-petition infringement of any copyright owned by Berry, except through communications and legal proceedings directly related to this adversary proceeding, until such time as there is a final determination on the merits, to grant Fleming a final and permanent injunction to the same effect, and to grant Fleming such other and further relief as is just and appropriate under the circumstances.

WHEREFORE, Fleming requests that this Court enter an order:

A.      Directing Berry, his counsel, and all other agents to cease and desist communications with Fleming, its employees, its counsel or agents, the United States government, or any other entity alleging that Fleming is liable for any post-petition infringement of any copyright owned by Berry, except through communications and legal proceedings directly related to this adversary proceeding, until such time as there is a final determination on the merits, and granting Fleming a final and permanent injunction to the same effect when these matters are finally determined; and

B.      Granting Fleming such other and further relief as is just and appropriate under the circumstances.

DOCS_DE:76309.1

Wilmington, Delaware                    Respectfully submitted,

Dated: August 1, 2003                   KIRKLAND & ELLIS LLP
                                        James H. M. Sprayregen, P.C. (ARDC No. 6190206)
                                        Richard L. Wynne (CA Bar No. 120349)
                                        Eric C. Liebeler (CA Bar No. 149504)
                                        Damian D. Capozzola (CA Bar No. 186412)
                                        Kirkland & Ellis
                                        777 South Figueroa Street
                                        Los Angeles, CA 90017
                                        (213) 680-8400 (Telephone)
                                        (213) 680-8500 (Facsimile)

                                        and


                                        PACHULSKI, STANG, ZIEHL, YOUNG, JONES &
                                        WEINTRAUB LLP


                                        *Scotta E. McFarland*          wp/Oak
                                        Laura Davis Jones (DE No. 2436)
                                        Ira D. Kharasch (CA No. 109084)
                                        Scotta E. McFarland (DE No. 4184)
                                        Christopher J. Lhulier (DE No. 3850)
                                        919 North Market Street, 16th Floor
                                        P.O. Box 8705
                                        Wilmington, Delaware  19899-8705 (Courier No. 19801)
                                        (302) 652-4100 (Telephone)
                                        (302) 652-4400 (Facsimile)

                                        Co-Counsel for Debtors and Debtors in Possession