# EXHIBIT "N"

Ueno, Thomas                                                              7/22/2005

```
 1              IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF HAWAII
 2
 3
 4   WAYNE BERRY, a Hawaii        :
     citizen,
                                  :
 5
                                  :
 6   Plaintiff,                   : CIVIL      CV03-00385
                                  : NO.:       SOM LEK
 7        vs.                     :
                                  :
 8                                :
     HAWAIIAN EXPRESS             :
 9   SERVICE, INC., a             :
     California corporation;      :
10   et al.,                      :
                                  :
11                                :
     Defendants.                  :
12   --------------------------->

13
14
15   Deposition noticed by:  Lex Smith, Esq.
16
17          VIDEOTAPED DEPOSITION OF THOMAS UENO
18
19
20   Taken on behalf of Defendant at the Law Offices of
     Kobayashi, Sugita & Goda, 999 Bishop Street, Suite
21   2600, Honolulu, Hawaii, commencing at 9:00 a.m. on July
     22, 2005.
22
23
24
25     REPORTED BY:   LYNANN NICELY, RPR/RMR/CSR #354
```

EXHIBIT "N"

Page 1

1  information, to assume that there is under no
2  compulsion, then under that circumstances in this
3  particular area, I would say yes, we have. Okay. And
4  I think that's appropriate because now -- that's why
5  I'm having this problem where I think what -- maybe not
6  -- I'm sorry about, I'm just not clear, but I'm trying
7  to be as clear as I can with you and I just want to
8  tell you what we did. And I feel that sometimes you're
9  asking me to tell you about what we didn't do. Okay.
10 And you're trying to tell me -- to get me to something
11 say something which I didn't do and that's why I'm
12 trying to make it clear as to what we did. And I'm
13 having this problem, okay, that we're trying to
14 mischaracterize things and you are trying to use a
15 specific term of art that may or may not apply. And so
16 that's why I'm saying well -- that's what's putting me
17 on my guard when you start doing that, okay.
18 Q    Did I understand your testimony correctly that in
19 these circumstances and defining fair market value as
20 being an opinion as to what a willing buyer and a
21 willing seller would agree to, that your reasonable
22 license fee is the same thing as fair market value?
23 A    Okay. As I answered to you under the conditions
24 that you have used into how we define fair market
25 value, the answer is yes.

Ueno, Thomas                                                              7/22/2005

1  Q   Okay. Let's take a break.
2      VIDEOGRAPHER: Time is 10:26 and we're going off
3  the record.
4                      (Brief recess.)
5      VIDEOGRAPHER: This is start of tape number two.
6  Time is now 10:41 a.m. and we are back on the record.
7  BY MR. SMITH:
8  Q   Mr. Ueno, in determining the reasonable license
9  fee, what facts did you take into consideration?
10 A   Well, I looked at the amount that was paid or the
11 amount that was given up by Fleming in relationship --
12 as it relates to the use of the software. And we
13 looked at the period of time that would be covered for
14 the use of this software for that fee and the estimated
15 number of containers processed at that time.
16 Q   Any other facts that you considered in coming to
17 your opinion of a reasonable license fee?
18 A   Well, the fact that the -- I guess that Mr. Berry
19 had the copyright and just the general information.
20 Q   Have you ever testified in a copyright case
21 before?
22 A   Not in a copyright case.
23 Q   Have you ever provided an opinion in a copyright
24 case?
25 A   Not in a copyright case, no.

Page 55

1  Q    Have you ever done any work on any intellectual
2  property case at all?
3  A    Yes, I have.
4  Q    What cases?
5  A    Let's see. I've done one for -- in fact, two of
6  them for the same company, Hilo Fish.
7  Q    Any others?
8  A    I can't recall right now. I don't know.
9  Q    You can't recall any intellectual property matter
10 that you've worked for other than two of them for Hilo
11 Fish?
12 A    Yes. As it relates to damages, I guess.
13 Q    Okay. Can you recall any intellectual property
14 matter that you've worked on, regardless of whether it
15 relates to damages, other than the two that you did for
16 Hilo Fish?
17 A    No, I can't recall right now.
18 Q    And what was the issue in the two Hilo Fish
19 matters?
20 A    Patent infringement.
21 Q    Who was the defendant in those cases?
22 A    Hilo Fish was the defendant.
23 Q    Who was the plaintiff?
24 A    I don't remember his name. I don't remember his
25 name.

```
 1  Q    Who was the plaintiff's counsel?

 2  A    I don't know.

 3  Q    Okay.  Did you provide an opinion in either of the

 4  matters that you did for Hilo Fish?

 5  A    Did we provide an opinion?  We did our report,

 6  yes.  And yes, we did provide an opinion.

 7  Q    And did you testify in either of the matters for

 8  Hilo Fish?

 9  A    No, did not.

10  Q    There was no deposition taken?

11  A    I don't believe so.

12  Q    Was it the same patent that was involved in both

13  cases?

14  A    Yes.

15  Q    And was it the same plaintiff in both cases?

16  A    I think so.  I think so.

17  Q    What was your opinion in that case?

18  A    What was the opinion?

19  Q    Yeah.

20  A    On the -- well, we had to figure out the amount

21  that was due to the owner of the patent.

22  Q    And how much did you conclude was due to the

23  patent holder?

24  A    How many million dollars?  I don't know.  Several

25  millions of dollars.
```

