# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WAYNE BERRY, a Hawaii citizen;<br><br>    Plaintiff,<br><br>vs.<br><br>HAWAIIAN EXPRESS SERVICE, INC., et al.,<br><br>    Defendants. | CIVIL NO. CV03-00385 SOM LEK<br>(Copyright)<br><br>SUPPLEMENTAL DECLARATION OF JEFFREY H. KINRICH IN SUPPORT OF DEFENDANT PCT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DAMAGES |

## DECLARATION OF JEFFREY H. KINRICH

I, Jeffrey H. Kinrich, declare under penalty of perjury under the laws of the United States of America that the following is true and accurate to the best of my knowledge and belief:

1. I graduated *summa cum laude* in 1976 from Pomona College with a B.A. in Mathematics. I then attended Stanford University and received an M.S. in Statistics in 1977. I subsequently attended the University of Maryland and graduated first in my class in 1980, receiving an MBA in Finance and Quantitative Methods. From 1981 to 2001 I worked for PricewaterhouseCoopers LLP where I achieved the status of Partner, Financial Advisory Services. From 2001 to the present I have worked for Analysis Group, Inc., where I am a Managing Principal. I have over two decades of litigation consulting experience with business clients and individuals on engagements involving applications of financial and economic analysis, accounting, business valuation, statistics, and computer systems. I specialize in damage quantification and valuation in the areas of commercial litigation and intellectual property, and I write and speak frequently on these subjects.

2. I have been retained by the Post-Confirmation Trust for Fleming Companies, Inc. to examine certain materials in the case and, if possible, render opinions on certain topics in the above-entitled action concerning damages and issues of economics.

//

//

//

3.  Attached as Exhibit A to this Supplemental Declaration is a true and correct copy of my September 28, 2005 Supplemental Rule 26(a)(2)(B) report in this matter. It contains a true and correct statement of my further opinions based on the materials described in the report.

Executed at Los Angeles, California, on September 28, 2005.

*/s/ Jeffrey H. Kinrich*
Jeffrey H. Kinrich

Case 1:03-cv-00385-DAE-LEK    Document 739-9    Filed 01/10/2006    Page 5 of 17

# Exhibit A

**Expert Supplemental Report of Jeffrey H. Kinrich — Wayne Berry v. Hawaiian Express Service, Inc.**

## I. Introduction

1. This report contains my supplemental opinions in the matter of *Wayne Berry v. Hawaiian Express Service, Inc.* pending in the United States District Court for the District of Hawaii, Case No. 03-00385 SOM-LEK.

## II. Assignment

2. I have been engaged by the Fleming Post-Confirmation Trust ("Fleming")[1] to respond to issues raised in Plaintiff's Opposition to Fleming's Motion for Summary Judgment. Specifically, Fleming has asked me to comment on the Declaration of Thomas Ueno dated September 12, 2005.

## III. Qualifications

3. My credentials were disclosed in my initial expert report dated June 16, 2005.

## IV. Documents Relied Upon

4. In addition to the documents reviewed in my initial expert report, I have reviewed the following documents: 1) the deposition of Thomas Ueno, 2) Defendants' Motion for Summary Judgment and accompanying documents and 3) Plaintiff's Opposition to Summary Judgment and accompanying documents.

## V. Ueno Incorrectly Claims that Cost Savings are Due to the FCS

5. In his declaration Ueno states that the Berry's FCS reduces Fleming's logistics costs and was the primary driver of the cost savings generated by the logistics department between 1996 and the present. (Ueno Declaration paragraphs 2 – 4.)

6. As stated in my previous report, the cost savings generated by the logistics department are generated by the know-how of Fleming's staff. Software of some type, whether it is Berry's FCS or the non-infringing spreadsheets, is a tool the department employees use in performing their logistics function. Berry's software was not necessary to generate any cost savings. The fact that Fleming's Logistics department was able to function when it transitioned from the FCS to the non-

---

[1] In this report, I use the term "Fleming" to refer to both the Post-Confirmation Trust and Fleming Companies, Inc.

