# EXHIBIT A

**Expert Report of Jeffrey H. Kinrich  --  Wayne Berry v. Hawaiian Express Service, Inc.**

## I. Introduction

1.  This report contains my opinions in the matter of *Wayne Berry v. Hawaiian Express Service, Inc.* pending in the United States District Court for the District of Hawaii, Case No. 03-00385 SOM-LEK.

## II. Assignment

2.  I have been engaged by the Fleming Post-Confirmation Trust ("Fleming")[1] to opine on the reasonableness of the damage analysis conducted by Thomas Ueno in his Expert Report dated March 21, 2005. Specifically, I have been asked to determine whether the figures set forth in Ueno's report accurately measure the damages suffered by Wayne Berry ("Berry") stemming from Fleming's alleged copyright infringement of Berry's Freight Control System software ("FCS") and other allegations raised in Berry's Second Amended Verified Complaint.

3.  To the extent that I find that Ueno's analysis does not accurately characterize the damages suffered by Berry, Fleming has also asked me to opine on Berry's damages.

4.  Although I understand the matter to be contested, my analysis assumes that Fleming is found liable under the claims in this matter.

## III. Qualifications

5.  I am a Managing Principal at the economic, financial, and strategy consulting firm Analysis Group, Inc. Analysis Group employs approximately 300 professionals in the areas of economic, finance, and strategy. I graduated summa cum laude from Pomona College in 1976 with a Bachelor of Arts degree in Mathematics. I received a Master of Science degree in Statistics from Stanford University in 1977, and a Master of Business Administration in Finance and Quantitative Methods from the University of Maryland in 1980, where I graduated first in my class. I am a Certified Public Accountant and have more than 20 years of experience analyzing damages in commercial disputes, with a

---

[1] In this report, I use the term "Fleming" to refer to both the Post-Confirmation Trust and Fleming Companies, Inc.

**Highly Confidential – Attorney's Eyes Only**

---

**Expert Report of Jeffrey H. Kinrich -- Wayne Berry v. Hawaiian Express Service, Inc.**

---

particular focus on intellectual property including copyright infringement. Analysis Group is compensated at the rate of $485 per hour for my time. Hourly rates for other staff range from $150 to $360 per hour. A resume detailing my experience, testimony within the past four years, and publications within the past ten years is attached to this report as **Exhibit 1.**

## IV. Documents Relied Upon

6.  This report incorporates information from documents provided to me in this case including financial data from Fleming's Hawaii division, agreements between Fleming and Wayne Berry, agreements between Y. Hata and Wayne Berry, the Expert Report of Thomas Ueno and various other documents. A complete list of the documents and data sources that I relied upon is attached as **Exhibit 2.** If additional documents or information become available, I reserve the right to update my analysis.

## V. Background

7.  Fleming was a food wholesaler with a division in Hawaii ("Fleming Hawaii"). Fleming arranged for products to be brought into Hawaii from the mainland and then shipped to its customers' stores throughout Hawaii.

8.  In 1999, Fleming purchased assets from Atlantic Pacific International, Inc. ("API"). Prior to the purchase, API had helped Fleming in transporting product from the mainland to Hawaii. API was charged with determining if it could coordinate transport for a price lower than that being offered by the vendor. If API were successful, Fleming and API would share the cost savings. After the purchase, Fleming brought this function in-house. Around the time Fleming purchased API's assets, Fleming received a free license from Wayne Berry to use the FCS.[2] As I understand it, the FCS was used to keep track of Fleming's shipments from the mainland.

---

[2] Memorandum from Ralph Stussi to Wayne Berry, re: License agreement for freight control system, 11/24/99 (A00449 - A00450); Deposition of Wayne Berry, 7/1/2004, pg. 81; End-User License Agreement - License for Freight Control System Software (HF00252 - HF00254)

**Highly Confidential – Attorney's Eyes Only**

9.    Between 1999 and 2003, Fleming modified certain portions of the FCS to meet its
      business needs.  In March 2003, a jury found that Fleming had made certain
      unauthorized changes to the FCS.

10.   On April 1, 2003, Fleming filed for Chapter 11 bankruptcy protection.  By that time,
      Fleming had switched to a version of the FCS that attempted to duplicate the original
      version for which it had a license.[3]  Berry claims that since this version of the FCS is not
      exactly identical to the licensed version, its use by Fleming infringes on his copyright.

11.   On or about June 9, 2003, Fleming ceased using the FCS and switched to an internally
      developed set of Excel spreadsheets ("Spreadsheets").  Berry claims that the
      Spreadsheets also infringe his copyright.

12.   On August 23, 2003, Fleming sold its Hawaii Division to C&S Wholesale Grocers, Inc.
      ("C&S").  It is my understanding that C&S still uses the allegedly infringing
      Spreadsheets.

## VI. Summary of Opinions

13.   Ueno bases his calculation of damages, as measured by the "value of the assets that
      Fleming gave for the use of the freight control system,"[4] on flawed assumptions that
      greatly overstate damages.  Both the numerator and denominator used by Ueno in
      calculating his "reasonable license" fee of $1,772 per container processed contain factual
      errors.  Berry's own licensing agreements for his more updated software show how
      unreasonable Ueno's calculations are.  Finally, even if Ueno has the facts straight, his
      measure of actual damages measures the wrong infringement—he bases this damage
      calculation on the purported value of the entire FCS rather than only on the infringing
      elements of the FCS.

---

[3] I am informed that Fleming no longer possessed an unaltered version of the FCS and needed to "recreate" the
original version.

[4] Ueno Attachment A, Page 4

**Expert Report of Jeffrey H. Kinrich — Wayne Berry v. Hawaiian Express Service, Inc.**

14. Ueno's calculation of damages, as measured by the "estimated profits that Fleming realized by its continued unauthorized use of Berry's freight control system,"[5] contains numerous flaws and greatly overstates damages. First, Ueno estimates Fleming Hawaii's profits rather than using the actual Fleming financial data that was made available to him. Second, Ueno only measures gross profits rather than net profits. Finally, in computing Fleming Hawaii's profits attributable to the infringement, Ueno incorrectly assumes that all of Fleming's profits are due to the FCS—he does not apportion Fleming's profits related to the infringement.

