# EXHIBIT "C"

LYNCH ICHIDA THOMPSON KIM & HIROTA

TIMOTHY J. HOGAN 5312-0
1132 Bishop Street, Suite 1405
Honolulu, Hawaii 96813
Telephone No. 528-0100
Fax No. 528-4997
E-mail: tjh@loio.com

Attorney for Plaintiff WAYNE BERRY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WAYNE BERRY,<br><br>        Plaintiff,<br><br>FLEMING COMPANIES, INC., aka<br>FLEMING FOODS, INC., aka<br>FLEMING, HAWAIIAN EXPRESS<br>SERVICE, INC., DOE<br>DOE PARTNERSHIPS,<br>CORPORATIONS AND OTHER<br>ENTITIES 1-20 S 1-50,<br><br>        Defendants. | Civ. No. CV01-00446 SPK LEK<br>(Copyright)<br><br>PLAINTIFF WAYNE BERRY'S<br>OPPOSITION TO FLEMING<br>COMPANIES, INC.'S MOTION<br>FOR SUMMARY JUDGMENT<br>ON ALL COUNTS OF<br>PLAINTIFF'S FIRST AMENDED<br>COMPLAINT FILED 9/5/01<br><br>HEARING<br>Date:     January 17, 2003<br>Time:     10:00 a.m.<br>Judge:   Hon. Samuel P. King<br><br>Trial Date  February 25, 2003 |

PLAINTIFF WAYNE BERRY'S OPPOSITION TO FLEMING COMPANIES,
INC.'S MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS OF
PLAINTIFF'S FIRST AMENDED COMPLAINT FILED 9/5/01

TABLE OF CONTENTS

I.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     A.   The Court May Finally Find that
          Wayne Berry Owns the Copyrights. . . . . . . . . . . . . . . . . . . . . . . . 2

     B.   Fleming Has Omitted The Critical Part Of The Asset Purchase
          Agreement that Was Signed Without Corporate Authority. . . . . . . 7

     C.   Fleming Admits That All It Got Was Non-Exclusive License To Use
          The Software. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     D.   Fleming And Mr. Berry Had Agreed That Mr. Berry Would Be Paid
          To Make The Changes.  Congress Has Mandated This As An
          Exclusive Right Of The Copyright Owner.   . . . . . . . . . . . . . . . . . 10

     E.   Fleming Agreed That Mr. Berry Would Market The
          Software Commercially But He Has Been Stymied By Fleming's
          Infringement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     F.   Fleming Has Not Used The Software
          In The Same Manner As API.   . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     G.   Mr. Dillon Has Admitted To Making a
          Hundred Illegal Derivatives. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     H.   HEX'S  Admitted Use of PCAnywhere Remote To Access The
          System Remains Evidence Of Infringement By Both HEX and
          Fleming.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     I.   Fleming Does Not Own A Copy Of
          The Berry Freight System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     J.   Fleming Has Forgotten About Its Infringement of the Y2K Derivative
          and its Illegal Modification of the Invoice Definition Program. . . . 20

III.    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

  A.    Fleming Cannot Rely On Section 117 Because It Does Not Own A
    Copy Of The Software  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

  B.    Issues Of Fact Remain As To What Constitutes The License. . . . . 23

  C.    Issues Of Fact Remain As to HEX's Infringement That Makes Both
    HEX and Fleming Liable.  . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

  D.    Issues Of Fact Remain As to Whether Fleming Is Using The Software
    In The Same Manner As API.  . . . . . . . . . . . . . . . . . . . . . . . . . 25

  E.    Fleming Is Wrong About Which Law
    Controls A Copyright Dispute. . . . . . . . . . . . . . . . . . . . . . . . . . 25

  F.    An Issue Of Fact Remains As To Whether The November 24, 1999
    License Was Rescinded.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

  G.    The Copyright Preempts The State Law Argument Raised By
    Fleming.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

  H.    Fleming Can't Rely On An Implied License Where It Also Alleges
    The Existence Of An Express License.  . . . . . . . . . . . . . . . . . . 28

III.    CONCLUSION.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## TABLE OF AUTHORITIES

CASES

*S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 (9th Cir. 1989) . . . . . . . . . . 26

*MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511, 513 (9th Cir. 1993) . . . . . 17-19

*Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir. 1998) . . . . . . . . . . 26

*Allen-Myland, Inc. v. International Business Machines Corp.*, 746 F. Supp. 520, 536 (E.D. Pa. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Aymes v. Bonelli*, 47 F.3d 23 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Cohen v. Paramount Pictures Corp.*, 845 F.2d 851, 854 (9th Cir. 1988) . . . . . . 25

*Foad Consulting Group, Inc. v. Azzalino*, 270 F.3d 821 (9th Cir. 2001) . . . . 28, 29

*Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Kip Ranow v. SIPA Press, Inc.*, 987 F.2d 580 (9th Cir. 1993) . . . . . . . . . . . . . . 27

*Midway Mfg. Co. v. Strohon*, 564 F. Supp. 741, 745 n.2 (N.D. Ill. 1983) . . . . . . 18

*Pickett v. Prince*, 207 F.2d 402 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 26


STATUTES

The Copyright Act, 17 U.S.C. § 410(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 26

The Copyright Act, 17 U.S.C.§ 201(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

The Copyright Act, 17 U.S.C. § 301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

The Copyright Act, 17 U.S.C. § 106(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 23

The Copyright Act, 17 U.S.C. § 117 . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 18, 22, 23

I.    <u>INTRODUCTION</u>.

The instant motion is an apparent last ditch effort to avoid the harsh

sanctions that Congress dictates must be befall wilful infringers.   Wayne Berry,

the developer and owner of the copyrights to the freight system that Fleming has

never paid a dime to him for, respectfully asks  the motion be denied in all

respects.

