# EXHIBIT "J"

                                                                1

1                IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF HAWAII

3    _____
                                  )
4    WAYNE BERRY,                 )
                                  )
5              Plaintiff,         )  CIVIL NO. 01-00446SPK-LEK
                                  )
6         vs.                     )
                                  )
7    FLEMING COMPANIES, INC.,     )
     aka FLEMING FOODS, INC.,     )
8    aka FLEMING, DOE             )
     INDIVIDUALS 1-50 and         )
9    DOE PARTNERSHIPS,            )
     CORPORATIONS and OTHER       )
10   ENTITIES 1-20,               )
                                  )
11             Defendants.        )
     _____)
12

13                    TRANSCRIPT OF PROCEEDINGS

14

15            The above-entitled matter came on for Further

16   Jury Trial commencing at 10:00 a.m. on Tuesday, March

17   4, 2003, Honolulu, Hawaii,

18

19   BEFORE:   HONORABLE SAMUEL P. KING

20            United States District Judge

21            District of Hawaii

22

23

24   REPORTED BY:   LISA J. GROULX, COURT REPORTER

25                  Notary Public, State of Hawaii

```
                                                            2

 1
 2                        A P P E A R A N C E S
 3
 4
 5
 6   FOR PLAINTIFF:    TIMOTHY J. HOGAN, ESQ.
 7                     LYNCH ICHIDA THOMPSON KIM & HIROTA
 8                     1132 Bishop Street, Suite 1405
 9                     Honolulu, Hawaii  96813
10                     (808) 528-0100
11
12
13   FOR DEFENDANTS:   LEX R. SMITH, ESQ.
14                     ANN TERANISHI, ESQ.
15                     Kobayashi, Sugita & Goda
16                     First Hawaiian Center
17                     999 Bishop Street, Suite 2600
18                     Honolulu, Hawaii  96813
19                     (808) 539-8700
20
21
22
23   ALSO PRESENT:   Ralph Stussi
24
25
```

```
                                                              3

 1
 2                              I N D E X
 3
 4
 5    DEFENDANT'S WITNESSES:                            PAGES
 6
 7    JACK BORJA
 8          Direct examination by Mr. Smith              5
 9          Cross-examination by Mr. Hogan              28
10
11
12    TERESA NOA
13          Direct examination by Mr. Smith             62
14          Cross-examination by Mr. Hogan              80
15          Redirect examination by Mr. Smith           98
16
17
18    REBUTTAL WITNESSES:
19
      WAYNE BERRY
20          Direct examination by Mr. Hogan            100
21
22    EXHIBITS:                         MARKED     RECEIVED
23        (None.)
24
25
```

77

```
 1       Q.   Okay.  Now you said the new database.  Was
 2   there something new about this database as far as you
 3   understood?
 4       A.   No, not new.  I mean, it's not new. But new
 5   hands, I should say.
 6       Q.   Okay.  Now during this meeting, did Mr. Berry
 7   say -- you indicated during API's time several people
 8   were making changes to Crystal Reports, right?
 9       A.   Correct.
10       Q.   Did Mr. Berry say anything at this meeting
11   that would indicate that that was going to stop?
12       A.   No.
13       Q.   Did he say anything at all that would
14   indicate that changes were going to be prohibited in
15   the system?
16       A.   No.
17       Q.   Mr. Berry drew some diagrams during that
18   meeting, right?
19       A.   Yes.
20       Q.   Now what did he indicate regarding whether or
21   not computers on the west coast were going to be used
22   to enter and retrieve data from the system?
23       A.   Can you repeat that question?
24       Q.   Do you recall whether Mr. Berry said anything
25   at this meeting about the system being operated from
```

78

```
 1   terminals at Hawaiian Express facilities in
 2   California?
 3       A.   He spoke about the setup of it, you know,
 4   where it was going to be and how it connected into our
 5   server.
 6       Q.   So his discussion was explaining how it was
 7   going to work in terms of connecting from the west
 8   coast?
 9       A.   Correct.
10       Q.   And that that was going to continue to
11   happen?
12       A.   Correct.
13       Q.   And, in fact, has that continued to happen?
14       A.   It has.
15       Q.   Is it being used any differently today from
16   the west coast than it was during 1999 when you were
17   an API employee?
18       A.   No.
19       Q.   Now did there come a time -- immediately
20   after the time that you became a Fleming employee, who
21   employed the people in California who were operating
22   those computers?
23       A.   After the --
24       Q.   Let me try to set this up again.
25            In October 1999, you became an employee of
```

