# EXHIBIT C

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

Berry v. HEX, et. al.

Case No. CV03 00385 SOM-LEK

**Rule 26(a)(2)(B) EXPERT REPORT OF MARTIN G. WALKER, PH.D**

**HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY**

Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, I, Martin G. Walker, Ph.D., provide the following expert report:

1.  I have been retained as an expert consultant by the Post-Confirmation Trust for Fleming Companies, Inc. regarding copyright infringement and other matters alleged by Plaintiff Wayne Berry ("Berry") in the Second Amended Verified Complaint (the "Complaint"), a true and correct copy of which is attached as Exhibit A. This report is based on my personal knowledge and experience as well as my investigation in this matter, and reflects my expert opinions on certain issues to which I may testify.

I.  **DATABASE SOFTWARE.**

2.  The software at issue in this case relates generally to the field of database applications. Database software is one of the oldest forms of software, and remains one of the most pervasive applications of computer systems. As is well known, one of the tasks that computers are particularly well suited for is collection and management of data. The computer systems responsible for managing the data, organizing the data, and presenting data in such a way as to be meaningful and understandable to humans are often called database systems. These systems can be huge and complex (for instance, the census data for the US), or much more modest (for instance in individual's address book). In fact a substantial fraction of all software systems implement some form of database systems.

II. **OVERVIEW OF EXPERIENCE WITH DATABASE SOFTWARE.**

3.  After formal programming training at MIT and Stanford University, I began writing commercial software in the mid 1970s. I have continued to program throughout my technical career, creating data capture programs (i.e. loading databases and processing data from databases) when I was with Knowledge Networks in 2001. I have continued to write data analysis programs in association with my consulting practice, writing my most recent data analysis program in April, 2005. As a result, I have nearly thirty years of experience in the design of large software projects. Most of these projects involved management of large amounts of data in circumstances where the organization of the data was extremely complex. For instance, I have over twenty-five years of experience in the fields of electronic design automation ("EDA")

software systems, circuit simulation, circuit analysis and circuit design. EDA software is used to design semiconductor devices called ICs (Integrated Circuits). As is well known, due to the inexorable advances in the industry, the complexity of these devices (and therefore the data representing the designs) is now immense. Managing the process of IC design thus involves managing massive quantities of data. As a scientist, researcher, author, and innovator in the field of EDA, I have made significant contributions to the development of EDA as an industry. I first began programming nearly forty years ago on early desktop computers. Some of these achievements and contributions are described below briefly and in greater detail in my CV, which is attached hereto as Exhibit B.

4.      In addition, beginning in the year 2000, I was the Chief Technology Officer (CTO) of an internet market research firm, Knowledge Networks. Knowledge Networks maintained a panel of approximately 50,000 consumers, each of whom had agreed to participate in one electronic survey per week. As the CTO, I was responsible for designing and managing numerous databases supporting multiple aspects of the operation of the company, including the database that contained demographic information on each panel member and other databases that stored the results of surveys. One database integration project involved the 2000 election. During each presidential debate, Knowledge Networks would survey our panel members to determine who they thought had "won" the debate. The results of this survey were stored in a database that was made available to CBS news within minutes of the end of the debate, and quoted by Dan Rather during post-debate analysis.

5.      Thus I have had substantial experience creating, designing, running and maintaining numerous complex databases in actual commercial environments. I am also familiar with Microsoft Access and other Microsoft applications.

### III.    EDUCATION AND EXPERIENCE.

6.      I received a B.S. in electrical engineering from the Massachusetts Institute of Technology in 1973, an M.S. in electrical engineering from Stanford University in 1976, and a Ph.D. in electrical engineering from Stanford University in 1979.

7.      My CV (Exh. B) contains an overview of my thirty years of experience. With

particular regard to intellectual property issues (including copyright and patent), I will note that I have worked on a significant number of such cases. In addition during my career as an executive in the software industry, I participated in many seminars regarding creation, identification, and protection of intellectual property, and I have read numerous articles in legal and business journals on those issues.

