KOBAYASHI, SUGITA & GODA

BERT T. KOBAYASHI, JR.   659-0
LEX R. SMITH            3485-0
THOMAS H. YEE           7344-0
SUITE 2600, First Hawaiian Center
999 Bishop Street
Honolulu, Hawaii  96813
Telephone:  (808) 539-8700
Fax No. (808) 539-8799
Email: lrs@ksg.law.com

Attorneys for Defendants

C&S LOGISTICS OF HAWAII, LLC, C&S
WHOLESALE GROCERS, INC., C&S
ACQUISITIONS LLC; ES3, LLC, and RICHARD
COHEN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WAYNE BERRY, a Hawaii citizen; | ) CIVIL NO. CV03-00385 SOM-LEK |
| | ) (Copyright) |
| Plaintiff, | ) |
| vs. | ) DECLARATION OF LEX R. SMITH |
| | ) |
| HAWAIIAN EXPRESS SERVICE, | ) |
| INC., et al., | ) |
| Defendants. | ) |
| _____ | ) |

DECLARATION OF LEX R. SMITH

1. I am an attorney licensed to practice law before the State and federal courts in the State of Hawaii and one of the attorneys representing C&S Wholesale Grocers, Inc. in this case. I am also local counsel for the Fleming Post Confirmation Trust ("PCT"). Unless otherwise indicated, I make this declaration based on personal knowledge.

2. I represented Fleming in the case that went to trial in 2003 and resulted in a verdict of $98,250 in Mr. Berry's favor. Fleming declared bankruptcy a few weeks after the verdict and my activity on behalf of Fleming ceased.

3. In the months following the Fleming bankruptcy petition, Damian Capozzola, Esq. contacted me from time to time in his effort to understand the claims and accusations that were being made by Wayne Berry and his counsel.

4. The plaintiff has produced a copy of an e-mail from the files that were produced to him in September of 2005. The e-mail is dated May of 2003 and indicates that Mr. Capozzola had obtained a copy of the database that was the subject of Mr. Berry's claims. It also indicates that I was copied on the e-mail and that I warned Mr. Capozzola about giving Mr. Berry and Mr. Hogan Fleming's data.

5.      Several months later, Mr. Berry sued Fleming. The complaint in this case naming Fleming as a defendant was filed in August of 2003 and I was retained to represent Fleming in that matter. During the entire time I have represented Fleming in this case, I had no recollection whatsoever that a copy of the database had been provided to Mr. Capozzola. My understanding has always been that the only copies of the database used between April and June 2003 were on the before image taken by Guidance.

6.      On July 22, 2003, Guidance Software produced a report detailing the work that it had performed over the July 4 weekend on the computer network located in Fleming's Logistics department in Kapolei.

7.      A copy of the Guidance report was provided to Plaintiff's counsel on July 23, 2003.

8.      The Guidance report explained that Guidance created two images: a "before" image taken at the time Guidance arrived at Fleming's warehouse in Kapolei; and a second "after" image taken after Guidance and Mark Dillon had performed certain work intended to remove from the Fleming Logistics network works authored by Plaintiff.

9.      In discovery in late 2003 Plaintiff requested complete copies of the Guidance images. I objected because the images contain tremendous

amounts of proprietary information that is not relevant to any issue in this case.

10. Also in late 2003, the Plaintiff requested copies of anything created by Wayne Berry that Fleming possessed. I responded that "subject to an appropriate protective order" a copy would be produced, redacted to protect Fleming's confidential data. The parties could not agree on a protective order. Discovery Master Clyde Matsui entered the first and only protective order in this case in 2005, which the plaintiff appealed. By the time plaintiff's appeal was denied, Guidance Software had already been a defendant in this case for nearly a year and any discovery of materials in Guidance's possession were being handled by Guidance's counsel and the Discovery Master.

11. In late 2003 or possibly early 2004, I proposed to Plaintiff's counsel that I would produce to him a list containing all the filenames on the before images and a separate list containing all the filenames on the "after" images. From those lists, the plaintiff could request production of specific files with possible relevance to this case. Attached hereto as Exhibit "A" is a true and correct copy of the e-mail discussing this arrangement.

12. Plaintiff's counsel expressly told me that he was accepting the lists I had agreed to produce, but that he was not waiving his right to move at any time to compel production of the entire images.

13. The lists identifying every file on the Guidance images were prepared by Guidance and produced to Mr. Hogan during the month of February of 2004. Because of the hundreds of thousands of files on Fleming's Logistics Network, the lists were very lengthy and were produced on a CD.

14. For the next *fifteen months*, Plaintiff did not follow-up my production of the lists with any request for production of any of the files identified on the lists.

15. On May 28, 2004 the plaintiff filed in this Court a motion for a preliminary injunction. The lists that I had produced in February of 2004 were the primary basis for Plaintiff's motion for preliminary injunction (the lists reflected several copies of the Berry-authored database were on the "after" images).

16. The May 28, 2004 Declaration of Timothy Hogan filed with his motion for preliminary injunction confirms that the lists of filenames were in Plaintiff's possession since February of 2004.

