# EXHIBIT H

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF HAWAII

3

4    WAYNE BERRY, a Hawaii      )    CIVIL NO. CV03-00385
     citizen,                   )         SOM LEK
5                               )    (Copyright)
              Plaintiff,        )
6                               )
         vs.                    )
7                               )       *ORIGINAL*
     HAWAIIAN EXPRESS           )
8    SERVICE, INC., a           )
     California corporation,    )
9    et al.,                    )
                                )
10            Defendants.        )
     _____)

11

12

13            DEPOSITION OF THOMAS UENO, CPA

14   Taken on behalf of Defendant Post-Confirmation Trust

15   at the offices of Kobayashi Sugita & Goda, 999 Bishop

16   Street, Suite 2600, Honolulu, Hawaii, 96813,

17   commencing at 10:11 a.m. on Monday, January 23, 2006.

18

19   REPORTED BY:  JOAN IZUMIGAWA, CSR No. 136

20                 Notary Public, State of Hawaii

21

22

23

24

25

```
 1    APPEARANCES:

 2    For Plaintiff Wayne Berry, a Hawaii citizen:

 3         TIMOTHY J. HOGAN, ESQ.
           Lynch Ichida Thompson Kim & Hirota
 4         1132 Bishop Street, Suite 1405
           Honolulu, Hawaii  96813
 5         Ph:  (808) 528-0100

 6    For Defendant Post-Confirmation Trust:

 7         ERIC C. LIEBELER, ESQ.
           Kirkland & Ellis LLP
 8         777 South Figueroa Street
           Los Angeles, California  90017
 9         Ph:  (213) 680-8484

10    For Defendants Mark Dillon, Teresa Noa, and Brian
      Christensen, et al.:
11
           LYLE S. HOSODA, ESQ.
12         Lyle S. Hosoda & Associates
           345 Queen Street, Suite 804
13         Honolulu, Hawaii  96813
           Ph:  (808) 524-3700
14


15
      Also present:  Jeffrey Kinrich
16                    Wayne Berry

17

18

19

20

21

22

23    Witness address:  c/o Timothy J. Hogan, Esq.

24

25
```

1              THOMAS UENO, CPA,

2    Being first duly sworn to tell the truth, the whole

3    truth, and nothing but the truth, was examined and

4    testified as follows:

5                  EXAMINATION

6    BY MR. LIEBELER:

7        Q.    Mr. Ueno, I'm Eric Liebeler.  I know you've

8    been deposed many times before so I'm just going to

9    give you one admonition, and that is this:  If you

10   don't understand any of my questions over the course

11   of the deposition this morning, will you tell me

12   that, please.

13       A.    Yes.

14       Q.    Now, you wrote a supplemental report that

15   you finished on December the 27th of 2005; is that

16   right, sir?

17       A.    That's correct.

18       Q.    And -- let's just give you a copy.  Do you

19   have a copy of that with you, sir?

20       A.    Yes, I do.

21       Q.    Okay.  Where is it?

22             I'm just going to -- I can just give you

23   this copy.  We can use that, as well.  And you have

24   the exhibits with it, as well?

25       A.    No.  I did not bring the exhibits with that.

1      Q.    Okay.  I've got what was produced to me as

2  the exhibits, so let me give you what I've got as

3  Trial Exhibit 93 along with the exhibits and just

4  have you identify that as your December 27th report,

5  sir.

6      A.    Yes, it is.

7      Q.    So Trial Exhibit 93 is your supplemental

8  report; is that right, sir?

9      A.    Yes, it is.

10     Q.    Do the attached exhibits look like the

11 exhibits that you had attached to your report?

12          MR. HOGAN:  I'm just going to state an

13 objection that it's voluminous.  Let the record

14 reflect it's voluminous, and obviously for him to go

15 through it line by line would not be possible in the

16 time we have.

17     Q.    BY MR. LIEBELER:  Just look at the face page

18 of each exhibit and -- I've included faithfully all

19 of the things that were produced to me.  I just want

20 you to look at each face page and make sure that

21 they're in general the exhibits that were attached to

22 this report.

