LYNCH ICHIDA THOMPSON KIM & HIROTA

TIMOTHY J. HOGAN 5312-0
1132 Bishop Street, Suite 1405
Honolulu, Hawaii 96813
Tel. No. (808) 528-0100
Fax No. (808) 528-4997
E-mail: tjh@loio.com

Attorney for Plaintiff
WAYNE BERRY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| WAYNE BERRY, a Hawaii citizen; | ) | Civ. No. CV03 00385 SOM-LEK |
| | ) | (Copyright) |
| Plaintiff, | ) | |
| | ) | DECLARATION OF THOMAS T. |
| vs. | ) | UENO |
| | ) | |
| HAWAIIAN EXPRESS SERVICE, | ) | |
| INC., a California corporation; et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DECLARATION OF THOMAS T. UENO

I, Thomas T. Ueno, make this declaration under the penalty of perjury. All the statements herein are true and correct to the best of my knowledge, information and belief. If called upon to testify regarding these matters, I am competent and

1

willing to do so.

1. I have been asked by Timothy J. Hogan to comment upon the Motion In Limine to Exclude Thomas Ueno filed by the Fleming Companies, Inc.'s Post Confirmation Trust ("PCT").

2. I will first address Mr. Kinrich's January Second Supplement Report Notes regarding Container Counts.

3. All the data we analyzed was produced by Fleming and its logistics group in the Guidance materials. Mr. Kinrich certainly had access to all of Fleming's files which were produced to us and more. Mr. Kinrich's analysis shows that there were at least 1,480 containers which were processed using Berry's FCS during the April 1, 2003 through June 9, 2003 relevant period.

4. The Fleming file, "Logistics Data – Theresa" shows that 1,528 containers were shipped during the April through June 2003 time period. The Logistics Data Org file worksheet "Containers" shows there were 1,720 containers shipped during the time period. We do not understand why the container counts vary. Based on the information provided, our count of 1,528 containers is a reasonable estimate of the number of containers processed by Berry's FCS during the relevant period.

5. Mr. Kinrich noted that he believes it seemed inappropriate to apply a

license fee on containers which were simply being tracked by Berry's FCS. It is unclear how he comes to this assumption. The issue at hand is the number of containers processed by Berry's FCS. Fleming was able to process and track the arrival date of these as well as every other container because of its use of Berry's FCS.

## FOODLAND

6. In regard to shipments for Foodland, all the data we analyzed was produced by Fleming and it logistics group in the Guidance Before materials.

7. The Fleming file, "Logistics Data – Theresa" shows that 386 containers were shipped for Foodland during the April to June 2003 time period. Similar to the total number of containers shipped as discussed above, it is unclear why there are differences in the number of containers in the Fleming reports.

8. We concluded that 386 containers is a reasonable estimate of the total number of containers shipped by Fleming with the assistance of Berry's FCS during the relevant period for Foodland. Note that the total containers shipped by Fleming (1,528), includes the 386 shipped for Foodland.

## KMART

9. In regard to the shipments for KMART, all the data we analyzed was produced by Fleming and its logistics group in the Guidance Before materials.

10. The Fleming billing files indicate that at least 298 containers were invoiced during the April through June relevant period. Again, there are a number of discrepancies between the Fleming files. For example, the Fleming billing file indicates that container 47727 was associated with a shipment for KMART, however, the Logistics Data Org spreadsheet does not indicate that this container included a shipment in part or in whole for KMART.

11. The total number of containers shipped for KMART is included in the overall count of containers processed by Berry's FCS.

## INVOICES

12. In regard to Invoices, we reviewed our analysis and do not disagree with Mr. Kinrich with regards to the amounts invoiced to third parties during the period. When we performed our analysis, there were order numbers which appear to be out of sequence, i.e., orders with ship dates far beyond from the order dates. We assumed that ship dates were in line with order dates. It is unclear why Fleming's records contain these inconsistencies.

13. In regard to the reasonable license fee Mr. Kinrich says: "My analysis of the data used by Mr. Ueno further shows the unreasonableness of his "Reasonable License Fee." As shown on Exhibit 5, the license fee per container proposed by Mr. Ueno exceeds the gross amount invoiced by Fleming per

container. Taking direct shipping costs as well as operating and overhead costs into consideration magnifies the distortion between the Fleming's actual benefit from using the Berry FCS software and the benefit perceived by Mr. Ueno. No one would pay a license fee greater than the revenues or contribution margin associated with the logistics operation.". In response, Mr. Kinrich has no basis to state that "no one would pay a license fee greater than the revenues or contribution margin associated with the logistics operation." Fleming was KMART's sole food supplier. Arguably, Fleming would be willing to sacrifice some shipping costs in order to keep its sole source deal. Likewise, Kmart with no other source of supply available would be willing to pay more if called upon. Fleming paid for the use of Berry's FCS because it needed it to operate. Specific situations such as the instance quoted by Mr. Kinrich is not a basis for evaluating Fleming decision regarding its continued use of Berry's FCS in light of the unique circumstances that Fleming, as a sole supplier was able to exploit.

14. In addition, the Reasonable License Fee that I have put forward is consistent with the Atlantic Pacific International, Inc. historical savings generated by the system and is therefore, reasonable.

Dated, Honolulu, Hawaii     2/22/06     .

_____
Thomas T. Ueno, CPA