KOBAYASHI, SUGITA & GODA

LEX R. SMITH            3485-0
THOMAS H. YEE           7344-0
SUITE 2600, First Hawaiian Center
999 Bishop Street
Honolulu, Hawaii  96813
Telephone:  (808) 539-8700
Fax No. (808) 539-8799
Email: lrs@ksg.law.com

KIRKLAND & ELLIS LLP
Eric C. Liebeler (CA Bar No. 149504)
Damian Capozzola (CA Bar No. 186412)
R. Olivia Samad (CA Bar No. 228611)
777 South Figueroa Street
Los Angeles, CA  90017
Telephone No. (213) 680-8400
Facsimile No.  (213) 680-8500
Email: eliebeler@kirkland.com

Attorneys for Defendant
POST-CONFIRMATION TRUST

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WAYNE BERRY, a Hawaii citizen; | ) CIVIL NO. CV03-00385 SOM-LEK |
| | ) (Copyright) |
| Plaintiff, | ) |
| | ) **MEMORANDUM IN SUPPORT OF** |
| vs. | ) **DEFENDANT PCT'S MOTION FOR** |
| | ) **ATTORNEYS' FEES AND COSTS** |
| HAWAIIAN EXPRESS SERVICE, | ) |
| INC., et al., | ) Judge:    Magistrate Leslie Kobayashi |
| | ) Trial Date: February 28, 2006 |
| Defendants. | ) Judgment Entered: March 9, 2006 |
| _____ | ) Non-Hearing |

# TABLE OF CONTENTS

I.    Introduction ........................................................................................................1

II.   Factual Background .........................................................................................3

    A.   Berry's Prepetition Lawsuit ...................................................................3

    B.   Fleming's Bankruptcy Filing, Berry's Post-Petition Lawsuit,
        and Related Proceedings Through Fleming's Confirmation. ..............4

    C.   Berry's Post-Confirmation Prosecution of His Post-Petition
        Lawsuit and His Numerous Allegations Against Fleming. .................7

    D.   Fleming's Methodical Deconstruction of Berry's Lawsuit and
        Eventual Success at Trial. ...................................................................10

III.  The PCT is a Prevailing Party Entitled to Costs and Fees............................12

    A.   The PCT is the Prevailing Party.........................................................12

        1.   The PCT Prevailed under Copyright Law. ...............................12

        2.   The PCT Prevailed under Trade Secret Law. ...........................14

    B.   The District of Hawaii Local Rules, the Federal Rules of Civil
        Procedure, and Applicable Law Entitle the PCT to Recover Its
        Costs, Attorneys' Fees and Non-Taxable Expenses, Totaling
        $3,402,965.59 for Kirkland & Ellis's Work. ......................................16

        1.   The PCT is Entitled To Attorneys' Fees and Related Non-
            Taxable Expenses.....................................................................16

        2.   The Court Should Award the PCT $3,369,626.30 in  Attorneys'
            Fees and Non-Taxable Expenses for Kirkland &  Ellis' Work,
            plus Amounts Properly Claimed from Work by  Kobayashi,
            Sugita & Goda...........................................................................20

        3.   The PCT is Entitled to Taxable Costs In the Amount of
            $33,339.29 Expended by Kirkland & Ellis, LLP......................21

IV.   Conclusion.....................................................................................................22

# TABLE OF AUTHORITIES

**Cases** ................................................................................................ **Page**

Contract Materials Processing, Inc. v. Kataleuna GmbH Catalysts,
   222 F. Supp. 2d 733 (D. Md. 2002) ....................................................15

Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.,
   122 F.3d 1211 (9th Cir. 1997)...............................................................19

Fantasy, Inc. v. Fogerty,
   94 F.3d 553 (1999) ...............................................................................18

Florentine Art Studio, Inc. v. Vedet K. Corp.,
   891 F.Supp. 532 (C.D. Cal. 1995)............................................... 13, 14

Fogerty v. Fantasy, Inc.,
   510 U.S. 517 (1994) ...................................................... 13, 16, 18, 19

Los Angeles News Serv. v. Reuters Television Int'l, Ltd.,
   149 F.3d 987 (9th Cir. 1998)..................................................................18

Magnuson v. Video Yesteryear,
   85 F.3d 1424 (9th Cir. 1996)..................................................................19

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. McClafferty,
   287 F. Supp. 2d 1244 (D. Haw., 2003) ................................................15

NLFC, Inc. v. Devcom Mid-Am., Inc.,
   916 F.Supp. 751 (N.D. Ill. 1996)..........................................................13

