```
1    Q     Why is it that you're able to say with
2    certainty that there are trade secrets there, even
3    though you don't have the definition?
4    A     Because I've been through that exercise, I know
5    they're there.  I've done exactly what I've just told
6    you.
7    Q     What are they?
8    A     I don't recall.
9    Q     You do not remember a single trade secret that
10   is on those computers, or that was on those computers
11   when you installed software in 1999, right?
12   A     I don't recall in the way you're asking the
13   question to enunciate, articulate the trade secret
14   contained in the files that's on the software that I
15   installed on those computers in 1999.
16   Q     Okay.  You've sued a company called ES3, right?
17   A     Yes.
18   Q     Please state every fact on which you base your
19   claim against ES3.
20   A     I'm not sure if I can recall all the pieces,
21   but I'll --
22   Q     Tell me every fact that you are aware of, as
23   you sit here today, that supports your claim against
24   ES3.
25   A     They're essentially in the logistics business.
```

1   They have common ownership of -- what do you call it
2   -- officers, directors, stock, all that kind of stuff
3   -- with C&S.  They share the same physical servers,
4   IP's and network, as C&S.  They make claims to be
5   doing similar work as Fleming's logistics department
6   claim to do.
7   Q       Anything else?
8   A       There's more.  I can't remember all the pieces
9   as we're sitting here.
10  Q       You made a reference to sharing the same server
11  as C&S.  I take it that's a server on the mainland
12  someplace?
13  A       That's what it appeared as, yes.
14  Q       Do you have any evidence whether anything
15  authored by you is on that server?
16          MR. HOGAN:  Objection as to the term "on,"
17  vague and ambiguous, in the digital millennium world.
18  A       If my recollection is correct, the analysis I
19  did of the IP's and the appearance of the network for
20  C&S, ES3, appeared as though they were all transparent
21  and all connected.  It's safe to assume that if C&S
22  has my stuff on their systems, ES3 has access to it.
23  Q       (By Mr. Smith):  That is an assumption on your
24  part, correct?
25  A       It's an assumption based on observed facts.

```
 1    Q      Please state any facts that you are aware of
 2    that indicate that the server that ES3 shares with C&S
 3    contains anything authored by you.
 4           MR. HOGAN:  Objection, vague as to the terms
 5    "contains" under the Digital Millennium Copyright Act,
 6    vague and ambiguous.
 7    A      As I just said, from the appearance of the
 8    networks, there's a transparency there.
 9    Q      (By Mr. Smith):  I'm not asking you what your
10    opinion is.  I'm asking what are the facts on which
11    you base your conclusion?
12    A      Well, my opinion is based on facts.
13    Q      Please state the facts.
14           MR. HOGAN:  Objection, asked and answered.
15    A      Asked and answered.
16    Q      (By Mr. Smith:  Please state what facts you are
17    aware of.  Not that you did an analysis.  Please state
18    what facts you are aware of that indicate to you that
19    the server that C&S uses in the mainland someplace
20    that you say it shares with ES3 has something authored
21    by you on it.  Please state the facts.
22           MR. HOGAN:  Objection, vague as to the term
23    "authored by you on it."
24    Q      (By Mr. Smith):  If you are aware of any facts,
25    please state them.
```

```
 1    A        I've given you all the facts that I can
 2    remember at this point.
 3    Q        (By Mr. Smith):  Please state them again.
 4             MR. HOGAN:  Objection, asked and answered.
 5    Counsel's question admits it's a second time around.
 6    A        Asked and answered.
 7             MR. HOGAN:  I get to say that.  You don't.
 8    Q        (By Mr. Smith):  Are you refusing to answer?
 9             MR. HOGAN:  Go ahead and say it again.
10             MR. SMITH:  Please read the question back.
11             MR. HOGAN:  And please read his answer back.
12                (Record read as follows:
13                  "Q  Please state any facts that you are
14                   aware of that indicate that the server that
15                   ES3 shares with C&S contains anything
16                   authored by you.
17                   A  As I just said, from the appearance of
18                   the networks, there's a transparency there.")
19    Q        (By Mr. Smith):  Okay.  I'm not asking about
20    the appearance of the networks or what you think the
21    appearance of the networks is.  I'm asking what are
22    the facts on which you base that conclusion, if you
23    can identify any?
24    A        That's the only facts I have at this time.
25    Q        Is that there's an appearance of a transparency
```

```
 1   would be speculation for you to try to say if anybody
 2   else has done that?
 3           MR. HOGAN:  I think you misstate my objection,
 4   Counsel.  I think maybe if you're done maybe we can
 5   take a break, five-minute break?
 6           MR. SMITH:  I don't think we need a break, do
 7   we?
 8           MR. HOGAN:  How long have we been going?
 9           MR. SMITH:  Not very long.
10           MR. LIEBELER:  We didn't really take a break
11   after my exam.  Let's take five, Lex.
12           MR. SMITH:  Okay.
13           MR. HOGAN:  Let's take five.
14           THE VIDEOGRAPHER:  The time is 13:35 p.m. and
15   we are off the record.
16           ( Break.)
17           THE VIDEOGRAPHER:  The time is 13:41 p.m. and
18   we're back on the record.
19   Q       (By Mr. Smith):  Mr. Berry, you've also sued
20   someone named Richard Cohen in this case; is that
21   right?
22   A       Yes.
23   Q       Please state each fact on which you base your
24   claim against Mr. Cohen.
25   A       Which claim?
```

1   Q       All claims that you're making against him.
2   A       Well, he seems to be the owner or principal
3   shareholder of C&S, the C&S acquisitions, the LLC's,
4   the C&S Logistics of Hawaii, ES3, all those different
5   names.  He was -- obviously gave his approval for this
6   transaction.  He's the ultimate authority of accepting
7   the transfers of all my software and things from
8   Fleming.
9   Q       Anything else?
10  A       I'm sure there's other things.  That's all I
11  can think of at the moment.
12  Q       You said he approved this transaction.  Which
13  transaction are you talking about; the acquisition of
14  the Fleming assets?
15  A       Well, I think there was a series of
16  transactions, if I'm not mistaken.
17  Q       Okay.  Is that the series of transactions that
18  culminated with the C&S acquisition of Fleming assets?
19          MR. HOGAN:  I'm going to object, vague and
20  ambiguous as to the term "Fleming assets."  I don't
21  think anybody is claiming that Fleming assets gave
22  rise to any claim.
23  Q       (By Mr. Smith):  I'm just trying to understand
24  what the transaction is that you say Mr. Cohen
25  approved.