# EXHIBIT F

# Thomas T. Ueno, CPA

**844 Queen Street**
**Honolulu, Hawaii 96813**

**Fax 808 591-0813**
**808 591-0441**
**E-mail tueno@hawaii.rr.com**

March 21, 2005

Timothy Hogan, Esquire
Lynch Ichida Thompson & Kim
First Hawaiian Tower
1132 Bishop Street, Suite 1405
Honolulu, HI 96813

RE:    Fleming Matter

## OPINIONS

My opinions as of this date on matters relevant to this case and the basis and reasons for
those opinions are described in Attachment A.   Our work is continuing in this matter;
you have informed me that additional information may become available. I reserve the
right to update my opinions as this additional information becomes available.

## INFORMATION CONSIDERED

In preparing this report and forming the opinions expressed in Attachment A, I have
considered the items of information disclosed in Attachment A-1. I have also considered
my knowledge, training and professional experience as a professional accountant.

## QUALIFICATIONS

A summary of my qualifications is presented in Attachment B.

## COMPENSATION

Thomas Ueno is being compensated at our normal hourly rate for this type of work of
$265 per hour to $325 per hour for deposition/testimony; manager at $205 per hour; and
professional staff at $175 to $185 per hour. Our compensation is not contingent on the
outcome of this litigation.

## OTHER TESTIMONY

The cases in which Thomas T Ueno CPA has testified as an expert at trial or by deposition within the preceding four years are listed in Attachment C.

Thomas T. Ueno, CPA

## ATTACHMENT A

### Opinions

### Summary

The reasonable license fee for the use of Berry's freight control system and the gross margin that Fleming earned with the unauthorized use of Berry's freight control system, based on my analysis of the information provided to me, are as follows.

- A reasonable license fee for Fleming's use of Berry's freight control system is **$1,772** per container. The unpaid license fee from the date Atlantic Pacific International, Inc. (API) sold some of its assets to Fleming Companies Inc. (Fleming) to the date of this report is as follows.

| Weekly Number of Containers | 55 | 200 | 400 | 600 |
|---|---|---|---|---|
| Unapid License Fee | $ 27,706,486 | $ 100,750,857 | $ 201,501,714 | $ 302,252,571 |
| 4/1/03-8/23/03 | $ 2,004,891 | $ 7,290,514 | $ 14,581,029 | $ 21,871,543 |
| 8/24/03-3/21/05 | $ 8,005,643 | $ 29,111,429 | $ 58,222,857 | $ 87,334,286 |

- The estimated gross margin that Fleming realized from the date it no longer had authorized use of Mr. Berry's system to the date of this report is **$269 million** based on C&S' pro forma revenues less the industry average cost of goods sold of 83 percent[1].

| Estimated Sales (January 10, 2000 - March 21, 2005) | $ | 1,583,411,324 |
|---|---|---|
| Cost of Sales (industry average 83%) | | 1,314,231,399 |
| Gross Margin | $ | 269,179,925 |
| | | |
| Gross Margin (4/1/03-8/23/03) | $ | 20,771,526 |
| Gross Margin (8/24/03-5/21/05) | $ | 85,341,148 |

### Background

Wayne Berry is an independent software developer who in 1993 began developing a freight control system in response to some interest expressed by the two ocean carriers serving Hawaii - Matson Navigation and SeaLand Service, Inc. Mr. Berry created a demonstration version of his freight control system.

---

[1] I am still awaiting data such as separate revenue and costs related solely Fleming Logistics and C&S Logistics and the number of containers currently (and since January 10, 2000, being processed through the Berry Freight Control System).

About a year later, Jack Borja told Mr. Berry that he believed his freight company's, Atlantic Pacific International, Inc. (API), operations could benefit from automation. API was a principal freight consolidator for Fleming in Hawaii.

Mr. Berry did a business system analysis of API and agreed to automate selected processes for API. Mr. Berry used the freight control system that he earlier developed as the basis for this freight control system for API. Mr. Berry researched the market and found no other software that performed all the functions that API needed.

Jack Borja engaged Mr. Berry to install his freight control system for API's use. Mr. Berry developed such a system, retained ownership of the software, and allowed API to use it. The terms and conditions for his development of this software with API are specifically outlined in his invoice to API dated November 27, 1995.[2] He invoiced API $2,000,000 for his work and stated in his agreement that Mr. Berry retains all rights to intellectual property created within the scope of this project. That scope was to develop software applications for:

- o  Freight/Logistics/ocean container shipping
- o  Purchase orders
- o  Bookings
- o  Tracking
- o  Auditing
- o  Accounts receivable
- o  Accounts payable
- o  Claims
- o  Scheduling

A central component of Mr. Berry's Freight Control System of an MS Access database designed to handle multiple purchase orders that are common in ocean freight consolidation in the consumer packaged goods market. Mr. Berry informed us that his freight control system has dependably handled over 50% of all food and consumer products shipped into Hawaii for over nine years.

Mr. Berry registered his freight control system with the United States Copyright Office on October 19, 1999.

API's key customer was Fleming Companies, Inc. (Fleming). On October 29, 1999, Mr. Berry licensed his freight control system to Fleming Foods, Inc. The license agreement set forth that all title and intellectual property rights in and to the freight control system software including database designs, report designs, custom code, functional designs, images, photographs, animations, video, audio, music, text, and 'applets' incorporated into the software are owned by Mr. Berry.[3]

---

[2] Wayne Berry's invoice to API for $2,000,000, dated 11/27/95, #2727 (backdated)
[3] End-User License Agreement between Fleming Foods, Inc. and Wayne Berry dated October 29, 1999.
HF 00252 - HF 00256

On October 9, 1999, just prior to Mr. Berry's licensing his system to Fleming, Fleming purchased some of the assets of API and discontinued using API as a freight consolidator. Thereafter, Fleming used Berry's freight control system and continues to use the system.

Fleming selected Manugistics Group's retail solution in August 23, 1999[4] apparently to replace its dependence on Berry's freight control system. Fleming planned to pilot the system in December 1999 and implement it by January 10, 2000. The Hawaii Division was excluded from the January 10, 2000 implementation. I assumed that Fleming's continuing copyright infringement[5] would encourage its management to convert its Hawaii Division earlier or very soon thereafter.

