# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| WAYNE BERRY, a Hawaii citizen, | ) ) ) | Civ. No. 03-00385 SOM/LEK |
| Plaintiff, | ) ) | ORDER DENYING PLAINTIFF WAYNE BERRY'S MOTION FOR PRELIMINARY INJUNCTION |
| vs. | ) ) | |
| HAWAII EXPRESS SERVICE, INC., a California corporation, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

OCT 08 2004

at ___ o'clock and ___ min. ___ M
WALTER A. Y. H. CHINN, CLERK

ORDER DENYING PLAINTIFF WAYNE BERRY'S
MOTION FOR PRELIMINARY INJUNCTION

I.      INTRODUCTION.

Plaintiff Wayne Berry seeks an injunction against Defendants C&S Wholesale Grocers, Inc., C&S Acquisitions, LLC, and C&S Logistics of Hawaii, LLC (collectively, "C&S"), as well as against Defendant Fleming Companies, Inc. ("Fleming"), and C&S and Fleming affiliates, officers, agents, servants, and employees, prohibiting the use, reproduction, and/or transfer of the "Berry Freight Control System" computer software ("FCS"). Berry claims that he owns the copyright to FCS and that Defendants have used and continue to use FCS and derivatives of FCS in violation of his copyright. Defendants deny that they are now using FCS or a derivative of FCS.

Berry's motion is DENIED. Berry has not shown a likelihood of success on his claim that Defendants are using, or

intend to use in the future, FCS or a derivative of FCS. Berry similarly fails to show irreparable harm or a balance of hardships tipping sharply in his favor. The court is not persuaded by Berry's argument that present infringement must be presumed because of past infringement. Defendants rebut that presumption, showing that any infringement after July 2003 was innocent and that they have no intention of infringing in the future.

II.    STANDARD FOR INJUNCTIVE RELIEF.

To obtain a preliminary injunction, a party must demonstrate: 1) probable success on the merits and irreparable injury; or 2) sufficiently serious questions going to the merits to make the case a fair ground for litigation, with the balance of hardships tipping decidedly in favor of the party requesting relief.[1] Topanga Press, Inc. v. City of Los Angeles, 989 F.2d 1524, 1528 (9th Cir. 1993). These two formulations represent two points on a sliding scale, with the required degree of irreparable harm increasing as the probability of success decreases. Miller v. Cal. Pac. Med. Ctr., 19 F.3d 449, 456 (9th

_____

[1] Traditionally, there were four factors to be considered in deciding whether an injunction or restraining order should issue: 1) the likelihood of the plaintiff's success on the merits; 2) the threat of irreparable harm to the plaintiff if the injunction is not imposed; 3) the relative balance of the harm to the plaintiff and the harm to the defendant; and 4) the public interest. Alaska v. Native Vill. of Venitie, 856 F.2d 1384, 1388 (9th Cir. 1988). These factors have been collapsed into the current test. See id.

2

Cir. 1994). These formulations are not separate tests, but the extremes of a single continuum. Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League, 634 F.2d 1197, 1201 (9th Cir. 1980).

"If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." Alaska v. Native Vill. of Venitie, 856 F.2d 1384, 1389 (9th Cir. 1988) (quoting Aguirre v. Chula Vista Sanitary Serv., 542 F.2d 779 (9th Cir. 1976)). If the plaintiff shows no chance of success on the merits, the injunction should not issue. Moreover, under any formulation, the moving party must demonstrate a "significant threat of irreparable injury." Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th Cir. 1987). Finally, a plaintiff must do more than merely allege imminent harm sufficient to establish standing; he or she must demonstrate immediate threatened injury as a prerequisite to injunctive relief. Associated Gen. Contractors of Cal., Inc. v. Coalition For Econ. Equity, 950 F.2d 1401, 1410 (9th Cir. 1991), cert. denied, 503 U.S. 985 (1992).

III.    FINDINGS OF FACT.

In an effort to rule quickly on the merits of this expedited motion for injunctive relief, and to avoid burdening the court's over-extended court reporters, the court did not

request and therefore does not have a transcript of the live
testimony, although the court was provided with a "rough"
transcript.  Therefore, in referring to any live testimony in
these findings of fact, this court is unable to give citations to
specific pages or lines of a transcript.

This court has reviewed the briefs and accompanying
papers.  All declarations and exhibits attached to the briefs are
received in evidence for purposes of only the present motion (not
trial), without objection by any party.  In addition, this court
held an evidentiary hearing on September 28, 2004.  The court
received further exhibits as evidence at the hearing and received
live testimony from Mark Dillon.  In receiving live testimony,
the court followed its nonjury civil evidentiary hearing
procedures, posted on the court's web site under this judge's
"Trial Procedures" at http://www.hid.uscourts.gov and described
in Kuntz v. Sea Eagle Diving Adventures Corp., 199 F.R.D. 665 (D.
Haw. 2001).  Under those procedures, all direct testimony is
presented in the form of written declarations, and witnesses are
made available for live cross-examination and redirect testimony.
Defendants waived live cross-examination of Berry, but Berry
exercised his right to cross-examine Dillon.  Based on the

4

evidence presented, the court finds the following by a
preponderance of the evidence.[2]

     A.   In 1993, Berry created FCS, a computer program
that can be used to coordinate shipments of items. Berry gave
Fleming, free of charge, a nonexclusive license to use FCS in
1999. See Fleming Ex. A; Berry Depo. at 82, Fleming Ex. B.
While Berry hoped to sell FCS to other entities that shipped
items long distances, he did not succeed in that effort. Berry
Depo. at 79.

