# Exhibit 15

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF HAWAII
 3
 4   WAYNE BERRY, a Hawaii      )
 5   citizen,                   )
 6               Plaintiff,     )
 7       vs.                    ) Civil No. CV03-00385
 8   HAWAIIAN EXPRESS SERVICE,  )           SOM-LEK
 9   INC., a California         ) (Copyright)
10   corporation, et al.,       )
11               Defendants.    )
12   _____)
13
14
15              DEPOSITION OF BRIAN CHRISTENSEN
16
17   Taken on behalf of Plaintiff Wayne Berry at 1132
18   Bishop Street, Suite 306, Honolulu, Hawaii, 96813,
19   commencing at 9:05 a.m., on Monday, December 6,
20   2004, pursuant to Notice.
21
22
23   REPORTED BY:   JANIS K. FLOATE, RPR, CSR 254
24                  Notary Public, State of Hawaii
25
```

```
 1   APPEARANCES:

 2

     For Plaintiff Wayne Berry:
 3
                 TIMOTHY J. HOGAN, ESQ.
 4               Lynch Ichida Thompson Kim & Hirota
                 1132 Bishop Street, Suite 1405
 5               Honolulu, Hawaii  96813

 6   For Defendants Hawaiian Express Service, Inc.;
     H.E.S. Transportation Services, Inc.; California
 7   Pacific Consolidators, Inc.; Jeffrey P. Graham and
     Peter Schaul:
 8
                 (telephonic appearance)
 9               EMILY REBER PORTER, ESQ.
                 Goodsill Anderson Quinn & Stifel
10               1800 Alii Place
                 1099 Alakea Street
11               Honolulu, Hawaii  96813

12   For Defendants Fleming Companies, Inc.; C&S
     Wholesale Grocers, Inc.; C&S Logistics of Hawaii,
13   LLC; C&S Acquisitions, LLC; ES3, LLC; and Richard
     Cohen:
14
                 LEX R. SMITH, ESQ.
15               Kobayashi Sugita & Goda
                 2600 First Hawaiian Center
16               999 Bishop Street
                 Honolulu, Hawaii 96813
17
     For Defendant Hawaii Transfer Company, Limited:
18
                 JULIA MORGAN, ESQ.
19               Fukunaga Matayoshi Hershey & Ching, LLC
                 1200 Davies Pacific Center
20               841 Bishop Street
                 Honolulu, Hawaii 96813
21
     For Defendant Foodland Super Market, Limited:
22
                 LEROY E. COLOMBE, ESQ.
23               Chun Kerr Dodd Beaman & Wong, LLC
                 900 Topa Financial Center
24               745 Fort Street
                 Honolulu, Hawaii 96813
25
```

1    If we can go off the record for one
2  second.
3            (Discussion off the record.)
4            (Exhibit 27 marked for identification.)
5  BY MR. HOGAN:
6       Q.   Mr. Christensen, you've been handed what's
7  been marked for identification as Exhibit 27.  It is
8  a three-page document starting with Exhibit M on the
9  front and then two pages of what looks like a letter
10 dated August 23rd.  Do you see that?
11      A.   Yes.
12      Q.   Have you ever seen this before?
13      A.   No.
14      Q.   Do you have any knowledge of any of the --
15 has anyone at C&S -- I'm not talking about lawyers,
16 but management at C&S -- ever identified to you that
17 they had an indemnity agreement with Fleming
18 regarding this litigation?
19      A.   No.
20      Q.   And you've never seen this letter before?
21      A.   Correct.
22           MR. HOSODA:  Asked and answered.
23 BY MR. HOGAN:
24      Q.   What is your job presently at C&S?
25      A.   I'm the division president.

