# Exhibit
# 8

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF HAWAII

 3

 4    WAYNE BERRY, a Hawaii        )

 5    citizen,                     )

 6                  Plaintiff,  )

 7       vs.                     ) Civil No. CV03-00385

 8    HAWAIIAN EXPRESS SERVICE, )          SOM-LEK

 9    INC., a California        ) (Copyright)

10    corporation, et al.,      )

11                  Defendants. )

12    _____)

13

14

15            DEPOSITION OF BRIAN CHRISTENSEN

16

17    Taken on behalf of Plaintiff Wayne Berry at 1132

18    Bishop Street, Suite 306, Honolulu, Hawaii, 96813,

19    commencing at 9:05 a.m., on Monday, December 6,

20    2004, pursuant to Notice.

21

22

23    REPORTED BY:    JANIS K. FLOATE, RPR, CSR 254

24                    Notary Public, State of Hawaii

25
```

```
 1    APPEARANCES:

 2

      For Plaintiff Wayne Berry:
 3
                      TIMOTHY J. HOGAN, ESQ.
 4                    Lynch Ichida Thompson Kim & Hirota
                      1132 Bishop Street, Suite 1405
 5                    Honolulu, Hawaii  96813

 6    For Defendants Hawaiian Express Service, Inc.;
      H.E.S. Transportation Services, Inc.; California
 7    Pacific Consolidators, Inc.; Jeffrey P. Graham and
      Peter Schaul:
 8
                      (telephonic appearance)
 9                    EMILY REBER PORTER, ESQ.
                      Goodsill Anderson Quinn & Stifel
10                    1800 Alii Place
                      1099 Alakea Street
11                    Honolulu, Hawaii  96813

12    For Defendants Fleming Companies, Inc.; C&S
      Wholesale Grocers, Inc.; C&S Logistics of Hawaii,
13    LLC; C&S Acquisitions, LLC; ES3, LLC; and Richard
      Cohen:
14
                      LEX R. SMITH, ESQ.
15                    Kobayashi Sugita & Goda
                      2600 First Hawaiian Center
16                    999 Bishop Street
                      Honolulu, Hawaii 96813
17
      For Defendant Hawaii Transfer Company, Limited:
18
                      JULIA MORGAN, ESQ.
19                    Fukunaga Matayoshi Hershey & Ching, LLC
                      1200 Davies Pacific Center
20                    841 Bishop Street
                      Honolulu, Hawaii 96813
21
      For Defendant Foodland Super Market, Limited:
22
                      LEROY E. COLOMBE, ESQ.
23                    Chun Kerr Dodd Beaman & Wong, LLC
                      900 Topa Financial Center
24                    745 Fort Street
                      Honolulu, Hawaii 96813
25
```

