# Exhibit 10

VII. **PLAINTIFF'S CLAIMS OF PRE-2003 INFRINGEMENT ARE BASELESS.**

Plaintiff argues that the Employees have not refuted his claims that before 2003 they committed illegal infringement by using Plaintiff's database. First, Mr. Christensen was not even using the database. He did not become President until March, 2003. So Plaintiff is just wrong with respect to Mr. Christensen. [See Exhibit A, 16:24-25; 17:1-2].

With respect to Ms. Noa, she never admitted nor testified to making changes to Plaintiff's database. Plaintiff cites no evidence in the record. Furthermore, any use by Ms. Noa of Plaintiff's database prior to 2003 was done pursuant to the valid license Fleming possessed as the jury had found, and again, as a salaried employee operating as instructed by the company.

In addition, Mr. Dillon and all of the other individual employees were not parties to the first lawsuit. Plaintiff's argument about alleged infringement by the Employees prior to 2003 is an improper attempt at offensive collateral estoppel. Whether then or now, these employees have merely done what the company asked them to do, and therefore, they are not personally liable. The ramifications of a contrary determination will strike at the heart of U.S. labor.

VIII. **PLAINTIFF HAS NO LEGAL PRECEDENT.**

Plaintiff spends pages 28 through 31 of his Opposition attempting to distinguish the two cases that the Employees cited

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WAYNE BERRY, a Hawaii citizen, ) | CIVIL NO. CV03-00385 SOM-LEK |
| ) | (Copyright) |
| Plaintiff, ) | |
| ) | AFFIDAVIT OF LYLE S. HOSODA |
| v. ) | |
| ) | |
| HAWAIIAN EXPRESS SERVICE, ) | |
| INC., et al. ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**AFFIDAVIT OF LYLE S. HOSODA**

STATE OF HAWAII            )
                           ) SS.
CITY AND COUNTY OF HONOLULU )

   LYLE S. HOSODA, being first duly sworn under oath deposes and says as follows:

   1.   I am the principal attorney of the law firm of LYLE S. HOSODA & ASSOCIATES, L.L.C., attorneys for Defendants Mark Dillon, Brian Christensen, Teresa Noa, Melvin Ponce, Justin Fukumoto, Jacqueline Rio, Alfredda Waiolama, and Sonia Purdy and am duly authorized to make this affidavit.

   2.   I am licensed to practice law in all of the Federal and State courts in the State of Hawaii.

\

\

\

3. Attached hereto as Exhibit "A" is a true and correct copy of select pages of the deposition of Brian Christensen taken on December 6, 2004.

FURTHER AFFIANT SAYETH NAUGHT.

_____
LYLE S. HOSODA

Subscribed and sworn to before me
this 29th day of December 2004.

_____
Notary Public, State of Hawaii
My Commission Expires: 4-9-2008
Print Name: Richard W. Hosoda

2

```
                                                                    1
 1              IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF HAWAII

 3

 4    WAYNE BERRY, a Hawaii     )

 5    citizen,                  )

 6                 Plaintiff,   )

 7       vs.                    ) Civil No. CV03-00385

 8    HAWAIIAN EXPRESS SERVICE, )         SOM-LEK

 9    INC., a California        ) (Copyright)

10    corporation, et al.,      )

11                 Defendants.  )

12    _____ )

13

14

15            DEPOSITION OF BRIAN CHRISTENSEN

16

17    Taken on behalf of Plaintiff Wayne Berry at 1132

18    Bishop Street, Suite 306, Honolulu, Hawaii, 96813,

19    commencing at 9:05 a.m., on Monday, December 6,

20    2004, pursuant to Notice.

21

22

23    REPORTED BY:   JANIS K. FLOATE, RPR, CSR 254

24                   Notary Public, State of Hawaii

25                       EXHIBIT A
```

```
 1    Q.    How long did you work for Foodland?
 2    A.    Thirteen years.
 3    Q.    Is it safe to say somewhere around 1993?
 4    A.    I left there in 1991.
 5    Q.    Where did you go after that?
 6    A.    To Fleming.
 7    Q.    What was the name of your employer at the
 8  time you worked for Fleming?
 9    A.    Fleming Companies.
10    Q.    Fleming Companies, Inc.?
11    A.    Yes.
12    Q.    Was it ever known by any other name to
13  you?
14    A.    I believe in Hawaii they had a dba of
15  Fleming Foods.
16    Q.    We still see the trucks on the freeway.
17    A.    Yes.
18    Q.    How long did you work for Fleming?
19    A.    Until C&S bought them last year.
20    Q.    Who do you work for presently?
21    A.    C&S Wholesale Grocers.
22    Q.    Do you recall the date of hire when you
23  began working for C&S?
24    A.    I believe it was September 2003.
25    Q.    Fleming filed bankruptcy April 1st, 2003.
```