1  Q    Okay. When I asked you for the facts that you
2  relied on in coming to your opinion of the reasonable
3  license fee, the first item that you listed was the
4  amount that was paid or given up to Mr. Berry for the
5  use of the software; is that right?
6  A    That was the amount that was given for the use of
7  the software.
8  Q    Okay. And what -- state specifically what are the
9  facts that you understand -- what are the facts that
10 you understand relating to the amount that was paid or
11 given up for the use of the software?
12 A    Well, I felt that what was given up was a note
13 that was due or guaranteed by the company or by the
14 owner of a company, which is API, for property held by
15 that person.
16 Q    What was the amount of the note?
17 A    I believe it was about $1.295 million.
18 Q    And who was the maker of that note? If you
19 recall.
20 A    I don't remember.
21 Q    Okay. As you sit here today, you don't remember
22 who the maker of the note was? I take it that the
23 payee on the note was Fleming; is that right?
24 A    I don't recall the details of that right now.
25 Q    So you're not sure as you sit here today whether

1  Fleming was even the holder of the note?

2  A    No, I believe they were.

3  Q    Okay. And what is the basis of the information

4  that that is what was given for the software?

5  A    What is the basis? The basis of that was it was

6  for the -- the note was given -- quite a bit of money

7  to be given up by anyone, whether it be a company or

8  otherwise, that $1.295 million was actually given up

9  and they had -- "they" meaning Fleming at that time had

10 the use of that software. And so I guess those are the

11 things I considered.

12 Q    Okay. How did you determine that the note was

13 given up in exchange for the software?

14 A    Well, basically that what I looked at was that

15 that was the note in existence, you know, and that was

16 what was given up at the time that Fleming was using

17 the software and Fleming knew at that time that it was

18 -- the software did belong to Mr. Berry and that they

19 also knew that it was copyrighted by Mr. Berry. And so

20 I just connected the two dots.

21 Q    Okay. So was Mr. Berry obligated on the $1.295

22 million note?

23 A    I don't believe so.

24 Q    Why then is Mr. Berry in any way connected to the

25 $1.295 million note?

1  Q   Okay. Explain how you -- the period -- I take it
2  the relevant period of time to your calculation of the
3  reasonable license fee is October 1999 to January of
4  2000; is that correct?
5  A   I think so.
6  Q   How does that period of time impact the license
7  fee? What's the significance of it?
8  A   How does the period of time --
9  Q   Explain what that period of time has to do with
10 calculations of the license fee.
11 A   Okay. That period of time then, what we have done
12 is computed the -- or estimated the amount of
13 containers processed, okay, using the software during
14 that period of time, okay. That was the significance
15 of that period of time.
16 Q   Okay. If Fleming had actually intended to use the
17 software for a longer period of time, then that would
18 be -- then that longer period would need to be inserted
19 into your formula in order to determine the reasonable
20 license fee.
21 A   If Fleming had intended to use the software for a
22 longer period of time for the consideration that it
23 gave, okay, and that was the agreed upon, you know,
24 with Mr. Berry, then that would certainly impact our
25 calculation of the reasonable license fee.

1  Q   You would have to take that longer period of time.

2  If it was five years, for example, that they intended

3  to use it.

4  A   Under the conditions that I've stated, the answer

5  is yes.

6  Q   Do you have -- let's take a recess.

7      THE VIDEOGRAPHER: Time is 11:54 and we're going

8  off the record.

9           (Brief recess.)