**Highly Confidential -- Attorney's Eyes Only**    ANALYSIS GROUP, INC. •    1

**Expert Supplemental Report of Jeffrey H. Kinrich -- Wayne Berry v. Hawaiian Express Service, Inc.**

infringing Excel spreadsheets shows that Ueno's assertion is incorrect--the FCS was not the primary driver of any cost savings generated by the logistics department.

7. While the Fleming employees require some kind of software, whether something like Berry's FCS or simply the Excel spreadsheets which replaced it, the software is merely a tool to track the required details and provide reports. This is no different than the fact that accounting software is required to manage any large company. Just because the accounting software is needed to operate a company does not mean that the accounting software can be said to have generated the company's profits. Similarly, just because the FCS (or some substitute) keeps the records for the logistics department does not mean that the software can be said to have generated the department's profits.

## VI. Ueno's Use of Fleming's Freight Profit/Loss Report is Not Relevant

8. Ueno asserts that in 2002, Fleming's Logistics department earned $2,011,839. He then claims that Fleming would lose this "profit" if it could not use the FCS. He bases this assertion on his review of Fleming's Freight Profit/Loss Report and an email from Teresa Noa. Ueno also claims that Fleming's logistics department's direct profits between April 1 and June 9, 2003 were $396,533. (Ueno Declaration paragraphs 5 and 6.)

9. The Freight Profit/Loss Report cited by Ueno is not relevant for several reasons. First, the data he relies upon is from a different year. Damages for this case are to be computed for the period April 1, 2003 through June 9, 2003, but the document he cites comes from 2002. Second, the document does not appear to be a regular, recurring management report. It is not clear how the purported "profits" were determined or for what purpose the report was generated.

10. The Freight Profit/Loss report supposedly shows the loss Fleming would suffer if it switched to "prepay," therefore eliminating the need for and benefit of Fleming maintaining an internal logistics function. But that is a "strawman." Ueno failed to consider Fleming's additional viable alternative of switching to a non-infringing

Expert Supplemental Report of Jeffrey H. Kinrich -- Wayne Berry v. Hawaiian Express Service, Inc.

alternative, which it eventually did. Therefore, measurement of profits to disgorge should be done by comparing the difference in profits using the alternative non-infringing software and profits using the FCS. Ueno's new damage figure of $396,533 fails to take this into account and therefore should be ignored.

### VII. Ueno Changes His Profit Disgorgement Methodology

11. Ueno's use of the Freight Profit/Loss report is a change in his methodology. In his initial report, he purported to calculate the profits and sales for Fleming Hawaii.[2] In his deposition, Ueno talks about how "integral" the software is to the operations of the entire Fleming Hawaii entity.[3] He says that without it, Fleming would have no business and no profits. He asserted that disgorgement should be based on Fleming's entire profits in Hawaii.

12. As discussed in my initial report at paragraphs 28-30, Ueno made numerous inaccurate assumptions in calculating his figures which led him to greatly overstate Fleming Hawaii's profits. Fleming Hawaii's financial documents show that Fleming Hawaii lost money during the period April 1, 2003 through June 9, 2003. (Recall that Fleming entered bankruptcy on April 1, 2003.)

13. Now that Ueno has come to learn that Fleming Hawaii lost money during the relevant period, he has changed his opinion. Because Fleming Hawaii lost money during the period of infringement, Ueno apparently is attempting to find profits to disgorge by shifting his analysis away from looking at Fleming Hawaii's profits as a whole and only looking at profits earned by the logistics department. This approach was not used in his original report.