15. The profits of Fleming Hawaii are not attributable to the FCS, or even to the operations of the logistics department. The logistics department is an expense, not a profit center. The FCS does not contribute to Fleming's profits; the value added from the logistics department is generated by the know-how of its employees. At most, the use of the FCS enabled Fleming to benefit from its savings over the cost of implementing an alternative system.

16. Wayne Berry suffered actual damages of no more than $16,800 due to Fleming's alleged unauthorized modifications to the FCS. The same amount is an estimate of Fleming's cost savings benefit from using the FCS.

17. Fleming Hawaii suffered losses between April 1, 2003 and August 23, 2003. Therefore, Fleming has no profits to disgorge under a disgorgement of profits theory of damages.

18. Fleming did not sell the FCS. Even if Fleming were profitable, the use of the FCS software did not contribute to Fleming's profits beyond the cost savings Fleming enjoyed from avoiding the cost of paying for modifications or installing an alternative system.

---

[5] Ibid.

---

**Expert Report of Jeffrey H. Kinrich -- Wayne Berry v. Hawaiian Express Service, Inc.**

---

## VII. Damages Overview

19.    Damages for copyright infringement include: "actual damages suffered by [the copyright owner] as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."[6]

## VIII. Critique of Ueno Report

20.    In his expert report, Ueno purports to use two methods to calculate a reasonable license fee. Both methods contain conceptual and factual errors that cause Ueno to grossly overestimate the damages suffered by Berry.

### A. Ueno's Claimed "Fleming Acknowledged Fee"

21.    In his report, Ueno states that, "my analysis of API's records for 1999 shows that Fleming determined that the license fee for the use of Berry's Freight Control System was about $1,772 per container processed."[7] Ueno cites no evidence showing that Fleming determined any such license fee.[8] In fact, Ueno derives this fee by himself by making unsubstantiated assumptions and conceptual errors, and by misinterpreting documents.

22.    Ueno estimates the license fee of $1,772 per container by dividing $1,295,000 by 731. Ueno claims that the numerator ($1,295,000) is the amount that Fleming paid to API in order to use the FCS. Ueno alleges that the denominator (731) is the number of containers processed by Fleming between the date the free FCS license was obtained (October 9, 1999) and the date he claims Fleming intended to cease use of FCS (January 10, 2000).[9] Both numbers used in Ueno's calculation are inappropriate.

---

[6] 17 U.S.C. § 504(b).

[7] Ueno Attachment A, Page 4

[8] As will be discussed below, documents cited by Ueno in his report and testimony given by Berry show that the only thing Fleming "acknowledged" was that it would pay nothing to license the software.

[9] Further, as discussed below, Fleming already had a license to use the FCS, so any measure of the appropriate license fee for the FCS is irrelevant.

---

23.  Ueno claims that "the additional consideration of $1.3 million was for use of Berry's Freight Control System."[10] Ueno points to a "Settlement and Release Agreement" as evidence of this consideration.[11] I have examined the document cited by Ueno and find no evidence to support his conclusion. The $1.3 million was a claim that Fleming had against API for API's failure to pay shipping companies on Fleming's behalf. As part of Fleming's purchase of API's assets, this claim against API was forgiven.[12] The document makes no mention of the FCS. In fact, other documents cited by Ueno contradict his conclusion. Berry's alleged license agreement and a follow-up letter from Fleming to Berry, both signed by Berry at approximately the same time as the API transaction, indicate that Fleming's purchase of API's assets did not include the acquisition of the FCS, and that Fleming was to receive a license for the FCS from Berry at no charge.[13] Furthermore, in his deposition, Berry states, "I don't remember receiving any money from this [the licensing of the FCS to Fleming]."[14] On the one hand, Ueno makes an unsubstantiated claim that Fleming purchased the FCS for $1.3 million; on the other hand, Ueno fails to acknowledge the fact that Fleming licensed the FCS for free. The record is clear that Fleming did not intend to pay anything (and in fact did not pay anything), let alone $1.3 million, for ownership or use of the FCS.[15] Ueno's determination that Fleming paid $1.3 million for the FCS is completely erroneous and without foundation.

---

[10] Ueno Attachment A, Page 5.

[11] Ibid, Settlement and Release Agreement.

[12] It is my understanding that had Fleming not purchased API's assets, API would have had difficulties in repaying the claimed $1.3 million note due to its tenuous financial situation. This means that even if the transaction described by Ueno did measure the consideration Fleming paid to API for the FCS, the fair market note would be far less than its $1.3 million face value. Even if Fleming had tried to recover this amount from value of API, API had insufficient assets to pay it: "You can't get blood from a stone." Further, I understand that, at least according to Berry, API had significant offsetting claims against Fleming. See Settlement and Release Agreement.

[13] Memorandum from Ralph Stussi to Wayne Berry, re: License agreement for freight control system, 11/24/99 (A00449 - A00450); End-User License Agreement - License for Freight Control System Software (HF00252 - HF00254).

[14] Deposition of Wayne Berry, July 1, 2004, p. 82.

[15] In fact, as discussed above, Fleming did not pay $1.3 million for anything at all. All it did was give up a claim for $1.3 million in unpaid freight charges from someone who didn't have the ability to pay it anyway.