II.    <u>BACKGROUND</u>.

This case will decide whether an individual software developer can survive

an orchestrated onslaught on his rights as a developer of the software system used

by Fleming Companies, Inc. ("Fleming") to operate its freight logistics services.

(hereinafter known as the "Freight Control System").   As part of its assault on

Plaintiff, Fleming seeks to prejudice Mr. Berry by alleging that he is a vexatious

litigant.  Fleming knows full well why Mr. Berry needs to continue to seek redress

for the myriad of Fleming wrongs.  Fleming, now under investigation by Federal

authorities, can't hide any longer behind the cloak of good corporate citizenship.

Like Enron and others, Fleming will hopefully soon be brought to justice for the

wrongs it has committed.

The Motion for Summary Judgment has addressed claims of infringement

only as they relate to the changes made to one of the three programs that are the

subject of this litigation, the Berry Freight Control System.   The First Amended

Complaint alleges infringement of three separate programs. Fleming has not even attempted to present evidence to support a grant of summary judgment on Plaintiff's claims that Fleming committed wilful infringement when it modified the Prepaid Vendor Invoice Definition For Crystal Reports V6.0, Copyright Registration Number TX5-268-865. The First Amended Complaint alleges that this infringement occurred *before* Fleming had any rights under the Asset Purchase Agreement or the limited license. First Amended Complaint at ¶¶ 15, 20, 21 and 33.

In addition, Fleming has not presented any evidence to rebut Plaintiff's claim that the creation of the Y2K derivative of Mr. Berry's FlemingPO.exe", Registration Number TX 5-079-439 was wilful infringement. First Amended Complaint at ¶¶ 13, 26, 32, 35 and 39.

A.    The Court May Finally Find that Wayne Berry Owns the Copyrights.

The Copyright Registration, sets forth the prima facie case of ownership of the Freight Control System. Congress has dictated that facts contained in the registration are to be accepted by the Court as true unless rebutted. The Copyright Act, 17 U.S.C. § 410(c). It is therefore established that the Freight Control System, that is the subject of this case, was first published by Wayne Berry no later than November 27, 1995. *See* Declaration of Wayne Berry ("Berry Dec.") at

2

¶ 47 and Exhibits "6" through "8." Despite Fleming's endless unsubstantiated drum beat to the contrary that fact is not subject to a genuine dispute. As a matter of law Mr. Berry owns the copyrights.

As further support for this proposition, it is undisputed the authorship of the Berry Freight System began in 1993, some three years before Mr. Berry began any corporate association with API. *See* Berry Dec., ¶¶ 11-15 and copyright registrations for the Freight Control System, Berry Dec., Exhibits "6" and "7." This fact of original authorship in 1993 is clearly stated in the as indicated on the Copyright registration to the Freight Control System and FlemingPO.exe. Berry Dec., Exhibits "6" and "7." The additional factual support is provided by the Declaration of Wayne Berry attached to the Concise Statement. To summarize, Mr. Berry had been approached by representatives of SeaLand and Matson to develop an automated freight tracking program in 1993. Mr. Berry began to construct a demonstration version of the software that eventually grew into the software that is the subject of this litigation. Berry Dec. at ¶¶ 11 through 13, and Exhibit "1."[1] During the time that Mr. Berry worked on the SeaLand/Matson system, he was engaged in numerous other projects developing software in Hawaii

---

[1] Exhibit "1" contains the listing of completed Demonstration Software as of October 24, 1994 and the attached additional pages relate to Sea-Land's "spec." for the freight system program that eventually became the Berry Freight Control System. The fax header shows it was received in October 1994.

3

as an independent contractor developer.  Berry Dec. at ¶ 13.

Further, Mr. Berry was never an API employee and never permitted anyone at API to direct him regarding his work as a software developer.  Berry Dec. at ¶¶ 18 & 19.  At no time did API ever own or possess a copy of the Freight Control System, Berry Dec., ¶ 25.  Mr. Berry's final and conclusive proof the fact that the Berry Freight System was not work made for hire and that Mr. Berry retained all intellectual property rights to the freight system is contained in the written acknowledgment of API through its Chairman Jack Borja.  Berry Dec. ¶ 18 and Exhibit "2."  Therefore, under applicable federal law, even if Mr. Berry was an employee, Exhibit "2" proves that he owns the copyrights.  The Copyright Act, 17 U.S.C.§ 201(b).  Exhibit "3" to the Berry Declaration proves that Mr. Berry was selling his programming services to Fleming not as API's employee but as an independent contractor.  Exhibit "4" to the Berry Declaration is an invoice presented to API for cost reimbursement and demonstrates the hours worked as an independent contractor as of February 7, 1995.

As to the allegation that changes had been made to the Berry Freight Control System by API employees though entirely irrelevant[2], that is simply not true.  In the Deposition of Mark Dillon, Mr. Dillon admits that the Berry Freight

---

[2]Congress makes it clear that only the owner of a copyright may make derivatives.  *See* The Copyright Act, 17 U.S.C. § 106(b).