79

```
 1   Fleming, right?
 2      A.   Correct.
 3      Q.   And other former API employees also became
 4   Fleming employees?
 5      A.   Correct.
 6      Q.   And there were still people on the west coast
 7   at the Hawaiian Express offices who were entering data
 8   into the software system and retrieving data from the
 9   system, right?
10      A.   Correct.
11      Q.   And who was the employer of the people at the
12   Hawaiian Express offices who were doing that?
13              THE COURT:  If you know.
14      A.   It was Fleming.
15      Q.   (By Mr. Smith) Okay.  And at some point, did
16   the people who were doing the work switch in
17   California change to Hawaiian Express payroll?
18              THE COURT:  If you know.
19      A.   They did.
20      Q.   Can you explain to the jurors what that
21   situation was or what that change was?
22      A.   It was the same -- actually, we let one
23   Fleming personnel go, and the other personnel became a
24   Hawaiian Express employee to perform the same duties.
25      Q.   Now who do the people that operate the system
```

80

1   in California report to?

2     A.   To me.

3     Q.   Who is their boss?

4     A.   Well, Hawaiian --

5     Q.   Start with today.  Who do they report to?

6     A.   They report to me.

7     Q.   Okay.  And who did they report to when they

8   were Fleming employees?

9     A.   To me.

10    Q.   Is there any difference at all in the work

11  that the people do in California now compared to when

12  they were Fleming employees?

13    A.   No.

14         MR. SMITH:  That's all of the questions

15  I have, Judge.

16         THE COURT:  Cross-examination.

17         MR. HOGAN:  Thank you, Your Honor.

18          CROSS-EXAMINATION

19  BY MR. HOGAN:

20    Q.   Ms. Noa, your job is dependent upon the

21  freight system; isn't that correct?  That if Fleming

22  ceased to use the freight system that API originally

23  had, isn't it true that your job would be in jeopardy?

24    A.   No.

25    Q.   And why do you say that?

96

```
 1      A.   No.
 2      Q.   Did Mr. Tsurada ask you?
 3      A.   No.
 4      Q.   Now you testified regarding the people at --
 5   originally, it was Fleming people that were being
 6   allowed to use the system in California; is that
 7   correct?
 8      A.   Correct.
 9      Q.   And at some point they became Hawaiian
10   Express employees?
11      A.   Correct.
12      Q.   And then you testified that they still report
13   to you.
14      A.   They do.
15      Q.   Now are you their supervisor?
16      A.   I am.
17      Q.   Do you believe --
18      A.   If I ever have any -- they listen to me.  And
19   if I ever have a problem with them, I just call the
20   next line up.
21      Q.   And who would that be?
22      A.   Pete Shaw.
23      Q.   But they're not Fleming employees; is that a
24   fair statement, ma'am?
25      A.   It is.
```

97

```
 1      Q.   And, in fact, you work with them but they
 2   don't actually work for you, do they?
 3      A.   Well, actually, yes.  We get an invoice from
 4   Hawaiian Express for $8,000 a month which is to cover
 5   their salaries.
 6      Q.   To cover their salaries?
 7      A.   Correct.
 8      Q.   What are these peoples names?
 9      A.   Al Perez and Pat Hiroyama.
10      Q.   Describe briefly how they use the database?
11           THE COURT:  If you know.
12      Q.   If you know.
13      A.   They're pretty much just gathering
14   information, the bills of lading.  The product is
15   delivered to their facility and it's on a bill of
16   lading.  They take the information off the bill of
17   lading and they input it into the database.  They
18   follow my load plan instructions.  I advise them how
19   to load a container.  Once that container is loaded,
20   they fax me the load plan, which will show me the
21   container, the seal, the vessel voyage, and the
22   sequence of the orders.  I input that information.
23      Q.   Okay.  But are they able to actually access
24   the database from California?
25      A.   Yes.
```