### IV. PUBLICATIONS AND SEMINARS.

8.  I have published over fifty articles relating to EDA software, including technical papers in peer-reviewed journals and an invited article in the International Electronic and Electrical Engineers (IEEE) Spectrum, and I have presented papers in various conference proceedings. I have authored numerous opinion pieces published in journals, such as EETimes, that served to establish and promote EDA technology and tools. I have also organized many seminars, which educated others about the emerging innovative concepts in the EDA industry. A list of material published in the last ten years also appears in Exh. B.

### V. AWARDS AND RECOGNITIONS.

9.  Under my leadership as Chief Executive Officer, in 1999, Frequency Technology was given the recognition of "Cool Company" by Fortune Magazine.

10. My innovative contributions to the Analog Workbench won Analog the 1984 Electronic Products New Product of the Year award.

11. In 1976, in recognition of my contributions to the design of GaAsFET amplifiers, I was awarded the IEEE Microwave Applications award.

12. For my inventions and innovations in the EDA industry, I have been awarded three patents by the United States Patent and Trademark Office.

### VI. OTHER TESTIMONY.

13. During the last four years, I have provided deposition testimony in *Synopsys v. Nassda, et al.*, Santa Clara Superior Court, Case No. CV 787950, *Synopsys v. Nassda*, United States District Court, Northern District of California, Case No. C-01-2519-SI (ND Cal.) and *Synopsys v. Nassda,* United States District Court, Northern District of California, Case No. C-03-02664-SI (ND Cal.). I have also testified as an expert in the following matters: *Aprés v. Ho,*

Santa Clara Superior Court, Case No. CV 778635, *Silvaco Data Systems v. Antonau et al*, Case No. 1-00-CV-79016; *Circuit Semantics Inc. v. Silvaco Data Systems and Ivan Pesic*, AAA Case No. 74 Y 117 01071 03 LMT; *Silvaco Data Systems v. Circuit Semantics, Inc.*, Case No. 1-04-017359.

### VII. COMPENSATION AND MATERIALS REVIEWED.

14. I am being compensated in this matter at the rate of $300 per hour with the exception of travel time for which my compensation is reduced by fifty percent. My compensation is not dependent upon the outcome of this case. I considered the materials contained in PCT-B MW 0001-0470, 0473-0548, 0550-0561, 0565-2490, and materials specifically referenced in this report to the extent not included in the numbered materials.

### VIII. SUMMARY OF MY ASSIGNMENT.

15. I was asked to compare the Berry Freight Control System, registered with the Copyright Office by Wayne Berry on October 19th, 1999, and referenced in the Complaint (the "Berry Database"), with various versions of software used by the Defendants after April 1, 2003. In particular, I was asked to determine if, in my opinion as an expert in the field of database design, there was any evidence of copyright infringement. I was asked to review two versions of the software used by Defendants: the databases used by the Defendants after April, 2003, through approximately June 9, 2003 (which I will refer to as the "Dual Databases"), and the system used by Defendants after June 9, 2003 (the "2003 Excel Spreadsheets").

16. I was also asked to analyze and comment on Berry's claims of misappropriation of trade secrets, as described in paragraphs 96-112 of the Complaint. Finally, I was asked to comment on Berry's claims of spoliation of evidence.

### IX. SUMMARY OF OPINIONS.

17. I understand that the Plaintiff alleges that the Dual Databases are an unlicensed derivative work and therefore infringe his copyright. I examined these allegedly infringing Dual Databases and determined that one is practically identical to the licensed software. In particular I found 1334 out of 1341 fields (99.5%) to be identical. Further, the few different fields add so little to the mix of protectable material that it is my opinion that the first of the Dual Databases

does not represent an unlicensed derivative work. The second Dual Database was authored entirely by Fleming, contains no content authored by Berry, and does not infringe any Berry copyright.