17. Also, in May of 2004, Guidance offered to turn the before and after images over to the Court to facilitate production of any files the Court deemed relevant. Fleming and C&S endorsed Guidance's proposal. In a letter to Magistrate Judge Leslie Kobayashi, I urged:

> the media should be held by a neutral party who is knowledgeable about computers, because the neutral party will be able to retrieve any information from the media that the court determines relevant to any issue in this case

Exhibit "B".

18. By e-mail dated May 18, 2004, Plaintiff flatly refused to have the images placed in the hands of a neutral third party who could retrieve any information the Court determines is relevant to any issue in this case. A copy of Plaintiff's e-mail is attached hereto as Exhibit "C".

19. After May of 2004, Plaintiff did nothing for the next ten months regarding the contents of any of the Guidance images.

20. In late April of 2005, Plaintiff provided the defendants with a list of 23,000 filenames which he had created from the "after" lists I had produced to him fourteen (14) months earlier. Plaintiff claimed that these 23,000 files contained (or were "suspected" of containing) "trade secrets" that he claimed to own.

21. On May 3, 2005, Fleming asked the Discovery Master to instruct Guidance to produce the 23,000 files Plaintiff claimed were his trade secrets in order for Fleming's expert to examine them. A copy of the Fleming's request is attached hereto as Exhibit "D".

22. Plaintiff responded to Fleming's request by requesting the Discovery Master order production of the entire Guidance images. (Exhibit "E").

23. On May 26, 2005, the Master ordered Guidance to produce the 23,000 files Plaintiff had designated from the "after" images plus all files the plaintiff claimed were "related to the version of the Berry database that Fleming used between March 7, 2003 and June 9, 2003." A copy of the Master's Order is attached hereto as Exhibit "F."

24. In addition to the 23,000 files from the "after" images, Plaintiff designated another approximately 140,000 files from the "before" images.

25. There was some discussion between Guidance and the Plaintiff regarding clarification of the Plaintiff's request. Attached hereto as Exhibit "G" is a copy of a June 6, 2005 e-mail exchange between Guidance and the plaintiff clarifying the requested files.

26. On or about June 16, 2005, Guidance produced a DVD containing the approximately 23,000 files plaintiff had requested from the "after" images.

27. On July 11, I learned that there were numerous attorney-client communications among the 23,000 files plaintiff had requested from Guidance. Attached as Exhibit "H" is my letter demanding that plaintiff return the DVD and identify specific files that he believed in good faith had relevant information in them.

28. On July 12, 2005, Plaintiff voluntarily sent the DVD containing the Guidance "after" files to the Master.

29. On July 13, 2005, Guidance wrote that in view of the concerns regarding attorney-client privilege, Guidance would be producing the approximately 140,000 files plaintiff requested from the "before" images only to (1) Lex Smith, (2) Damian Capozzola, and (3) the Discovery Master. A copy of Guidance's e-mail is attached hereto as Exhibit "I".

30. On July 18, 2005 Guidance produced the files from the "before" images to the Discovery Master and to counsel for the PCT.

31. On July 20, 2005 I offered to produce immediately to the plaintiff the entire Guidance production, if the plaintiff would agree that my doing so was not a waiver of the attorney-client privilege. I repeated this

offer on July 21 and July 25, 2005. Plaintiff refused. Copies of the correspondence relating to this matter are attached hereto as Exhibit "J."

32. Because of the plaintiff's rejection of my offer, I began the laborious task of searching the Guidance production for attorney client privileged materials.

33. The plaintiff's request was extraordinarily overbroad. Guidance estimated that the files plaintiff had designated would fill **70 million pages**. The files plaintiff requested included defendant Mark Dillon's research regarding his baby's weight gain; correspondence regarding Mr. Dillon's wife's visa application to Eastern Europe and many tens of thousands of other irrelevant files.

34. On September 21, 2005 (after removing all of the files I could find that contained attorney-client communications), I produced the files from the before and after images to Mr. Hogan. (Exhibit "K"). A privilege log was provided to Mr. Hogan.

35. I understand from Dr. Martin Walker that the September 21, 2005 production of more than 140,000 files included the e-mail which has triggered the plaintiff's instant motion to "reconsider."

36. On October 5, 2005, Discovery Master Clyde Matsui ordered that Plaintiff is not entitled to receive any more files unless and until he

9

states a good faith basis. The plaintiff never complied with the Master's order and has never provided any good faith basis for his massive discovery demand. Specifically, the Master ordered:

> Plaintiff shall provide, to Defendants, an explanation as to the good faith basis for each of the Guidance Files requested.
>
> …
>
> Plaintiff is ordered to demonstrate the good faith basis for each of the files requested.
>
> …
>
> No later than 10 days after receipt of Plaintiff's explanations, C&S shall:
>
> (a) produce a copy of all Guidance Files identified by Plaintiff to which it has no objection to production, and
>
> (b) provide Plaintiff with an explanation of all Guidance Files identified by Plaintiff to which it objects.
>
> …

Exhibit "L"

37. The procedure ordered by the Master has never taken place because the plaintiff never obeyed the order. Plaintiff has never provided a good faith basis for the production of any of the tremendous number of files he demanded.

I declare under penalty of perjury that the statements made herein are true and correct to the best of my knowledge, information and belief.

DATED: Honolulu, Hawaii, February 17 2005.

_____
LEX R. SMITH