23     A.    In general they are.

24     Q.    Now, in your report you have indicated --

25 and I'm on the first page of Trial Exhibit 93.  93,

1    first page.  You have said, "I prepared these

2    supplemental opinions based on new information that

3    was made available to me."

4        A.    That's correct.

5        Q.    What new information was made available to

6    you did you use to prepare these reports?

7        A.    Mr. Hogan gave me a disk full of records,

8    and the records are the ones that you're referring to

9    in the exhibits and --

10       Q.    Was there anything on that disk other than

11   the exhibits that are attached to your report, sir?

12       A.    Other than the information for the exhibits

13   in our report, no.

14       Q.    Where is that disk now, sir?

15       A.    Okay.  What I've produced here is a copy of

16   the information that was given to us.

17       Q.    Okay.  So the disk that you're showing me is

18   in fact a copy of the disk that was given to you by

19   Mr. Hogan; is that --

20       A.    It's a copy of the information --

21       Q.    -- right, sir?

22       A.    Yeah, he -- what he did was e-mail it to us

23   and so we downloaded it to a disk for you.

24       Q.    Was there a cover e-mail along with that

25   information?  You know, "Dear Mr. Ueno:  Here is some

1    more information for you.  Sincerely, Tim"? That kind

2    of thing?

3        A.    Without the "sincerely," yes.

4        Q.    Where is that e-mail?

5        A.    Gee.  I'm not sure whether it's on there or

6    not.  It could be on there.

7        Q.    So as of now you don't know exactly where it

8    is, but it might be on the disk you just gave me.

9    Fair?

10        A.    Yes, because I asked my staff to copy all

11    the e-mails and that file, and so I'm assuming it's

12    there.

13        Q.    Do you have hard copies of that information

14    with you here today, sir?

15        A.    No, I don't.

16        Q.    I'm going to write on this "Produced by

17    Mr. Ueno at 1/23/05 deposition."

18            MR. HOGAN:  I don't know what's on that

19    disk.  I don't -- so I can't tell you what --

20            MR. LIEBELER:  I understand.  I'm just

21    saying "produced."  I'd like you to initial that,

22    Mr. Hogan, just --

23            MR. HOGAN:  I'm not here to be an exhibit --

24    I understand.

25            MR. LIEBELER:  That's fine.

1    question to Mr. Hogan or Mr. Berry?

2        A.    Which specific question?

3        Q.    The specific question about whether or not

4    the $2.7 million number was actually collected by

5    Fleming.

6        A.    No.  We don't ask that kind of questions.

7    We do it in our analyses.

8        Q.    So the answer is:  No, you didn't ask that

9    question?

10            MR. HOGAN:  Objection.  Misstates his

11    testimony.

12        A.    That's correct.

13        Q.    BY MR. LIEBELER:  Thank you.

14            Did you do any analysis, sir, to determine

15    what, if any, expenses Fleming would have in earning

16    that $2.7 million number?

17        A.    We did some analyses on that.

18        Q.    Okay.  What analysis did you do?

19        A.    We looked at the -- some of the costs -- or

20    the costs of the logistics department.

21        Q.    What other analysis did you do, sir?

22        A.    Well, that was about the type of information

23    that we've had.  So we looked at that.

24        Q.    Other than looking at the costs of the

25    logistics department specifically, did you do

1   anything else to try to determine what expenses were

2   associated with that $2.7 million billing number?

3        A.    I looked at whatever information that we had

4   available to us, and that was the only type of costs

5   that I could specifically identify.

6        Q.    Did you actually look at the P&L's from the

7   Hawaii division for that period of time, sir?

8             MR. HOGAN:  Objection.  Vague as to what

9   "P&L" means.

10        A.    As we sit here now, I don't recall

11   specifically.

12        Q.    BY MR. LIEBELER:  Okay.  Let's take a look

13   at what has been marked elsewhere as Trial Exhibit

14   202.  I may need to get Mr. Capozzola to confirm that

15   for me.

16             MR. LIEBELER:  Mr. Berry, you need to leave,

17   please.  This is a counsel-only document so I -- I

18   mean, I don't know how we're going to deal with this

19   at trial, but for the moment, at least, it's covered

20   by the counsel-only protective order.

21             MR. BERRY:  Do you want me to skip this and

22   go back to the office?