Warner Bros., Inc. v. Dae Rim Trading, Inc.,
   877 F.2d 1120 (2d Cir. 1989) ...............................................................13

**Statutes**

17 U.S.C. § 505....................................................................................21

Fed. R. Civ. Proc. 54(d)(1) .................................................................21

Haw. L. R. 54.2(f)................................................................................21

Haw. Rev. Stat. § 482 ................................................................. 14, 15

## I.    Introduction

The legal standard that applies here is whether the PCT has succeeded on a significant issue in the litigation that achieves some of the benefits the PCT sought in defending the suit.  *See* discussion of legal standards at § III(A), *infra*. Measured by this standard, there can be no question that the PCT is the prevailing party in this case.  The PCT has reduced Berry's onslaught of trumped up demands for riches to an award of just $57,534 and prevailed against all injunction requests while eliminating his unending barrage of false charges and accusations.

The PCT[1] defended this case vigorously because it had no other choice: Berry hounded the PCT on an almost daily basis seeking baseless injunctive relief for illegitimate purposes and refused to accept a generous $400,000 settlement offer early in the case, which turned out to be seven times larger than the $57,534 he won at trial two years later.  Along the way he filed numerous meritless motions and did everything he could to make the litigation as expensive as possible for the PCT, even refusing to voluntarily produce for inspection the software on which his claims stood.

//

---

[1] Fleming Companies, Inc. filed Chapter 11 bankruptcy on April 1, 2003.  The Bankruptcy Court approved Fleming's reorganization plan to create the Post-Confirmation Trust (PCT) to hold all of Fleming's assets and liabilities for the benefit of Fleming's creditors.

Even though the neutral bankruptcy judge in the District of Delaware estimated his claim in July 2004 to be worth no more than $100,000, Berry relentlessly pursued this postpetition litigation for two more years against Fleming, its employees, its business partners, and the trust that holds Fleming's post-bankruptcy assets and liabilities.  He claimed all of these damages based on seventy days worth of inadvertent infringement of an obsolete freight management database -- which he never successfully licensed to anyone -- because he had visions of duplicative overlapping damage awards from an ever-increasing group of defendants.

Throughout this lawsuit he claimed damages that grew from $35 million to $48 million to $213 million,[2] amounts that would have severely crippled or destroyed the PCT's objective of paying Fleming's legitimate creditors under the terms of Fleming's plan of reorganization.  Indeed, Berry showed such disdain for the thousands of other, legitimate creditors of the Fleming estate (including banks, taxing authorities, suppliers, employees, and bondholders) that he (unsuccessfully) tried to single-handedly stop the entire reorganization and liquidation process now embodied by the PCT, all for the benefit of his own ego and his trumped-up $57,000 claim, $43,000 less than the Delaware Bankruptcy Court estimated two

---

[2] *See* Capozzola Declaration Exs. A, B, C (4/21/04 e-mail from T. Hogan to D. Capozzola [7/1/04 Berry Dep. Ex. 9]; W. Berry Administrative Claim; Expert Report of T. Ueno).

years prior.

The PCT's goals in defending this lawsuit were to deny Berry injunctive relief that might have unknown consequences by providing Berry a continuing platform for harassment, and to resolve this matter for a reasonable price point that the PCT could absorb. Fleming accomplished both of these goals, and then some. Measured by any applicable legal or factual yardstick, the PCT is the prevailing party and is entitled to costs and fees under the Copyright Act. More importantly, the legitimate creditors of the Fleming estate are entitled to reimbursement for the millions of dollars in PCT legal fees that Wayne Berry has wastefully consumed with his crusade.

## II.     Factual Background

### A.     Berry's Prepetition Lawsuit

In late 1999 Berry granted Fleming a no-charge user license to use an Access database to help its employees track shipments of product coming across the ocean to Hawaii from the U.S. mainland. The parties' relationship soured and by the middle of 2001 Berry had filed a wide-ranging complaint against Fleming. Ex. D (July 3, 2001 Complaint).[3]  Fleming successfully defended that lawsuit on all counts except one. Ex. E (2003 Special Verdict form). With regard to that one

---

[3] All exhibits are attached to the concurrently-filed supporting Declaration of Damian D. Capozzola.

count of copyright infringement, the jury stated that Fleming had a license to use the software as originally conveyed but also found that Fleming had willfully made unauthorized changes to the software. The jury awarded Berry $98,250. *Id*.

### B. Fleming's Bankruptcy Filing, Berry's Post-Petition Lawsuit, and Related Proceedings Through Fleming's Confirmation.