On March 6, 2003, a jury found for Mr. Berry on ownership of the three software components of his freight control system. It found that Fleming's making derivative copies of Berry's freight control system infringed on Mr. Berry's copyright. On April 1, 2003, and just prior to the Court's ruling on Mr. Berry's Motion for Permanent injunction, Fleming filed its voluntary Chapter 11 petition.

In 2003, C&S Wholesale Grocers, Inc. acquired Fleming Companies, Inc. In February 2004, Fleming and C&S produced a CD Rom disk that contained a record of the files that Fleming sold to C&S. Mr. Berry analyzed the CD Rom disk and found that among the files remaining on Fleming's and/or C&S' computers were 16 copies of Mr. Berry's copyrighted work that had been transferred to C&S.

**Damages**

A copyright is an intangible asset or an asset that does not have physical substance, that grants rights and privileges to a business owner, and that are inseparable from the enterprise. The law protects the owner of intellectual property from the unauthorized exploitation of it by others. A business enterprise that owns intellectual property can either internally utilize its benefits or transfer interests in the property to others.

Mr. Berry copyrighted his freight control system software. Computer software as defined by Revenue Procedure 69-21 (1969-2 CB 303) includes those programs or routines used to cause a computer to perform a desired task or set of tasks, and the documentation required to describe and maintain those programs. Computer programs of all classes, for example, operating systems, executive systems, monitors, compilers and translators, assembly routines, and utility programs as well as applications programs are included.

The Copyright Act (17 U.S.C. Sect. 101) defines a computer program as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." That set of statements or instructions was Berry's freight control system and the result was a successful logistics operation that contributed, among other things, sales and savings to the company.

---

[4] Manugistics News & Events Detail web site
[5] Ralph Stussi's memorandum to Wayne Berry dated November 24, 1999, Exhibit 50, A00431 and A00432

Attachment A, Page 3

Freight Control System Cornerstone

Berry's freight control system became a cornerstone of Fleming's logistics business in Hawaii. It became an essential foundation block of Fleming's operations without which Fleming would be unable to handle the increased volume of containers. Mark Dillon of Fleming (and C&S) stated it would be impossible for Fleming to operate without it:

> Q: Is it fair to say, sir, if you're ordered to stop using the spreadsheets, that running the logistics operation out of Kapolei would become much more difficult?
> A: Much more –
> Q: Difficult. Difficult, sir.
> A: I'd say impossible. But, yeah, I can't conceive of it. I don't know how we would carry on.

Fleming was unable to find an off-the-shelf replacement system to replace Berry's freight control system nor was it able to custom develop one. Other typical cornerstones of businesses are management and key personnel and financing. A company will be severely handicapped or be forced to cease operations without any one of these cornerstones. The absence of any one would result in a company's demise.

License Fee

I computed below a reasonable license fee for the use of Berry's copyrighted freight control system. I used two methods to compute the fee. The first is based on the value of the assets that Fleming gave for the use of the freight control system. The second is based on estimated profits that Fleming realized by its continued unauthorized use of Berry's freight control system.

Fleming Acknowledged Fee

My analysis of API's records for 1999 shows that Fleming determined that the license fee for the use of Berry's Freight Control System was about $1,772 per container processed.

I estimated the license fee that Fleming would pay for the use of the Freight Control System by analyzing the consideration given up by Fleming to API (and Borja) that is documented in the agreements covering API's sale of its assets to Fleming and the Settlement and Release Agreement between API, Borja, Fleming and other related parties for the use of the software. In addition to the sales price for its assets, API and Borja received additional consideration from Fleming by which Fleming released and discharged API and the Borjas from any and all claims, obligations, etc. that Fleming had.[6] This would include its note for $1,295,000.

---

[6] Settlement and Release Agreement dated October 7, 1999 between API, A&A Consolidators, Borjas, and Fleming, p 4. Exhibit 218

Attachment A, Page 4

Our review of documents and discussions with W. Berry disclose that Fleming gave additional consideration during its purchase of API's assets of about $1.3 million. The net proceeds from the sale of the Cudahy property (after payment of the mortgage loan and expenses of the sale) was insufficient to pay the approximately $80,000 that Fleming paid to truckers and jobbers for API, API's open account balance of $295,607.67 to Fleming, and API's $1,295,000 note to Fleming. Jack Borja testified that he owed $1.2 million to Fleming at that time.[7] W. Berry recalled that the net sale proceeds were less than $300,000. None of the sales proceeds were available to pay down the Fleming note.

The additional consideration of $1.3 million was for use of Berry's Freight Control System. However, it was given to Borja instead of Berry; and Fleming knew that Berry held the copyright to his freight control system and the license fee was due to him. Fleming paid $60,288 for specific assets it purchased from API.[8] Fleming knew that Berry's Freight Control System was not an asset that API sold as acknowledged in a memorandum from Ralph Stussi to Wayne Berry in which Mr. Stussi states "We understand that this product is licensed, not sold and that all title and intellectual property rights in and to the software product and any copies we make are owned by you."[9]

Fleming needed to use Berry's Freight Control System after its purchase of API's assets, until it was able to bring up its replacement system, the Manugistics system.[10] It planned to implement the Manugistics system on January 10, 2000.[11] Fleming gave the $1.3 million of additional consideration for its use of Berry's Freight Control System from the date of the sale of assets on October 9, 1999 to the expected date (January 10, 2000) that Fleming would no longer use the Freight Control System. Jack Borja stated that after the asset sale that he went to Mr. Berry and asked him to grant Fleming whatever license there is for them to use the system.[12]

As the custodian of records of API, Wayne Berry provided me a report of containers that were handled by API for Fleming during the period 11/15/95 through 10/9/99 (there were containers which landed through the end of 10/99 however; the API sale of assets was completed on 10/9/99). According to the report, API was responsible for 11,681 Fleming containers. There are 203 weeks during that period. I divided the 11,681 containers per week by 203 weeks per period to arrive at an estimate of 57 containers per week processed by API.

Between 1/1/99 and 10/9/99 (40 weeks), API processed 13,834 containers for Fleming. I divided 13,834 by 40 to arrive at an estimate of 55 containers per week.