     B.   Berry subsequently updated FCS, calling the new
version FCS 2003. Id. at 41; Fleming Ex. B. This program,
according to Berry himself, is "radically different in many ways
and much improved than the one that was left with Fleming in
October of 1999." Id. at 29. Berry has licensed, for a fee, FCS
2003 to at least one company not involved in the present
litigation. Id.

     C.   The present lawsuit is a continuation of a dispute
that generated a previous lawsuit. In 2001, Berry sued Fleming
in this district, alleging that Fleming had infringed on his

_____

   [2]To the extent any finding of fact should more properly be
designated a conclusion of law, it should be treated as a
conclusion of law. Similarly, to the extent any conclusion of
law should more properly be designated a finding of fact, it
should be treated as a finding of fact. For ease of reference to
particular findings and conclusions in later proceedings, if any,
the findings and conclusions are presented in lettered
paragraphs.

copyright to FCS,[3] as well as on his copyrights to two other
programs, "Crystal Reports Software" and "Flemingpo.exe
Software." Berry v. Fleming Companies, Inc. et al., Civ. No. 01-
00446 SPK/LEK. On March 6, 2003, a jury found that Berry owned
the copyrights to all three programs and that Fleming had a
license to use all three programs. See Fleming Ex. 2. The jury
further found that Fleming had willfully violated Berry's
copyright to FCS by making unauthorized changes to FCS. Id.
However, the jury rejected Berry's contention that Fleming had
made unauthorized changes to the other two programs. Id. The
jury awarded Berry $98,250.00 in damages for Fleming's
infringement of the FCS copyright. Id.

     D.   Fleming filed five post-trial motions challenging
the verdict. All of these post-trial motions remain pending
before Judge King, and no hearing date has been set at this time.
The delay was caused when Fleming filed a petition for voluntary
bankruptcy that automatically stayed the proceedings before Judge
King. The Delaware Bankruptcy Court has recently lifted the stay
on Berry's pre-petition suit. See Fleming Ex. 3.

     E.   Even while challenging the verdict, Fleming took
steps to end its use of FCS. Mark Dillon, the Logistics LAN
Administrator of Fleming's Hawaii division and now a C&S

---

     [3] Subsequent references to FCS refer to the original version
of FCS, unless otherwise stated.

employee, testified during the bankruptcy proceedings that Fleming went back to the "Berry database in its original form, the form under which it was licensed to us in October 1999." Dillon Bankruptcy Testimony, Hearing Ex. 102 at 86, received in evidence by this court.    Dillon acknowledged that Fleming did not have an archived copy of FCS in the exact form that had been licensed to Fleming in 1999, but said that he did have a copy from June 2000.    Id.    Dillon stated that the only difference between the June 2000 version and the version licensed in October 1999 was that the 2000 version had a feature he had added to compensate for a Y2K failure, as well as a field scratch name added to the company name table, and possibly two label changes on other fields.    Dillon Affidavit ¶ 13 (as revised orally at the hearing before this court).    Dillon said that he removed the Y2K feature to try to return FCS to its original licensed version, id. ¶ 14, having forgotten about the other changes, see Dillon Live Testimony.

    F.    Dillon and Teresa Noa, another former Fleming employee who now works for C&S, said that reverting to the original FCS database caused a variety of problems.    Hearing Ex. 102 at 86-87; Noa Aff. ¶ 14.    Therefore, Fleming opted to discontinue use of FCS altogether on June 9, 2003.    Hearing Ex. 102 at 87; Noa Aff. ¶ 17.    Dillon says that the functions formerly performed by Berry's software "have since been performed

using a combination of Microsoft Excel and Crystal Reports,"
which are both "'off the shelf' products available to the public
over the Internet or any of numerous retail stores." Dillon
Decl. ¶ 4, Fleming Ex. D. To switch from FCS to Excel, Dillon
extracted the Fleming data that had been used with FCS, and then
imported that data into the Excel system. Hearing Ex. 102 at
108-09. Berry claims that this extraction violated his copyright
because Fleming transferred not only its data, but also
components of FCS.

      G. At the hearing on the present motion, Berry
identified as such components certain spreadsheet fields and the
portion of FCS that assigned sequential numbers to orders.
Dillon countered that certain fields were necessary in any
spreadsheet in the industry. Berry noted that C&S now uses
spreadsheets with sequential numbers for orders, and argued that
Dillon had imported the numbering system from FCS. There is no
evidence before the court that the component of FCS that provided
for sequential numbers is somehow unique to FCS. Dillon
testified at the hearing that all tracking systems, including
systems that existed long before computers were in use, assigned
identifiers to orders. He likened the identifiers to ledger
numbers. The particular FCS components that Berry alleges Dillon
copied when Dillon imported data are necessary parts of any
freight tracking system.