```
 1    Q.    How long have you held that position?
 2    A.    Since March of 2003.
 3    Q.    Now, March 2003 was the period during the
 4  original jury trial.  Do you recall that?
 5    A.    That's my understanding, yes.
 6    Q.    Is it fair to say that you were the
 7  replacement for Ralph Stussi?
 8    A.    Yes.
 9    Q.    Do you have any understanding of the
10  reason that Ralph Stussi ceased to be the division
11  head at Fleming?
12    A.    Yes.
13    Q.    What is that understanding?
14    A.    That he had an opportunity at another
15  division in Texas.  So he took that.
16    Q.    Do you have any understanding that Mr.
17  Stussi was disciplined in any way for his conduct of
18  the litigation?
19    A.    No.
20    Q.    Presently, sir, do you supervise any
21  employees?
22    A.    Yes.
23    Q.    Have you supervised employees since March
24  of 2003?
25    A.    Yes.
```

```
 1    Q.    Who do you supervise?
 2    A.    I'm responsible for the division as a
 3  whole.
 4    Q.    So that would be all --
 5    A.    All.
 6    Q.    -- the employees?
 7    A.    Correct.
 8    Q.    How many employees are at the division?
 9    A.    Approximately 210.
10    Q.    Now, you're aware that there is a lawsuit
11  regarding the use of certain software?
12    A.    Yes.
13    Q.    So we have the terms clear, prior to the
14  jury trial in March, what is your understanding of
15  what software Fleming was using in its logistics
16  department in Hawaii to operate its rate program?
17        MR. SMITH:  Objection.  Overbroad, vague
18  and ambiguous.
19        MR. HOSODA:  I object to the form as well.
20  BY MR. HOGAN:
21    Q.    Have you ever met Wayne Berry before?
22    A.    Yes.
23    Q.    Are you aware that Mr. Berry is a computer
24  programmer?
25    A.    Yes.
```

```
 1    Q.    Why do you believe that to be so?
 2    A.    I met Mr. Berry in the late '90s when he
 3  was with API and first came to work with Fleming.
 4    Q.    When you say API, you mean Atlantic
 5  Pacific International, Inc.?
 6    A.    Right.
 7    Q.    We can use API.
 8    A.    Okay.
 9    Q.    What did API do for Fleming, to the best
10  of your knowledge?
11    A.    They helped develop a system to coordinate
12  and track freight.
13    Q.    As part of that system, computers are
14  used; is that a fair statement?
15    A.    Yes.
16    Q.    Are you aware that one of the programs
17  that is used in that computer system is an Access
18  database?
19    A.    I've heard that.
20    Q.    You've heard that?
21    A.    Yes.
22    Q.    Where have you heard that?
23    A.    It could have been through Ralph Stussi or
24  Mark Dillon.
25    Q.    But is it fair to say that there is a term
```

```
 1  that you feel comfortable with to identify that
 2  Access database that was being used in March of
 3  2003?
 4       A.   I think that Access database is fine.
 5       Q.   If we use Access database and we talk
 6  about it in terms of the timing and the year, would
 7  that be sufficient so we understand it?
 8       A.   Yes.
 9       Q.   So March 1st, 2003, is it your
10  understanding that there was an Access database
11  operating at Fleming logistics?
12            MR. SMITH:  Calls for speculation.
13  BY MR. HOGAN:
14       Q.   You can answer the question, if you can.
15       A.   That's my understanding.
16       Q.   What do you base that understanding on?
17       A.   From what little I know about the database
18  itself, I've heard that term used.
19       Q.   Had you heard it on or about March 1st,
20  2003?
21       A.   Yes.
22       Q.   Were you supervising employees at that
23  time at Fleming that were working in the freight or
24  the Fleming logistics department
25       A.   No.
```