```
 1            If we can go off the record for one
 2    second.
 3                 (Discussion off the record.)
 4                 (Exhibit 27 marked for identification.)
 5    BY MR. HOGAN:
 6        Q.    Mr. Christensen, you've been handed what's
 7    been marked for identification as Exhibit 27.  It is
 8    a three-page document starting with Exhibit M on the
 9    front and then two pages of what looks like a letter
10    dated August 23rd.  Do you see that?
11        A.    Yes.
12        Q.    Have you ever seen this before?
13        A.    No.
14        Q.    Do you have any knowledge of any of the --
15    has anyone at C&S -- I'm not talking about lawyers,
16    but management at C&S -- ever identified to you that
17    they had an indemnity agreement with Fleming
18    regarding this litigation?
19        A.    No.
20        Q.    And you've never seen this letter before?
21        A.    Correct.
22             MR. HOSODA:  Asked and answered.
23    BY MR. HOGAN:
24        Q.    What is your job presently at C&S?
25        A.    I'm the division president.
```

1    Q.    How long have you held that position?

2    A.    Since March of 2003.

3    Q.    Now, March 2003 was the period during the

4    original jury trial.  Do you recall that?

5    A.    That's my understanding, yes.

6    Q.    Is it fair to say that you were the

7    replacement for Ralph Stussi?

8    A.    Yes.

9    Q.    Do you have any understanding of the

10   reason that Ralph Stussi ceased to be the division

11   head at Fleming?

12   A.    Yes.

13   Q.    What is that understanding?

14   A.    That he had an opportunity at another

15   division in Texas.  So he took that.

16   Q.    Do you have any understanding that Mr.

17   Stussi was disciplined in any way for his conduct of

18   the litigation?

19   A.    No.

20   Q.    Presently, sir, do you supervise any

21   employees?

22   A.    Yes.

23   Q.    Have you supervised employees since March

24   of 2003?

25   A.    Yes.

1      Q.    Who do you supervise?

2      A.    I'm responsible for the division as a

3  whole.

4      Q.    So that would be all --

5      A.    All.

6      Q.    -- the employees?

7      A.    Correct.

8      Q.    How many employees are at the division?

9      A.    Approximately 210.

10     Q.    Now, you're aware that there is a lawsuit

11  regarding the use of certain software?

12     A.    Yes.

13     Q.    So we have the terms clear, prior to the

14  jury trial in March, what is your understanding of

15  what software Fleming was using in its logistics

16  department in Hawaii to operate its rate program?

17           MR. SMITH:  Objection.  Overbroad, vague

18  and ambiguous.

19           MR. HOSODA:  I object to the form as well.

20  BY MR. HOGAN:

21     Q.    Have you ever met Wayne Berry before?

22     A.    Yes.

23     Q.    Are you aware that Mr. Berry is a computer

24  programmer?

25     A.    Yes.

```
 1        Q.    Why do you believe that to be so?

 2        A.    I met Mr. Berry in the late '90s when he

 3   was with API and first came to work with Fleming.

 4        Q.    When you say API, you mean Atlantic

 5   Pacific International, Inc.?

 6        A.    Right.

 7        Q.    We can use API.

 8        A.    Okay.

 9        Q.    What did API do for Fleming, to the best

10   of your knowledge?

11        A.    They helped develop a system to coordinate

12   and track freight.

13        Q.    As part of that system, computers are

14   used; is that a fair statement?

15        A.    Yes.

16        Q.    Are you aware that one of the programs

17   that is used in that computer system is an Access

18   database?

19        A.    I've heard that.

20        Q.    You've heard that?

21        A.    Yes.

22        Q.    Where have you heard that?

23        A.    It could have been through Ralph Stussi or

24   Mark Dillon.

25        Q.    But is it fair to say that there is a term
```

1    that you feel comfortable with to identify that

2    Access database that was being used in March of

3    2003?

4        A.    I think that Access database is fine.

5        Q.    If we use Access database and we talk

6    about it in terms of the timing and the year, would

7    that be sufficient so we understand it?

8        A.    Yes.

9        Q.    So March 1st, 2003, is it your

10   understanding that there was an Access database

11   operating at Fleming logistics?

12           MR. SMITH:  Calls for speculation.

13   BY MR. HOGAN:

14       Q.    You can answer the question, if you can.

15       A.    That's my understanding.

16       Q.    What do you base that understanding on?

17       A.    From what little I know about the database

18   itself, I've heard that term used.

19       Q.    Had you heard it on or about March 1st,

20   2003?

21       A.    Yes.

22       Q.    Were you supervising employees at that

23   time at Fleming that were working in the freight or

24   the Fleming logistics department

25       A.    No.

1    Q.    Who was supervising them?

2    A.    Ralph Stussi.

3    Q.    When did Ralph Stussi stop working for

4    Fleming Hawaii?

5    A.    Right about that time actually.

6    Q.    So do you recall the precise date?

7    A.    No, I don't.

8    Q.    Was it prior to April 1st, 2003?

9    A.    Yes.

10    Q.    So sometime after April 1st, 2003 or after

11    March 1st, 2003 but before April 1st, 2003, you

12    became the supervisor of the people at the Fleming

13    freight logistics department?

14    A.    Correct.

15    Q.    But you don't know the exact date?

16    A.    I became the president on the 23rd, I

17    believe, of March.

18    Q.    At that time it is your understanding that

19    you would be their supervisor?

20    A.    Correct.

21    Q.    Were you aware at that time, sir, that

22    there had been a jury verdict finding that Fleming

23    had infringed Mr. Berry's software?

24    A.    Yes.

25    Q.    What, if anything, did you do to ensure

1    that Fleming no longer infringed Mr. Berry's

2    software?

3         A.    My understanding was that we did have a

4    license to use the original software and that was

5    the intent and it was to go back to that original

6    form of the database.

7         Q.    Now, did you make the decision to do that?

8         A.    No.

9         Q.    Do you know who did?

10        A.    No.

11        Q.    Do you know how it was communicated to you

12   that there had been a decision to do that?

13        A.    Specifically, no, I don't know who told me

14   that, but yes.

15        Q.    You believe that was before April 1st?

16        A.    The verdict?

17        Q.    No.  I'm sorry.  That the decision to go

18   back to what was -- I believe you used the term

19   original version.  I think that's what you said.

20   I'm not trying to misstate it.  But if you did say

21   the original version, that decision was prior to

22   April 1st?

23        A.    I'm not sure on the date.

24        Q.    Were you aware prior to the filing of the

25   Fleming bankruptcy on April 1st, 2003, that Fleming