11

1    Is that your understanding?
2       A.   Yes.
3       Q.   Subsequent to that time did you receive
4    any additional compensation from Fleming or anyone
5    regarding your work at Fleming or C&S besides your
6    regular salary?
7       A.   Yes.
8       Q.   What did you receive?
9       A.   I received a bonus, I believe, in 1993.
10      Q.   In 1993?
11      A.   I'm not sure of the year, but about there.
12      Q.   Did you receive a retention bonus from
13   Fleming after the filing of the bankruptcy?
14      A.   No.
15      Q.   Do you know of any employees at Fleming in
16   Hawaii that received a retention bonus?
17      A.   No.
18      Q.   Do you know what I'm talking about when I
19   say retention bonus?
20      A.   Yes.
21      Q.   What is your understanding of what it
22   means?
23      A.   Paid to stay.
24      Q.   Is it fair to say, to your knowledge, no
25   one was given retention bonuses?

1         If we can go off the record for one
2  second.
3              (Discussion off the record.)
4              (Exhibit 27 marked for identification.)
5  BY MR. HOGAN:
6       Q.   Mr. Christensen, you've been handed what's
7  been marked for identification as Exhibit 27.  It is
8  a three-page document starting with Exhibit M on the
9  front and then two pages of what looks like a letter
10 dated August 23rd.  Do you see that?
11      A.   Yes.
12      Q.   Have you ever seen this before?
13      A.   No.
14      Q.   Do you have any knowledge of any of the --
15 has anyone at C&S -- I'm not talking about lawyers,
16 but management at C&S -- ever identified to you that
17 they had an indemnity agreement with Fleming
18 regarding this litigation?
19      A.   No.
20      Q.   And you've never seen this letter before?
21      A.   Correct.
22           MR. HOSODA:  Asked and answered.
23 BY MR. HOGAN:
24      Q.   What is your job presently at C&S?
25      A.   I'm the division president.

```
 1      Q.   How long have you held that position?
 2      A.   Since March of 2003.
 3      Q.   Now, March 2003 was the period during the
 4  original jury trial.  Do you recall that?
 5      A.   That's my understanding, yes.
 6      Q.   Is it fair to say that you were the
 7  replacement for Ralph Stussi?
 8      A.   Yes.
 9      Q.   Do you have any understanding of the
10  reason that Ralph Stussi ceased to be the division
11  head at Fleming?
12      A.   Yes.
13      Q.   What is that understanding?
14      A.   That he had an opportunity at another
15  division in Texas.  So he took that.
16      Q.   Do you have any understanding that Mr.
17  Stussi was disciplined in any way for his conduct of
18  the litigation?
19      A.   No.
20      Q.   Presently, sir, do you supervise any
21  employees?
22      A.   Yes.
23      Q.   Have you supervised employees since March
24  of 2003?
25      A.   Yes.
```

46

```
 1      Q.    Do you have any knowledge that Mr. Griffin
 2   was ever told that the manner in which this was
 3   handled was not consistent with his four options?
 4      A.    No.  I believe that this e-mail here was
 5   just part -- it's just a suggestion at the time from
 6   Mr. Griffin.
 7      Q.    A suggestion.  But you weren't required to
 8   follow his suggestions?
 9      A.    Correct.
10      Q.    What makes you believe that?
11      A.    Well, it was a recommendation that he had
12   which way we should go, and at about this time, you
13   know, with the bankruptcy going on, getting monies
14   in order to develop a software was going to be a
15   reach, and I believe at that point is when we
16   decided to go to a manual system basically just to
17   abandon the software and that was the most
18   cost-effective way to go.
19      Q.    In the earlier e-mail from Mr. Dillon,
20   regarding Mr. Dillon, which was Exhibit 28, where he
21   says, "I would not select someone known to me.  I
22   understand that this person may not see any part of
23   the Berry database or its screens at any time."
24   That's Mr. Dillon's view, that he shouldn't be
25   involved or the person getting to make it shouldn't
```