10     VIDEOGRAPHER: This is the start of tape number

11 three.  The time is now 1:12 p.m. and we are now back

12 on the record.

13 BY MR. SMITH:

14 Q   Mr. Ueno, isn't it a fact that you are not an

15 expert on the business practices in the shipping

16 industry?

17 A   I do not consider myself an expert on the business

18 practices in the shipping industry.

19 Q   And you are not an expert on the business

20 practices in the wholesale grocery industry.

21 A   Wholesale grocery?  Well, I don't consider myself

22 an expert per se, but I have quite a bit of experience

23 in the wholesale grocery industry.

24 Q   Okay.  And you are not an expert on the business

25 practices in the software industry.

```
 1  A     I consider myself pretty much so an expert in that
 2  area.
 3  Q     You are an expert on business practices in the
 4  software industry?
 5  A     Yes, I am.
 6  Q     And is it correct that you are not an expert on
 7  consumer behavior?
 8  A     Consumer behavior.  No, I'm not an expert on
 9  consumer behavior.
10  Q     What experience or training do you have in the
11  software industry?
12  A     Well, I have about 25, 30 years in the software
13  industry.
14  Q     Please describe specifically what you've been
15  doing for 25 or 30 years in the software industry.
16  A     While I was working as a professional with both
17  Haskins & Sells and Grant Thornton, I did the
18  development of financial systems.
19  Q     Anything else that makes you an expert on the
20  business practices in the software industry?
21  A     Of course we marketed it, we did everything as it
22  relates to that software development.  We did the
23  requirements analyses, we did the systems designs, both
24  the general designs as well as detailed designs, we did
25  the system testings, did the training, the manuals, did
```

1  the installs, the conversions, we do the follow-up with
2  that. We -- in the marketing area, we have done all
3  the marketing to sell the software. We have done it
4  both in custom software as well as packaged software.
5  Q    So you left Grant Thornton 15 years ago; is that
6  correct?
7  A    That's about right.
8  Q    Have you had any exposure to the software industry
9  in the last 15 years since you left Grant Thornton?
10 A    Yes, I have.
11 Q    And what is that?
12 A    We helped maintain the Peoplesoft accounting
13 system. That would be their enterprise applications
14 from Peoplesoft.
15 Q    What else?
16 A    That's the main thing that I was working on.
17 Q    When did you help maintain the Peoplesoft system?
18 A    For about the first five years after I left.
19 Q    Approximately 1990 to '95.
20 A    To about '95, perhaps to about '97.
21 Q    Okay. In the last eight years, have you had any
22 exposure to the software industry?
23 A    In terms of marketing and selling it, is that what
24 you mean?
25 Q    Any exposure to the business practices in the

1  software industry.

2  A    Well, because I have an interest in it, I do a lot

3  of reading on it. And I'm not sure how you classify

4  cable systems, what you would consider cable

5  communications by the software industry.

6  Q    You tell me. If you consider it part of the

7  software industry, you can tell me about it.

8  A    No, I'm not sure how -- what you consider to be

9  software industry. It's a broad term. I'm just saying

10 that if you consider cable in it, we also did a

11 start-up company with cable communications.

12 Q    What was the name of that company?

13 A    Jesus. It just passed my mind. I'm sorry, I

14 don't remember.

15 Q    How long ago was it?

16 A    Just about four years, five years ago.

17 Q    Okay. So you personally were involved in the

18 marketing of software?

19 A    Yes.

20 Q    And it was a financial package that you were

21 marketing?

22 A    It's -- well, it's business operations, so it's --

23 and finances was one of the key areas in it.

24 Q    And you personally were involved in system design?

25 A    Yes.

Ueno, Thomas                                              7/22/2005

1  Q    You personally were involved in training?

2  A    Yes.

3  Q    And you personally were involved in installing and
4  converting the software?

5  A    Yes.

6  Q    And what was your involvement in these things?

7  A    Well, what was the first item you asked about?

8  Q    Marketing.

9  A    In the marketing, I did primarily most of the
10 marketing for our company, so I would go in and
11 identify the prospects, I would develop marketing
12 materials, I would define the features of the systems
13 as well as the benefits that one would derive from such
14 systems, I would meet with the prospects, I would scope
15 out their needs, then I would develop proposals, I
16 would write the proposals, I would present the
17 proposals, get involved in the selling process itself
18 in terms of closing the transaction -- closing the
19 deals with the people, work out the financial terms of
20 the agreements, would work with the attorneys in
21 developing the agreements. I don't know, I don't know
22 -- it's a whole breadth --

23 Q    And on top of that, you also designed the systems?

24 A    I would do the systems design. But first of all
25 that -- we would do the systems requirements

1  definitions which would mean that we would understand

2  -- would talk to management to understand what the

3  overall objectives of the systems were.