### VIII. Ueno Claims Without Substantiation FCS Provides Additional Allowances

14. Ueno claims that the FCS is responsible for profits in divisions other than Fleming Hawaii. (Ueno Declaration paragraphs 8 – 10.) Ueno provides no evidence or quantification of these alleged additional profits, nor does he mention them in his

---

[2] Ueno Attachment A, Pages 6 - 8
[3] Ueno Deposition, Pages 115 - 120

Highly Confidential -- Attorney's Eyes Only                                     ANALYSIS GROUP, INC. •        3

**Expert Supplemental Report of Jeffrey H. Kinrich -- Wayne Berry v. Hawaiian Express Service, Inc.**

initial report.

### IX. Ueno Fails to Justify Software Licensing on a Per-Use Basis

15. Ueno attempts to justify the concept of a "per container" fee of $1,772 for use of the FCS by citing examples of software such as LexisNexis that charge customers on a per use basis. (Ueno Declaration paragraph 11.) This is unreasonable.

16. The types of software that Ueno cites are very different in nature to the FCS. For example, LexisNexis charges customers for accessing its proprietary database of legal and news documents. Unlike LexisNexis, Berry does not own the data used by the FCS. In this case, the data used in the FCS are all internal to Fleming. Fleming needs the FCS or some other software to manage and coordinate its own logistics process.

17. Furthermore, Ueno's use of a per container fee contradicts Mr. Berry's previous licensing behavior. I am not aware of and Ueno has not pointed to any situation where Wayne Berry has charged a per use fee to a licensee of his software.

18. Finally, as discussed in my initial expert report in paragraph 25, it is a general industry practice to charge a flat fee for the licensing of logistics software.

### X. Ueno Wrongfully Asserts $1,295,000 Represents a Reasonable License Fee

19. Ueno again stands by his asserted reasonable license fee of $1.295 million. He bases this on the amount of a loan that Jack Borja owed to Fleming. He states that "Fleming forgave its $1,295,000 loan that it gave to Jack Borja, president of API, in exchange for the use of the Berry FCS." (Ueno Declaration paragraph 12.) Ueno is incorrect. I understand that Berry, not Borja, was president of API at the time. Borja owned all of the API stock and the note Borja signed was to cover the debt API owed to Fleming. At that time, Berry did not own any of API, although today he owns 100% of it.

20. As discussed in my initial expert report at paragraph 23, Ueno's assertion that Fleming's forgiveness of the $1,295,000 note is in exchange for the use of the FCS is completely refuted by the facts. The document forgiving API of its loan

**Expert Supplemental Report of Jeffrey H. Kinrich -- Wayne Berry v. Hawaiian Express Service, Inc.**

obligation does not mention the FCS. Fleming's deal with API was explicit in acknowledging that API did not own the software. At around the time of the agreement between API and Fleming, Fleming entered into a separate agreement with Mr. Berry to license the FCS at no charge. It defies common sense that Ueno can continue to connect an unrelated agreement between API and Fleming to the reasonable license fee that Fleming would pay for use of the FCS.[4]

21. Furthermore, as discussed in my initial expert report at footnote 12, even if Ueno is correct in assuming that the Fleming's forgiving API of its loan represents the license fee it would pay to Berry, his fee amount is still incorrect. API was in no position to pay off its debt, so the market value of the $1.295 million note was less than the face value. Also, in the Settlement and Release Agreement API released Fleming from certain obligations. The value of these obligations would also need to be deducted from the so called reasonable license fee.

**XI. Ueno Wrongfully Links License Period to Manugistics Conversion Date**

22. Ueno continues to claim that the (unsupported) $1.295 million license fee would have covered a period of approximately 3 months (October 9, 1999 through January 10, 2000). He assumes this because he states that Fleming planned to switch to a different logistics system by that time and that by January 1, 2000 Fleming had infringed the FCS due to its insertion of a Y2K fix. (Note that the argument about the Y2K fix in determining his license period did not appear in Ueno's original report.) This time period allows him to assume a per container fee of $1,772. (Ueno Declaration paragraphs 13 and 14.)