---

**Expert Report of Jeffrey H. Kinrich — Wayne Berry v. Hawaiian Express Service, Inc.**

---

24.    Ueno claims that the number of containers processed between October 9, 1999 and January 10, 2000 is relevant because Fleming was planning on phasing out its use of the FCS by January 10, 2000. This is an aggressive assumption not supported by the facts. Ueno states, "Fleming selected Manugistics Group's retail solution in August 23, 1999 apparently to replace its dependence on Berry's freight control system. The Hawaii Division was excluded from the January 10, 2000 implementation."[16] These two sentences directly contradict each other. Ueno claims that Manugistics was chosen to replace the FCS, yet Hawaii, the only part of Fleming that used the FCS, was not included. Besides not making logical sense, Ueno's contention is not supported by the facts. As of November 1999, Fleming did not even know if Manugistics was "capable of handling the ocean logistics we [Fleming] require."[17] Ueno continues, "I assumed that Fleming's continuing copyright infringement would encourage its management to convert its Hawaii Division earlier or very soon thereafter."[18] Ueno's use of a footnote seems to indicate that Fleming acknowledged its copyright infringement. However the document cited by Ueno clearly shows that Fleming had a free license to use the software, was not infringing, and therefore did not have any incentive to use an alternative solution.[19] The facts of the case bear this out. Until June 9, 2003, Fleming continued to use the FCS, albeit in a modified form.[20] [21]

---

[16] Ueno Attachment A, Page 3.

[17] J00257

[18] Ueno Attachment A, Page 3.

[19] Memorandum from Ralph Stussi to Wayne Berry, re: License agreement for freight control system, 11/24/99 (A00449 - A00450). While Fleming may have preferred to use a single software system to simplify its overall business management, and thus may have eventually migrated to Manugistics or some other system, there was nothing about its use of the FCS system itself that would encourage Fleming to accelerate the conversion.

[20] Extending the period used in Ueno's analysis would greatly diminish his license fee. For example, if one assumed that Fleming planned on using the FCS through June 9, 2003 and that the weekly containers processed remained constant at 55, then Ueno's calculated license fee per container would shrink from $1,772 to $123—a reduction of more than 93%. Increasing the number of containers processed per week would further reduce Ueno's calculated license fee per container. Of course neither of these numbers represents any sort of license fee per container that Fleming would have paid to Berry. Fleming had a free license to use the FCS.

[21] After the March 6, 2003 jury verdict, Fleming attempted to revert to the licensed version of the FCS. Fleming used this version of the FCS until approximately June 9, 2003.

---

---

**Expert Report of Jeffrey H. Kinrich — Wayne Berry v. Hawaiian Express Service, Inc.**

---

25.    Besides the erroneous inputs, the metric employed by Ueno that uses these inputs is fundamentally flawed. Contrary to Ueno's calculation, there is no evidence that users pay for software like the FCS on a per container basis. Based on my discussions with Fleming's logistics expert Brad Dechter, logistics software is generally purchased on either a flat fee or per user fee; it is not normal practice to charge customers on a "per container processed" basis. In support of this point, Berry himself licensed a new and improved version of his FCS to Y. Hata for what amounts to a fixed fee of $150,000 plus $15,000 per year in software maintenance.[22] Thus Ueno's license fee per container calculation does not represent a measure of Berry's "actual loss," the remedy allowed under the copyright infringement statute.

26.    Even if Ueno's metric could be used to calculate damages, he has not measured the proper license fee per container. Ueno calculates his license fee based on his purported determination of the entire FCS's value. To properly measure Berry's actual loss, Ueno should base the license fee on the allegedly infringing portion of the software (i.e. the unauthorized modifications). The value of the unauthorized modifications is far less than the value of the FCS as a whole.

27.    All of the errors above cause Ueno to calculate huge damages that are not grounded in reality. Depending on the time period he uses,[23] damages range between $2 million and $302 million. Given that Berry licensed a superior version of the FCS to Y. Hata for $150,000, even if Fleming did not possess a free license to use the software, which it did, Fleming would not have licensed the FCS for anything near the amounts calculated by Ueno. Due to the numerous factual and conceptual flaws in his analysis, the damages calculated by Ueno in the "Fleming Acknowledged Fee" section of his report cannot be relied upon.

---

[22] Letter from Wayne Berry to Brian Marting, re: Agreements, 4/14/05.

[23] One of the periods Ueno includes is October 9, 1999 through March 21, 2005. I understand that any damages prior to April 1, 2003 are irrelevant to these proceedings.

### B. Net Sales and Gross Profits

28.    In this section of his report, Ueno purports to determine Fleming Hawaii's profits.  Ueno estimates that between April 1, 2003 and August 23, 2003, Fleming Hawaii earned profits between $8.8 million and $20.7 million.[24]  As discussed in Section VII of this report, disgorgement may be an allowable damages remedy for copyright infringement.  However Ueno's analysis is both conceptually and factually flawed.

29.    Ueno claims that since he has "not been provided with sales data for either Fleming or C&S," he relies in part on pro forma C&S financial data for the year ending August 16, 2004 to calculate his profits.[25]  (I note that after his report was filed, Ueno was in fact provided with actual financial information for Fleming Hawaii between April 1, 2003 and August 23, 2003.[26]  I am informed that Ueno refused to review the information and returned it unopened to Fleming's counsel.)  By using the pro forma data from C&S and additional data from RMA,[27] Ueno estimates Fleming Hawaii's profits between April 1, 2003 and August 23, 2003.  Ueno's analysis relies on estimated data that falsely show profits during a period in which Fleming Hawaii actually suffered losses.[28]

30.    Besides using the wrong data in calculating Fleming Hawaii's profits, Ueno further errs by calculating the wrong profits.  Ueno's numbers purport to represent Fleming Hawaii's gross margin.  Gross margin is typically defined to be revenue less cost of goods sold.  By only calculating gross profits, Ueno has ignored operating and other expenses.  It is my understanding that in disgorging profits, all costs of the business must be taken into

---

[24] He estimates that C&S earned profits ranging between $36 and $85 million in the period August 23, 2004 through March 21, 2005.  He also presents an "NPV 10 Years, 21%" gross margin for C&S that ranges between $96 and $226 million.  This purports to discount C&S's future profits.  This NPV analysis is particularly irrelevant and misleading because if Plaintiff is successful, C&S will be enjoined from using any of Berry's software (or, if not enjoined, would certainly cease using it to avoid further infringement) and its future profits will necessarily be unrelated to the FCS.