4

Control System was kept, not at API as Fleming would have the Court believe, but in Mr. Berry's home on the North Shore. The Berry Dec. evidences that the Software is still in Mr. Berry's possession on the same server that he owned and operated it on in October 1999. Berry Dec. at ¶ 48. As to the alleged changes made by Mr. Dillon, his deposition establishes that he was unsure if he ever made the change that Fleming relies upon for its claim of ownership and that Fleming used to mislead the Court in not granting summary judgment on this issue.  There is no admissible evidence that certain changes had been made to the Berry system by anyone except Mr. Berry during the time after the original authorship was established starting in 1993.   Finally, from a legal standpoint the issue of ownership of a derivative is simply a red herring. The owner of the original, Mr. Berry, always owns them as a matter of Federal Law. The Copyright Act, 17 U.S.C. § 106(b).

In regard to the changes, Mr. Dillon admitted in his deposition that he could not have made the alleged changes without Mr. Berry's authority. *See* Excerpts from the Deposition of Mark Dillon dated March 25, 2002 , pp. 68 to 69. Hogan Dec. Exhibit "A." Further, this testimony verifies Mr. Berry's declaration that proves that API never even possessed a copy of the Freight Control System, that remained resident on Mr. Berry's home system. Berry Dec. ¶ 25.

Mr. Dillon could therefore not have made any changes without Mr. Berry's authority.   The evidence is clear that Mr. Dillon never made any changes to the Berry Freight Control System. At best he thought he "might" have made a change to one field.  This never happened because Mr. Dillon never had the password to the Design Master that Mr. Dillon admits must be obtained to make a change. Further, unlike Mr. Dillon who is unsure, Mr. Berry is certain that Mr. Dillon had no part in making the change to the image field that Mr. Dillon "thinks" he "may" have changed.  Berry Dec. at ¶ 37.  Mr. Dillon's only vague recollection of making any possible change is reflected in his deposition where he admits that he can't be sure if he ever made any changes to the Freight Control System. Excerpts from the Deposition of Mark Dillon dated March 25, 2002 , pp. 54 to 56. Hogan Dec. Exhibit "A."   Mr. Dillon testified regarding the one change he thought he might have made:

> I believe I did.  I believe I asked for permission to do
> that.  I believe I did it myself, *but I could be wrong.  It
> could have been something Mr. Berry did himself*, but we
> arranged to make the change.

Excerpts from the Deposition of Mark Dillon dated March 25, 2002 , p. 56, lines 1-5.  Hogan Dec. Exhibit "A" (emphasis added).

Unlike Mr. Dillon who testified he's not sure if he made the single change, Mr. Berry knows who created the "image" field. Mr. Berry specifically recalls

writing this field and knows he never authorized Mr. Dillon to make any changes to the Freight Control System.  Berry Dec. ¶¶ 37 and 47.

B.    Fleming Has Omitted The Critical Part Of The Asset Purchase
      Agreement that Was Signed Without Corporate Authority.

Fleming states in its Memo. in Support, that it paid "over 40,000" for the API assets.  The Court might wonder why Fleming can't come up with the exact figure. The reason is because to show the real total Fleming would have to concede that its claim to ownership is nothing but a contrived device to confuse the Court.   The Asset Purchase Agreement provided a three step process to determine the final inventory of assets and the final purchase price.  *See* Asset Purchase Agreement, Fleming Concise Statement, Exhibit "B" at p. 7. *See also* Berry Dec. at ¶ 49 and  Exhibit 9.[3]   Fleming claims that the Asset Purchase Agreement sold "Software System to Track Freight Operation (including sailing charges [sic] 30,000."[4]  This was not, however,  part of the final purchase per the agreement.  *See* Memorandum in Support at p. 4. and Asset Purchase Agreement,

---

[3]Exhibit 9 is highlighted with boxes to show the relevant proof regarding the final understanding that the Asset Purchase Agreement did not contemplate any transfer of any freight tracking software.

[4]Prior to Mr. Berry's system, API had handled about 40 containers a week using spreadsheets to track freight.  To the extent that Fleming bought any copyrights, these "sailing charts" are the only plausible software that API could have sold.

7

Fleming's Concise Statement, Exhibit "B" at p. 7, *compare* Berry Dec. Exhibit "9"
that is the final adjusted inventory to be included in Schedule 3.

After Fleming learned that API did not own the Berry Freight System, the
parties re-characterized what had been called "Software System to Track  Freight"
to what the final agreement referred to as:  "Misc. Sofware [sic] and Slush per
Contract."  *See* Berry Dec. at Exhibit "9" This no more points to Mr. Berry's
software as it does to transferring the ownership of the copyrights to Microsoft
Windows.

There is an issue of fact as to whether the final Asset Purchase Agreement
was even authorized by API but was rather simply Mr. and Mrs. Borja's personal
act to escape their guarantor liability to Fleming. *See* Berry Dec. ¶¶ 61and 62 and
Exhibit "15." The API Bylaws make clear that Mr. Berry had to sign.  There is an
issue of fact whether the Asset Purchase Agreement is even an enforceable
agreement.