18.  I have reviewed each of the alleged infringing elements of the 2003 Excel Spreadsheets. As explained in greater detail below, I performed this extrinsic analysis by considering each element identified by Berry as having been copied by Defendants. Next, I identified the subset of those elements subject to copyright protection. Finally I compared the remaining protectable content with the claimed infringing content in the 2003 Excel Spreadsheets. I found that Berry had identified only very limited copyrightable content, and of this content, none of it was copied in the 2003 Excel Spreadsheets. Thus it is my opinion that the 2003 Excel Spreadsheets do not constitute an unlicensed derived work.

19.  I also reviewed the allegations of Misappropriation of Trade Secrets. I found that Berry did not identify any information with sufficient particularity to distinguish it from matters of general knowledge, nor did Berry identify any information with independent economic value from not being generally known, and therefore Berry did not identify any trade secrets. Thus it is my opinion that the defendants could not have misappropriated trade secrets (since there are no identified trade secrets to misappropriate).

20.  Finally, I reviewed Berry's claims regarding spoliation of evidence and found them to be lacking in foundation and otherwise incorrect.

## X.  INTRODUCTION TO DATABASE DESIGN.

21.  This section presents a brief overview of concepts and terms associated with database design. Particular attention is given to copyrightability of various aspects of a database.

22.  Briefly, a database is an organized collection of information. The data are organized into *fields, records,* and *tables.* A field contains a single piece of information. A record contains data for a collection of fields. Tables are a collection of records. A database then contains one or more tables. Tables and the fields within tables are assigned names so that the data can be more easily referenced.

23.  Confusingly, the term "database" not only refers to the data (as I have used the

my opinion that it does not fall within "Modification, Reverse Engineering, Decompilation, nor Disassemble." Thus it is my opinion that creation of the "Auxiliary Logistics Data" would not have been prohibited by the proposed EULA even assuming its validity, and in any event does not constitute an unlicensed derivative work or any other form of copyright infringement.

46. For the reasons stated above, it is my expert opinion that Fleming was not using unlicensed derivative software during the period of April 1 through June 9, 2003.

### XIII. POST JUNE 9, 2003 SOFTWARE: EXCEL SPREADSHEETS.

47. I understand that as of June 9, 2003, Fleming had created a new database system for its use. This new system consists of a series of Excel spreadsheets. Queries of these spreadsheets are created with Microsoft tools. For clarity, I will refer to this new database as "the 2003 Excel Spreadsheets." It is undisputed that Fleming populated[3] these spreadsheets by using queries to remove relevant data from the two databases discussed in the previous section, FCS Logistics Data and Auxiliary Logistics Data, and insert the data into the spreadsheets.

48. Berry apparently contends that this new database system constitutes an unlicensed derivative work. In particular, Berry variously contends the following:

- that the process of extracting Fleming's data somehow infringed Berry's copyright (see Undisputed Fact #3);
- that the 2003 Excel Spreadsheets themselves are an unlicensed derivative work (see Undisputed Fact #3);
- that the 2003 Excel Spreadsheets contain literal elements of Berry's data structures (Undisputed Fact #3); and
- that the 2003 Excel Spreadsheets contain "protected elements [which] were copied from Berry's Freight Control System" (Berry's Motion for Summary Judgment, p. 15).

49. This section details my analysis and the basis for my conclusions regarding the

---

[3] The term "populated" refers to the process of importing data into a database. Initially upon design of a database, the database itself, such as Fleming's 2003 Excel spreadsheets, contains no data. Thus Fleming must grab their data from the original Berry database and put it into their new database. This process is referred to as "populating" their new database.

above issues. First I consider the allegation regarding the extraction process. The last three allegations actually amount to the same issue: that the 2003 Excel Spreadsheets are an unlicensed derivative work. I will consider them together in the latter part of this section.

50. However, before detailing my analyses, it is important to review the aspects of this process which are not at issue. In particular, it is undisputed that the data contained in the Berry Database was owned by Fleming, and there are no contrary claims of ownership at issue in this matter. Further, it is undisputed that Berry had granted Fleming permission to change and modify reports that came out of the system. See Exh. Q. Indeed, I note that Berry has made no claims regarding these aspects, either in the Second Amended Complaint, in his deposition testimony, nor in his Summary Judgment Motion. Thus the only aspect of the database which remains at issue concerns the structure of the individual tables.