23             MR. HOGAN:  Yeah.  You can go back.  That's

24   fine.

25             (Mr. Berry left the deposition.)

1      Q.   BY MR. LIEBELER:  Let me give you that.

2           MR. LIEBELER:  Let me find out what the

3   trial exhibit numbers are.

4           (Discussion off the record.)

5      Q.   BY MR. LIEBELER:  Is that a document you

6   ever looked at before, sir?

7      A.   I can barely see it, I'm sorry.  Do you have

8   a bigger copy of this?

9      Q.   No.

10      A.   Oh.  I really am having a hard time seeing

11   it.  I'm sorry, but I'm having a hard time reading

12   it.

13      Q.   This is the only copy that we have.  It's

14   how it's been produced to me and how we've been using

15   it over the course of this case.

16           MR. HOGAN:  I'll state a

17   mischaracterization:  that this isn't, I don't

18   believe, the way that they were produced to us.  I

19   don't have them with me, but I don't believe that.

20           MR. LIEBELER:  It's the only copy I've ever

21   seen so --

22           MR. HOGAN:  I'm not disputing that so --

23           MR. LIEBELER:  Got it.

24      A.   Your question again?

25      Q.   BY MR. LIEBELER:  Have you ever seen this

1    financial statement before?

2        A.    I don't think so.

3            (Discussion off the record.)

4        Q.    BY MR. LIEBELER:  Did you ever examine, sir,

5    the financial statements that Mr. Kinrich relied on

6    for purposes of his opinion?

7            MR. HOGAN:  Objection.  Calls for

8    speculation.  Lacks personal knowledge.

9        Q.    BY MR. LIEBELER:  Did you ever examine,

10   sir --

11           MR. HOGAN:  No.  How can he tell what your

12   expert examined?

13           MR. LIEBELER:  Because it's in his report

14   and he read my expert's report, Tim.

15           MR. HOGAN:  I believe he already submitted a

16   declaration that he had a different set of documents

17   than your expert.

18           MR. LIEBELER:  Fine.  Fine.

19       Q.    BY MR. LIEBELER:  Go ahead and answer, sir.

20       A.    I've looked at those reports that were

21   attached.

22       Q.    Is this one of those documents, to the best

23   of your recollection, 202?

24           MR. LIEBELER:  Let the record reflect that

25   I've given Mr. Ueno what has been marked in the trial

1   exhibit list as Exhibit 202, and that's what he's

2   looking at now.

3           MR. HOGAN:  Let the record reflect that you

4   didn't use the trial exhibits in the deposition

5   so it's -- unless counsel is going to testify and

6   authenticate them at the trial, we'll just have to

7   take your word for it.

8           MR. LIEBELER:  Fine.  Whatever.

9       A.   You know, there are -- there are many

10  different reports in here and -- there are just

11  several -- there are lots of reports in here.

12      Q.   BY MR. LIEBELER:  So you don't know whether

13  or not you've ever seen that before, sir?

14      A.   I -- I haven't seen these.

15      Q.   Have or have not, sir?

16      A.   I have not seen these.

17      Q.   Very good.  If you haven't seen it, then why

18  don't you go ahead and give it back to me.  Or you

19  can keep it.  I don't care.  It doesn't matter.

20      A.   No, I'm just flipping through it to see what

21  type of reports these are.

22      Q.   That's fine.

23          MR. HOGAN:  Just so the record is clear, I

24  believe the reports that were provided in

25  Mr. Kinrich's report did not have Bate stamps.  The

1    ones that you have in front of you now are Bate

2    stamped.

3        A.    I don't believe I've seen these reports.

4        Q.    BY MR. LIEBELER:  You don't believe you've

5    seen those before, sir?

6        A.    Uh-uh.  No.  I don't believe I've seen this

7    before.

8        Q.    Why don't you flip through the rest of it

9    just to make sure.

10       A.    No.

11       Q.    You've not seen that?

12       A.    I don't believe so.

13       Q.    What were the amount of expenses that you

14   determined, if any, were associated with the $2.7

15   million number in the first paragraph of your "Total

16   Invoices to 3rd Parties" section of your report, sir?

17       A.    I guess when you look at the work that was

18   done -- or the e-mail that we received from -- Let's

19   see -- Teresa Noa, I think we came up with a number

20   of $262,000.