Fleming's April 1, 2003 bankruptcy petition -- which was filed for reasons having nothing to do with Wayne Berry's freight control system -- stayed the proceedings and entry of judgment. Meanwhile, Fleming was moving as quickly as it could to get away from the Berry database. By June 9, 2003, Fleming had moved to a system using non-infringing Microsoft Excel spreadsheets. Ex. F at 12, 21, 27 (June 27, 2005 Order). On July 23, 2003 -- when Fleming was no longer infringing -- Berry sued a number of other entities alleging postpetition copyright infringement pertaining to their dealings with Fleming, and on August 13, 2003 Berry added Fleming and C&S Wholesale Grocers, then the prospective purchaser of Fleming's Hawaii division, as defendants in his new lawsuit. Exs. G, H (original and first amended complaints). Fleming then sold its Hawaii division to C&S anyway on August 23, 2003. Ex. I at 9.

The Asset Purchase Agreement with C&S contained a detailed schedule of items sold, including software. It does not list the 1993 FCS. Ex. J (excerpts of APA, §§1.1, 2.1(f) & Schedule 8.11 (APA)). Nonetheless, Berry insisted that Fleming must have sold his software to C&S and filed a $48 million administrative

4

claim in the Delaware Bankruptcy Court.  Ex. B (June 9, 2004 Administrative
Claim).

Berry filed his claim for maximum leverage on June 9, 2004, just weeks
before the July 26, 2004 confirmation hearing.  On or about June 18, 2004 Fleming
offered to settle all of Berry's claims for $400,000, the same price point that Berry
himself had proposed just five months prior, and stipulated injunctive relief.  Exs.
K, RR, SS; *see also* concurrently filed Declaration of Lex Smith.  But thinking he
had Fleming's back against a wall, Berry rejected rational economic discourse and
terminated further settlement discussions, choosing instead to thwart Fleming's
efforts to investigate what if any of Berry's software actually existed on C&S's
servers by threatening a RICO suit against the technology company that Fleming
had retained to investigate that issue.  Smith Decl.; Exs. L, M (Stevens &
Anderson depositions at 13:3-14:22 and 10:13-13:8, respectively).

Notwithstanding Berry's efforts to prevent Fleming from defending against
Berry's $48 million administrative claim by intimidating Fleming's consultants,
Fleming convinced the Delaware Bankruptcy Court that Fleming did not sell
Berry's freight tracking system to C&S and furthermore that any other claim Berry
may have (i.e., his post-petition lawsuit) would be worth no more than $100,000.
Perhaps the best evidence of the extent to which Berry was overplaying his hand is
the reaction of the Court and counsel as the Court confirmed Fleming's plan over

Berry's objection.

THE COURT:  Yeah, but even your statement, the long term goal of our operation is to interface with our company's total inbound logistics system.  What does that mean?

MR. HOGAN:  It's, I believe, to get rid of Mr. Berry.  That's what I believe it meant.  Which is -- he's almost gone, Your Honor, so --

(Laughter)

MR. HOGAN:  But now he's C&S's problem.

(Laughter)

THE COURT:  Yes, he will.

MR. HOGAN:  Let's say I have nothing else, Your Honor.

THE COURT:  All right.  What other evidence?

MR. HOGAN:  I think that's it, Your Honor.

THE COURT:  All right.

MR. LIEBELER:  Nothing further on estimation, Your Honor.  I would yield to Mr. Sprayregen with respect to the overall confirmation issues.

THE COURT:  All right.  Well, let me make a ruling on the estimation so we can proceed more orderly.  I think that -- and again, for purposes of this proceeding, I must assume there is some claim that Mr. Berry has against the debtor that would qualify as an administrative expense.  And I'm prepared to estimate the administrative expense at $100,000. . . .

> With respect to any alleged damages for a sale to C&S, **there is no evidence of a sale to C&S**. The asset purchase agreement specifically does not include the software. My ruling at the hearing on approval of the asset purchase agreement made it clear that there was no sale of Mr. Berry's software. So nothing can be attributed to any value the debtor received as a result of any sale of the software. **So I would estimate the Berry administrative claim against the debtor at $100,000**.

Ex. N (July 26, 2004 hearing transcript) at 173:5-174:20 (bold emphasis added).

Indeed, in light of the jury's ultimate verdict of $57,534, the Delaware Bankruptcy Court's prediction was overly optimistic.

### C.    Berry's Post-Confirmation Prosecution of His Post-Petition Lawsuit and His Numerous Allegations Against Fleming.