[7] Testimony of Jack Borja in Civil No. 01-00446SPK-LEK, March 4, 2003, pg 45
[8] Asset Purchase Agreement dated October 9, 1999 between API and Fleming, Schedule 1
[9] Memo for Ralph Stussi to Wayne Berry dated November 24, 1999 (A00432), pg 1
[10] Memo for Ralph Stussi to Wayne Berry dated November 24, 1999 (A00432), pg 2
[11] Email from Dave Badten of Fleming to Mark D of Fleming dated November 19, 1999. Exhibit 14
[12] Testimony of Jack Borja in Civil No. 01-00446SPK-LEK, March 4, 2003, pg 23

The above information yields a license fee on a per container basis of $1,772 per container. I calculated this fee by dividing the $1.3 million by the number of containers that Fleming expected to process during the period October 9, 1999 to January 10, 2000.

| | | |
|---|---|---|
| Consideration for use of Freight Control System | | $ 1,295,000 |
| Estimated Number of Containers Processed Per Week in 1999 | 55 | |
| # of Weeks - 10/9/99 - 1/10/00 | 13.3 | |
| Estimated Number of Containers Processed in Period | 731 | |
| License Fee Per Container | | $    1,772 |

The total license fees accrued as a result of the unauthorized use of Berry's freight control system is calculated by multiplying the license fee per container of $1,772 by the number of containers that Fleming processed in Hawaii from the date it acquired certain assets of API (October 9, 1999) to the date of this report (March 21, 2005). I made the following estimates of license fees due to Mr. Berry based on varying numbers of containers processed per week. For example, 55 containers per week would be low estimate because it assumes Fleming had no growth in its number of containers processed. I presented below the unpaid license fees due given certain average numbers of containers processed per week. The documents show that the number of containers processed per week varied from 150 to 600.

| Weekly Number of Containers | 55 | 200 | 400 | 600 |
|---|---|---|---|---|
| Unapid License Fee | $  27,706,486 | $ 100,750,857 | $ 201,501,714 | $  302,252,571 |
| 4/1/03-8/23/03 | $    2,004,891 | $    7,290,514 | $  14,581,029 | $   21,871,543 |
| 8/24/03-3/21/05 | $    8,005,643 | $  29,111,429 | $  58,222,857 | $   87,334,286 |

Net Sales and Gross Profits

Berry's freight control system is comprised of integrated purchasing system, freight system, specialized freight billing system, and numerous other subsystems such as truck GPS reporting, detention and demurrage – equipment tracking, EDI, synthetic loan planning and bar coding. The system optimizes transportation operations by managing the numerous detailed requirements and rules of the transportation and freight handling business. The system enabled Fleming to handle, with fewer staff and greater accuracy, a huge increase in the number of containers while at the same time improving customer satisfaction.

The system optimizes inbound transportation in terms of volumes and tariffs. Such optimization is achieved by system features such as maximizing container utilization and improved scheduling of consolidation deliveries. Jeff Hull, spokesman for Matson, says that shippers with a greater mix of commodities shipped could realize savings in tariffs

Attachment A, Page 6

paid. He also stated that increasing the volume of containers handled could perhaps result in lower operating costs.[13]

The system enables the user to achieve other efficiencies such as the automated reconciliation of receiving documents with invoices and claims. The system also audits all freight bills thereby eliminating overpayments. The EDI features not only impact cash flows but also enable better inventory management and reduced inventory levels. The inventory labeling and tracking systems tracks the movement of all inventory thereby reducing loss and allows management to pin point problem areas.

Methodology

I have not been provided with sales data for either Fleming or C&S. As such, I prepared estimates of gross profits based on the following information and assumptions. Profits are often defined to be revenues minus costs. It is the value of each output and input at its market price even if it is not sold on a market.

Estimate Using C&S Court Filings And Industry Averages

C&S entered as Exhibit B[14] a pro forma income statement. The statement identifies C&S Logistics Hawaii, LLC as having net sales of $309,706,165 for the year ended August 16, 2004. By applying the industry average gross profit of 17 percent[15], I estimated the gross profit was $52,650,048. I indexed that amount for the other years between 2000 to the date of the report to determine the total gross profits realized by Fleming (and C&S), of $269,179,925.

Estimate Using C&S Court Filings

I based this calculation on the pro forma income statement mentioned above. Net sales and the indexing methodology remains the same. The distinction with this calculation is that the C&S pro forma lists gross profit as 7.21 percent of net sales leading to a gross profit of $22,329,814 for the year ended August 16, 2004. I indexed that amount for the other years between 2000 to the date of the report to determine the total gross profits realized by Fleming (and C&S), of $114,163,956.

The difference in the above gross margins arises from the use of actual data versus pro forma or projection data and the use of only pro forma data. These differences provided the following range of values.

---

[13] "Cold cargo shipper fortifies larger forwarder", American City Business Journals Inc., 1997
[14] Reply of C&S Acquisition LLC and Certain of its Affiliates to Objections Based on Adequate Assurance
[15] Ratio Books, Robert Morris

| Methodology | | Annual Gross Margins | | NPV 10 Years, 21% |
|---|---|---|---|---|
| Pro forma statement and industry averages | $ | 52,650,048 | $ | 225,698,106 |
| Pro forma statement and pro forma margins | $ | 22,329,814 | $ | 95,722,550 |

The above chart shows the net present value of the annual gross margins to be achieved by the company over the next ten years, using a 21 percent discount rate.

I calculated the gross margin Fleming earned when it used this cornerstone freight control system from the date it acquired certain assets of API to the date of this report. I used the pro forma statement and industry averages assuming that Fleming's pro formas are its best projections. I used the industry average cost of goods sold because Fleming was a large and growing food wholesaler and probably helped make these averages. I computed the gross margin by calculating sales for the period assuming no increase in sales and deducting cost of sales of 83 percent of sales.

Gross Margins Post Petition and Sale

Fleming filed for bankruptcy protection on 4/1/03 and was sold to C&S on 8/23/03. I have computed the amounts from the bankruptcy filing to the date of the sale and also from the date of the sale to the date of the report.

| | Industry averages | | Pro forma margins | |
|---|---|---|---|---|
| Post petition (4/1/03-8/23/03) | $ | 20,771,526 | $ | 8,809,571 |
| Post sale to C&S (8/23/03-3/21/05) | $ | 85,341,148 | $ | 36,194,687 |

Savings Realized

Gross margin and profits are a function of the specific savings resulting from the use of Berry's freight control system. Savings reduce expenses such as cost of goods sold and operating expenses. Reduced cost of goods sold increases gross margins and reduced operating expenses increases operating income and profits.

Fleming's use of Berry's freight control system resulted in savings throughout Fleming. As discussed above, the savings are not limited to logistics but also to other segments of the operations.

Listed below are some of the identified areas of savings.