H.    On or about July 7, 2003, C&S agreed to purchase Fleming's wholesale division, including the division in Hawaii. See Fleming Ex. G.  C&S purchased the intellectual property owned and used by Fleming, but FCS was not listed among the assets being acquired.  Id. at Schedule 8.1.  Over Berry's objections, the Bankruptcy Court approved the sale on August 15, 2003, see Fleming Ex. 4, and the sale closed on or about August 23, 2003, see Fleming Ex. H.

I.    In early July 2003, Fleming hired Guidance Software, Inc. ("Guidance"), to remove any software created by Berry from its computer system and to ensure that no Fleming employee would have access to such software.  See Fleming Exs. E and F.  Guidance assigned Michael Gurzi to cleanse Fleming's computer system.  Gurzi said that he first made an image of each computer to "preserve the original data and hold it as evidence." Fleming Ex. F.  Gurzi next wiped the computers clean of all programs and data.  He then re-installed software, such as Microsoft Office, that was not owned by Berry.  Id.  Gurzi and Dillon also restored approximately 20,000 user files, such as Word documents and Excel Spreadsheets, to the system.  Hearing Ex. 102 at 92-93.  Gurzi then made a second image of each drive to preserve a record of the reconstructed data.  See Fleming Ex. F.  Gurzi said that, after his work, Fleming's files were "wiped of all data to include any software created by Mr. Wayne Berry,

9

and any derivative thereof" as of July 7, 2003.   Gurzi Aff. ¶ 8,
Fleming Ex. E.

        J.    Berry alleges that the second image produced by
Gurzi shows that sixteen files including the words "Fleming
Logistics MDB" in their names remained on the network after the
computers were supposedly scrubbed of all Berry files and
software.   These files, according to Berry, are FCS files.
According to Dillon, those files "were among the user files that
were retained on the network."  Hearing Ex. 102 at 94.   The
retention, Dillon said, was inadvertent.   He had created the
files in connection with Berry's original lawsuit, and had placed
them where he thought they would escape detection by Berry, who
knew Fleming's system and could have examined files in Fleming's
system.   To hide any files that Berry might examine in connection
with the prior litigation, Dillon put the files he created for
litigation purposes on his home computer.  Dillon sometimes also
put information under file titles unlikely to arouse suspicion.
Id.; Dillon Live Testimony.   Dillon said that at some point
before July 26, 2004, he did a search of every computer on the
network and determined that the sixteen offending files were no
longer on the system.   Id.   However, because it is unclear when
these files were removed, it is unclear whether they were on the
system when C&S took over.

10

K.   On Sunday, July 13, 2003, after Gurzi had completed his work, Dillon reduced the size of the database still on the computer.  Dillon said he was only accessing Fleming's data, but Berry argues that Dillon was also accessing FCS or components of FCS.

L.   After Berry filed the present complaint, Fleming retained a second forensic software expert, New Technologies, Inc. ("NTI").  NTI was retained to examine the computers sold by Fleming to C&S to determine whether any files or software created by Berry were on the computers at the time of the sale.  See Stevens Depo. at 10, Fleming Ex. K.  If any files were found, NTI was to determine the last time that any such files had been opened or modified, and to erase any such software from the system.  Id.

M.   On learning that Fleming had retained NTI, Berry's counsel contacted NTI and warned NTI that it could face RICO charges, as Guidance already had, if it worked for Fleming and accessed the FCS program.  Anderson Depo. at 11-13, Fleming Ex. M.  Although it had already sent a consultant to Hawaii to work on the project, NTI cancelled its consulting agreement with Fleming to avoid a potential lawsuit.  Id. at 11, 14-15  NTI was to have performed its work by the first week of July 2004. Stevens Depo. at 14.

11

N.    The court is thus left without a definitive statement as to the present state of the computer files and must rely on what the parties argue happened earlier and on the inferences the parties urge upon the court.  Berry asserts that the information captured by Gurzi after the scrubbing, including the sixteen files containing Berry's software, "was what Fleming sold to C&S."  Motion at 7.  Berry's attorney, Timothy Hogan, says that Lex Smith, Fleming's counsel, "told me it was his understanding that the second acquired images contained the software that was sold to C&S."  Hogan Decl. ¶ 16.  Even if Hogan could serve as a fact witness while being counsel of record, and even if Smith's testimony were considered a party admission, it would be unpersuasive.  It is equivocal and does not represent concrete evidence that Berry's intellectual property was transferred in the sale.

O.    There is, however, some evidence that C&S did not use or access FCS, even if it was on its system.  The court therefore finds that Berry has not met his burden of showing that FCS, even if it was transferred to C&S, is still on C&S's computers or is still being used today.[4]

P.    Berry next asserts that Fleming "trick[ed] the

---

[4] It would have been helpful to the court to have had NTI's report to corroborate, or disprove, Dillon's and Noa's testimony.  Berry's efforts to impede NTI suggest that Berry's true objective may not be to protect any rights in FCS.