```
 1      Q.    Who was supervising them?
 2      A.    Ralph Stussi.
 3      Q.    When did Ralph Stussi stop working for
 4  Fleming Hawaii?
 5      A.    Right about that time actually.
 6      Q.    So do you recall the precise date?
 7      A.    No, I don't.
 8      Q.    Was it prior to April 1st, 2003?
 9      A.    Yes.
10      Q.    So sometime after April 1st, 2003 or after
11  March 1st, 2003 but before April 1st, 2003, you
12  became the supervisor of the people at the Fleming
13  freight logistics department?
14      A.    Correct.
15      Q.    But you don't know the exact date?
16      A.    I became the president on the 23rd, I
17  believe, of March.
18      Q.    At that time it is your understanding that
19  you would be their supervisor?
20      A.    Correct.
21      Q.    Were you aware at that time, sir, that
22  there had been a jury verdict finding that Fleming
23  had infringed Mr. Berry's software?
24      A.    Yes.
25      Q.    What, if anything, did you do to ensure
```

1  that Fleming no longer infringed Mr. Berry's
2  software?
3      A.    My understanding was that we did have a
4  license to use the original software and that was
5  the intent and it was to go back to that original
6  form of the database.
7      Q.    Now, did you make the decision to do that?
8      A.    No.
9      Q.    Do you know who did?
10     A.    No.
11     Q.    Do you know how it was communicated to you
12 that there had been a decision to do that?
13     A.    Specifically, no, I don't know who told me
14 that, but yes.
15     Q.    You believe that was before April 1st?
16     A.    The verdict?
17     Q.    No.  I'm sorry.  That the decision to go
18 back to what was -- I believe you used the term
19 original version.  I think that's what you said.
20 I'm not trying to misstate it.  But if you did say
21 the original version, that decision was prior to
22 April 1st?
23     A.    I'm not sure on the date.
24     Q.    Were you aware prior to the filing of the
25 Fleming bankruptcy on April 1st, 2003, that Fleming

```
 1   was going to file bankruptcy?
 2        A.   No.
 3        Q.   Is it fair to say that you found out after
 4   they filed?
 5        A.   Yes.
 6        Q.   Have you ever offered any of the employees
 7   that are presently working for you the option of not
 8   using any of the software that's subject to this
 9   litigation?
10             MR. SMITH:  Vague and ambiguous.
11             MR. HOSODA:  I join.
12   BY MR. HOGAN:
13        Q.   After the jury verdict Fleming did
14   something to the software that was operating in the
15   freight logistics department; is that correct?
16        A.   Yes.
17             MR. SMITH:  Vague and ambiguous, over
18   broad.
19             MR. HOSODA:  I join.
20   BY MR. HOGAN:
21        Q.   Did Fleming, to the best of your
22   knowledge, revert to the original license version?
23        A.   Yes.
24        Q.   Why do you say that?
25        A.   Because Mark Dillon, who was my
```

1   programmer, took the oldest copy that he had and
2   took out the changes that he had made to get it to
3   that original state.
4       Q.   What makes you say that that happened?
5   Why do you believe that?
6       A.   Because after that, we had a lot of
7   problems with the database and it was based on
8   taking out the changes that we made to make it work.
9       Q.   Did it ever occur to you to contact Wayne
10  Berry to get an actual original copy of the
11  software?
12      A.   I wasn't involved in the trial itself and
13  the subsequent decision to go back to the software.
14  So I don't know if I can answer that.
15          MR. HOGAN:  Let's mark this as the next in
16  order.
17          (Exhibit 28 marked for identification.)
18  BY MR. HOGAN:
19      Q.   Mr. Christensen, you have been handed a
20  document marked for identification as Exhibit 28.
21  Have you ever seen that before?
22      A.   Yes.
23      Q.   Is that one of the e-mails that you
24  reviewed prior to your deposition?
25      A.   Yes.

129

C E R T I F I C A T E

STATE OF HAWAII           )
                          ) SS.
CITY AND COUNTY OF HONOLULU )

I, JANIS K. FLOATE, Notary Public, State of Hawaii, do hereby certify:

That on December 6, 2004, appeared before me Brian Christensen, the witness whose deposition is contained herein; that prior to being examined, the witness was by me duly sworn;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting under my supervision; that the foregoing represents to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

DATED this 15 day of Dec, 2004, in Honolulu, Hawaii.

_____
JANIS K. FLOATE, RPR, CSR 254
Notary Public, State of Hawaii
My Commission Exp: December 12, 2005

JAN FLOATE & ASSOCIATES (808) 263-1149