```
1    was going to file bankruptcy?

2         A.    No.

3         Q.    Is it fair to say that you found out after

4    they filed?

5         A.    Yes.

6         Q.    Have you ever offered any of the employees

7    that are presently working for you the option of not

8    using any of the software that's subject to this

9    litigation?

10             MR. SMITH:  Vague and ambiguous.

11             MR. HOSODA:  I join.

12   BY MR. HOGAN:

13        Q.    After the jury verdict Fleming did

14   something to the software that was operating in the

15   freight logistics department; is that correct?

16        A.    Yes.

17             MR. SMITH:  Vague and ambiguous, over

18   broad.

19             MR. HOSODA:  I join.

20   BY MR. HOGAN:

21        Q.    Did Fleming, to the best of your

22   knowledge, revert to the original license version?

23        A.    Yes.

24        Q.    Why do you say that?

25        A.    Because Mark Dillon, who was my
```

24

1    programmer, took the oldest copy that he had and

2    took out the changes that he had made to get it to

3    that original state.

4        Q.    What makes you say that that happened?

5    Why do you believe that?

6        A.    Because after that, we had a lot of

7    problems with the database and it was based on

8    taking out the changes that we made to make it work.

9        Q.    Did it ever occur to you to contact Wayne

10   Berry to get an actual original copy of the

11   software?

12       A.    I wasn't involved in the trial itself and

13   the subsequent decision to go back to the software.

14   So I don't know if I can answer that.

15              MR. HOGAN:  Let's mark this as the next in

16   order.

17              (Exhibit 28 marked for identification.)

18   BY MR. HOGAN:

19       Q.    Mr. Christensen, you have been handed a

20   document marked for identification as Exhibit 28.

21   Have you ever seen that before?

22       A.    Yes.

23       Q.    Is that one of the e-mails that you

24   reviewed prior to your deposition?

25       A.    Yes.

C E R T I F I C A T E

STATE OF HAWAII                    )
                                  ) SS.
CITY AND COUNTY OF HONOLULU        )

I, JANIS K. FLOATE, Notary Public, State of Hawaii, do hereby certify:

That on December 6, 2004, appeared before me Brian Christensen, the witness whose deposition is contained herein; that prior to being examined, the witness was by me duly sworn;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting under my supervision; that the foregoing represents to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

DATED this __15__ day of __Dec__, 2004, in Honolulu, Hawaii.

_____
JANIS K. FLOATE, RPR, CSR 254
Notary Public, State of Hawaii
My Commission Exp: December 12, 2005

JAN FLOATE & ASSOCIATES (808) 263-1149