4       We then go and review the current systems that

5  they have in place, working -- talking to all of the

6  people who are using the system, finding out how

7  they're using it, what features they like about the

8  current system. We find out what things they are

9  looking for in addition to what the current system is

10 doing. We then document that into a requirements

11 document.

12      We then go through and design the features. We

13 also pick up information about volumes that are being

14 processed by the systems. We look at frequencies that

15 is it's processed by the systems, like you may have

16 peak frequencies at certain times when you have a large

17 amount being processed through your system.

18      We look at how the system must interface with

19 other systems so we understand all the other

20 applications currently in place. We understand things

21 that they do not want to include in the system for

22 various reasons. Sometimes confidentiality.

23      Once we understand all of this, we then develop a

24 requirements document which can be used then to specify

25 what the system must do.

Ueno, Thomas                                                    7/22/2005

```
 1  Q    Are you done?

 2  A    I am done about the requirement side.  Do you want

 3  me to go further into systems design as to what we do

 4  in that --

 5  Q    No.  Did you also write the software then?  Did

 6  you code the software, too?

 7  A    Although I'm trained to code, I did not do

 8  specific coding itself.  But what we did was we got

 9  involved in the system tests.  So I would be involved

10  in the tests of the specific module, the shrink tests.

11  We do the unit testing, the shrink testing.  Then we do

12  the module testing.  We also get involved in the

13  overall system testing.  We then do the evaluations

14  related to that, working with the client to evaluate

15  how the system is running.

16  Q    Did you ever look at the software that's the

17  subject of this case?

18  A    I did not.

19  Q    Given your tremendous knowledge of programming and

20  of software, why didn't you look at it?

21  A    One thing I don't think I have a tremendous

22  knowledge of, you know, programming and I think you

23  mischaracterize what I'm saying.  You know, I think I

24  understand what is involved in the systems development

25  process, okay, design, maintenance of systems.  But I
```

Ueno, Thomas                                                  7/22/2005

1   did not look at the software itself.
2   Q    Okay. I would like you to take a look at your
3   report, please. Could you turn to page six. It says
4   net sales and gross profits in the middle of the page,
5   right?
6   A    Yes.
7   Q    And it's a fact that you don't know what Fleming's
8   net sales were for any time after October of 1999,
9   right?
10  A    After October of 1999? No, I don't think so.
11  Q    And you don't know what Fleming's gross profits
12  were for any period after 1999.
13  A    Gross profits? We did not have the financial
14  information that we requested and as a result, that
15  information was not provided to us.
16  Q    And the same is true for CNS net sales and CNS
17  gross profits, you don't know what they were, do you?
18  A    That information was not provided to us by you.
19  Q    Okay. If as a matter of fact Fleming's books and
20  records show that Fleming lost money at all -- in
21  Hawaii at all relevant time periods, that would pretty
22  much moot any discussion of profit, right?
23  A    Okay. If at any time Fleming lost money, you
24  know, they lost money, and so you're asking me does
25  Fleming have a profit. If Fleming lost money, Fleming

CERTIFICATE

I, LYNANN NICELY, C.S.R., do hereby certify:

That I was acting as shorthand reporter in the foregoing matter on July 22, 2005;

That the witness, whose testimony is contained herein, prior to being examined and pursuant to stipulation was by me duly sworn or affirmed, that the proceedings were taken by me in machine shorthand and were thereafter reduced to print under my supervision by means of computer-assisted transcription; that the foregoing represents, to my best ability, a true and accurate transcript of the proceedings had in the foregoing matter;

That, if applicable, the witness was notified through counsel, by mail, or by telephone to appear and sign; that if the deposition is not signed, either the reading and signing were waived by the witness and all parties, or the witness failed to appear and the original has been sealed unsigned;

That pursuant to HRCP 30(f)(1) the original will be forward to noticing counsel for retention.

I further certify that I am not attorney for any of the parties hereto, nor in any way interested in the outcome of the cause named in the caption. Dated on 07/22/2005.

*[signature]*
LYNANN NICELY, RPR
Notary Public, State of Hawaii
My commission expires: 1/24/06