23. Ueno's analysis mischaracterizes the situation. Fleming had a zero-cost license to use the FCS. There is no evidence supporting Ueno's claim that Fleming Hawaii was going to use Manugistics in January of 2000. The very email cited by Ueno contradicts him—it specifically states that Hawaii would be excluded from the

---

[4] Again, as stated in my initial expert report at paragraph 23, Fleming had a free license to use the FCS.

**Expert Supplemental Report of Jeffrey H. Kinrich -- Wayne Berry v. Hawaiian Express Service, Inc.**

Manugistics roll-out.[5]

24. Furthermore, as of the time of the asset purchase and licensing of the FCS in October 1999, there is no evidence showing that Fleming knew about the Y2K problem with the FCS. Fleming could have paid Mr. Berry to make this modification for them. As discussed in my initial expert report at paragraphs 37-42, in an arms length transaction, Mr. Berry would have done this for far less the $1.295 million asserted by Ueno.

25. Ueno's own assumptions show the unreasonableness of his per container fee. Based on his assumption of 55 containers per week and $1,772 per container, Fleming would pay almost $100,000 per week to license the software. If this were even close to being true, Fleming would have bought or developed other software even if it cost "well in excess of $100,000," as Mr. Berry has interpreted Mr. Griffin's email.[6] Of course in reality, Fleming could have paid Mr. Berry to make the modifications. I quantified this cost in my initial expert report at paragraph 41. Also, Fleming Hawaii's cost of actually replacing the software with the non-infringing Excel spreadsheets was nowhere near $100,000.

## XII. Ueno Unfairly Criticizes My Supporting Sources as Unreliable

26. Ueno criticizes my use of Fleming Hawaii's P&L in calculating profits for the division. He claims that these management reports may have numerous errors and he further criticizes the fact that the documents are not audited. (Ueno Declaration paragraphs 15 and 16.)

27. Ueno's criticisms are unfounded. The documents relied upon in my report are ordinary course of business documents of the type that I commonly rely upon in doing my work. Ueno has not provided any examples of errors in these reports— he simply asserts that there might be errors.

28. Reports showing this level of detail are seldom audited, but they provide valuable

---

[5] J00256-7

[6] Hogan Declaration, Exhibit 4

**Expert Supplemental Report of Jeffrey H. Kinrich -- Wayne Berry v. Hawaiian Express Service, Inc.**

information. If damage analyses were limited to audited financial statements, no analyst would have access to departmental or detailed (but usually unaudited) reports. That is not the proper standard.

29. Furthermore, Ueno has no basis to criticize me for my reliance on an ordinary management report given that he chooses to rely on a more suspect document. The Freight Profit/Loss document cited by Ueno in his declaration suffers from the same deficiencies of the document that I relied on, but the document used by Ueno is even less reliable. In addition to possibly having errors and not being audited, this document appears to be an ad hoc report, making it more prone to errors than a more formal management report, and is for the wrong year.

**XIII. Ueno Mistakenly Asserts Accounting Irregularities Make Documents Unreliable**

30. Ueno further criticizes my use of Fleming Hawaii P&Ls because Fleming's management misstated the company's financial statement. (Ueno Declaration paragraphs 17 – 19.)

31. The document cited by Ueno in drawing this conclusion does not allege that any of Fleming's accounting irregularities occurred in 2003.[7] The reports I used in my initial expert report were generated in 2003. There is no credible evidence that leads me to believe that they are unreliable.

32. Furthermore, Fleming's management was accused of overstating profits. Therefore, to the extent that the documents I used do overstate Fleming Hawaii's profits as postulated by Ueno, the results stated in my initial expert report are conservative. Ueno has no basis to assert that the profits shown on Fleming Hawaii P&L's are understated.

---

[7] Hogan Declaration, Exhibit 10.

Highly Confidential -- Attorney's Eyes Only

ANALYSIS GROUP, INC. •   7

**Expert Supplemental Report of Jeffrey H. Kinrich -- Wayne Berry v. Hawaiian Express Service, Inc.**

### XIV. Ueno's Claim that My Report Differs from Supporting Source Proves Nothing

33. Ueno claims that Exhibit 5 to my initial expert report is not supported by the supporting financial documents and that the "Retail Service Expense of $122" is not on the documents I cited. Ueno claims that I overstated Fleming's loss by $500,000. (Ueno declaration paragraphs 20 – 22.)