[25] Ueno Attachment A, Page 7

[26] PCT-B 1-376 contain this information.

[27] RMA compiles industry average financial data that are often useful in the absence of actual data.  In this case where actual data are available, the use of RMA information is inappropriate.

[28] Fleming Hawaii's losses during the post-petition period will be discussed below.

account.[29]  By ignoring these additional expenses, Ueno has greatly overstated his own estimate of Fleming Hawaii's profits.[30]

31.     In addition to using the wrong data and the wrong profits, Ueno incorrectly associates all of Fleming Hawaii's purported profits to the copyright infringement.  While the allocation of profits related to the infringement is the responsibility of the defendant, Ueno must acknowledge that less than 100% of Fleming Hawaii's profits should be attributable to the copyright infringement.  In this case the infringement only relates to the unauthorized modification of the FCS and not the entire FCS itself.  Therefore any apportionment of Fleming's profits due to the unauthorized modifications would be de minimis.[31]

32.     Due to the his use of the wrong data, the wrong measure of profits and his failure to properly allocate the profits to the infringing behavior, the damages calculated by Ueno in the "Net Sales and Gross Profits" section of his report cannot be relied upon.

**C.  Cost Savings**

33.     In this section of his report, Ueno presents what he claims to be the "savings realized by Fleming from January 10, 2000 until the date of this report and an estimate of continued use for the next 10 years."[32]  Ueno did not do much, if any, independent analysis in

---

[29] On Attachment A, Page 7, Ueno even states, "Profits are often defined to be revenues minus costs." Ueno never explains why he then only subtracts a portion of costs rather than all costs in arriving at his estimate of profits.

[30] Exhibit 1 of Ueno's report shows that under his own methodology, Fleming Hawaii's operating profit is only .67% to 1.6% which is far lower than the 7.21% to 17% gross profit margins that he uses to calculate his damages.  Using the operating margins found in his report would reduce Fleming Hawaii's estimated profits to below $2 million for the period April 1, 2003 through August 23, 2003 period.  Of course, as will be discussed later, Fleming Hawaii actually lost money during this time period and Fleming Hawaii's overall profitability is irrelevant to damages related to infringement.

[31] Even if one considered the software as a whole to be infringing, the profits attributable to the software would also be de minimis.  Any profits (likely in the form of cost savings) attributable to the logistics department are earned through the employees' abilities to move product from the mainland to Hawaii for less than the vendors offer.  The FCS software does not help the logistics team find these deals —it is merely a receptacle that keeps track of information once the deals have been found.  The software is only tangential to Fleming's ability to cut costs in bringing product into Hawaii.  Therefore, none of the cost savings generated by the logistics department are due to the FCS even if Fleming Hawaii did have profits to disgorge.  The only element of cost savings related to the use of the FCS system is the cost Fleming avoided by not having to purchase or contract for a replacement system.

[32] Ueno Attachment A, Page 10.  Ueno's inclusion of cost savings for the period prior to April 1, 2003 and "Future -10 years" are irrelevant for reasons discussed above. See footnotes 23 and 24.

**Expert Report of Jeffrey H. Kinrich — Wayne Berry v. Hawaiian Express Service, Inc.**

preparing this portion of his report; he by and large repeats information from "Mr. Berry's Damage Model."[33] The data used in this model are from the period between 1995 and 1999. During this time API, not Fleming, was using the FCS. Ueno should base his analysis on the cost savings of Fleming and C&S for the period April 1, 2003 to the present; he does not.

34.    Additionally, Ueno assumes that cost savings are generated by Berry's software. But as discussed above, the FCS is not responsible for the value added by Fleming's logistics function—its employees are.

35.    Finally, Ueno incorrectly associates all of Fleming Hawaii's cost savings with the alleged copyright infringement. Ueno's report and supporting documentation do not indicate that he has done any of the analysis that would be necessary to determine what portion if any of the logistics department's cost savings is attributable to the software. I am informed that any freight cost savings generated by the logistics department is not attributable to the FCS system. Rather, I understand that, at best, the FCS system saves clerical costs in tracking transactions.

36.    Due to the his reliance on data from a different company for the wrong time period and his failure to properly allocate the cost savings to the infringing behavior, the damages calculated by Ueno in the "Cost Savings" section of his report cannot be relied upon. A better estimate of the cost savings enjoyed by Fleming due to its allegedly unauthorized use of the FCS is discussed below.

**IX. Actual Damages Suffered By Berry**

37.    Because Ueno's damages cannot be relied on, I have been asked to opine as to whether Berry was damaged by its actions and if so, to quantify the damages.

38.    When Fleming purchased API's assets, it entered into a license agreement with Berry for use of the FCS. Fleming allegedly violated Berry's copyright by modifying the FCS.

---

[33] Ueno Attachment A, Page 9.

---

**Expert Report of Jeffrey H. Kinrich -- Wayne Berry v. Hawaiian Express Service, Inc.**

---

Assuming Berry's contentions are correct, he suffered damage by being deprived of the opportunity to modify the software himself. Damages can therefore be calculated as the time it would have taken Berry to modify the FCS times his hourly rate. This lost compensation is a measure of the actual damages suffered by Berry due to Fleming's copyright infringement.

39. **Exhibit 3** shows the modifications made by Fleming to the FCS as well as the amount of effort required to make each change. As shown on the exhibit, Fleming employees spent between 136 and 168 hours modifying the FCS to meet Fleming's business needs.

40. In Berry's dealings with Y. Hata, he states that he charges $100 per-hour for his consulting services.[34] Berry implies that this rate blends his two functions as a programmer and a freight consultant. According to Berry, the rate for a computer programmer is only $75 per-hour. A billing rate of $100 per-hour for Berry to modify the FCS is reasonable based on Berry's own statements.