C.    Fleming Admits That All It Got Was Non-Exclusive License To Use
      The Software.

In Sub part "C" to the Memo. in Support, Fleming finally concedes that all
it ever got was a license.  The issue is what license did Fleming get.  The Berry
Dec. makes clear that both Fleming and Mr. Berry understood that the November
24, 1999 letter was an addendum to the End User License Agreement ("EULA")

8

and not a free standing license.  Therefore, an issue of fact exists as to the

intention of the parties as to what constitutes the "license."   Berry Dec. at ¶ 48.

Fleming has asked the Court to consider parole evidence to gin up its implied

license so it is estopped from arguing that Mr. Berry's understanding and

statements made by Fleming are inadmissable.  To summarize Mr. Berry's

Declaration, On October 29, 1999, Mr Berry delivered the EULA to Fleming.

Everyone that used the system received a copy.   Fleming continued to use the

software after receipt of the EULA.  By the EULA's terms use meant acceptance

of the terms.  Fleming accepted by using the software.  On or about November 24,

1999, Fleming President Ralph Stussi contacted Mr. Berry to seek changes to the

EULA.  A copy of the redline of the letter Mr. Berry received from Fleming is

attached to the Berry Dec. as Exhibit "10."  *See* Berry Dec. ¶¶ 35 and 48.

Mr. Berry made it clear to Fleming that he would permit an addendum to

the EULA.  Fleming agreed and told Mr. Berry what parts of the agreement

needed changing.  One thing that was never agreed to was that Fleming would

have the right to make changes to the Freight Control System.  Fleming only

asked for and received permission to make a change in Crystal Reports and that is

all Mr. Berry agreed to allow in the Eula and the Addendum.   Berry Dec.¶ 48.

9

D.    Fleming And Mr. Berry Had Agreed That Mr. Berry Would Be Paid
      To Make The Changes.  Congress Has Mandated This As An
      Exclusive Right Of The Copyright Owner.

In an exchange of correspondence between Fleming and Mr. Berry the

parties established, prior to the execution of the EULA,  that Mr. Berry would be

paid for making changes to the system that Fleming was using for no

consideration to Mr. Berry.   Berry Dec. ¶ 51 and Exhibits "11" and "12."   The

EULA made this even more clear.   Later, when Fleming asked to make a change

in one of the reports that the system generates, Mr. Berry gave his limited

permission for that one change. Fleming, had the chance to seek permission to

make additional changes but didn't.  The reason was clear, had Fleming disclosed

its intentions to make unlawful derivatives of the software, then the deal would not

be struck and Fleming would never get its hands on the software, that was still

resident on Mr. Berry's home server in Pupukea.

E.    Fleming Agreed That Mr. Berry Would Market The Software
      Commercially But He Has Been Stymied By Fleming's Infringement.

The November 24, 1999 Addendum clearly states that Fleming understood

that Mr. Berry would commercially market the software.  In 2002 Mr. Berry

nearly closed on a deal with Foodland, the state's largest grocery chain, but was

told that Foodland could obtain the use of this software from Fleming and saw no

need to pay Mr. Berry for it. Berry Dec. at ¶ 52.  Because Fleming is now using

10

the software for inbound and outbound freight, Mr. Berry can't sell that service to

Foodland who Fleming has allowed to use the software. The software was never

used for this while used by API. Berry Dec. at ¶ 53. Fleming's use of the

software beyond that of API is an independent grounds for the Court to deny the

motion.

      F.    <u>Fleming Has Not Used The Software In The Same Manner As API.</u>

Under API, the Berry System was used only for "inbound" freight.  The

only exception was for Stop in Transit for neighbor island shipments. Berry Dec.

at ¶ 53. Fleming has begun, in total violation of the license agreement, using the

software for "outbound" freight. The proof of this is contained in the copy of the

database obtained from Fleming in discovery. This clearly shows that Fleming is

using the system for making deliveries from Hawaii to Guam.  Berry Dec. ¶¶ 54

through 56.  In addition, Fleming is allowing its customers to use the system.

Berry Dec. ¶¶ 57 & 58.  API never did this and this is a total violation of the terms

of any license that Fleming purports to possess.  In addition, the same records

show that Fleming is using the system as freight forwarder for its customers. The

Berry Dec. at ¶ 56, describes how Fleming is now delivering not to its warehouse

as under API but direct to stores. In this case, Foodland, the same grocery store

company that informed Mr. Berry that it didn't need his system because they got it

free from Fleming.

G. Mr. Dillon Has Admitted To Making a Hundred Illegal Derivatives.

Fleming makes the unsubstantiated claim that the system "has not

materially changed." Memo in Op at pg. 7. To support this claim Fleming cites to

the Declaration of Mark Dillon filed on August 24, 2001. This declaration was

filed before Mr. Dillon's deposition on March 25, 2002, in which Mr. Dillon

admitted to making hundreds of derivatives and in which he admitted that the

alleged November 24, 1999 license did not authorize.

Question by Mr. Hogan at pg. 99 at line 3:

12    Q    And how many times would you say that
13  you've made changes to the screens, tables,
14  layout of the database from the time that you
15  started working for Fleming?
16    A    Oh, how many times?  Probably like a
17  hundred times.
18    Q    A hundred times.  So each time when you
19  made that change, did you make a copy of the
20  software; so you backed up what you had when you
21  were done with the change, so if you had to
22  reinstall it, at least produce it, that you would
23  have a copy of it?
24  Answer:  On occasion.  I had an archive.  I
25  still have an archive version of the database,
            pg. 100
1    the original screens.