The Extraction/Population Process

51. As mentioned above, it is undisputed that the data were the property of Fleming. I understand that Fleming used MS Query to transfer the data from the Berry Database and into the spreadsheets. In my opinion, using tools to extract data does not, in and of itself, infringe Berry's copyrights. In fact, I understand that such use is specifically permitted.

52. Further, I have reviewed all material and references submitted by Berry as part of this Summary Judgment Motion. I can find no discussion, no argument, and no analysis of any possible reason that the data are owned by Berry, nor any discussion of why extraction of the data should be considered an infringement of Berry's copyright.

53. In fact Berry's own expert, Dr. Johnson, comments that "It seems clear to me that Fleming has the legal right to their data." (See Johnson's production of documents Bates stamped B0031 and attached as Exh. H)

54. In my opinion, it is clear that the Fleming owns the data and has the right to extract their data from Berry's database.

**The 2003 Excel Spreadsheets**

55. The next issue I considered was to determine if the 2003 Excel Spreadsheets constitute an unlicensed derivate work.

56. Berry and Johnson both suggest that the basis for the infringement allegation regarding the 2003 Excel Spreadsheets is that their *structure* is somehow derived from the Berry FCS. When asked for further details in their depositions, both Berry and Johnson identified the relations among the tables as the elements of the structure that were allegedly copied. Thus my analysis will first focus on the structure of the relations among the tables.

57. As an initial matter, I examined the copyright filing of Berry's 1993 FCS, ("the Filing") to determine which aspects of the structural relationships were actually copyrighted. I could not identify any relational elements explicitly identified in the copyright. Furthermore, during his deposition, Mr. Berry was asked to identify such relational aspects in the Filing. As I watched, Mr. Berry reviewed the filing for at least 20 minutes and was unable to identify any such relational aspects. As of the following day, Mr. Berry had still not been able to identify any structural aspects. Given that Mr. Berry has initiated litigation alleging many millions of dollars in damages, and named well over twenty individuals and entities as defendants, I would have expected that Mr. Berry would have a detailed understanding of his copyright filing, which is central to this litigation. Thus I find his inability to identify any relational aspects of the tables in the copyright notice especially significant. As a result of my inability to identify these relational aspects of the database in the filing, and especially Berry's inability to identify such aspects in the filing, it is my belief the Berry did not copyright the relations among the tables. Thus the 2003 Excel Spreadsheets cannot be an unlicensed derivative work.

58. However, in case someone is able to identify such structure in the copyright filings, I further investigated Berry's claims. In particular, I identified specific structural elements which Berry alleges were copied in the 2003 Excel Spreadsheets. In order to perform this analysis, I first looked at the overall organization of the 2003 Excel Spreadsheets and compared their organization with the Berry 1993 FCS database. The following table compares the two programs:

|  | Berry 1993 FCS | 2003 Excel Spreadsheets |
|---|---|---|
| **Underlying Program** | Access (database manager) | Excel (spreadsheet) |
| **Number of Files** | 1 database file | 4 spreadsheet files |
| **Number of Top Level Elements** | 65 tables | 13 worksheets |
| **Number of Sub Elements** | 1334 fields | 260 columns |

59. As can easily be seen, the 2003 Excel spreadsheets are quite different from the Berry 1993 FCS database. The large differences in number of tables and number of fields suggest two very different works and weigh against Berry's allegation that the 2003 Excel Spreadsheets is somehow derived from the structure of the Berry 1993 FCS.

60. Again giving Berry the benefit of the doubt, I then proceeded to analyze the specific claim that elements of the relational structure were somehow derived from the Berry 1993 FCS. My first step was to specifically identify the allegedly copied elements. As mentioned above in the discussion relating to relations among tables, I noted that the characteristic element of such relations were the data in one table that referred to a record in another table, the so-called pointer. Thus, I examined the specific pointer elements that Berry identified as being copied.