21       Q.    What e-mail specifically are you referring

22   to, sir?  Give me the date on it, if you would be so

23   kind.

24       A.    Excuse me.

25       Q.    Sure.

1      A.    April 3rd, 2003.

2      Q.    Other than that e-mail, did you look at any

3   other expense information associated with that $2.761

4   million in revenue, sir?

5      A.    We looked at -- again, we looked at the

6   financial information that we had available.

7      Q.    All right.  Let's take a look at the next

8   paragraph of your report, and that's the one

9   beginning, "I used Fleming's Excel file named

10   'Logistics Data' dot 'Org,' worksheets 'Orders' and

11   'Invoices.'"  You see that paragraph, sir?

12      A.    Yes, I do.

13      Q.    Now, the last sentence in that paragraph

14   reads, "This assumption was confirmed by agreeing the

15   weight and cube of the individual items across both

16   worksheets."

17      A.    That's correct.

18      Q.    What does that mean, sir?

19      A.    Oh.  We were looking at the worksheets, and

20   basically we looked at the worksheets for the order

21   versus the worksheets for the billings, the

22   invoices --

23      Q.    Which exhibits are those to your

24   supplemental report, sir?

25      A.    Let's see.

1    analysis, okay?  After he did that analysis, he said,

2    "Mr. Ueno, I've done that analysis.  Here is what I

3    did.  Here is how I did it.  Check me off on it," and

4    you did.  Have I got it right?

5        A.    That's correct.

6        Q.    You didn't do any of the individual checking

7    of the line items across the worksheet?  That was

8    Mr. Hoe's job, correct?

9              MR. HOGAN:  Objection.  Misstates testimony.

10       A.    Okay.  Did I do any of it?  Is that your --

11   is that the point you're making?

12       Q.    BY MR. LIEBELER:  Did you check any of the

13   individual line items?  Did you yourself do that?

14       A.    Did I check any of the individual --

15       Q.    Yes.

16       A.    Yes, I did individual --

17       Q.    I thought you told me Mr. Hoe did that and

18   then he showed you what he had done.

19             MR. HOGAN:  Objection.  Misstates testimony.

20       A.    Okay.  I believe that when you -- if you use

21   the word "checking," I believe that if I looked at

22   what he did and looked at a specific item -- specific

23   line item that that's considered part of checking.

24   Now, you may not consider that part of checking.  And

25   so -- so that's what -- that's where the -- I just

1    want to make sure that we're clear as to what we're

2    saying.  That's it.

3         Q.    BY MR. LIEBELER:  How many different

4    individual items were there that were confirmed

5    across the 2 separate worksheets, sir?

6         A.    Oh, I don't know exactly how many.

7         Q.    Can you estimate it for me.

8         A.    Well, I would say that he looked at the

9    1500, and I'm not sure how many specifically he

10   looked at individually.

11        Q.    But there were 1500 items that he was

12   responsible for checking off across the 2

13   spreadsheets; is that right?

14        A.    That's correct.

15        Q.    You don't know how many Mr. Hoe actually

16   looked at; isn't that right, sir?

17        A.    No, I don't.

18        Q.    He showed you what he had done, and how many

19   did you specifically look at as examples that he had

20   done?

21        A.    Specifically?

22        Q.    Yes.

23        A.    Not more than half a dozen.

24        Q.    So out of 1500 potential items, you yourself

25   looked at no more than 6.  Fair?

1      A.    That's correct.

2      Q.    Looking at the next paragraph, you are

3  essentially looking for the same items on the orders

4  worksheet and the invoices worksheet, correct?

5      A.    That's correct.

6      Q.    You did that by looking at the order ID and

7  the job ID to confirm that those reflected the same

8  shipment; is that right?

9      A.    That's correct.

10      Q.    Again, who was it that actually did that?

11  Was it Mr. Hoe that went through that process, or was

12  that you along the lines of the same process you

13  articulated to me a minute ago?

14      A.    It was along the lines of the same process I

15  articulated earlier.

16      Q.    Got it.  Which is to say, just to get it

17  right, that Mr. Hoe was the one that did it as an

18  initial matter?  He showed you what he had done and

19  showed you some number of specific examples of that

20  cross-checking, right?