Berry refused to learn from what happened in Delaware. Instead, he turned up the volume. Throughout the course of the present case, as well as in connection with the Fleming bankruptcy, Mr. Berry has made numerous scurrilous allegations against Fleming and the PCT. These include:

1. That Fleming is somehow still in operation and scheming to sell outdated "re-pasteurized" milk to Hawaii consumers. Ex. O (May 19, 2005 Berry deposition at pp. 349-351).

2. That Fleming and its counsel are involved with a smuggling conspiracy and/or organization "with a propensity for decapitating missionaries."[4]

---

[4] "We have always wondered where Fleming was *laundering the cigarette trafficking revenues* that, by our estimate, are measured in the hundreds of million if not billions of dollars. A little research has hit upon FCI Holdings Corporation as a "blocked" entity under the Treasury Department Office of Foreign Asset Control ("OFAC") compare http://www.triacnet.com/hottopic/ofac2.htm and Mr. Sprayregen's Declaration Docket 190-3. Because we have knowledge that

3.  That Fleming and its counsel have connections to terrorist organizations.[5]

4.  That Fleming and its counsel has dispatched armed gunmen to Mr. Berry's home in order to injure him.[6]

5.  That Fleming has engaged in cigarette smuggling; [7]

6.  That Fleming is affiliated with organized crime.  Ex. T at 6-7 (Berry's Dec. 20, 2004 Opposition to Hawaii Transfer Company, Ltd.'s Motion for Summary Judgment)[8]

---

Fleming's surprise witness in the infringement trial has had *connections with a foreign terrorist organization (with a propensity for decapitating missionaries)* we remain justifiably concerned by your silence interspersed with threats."  *See* Ex. P (emphasis added) (July 15, 2003 Email from T. Hogan).

[5] In his Motion for Leave to File Second Amended Complaint in the present case, Plaintiff included in his proposed draft Second Amended Complaint, allegations that Fleming is involved in a criminal racketeering scheme involving terrorists, notably Al Quida [sic].  *See* Ex. Q at internal page 42.

[6] In his February 5, 2003 deposition in Plaintiff's previous suit against Fleming, Civil No. CV 01 00446, Plaintiff stated that he believed that Fleming had sent armed gunmen to his home.  *See* Ex. R at 7:6-8:18 (Excerpts of Berry Dep. Feb. 5, 2003).

[7] In his RICO statement, Plaintiff states that he "discovered certain records of Fleming related companies that appeared to be engaged in cigarette diversions or trafficking," and that "[a]fter further investigation, Mr. Berry discovered documents dating back to 1993 detailing the agreement by the Lindseys and Mr. Borja using the Fleming money to facilitate the trafficking of untaxed cigarettes."  *See* Ex. S at 18-19 (Berry's June 18, 2004 RICO Statement).

[8] In his Opposition to Hawaii Transfer Company's Motion for Summary Judgment (Ex. T at pp. 6 ff.), Plaintiff noted:

> Mr. Berry has alleged one of the most vibrant and ongoing racketeering enterprises in the history of the State of Hawaii.  This enterprise, as set forth in Mr. Berry's declaration in ¶¶ 18-42 and as alleged by the Second Verified Complaint, and RICO statement the conduct of an enterprise engaged in numerous predicate acts, including mail and wire fraud, the smuggling of

7.  That Fleming has engaged in trafficking of illegal firearms;[9]

8.  That Fleming is engaged in a racketeering scheme involving Kmart;[10] and

9.  That Fleming is/was behind a scheme to overcharge Hawaii consumers, using Plaintiff's FCS.[11]

These vindictive and scattershot allegations reflect the way Berry has prosecuted this case from its inception and certainly since he filed the operative (second amended and verified) complaint during the summer of 2004.  Berry's

---

untaxed cigarettes and, as to Mr. Berry's specific RICO injury, clear acts of criminal copyright infringement.

. . .

In any event, Mr. Berry has uncovered the link between this Hawaii based Racketeering Enterprise operating as the Fleming Logistics Enterprise and the Providence Rhode Island Patriarcha Crime Family through DiSilva Transportation, Inc. and its subsidiary Webster Trucking and its principal Thomas DiSilva that are closely associated with C&S and James Kleban.

[9] In his RICO Statement, Plaintiff asserts that "In or about 1998, Mr. Berry was informed by a temporary API employee, Mauro Edwards, that he overheard one of Jack Borja's relatives, who was an API employee, discussing the shipment of machine guns with silencers in Fleming controlled ocean containers . . . Mr. Berry immediately contacted the Alcohol Tobacco and Firearms ("ATF") to report this information."  *See* Ex. S at 18.

[10] Again in his RICO Statement, Plaintiff describes a "Fleming-Kmart fraudulent billing scheme," through which he alleges that one of the Fleming entities ships goods for Kmart "under materially false shipping documents created through the unlawful infringing use" of FCS.  *See* Ex. S at 14.