- Personnel savings -- reduced number of personnel to do the freight control. Employees could process more containers in the same period of time. Prior to the implementation of the system, approximately 20 people were needed to process 20 containers a week. With the freight control system, 14 people were processing at least 55 containers a week. Manual processing limits growth because of the difficulty

Attachment A, Page 8

of coordinating and integrating the numerous rules and transactions in freight processing.

- Improved container utilization means lower freight cost. Mr. Berry estimates that prior to the use of his freight control system, Fleming container fill rate was about 70 percent. With the use of his freight control system, Fleming was able to achieve fill rates as high as 90 percent (a 28 percent improvement). Improved container utilization results from the use of such system features as order tracking and waypoint receiving
- Lower tariffs through an improved mix of commodities in a container.
- Reduced inventory levels through the use of such features as EDI, transportation planning, loading plans, and scheduling.
- Improved cash flow though more accurate reconciliation of receiving reports with invoices and claims and EDI. All freight bills are audited.
- Improved utilization of equipment.
- Ability to take advantage of shipping allowances. Mr. Berry informed me that Fleming prior to 1995 would have vendors deliver product to Fleming's warehouse in Hawaii. After implementation of API and the system, Fleming was able to take control of goods on the U.S. mainland, and take advantage of the shipping allowances offered by vendors. Even though Fleming now had the added transportation cost, the net effect was a lower product cost.

I must first identify all of the savings that Fleming realized in order to estimate the total savings Fleming realized from its unauthorized use of Berry's freight control system. The above list of savings is not all inclusive and is intended to convey the pervasive application of Berry's freight control system on Fleming. A macro measure of such savings was estimated by Mr. Berry.

I analyzed Mr. Berry's Damage Model[16] and determined that based on the other information reviewed, it reasonably estimates the savings realized by Fleming. The damage model is based on reports produced by the Freight Control System for containers shipped for Fleming between 1995 and 1999. During that time period, API oversaw 11,681 containers for Fleming. API's gross profit was based on a simple formula, cost of Fleming to have product shipped themselves minus what the cost to have API organize the shipping divided by two (a 50/50 split between API and Fleming).[17]

According to the Sales and Allowance Report, API had $40,556,931 in sales, or $3,472 per container. Also according to that report, Fleming was able to take $9,106,128 in shipping allowances ($779 per container). Those containers cost $28,491,500 to ship ($2,509 per container).[18]

---

[16] "Summary of Voluminous Records Contained in Disclosure A00519"

[17] Currently Fleming is able to keep all savings.

[18] Mr. Berry's model shows $2,439 per container. Mr. Berry took an average based on 11,681 containers. When I reviewed the Container Costs Report, there were only 11,380 containers listed, my average container price is derived by dividing $28,491,550 by 11,380 not 11,681.

Attachment A, Page 9

Additional costs totaling $571,878 ($48.96 per container) were found in the Job Costs Report. I added total sales and allowances and subtracted from that container costs and job costs to determine an average savings of $1,699 per container ($920 in shipping and $779 in allowances). The table below outlines the savings realized by Fleming from January 10, 2000 until the date of this report and an estimate of continued use for the next 10 years. I also included savings post petition to date of the sale to C&S, and from the date of the sale to the date of the report.

| | 55 per week | | 200 per week | | 400 per week | | 600 per week | |
|---|---|---|---|---|---|---|---|---|
| Past (1/1/00– 3/21/05) | $ | 25,243,581 | $ | 91,794,839 | $ | 183,589,678 | $ | 275,384,517 |
| Future– 10 years | $ | 19,415,784 | $ | 190,579,257 | $ | 381,158,514 | $ | 571,737,771 |
| 4/1/03–8/23/03 | $ | 1,922,303 | $ | 6,990,194 | $ | 13,980,388 | $ | 20,970,582 |
| 8/23/03–3/21/05 | $ | 7,675,864 | $ | 27,912,233 | $ | 55,824,466 | $ | 83,736,699 |

Attachment A, Page 10

Exhibit I
Gross Profits

| Income Data | C&S proforma industry average | Using C&S Proforma |
|---|---|---|
| Net Sales | 100.00% | 100.00% |
| Gross Profit | 17.00% | 7.21% |
| Operating Expenses | 15.40% | 6.54% |
| Operating Profit | 1.60% | 0.67% |

| | C&S proforma industry average | Using C&S Proforma |
|---|---|---|
| Net Sales | 309,706,165 | 309,706,165 |
| Gross Profit/year (2003) | 52,650,048 | 22,329,814 |

| | |
|---|---|
| 2000 Start of Unlicensed Use | 1/10/2000 |
| 2000 Period End | 12/31/2000 |
| 2005 Period Start | 1/1/2005 |
| 2005 Date of Report | 3/21/2005 |
| 2005 Period End | 12/31/2005 |

**Indexed Gross Profits- Past**

| Period Start | Period End | C&S proforma industry average | Using C&S Proforma |
|---|---|---|---|
| 1/10/2000 | 12/31/2000 | 47,739,911 | 20,247,339 |
| 1/1/2001 | 12/31/2001 | 50,564,896 | 21,445,465 |
| 1/1/2002 | 12/31/2002 | 51,491,747 | 21,838,559 |
| 1/1/2003 | 12/31/2003 | 52,650,048 | 22,329,814 |
| 1/1/2004 | 12/31/2004 | 54,440,150 | 23,089,028 |
| 1/1/2005 | 3/21/2005 | 12,293,173 | 5,213,752 |
| Total Past Gross profits | | 269,179,925 | 114,163,956 |
| | | | |
| 4/1/2003 | 8/23/2003 | 20,771,526 | 8,809,571 |
| | | | |
| 8/24/2003 | 12/31/2003 | 18,607,825 | 7,891,907 |
| 1/1/2004 | 12/31/2004 | 54,440,150 | 23,089,028 |
| 1/1/2005 | 3/21/2005 | 12,293,173 | 5,213,752 |
| | | 85,341,148 | 36,194,687 |

| | | | |
|---|---|---|---|
| Total Sales | | 1,583,411,322 | 1,583,411,322 |

**Gross Profits - Future**

| | | | |
|---|---|---|---|
| 3/22/2005 | 12/31/2005 | 44,193,180 | 18,743,108 |
| 4/1/2006 | 12/31/2006 | 56,486,354 | 23,956,859 |
| 4/1/2007 | 12/31/2007 | 56,486,354 | 23,956,859 |
| 4/1/2008 | 12/31/2008 | 56,486,354 | 23,956,859 |
| 4/1/2009 | 12/31/2009 | 56,486,354 | 23,956,859 |
| 4/1/2010 | 12/31/2010 | 56,486,354 | 23,956,859 |
| 4/1/2011 | 12/31/2011 | 56,486,354 | 23,956,859 |
| 4/1/2012 | 12/31/2012 | 56,486,354 | 23,956,859 |
| 4/1/2013 | 12/31/2013 | 56,486,354 | 23,956,859 |
| 4/1/2014 | 12/31/2014 | 56,486,354 | 23,956,859 |
| 4/1/2015 | 12/31/2015 | 56,486,354 | 23,956,859 |
| Total | | 609,056,716 | 258,311,701 |
| NPV | | 225,698,106 | 95,722,550 |