Delaware Bankruptcy Court" into approving the sale to C&S by
falsely claiming that it was not using FCS and falsely claiming
that FCS would not be part of the sale. Motion at 8-9. Berry
again points to the presence of Berry's software on the network
when Guidance took the post-scrubbing image as proof that FCS was
sold to C&S. Id.; Berry Decl. ¶ 6. As the court has explained,
it is unclear whether FCS was on the Fleming computers at the
time of the sale.

      Q.   Berry further claims that Fleming and Gurzi
committed "fraud" that was "clear and unmistakable" on the
Bankruptcy Court when Gurzi, not having examined Dillon's home
computer, told the court that he had made sure that no Fleming
employee had access FCS. Mot. at 11; Dillon Depo. at 321-323,
Berry Ex. M; Gurzi Aff. ¶ 9, Berry Ex. I. It does appear that
Gurzi's report may have been incorrect. Dillon was able at the
time to access Berry software from home. However, there is no
evidence of an intent to defraud the court. Gurzi apparently was
unaware of what was on Dillon's home computer. More importantly,
there is no evidence that Dillon did access FCS from his home,
and there is no evidence to refute Dillon's testimony that he has
not used FCS since June 2003. Having observed Dillon's demeanor,
this court finds Dillon credible. At worst, Dillon forgot about
files on his home computer.

      R.   Fleming acknowledges that a literal copy of FCS

was made when Guidance recorded an image of all files on its
computer before the scrubbing.  Fleming argues, however, that
Gurzi's copying, done as part of the effort to comply with the
jury's finding of infringement, was fair use because it was done
in an effort to preserve evidence in the ongoing litigation.
Opp. at 18.

      S.  Berry next contends that his intellectual property
is at risk, and that he faces imminent harm, because Fleming
intends to "create a replacement for Mr. Berry's work."  Mot. at
16.  Berry argues that a company called Manugistics, Inc., is
doing work for Fleming post-bankruptcy, and that Manugistics is
"engaged in ongoing software development regarding software that
performs the same apparent functions" as FCS.  Mot. at 17-18.
Berry claims that Fleming, in conjunction with Manugistics, is
improperly using FCS to reverse-engineer a program that will
compete with FCS.

      T.  While Fleming and Manugistics are admittedly
working to develop software, there is no evidence that they are
reverse-engineering FCS in the process.  Certainly, a bankruptcy
filing by Fleming suggests that Fleming continues to use
Manugistics.  Berry Ex. S.  An e-mail from Noa to Dillon
indicates that Fleming was considering using a Manugistics
program to replace FCS.  See Berry Ex. W.  A replacement,
however, is not necessarily a product of reverse-engineering.

There is no evidence that Fleming and Manugistics are improperly using FCS in trying to replace FCS.

U.    Berry first attempts to demonstrate nefarious conduct by relying on what appears to be the transcript of a message left by Fleming attorney Lex Smith for Berry's attorney. Id.; Berry Ex. Q.  Even assuming the transcript were accurate and admissible, it does not support Berry's position.  On the tape, Fleming's attorney states that Fleming intends to work with a programmer that has never had any access to Berry's software to create a system that meets Fleming's needs.  The attorney notes that he himself should not be part of the process because he has had access to Berry's software through the litigation and could theoretically be accused of passing information to the new programmers, even though, he says, "I don't understand anybody's programming."  Berry Ex. Q.  The recorded statement supports Fleming's contention that it sought to develop software wholly independent of Berry's program to meet its computer needs. Berry's copyright in FCS does not preclude Fleming, or any other party, from independently developing software to compete with FCS.

V.    Berry next attempts to demonstrate improper reverse-engineering by relying on a letter sent from the attorney for Manugistics to the attorney for Berry.  In this letter, Manugistics states that Fleming was licensed to use NetWORKS

15

Routing, a program developed in the 1980s, not NetWORKS
Transporter. See Berry Ex. R. Berry claims that documents filed
in the Bankruptcy Court show that Fleming was actually a NetWORKS
Transporter user. Mot. at 17; Berry Ex. S. The document relied
on by Berry appears to be an undated form letter sent to a
"Manugistics NetWORKS Transport Client." Berry Ex. S. "Fleming
Companies 39787" is written by hand in the top right corner of
the page, but there is no other information indicating that the
letter was sent to Fleming. Id.

     W.   Moreover, Berry has not demonstrated why it
matters whether Fleming was using the Routing software, as stated
by Manugistics's attorney, or the Transport software, as claimed
by Berry. Berry argues that the letter from Manugistics damages
Fleming's credibility and is therefore relevant. However, Berry
admits that Fleming's use of the Transport software does not
demonstrate that Manugistics is reverse-engineering FCS.
Therefore, Berry has not shown how his rights would be infringed
by Fleming's alleged use of the Transport program.

     X.   Berry claims that an invoice from Manugistics to
Fleming, filed in the Bankruptcy Court, shows that Manugistics
accessed a file with the prefix "151" while working for Fleming.
Berry alleges that this "is the same prefix as one of the
machines that is operating at Fleming, now C&S." Mot. at 19;
Berry Ex. T; see also Berry Ex. I (Guidance's report showing one

16

file with the "151" prefix on Fleming's computer). Berry
contends that this shows reverse-engineering, but the argument
misses the step of establishing what the file with prefix "151"
contains.