34. Ueno apparently failed to read **Footnote b** to Exhibit 5 of my initial expert report. This footnote states, "Fleming's Hawaii division was divested in period 9. Accordingly, the financial statements did not include standard period ending line items. These items were imputed based on prior periods' data (PCT-B 000065)."[8] As stated in the exhibit, I adjusted the reported financials to more accurately portray Fleming's performance during the relevant time period. **Supplemental Exhibit 1** explains my adjustments in more detail and shows that the entire difference of $494,974 that Ueno supposedly uncovered in Attachment A of his Declaration is explained by adjustments disclosed in **Footnote b**. In addition, any disagreement about this adjustment is irrelevant, because the adjustment only affects periods after June 9, which is the last date of infringement according to the Court's ruling.

### XV. Ueno Unfairly Criticizes Unsubstantiated Expense Deductions

35. Ueno further criticizes me for not showing how certain costs were deducted to reach a loss. (Ueno Declaration paragraphs 23 – 25)

36. I did not fail to show any relevant calculations. I used the gross profit figures directly from the Fleming Hawaii management reports. Those summary documents generated by Fleming Hawaii do not show a breakout of Cost of Goods Sold. In my experience I find this to be a common practice for distribution companies such as Fleming; distribution companies often start reporting at the gross profit line because the costs below gross profit are the only costs they can control.

---

[8] The document PCT-B 000065 cited twice on Exhibit 5 as well as once on Exhibit 2 of my initial expert report

Expert Supplemental Report of Jeffrey H. Kinrich -- Wayne Berry v. Hawaiian Express Service, Inc.

control.

37. Ueno mischaracterizes my analysis. He makes it appear that I did not make certain necessary calculations in forming my opinion. In fact, I simply used the management reporting documents used by Fleming in its ordinary course of business. The accounting entries on these documents allowed me to adequately calculate Fleming Hawaii's profits over the relevant periods.

## XVI. Ueno's Claims that I Did Not Analyze Certain Periods Prove Nothing

38. Ueno states that I did not analyze all of 2003 or proceeding and succeeding years in doing my analysis. (Ueno Declaration paragraph 26.)

39. I am not sure what Ueno's point was in stating that I did not analyze certain periods. I only analyzed data and calculated damages for the period that was relevant to the case at the time I filed my report.[9] In his initial report, Ueno on the other hand presented several damages figures for time periods completely unrelated to the case.[10]

## XVII. Ueno Incorrectly Claims that My Period 4 Adjustment Was Not Explained

40. Ueno claims that I did not explain whether I applied the 9/28 adjustment for Period 4 to all sales and expenses. (Ueno Declaration paragraph 30.) This adjustment is necessary to account for the fact Fleming's infringement began in the middle of one of its reporting periods. Ueno is wrong.

41. As discussed above, Ueno apparently did not read the footnotes to Exhibit 5 of my initial expert report. **Footnote a** states, "For accounting purposes, Fleming uses a 13 month calendar (April 1, 2003 is the 10th day of Period 4.) The reported values were reduced by 9/28 to only include the portion of period 4 occurring after April 1st." Furthermore, as shown on **Supplemental Exhibit 2**, Ueno should have easily

---

[9] I understand that the period between June 9, 2003 and August 23, 2003 is no longer relevant because the Spreadsheet program has been found to be non-infringing.

[10] For example in Attachment A, Page 1 of his initial expert report, Ueno includes damages for the period January 10, 2000 through March 21, 2005.

**Expert Supplemental Report of Jeffrey H. Kinrich -- Wayne Berry v. Hawaiian Express Service, Inc.**

been able to determine that I did in fact apply the adjustment to all Period 4 sales and expenses.