41. On **Exhibit 4**, I show that the cost Fleming should have paid Berry to modify the FCS ranges between $13,600 and $16,800. This range is conservative because during the period between April 1, 2003 and June 9, 2003, Fleming used a version of FCS that attempted to emulate Berry's original version; many of the allegedly infringing modifications had been removed. The numbers shown in **Exhibit 4** assume that Berry was damaged by all the unauthorized changes and not only the unauthorized changes remaining after April 1, 2003.

42. There are no incremental actual damages suffered by Berry caused by Fleming's transition to the Spreadsheets. It is my understanding that the Spreadsheets are functionally inferior to Berry's FCS and was developed by Fleming for the sole purpose of eliminating its reliance on the FCS. Fleming would not have paid Berry to make the Spreadsheets if it could have simply paid Berry to alter the FCS.

---

[34] Letter from Wayne Berry to Brian Marting, re: Freight Control System, 6/6/02

Highly Confidential -- Attorney's Eyes Only

---

**Expert Report of Jeffrey H. Kinrich — Wayne Berry v. Hawaiian Express Service, Inc.**

---

## X. Disgorgement of Profits

43.  **Exhibit 5** shows Fleming Hawaii's financial performance between April 1, 2003 and August 23, 2003. During the period from April 1, 2003 to June 8, 2003, Fleming Hawaii had revenue of $54 million but lost approximately $861 thousand dollars. During the period from June 9, 2003 to August 23, 2003, Fleming Hawaii lost an additional $343 thousand while generating revenue of almost $53.5 million. (This result is not surprising; recall that Fleming was in bankruptcy.)

44.  Fleming Hawaii did not achieve profits. However, even if there were profits to disgorge, the profits would have to be apportioned among the contributing factors. Berry would only be entitled to the share of profits that are attributable to Fleming's modification of the FCS. As I discussed above, the FCS is not a profit generating part of Fleming Hawaii or its logistics department. It is a receptacle of data used by the staff. The profits (or cost savings) attributable to logistics are due to the know-how of the staff and not to the FCS. Fleming's only "profit" is the cost it avoided by not paying Berry to modify the system. This amount has already been captured in the estimate of actual damages above. It should not be double counted here.

Dated the ___16th___ day of June 2005, at Los Angeles, CA.

*[signature]*

Jeffrey H. Kinrich

---

**Exhibit 1**

**JEFFREY H. KINRICH**
**Managing Principal**

Phone: (213) 896-4544                                        601 South Figueroa Street
Fax: (213) 623-4112                                                            Suite 1300
jkinrich@analysisgroup.com                                 Los Angeles, CA 90017

Jeff Kinrich has over two decades of litigation consulting experience with business clients and individuals on engagements involving applications of financial and economic analysis, accounting, business valuation, statistics, and computer systems. He specializes in damage quantification and valuation in the areas of commercial litigation and intellectual property, and is a frequent writer and speaker on these subjects.    Mr. Kinrich has testified frequently on damages, valuation, and accounting issues in numerous state and federal courts. He is a Certified Public Accountant in the State of California, and holds an Accreditation in Business Valuation.

Mr. Kinrich holds an MBA in Finance and Quantitative Methods from the University of Maryland, an M.S. in Statistics from Stanford University and a B.A. in Mathematics from Pomona College. Prior to joining Analysis Group, Inc., he spent 20 years with PricewaterhouseCoopers LLP.

**EDUCATION**

1980          MBA, Finance and Quantitative Methods, University of Maryland, with honors, first in class, 1980.

1977          M.S., Statistics, Stanford University.

1976          B.A., Mathematics, *summa cum laude*, Pomona College, first in class, 1976.

**PROFESSIONAL EXPERIENCE**

2001-Present    Analysis Group, Managing Principal

1981–2001       PricewaterhouseCoopers LLP, Partner, Financial Advisory Services

1978-1980       BDM Corporation; Statistical Analyst

1977-1978       Lawrence Livermore Laboratory; Statistician

*Jeff Kinrich, page* 2

## AWARDS

Elijah Watts Sells Silver Medal for second highest score in the U.S. on CPA Examination

Forbes Gold Medal for the highest CPA examination score in California.

## PROFESSIONAL AND BUSINESS AFFILIATIONS

Certified Public Accountant

Member of the American Institute of Certified Public Accountants and the California Society of Certified Public Accountants

Accredited Business Valuator

California Society of CPAs Litigation Sections, Steering Committee

American Institute of CPAs, Forensic and Litigation Services Committee

Licensing Executives Society

Phi Beta Kappa

Board of Directors and Treasurer, Bet Tzedek Legal Services

## SELECTED EXPERIENCE

### *Intellectual Property*

- Analyzed patent infringement damages under both lost profits and reasonable royalty approaches for a wide variety of patents. Industries include medical products, cable television, aircraft engine housings, telephone equipment, toys, semiconductors, computer printer cartridges, disposable diapers, automobile components and accessories, cigarette lighters, photographic equipment, oil tools, satellite antenna feeds, water coolers, athletic shoes, contact lenses, sprinkler systems, computer disks, magnetic insoles, robotic surgery devices, compact disk cases, superconducting amplifiers, food products, and many others.

- Measured patent damages for business method patents, including insurance processing systems, space orbital trajectories, encryption algorithms, and farming methods.

- Negotiated a reasonable royalty in settlement of a patent dispute.

- Measured damages from various trademark and copyright infringement matters, including software and entertainment properties. Valued trademarks and copyrights. Apportioned profits between infringing and non-infringing elements.

- Computed damages for trade secrets and non-compete agreements. Issues involved theft of customer lists, business plans, and manufacturing methods and technologies.

**Highly Confidential -- Attorney's Eyes Only**                         ANALYSIS GROUP, INC. ▪

### Technology/Computers

- Conducted numerous damage studies relating to high tech intellectual property, including semiconductors, space systems, computers, printers, medical products, search engine design, and others. Computed both lost profits and reasonable royalties.

- Measured damages in connection with several Internet issues, including cybersquatting and misuse of website names.

- Computed lost profits and disgorgement from sale of counterfeit software.