Excerpts from the Deposition of Mark Dillon dated March 25, 2002 , pp. 99, line
12  to p. 100, line 1.  Hogan Dec. Exhibit "A."

12

Mr. Dillon also admits that Fleming management lied to him about having

the authority to make the changes as follows:

Questioning at pg. 106

4     Q   You testimony is that Mr. Stussi told
5   you that he paid Mr. Berry money to use the
6   software?
7     A   I thought that's what he said.
8     Q   Do you know when he might have said
9   that?
10     A   That would have been in late '99.


                    . . .


17     Q   Did he say how much he paid Mr. Berry?
18     A   I can't recall.
19     Q   If you knew that they hadn't paid
20   Mr. Berry anything for it, would it change your
21   view whether it was okay to make changes to the


            . . .


BY MR. HOGAN at pg. 107:

2     Q   I mean, just from a moral perspective.
3   I don't care about your legal perspective.
4     A   All I know is I had a right -- we had a
5   right to make changes.  For some reason or
6   another, Mr. Berry agreed that we could make
7   those changes.  That's all I know.  I don't know
8   what the financial arrangements were.


           .   .   .


Questioning BY MR. HOGAN at pg. 108:

13

24   Q   Have you ever -- You've been handed a[5]
25   document that's been marked as Exhibit 11.  Have

pg. 109

1    you ever seen this before, sir?
2    A    I think I saw it only after the
3    litigation began.
4    Q    Okay.  Do you ever recall Mr. Stussi or
5    anyone, Mr. Christensen or anyone in the
6     management at Fleming, providing you a copy of
7    his at any time prior to the litigation
8    commencing?
9    Answer.   I don't recall that.  I could be
10   mistaken.  Yeah.
11   Question.   Have you taken a chance to read this?
12   Have you read it?
13   Answer.  I just read it.
14   Question.   Can you tell me anywhere in here that
15   it provides for making changes to the database?
16   Answer.   No, it doesn't.  And I realize that I
17   think the last time I read it was when the
18   litigation came up, and I realize it was talking
19   about Crystal Reports. . . .

Excerpts from the Deposition of Mark Dillon dated March 25, 2002 , pp. 108, line

24 to 109, line 19.   Hogan Dec. Exhibit "A."

In addition, Fleming also admits that "Mr. Dillon has continued to make

changes to the software in order to "more effectively address Fleming's needs."

Memo. in Support, at pg. 7. This is a blatant admission of wilful infringement.

_____

[5]Exhibit 11 to the Dillon Deposition was the November 24, 1999
Addendum.  *See* Hogan Dec. Exhibit "A" at p. 4.

14

Nothing has ever been said that it was necessary to make these changes to permit the program to run as required by The Copyright Act, 17 U.S.C. § 117. Fleming just wanted a new program so it made one, or rather, made a hundred of them. The detail of some of the hundred or so derivative copies is set forth in the Declaration of Mark Dillon. *See* Excerpts from the Deposition of Mark Dillon dated March 25, 2002 , pp. 110, line 6 to 119, line 6.  Hogan Dec. Exhibit "A." What the Dillon testimony shows is that Fleming management lied to Mr. Dillon and induced him to commit criminal copyright infringement. There is no issue of fact that Mr. Berry was not paid anything although he clearly agreed to the license under the term that he would be compensated for any changes that Fleming sought to make. Berry Dec. ¶ 51 and Exhibit "11."  To induce Mr. Dillon to violate Federal law, Fleming lied about the Mr. Berry being compensated and lied about having authority to make the changes.

Further, Fleming relies on Mr. Dillon's stale declaration to support its claim that "when Fleming bought all of API's computers and licensed any software it didn't buy (if any), kept the same software on the computer, and used the computers in exactly the same way."  What Fleming didn't know at the time of the Dillon Declaration, that is now confirmed by the Dillon Deposition, is that at the time of the API sale of assets to Fleming, the Freight Control System, that is

15

the subject of this litigation, wasn't even on an API computer and never was. As Dillon correctly testified, the software that Fleming is fighting 'tooth and nail' to keep, was and is on Mr. Berry's home server, then located in Pupukea on the North Shore. What this means is that API not only didn't own a copy of the software, it didn't even possess a copy. Therefore, all of Fleming's argument about the application of 17 U.S.C. § 117, is of no relevance because Fleming never became the owner of a copy. At best, Fleming was a licensee and already and an infringer on November 24, 1999. That infringement was never cured by the November 24, 1999 addendum and remains today an additional basis for the Court to find Fleming is a wilful infringer and an additional grounds to deny the motion. This early infringement is another claim that Fleming has overlooked in its motion. Fleming has produced no evidence to rebut this claim of infringement that is based on the fact that prior to November 1999, Fleming made changes to the Berry software to put its name on API's custom invoices. Berry Dec. § 51 and Exhibit "11." Fleming's motion doesn't even attempt to address this clear evidence of infringement that must be tried to the jury.

H.    HEX'S  Admitted Use of PCAnywhere Remote To Access The System Remains Evidence Of Infringement By Both HEX and Fleming.