61. Attached as Exhibit I is Berry's identification of the allegedly copied elements[4]. Of the 41 elements on this list, I recognized that two of these were possibly pointer elements which I investigated further. These are item 31, which relates the "Item – Job Cost Detail" table with the "Item – Container" table in the Berry database, and item 17, which relates the "Cost – Container" table with the "Item – Container" table in the Berry database.

62. As I mentioned above in Section X, "Introduction to Database Design," there are three principal aspects of a structural relation: the table in which the pointer is stored, the table the pointer references, and the pointer itself. It follows that in order for a structural relationship to be copied, all three aspects must be copied. Further, as discussed in Section X above, the similarities in the tables cannot be due to external factors such as business requirements, since

---

[4] Berry attached this identification to the Berry Affidavit as Exhibit 34.

similarities due to such external factors do not result in copyright infringement. Thus I analyzed these two structural elements with both of these issues in mind.

**Analysis of Exhibit I Item 31 - "Container ID"**

63. First considering item 31 above, I looked at the relevant tables and worksheets. The table below summarizes what I found.

| Berry 1993 FCS Database | | 2003 Excel Spreadsheets | |
|---|---|---|---|
| Table Name | Number of Fields | Worksheet Name | Number of Columns |
| Referenced Object | | | |
| Item – Container | 125 | Container | 42 |
| Primary Object | | | |
| Item – Job Cost Detail | 31 | Order | 47 but only 2 items are extracted from Item – Job Cost Detail; the rest are extracted from other sources. |

64. As can easily be seen, the various objects (tables and worksheets) are quite different. For instance considering just the primary objects, the Berry table has 31 fields, while the worksheet from the 2003 Excel Spreadsheet has 47 columns. It is difficult to imagine how Berry could claim that this worksheet is somehow copied from his database. But further investigation reveals even more distinctions between the two objects. I reviewed the command that I understand Dillon used to create this worksheet for the 2003 Excel Spreadsheets. This command (which is Exhibit 13 to Berry's Affidavit from September, 2003) is attached as Exhibit J. I found that Dillon created a new object unlike any object that existed in the Berry database. When Dillon extracted Fleming's data from the Berry 1993 FCS database, Dillon combined data from two different tables. Thus Dillon implemented a new object with fundamentally different business requirements. Whereas Berry envisioned an external requirement that separated "Item – Job" and "Item – Job Cost Detail" so that one job could have multiple detail records associated with it, Dillon implemented a system with no distinction between the two issues as is illustrated in Figure 3. Thus it is my opinion that the "Order" worksheet *cannot* be derived from the "Item – Job Cost Detail" table.



Figure 3. There are two tables in the Berry database while there is one table in the spreadsheets that hold similar data.

65.     A similar analysis leads to an identical conclusion regarding the referenced objects. (The command used to create the "Container" worksheet is attached as Exhibit K.) First, the sizes are significantly different: 125 fields vs. 54 columns. The Excel worksheet similarly implements a system based on different business requirements and it combines data from two different tables in the Berry Database (i.e. the worksheet combines data from the Berry tables, the "NotesCtn Firsts" table and the "Item – Container" table). Further, in this case, Dillon's Spreadsheets are configured to contain data for which there is no corresponding record in the Berry FCS database. This is because Dillon's use of the keywords "LEFT OUTER JOIN" near the end of the command in Exh. K signifies the creation of records that do not exist in the Berry

database, since the command instructs Access to create such records even when the corresponding record in the Berry database doesn't exist.

66. Since the Dillon objects are clearly not derived from the Berry objects, it is my opinion that the *relation* between the objects is not copied from the Berry database. Thus the allegedly copied element #31 in Exh. I does not represent copyright infringement.