21      A.    That's correct.

22      Q.    How many specific examples of that

23  cross-checking did he show you on this -- on the

24  cross-checking done on this paragraph, sir?

25      A.    That he showed me?

1    sir?

2        A.    The total amount that we have asked for in

3    terms of the -- no.  It does not affect the license

4    fee in terms of the 1,772 times the 1528 containers.

5    No, it does not.

6        Q.    It doesn't reflect (sic) the reasonable

7    license fee portion of your opinion, correct, sir?

8        A.    That's correct.

9        Q.    Does it impact the lost profits or the

10   profits of the infringer portion of your opinion,

11   sir?

12       A.    In terms of the profits to the infringer, we

13   still have the same dollar amount of sales that's

14   made during that period, the 55 million.  That does

15   not change.  It's not affected by this.

16       Q.    Now, you're aware, are you not, that in

17   order to bring in that $55 million, Fleming actually

18   has to pay for the goods that it gets?  Right?

19            MR. HOGAN:  Objection.  Misstates facts not

20   in evidence.  Fleming filed bankruptcy.

21       A.    Fleming has to pay for the goods that it

22   gets?

23       Q.    BY MR. LIEBELER:  Yes.

24       A.    Normally that's not the way business works.

25   And I believe Fleming, being a very large company,

Alii Court Reporting    (808) 394-Alii (2544)

1    also had credit given to it by its -- by its various

2    vendors, so therefore the amounts were probably

3    obligated through orders.  And subsequent, then, when

4    the goods were promptly shipped and they took title

5    to it, that they then picked it up as an accounts

6    payable.

7         And so the reports that we're looking at,

8    I'm assuming that because it's orders and invoices

9    and -- that Fleming does have an accrual basis

10   accounting system that it uses.  I'm also assuming

11   that -- because Fleming filed its reports with the

12   SEC, as a result of that that they're using the

13   accrual basis of accounting.  So it's not based, as

14   you mentioned, on a cash basis.

15        Q.   I didn't say anything about a cash basis in

16   my question, sir.

17        A.   Your question refers to, On the basis as --

18   a cash basis is the only time that they would record

19   a cost.  The cost is recorded at the time it's

20   accrued.

21        Q.   Are there costs associated with this $55

22   million in sales numbers, sir?

23        A.   Are there costs associated with the $55

24   million in sales?  I would think there would be.

25        Q.   Do you know what those are, sir?

1     A.    There could be various -- you have various

2     types of costs.  You have both the direct costs and

3     the indirect costs.

4     Q.·   Do you know what those costs are, sir, as a

5     dollar value?

6     A.    No, I don't.

7     Q.    Have you tried to ascertain those?

8     A.    I have not, you know, looked at the specific

9     cost items related to that.  I've looked at some of

10    the -- the nature of the indirect cost items in

11    there.

12    Q.    Have you made an effort to determine the

13    dollar value of the costs associated with that $55

14    million in sale number, sir?

15    A.    No, I have not.

16    Q.    It's fair to say that when Fleming buys

17    goods and ships them to Hawaii and turns around and

18    resells them here, it doesn't get those goods for

19    free, does it?

20         MR. HOGAN:  Objection.  Misstates facts not

21    in evidence.  It did on April 1st, 2003.

22    A.    Again, it's fair to assume that when someone

23    gets goods that it has to incur some costs for it?  I

24    guess you could assume that.

25    Q.    BY MR. LIEBELER:  That's a fair assumption,

1    isn't it, sir?

2        A.    As to whether it's fair or not -- are you

3    saying in general?

4        Q.    I'm saying for the Fleming company in the

5    period following April 1st of 2003, sir.

6        A.    See, I don't know -- I don't have specific

7    information as to its specific costs so -- I can say

8    that in general it's -- your statement in general is

9    correct.

10       Q.    Do you have any reason to believe that after

11   the bankruptcy petition was filed, Fleming got goods

12   for free?

13       A.    I don't know.

14       Q.    Do you have any basis to assume that, sir?

15       A.    I -- I just don't know.

16       Q.    Don't know one way or the other?

17       A.    I don't know.

18            MR. LIEBELER:  Let's take 5 minutes.  I

19   don't have a whole lot more to do.