[11] Again, Plaintiff alleged in his RICO Statement, that ". . . victims include the consumers of the state of Hawaii, that, through the maintenance of a monopoly facilitated by this infringement have been overcharged no less than 15% on all consumable packaged foods for the past 10 years or more."  *See* Ex. L. at 10.

operative complaint alleged direct, contributory and vicarious infringement, conspiracy to infringe, misappropriation of trade secrets, violations of the Sherman Act, and RICO claims against twelve corporate entities and fifteen individuals.  Ex. U at ¶ 3-22 (Second Amended Verified Complaint).  Ultimately, the only defendants who remained in the case were Fleming and several individual former Fleming employees.  All other parties either settled or won on summary judgment, and Fleming prevailed against the conspiracy and trade secret claims as well.  Ex. F at 2, n.2 (June 27, 2005 Order).

> **D.    Fleming's Methodical Deconstruction of Berry's Lawsuit and Eventual Success at Trial.**

By the summer of 2005 Berry's overall damages claims had grown from the $30-$50 million range into the $200 million range.  *Compare* Exs. A (4/21/2004 e-mail), and B (administrative claim) *with* Ex. C (Ueno March 21, 2005 report alleging at p. 1 $213 million in damages from April 1, 2003 through March 21, 2005 [$21MM + $87MM in reasonable license fee and $20MM + $85MM in gross margin]). But on June 27, 2005, the PCT secured a summary judgment ruling that dismissed Berry's claims against the PCT for conspiracy and trade secret misappropriation, reaffirmed the Court's commitment to the holding that any infringement was inadvertent, and held the Excel spreadsheets to be noninfringing (thus limiting the window of infringement against Fleming to April 1, 2003 to June 9, 2003).  Ex. F at 12-21, 25, 30, 32, 40 (June 27, 2005 Order).  Berry and his

counsel knew full well that this was a significant victory for the PCT and a devastating loss for themselves:  two days after the Court's order they sent an e-mail to their damages expert stating that Judge Mollway had "killed a lot of our case."  Ex. GG (June 29, 2005 e-mail from T. Hogan to T. Ueno and W. Berry).

Notwithstanding this private acknowledgement that the Court's June 27, 2005 Summary Judgment Order had decimated his case, Berry continued to shoot for the moon at trial.  Berry's Trial Exhibit 90 claimed at least $76 million in actual damages and Fleming profits, Ex. HH, and the Court will recall that in his closing argument to the jury Berry requested at least $48 million in disgorged profits and many millions more in actual damages.  Ultimately the jury awarded him only $57,534, Ex. II, just one or two percent of the damages Berry claimed at trial and an even smaller fraction of the damages he claimed overall throughout the lawsuit.

The PCT's convincing victory against Berry's damages is consistent with the many other ways in which the PCT soundly defeated Berry throughout these proceedings.  For example, Berry requested injunctive relief in his complaint and moved for injunctive relief twice.  Moreover, his own motion for attorneys' fees suggests that getting an injunction was really his primary goal all along.  Ex. JJ (p. 3 from Berry attorneys' fees motion).  In any event, both times Fleming prevailed and the Court denied injunctive relief.  Exs. KK, LL (excerpts from Court Orders denying injunctive relief).  Berry alleged and attempted to prove that the

infringement was a willful part of a conspiracy; the Court found that any

infringement was inadvertent.  *Compare* Ex. U (Second Amended Complaint) at

¶¶ 93-94 *with* Ex. F (June 27, 2005) Order at 28, 30.  Berry's counsel traveled to

Delaware arguing that Berry's claims made the PCT's restructuring plan not

feasible, and got laughed out of court.  The PCT won summary judgment against

Berry's claims based on the PCT's use of Excel spreadsheets, which covered more

than half of the window of time applicable to Fleming at all.[12]  Finally, Berry

attempted to blindside the Court and Fleming by suggesting in his trial exhibits

(*see* Ex. HH) that at trial he would pursue vicarious liability damages pertaining to

Hawaiian Express, with whom he had already settled.  The Court rightly threw out

these claims as well.[13]

## III.    The PCT is a Prevailing Party Entitled to Costs and Fees.

### A.    The PCT is the Prevailing Party.

#### 1.    The PCT Prevailed under Copyright Law.

Under the Copyright Act, a "prevailing party is one who succeeds on a

---

[12] There are seventy days between April 1, 2003 (the date of Fleming's bankruptcy) to June 9, 2003 (the date Fleming switched to the Excel spreadsheets). Between June 9, 2003 and August 23, 2003 (the date Fleming's sale to C&S closed) there are seventy-five days.  The PCT's summary judgment victory for the post-June 9, 2003 timeframe when Fleming was using the Excel spreadsheets means that when Berry sued Fleming there was no ongoing infringement at all.