Exhibit 2
Savings

| | Amount | Number of Containers based on | Per Container |
|---|---|---|---|
| API Sales | 40,556,931 | 11,681 | 3,472.04 |
| Fleming Allowance | 9,106,128 | 11,681 | 779.57 |
| Container Cost | 28,491,500 | 11,380 | 2,503.65 |
| Job Costs | 571,878 | 11,681 | 48.96 |
| Container Count (95-99) | 11,681 | | |

| Savings | Amount |
|---|---|
| Fleming Allowance | 780 |
| API Sales | 3,472 |
| Less: Container Cost | 2,504 |
| Less: Job Cost | 49 |
| Savings per Container | 1,699 |

**Past Savings**

| Period Start | Period End | Weeks in Period | Savings per container | Total 55 per week | Total 200 per week | Total 400 per week | Total 600 per week |
|---|---|---|---|---|---|---|---|
| 1/1/2000 | 12/31/2000 | 51 | 1,699 | 4,739,012 | 17,232,770 | 34,465,540 | 51,698,310 |
| 1/1/2001 | 12/31/2001 | 52 | 1,699 | 4,859,156 | 17,669,657 | 35,339,314 | 53,008,971 |
| 1/1/2002 | 12/31/2002 | 52 | 1,699 | 4,859,156 | 17,669,657 | 35,339,314 | 53,008,971 |
| 1/1/2003 | 12/31/2003 | 52 | 1,699 | 4,859,156 | 17,669,657 | 35,339,314 | 53,008,971 |
| 1/1/2004 | 12/31/2004 | 52 | 1,699 | 4,872,905 | 17,718,200 | 35,436,400 | 53,154,600 |
| 1/1/2005 | 3/21/2005 | 11 | 1,699 | 1,054,597 | 3,834,898 | 7,669,796 | 11,504,694 |
| | | 270 | | 25,243,581 | 91,794,839 | 183,589,678 | 275,384,517 |
| | | | | | | | |
| 4/1/2003 | 8/23/2003 | 21 | 1,699 | 1,922,303 | 6,990,194 | 13,980,388 | 20,970,582 |
| | | | | | | | |
| 8/24/2003 | 3/21/2005 | 82 | 1,699 | 7,675,864 | 27,912,233 | 55,824,466 | 83,736,699 |

**Future Savings**

| Period Start | Period End | Weeks in Period | Savings per container | Total 55 per week | Total 200 per week | Total 400 per week | Total 600 per week |
|---|---|---|---|---|---|---|---|
| 3/22/2005 | 12/31/2005 | 41 | 1,699 | 3,791,197 | 13,786,171 | 27,572,343 | 41,358,514 |
| 1/1/2006 | 12/31/2006 | 52 | 1,699 | 4,859,140 | 17,669,600 | 35,339,200 | 53,008,800 |
| 1/1/2007 | 12/31/2007 | 52 | 1,699 | 4,859,140 | 17,669,600 | 35,339,200 | 53,008,800 |
| 1/1/2008 | 12/31/2008 | 52 | 1,699 | 4,872,489 | 17,718,143 | 35,436,286 | 53,154,429 |
| 1/1/2009 | 12/31/2009 | 52 | 1,699 | 4,859,140 | 17,669,600 | 35,339,200 | 53,008,800 |
| 1/1/2010 | 12/31/2010 | 52 | 1,699 | 4,859,140 | 17,669,600 | 35,339,200 | 53,008,800 |
| 1/1/2011 | 12/31/2011 | 52 | 1,699 | 4,859,140 | 17,669,600 | 35,339,200 | 53,008,800 |
| 1/1/2012 | 12/31/2012 | 52 | 1,699 | 4,872,489 | 17,718,143 | 35,436,286 | 53,154,429 |
| 1/1/2013 | 12/31/2013 | 52 | 1,699 | 4,859,140 | 17,669,600 | 35,339,200 | 53,008,800 |
| 1/1/2014 | 12/31/2014 | 52 | 1,699 | 4,859,140 | 17,669,600 | 35,339,200 | 53,008,800 |
| 1/1/2015 | 12/31/2015 | 52 | 1,699 | 4,859,140 | 17,669,600 | 35,339,200 | 53,008,800 |
| | | | | 52,409,296 | 190,579,257 | 381,158,514 | 571,737,771 |
| | | | NPV | 19,415,784 | 190,579,257 | 381,158,514 | 571,737,771 |

Exhibit 3
Discount Rate

**Discount rate (Build-up method)**

| | | |
|---|---|---|
| Risk free rate | 5% | Long-term (20-year) U.S. Treasury Coupon Bonds Yield |
| Equity risk premium | 8% a | |
| Industry risk premium | -2.14% b | |
| Risk premium for size | 9.15% c | (*) If you see buisness as a nation, this number will be reduced. |
| Unsystematic risk | 1% d | (*) If you see buisness as a nation, this number will be reduced. |
| NCF Discount rate | 21.01% | |

**Source**
a: SBBI Valuation Edition 2002 Yearbook, Stock Market Return and Equity Risk Premium Over Time, P.77
b: SBBI Valuation Edition 2002 Yearbook, Industry Premia Estimates, P.46
c: SBBI Valuation Edition 2002 Yearbook, Long-Term Returns in Excess of CAPM Estimation for Decile Portofolios of the NYSE/AMEX/NASDAQ, P.133
d: Assuming that business is limited in Hawaii.