   Y. Berry attempts to demonstrate Fleming's and C&S's
impure intentions by pointing to Noa's actions. Berry alleges
that Noa "fled to Iowa . . . with a copy of the pirated FCS" to
escape this court's jurisdiction. Mot. 20-21. First, there is
no evidence that Noa "fled" the jurisdiction. She claims that
she moved to Iowa, where her family resides, because of
employment uncertainties resulting from Fleming's bankruptcy.
Noa Aff. ¶ 22. More importantly, there is no evidence that Noa
had a copy of Berry's software. Berry claims that Noa's "desire
to continue to use the infringing software is evidenced by" an e-
mail she sent to Dillon in June 2003 when Fleming was struggling
to revert back to the original after the jury found that it had
infringed Berry's copyright. Id. In the e-mail, Noa expresses
frustration at the effects of the changes made to comply with the
jury's ruling and asks, "Can't we buy time using the database?"
This e-mail does not support Berry's contention that his
copyright was, and still is, being infringed. The e-mail merely
shows that one subordinate employee asked whether the company
could return to the earlier program. There is no evidence that
Fleming in fact reverted to the old system. The evidence shows

that Fleming, frustrated with attempts to operate under the
unmodified version of Berry's software for which it had a
license, decided to turn to a program wholly unrelated to FCS.
Hearing Exhibit 102 at 86, Ex. C; Noa Aff. ¶¶ 15-20.

      Z.   Berry claims Noa's intent to infringe on his
copyright is further demonstrated by her creation of a website,
earthlogistics.com, which Berry claims C&S and Fleming "more
likely than not . . . concocted as another scheme to continue
their endless infringement." There is no evidence supporting
this contention. Noa states that she purchased the website when
she was considering opening a consulting business and that she
"did not use or attempt to use" Berry's software on her website.
Noa Aff. ¶ 23. Berry has presented no evidence casting any doubt
on this assertion.

      AA.  Berry further claims that he has "smoking gun
evidence" of an intent by Fleming and C&S to commit future
infringement. He claims that they signed a "contract to commit
future criminal infringement." Reply to Fleming at 7. This
argument is meritless. The supposedly incriminating contract is
a letter from Fleming to C&S at the time of the asset purchase,
acknowledging that Fleming has been sued by Berry and that any
liability arising from any "past, present or *future* use of the
Berry Technology" is an excluded liability under the asset
purchase agreement. (Italics added.) Berry Reply Ex. C.

Contrary to Berry's assertion that this letter demonstrates an intent, and even a contractual obligation, to commit future infringement, this language is merely meant to protect C&S in connection with any infringement committed by Fleming.[5]

BB. Dillon further testified that the C&S facility in Hawaii maintained a network separate from Fleming's to avoid any possibility, or the appearance of a possibility, that Berry's software would be transferred from Fleming to C&S. _Id._ at 110. Berry in turn contends that creating this separation is "proof of the willful infringement." Reply at 9. Berry, however, has presented no evidence to counter Fleming's testimony that it maintained separate networks in good faith to avoid even the appearance of impropriety.

CC. In sum, the court finds that Berry has failed to show that the infringement, if any, was willful. The court finds that Berry has failed to show that the alleged infringement had any effect on the market for Berry's product. Berry has not shown that his software was used or accessed by Defendants and has not shown that it was used to develop a derivative work. Therefore, on these facts, the court finds that there is no risk of future infringement.

---

[5] Berry goes so far as to argue that the letter "is evidence sufficient to invoke the grand jury." Reply at 7. The court disagrees.

19

DD.  In contrast to Berry, who has not shown that he will be harmed if Defendants are allowed to use the programs they are presently using, Defendants will be greatly harmed by the requested injunction.  While Berry seeks to enjoin Defendants' use of spreadsheets that he says are derivatives of FCS, Dillon testified that it would be difficult or impossible to run the logistics program at C&S without using the spreadsheets.  Dillon Live Testimony.  The balance of hardships before the court thus tips sharply in favor of Defendants.

IV.    CONCLUSIONS OF LAW.

A.    To prevail on a claim of copyright infringement, Berry must establish that 1) he owns the copyright at issue, and 2) Defendants violated one of Berry's exclusive rights under 17 U.S.C. § 106.  See Feist Publ'n, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361-63 (1991).

B.    A copyright owner has the exclusive right to make copies of his work.  17 U.S.C. § 106(1).  A copyright owner has the exclusive right to make derivative works based on his work. 17 U.S.C. § 106(2).  See also Pickett v. Prince, 207 F.3d 402, 405-06 (7th Cir. 2000) (included among "uncited authorities" referred to by Berry at the hearing on the present motion). A copyright owner has the exclusive right to distribute his work. 17 U.S.C. § 106(3).