Dated the 28th day of September 2005, at Los Angeles, CA.

*[signature]*
Jeffrey H. Kinrich

Attorney Work Product
Privileged & Confidential

## Supplemental Exhibit 1

### Detailed Description of Adjustments to Period Nine Financials

*Wayne Berry v. Hawaiian Express Services*

| | YTD Periods 1 - 8 | | Adjusted Period 9[c] | Per Declaration of Ueno[d] | Difference[e] |
|---|---|---|---|---|---|
| | Dollars[a] | % of Sales[b] | | | |
| Net Sales | $185,682,231 | 100.00% | $9,604,397 | | |
| Customer Service Product Proc. | ($1,085,385) | -0.58% | ($56,141) | ($56,142) | $1 |
| Building Expense | ($3,759,157) | -2.02% | ($194,442) | ($194,442) | ($0) |
| SG&A | | | | | |
| Gen Admin Exp | ($881,848) | -0.47% | ($45,614) | ($45,614) | $0 |
| IT Exp | ($91,124) | -0.05% | ($4,713) | ($4,713) | ($0) |
| Selling Exp | | | | | |
| Additional Compensation | | | | | |
| Retail Service Expense | ($2,360) | 0.00% | ($122) | ($122) | ($0) |
| Credit Losses | ($120,000) | -0.06% | ($6,207) | ($6,207) | $0 |
| Other Expense | ($4,963) | 0.00% | ($257) | ($256) | ($1) |
| Total SG&A | ($1,100,295) | | ($56,913) | ($56,912) | ($1) |
| Interest Income | $150,842 | 0.08% | $7,802 | $7,803 | ($1) |
| Working Cap Charge | ($2,425,787) | -1.31% | ($125,474) | ($125,474) | $0 |
| Overhead Burden Charge | ($1,349,557) | -0.73% | ($69,806) | ($69,806) | $0 |
| Total Adjustments to Earnings Before Taxes | | | ($494,974) | ($494,974) | ($0) |

Notes and Sources:
a. Period 8 year-to-date financials from PCT-B 000065
b. Period 8 year-to-date financials as a Percentage of Net Sales
c. Values for Period 9 were imputed by applying Period 8 year-to-date percentages of net sales to Period 9 net sales (per footnote [b] to Exhibit 5 from Expert Report of Kinrich, 6/16/05)
d. Difference between Fleming Hawaii financials (PCT-B 000319, -255, -193, -128, -065, -064, and -005) and Kinrich Exhibits per Ueno ("Differences" column of Attachment A to Declaration of Ueno)
e. = [c] - [d]

ANALYSIS GROUP, INC.

*Attorney Work Product*
*Privileged & Confidential*

## Supplemental Exhibit 2

### Reconciliation of Kinrich and Ueno Earnings Before Taxes
#### Periods Four through Six
*Wayne Berry v. Hawaiian Express Services*

|     |                                                                            | Period 4    | Period 5    | Period 6    | Total<br>4/1/2003 - 6/8/2003 |
|-----|----------------------------------------------------------------------------|-------------|-------------|-------------|------------------------------|
| [A] | Ueno Earnings Before Taxes                                                 | ($67,018)   | ($399,969)  | ($502,079)  | ($969,066)                   |
| [B] | Ueno Adjusted Earnings                                                     | ($67,018)   | ($399,969)  | ($394,491)  | ($861,478)                   |
| [C] | Kinrich Earnings Before Taxes                                              |             |             |             | ($861,478)                   |
| [D] | Difference between Kinrich Exhibit 5 &<br>Ueno Attachment A-1 (4/1/2003 - 6/8/2003) |             |             |             | $0                           |

Notes and Sources:
[A] From Declaration of Ueno, Attachment A-1
[B] Period 6 earnings are multiplied by (22/28). 22 days of Period 6 fall before 6/8/2003
[C] From Exhibit 5 of Expert Report of Kinrich, 6/16/05
[D] = [B] - [C]

ANALYSIS GROUP, INC.