- Testified as to the value of a software VAR agreement.

- Conducted international transfer pricing analysis for computer manufacturer.

- Determined damages from breach of a software/firmware development agreement.

### Commercial Damages

- Evaluated lost profits damages for hundreds of commercial litigation engagements, including breach of contract and business tort matters. Matters involved dozens of different industries.

- Evaluated impact of mergers on value of combined firms; computed damages resulting from failed or improperly implemented mergers

- Measured losses due to business interruption.

- Determined damages from breach of distribution and franchising agreements.

- Computed commissions owed to sales force

- Valued assets and evaluated accounting issues in connection with merger and purchase price disputes.

- Conducted several alter ego studies. Searched for commingling of funds, violation of corporate formalities, and other improper transactions between the company and shareholder/parent.

- Analyzed and testified about accounting issues, records, and related matters.

- Provided technical consulting on many applications of statistics to litigation, including statistical sampling, regression analysis, time series, probability theory, and survey design.

- Prepared analyses of loss of individual earnings in connection with wrongful termination, employment, and personal injury claims.

- Served as an arbitrator or court-appointed special master in several commercial disputes.

### Entertainment

- Determined royalties owed entertainers and managers.

- Computed damages for copyright and breach of contract issues relating to infomercial sales.

- Measured actual losses and disgorgement of profits from copyright infringement related to scripts and story ideas.

- Assisted numerous entertainment executives and performers in valuing personal, professional and entertainment assets.

**Highly Confidential -- Attorney's Eyes Only**                    ANALYSIS GROUP, INC. •

*Jeff Kinrich, page* 4

- Computed lost profits from a breach of an agreement to lease movie projection equipment.
- Valued the overseas rights to a catalog of films.
- Estimated damages relating to failure to execute a film financing guarantee.
- Analyzed cost savings and antitrust issues resulting from selling box-lot quantities of recorded music at a discounted price.
- Evaluated the likely impact of a new video distribution technology.
- Measured value of broadcast and publicity rights.
- Computed damages related to breach of radio advertising sales contract.

*Telecommunications*

- Conducted a lost profits study for a major telecommunications antitrust suit.
- Measured damages in connection with various telecommunications patents and trade secrets.
- Testified as to damages from alleged below cost pricing of telecommunications services.
- Critiqued plaintiff's claim in an offshore telecom litigation.
- Worked for a cellular telephone service provider defending against breach of contract claims from a former agent.
- Testified concerning the value of stock in two privately held communications companies in conjunction with a purchase price dispute.
- Analyzed claim of predatory pricing in the cellular industry.
- Acted as arbitrator in telecommunications contract dispute.

*Automobile Industry*

- Conducted various damage analyses involving automobile dealership disputes, including dealer terminations, dealer relocations, and failure to award a dealership. Analyzed deal financial records and other economic information to quantify the value of automobile dealerships.
- Conducted transfer pricing study for automobile importer.
- Investigated alternative causes for failure of auto dealerships. Searched for diverted funds.
- Acted as a neutral arbitrator in dispute between manufacturer and insurer over extended warranty payments.
- Assisted manufacturer in investigating fraud and diversion of funds in connection with a collection dispute.
- Analyzed accounting issues in connection with the sale of a dealer network.

**Highly Confidential — Attorney's Eyes Only**                    ANALYSIS GROUP, INC. •

*Jeff Kinrich, page 5*

**Business Valuation**

- Valued numerous businesses in connection with commercial or personal disputes.
- Valued intangibles, including patents, trademarks, copyrights, trade secrets and business protocols.

**Construction/Environmental**

- Evaluated statistical methods for invasive testing of construction defects.
- Opined about appropriate expenditures by homeowner's associations in connection with maintenance and capital expenditures.
- Testified for a construction contractor as to the amount due in a breach of contract dispute, as well as opining on alter ego issues.
- Measured the diminution in value and lost rents due to a construction delay claim resulting from environmental contamination.

**Tax Disputes**

- Conducted transfer pricing studies for automobile importer, semiconductor manufacturer, computer maker, and consumer electronics manufacturer.
- Designed sampling methodology to evaluate customs duty drawback claims.
- Measured damages from improper conversion from an S-Corp. to a C-Corp.

**Family Law**

- Conducted valuations of numerous private businesses.
- Performed analyses of lifestyle and cash available for support.
- Valued professional practices, including law firms and accounting firms.
- Determined community portion of earnings and assets under various circumstances. Apportioned and valued stock options and profit participations.
- Traced and valued separate vs. community property. Conducted Periera-Van Kamp analyses of pre-marital property.

**Highly Confidential -- Attorney's Eyes Only**

ANALYSIS GROUP, INC. ·

*Jeff Kinrich, page 6*

## PUBLICATIONS

"Engagement Letters for Litigation Services: Business Valuation and Forensic & Litigation Services Practice Aid 04-1," (co-author), *American Institute of Certified Public Accountants*, 2004.

"Trademark Misuse," *Litigation Support Report Writing: Accounting, Finance, and Economic Issues*, Friedman and Weil, eds., John Wiley & Sons, 2003.

"Analysis and Measurement of Damages in Patent Infringement Actions," Patent Litigation 2001, (co-author), Practising Law Institute, 2001.

"Cost Estimation," *Litigation Services Handbook: The Role of the Accountant as Expert Witness*, 3rd ed., Weil, Wagner, and Frank, eds., John Wiley, 2001.

"Preparing for Daubert Challenges in Antitrust Cases," *Antitrust Section of the American Bar Association, Economic Committee Newsletter*, (co-author), Spring 2001

"Conflicting Rulings About Conflicts," *The Witness Chair*, California Society of CPA's, (co-author), Fall, 1996.

"Damage Measures in Patent Infringement Actions," *Second Annual Institute for Intellectual Property Law*, (co-author), Practising Law Institute, 1996.

"Damages on the Internet," *Proceedings of the AIPLA Winter Conference*, AIPLA, 1996.