It is well settled in the Ninth Circuit that the loading of a program into the

16

memory of a computer constitutes the making of copy. *MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511, 513 (9th Cir. 1993). When HEX uses the PCAnywhere Remote program it is loading a copy of the program into memory. That is infringement. Fleming agreed not to allow third party use of the software but admits that it is allowing HEX to use it. That's infringement. At the time of the API Fleming split in October - November 1999, Fleming personnel were operating the system in the two California terminals. *See* Declaration of Mark Dillon attached to Fleming's Concise Statement as Exhibit "G" at ¶ 16. Both Fleming and HEX admit that HEX, the unlicensed third party that Fleming promised would never use Mr. Berry's system is now operating it. Fleming's allegation that the system is being used in the same manner as API is simply false and raises an issue of fact precluding summary judgment.

The Ninth Circuit held in *Mai Sys*.

> While we recognize that this language is not dispositive, it supports the view that the copy made in RAM is "fixed" and qualifies as a copy under the Copyright Act.

> . . .

> However, since we find that the copy created in the RAM can be "perceived, reproduced, or otherwise communicated," we hold that the loading of software into the RAM creates a copy under the Copyright Act. 17 U.S.C. § 101. We affirm the district court's grant of summary judgment as well as the permanent injunction as it relates to this issue.

17

*MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511, 513 (9th Cir. 1993).

By allowing HEX to use the software, both HEX and Fleming are making an unauthorized copy and are infringing.

I.    Fleming Does Not Own A Copy Of The Berry Freight System.

In its last ditch attempt to avoid the extreme sanctions Congress mandates for wilful infringement Fleming argues that as an owner of a copy it can make what ever changes its likes. First, Fleming proceeds from a false premise: that it owns a copy of the Berry Freight System. In *MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511, 513, n.5 (9th Cir. 1993) the Ninth Circuit unambiguously held that "Since MAI licensed its software, the Peak customers do not qualify as "owners" of the software and are not eligible for protection under § 117." Fleming therefore cannot claim to be an owner of a copy of the software as a matter of law. *See also Allen-Myland, Inc. v. International Business Machines Corp.*, 746 F. Supp. 520, 536 (E.D. Pa. 1990) (holding that Section 117(1) permits the copying of a program onto RAM in order to permit the computer to execute the program); *Midway Mfg. Co. v. Strohon*, 564 F. Supp. 741, 745 n.2 (N.D. Ill. 1983) (holding § 117 is intended to permit owners of copies to make the programs compatible with their computer hardware or systems.)  As a matter of well settled 9th Circuit law, Fleming cannot avail itself of a 17 U.S.C. § 117 defense.

18

Even if the Court was inclined to disregard the *Mai Sys'* holding, the facts stated above clearly show that API never even "possessed" a copy of the Berry Freight Control System that was kept secure on Mr. Berry's server located at his home. As the Berry Dec. details Mr. Berry personally transferred a derivative copy of this Design Master housed on his home server to Fleming and then rewrote it at Fleming to configure it to run on Fleming's server. At no time did a "copy" ever pass through API. Further, as the final nail in Fleming's coffin, Jack Borja stated in his letter to Fleming before the asset purchase agreement was inked that "I only have a non-transferable license...." Berry Dec. at ¶ 59 and Exhibit "13." In addition, Fleming never paid Mr. Berry anything and therefor cannot claim to have bought a copy. Berry Dec. at ¶ 51.  Fleming's Section 117 argument, that must be based on the ownership a copy, is invalid as based on a false premise.

Fleming principally relies on *Aymes v. Bonelli*, 47 F.3d 23 (2d Cir. 1995) for support of its claim that it was free to make one hundred derivative changes. *Aymes* dealt with the necessity to make changes to allow the software to run on a machine. Fleming has not argued that it "had" to make the changes to get the software running and Mr. Dillon in his Deposition admits that there was no necessity in making changes, just the desire to improve upon the work. Excerpts

from the Deposition of Mark Dillon dated March 25, 2002 , pp. 110, line 6 to 119,

line 6.  Hogan Dec. Exhibit "A."    *Ames* also required that the party claiming the

defense be an "owner" of a copy.  The court in *Ames* held that a party who was not

an owner of a copy would necessarily be an infringer if engaged in "unauthorized

editing of the underlying work." *Aymes* at 47 F.3d at 25.  Under *Aymes* Fleming is

an admitted wilful infringer.

       J.    Fleming Has Forgotten About Its Infringement of the Y2K Derivative
           and its Illegal Modification of the Invoice Definition Program.

      Having admitted the "hundreds" of Freight Control System derivatives,

Fleming has forgotten that one of the claims that it seeks to obtain judgment upon,

relates to the creation of its alleged Y2K Program to fix Mr. Berry's EDI

component of the Freight Control System, "FlemingPO.exe".   Plaintiff's Expert

has found sufficient similarity in the two programs for the Court to find an issue of

fact remains as to whether Fleming created this illegal derivative that would

preclude the grant of summary judgment.

      Professor Philip Johnson of the University of Hawaii concluded that:

> There is substantial evidence that the structure of the text
> file that is opened by both programs has the same
> structure. There is also substantial evidence that the
> database updated by the two programs has the same
> format.

Further Professor Johnson found that the two programs contained the same

elements as follows:

> However, there are at least two places in the code where structural sequences match between the two programs. These matching sequences are described by Wayne Berry in his document "Fleming Y2K Software Comparison to Berry Original." In these cases, the ordering of updates to a sequence of over a dozen database tables is the same in the two programs. Although it is possible that Dillon could have come up with the same sequence of updates without reference to the Berry code, the explanation that is more parsimonious with the data is that Dillon was using the Berry code as a reference while he wrote that section.
>
> In conclusion, my opinion is that there is evidence that the "Dillon" version of FlemingP0 was written with knowledge of the "Berry" version.