**Analysis of Exh. E Item 17 – "Unit ID"**

67. Berry additionally alleges that the structural relationship represented by Item 17 is also copied by the 2003 Excel Spreadsheets. Item 17 identifies a relation (in the Berry Database) between the "Cost – Container" table and the "Item – Container" table. This relation is alleged to correspond to a relation (in the 2003 Excel Spreadsheets) between the "Container" worksheet and the "Costs" worksheet.

68. I already analyzed the differences between the "Item – Container" table and the "Container Data" worksheet in the previous section, and found that they were fundamentally different. Thus I next turned to an analysis of the "Cost – Container" table and the "Costs" worksheet. I first noted that the sizes of the two objects were quite different: the table has 16 fields, where the worksheet has 11 columns. And although this table appears to represent a similar business requirement to the worksheet, this is simply because the external business requirement is similar: there can be one or more costs that must be aggregated into a single container's total shipping cost. Thus, to the extent that there is similarity in these two objects, it is due to external requirements, not copying. Further, as mentioned above, the other two objects in this relation are markedly different. In summary, the element detailed in Item 17 does not represent copying, and does not support Plaintiff's contention that the 2003 Spreadsheets are an unlicensed derivative of the Berry 1993 FCS database.

69. Thus it is my opinion that, even if Berry were to show that he has copyrighted the structural relations among the tables, the specific elements identified by Berry are not copied from Berry's 1993 FCS database, and thus do not support Berry's allegation that the 2003 Spreadsheets are a derived work.

## Other Allegedly Copied Elements

70. A further review of Exhibit 34 leads me to believe that Berry may at some point allege that each of the other 39 elements identified in Exhibit 34 support his claim of copyright infringement. Although Berry has not yet made such an allegation, I conducted an extrinsic examination of each of these elements in detail to determine if any of them evidenced copyright infringement.

71. I performed this analysis by first looking at each of the 39 remaining elements that Berry alleges were copied[5]. For each of these elements, I considered the distinction between an idea (which I understand is not protectable by copyright) and the expression of the idea (which I understand may be protectable). As part of this analysis, I considered the possible range of expression for each particular idea. If there were only one way to express an idea, then the idea is not separable from its expression, and the element is not protectable by copyright. Further, if there were only limited possible expression, then the element would be protected by so-called "thin" protection only. If there were a broad range of possible expression, the element would be protectable by so-called "broad" protection. Since I understand that expressions derived from external requirements such as "business rules" are not protectable, I also considered if the expression was driven by such business rules. Finally, I compared the Berry-identified element with its corresponding allegedly copied element in the 2003 Excel Spreadsheet, applying the appropriate standard of protection (i.e. "broad" or "thin").

72. Since Berry broadly identified "structure" of the database as a protectable element, I paid particular attention to how each element identified in Exh. 34 expressed the "structure" of Berry's database. In particular, I identified following four aspects of structure that could be expressed by a particular identified element:

- the name of the table
- the collection of fields within a table
- the function of the particular field, and

---

[5] Since I individually examined each element identified by Berry (i.e. dissected the copyright claims into individual elements) and analyzed each element for its level of protection and degree of copying, if any, I termed the process "analytic dissection."

- the name of the field.

(Another structural aspect, relations between tables, was explored in detail in the previous section.)

73.     Exhibit L presents the results of my analysis. For illustrative purposes, I will discuss in detail one of these analyses below. The following table is my analysis for the first element identified by Berry, "Company – Name.ID."

| Berry Element | 2003 Excel Spreadsheet Element | Walker Analysis |
|---|---|---|
| `Name - Company.ID` | `Contacts.Contact ID` | This element consists of a field called "ID" within a table called "Name – Company." The alleged copied element is a field called "Contact ID." |
| | | It is industry standard practice for a table used in a relational database (as described above in section X), such as the Berry Database, to have a field with a unique identifier. The purpose of this identifier is to relate entries in one table with those in another table. The 'ID' field in the Berry database is just such a field. It is a unique "serial number" assigned to each company to facilitate references to that company. For instance, the first company in the database might have ID as one, the second company, two, and so on. There is no unique expression in such a number. |
| | | In the context of a relational database, such fields are not only a normal and accepted practice, but are practically required for their efficient operation. Further the label, 'ID' for this type of field is standard jargon in the database industry. I can find nothing original or creative in the name, 'ID.' |