20            (Recess:  11:14 a.m. to 11:24 a.m.)

21       Q.    BY MR. LIEBELER:  All right.  Back on the

22   record.

23            Mr. Ueno, let's go back to the 55,120,183

24   number on Attachment A, page 2 of your report -- of

25   your December 27th report.  You see that, sir?

1     A.    That's right.

2     Q.    Now, you told me -- and that's a net sales

3  number, right?

4     A.    That's correct.

5     Q.    We talked a little bit about expense

6  information or cost information associated with that.

7  I take it that the $262,000 of indirect freight

8  department costs does count against that $55 million

9  number.  Right?

10    A.    The -- well, all I'm saying is:  That is

11 what Teresa Noa estimated as the cost of the

12 logistics department.

13    Q.    You have no reason to disagree with that,

14 with her estimate of those costs; is that right?

15         MR. HOGAN:  I'm going to object.  Vague as

16 to the term and -- the time that that number is based

17 on.

18    A.    I have -- all I can say is:  That is what

19 Teresa Noa has stated to be the number, okay?  And

20 that's it.  That's -- I cannot give any opinion as to

21 whether that's -- you know, that's Fleming's numbers

22 or not.

23    Q.    BY MR. LIEBELER:  You have no basis as you

24 sit here today to disagree with that number on her

25 part?  Might be right, might not be right?  You just

1  have no view, correct, sir?

2      A.    Yeah.   Again, I have -- I have -- the only

3  thing I have is what I have in that e-mail, and

4  that's it.

5      Q.    You have no independent basis with which to

6  disagree with her assessment of that cost; is that

7  right, sir?

8      A.    To disagree?  No, I do not have an

9  independent basis to disagree with that cost.

10     Q.    Do you have any specific information

11  available to you that would tell you what the costs

12  are associated with the $55 million net sales number

13  in your report?

14     A.    No.

15         MR. LIEBELER:  I don't think I have anything

16  further.

17         We've got to put on the record that I've

18  given back to Mr. Hogan copies of the disks that

19  Mr. Ueno produced at the beginning of the deposition.

20         Is that right, Mr. Hogan?

21         MR. HOGAN:  Upon that representation, I have

22  2 disks in my hand, and when I get back, I'll take a

23  look and see what they are.

24         MR. LIEBELER:  Okay.

25         MR. HOGAN:  I have one question --

1          MR. LIEBELER:  If they're not --

2          MR. HOGAN:  I will call you.

3          MR. LIEBELER:  -- let me know.

4          MR. HOGAN:  I will actually call you right

5     away.

6                          EXAMINATION

7     BY MR. HOGAN:

8          Q.   Mr. Ueno, the $260,000 number that you're

9     talking about, is that an annualized number, or was

10    it based on the period of time that the $55 million

11    number was based?

12         A.   It's an annualized number.

13         Q.   The $55 million is for what period of time?

14         A.   April 1st until June 9.

15         MR. HOGAN:  That's it.

16         MR. LIEBELER:  Very good.

17         (Concluded:  11:27 a.m.)

18

19

20

21

22

23

24

25

1    STATE OF HAWAII                )

2    CITY AND COUNTY OF HONOLULU  )

3        I, JOAN IZUMIGAWA, Notary Public in and for the

4    State of Hawaii, CSR No. 136, do hereby certify:

5        That on Monday, January 23, 2006, at 10:11 a.m.,

6    appeared before me THOMAS UENO, CPA, the witness

7    whose deposition is contained herein; that prior to

8    being examined, he was duly sworn to tell the truth,

9    the whole truth, and nothing but the truth in his

10   deposition;

11       That the deposition was reported by me in machine

12   shorthand at the time and place stated herein and was

13   thereafter reduced to writing under my supervision;

14   that the foregoing is a true and correct transcript

15   of the proceedings had.

16       I further certify that I am not attorney for any

17   of the parties hereto nor in any way interested in

18   the outcome of the pending cause.

19       Dated this _____23rd_____ day of January 2006 at

20   Honolulu, Hawaii.

21

22

23   _____

24        Notary Public, State of Hawaii

25       My commission expires:  August 18, 2006