[13]  At one point in the parties' history Berry even claimed that he had a cause of action against the United States as a vicarious infringer.  Ex. MM (June 21, 2002 letter from T. Hogan).

significant issue in the litigation that achieves some of the benefits the party sought in bringing the suit." *Florentine Art Studio, Inc. v. Vedet K. Corp.*, 891 F.Supp. 532 (C.D. Cal. 1995) (quoting *Warner Bros., Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1126 (2d Cir. 1989)); *see also NLFC, Inc. v. Devcom Mid-Am., Inc.*, 916 F.Supp. 751, 756 (N.D. Ill. 1996) ("A 'prevailing party' is considered one who succeeds on a significant issue in the litigation after an adjudication on the merits."). Prevailing defendants are entitled to recover attorneys' fees on the same basis as prevailing plaintiffs. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994).

For all of the reasons stated in Section II(D), *supra*, the PCT is the prevailing party. In *Florentine*, the court found that the defendants who prevailed on seven of nine infringement counts were the prevailing parties in a copyright infringement suit and were entitled to reasonable attorneys' fees. The defendants prevailed on seven of the nine infringement counts, were found merely to be innocent infringers on the remaining two, and were assessed the minimum statutory damages. They established that they never knowingly copied any copyrighted work. *Florentine*, 891 F.Supp. at 541. Among other things, the court reasoned that the plaintiff knew that there were only two works at issue but still brought numerous claims, plaintiff rejected the November 11 settlement letter, and there were no complex or novel legal issues in the case, which could have justified continuing the action. *Id.* at 542.

Like the defendants in *Florentine*, the PCT prevailed on the vast majority of claims that were asserted in this case and prevailed on the contested issues of willful infringement and derivative works. The PCT established that Fleming's infringement was inadvertent -- not willful -- and the PCT also was able to prove that the systems it used after June 9, 2003 were not infringing derivative works. Fleming admitted to making changes to the FCS and offered amounts seven times in excess of the jury verdict Berry ultimately won. Like the plaintiff in *Florentine*, Berry raised no legitimate complex or novel issues in the case against Fleming that could have justified continuing this action. As did the defendants in *Florentine*, the PCT succeeded in a substantial part of this litigation, and achieved substantially all the benefits it hoped to achieve in defending the suit and should be deemed the prevailing party.

17 U.S.C § 505 of the Copyright act permits the PCT to recover attorneys' fees for the "related claims" Berry raised because they are so intertwined that time spent on them cannot be differentiated from the time the PCT spent on the Copyright claims. The PCT, however, has another basis to recover fees.

## 2.    The PCT Prevailed under Trade Secret Law.

The PCT is also allowed to recover attorneys' fees under Hawaii's Trade Secret Act, Haw. Rev. Stat. § 482B-5, as the prevailing party that successfully defended against a groundless claim. Hawaii's Trade Secret Act, Haw. Rev. Stat.

§ 482B-2, et. seq., follows the Uniform Trade Secrets Act ("UTSA") and therefore cases decided under the UTSA are instructive. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. McClafferty*, 287 F. Supp. 2d 1244, 1249 (D. Haw., 2003). Under the UTSA, where a plaintiff failed to present any admissible evidence in support of its claims and engaged in vexatious litigation, the claim is brought in bad faith and justifies an aware of attorneys' fees. *See Contract Materials Processing, Inc. v. Kataleuna GmbH Catalysts*, 222 F. Supp. 2d 733, 745 (D. Md. 2002).

The Court summarily dismissed this claim under the Act, which requires: (1) the existence of a trade secret, and (2) misappropriation of the trade secret. *See* Haw. Rev. Stat. § 482B-2, Ex. F (June 27, 2005 Order) ("As an initial matter, Berry does not show that any files that were on the computers qualify as his trade secrets. Berry has not presented any evidence those files had any independent economic value resulting from not being generally known. In fact, Berry initially gave FCS to Fleming for free. Further, Berry has not yet identified the '30 of the other programs' that he alleges were transferred."). Because the plaintiff presented no evidence on this point and brought it merely to pile on to his claims against Fleming (and all the other defendants against whom these claims were also dismissed), the successful defense of this groundless claim entitles the PCT to recover attorneys' fees.