**Condition**
Hawaii sales: $300 million / year

EX 4
Food Inflation Rate

Commodities – Food

| Year | Percent Change |
|------|----------------|
| 1939 | -2.5% |
| 1940 | 1.7% |
| 1941 | 9.2% |
| 1942 | 17.6% |
| 1943 | 11.0% |
| 1944 | -1.2% |
| 1945 | 2.4% |
| 1946 | 14.5% |
| 1947 | 21.7% |
| 1948 | 8.3% |
| 1949 | -4.2% |
| 1950 | 1.6% |
| 1951 | 11.0% |
| 1952 | 1.8% |
| 1953 | -1.4% |
| 1954 | -0.4% |
| 1955 | -1.4% |
| 1956 | 0.7% |
| 1957 | 3.2% |
| 1958 | 4.5% |
| 1959 | -1.7% |
| 1960 | 1.0% |
| 1961 | 1.3% |
| 1962 | 0.7% |
| 1963 | 1.6% |
| 1964 | 1.3% |
| 1965 | 2.2% |
| 1966 | 5.0% |
| 1967 | 0.9% |
| 1968 | 3.5% |
| 1969 | 5.1% |
| 1970 | 5.7% |
| 1971 | 3.1% |
| 1972 | 4.2% |
| 1973 | 14.5% |
| 1974 | 14.3% |
| 1975 | 8.5% |
| 1976 | 3.0% |
| 1977 | 6.3% |
| 1978 | 9.9% |
| 1979 | 11.0% |
| 1980 | 8.6% |
| 1981 | 7.8% |
| 1982 | 4.1% |
| 1983 | 2.1% |
| 1984 | 3.8% |
| 1985 | 2.3% |
| 1986 | 3.2% |
| 1987 | 4.1% |
| 1988 | 4.1% |
| 1989 | 5.8% |
| 1990 | 5.8% |
| 1991 | 2.9% |
| 1992 | 1.2% |
| 1993 | 2.2% |
| 1994 | 2.4% |
| 1995 | 2.8% |
| 1996 | 3.3% |
| 1997 | 2.6% |
| 1998 | 2.2% |
| 1999 | 2.1% |
| 2000 | 2.3% |
| 2001 | 3.2% |
| 2002 | 1.8% |
| 2003 | 2.2% |
| 2004 | 3.4% |
| Average inc | 4.33% |

ATTACHMENT A-1
Information Considered

- o Asset Purchase Agreement dated October 9, 1999 between API and Fleming
- o Settlement and Release Agreement among API, A&A Consolidators, Inc., Jack and Heidi Borja, and Fleming made on October 7, 1999.
- o Memorandum from Ralph Stussi to Wayne Berry, License agreement for freight control system, dated November 24, 1999
- o Email from Dave Badten to MarkD re: edi transmission to Fleming Hawaii logistics, dated November 19, 1999
- o Transcript of Proceedings in the Wayne Berry vs. Fleming Companies, Inc., et al.
- o Descriptions of the Berry Freight Control System
- o Discussions with Wayne Berry
- o Crystal Reports, Job Costs
- o Crystal Reports, Container Costs
- o Crystal Reports, Sales
- o SBBI Valuation Edition 2002 Yearbook
- o Economic Report of the President 2005
- o Testimony of Mark Dillon, September 28, 2004
- o Wayne Berry's invoice to API for $2,000,000, dated 11/27/95
- o "Summary of Voluminous Records Contained in Disclosure A00519"
- o Robert Morris Ratio Books

Exhibit 5
License Fee

License Fee per Container    1772

| Period Begin | Period End | Number of Weeks in Period | Per Container | 55 | Containers per week | | |
|---|---|---|---|---|---|---|---|
| | | | | | 200 | 400 | 600 |
| 4/1/2003 | 8/23/2003 | 21 | 1,772 | 2,004,891 | 7,290,514 | 14,581,029 | 21,871,543 |
| 8/24/2003 | 3/21/2005 | 82 | 1,772 | 8,005,643 | 29,111,429 | 58,222,857 | 87,334,286 |

Exhibit 6
Containers per week

| | |
|---|---|
| Total Containers (95-99) | 11,681 |
| Period Start | 11/15/1995 |
| Period End | 10/9/1999 |
| Number of weeks in period | 203 |
| Containers per week | 57 |

1999 Calculations

| | |
|---|---|
| 1999 starts with container # | 13,834 |
| 1999 containers | 2,212 |
| | |
| Period Start | 1/1/1999 |
| Period End | 10/9/1999 |
| Number of weeks in period | 40 |
| Containers per week | 55 |

**ATTACHMENT B**
Resume

# Thomas T. Ueno

Mr. Ueno, principal of Thomas T. Ueno CPA, is a Certified Public Accountant and a Certified Forensic Accountant. He is a management consultant who provides litigation support services to attorneys in Hawaii and the mainland. He knows how to analyze and scrutinize financial statements, audit reports, tax returns and financial reports because of his audit, business management, and litigation support experience and professional accounting training.

Mr. Ueno understands the legal process and has served as an expert witness since 1981. He has testified in depositions and in court. He has worked with plaintiffs' and defendants' attorneys on commercial litigation and on personal injury matters. For example, he worked on several insurance defense cases involving professional malpractice, business interruption and destruction, and loss of future employment income. He has served as mediator and arbitrator for assignments from the American Arbitration Association.

Mr. Ueno understands the management and financial challenges of running a business and can quickly assess and detect improprieties by drawing on his 25 years of management consulting experience. He analyzes businesses and works with owners in developing their business plans for growth and success. He helps turn around ailing businesses. He analyzes economic information and relates its potential impact to a business. He has worked on several matters involving resort rentals and timeshare and related tourism activities.

Knowledge of the industry is key to doing sound financial and business analysis. Over the past 25 years, Mr. Ueno gained a breath of experience with key industries in Hawaii including government, not-for-profits, health care, hotels, retail and wholesale, legal and other professional services, real estate development, agriculture, restaurants, and travel and hospitality.

Descriptions of some of Mr. Ueno's relevant litigation support experiences are as follows:

- Asset Finding – Detail tracing of cash from billings to collections and payments. Analyzed aging reports, shareholder loan transactions, and capital transactions. Reviewed loan applications and documents. Tracked the flows of cash received and disbursed for certain officers. Traced inter-company transfers, payments of personal expenses, and deposits to personal bank accounts. Reviewed bank reconciliations and agreed deposits and withdrawals with the accounting records.