C.    Notwithstanding § 106, certain uses of copyrighted
works are considered "fair use" and do not infringe on the
owner's copyright.  See 17 U.S.C. § 107.  Factors to be
considered in a fair use analysis include: 1) the purpose and
character of the use; 2) the nature of the copyrighted work; 3)
the amount and substantiality of the portion used in relation to
the copyrighted work as a whole; 4) and the effect of the use
upon the potential market for or value of the copyrighted work.
Id.  A fair use inquiry "calls for case-by-case analysis" of the
four factors "in light of the purposes of copyright." Campbell
v. Acuff-Rose Music, Inc., 510 U.S. 569, 577-78 (1994).  In
considering the final factor, a court must consider the impact on
the market not only for the original work, but also for any
derivative work.  Id. at 590.

D.    Showing a reasonable likelihood of success on the
merits on a copyright infringement claim raises a presumption of
irreparable harm.  Johnson Controls, Inc. v. Phoenix Control
Sys., Inc., 886 F.2d 1173, 1174 (9th Cir. 1989).  However, this
presumption can be rebutted.  An injunction is improper when a
defendant has in good faith abandoned the infringing conduct and
there is little evidence it will be resumed.  Volkswagenwerk
Aktiengellschaft v. Church, 411 F.2d 350, 352 (9th Cir. 1969);
see also Reader's Digest Ass'n, Inc. v. Conservative Digest,
Inc., 821 F.2d 800, 807 (D.C. 1987) ("When defendant has ceased

21

its infringing conduct and shows no inclination to repeat the offense, an injunction is not warranted."), overruled on other grounds by Fogarty v. Fantasy, Inc., 510 U.S. 517, 521 (1994). When the infringement was innocent and there is no indication of an intent to infringe in the future, neither the public nor the plaintiff needs the protection of an injunction. In re Circuit Breaker Litig., 860 F. Supp. 1453, 1456 (C.D. Cal. 1994), aff'd by, Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply, Inc., 106 F.3d 894 (9th Cir. 1997).[6] Moreover, when there is no longer a market for the infringed product, there is no need for an injunction. See Marisa Christina, Inc. v. Bernard Chaus, Inc., 808 F. Supp. 356, 359 (S.D.N.Y. 1992).

    E.    No presumption of irreparable harm attaches here.

Even if Berry could show a likelihood of success on his infringement claim, Defendants show that any infringement was innocent and no longer continuing. Dillon explained that, after the jury's verdict in the earlier case, he made a good faith

---

    [6] Berry relies on Cadence Design Sys., Inc. v. Avant! Corp., 125 F.3d 824 (9th Cir. 1997), for the proposition that an injunction is warranted. Cadence is distinguishable from the present case. In Cadence, the district judge erred by denying an injunction solely on the ground that there was no irreparable harm because only money damages would be suffered. Id. at 829. The Ninth Circuit specifically noted that Cadence did not involve innocent infringement, infringement that did not affect market value, or a product that no longer has market value. Id. at 828-29. These factors and others, such as Berry's actions preventing Defendants from developing evidence through NTI, are present here.

effort to rid Fleming's computers of the offending files. Even
if he did not succeed in that effort, the failure appears to have
been due to an oversight. More critically, while Berry has made
sweeping assertions that Fleming and C&S continue to use FCS, he
does so without supporting evidence. The evidence shows that
Defendants have not used Berry's software since the summer of
2003. Defendants say they are currently using Excel and Crystal
Reports, for which Microsoft owns the copyrights. Berry has
presented no evidence showing that the software now used is
actually a derivative of FCS. Furthermore, Berry does not show
that Defendants have any intention of resuming their use of FCS,
a program Berry concedes is outdated.

F.    Without the presumption, Berry cannot establish
irreparable harm. Defendants have shown that there is no market
for FCS, which mitigates against the need for an injunction.
Berry created FCS in 1993. As Berry never received any money for
FCS, there may never have been a substantial market for the
product. Certainly there is no evidence of such a market today.
By now, of course, Berry has updated the program. FCS 2003 is,
by Berry's own admission, "radically different in many ways and
much improved" over FCS 1993. There is simply no evidence to
support a finding of irreparable harm in the absence of the
presumption, which has been rebutted.

23

G.   Even if the court applies the "balance of
hardships" test instead of examining irreparable harm, Berry
fails.  Far from tipping sharply in Berry's favor, the balance of
hardships tips in Defendants' favor.  Berry's potential hardships
are nonexistent or slight, given the absence of a market for FCS
1993.  By contrast, as noted earlier, C&S would face great
difficulty in conducting its operations if an injunction were
entered.

H.   Even assuming Berry could show actual harm, an
injunction would not be warranted because Berry does not show a
likelihood of success on the merits.  And, of course, without
showing such a likelihood, Berry would not be entitled to the
presumption of irreparable harm.