"Section 482 and Technology Transfers," *Price Waterhouse, Intellectual Property Conference*, (co-author) 1993

"Dull Witnesses," *Litigation*, American Bar Assoc., Vol. 19, No. 3, Spring, 1993.

"Economic Damages in Patent Infringement Cases," *Patent Litigation 1991*, (co-author), Practising Law Institute, 1991.

"Forensic Accounting and Litigation Consulting Services," *The Accountant's Handbook 7th ed.*, (co-author), John Wiley, 1990.

"A Lawyer Isn't the Only Expert You Need in Court," *Price Waterhouse Review*, 1986, Number 2.

"Personal Computers: The Litigator's Ultimate Weapon," *Los Angeles Lawyer*, May and June, 1983 (co-author).

**Highly Confidential — Attorney's Eyes Only**

Highly Confidential -- Attorney's Eyes Only

**Exhibit 2**

*Wayne Berry v. Hawaiian Express Service*

**Documents Relied Upon**

| Bates Prefix | Beg. Bates | End Bates | Description |
| --- | --- | --- | --- |
| N/A | N/A | N/A | Asset Purchase Agreement, 10/9/99 |
| N/A | N/A | N/A | Attachment - Software End User License Agreement between Y.Hata and Wayne Berry, 5/8/03 |
| N/A | N/A | N/A | Attachment to letter from Wayne Berry - Service Agreement between Y.Hata and Wayne Berry, 5/8/03 |
| N/A | N/A | N/A | Attachment to letter from Wayne Berry - Service Agreement's End User License Agreement |
| N/A | N/A | N/A | Bylaws of Atlantic - Pacific International Services |
| N/A | N/A | N/A | Bylaws of Fleming Companies |
| N/A | N/A | N/A | Comparison of Wayne Berry and Descartes Pricing |
| N/A | N/A | N/A | Container Costs Report - 11/1/95 - 10/31/99 |
| N/A | N/A | N/A | Declaration of Ralph Stussi |
| N/A | N/A | N/A | Declaration of Timothy Hogan (with Exhibits A-Y), 4/18/05 |
| N/A | N/A | N/A | Declaration of Wayne Berry (with Exhibits A - S), 4/18/05 |
| N/A | 174 | 179 | Declaration of Wayne Berry Exhibits A through G, 11/21/01 |
| N/A | N/A | N/A | Email from Wayne Berry to Brian Marting, re: Agreements (with Draft Service Agreement) |
| N/A | N/A | N/A | Email from Wayne Berry to Brian Marting, re: Agreements, 5/8/03 |
| HF | 252 | 254 | End-User License Agreement - License for Freight Control System Software, 10/29/99 |
| N/A | N/A | N/A | Excerpt from Deposition of Wayne Berry, pp. 78-85, 7/1/04 |
| N/A | N/A | N/A | Excerpt from Deposition of Wayne Berry, pp.110-115, September 2004 |
| N/A | N/A | N/A | Excerpt of Deposition of Ralph Stussi |
| N/A | N/A | N/A | Exhibit A to letter from Wayne Berry - Customer List |
| N/A | N/A | N/A | Exhibit B to letter from Wayne Berry - Certain Companies and/or Individuals |
| N/A | N/A | N/A | Expert Report of Thomas Ueno, 3/21/05 |
| PCT-B | 377 | 379 | Fleming 13-Period Calendar |
| HF | 122 | 123 | Fleming Asset Purchase from APi - Summary |
| PCT-B | 315 | 376 | Fleming financial statements, for Period 4 |
| PCT-B | 251 | 314 | Fleming financial statements, for Period 5 |
| PCT-B | 187 | 250 | Fleming financial statements, for Period 6 |
| PCT-B | 124 | 186 | Fleming financial statements, for Period 7 |
| PCT-B | 60 | 123 | Fleming financial statements, for Period 8 |
| PCT-B | 1 | 59 | Fleming financial statements, for Period 9 |
| N/A | N/A | N/A | Freight Analysis and Potential Cost Savings - Prepared by Wayne Berry |

ANALYSIS GROUP, INC.

Highly Confidential -- Attorney's Eyes Only

## Exhibit 2
### *Wayne Berry v. Hawaiian Express Service*
### Documents Relied Upon

| Bates Prefix | Beg. Bates | End Bates | Description |
|---|---|---|---|
| N/A | N/A | N/A | Freight Control System Procedures |
| N/A | N/A | N/A | Handwritten notes - Hawaiian Ocean Transport |
| A | 467 | 467 | Invoice from Wayne Berry to Atlantic Pacific International |
| N/A | N/A | N/A | Invoices from Wayne Berry to Y. Hata & Company for software license |
| N/A | N/A | N/A | Invoices from Wayne Berry to Y-N, Inc for software license |
| N/A | N/A | N/A | Job Costs Report - 11/1/95 - 10/31/99 |
| N/A | N/A | N/A | Letter from Borja to Sussi, 9/16/99 |
| N/A | N/A | N/A | Letter from Brad Dechter to Damian Capozzola, 6/6/05 |
| N/A | N/A | N/A | Letter from Brian Marting, re: Follow-up Issues on Freight Analysis |
| J | 67 | 68 | Letter from Craig Shikuma to Timothy Hogan, re: Fleming/API Settlement Agreement |
| N/A | 256 | 257 | Letter from Dave Baden to Mark D, re: edi transmission to Fleming Hawaii logistics |
| HF | 205 | 206 | Letter from Jack Borja with Proceeds from Sale of Cudahy Terminal |
| N/A | 64 | 66 | Letter from Timothy Hogan to Craig Shikuma, re: Fleming/API Settlement Agreement |
| N/A | N/A | N/A | Letter from Wayne Berry to Brian Marting, re: Agreements (with attachments), 5/8/03 |
| N/A | N/A | N/A | Letter from Wayne Berry to Brian Marting, re: Agreements, 4/14/05 |
| N/A | N/A | N/A | Letter from Wayne Berry to Brian Marting, re: Freight Control System, 6/6/02 |
| N/A | N/A | N/A | Letter from Wayne Berry, re: Freight Control System Implementation |
| N/A | N/A | N/A | Letter from Wayne Berry, re: Freight/Commodity Control Service Agreement |
| A | 449 | 450 | Memo from Ralph Stussi to Wayne Berry re: License agreement for freight control system, 11/24/99 |
| N/A | N/A | N/A | Memorandum in Opposition to Plaintiff Wayne Berry's Motion for Summary Judgment |
| N/A | N/A | N/A | Notes from Wayne Berry meeting |
| N/A | N/A | N/A | Outline of Procedures |
| N/A | N/A | N/A | Plaintiff Wayne Berry's Concise Statement of Facts, 4/20/05 |
| N/A | N/A | N/A | Rule 26(a)(2)(B) Expert Report of Martin G. Walker, 5/31/05 |
| HF | 224 | 228 | Sale of Trucking and Cost per Case information |
| N/A | N/A | N/A | Sales and Allowance Report - 11/1/95 - 10/31/99 |
| N/A | N/A | N/A | Settlement and Release Agreement, 10/7/99 |
| N/A | N/A | N/A | Summary of Voluminous Records Contained In Disclosure A00519 |
| N/A | N/A | N/A | Trial Transcript, 2/26/03 |
| N/A | N/A | N/A | Various emails from Wayne Berry to Brian Marting |