A true and correct copy of an Excerpt of Professor Johnson's report is attached to the Declaration of Timothy J. Hogan, as Exhibit "B. "

To prove infringement on this claim, Plaintiff must prove that the accused infringer had access to the program and that it is similar. In Mr. Dillon's deposition he admits to access. Excerpt of Deposition of Matt Dillon at pp. 34 & 35, Hogan Dec., Exhibit "A." The Johnson report proves that the programs are similar and that it that Dillon had to have "knowledge" of the Berry program. Therefore, as a matter of law Y2K derivative is a copy of Mr. Berry's program. Fleming cannot obtain summary judgment on this claim and has not even

21

attempted to produce any evidence that would support the grant of judgment on this claim.

In addition, Fleming has not even attempted to argue that it did not infringe upon Mr. Berry's copyright when it modified, prior to any execution of the Asset Purchase Agreement or the limited license, the "Prepaid Vendor Invoice Definition For Crystal Reports V6.0", Copyright Registration Number TX5-268-865. A copy of that registration number is attached to the Berry Dec. at Exhibit "8." The allegations in the First Amended Complaint at ¶¶ 15, 20, 21 and 33 are entirely un-rebutted.

III.   ARGUMENT.

   A.   Fleming Cannot Rely On Section 117 Because It Does Not Own A
        Copy Of The Software

Congress attempted to address issues related to the use of software that would permit an "owner of a copy" to make limited changes in the program to allow it to run on a "machine."

> § 117. Limitation on exclusive rights: computer
> programs
>
> (a) Making of additional copy or adaptation by owner of
> copy. Notwithstanding the provisions of section 106, it is
> not an infringement for the owner of a copy of a
> computer program to make or authorize the making of
> another copy or adaptation of that computer program
> provided:

22

> (1) that such a new copy or adaptation is created as an
> essential step in the utilization of the computer program
> in conjunction with a machine and that it is used in no
> other manner, or
> (2) that such new copy or adaptation is for archival
> purposes only and that all archival copies are destroyed
> in the event that continued possession of the computer
> program should cease to be rightful.
>
> . . .

The Copyright Act, 17 U.S.C. § 117. (Lexis 2002).

Fleming asks the Court to find that Congress meant to remove from the owners of copyrights the exclusive rights afforded under 17 U.S.C. § 106 (b) that preserves the right to make derivatives to the owner.  Having admitted that it has made "hundreds" of derivatives, Fleming seeks to cure its admitted infringement with the Section 117 defense.   First, as stated above, Fleming doesn't even get to this section because it can't show it is an "owner" of a copy.  There is at a minimum an issue of fact that precludes the grant of summary judgment.

Congress intended in enacting § 117 to protect the owner of a lawful copy from being held an infringer when that copy was used on his/her computer. It was never intended as a refuge for the wilful infringer who admits to making "hundreds" of derivatives.

    B.    <u>Issues Of Fact Remain As To What Constitutes The License.</u>

Mr. Berry Declaration demonstrates that both parties understood this to be

23

an addendum to the EULA. The most important change is demonstrated by Mr.

Berry insistence that the Subject line of the document be changed to track the

language of his EULA. Berry Dec. ¶ 35. Compare Berry Dec. Exhibit 10 and 14.

Fleming understood this and agreed that the November 26, 1999 document was an

Addendum. The final version of the Addendum shows Mr. Berry's intention in

the Title. *See* Berry Dec. ¶ 63 and Exhibit "17." Further, by using the software

for the period of November 1 to 26, 1999, the day the Addendum was signed,

Fleming was either an unlicensed infringer or had accepted the EULA. Either

way, the parties both understood that the November 24, 1999 Addendum was

addressing only the parts in the EULA that Fleming found unacceptable. Berry

Dec. ¶ 35   The clause in the EULA that prohibited the use of "application sharing

technology" i.e. PCAnywhere, was never rejected.   *See* Berry Dec. Exhibit 14 at

p. 2. Similarly, the EULU prohibited "Modifications." *Id*. If the Court finds that

the November 24, 1999 document is the only evidence of the license, then the

Court must find that Fleming was an unlicensed infringer prior to that time

because it had no license prior to November 26, 1999.

    C.    Issues Of Fact Remain As to HEX's Infringement That Makes Both
                HEX and Fleming Liable.

HEX admits that it is using the software. The MAI case stands for the

authority that using the software requires making a copy. HEX has no license to

use the software and its use is clearly Fleming's infringement for allowing the

creation of that copy. Fleming originally claimed that Fleming personnel would

input data into the system in California. Fleming concedes that HEX personnel

are performing this function. Excerpt of Deposition of Mark Dillon at p. 149,

Hogan Dec. Exhibit "A." That is use by an unauthorized third party and evidence

of the use beyond the scope of the license even under Fleming's interpretation.

      D.    Issues Of Fact Remain As to Whether Fleming Is Using The Software
           In The Same Manner As API.

As the Berry Dec. evidences, Fleming is now engaged in using the system

for "outbound" freight. Berry Dec. ¶¶ 53 - 57. API never did that. This is clear

evidence that Fleming has exceeded the scope of the November 24, 1999

Addendum and rebuts the claim that Fleming makes that the software is being

used in the same manner as under API. In addition, Fleming admits that it has

permitted a number of users far greater than ever under API. Berry Dec., ¶¶ 57 &

58 and Exhibit 16.