74.     This table is divided into three columns. The first column shows the element from the Berry database that Berry alleges was copied. The identification of the element follows the format from Berry's Exhibit 34, ie <table name>.<field name>. In this case, "Name-Company.ID," which corresponds to a table name of "Name-Company" and a field name of "ID." The second column has the corresponding information from the 2003 Spreadsheets. In this case the worksheet name is "Contacts," and the column name is "Contact ID." Each of the allegedly

copied elements are identified in a similar manner. Berry's Exh. 34 properly identifies the field name (or corresponding column name) from both the FCS 93 database and the 2003 Spreadsheets, however, it only identifies the table name from the 1993 FCS database, but does *not* identify the corresponding worksheet name. I supplied this missing information in my Exhibit L.

75. In consideration of this element, I note that Berry claims that the name "ID" somehow represents his unique expression and is therefore protectable expression. That claim is incorrect; there is nothing unique about the concept of using "ID" as the name of a pointer field. But nonetheless I continued with a detailed analysis of this element. As discussed above in Section X, the concept of using an identifier in a table is standard industry practice. It is even such standard practice that it has a standard name: "primary key." Further as discussed above, it is common practice to name such a field as "ID," or "<table name>ID" (e.g. "CompanyID") as in the example discussed in detail in Section X above. Thus, this field in Berry's database does not represent copyrightable expression, thus my analysis of this element stopped. It is not necessary to determine if the element was copied if the element itself is not protected.

76. This attempt by Berry to identify allegedly copied elements that are clearly not protectable is not an isolated occurrence. In fact six of the elements that Berry identifies as being copied are such industry standard, ID-related fields.

77. The attached Exhibit L contains my analysis of each element in detail. However, after analyzing each of the elements according to the methodology I outlined above, I found that the allegedly copied elements could be categorized as follows according to the type of copyright protection properly afforded to the element:

//

//

//

//

//

//

RULE 26(a)(2)(B) EXPERT REPORT OF MARTIN G. WALKER, PH.D.
CASE NO. CV03 00385 SOM-LEK                                    23
HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

| Identification in Exh. 34 | Level of Copyright Protection (see Exhibit L for detailed analysis on a per element basis) |
|---|---|
| 1, 3, 21, 22, 27, 30 | These elements are primary keys and do not represent original expression and therefore are not subject to copyright protection. |
| 8, 9, 13, 29 | These elements are merely descriptive of their contents, and are subject to thin protection at most and the Dillon element is not identical to the Berry element, so there is no infringement. |
| 32, 33, 34, 35, 36, 37 | These elements are not protectable since the concept merges with the expression. |
| 4, 10, 11, 12, 18, 19, 20 | These elements derive from external business requirements, thus are not protectable. |
| 2, 5, 6, 7, 14, 15, 16, 38-41 | These elements are subject to thin protection only because they are driven by external or industry terminology. These elements are not virtually identical so there is no infringement. |
| 24, 25, 26, 28 | These elements in the Dillon Spreadsheets evidence different structure than the identified counterparts in the Berry database, and are therefore not copied. |

78. As a result of this analysis, I found that few of the allegedly copied elements were actually protectable by copyright, and that of these few that were protectable, they were subject to thin protection only, and that Dillon did not literally copy these elements. Thus it is my conclusion that the Dillon 2003 Spreadsheets should not be considered to derive from Berry's 1993 FCS.