//

15

**B.    The District of Hawaii Local Rules, the Federal Rules of Civil Procedure, and Applicable Law Entitle the PCT to Recover Its Costs, Attorneys' Fees and Non-Taxable Expenses, Totaling $3,402,965.59 for Kirkland & Ellis's Work.**

**1.    The PCT is Entitled To Attorneys' Fees and Related Non-Taxable Expenses.**

This Court has the discretion to award attorneys' fees and otherwise non-taxable expenses to the PCT as the prevailing party, pursuant to Section 505 of the Copyright Act:

> In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof.  Except as otherwise provided by this title, the court may also award reasonable attorney's fees to the prevailing party as part of the costs.

17 U.S.C. § 505.  The Copyright Act entitles prevailing defendants to recover attorneys' fees on the same basis as prevailing plaintiffs, and attorney's fees are awarded to the prevailing party as a matter of the court's discretion.  *Fogerty v. Fantasy, Inc.*, 510 U.S. at 534.

The Supreme Court has suggested a non-exclusive list of factors for the District Court to consider in awarding fees.  These factors include measuring each party's degree of success as well as "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *Fogerty*, 510 U.S. at 535, n. 19.  Applying these factors, the

16

Court should award attorneys fees and non-taxable expenses to the PCT.

Degree of Success. As noted in Section II(D), the PCT achieved an overwhelmingly greater degree of success than Berry. First, the PCT prevailed on numerous claims asserted by Berry, including outright dismissal of most of them, while Berry really did not prevail on any of them in any meaningful sense. Moreover, Berry never received an injunction of any sort notwithstanding his repeated attempts to obtain one. Because the jury awarded him a tiny fraction of the amount he claimed that he would recover in damages, he can hardly be said to have "prevailed" on this claim. Berry's continuous assertions that he was guaranteed millions of dollars in damages should be contrasted with the $57,534 damage award actually obtained.

Frivolousness. Berry improperly used this lawsuit to pursue wide-ranging and unreasonable, overbroad discovery requests to further his crusade against Fleming as articulated in Section II(C), *supra*. Almost two years before trial Fleming offered Berry $400,000, seven times the amount he would eventually receive, but Berry rejected that offer and instead chose to frivolously drag twelve corporate entities and fifteen individuals through two years of litigation.

Objective Unreasonableness of Factual and Legal Arguments. Relatedly, the bottom line results speak for themselves: the PCT's factual and legal arguments

17

were reasonable, and Berry was completely and objectively unreasonable in his steadfast insistence that he was entitled to millions of dollars in actual damages.

Compensation And Deterrence. In view of Berry's massive miscalculation of the amount he could recover in this suit, and in view of Berry's demonstrated pattern of choosing to continue his crusade at every possible opportunity, an award of the PCT's attorney's fees and costs would serve the important purposes of compensation and deterrence. In the absence of any significant financial downside Berry will continue to harass the PCT and others associated with the PCT, all to the detriment of the PCT's legitimate creditors.

On balance, all four of these factors weigh in favor of an award of attorney's fees in favor of the PCT. And perhaps as importantly, such an award would also further the purposes of the Copyright Act. "Faithfulness to the purpose of the Copyright Act" is the pivotal criterion in determining whether to make an attorney's fees award. *Fogerty*, 510 U.S. at 535; *Fantasy, Inc. v. Fogerty*, 94 F.3d 553, 558 (affirming district court's $1.3 million fee award for defendant following remand from Supreme Court); *see also Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 997 (9th Cir. 1998), *cert. denied*, 525 U.S. 1141 (1999) ("We conclude that fees are warranted inasmuch as it served the purposes of the Copyright Act for LANS to establish its right to extraterritorial damages and to defend its favorable ruling below on fair use."); *Magnuson v.*

18

*Video Yesteryear*, 85 F.3d 1424, 1432 (9th Cir. 1996) ("This court has emphasized that in considering motions for attorney's fees under § 505 of the Copyright Act, the district court should seek to promote the Copyright Act's objectives."); *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211 (9th Cir. 1997).

The PCT's successful defense against Berry's meritless claims has "further[ed] the policies of the Copyright Act every bit as much as a successful prosecution of an infringement claim by the holder of a copyright." See *Fogerty*, 510 U.S. at 527. It also confirms important principles in software and database media. Off-the-shelf software is not an infringing derivative. A software designer may not claim a copyright in data. And a failed attempt to remove infringing changes and revert to software in its licensed form does not comprise willful copyright infringement. Accordingly, the PCT is the prevailing party, and an award of fees is appropriate to encourage "defendants who seek to advance a variety of meritorious copyright defenses ... to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement." *Fogerty*, 510 U.S. at 527.