- Loss Analysis - Computed the business losses incurred by the client as a result of the alleged incident such as a failed computer system. Conducted a

Attachment B page 1

detailed analysis of the client's business. Analyzed historical financial statements (including income tax returns) and related books and records and measured the loss of revenues, estimated the related direct expenses, and determined the resulting impact on its net income and cash flows.

- Lost Profits Analysis - Conducted a detailed analysis of the company's historical financial performance; assessed its financial, management, and other resources; reviewed business plans; and estimated the company's projected revenues, direct costs, and gross margins. Reviewed and analyzed the company's historical cash flows and the assumptions for its cash flow projections. Analyzed direct expenses to determine the expenses directly related to the generation of projected revenues. Calculated the present value of the future lost profits and calculated the interest on lost profits incurred for the period from the date of the incident to the trial date.

- Reconstruction of Financial Records - Developed complete sets of receipts and disbursement journals, general ledgers, and financial statements from available documents. Prepared comparative financial statements and tax return information to show historical trends. Identified missing records through reconciliation with external records such as bank statements, loan applications, and tax returns.

- Business Valuations - Estimated the fair market value of businesses based on our review of their historical financial performance, review of their business plans, review of assets and liabilities, assessment of the contingent liabilities, review of management, and analysis of the future economic trends. Used valuation methods such as the discounted cash flow, present value of projected earnings, and net asset value.

- Internal Control Review - Reviewed the internal controls in a company to identify specific areas of weaknesses that may contribute losses from the alleged incident. Mapped the flow of key document handling and approvals to identify the key people. Ascertained that the auditors properly followed generally accepted auditing standards in communicating material weaknesses and other internal control issues to the client.

- Adherence to Generally Accepted Accounted Principles - Reviewed the financial statements to ensure that they are presented in accordance with GAAP and that the proper disclosures are made, such as accrued liabilities and the notes to the financial statements.

Mr. Ueno has provided litigation support services since 1981. He has been qualified in federal, circuit, and family courts as an expert witness. Mr. Ueno is a Diplomat of American College of Forensic Examiners (ACFE).

Attachment B page 2

Prior to starting his own firm, Mr. Ueno was the partner-in-charge of Grant Thornton's management consulting department in Honolulu where he directed the firm's litigation support practice and served as an expert witness and consultant. He served as the firm's liaison for its management consulting operations with the Grant Thornton International Asia-Pacific operations. He also served on the firm's national government services committee.

Mr. Ueno earned his BBA in accounting and his MBA from the University of Hawaii. He served on the strategic planning and visioning committees of the American Institute of Certified Public Accountants and is the past president of the Hawaii Society of CPAs. He served as a member of council of the AICPA. He is a charter member of the AICPA's Group of 100, a prestigious cross functional group of nationally prominent, forward-thinking CPAs.

Attachment B page 3

**Attachment C**
Other Testimony

The following are the matters on which I provided a report/and or deposition testimony within the last four years.

| Case | Number & Venue |
|---|---|
| Abaya v Mantell | State of Hawaii, First Circuit Court |
| Alan Park v. GEICO, et al | Civil No 02-1-1093-05 RWP; State of Hawaii, First Circuit Court |
| Allen Guastavino v Watkins-Johnson Company | CV 788289; Superior Court CA, Santa Clara |
| AOAO The Twin Towers v Fidelity Management Inc | Civil No 01-1-1948-06 (EEH); State of Hawaii, First Circuit Court |
| Bar-B-Q & Things, Jaron's Restaurant & Zia's Café v. C&C of Honolulu | Civil No 00-1-2547-08; State of Hawaii, First Circuit Court |
| California Discount Tire; Maui Carpet & Drapery; Russ' California Discount | |
| Carlson | Civil No. 99-0014 DAE ; US District Court, District of Hawaii |
| City Bank v UBS Paine Webber, Inc and Christina M. Li | Civil No. 01-00827 SOM-LEK; State of Hawaii, First Circuit Court |
| Commercial Truck & Lift Center, Inc. | Civil No. 00-1-3152-10; State of Hawaii, First Circuit Court |
| Danny Lowrey v. Paul Takeda, et al | |
| David Ashmore et al v Poipu Resort Partners et al | Civil No. 98-5257-12; |
| David Kaplan v. Y-Bron Hawaii Incorporated dba Fantasy Restaurant and Evergreen Restaurant. Hoa an Nguyen, and Doe defendants | Civil No. 95-0136-01; State of Hawaii, First Circuit Court |
| Doran et al v Aus et al | CV00-00386 SPK KSC; State of Hawaii, Second Circuit Court |
| Dotson v Roscoe Moss Hawaii | Civil No. 01-1-0628(3); State of Hawaii, First Circuit Court |
| Easterday v. Fireman's Fund | |
| Edward Au vs Hajalee, Inc. dba Highway Supermarket | Civil No. 99-2750-07; State of Hawaii, First Circuit Court |
| Finance Enterprises, Ltd. v. John Doe | Civil No. 98-5316-12EEH; State of Hawaii, First Circuit Court |
| Gilbert Wizman v. Star Market | Civil No. 02-1-1406-06; State of Hawaii, First Circuit Court |
| Godinet v Godinet | ; |
| Hawaii Helicopters Inc v. Helicopter Consultants of Maui Inc. et al | Civil No. CV01-00113 SPK LEK; State of Hawaii, Second Circuit Court |
| Hawaii Island Escrow et al v. Fagundes | Civil No. 02-1-0220 (K); State of Hawaii, First Circuit Court |
| Hawaii Microfilm Services v. Shin | |
| Hilo Fish Company Inc v Hawaii International Seafood | Civil No. 00-00185 HG FIY; State of Hawaii, Third Circuit Court |
| Hilo Fish Company, Inc. vs American Insurance Agency, et.al. | Civil No.3C99-0-000289; State of Hawaii, Third Circuit Court |
| Hilton Hawaiian Village v. Kerr Pacific, et al. | Civil No. 98-4315-10 (KNB); State of Hawaii, First Circuit Court |