I.   In examining the likelihood of success on the
merits, the court recognizes that Fleming is challenging the
validity of Berry's alleged copyright.  If Berry does not own
FCS's copyright, then his rights could not have been violated by
Fleming's alleged use of FCS.  Berry urges this court to give
collateral estoppel effect to the finding by the jury in the
prior action that Berry owns the FCS copyright.  The court will
give collateral estoppel effect to that finding only if it is a
final judgment.  "A 'final judgment' for purposes of collateral
estoppel can be any prior adjudication of an issue in another
action that is determined to be 'sufficiently firm' to be

24

accorded conclusive effect."  Luban Indus., Inc. v. United
States, 707 F.2d 1037, 1040 (9th Cir. 1983).  Factors to consider
include: 1) whether the parties were fully heard; 2) whether the
court supported its decision with a reasoned opinion; and 3)
whether the decision was subject to appeal or in fact was
reviewed on appeal.  Id.

    J.   The jury's ruling is not presently entitled to
collateral estoppel effect.  Judge King has not ruled on
Fleming's post-trial motions.  Clearly, Fleming cannot seek
appellate review before Judge King rules.  At least at present,
this court does not give collateral estoppel effect to the jury's
determination that Berry owns the copyright to FCS.

    K.   However, the jury's ruling certainly does create a
likelihood that Berry will prevail on his claim of ownership.
Verdicts may be vacated, and trial court rulings may be reversed,
but Berry has in hand a trial victory that makes it likely he
will succeed in establishing his copyright ownership of FCS.  The
court therefore proceeds on this motion assuming that Berry owns
the copyright to FCS.

    L.   Berry alleges that numerous actions taken by
Fleming and C&S violated his copyright.  First, Berry claims that
Fleming's admitted use of FCS until June 2003 was improper
because the jury's finding of infringement terminated the license
that Fleming previously had to use FCS.  Second, Berry alleges

that, even if the original license was not terminated, Fleming
did not have a copy of the original program, for which it had a
license, and it therefore used a modified version of FCS that
violated Berry's copyright.  Similarly, Berry contends that the
act of transforming the altered and infringing copy into the
original was itself infringement.  Third, Berry claims that
Defendants violated his copyright by having Guidance copy his
software in making a record of Fleming's entire hard drive.
Fourth, Berry claims that his copyright was violated when
Guidance restored sixteen files containing FCS to Fleming's hard
drive.  Fifth, Berry claims that his copyright was infringed when
Defendants extracted data from FCS, so that the data could be
imported into the Excel program.  Sixth, Berry claims his
copyright has been infringed by reverse-engineering done by
Fleming and/or C&S in concert with Manugistics.  These
contentions will be addressed in turn.

        M.    Berry has not established a likelihood of success
on his claim that Fleming's admitted use of FCS until June 2003
violated his copyright because the original license terminated
with the jury's finding of infringement.  The license agreement
does not contain a provision stating that it will be terminated
if Fleming is found to have infringed.  See Fleming Ex. A.  Berry
cites no law for his contention that a license automatically
expires when the licensee is found to have infringed by making

                                26

unauthorized changes to the copyrighted work.[7]  Fleming was
entitled to revert to using the original version of FCS that
Berry had licensed Fleming to use.

N.    Nor has Berry shown a likelihood of
success on the merits of his claim that his copyright was
violated by the process Fleming used to revert to the original
version of FCS.  Dillon concedes that Fleming no longer had a
copy of the original FCS that was licensed to Fleming in 1999.
However, he stated that he had a copy that was identical to the
original, except that Dillon had added a feature to deal with the
Y2K problem, and had made a few other technical changes.  Dillon
then removed the Y2K feature, thinking he was thereby returning
FCS to its original version, which Fleming had a license to use.

O.    Berry argues that the act of altering the
infringing version (by removing the Y2K feature) was itself an
act of copyright infringement.  Reply to Fleming at 10-11.  Berry
contends that Dillon created "another derivative, to suit
Fleming's business needs," when he altered the infringing
version.  Id. at 11.  The act of removing the infringing element

---

    [7] Berry's claim that the license was no longer valid because
Fleming failed to assume the license, and therefore rejected it,
in the bankruptcy proceeding is without merit.  Fleming, as
debtor, had no need to assume the license because Fleming owed no
outstanding payments to Berry for the license.  Fleming received
the license free of charge and had no obligation to make future
payments for the license.  Accordingly, there was no need to
assume the license in the bankruptcy proceeding.

                                27

of a work is not itself the creation of a derivative work.[8]  Even
if a derivative were created, it was done innocently and in good
faith, without causing any harm to Berry.[9]

      P.   The court further concludes that it was "fair use"
for Guidance to copy Fleming's hard drives, including Berry's
software, to preserve a record of what was on the computer before
the scrubbing intended to remove FCS.  Reproduction of a
copyrighted work to maintain a record for use in the course of
litigation is fair use.  See Religious Tech. Ctr. v. Wollersheim,
971 F.2d 364, 367 (9th Cir. 1991); see also Nimmer on Copyright
§ 13.05[D][2], p. 13-223 (2003) (works are customarily reproduced
in various types of judicial proceedings . . . and it seems
inconceivable that any court would hold such reproduction to
constitute infringement").[10]  Moreover, Guidance's use was

---

    [8] A clothing manufacturer, for example, might infringe a
photographer's copyright by putting a photograph on a t-shirt,
thereby creating a derivative work of the original photo.
Removing the offending photograph would not constitute the
creation of another derivative work, and the manufacturer would
not be precluded from selling the shirt once the offending
material was removed.  If Fleming removed the offending additions
to FCS, Fleming would not thereby create a derivative work.
Fleming was free to use FCS, subject to the license, assuming the
additions were removed.