Page 2 of 3

ANALYSIS GROUP, INC.

Highly Confidential -- Att...

## Exhibit 2
### *Wayne Berry v. Hawaiian Express Service*
### Documents Relied Upon

| Bates Prefix | Beg. Bates | End Bates | Description |
|---|---|---|---|
| A | 1 | 1 | Wayne Berry - Damage Model |

AN

rney's Eyes Only

lLYSIS GROUP, INC.

Highly Confidential – Attorney's Eyes Only

Exhibit 3

*Wayne Berry v. Hawaiian Express Service*
**Hours Required to Make Allegedly Unauthorized Modifications**

|  | Number of Hours | |
| --- | --- | --- |
|  | Low | High |
| Removal of Extraneous Tables | 32 | 40 |
| Addition of Vendor Defaults | 32 | 40 |
| Standardization of Forms | 32 | 32 |
| Alteration of Accounts Receivable Payment Form | 24 | 24 |
| Modification of Tab Orders | 8 | 16 |
| *Ad Hoc* Changes | 8 | 16 |
| Total Hours Needed | 136 | 168 |

Note:
A minimum and maximum estimate of the time necessary to complete each task was given

Source:
Discussion with Mark Dillon

ANALYSIS GROUP, INC.

Highly Confidential – Attorney's Eyes Only

**Exhibit 4**

*Wayne Berry v. Hawaiian Express Service*
**Actual Damages Suffered Due to Alleged Copyright Infringement**

|  | Low | High |
|---|---|---|
| [A] Hours Required to Make Allegedly Unauthorized Modifications | 136 | 168 |
| [B] Hourly Consulting Fee | $100 | $100 |
| [C] Total Cost to Make Modifications | $13,600 | $16,800 |

Notes and Sources:
[A] From Exhibit 3
[B] Letter from Wayne Berry to Brian Marting, re: Freight Control System, 6/6/02.
[C] = [A] x [B]

ANALYSIS GROUP, INC.

Highly Confidential – Attorney's Eyes Only

Exhibit 5

*Wayne Berry v. Hawaiian Express Service*

**Fleming Hawaii Financial Performance**

*April 1, 2003 – August 21, 2003*

| | 4/1/2003 - 6/6/2003 [a] | 6/7/2003 - 8/22/2003 [a] | Total |
|---|---|---|---|
| Net Operating Sales | 54,041,385 | 53,490,451 | 107,531,835 |
| Net Sales | 54,435,793 | 53,916,556 | 108,352,348 |
| Gross Margin All Ops | 4,601,427 | 4,804,780 | 9,406,206 |
| Cust. Serv. Product Proc. | (329,524) | (351,153) | (680,678) |
| Warehouse Expense | (1,092,080) | (940,211) | (2,032,291) |
| Net Transportation | (520,914) | (307,249) | (828,163) |
| Add Back Trans Rev | (764,641) | (832,952) | (1,597,593) |
| Building Expense | (1,186,658) | (1,182,579) | (2,369,237) |
| Gross Margin | 707,409 | 1,190,734 | 1,898,144 |
| SG&A | | | |
| Gen Admin Exp | (286,930) | (134,802) | (421,732) |
| IT Exp | (30,764) | (25,143) | (55,907) |
| Selling Exp | (183,746) | (154,108) | (337,854) |
| Additional Compensation | 34,893 | 16,616 | 51,509 |
| Retail Service Expense | 0 | (122) | (122) |
| Credit Losses | (36,904) | (39,421) | (76,386) |
| Other Expense | (1,365) | (1,435) | (2,800) |
| Total SG&A | (504,877) | (338,416) | (843,293) |
| Operating Earnings[b] | 202,533 | 852,318 | 1,054,851 |
| Interest Income & PS Dividends | 45,233 | 49,171 | 94,406 |
| Working Capital Charge | (711,244) | (811,565) | (1,522,809) |
| Overhead Burden Charge | (398,000) | (433,122) | (831,122) |
| Earnings Before Taxes | ($861,478) | ($345,196) | ($1,206,674) |

Notes:

a. For accounting purposes, Fleming uses a 13 period calendar (April 1, 2003 is the 10th day of Period 4). The reported values were reduced by 8/26 to only include the portion of period 4 occurring after the April 1st.

b. Fleming's Hawaii division was divested in Period 9. Accordingly, the Period 9 financial statements did not include standard period ending line items. These items were imputed based on prior periods' data (PCT-B 000065).

Sources:
PCT-B 00031R, -255, -193, -128, -065, -064, and -005

ANALYSIS GROUP, Inc.