      E.    Fleming Is Wrong About Which Law Controls A Copyright Dispute.

The Court's chief function in copyright case is to protect the rights of the

author. *Cohen v. Paramount Pictures Corp.*, 845 F.2d 851, 854 (9th Cir. 1988).

Chief Judge Posner of the United States Court of Appeals for the Seventh Circuit

in a recent and thoughtful case addressed the law of copyrights in derivatives. In

25

*Pickett v. Prince*, 207 F.2d 402 (7th Cir. 2000)  the Court held that: "We need not pursue the issue of originality of derivative works.  The Copyright Act grants the owner of the copyright the exclusive right to prepare derivative works based upon the copyrighted work."  *Prince*, 207 F.3d at 405 *citing Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir. 1998).   In this case, the Court need not pursue the issue of the originality of the alleged changes or derivatives allegedly created by Mr. Berry and/or Mr. Dillon as API employees.  That is not an issue once the Court recognizes, as the law requires, that Mr. Berry is the author of the original work begun in 1993.

To prevail on a claim of copyright infringement, Plaintiff need only prove ownership of a copyright and copying "beyond the scope of a license." *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 (9th Cir. 1989).

To make out a claim of copyright ownership, the Developer need only produce the registration filings.  Mr. Berry's copyright registration creates a presumption that he owns the copyright and that the copyright is valid. The Berry Dec. Exhibits "7" through "9" are the prima facie proof of ownership as established by The Copyright Act, 17 U.S.C., Section 410(c).   Mr. Berry's proffer of the certificate of copyright registration thus shifts to Fleming the burden of proving the invalidity of the copyright, *see Hasbro Bradley, Inc. v. Sparkle*

26

*Toys, Inc.,* 780 F.2d 189, 192 (2d Cir. 1985) (Friendly, J.) (and there the burden

rests, unless the presumptions are rebutted. )

F.    An Issue Of Fact Remains As To Whether The November 24, 1999
      License Was Rescinded.

In *Kip Ranow v. SIPA Press, Inc.*, 987 F.2d 580 (9th Cir. 1993) the court

held that "the breach would justify rescission of a licensing agreement only when

it is 'so material and substantial in nature that [it] affects the very essence of the

contract and serves to defeat the objects of the parties.'" *Ranow* at p. 586. In this

case, HEX and Fleming's continued threat to the Developer's ownership rights, let

alone the continued unauthorized use of this software and the making of a hundred

illegal derivative copies constitutes a total breach of the agreement. It was clearly

understood in the November 24, 1999 Addendum that Fleming would, at a

minimum, not contest his ownership interest. Fleming has done that and that is

about as material a violation as one can imagine. There is therefore an issue of

fact as to whether the license was properly rescinded and that must be tried to the

jury.

G.    The Copyright Preempts The State Law Argument Raised By
      Fleming.

Since filing its motion to dismiss, Fleming has continued to pursue the red

herring of state law controls the license and its interpretation. Congress has

specifically acted to prevent this exercise by making it clear that federal not state law controls the making of a copyright and its transfer. *See* The Copyright Act, 17 U.S.C. § 301.

     H.    Fleming Can't Rely On An Implied License Where It Also Alleges The Existence Of An Express License.

Fleming cites *Foad Consulting Group, Inc. v. Azzalino*, 270 F.3d 821 (9th Cir. 2001) for the proposition that everyone knew that Fleming was going to infringe on Mr. Berry's copyrights and therefore, the Court should imply a license. First, Mr. Berry didn't understand that and the letters written between him and Fleming clearly support his understanding that he was to be paid for the changes to his system. Berry Dec. at ¶ 34.

Second, Fleming asked for permission to make a change to one invoice report. Where the parties have addressed an issue, the Court should not imply additional terms. There is no need for the Court to turn to the gap fillers addressed in *Foad* where the parties have themselves addressed the issue.

In addition, the Court may not fashion an implied license where it would violate the clear dictates of the Copyright Act. See *Foad* 270 F.3d at 827. The Copyright Act, 17 U.S.C. § 106(b) preserves to the owner of a copyright the exclusive right to make derivative works. For the Court to imply that right is vested in Fleming the Court must disregard the clear reservation of rights in the

28

Copyright Act. *Foad* makes it clear that the Court may not trample on the rights that Congress has reserved in fashioning an "implied" license.

As another reason that *Foad* won't save Fleming is the undisputed fact that Mr. Berry received no consideration for the alleged implied license. Berry Dec. at ¶ 51. Under *Foad*, the alleged implied license is unenforceable as follows:

> Of course, to be enforceable, the oral grant would have to be backed by consideration and otherwise satisfy the formation requirements of state contract law.

*Foad*, 270 F.3d at 828 at n. 11 (citations omitted). It is undisputed that Fleming paid nothing to Mr. Berry. Berry Dec. at ¶ 51. Therefore, there can be no implied license.

## III.  CONCLUSION.

For the reasons stated, Wayne Berry respectfully asks that the motion be denied in all respects.

Dated: Honolulu, Hawaii, ___12 - 30 - 2002___.

_____
TIMOTHY J. HOGAN
Attorney for Plaintiff
WAYNE BERRY

29