The Johnson Report

79. I have reviewed in detail the expert report of Dr. Johnson dated March 19, 2005, attached as Exhibit C. Careful reading of Dr. Johnson's report reveals several significant points. First, Dr. Johnson devotes most of his report to advocating *one* method for extracting Fleming's data from the Berry database. Dr. Johnson does not opine that his is the *only* permitted method to extract the data. In fact, Dr. Johnson admits that extracting the data is permissible in general, and he merely specifies one particular method to perform this extraction. Although I agree with Dr. Johnson that Fleming did not use *his* method to extract the data, it is my opinion that the method that the Defendants did use (i.e. using Microsoft tools to extract the data) is a specifically permitted use, and does not, in and of itself, represent copyright infringement. Indeed, the "Posner Case" that Dr. Johnson references (Assessment Technologies v. WireData, 350 F.3d 640 (7th Cir. 2003)) specifically authorizes this very practice, as Dr. Johnson observed in his notes.

80. The second point regarding the Johnson Report is that Dr. Johnson did not perform any analysis of the allegedly copied elements. According to Johnson's report, the only matters that Dr. Johnson considered were details of the data extraction process. Surprisingly, during his deposition, Dr. Johnson admitted that he did not even examine the 2003 Excel Spreadsheets at all. He also admitted that he didn't examine the Berry 1993 FCS database. Thus it appears that Dr. Johnson has no basis to opine that the 2003 Spreadsheets represent a work derived from the Berry database. Since Dr. Johnson did not examine either pertinent work, it is not surprising that his conclusions are wrong. Dr. Johnson's opinions should be properly limited to aspects of the extraction of the data, not to the structure of the 2003 Excel Spreadsheets. In summary, it is my opinion that Johnson disclosed no basis for his statement that "Fleming ... are (sic) using a derived work" and that, in fact, his opinion is wrong.

### XIV. ALLEGED MISAPPROPRIATION OF TRADE SECRETS

81. It is my understanding that the Plaintiff in a trade secret action has an affirmative obligation to identify trade secrets at issue with sufficient particularity to distinguish them from matters generally known. I have reviewed Berry's complaint, Berry's affidavit, the Berry Declaration, and Berry's responses to Defendant's interrogatories, and I personally attended his deposition. I have found that Berry has not been unable to identify *any* trade secrets at issue in this matter. This section details the basis for my finding. Before discussing the foundation for my opinion in general, I will detail a particular example of Berry's failure so as to make the general case more clear.

82. According to the Berry Summary Judgment brief (but noticeably not supported in the companion Concise Statement of Facts) the Berry Declaration ¶ 9-27 purports to address specific trade secrets. For instance ¶ 19 states that Berry considers the file "L04.asp" to be one of his trade secrets in the source code category. As an initial matter, it is obvious that a source code file name is not normally a trade secret. The contents of a source code file may disclose one or more trade secrets, and in this case Berry speculates that this file has something to do with accessing and printing reports over the internet. However, Berry does not specify the trade secret with any particularity, let alone distinguish it from generally known matters. For example Berry

- that the server (if the file was on the server) was the same server on which Berry had installed his software 5 years earlier;
- that the listing in the Guidance image has anything to do with the notation. The only evidence Berry cites is file size. And most importantly, the file sizes are **different**. Berry bases his entire theory on the fact that he found an unallocated cluster that matched the size of the file that Gorzi supposedly found. But the size of the cluster cited by Berry is 4.719Gbytes, and the size noted in the notation is 4.630Gbytes. These sizes are obviously different.

97. In summary it is my opinion, based on the specific issues cited above as well as numerous other issues in the report itself, that the Berry Declaration Re Spoliation contains unfounded speculation and unsupported expert opinion and should be disregarded in its entirety.

## XVI. CONCLUSION.

98. My principal conclusions in this matter can be summarized as follows:

- That the Dual Databases, used prior to June 9, 2003, are not unlicensed derivatives of the Berry FCS 93 database;
- That the 2003 Excel Spreadsheets, used as of and after June 9, 2003, do not constitute an unlicensed derived work;
- That Berry has not identified any trade secrets; and
- That the Berry Declaration Re Spoliation should be disregarded as inappropriate expert testimony.

Dated: May 31, 2005

_____
MARTIN G. WALKER, PH.D.