//

//

//

19

**2.    The Court Should Award the PCT $3,369,626.30 in Attorneys' Fees and Non-Taxable Expenses for Kirkland & Ellis' Work, plus Amounts Properly Claimed from Work by Kobayashi, Sugita & Goda.**

The foregoing factual and legal analyses demonstrate that the PCT is the prevailing party and is therefore entitled to recover its attorneys' fees and non-taxable expenses.  As articulated in the Capozzola Declaration and summarized in Exhibit XX, these amounts properly total $3,369,626.30 for Kirkland & Ellis's work.[14]  The concurrently-filed Declaration of Damian D. Capozzola and its related exhibits establish that the services provided and expenses incurred were reasonable and necessary in the defense of this action, and that the hourly billing rates charged for the services are the generally prevailing rates in the attorneys' communities for attorneys of comparable standing and experience.   The fees listed are the customary fees for the attorneys and their staff members.  The totals are based on the contemporaneous time records and expenses of counsel for the PCT, true and correct copies of which are attached to and summarized in the Capozzola Declaration and its related exhibits in conformity with the format that the Local Rules require.  Given the volume of the materials generated over two years of active litigation they are contained in the Capozzola Declaration and its related

---

[14]   The PCT also incorporates by reference the information specific to the PCT contained in the concurrent filing by Lex Smith and the law firm of Kobayashi, Sugita, and Goda, and requests the additional amount of fees, non-taxable expenses, and taxable costs articulated there.

exhibits, and incorporated here by reference.  *See generally* Capozzola Declaration ¶¶ 41-45, 48-54, and Exhibits NN-QQ and TT-YY.

### 3. The PCT is Entitled to Taxable Costs In the Amount of $33,339.29 Expended by Kirkland & Ellis, LLP.

Taxable costs **shall** be allowed as of course to the prevailing party.  Fed. R. Civ. Proc. 54(d)(1) (emphasis added), 17 U.S.C. § 505, Haw. L. R. 54.2(f). Moreover, Section 505 of the Copyright Act also provides for the recovery of attorneys' fees and other costs, stating in relevant part:

> In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof.

17 U.S.C. § 505.  Fleming is entitled to recover all its attorneys' fees as well as taxable costs and nontaxable expenses, as it is the prevailing party.

Local Rule 54.2(f) and District Court Form AO133 specifically authorize the taxation of the following reasonably acquired and actually incurred costs, including:  (1) fees of the clerk; (2) deposition and trial reporter fees; (3) fees and disbursements for printing; and (4) copying costs.  The PCT claims $33,339.29 in such taxable costs as calculated in the supporting Declaration of Damian D. Capozzola and its Exhibits W ($19,392.38 in deposition expenses), X ($11,556.53 in hearing / trial transcripts), Y ($2,178.08 in outside printing / exhibit costs), and $212.30 in costs for copies of exhibits to motions).  *See also* Capozzola

21

Declaration ¶ 50 (costs are correctly stated, were necessarily incurred, and are allowable by law).

## IV.    Conclusion

The plaintiff, motivated by the prospect of large money damages and an irrational personal animosity against Fleming, has pursued Fleming and the PCT in three forums over five years. The summary judgment rulings in this case jettisoned most of the plaintiff's claims and by his own admission "killed a lot of our case." Berry never got injunctive relief, allegedly the highlight of his complaint according to his own motion for attorneys' fees, and the jury verdict of $57,534 -- seven times less than Fleming offered to settle two years ago -- is insignificant, especially when weighed against what the PCT was forced to spend to fend off Berry's

//

crusade.  All of this confirms that at the end of the day the PCT has prevailed.  In furtherance of the specific purposes of the Copyright Act and general fairness, the PCT asks this Court for an order entitling it to recover its full costs and fees from the plaintiff.

Dated:  Honolulu, Hawaii, March 23, 2006

/s/ Thomas H. Yee
_____
KOBAYASHI, SUGITA & GODA
Lex R. Smith (659-0)
Thomas H. Yee (7344-0)
Suite 2600 First Hawaiian Center

999 Bishop Street
Honolulu, HI  96813
Telephone:    (808) 539-8700
Facsimile:    (808) 539-8799

     and

KIRKLAND & ELLIS LLP
Michael E. Baumann (CA Bar No. 145830)
Damian D. Capozzola (CA Bar No. 186412)
R. Olivia Samad (CA Bar No. 228611)
777 South Figueroa Street
Los Angeles, CA 90017
Telephone:    (213) 680-8400
Facsimile:    (213) 680-8500

Co-Counsel for the Post Confirmation Trust for
Fleming Companies, Inc.