| Case | Number & Venue |
|------|----------------|
| Himuro v. Nakamoto | Civil No. 99-1650-04; State of Hawaii, First Circuit Court |
| Ikeda v. Koichiro Ushirubo | Civil No. 98-4422-10; State of Hawaii, First Circuit Court |
| IKON Office Solutions v. Printer's Pride Inc | Civil No. 98-4269-09; State of Hawaii, First Circuit Court |
| Investors Equity Life Insurance Company of Hawaii Ltd. V Ernst & Young | |
| Jean Michael Pourny v. Miyake Concrete Accessories Inc | Civil No. 99-00265; State of Hawaii, Second Circuit Court |
| Jeffery Trinh v The Gap | Civil No. 378-AO-0290; State of Hawaii, First Circuit Court |
| Long & Melone, Ltd. vs. North Kona Development Corp. | Civil No. 97-00879; State of Hawaii Circuit Court, Third Circuit |
| Long & Melone, Ltd. vs. North Kona Development Corp. | No. 1CC92-0-002880; U.S. District Court, District of Hawaii |
| Loveland Academy LLC v Patricia Hamamoto, DOE, et al | Civil No. 02-00693; US District Court for District of Hawaii |
| Nobuaki Yamaguchi v. Y-S- (Hawaii) Inc., et al | Civil No. 98-3020-06; State of Hawaii Circuit Court, First Circuit |
| OCM Real Estate Opportunities Fund A, LP et al v Bill D. Mills et al | Civil No. 99-00781; State of Hawaii Circuit Court, First Circuit |
| OTM v. State of Hawaii, Department of Transportation | Civil No. 96-0404-01; State of Hawaii, First Circuit Court |
| Pancakes of Hawaii v. Sofos Realty Corp., et al | Civil No. 91-0856(2); State of Hawaii, Second Circuit Court |
| Ralph Callender, M.D. v. Kaanapali Beach Hotel, Ltd | Civil No. 2C99-0468(2); State of Hawaii, Second Circuit Court |
| Roy Lee Compton (minor) et al v American Honda Motor Company, Angello's All Terrain & Towing et al | CV 011149; Superior Court CA, San Luis Obispo |
| Roy Takatsuki, dba Roy Takatsuki Construction v. Association of Apartment Owners of Poipu Shores; Castle Resorts & Hotels, Inc. et al | Civil No. 00-01-0116; State of Hawaii, Fifth Circuit Court |
| Russell Toshio Yamane v O&Y Inc., et al | |
| Ruth Koga and Standard Sales vs Ikazaki et al. | No. 95-3573-10(VSM); State of Hawaii Circuit Court, First Circuit |
| Sasakura vs Aaron Yoo | CV02 00565 HG-KSC; US District Court for District of Hawaii |
| Sophronia Josselin vs Jean Marie Josselin | FC-D No. 00-1-1443; Family Court of the First Circuit, State of Hawaii |
| Spring Patents | |
| Stanford Carr Development Corp et al v Unity House Incorporated et al | CV 99-1781-05 VLC; State of Hawaii, First Circuit Court |
| Wayne C. Metcalf II as Liquidator of Investors Equity Life Insurance Company of Hawaii, Ltd. v. Ernst & Young | Civil No. 1CC96-0-1275; State of Hawaii Circuit Court, First Circuit |
| Wayne C. Metcalf, III v. Henry Akiu, Jr. et al. and Henry Akiu Jr. et al. v. Peter Po Sang Wong, et al. and Mark Hopkins v. Peter Po Sang Wong, et al. | Civil No. 97-5273-12; Civil No. 99-4504-12; State of Hawaii Circuit Court, First Circuit |

Attachment C-2

| Case | Number & Venue |
|---|---|
| Weaver v. Buck | Civil No. 01-1-00129; State of Hawaii Circuit Court, First Circuit |
| Whitey's Boat Cruises et al v. State of Hawaii | Civil No. 97-0139; State of Hawaii Circuit Court, First Circuit |
| Pancakes of Hawaii v. Sofos Realty Corp., et al | Civil No. 91-0856(2); State of Hawaii, Second Circuit Court |
| Ralph Callender, M.D. v. Kaanapali Beach Hotel, Ltd | Civil No. 2C99-0468(2); State of Hawaii, Second Circuit Court |
| Rearden vs. Lonnie Tiner, D.D.S. | |
| Roy Lee Compton (minor) et al v American Honda Motor Company, Angello's All Terrain & Towing et al | CV 011149; Superior Court CA, San Luis Obispo |
| Roy Takatsuki, dba Roy Takatsuki Construction v. Association of Apartment Owners of Poipu Shores; Castle Resorts & Hotels, Inc. et al | Civil No. 00-01-0116; State of Hawaii, Fifth Circuit Court |
| Russell Toshio Yamane v O&Y Inc., et al | |
| Ruth Koga and Standard Sales vs Ikazaki et al. | No. 95-3573-10(VSM); State of Hawaii Circuit Court, First Circuit |
| Sasakura vs Aaron Yoo | CV02 00565 HG-KSC; US District Court for District of Hawaii |
| Sato & Loui | |
| Scott Stuber vs. Fireman's Fund Insurance Company | S.P. No 98-0087; State of Hawaii, First Circuit Court |
| Sophronia Josselin vs Jean Marie Josselin | FC-D No. 00-1-1443; Family Court of the First Circuit, State of Hawaii |
| Spring Patents | |
| Stanford Carr Development Corp et al v Unity House Incorporated et al | CV 99-1781-05 VLC; State of Hawaii, First Circuit Court |
| Terrence Craig, et al. vs. Village Resorts, Inc. | |
| Valenciano v. Law Offices of Zenger | |
| Wayne C. Metcalf II as Liquidator of Investors Equity Life Insurance Company of Hawaii, Ltd. v. Ernst & Young | Civil No. 1CC96-0-1275; State of Hawaii Circuit Court, First Circuit |
| Wayne C. Metcalf, III v. Henry Akiu, Jr. et al. and Henry Akiu Jr. et al. v. Peter Po Sang Wong, et al. and Mark Hopkins v. Peter Po Sang Wong, et al. | Civil No. 97-5273-12; Civil No. 99-4504-12; State of Hawaii Circuit Court, First Circuit |
| Weaver v. Buck | Civil No. 01-1-00129; State of Hawaii Circuit Court, First Circuit |
| Whitey's Boat Cruises et al v. State of Hawaii | Civil No. 97-0139; State of Hawaii Circuit Court, First Circuit |
| WITKO, Inc. vs. Trustees of the Estate of Bernice Pauahi Bishop Estate, et.al. | Civil No. 97-1198-03; State of Hawaii Circuit Court, First Circuit |
| Y.K. Chow v. Myles Suehiro et al. | Civil No. 96-4458-10; State of Hawaii, First Circuit Court |

Attachment C-3