    [9] No harm has occurred because the program created by
removing the Y2K feature did not, in fact, meet Fleming's
business needs.  Shortly thereafter, Fleming abandoned the use of
FCS altogether.

    [10] Berry contends that Guidance's claim of fair use "is
rebutted by the fact that Guidance, at the time, was in violation
of a court order that prohibited the destruction of any evidence

"neither commercially exploitative of the copyright, nor commercially exploitative of the copyright holder's market." Jartech, Inc. v. Clancy, 666 F.2d 403, 407 (9th Cir. 1991).

Q.    Berry's claim that his copyright was violated when Guidance copied sixteen files containing FCS has greater merit. A literal copy of Berry's work was made when these files were returned to Fleming's network.  These files were not necessary for record-keeping related to the litigation.  Therefore, Berry has shown a likelihood of success on the merits on this one claim.  Fleming, however, has rebutted any presumption of irreparable harm based on this past violation.  Any FCS files on Fleming's computers after June 2003 were there inadvertently and were not used to track freight.  Noa Aff. ¶ 21.  Even if FCS was retained in Fleming's system at the time of the transfer to C&S, this retention was innocent and unknowing.

R.    Furthermore, Berry has not shown a likelihood of success on the merits of his claim that his copyright was violated when Fleming extracted its data from FCS.  Berry claims that Dillon extracted pieces of his program when he extracted data, but cannot show that Dillon's later creation violated his copyright.  Berry points to Dillon's alleged copying of the FCS

---

. . . [and that] Guidance stole in the night without notice to the Court or Mr. Berry."  Reply to Fleming at 11-12.  Berry makes a serious accusation, but presents no evidence to support it. Moreover, it is unclear how the making of an allegedly illegal copy of FCS amounted to destruction of evidence.

29

sequential numbering system, but sequential numbering is a time-honored practice, and there is no evidence that the portion of the FCS system that automatically numbers items is unique.  What Berry is complaining about appears to the court to be obvious functional elements that any spreadsheet set up to track freight would have to have.  Even if Dillon copied those features from FCS, Berry may no more claim copyright infringement with respect to those features than he could claim copyright infringement if Dillon copied a typeface that FCS used.

      S.   Berry's reliance on Assessment Technologies of Wisconsin v. Wiredata, 350 F.3d 640 (7th Cir. 2003), is misplaced.  In that case, the court found that the extraction of raw data from a copyrighted database did not constitute a copyright violation.  See id. at 644.  Further, the court held that such an extraction would not violate a copyright on software "even if the raw data were so entangled with [the software] that they could not be extracted without making a copy of the program."  Id.

      T.   Similarly misplaced is Berry's reliance on Dun & Bradstreet Software Services, Inc. v. GEAC Computer Systems, Inc., 307 F.3d 197 (3d Cir. 2002).  In that case, the defendant admitted that he could not have written his program without copying critical elements of source code from the plaintiff's software.  Id. at 207.  The court found that the defendant had

30

infringed upon the plaintiff's software, despite the fact that
the copied portion had been relatively small.  *Id.*  Berry has not
shown anything comparable.  At most, he has presented evidence
that Dillon copied features of FCS that were in wide use long
before FCS was created.

U.    Berry does not support his contention that C&S, in
conjunction with Manugistics, reverse-engineered his software to
develop a competing program.  Berry has merely shown that C&S
hired Manugistics.  It is not clear whether C&S is using existing
Manugistics software or if it is developing new software to meet
its needs.  Assuming the latter, Berry fails to show that FCS is
being used to develop that software.  A copyright in FCS does not
allow Berry to prevent a competitor from independently developing
a program that serves the same customer's needs.

V.    Finally, Berry's accusations regarding Noa's
"flight" to Iowa and her website "earthlogistics.com" are
similarly devoid of any factual support.

V.    REQUEST FOR JUDICIAL NOTICE AND MOTION TO STRIKE

The parties ask the court to take judicial notice of
various filings made before the Bankruptcy Court.  The court
takes judicial notice only as to the fact that such filings were
made, but not as to the truth of the various allegations and
factual assertions made by the parties in those filings.

31

The court was asked to strike certain declarations, but the parties subsequently agreed to this court's consideration of all declarations and exhibits attached to the briefs.

VI.      CONCLUSION.

For the foregoing reasons, Berry's motion for a preliminary injunction is DENIED.  The court takes the judicial notice noted above, and denies Fleming's request that declarations be stricken.


IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, October 8, 2004.


SUSAN OKI MOLLWAY
UNITED STATES DISTRICT JUDGE


Berry v. Hawaiian Express Service, Inc., et al., Civ. No. 03-0385
SOM/LEK; ORDER DENYING PLAINTIFF WAYNE BERRY'S MOTION FOR
PRELIMINARY INJUNCTION.


32