**EXHIBIT "F"**

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3

 4    WAYNE BERRY, a Hawaii Citizen,   ) CIVIL NO. 03-00385SOM
                                       )
 5                  Plaintiff,         )
                                       )
 6          vs.                        )
                                       )
 7    HAWAII EXPRESS SERVICE, INC.,    )   - VOLUME 4 -
      et al.,                          )
 8                                     )
                    Defendants.        )
 9    _____)

10

11              TRANSCRIPT OF PROCEEDINGS

12         The above-entitled matter came on for hearing on

13    Thursday, March 2, 2006, at 9:24 a.m., at Honolulu, Hawaii,

14    BEFORE:          THE HONORABLE SUSAN OKI MOLLWAY
                       United States District Judge
15
      REPORTED BY:     STEPHEN B. PLATT, RMR, CRR
16                     Official U.S. District Court Reporter

17    APPEARANCES:     TIMOTHY J. HOGAN, ESQ.
                       WESLEY W. ICHIDA, ESQ.
18                     Lynch Ichida Thompson Kim & Hirota
                       1032 Bishop Street, Suite 1405
19                     Honolulu, Hawaii  96813

20                                  Attorneys for the Plaintiffs

21                     MICHAEL E. BAUMANN, ESQ.
                       DAMIAN D. CAPOZZOLA, ESQ.
22                     Kirkland & Ellis LLP
                       777 South Figueroa Street
23                     Los Angeles, CA  90017

24                                  Attorneys for Defendant
                                    Post Confirmation trust
25                                  for Fleming companies, Inc.
```

EXHIBIT F

1   APPEARANCES (Continued):

2

3

4                     LYLE S. HOSODA, ESQ.
                      RAINA P.B. MEAD, ESQ.
5                     Lyle S. Hosoda & Associates, LLC
                      345 Queen Street, Suite 804
6                     Honolulu, Hawaii  96813

7                                 Attorneys for Defendants
                                  Mark Dillon, Teresa Noa,
8                                 Melvin Ponce, Sonia Purdy,
                                  Justin Fukumoto, Alfredda
9                                 Waiolama and Jacqueline Rio

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE CLERK:  (Taking photograph of the witness.)

2              (Ms. Noa assumed the witness stand.)

3              THE CLERK:  Could you raise your right hand.

4              Do you solemnly swear or affirm that the testimony

5     you are about to give before this court shall be the truth,

6     the whole truth, and nothing but the truth?

7              THE WITNESS:  I do.

8              THE CLERK:  Thank you.

9              Please be seated.

10             Please state your name and spell your full name.

11             THE WITNESS:  Teresa Noa, T-E-R-E-S-A, N-O-A.

12                          TERESA NOA,

13    called as a witness on behalf of the Defendant, having been

14    produced and duly sworn, was examined and testified as

15    follows:

16                    DIRECT EXAMINATION

17    BY MR. HOSODA:

18    Q.   Good afternoon, Ms. Noa.

19    A.   Good afternoon.

20    Q.   Could you tell us where you live?

21    A.   I live in Wapello, Iowa.

22    Q.   Where were you born?

23    A.   Wapello.

24    Q.   Where did you go to high school?

25    A.   Wapello High School.

1   down what you had, which was at that time -- let's go back a

2   couple of weeks earlier, in May:

3          Just ripping it out.  You don't have the

4   spreadsheets up yet.  You've got nothing.  And I'll take your

5   testimony that you could sit down and do this, 100 containers.

6          But the reality was, ma'am, you said you were on

7   maternity leave.  Would that have been possible at that moment

8   in time, for you to do 100 containers a week in May of 2003,

9   to stop what you were doing and do that?

10  A.    No.

11  Q.    No?

12         Fleming had to continue to use Mr. Berry's database;

13  isn't that correct?

14  A.    Until something else was available.

15  Q.    Until something else was available.

16         MR. HOGAN:  Thank you.

17         Thank you, Your Honor.

18         MR. BAUMANN:  Nothing further.

19         MR. HOSODA:  Nothing further, Your Honor.

20         THE COURT:  Okay.

21         Then the witness may step down.

22         (Ms. Noa was excused at 2:09 p.m.)

23         THE COURT:  Who is the next defense witness, please?

24         MR. HOSODA:  Your Honor, the defense would call

25  Alfredda Waiolama to the stand.

1    A.    That's correct.

2    Q.    Thank you.

3              MR. HOGAN:  No further questions.

4              MR. BAUMANN:  No redirect -- no recross.

5              THE COURT:  Okay?

6              MR. HOSODA:  Yes, Your Honor.

7              THE COURT:  Then the witness can step down.

8              (Mr. Ueno was excused at 9:44 a.m.)

9              THE COURT:  Do you have other witnesses?

10             MR. HOGAN:  Yes, Your Honor.

11             We're going to recall Brian Christensen, briefly.

12             THE COURT:  Okay.

13             (Mr. Brian Christensen approached

14              the witness stand at 9:45 a.m.)

15             MR. HOSODA:  No objection, Your Honor.

16                       BRIAN CHRISTENSEN,

17   recalled as a witness on behalf of the Plaintiff, having been

18   produced and previously duly sworn, was examined and testified

19   as follows:

20                       DIRECT EXAMINATION

21   BY MR. HOGAN:

22   Q.    Good morning.

23   A.    Good morning.

24   Q.    During the time of the bankruptcy, is it a fair statement

25   to say that Fleming ran into credit problems?

1  A.   Yes.

2  Q.   And would it be fair to say that the -- some of the

3  customers of Fleming, during that period of time, actually

4  fronted the money for the purchases?

5  A.   Yes.

6  Q.   Thank you.

7            MR. HOGAN:  No further questions.

8            THE COURT:  Okay, you can step down.

9            MR. HOGAN:  Plaintiff rests, Your Honor.

10           THE COURT:  All right.

11           (Mr. Christensen was excused at 9:45 a.m.)

12           THE COURT:  Since the jury has only been here a

13  little while, we're going to take a break, maybe about 20

14  minutes.

15           THE CLERK:  All rise.

16           (The jury was excused at 9:45 a.m.)

17           (The following proceedings were held in

18           open court, outside the presence of the jury:)

19           THE CLERK:  Please be seated.

20           THE COURT:  Okay.

21           MR. HOSODA:  On behalf of the employee defendants,

22  Your Honor, I'd like to make a motion for judgment as a matter

23  of law.

24           We have prepared legal briefs, in case the court is

25  inclined -- or would like that.  But I'd like to just start

1    Q.    Okay.

2          And, then, the next part of your division?

3    A.    That's the human resources department, and primarily the

4    benefits of the associates.

5    Q.    Okay.  And how about the last?

6    A.    Information technology, keeping our systems going.

7    Q.    Okay.

8          Do you mean all the computer systems?

9    A.    No, Fleming's computer systems.

10   Q.    Okay.  At the division or everywhere?

11   A.    At our division.

12   Q.    Okay.

13   A.    Those particular two people.

14   Q.    Now, was Mark Dillon in that information technology?

15   A.    No, he was not.

16   Q.    Where was he?

17   A.    I believe he was under transportation.

18   Q.    Okay.

19          But didn't he work on computers?

20   A.    Yeah, but logistics department maintained Mr. Berry's

21   software, which was not on the main frame, so he was in charge

22   of that.

23   Q.    Okay.

24          Now, I want to move to the financial statements for

25   a little bit.

1   A.   Okay.

2   Q.   Did you review the financial statements while you were

3   division president?

4   A.   Yes.

5   Q.   And why did you do that?

6   A.   Besides being my job, you know, it's reflective of the

7   performance of the division, so that we can monitor our

8   performance.

9   Q.   Okay.

10       And you heard Mr. Chun's testimony.  I don't want to

11  repeat that, but was that information that you were reviewing

12  to monitor the performance of your division?

13  A.   Yes.

14  Q.   If you -- what was the most important bit of financial

15  information -- I guess, let's do this.

16       MR. BAUMANN:  Let's bring up Exhibit 202, and go to

17  Page 6 of Exhibit 202.

18  BY MR. BAUMANN:

19  Q.   Exhibit 202 is what period?

20  A.   Period four.

21  Q.   And that's the income statement for that period?

22  A.   Yes.

23  Q.   Okay.

24       Looking at the income statement, what was the most

25  important bit of information to you, as division president?

1    A.    The bottom line.

2    Q.    Okay.

3              MR. BAUMANN:  Can we go to...

4    BY MR. BAUMANN:

5    Q.    And where is the bottom line on that financial statement?

6    A.    Right on the bottom, the earnings before taxes.

7    Q.    Okay.

8              And what does it show for this period, this being

9    period four.

10    A.    It shows a loss of $98,764.

11    Q.    Okay.

12              Now, I'd like to go to Exhibit 74 -- well, before I

13    do that, you have had the financial statements and looked at

14    them.

15              If we go to Exhibit 203 and the sixth page of

16    that -- I'm going to flash it up if you don't want to look at

17    the book.

18    A.    Okay.

19    Q.    Can you tell us what that is?

20    A.    That looks like period five, 2003.

21              MR. BAUMANN:  That's good.

22    BY MR. BAUMANN:

23    Q.    And what were the -- what was the bottom line in that

24    period?

25    A.    That was a loss of $399,969.

79

1          MR. BAUMANN:  And, if we could go to the next

2    period, period six, income statement.

3    BY MR. BAUMANN:

4    Q.   Would you take a look at that, please?  And what's the

5    bottom line for that period?

6    A.   That was a loss of $502,079.

7    Q.   Okay.

8          Now, if you -- we have been showing the jury

9    Exhibit 74.  If we could go to Exhibit 74, does that exhibit

10   have a bottom line, as well, showing the performance just

11   during the period April 1st to June 9th, 2003?

12   A.   Yes, it does.

13   Q.   And what does that show for this relevant time period?

14   A.   It shows a loss of $879,409.

15   Q.   What does that indicate to you about what was happening

16   at the division during that time?

17   A.   Well, we weren't making money.

18   Q.   Okay.

19          When was bankruptcy declared?

20   A.   April 1st, 2003.

21   Q.   Now, we have been here discussing a database that deals

22   with logistics.  Is there a place that you would go --

23          MR. BAUMANN:  And I guess we can stick to

24   Exhibit 74.

25   BY MR. BAUMANN:

1    Q.    ...where you would go to find out how your division was

2    performing with regard to anything related to logistics?

3    A.    Well, I think, as Andrew stated earlier, for

4    transportation, that encompasses all the moves regarding

5    logistics.  And you'd have to look at that line, net

6    transportation, and then the equalization line.

7    Q.    And why would you look at both?

8    A.    Because that encompasses all the revenue and associated

9    expenses for transportation.

10          MR. BAUMANN:  I'd like to put up Exhibit 237, which

11    was the chart with the number 74.1.8.

12    BY MR. BAUMANN:

13    Q.    And this was the number that Mr. Chun calculated for us.

14          THE CLERK:  (Assisting witness with exhibit.)

15          THE WITNESS:  Oh, thanks.

16    BY MR. BAUMANN:

17    Q.    Okay, now, what does that show?

18    A.    The totals.  It shows that we made revenue, in moving the

19    freight, of $108,000.  And the total transportation cost was

20    $528,000, so we netted out -- losing $420,000.

21    Q.    And that covers all of the costs of moving goods from

22    where to where?

23    A.    Basically from either the manufacturer or the West Coast

24    to the store door.

25    Q.    And when you say it's a loss, what does that mean, just

81

1   in layman's terms?

2   A.   That our revenues produced by the department did not

3   offset the expenses of that department.

4   Q.   Now, we have been looking at a date up there -- if we go

5   back to Exhibit 74, the first page -- of June 9th, 2003.

6          What happened after June 9th, 2003?

7   A.   That's when we began to use the spreadsheets instead of

8   the software.

9   Q.   Did your costs increase for your division after you

10  switched to the spreadsheets?

11  A.   No.

12  Q.   Did the work get done by the employees at your division,

13  after you switched to the spreadsheets?

14  A.   Yes, it did.

15  Q.   Could you tell -- or can you tell from the financial

16  statements what happened to profitability after the switch

17  from the database to the spreadsheets?

18  A.   It got better.

19  Q.   Okay.

20          And we could look at that --

21          MR. BAUMANN:  Let's go to Exhibit 205, and the sixth

22  page of that.

23  BY MR. BAUMANN:

24  Q.   And that period seven, is that a period after June 9th,

25  2003?

1   A.   Yes.

2   Q.   And if we go to the -- what you call the "bottom line,"

3   profitability, what does that indicate?

4   A.   It's a loss of $318,221.

5   Q.   And you said you thought you did a little better?  Was

6   that -- what were you comparing that to?

7   A.   The prior periods.

8   Q.   Okay.

9        If you'd go to the next period, in Exhibit 206,

10  period eight...

11  A.   Yeah, that shows a loss of $132,352.

12  Q.   So the loss went down even further --

13  A.   Correct --

14  Q.   -- after the shift to the spreadsheets?

15  A.   Yes.

16  Q.   Now, you're not suggesting, are you, sir, that there's a

17  direct link between the databases used in logistics and the

18  performance of your division, are you?

19  A.   No, no.

20  Q.   Would you agree or disagree with the claim that without

21  Berry's database the Fleming Hawaii division could not

22  operate?

23  A.   I disagree.

24  Q.   Why?

25  A.   Because we're operating without it now.

```
 1              THE COURT:  Sir, I need you to go and stand over
 2    there, next to that chair, because we are taking pictures of
 3    all of the witnesses so that the jurors can get pictures.
 4              (Mr. Chun complied.)
 5              THE CLERK:  (Taking photograph of the witness.)
 6              (Mr. Chun assumed the witness stand.)
 7              THE CLERK:  Please stand and raise your right hand.
 8              Do you solemnly swear or affirm that the testimony
 9    you are about to give before this court shall be the truth,
10    the whole truth, and nothing but the truth?
11              THE WITNESS:  I do.
12              THE CLERK:  Thank you.
13              Please be seated.
14              Please state your name and spell your first and last
15    name.
16              THE WITNESS:  Andrew Chun, A-N-D-R-E-W, C-H-U-N.
17                        ANDREW CHUN,
18    called as a witness on behalf of the Defendant, having been
19    produced and duly sworn, was examined and testified as
20    follows:
21                      DIRECT EXAMINATION
22    BY MR. BAUMANN:
23    Q.   Good morning, Mr. Chun.
24    A.   Good morning.
25    Q.   Where do you live?
```

1  A.   In Pearl City, Hawaii.

2  Q.   Where did you go to High School?

3  A.   Maryknoll High School.

4  Q.   Please tell the jury a little bit about your educational

5  background.

6  A.   I graduated from the University of Hawaii in 1992 with a

7  DBA in accounting.  I obtained my CPA license in June of --

8  no, January of 1997.

9  Q.   Now, between April 1st, 2003, and June 9th, 2003, where

10  did you work?

11  A.   I was working at Fleming Companies.

12  Q.   And when --

13  A.   Hawaii.

14  Q.   Fleming Companies Hawaii?

15  A.   Yes.

16  Q.   And when did you start there?

17  A.   I started there in June of 1998 until C&S took over from

18  Fleming.

19  Q.   Do you recall when that was?

20  A.   I believe that was September of 2003.

21  Q.   And what was your title during this period, April 1st,

22  2003, to June 9th, 2003?

23  A.   It was controller.

24  Q.   Okay.

25       Now, prior to your coming on the stand, I gave you a

1    book of exhibits.  It's right in front of you.  Do you see

2    that?

3    A.    Yes.

4    Q.    And would you just flip through that, Exhibits 202

5    through 207 -- they are in evidence.  And, just generally,

6    what are those?

7    A.    (Perusing documents.)  These are the financial statements

8    for Fleming Companies Hawaii.

9    Q.    For particular periods?

10   A.    Uh --

11   Q.    You don't need to identify the periods.  It's just --

12   there's a time frame involved, is there not?

13   A.    Yes, there is.

14   Q.    Okay.

15          Are you familiar with those documents?

16   A.    Yes, I am.

17   Q.    Who prepared those?

18   A.    I did, with the help of my staff.

19   Q.    Okay.

20          I'd like you to take a look at Exhibit 204.

21          MR. BAUMANN:  And if we could put up 8.1.

22   BY MR. BAUMANN:

23   Q.    It may be easier, Mr. Chun, if you can see the board.  It

24   might go a little faster than trying to flip through all of

25   those.

1    A.    Okay.

2    Q.    Can you tell me what Exhibit 204 is?

3    A.    That is the income statement summary for -- I can't --

4    well, period six, 2003.

5    Q.    Okay.

6          And does that income statement identify the expenses

7    of the Hawaii division?

8    A.    Yes, it does.

9    Q.    Does it identify revenue of the Hawaii division?

10   A.    Yes, it does.

11   Q.    Okay.

12         I'd like you to go to 204.8.4.  Could you tell us

13   what these two lines from the financial statement are?  Well,

14   first, let me try it this way, Mr. Chun, because I am getting

15   to a particular thing.

16   A.    Okay.

17   Q.    There's a net sales line.  And then below that, there's

18   product margin and other margin; is do you see that?

19   A.    Yes.

20   Q.    Now, why the big difference between those two numbers?

21   A.    The difference between net sales and product margin is

22   the cost of goods sold.

23   Q.    Okay.

24         Why isn't there a line for cost of goods sold?

25   A.    Because -- uh, mainly for, uh -- it's not a necessary

1   line to show on the financial statements, because -- uh...

2   the -- the definition of -- uh, cost of goods is -- uh, the

3   difference between net sales and product margin.

4            So it's really not necessary to show it on the face

5   of the financials.

6   Q.   Now, Mr. Chun, during the time you were controller in

7   this April 1st to June 9th, 2003, time period, did the Hawaii

8   division account for the revenues and associated expenses of

9   transporting goods from the mainland to the stores, where they

10  sold them?

11           MR. HOGAN:   Objection; vague.

12           THE COURT:   I'll allow it.

13           Go ahead.

14  A.   Yes, we did.

15  BY MR. BAUMANN:

16  Q.   And where is that shown on the financial statements?

17  A.   There is a separate transportation profit & loss

18  statement.

19           MR. BAUMANN:   Can we look at 8.1?

20  BY MR. BAUMANN:

21  Q.   Could you tell us what that line is, sir?

22  A.   That is the net transportation expense.   It includes

23  revenues generated by the transportation department, and also

24  the direct expenses attributable to that department.

25  Q.   Okay --

1    A.    Yeah.

2    Q.    And what does the little minus sign next to it mean?

3    A.    That would mean it's an expense of the company.

4    Q.    But it includes revenues, you said?

5    A.    Yes, so it's net -- it's the revenues -- uh, net of

6    expenses.  So it's a net loss -- or a net expense to the

7    company.

8    Q.    Okay.

9          Now, is there any other line on the income statement

10   that has anything to do with freight movement, or shipping, or

11   logistics?

12   A.    Yes, there is a line called equalization that deals with

13   the freight income or expense.

14   Q.    And is what's on the screen now the market change

15   equalization line from the financial statement?

16   A.    Yes, it is.

17   Q.    Now, there are two items referred to with a slash between

18   them.  Are they different things?

19   A.    Yes.  Market change mainly had to do with cost changes

20   and inventory and did not have anything to do with freight.

21   Equalization was mainly the freight income.

22   Q.    Related to any particular part of movement of the goods?

23   A.    Just the movement from the mainland to Hawaii.

24         THE COURT:  Counsel, I know you're trying to be

25   really efficient and use your time.  The concern I have is

1    your record.

2              I don't know if there's an appeal that the appellate

3    court is going to understand what's going on, since they can't

4    see this screen, and they don't know where to find these

5    things.  So you might want to keep that in mind.

6              MR. BAUMANN:  I was going to mark at the end of

7    this -- or attempt to -- a summary exhibit, Your Honor.  But I

8    thank you for that.

9              I could identify it by page?

10             THE COURT:  That would be helpful.

11             MR. BAUMANN:  Okay.

12   BY MR. BAUMANN:

13   Q.   We have been looking at the income statement for period

14   six; is that correct?

15   A.   You know, I really can't see that on the top of the

16   screen.

17   Q.   Well, take a look at Exhibit 204.

18   A.   Okay.  Yes.

19   Q.   So the discussions we have been having about net

20   transportation deals with -- we have been looking at just this

21   page of Exhibit 204; is that correct?

22   A.   Yes, that's correct.

23   Q.   Okay and we were talking -- you referred to another line,

24   market change equalization.  And that appears on Exhibit 204

25   at the page -- sixth page Bates Stamp 193; is that right?

1   A.   Yes, correct.

2   Q.   Now, you were just explaining a little bit about the

3   equalization line.  Does that have anything to do with freight

4   shipping?

5   A.   Yes.

6   Q.   And does the market change portion of it have anything to

7   do with freight shipping?

8   A.   No, it does not.

9   Q.   And, by the way, before we leave Exhibit 204, the income

10  statement, are you familiar -- have you ever heard the term

11  "bottom line"?

12  A.   Yes, I have.

13  Q.   Okay.

14            And, in layman's terms, can you just explain what

15  you understand that to be.

16  A.   That is basically your top-line revenues minus all your

17  expenses to get to a number.

18  Q.   Okay.

19            Now, if we were trying to find the bottom line on

20  Exhibit 204, on that page we have been looking at, that 193,

21  where would we find that?

22            MR. HOGAN:  Your Honor, I'm going to make an

23  objection.  The bottom line is not relevant.

24            THE COURT:  Overruled.

25            You can go ahead and answer.

1    A.    That would be the earnings before tax line at the bottom

2    of the exhibit.

3                (Discussion off the record between counsel.)

4    BY MR. BAUMANN:

5    Q.    And what does this show for the period six financial

6    statement?

7    A.    That the division lost money for that particular period.

8    Q.    How much money?

9    A.    502079.

10               MR. HOGAN:    Again, Your Honor, same objection.

11   Move to strike.

12               (Discussion off the record.)

13   A.    $502,079.

14   BY MR. BAUMANN:

15   Q.    And that's a loss?

16   A.    That's a loss, yes.

17   Q.    Okay.

18               Now, we talked about the market change and

19   equalization.    You said equalization was the only part that

20   dealt with freight.

21   A.    Yes.

22   Q.    In the financial statements that we have been looking at

23   in Exhibit 204, is there a place where the financial

24   statements break down market change in the portion that is

25   equalization?

1   A.   Yes, there is.

2   Q.   If you go to Page 195 --

3   A.   195, yes.

4   Q.   And where do you find that?

5        Well, let me ask this:  What's just the equalization

6   portion for period six that we have been looking at?

7   A.   It would be 1,216, just for equalization.

8   Q.   1,216?

9   A.   Yes.

10  Q.   And each of the financial statements -- I'm not going to

11  make you do this, but in each of the financial statements,

12  Exhibits 203, 204, 205, 206 and 207, that are in evidence, can

13  you go through those -- would you be able to? -- and find that

14  breakdown between equalization and market change?

15  A.   Yes, I would.

16  Q.   And in each of those financial statements, Exhibits 202

17  through 207, would you be able to look at those and find the

18  line item for net transportation?

19  A.   Yes.

20  Q.   All right.

21       Now, Mr. Chun, I'm going to show you -- and you have

22  in your binder -- and this may be a little easier to work

23  with -- Exhibit 74 is a summary of the financial statements

24  that is in evidence.

25       THE COURT:  There's a skinny little binder you have?

49

```
 1              MR. BAUMANN:  No, it's right in the front of the

 2   binder he has with all the financial statements.

 3              THE COURT:  Oh, okay.

 4              THE CLERK:  (Assisting witness with exhibit binder.)

 5              (Discussion off the record between counsel.)

 6   A.   Yes, I see it.

 7   BY MR. BAUMANN:

 8   Q.   Okay.

 9              Now, if you take a look at that, do you find a line

10   for the net transportation amount between April 1st and June

11   9th, 2003?

12   A.   Yes, there is an amount for net transportation for that

13   time period.

14   Q.   Okay.

15              And, for that time period, is the number positive or

16   negative?

17   A.   It is a negative.

18   Q.   And what is the dollar amount of the negative?

19   A.   $528,924.

20   Q.   And what does that show about the transportation portion

21   of Fleming's business during this time period?

22   A.   It means that the cost exceeded the expenses for the

23   transportation -- you know -- I'm sorry, the cost exceeded the

24   revenues for the transportation department.

25   Q.   Now, if you were trying to figure out, taking end-to-end,
```

1   from the mainland all the way to the stores, all

2   transportation expenses and shipping, would you just look at

3   the net transportation line?

4   A.   No, you would not.  You would have to take into

5   consideration another line on the financial statements.

6   Q.   And which line is that?

7   A.   That would be the equalization line.

8   Q.   Okay.

9           So, if -- on this Exhibit 74, there is a line called

10  market change equalization; do you see that?

11  A.   Yes.

12  Q.   But you told us before you would have to take market

13  change out to get just the freight portion of this; is that

14  correct?

15  A.   That's correct, yes.

16  Q.   And, if you went back into the financials and looked at

17  each financial statement, the equalization line we looked at,

18  you would be able to do that, would you not?

19  A.   Correct.

20  Q.   And have you, in fact, undertaken to determine just what

21  the equalization part of that number is?

22  A.   Yes, I did.

23  Q.   Okay.

24          So --

25          MR. BAUMANN:  If we can go --

1    BY MR. BAUMANN:

2    Q.    So, if we take out market change -- I'm going to take

3    that out -- would the $140,200 figure that appears in Exhibit

4    74 change?

5    A.    (Perusing document.)

6    Q.    If I take out the market portion --

7    A.    Yes.

8    Q.    -- and just leave equalization?

9    A.    Yes.

10    Q.    Okay.

11         And you have calculated what that would be.  So I am

12    going to take out the $140,000.  And what amount did you

13    calculate that just relates to equalization?

14    A.    (Perusing documents.)  Just for equalization during that

15    time period, I calculated $108,228.

16    Q.    $108,228?

17    A.    Yes.

18    Q.    Okay.

19         Now, if you -- I asked you before, if you wanted to

20    see the total revenues and expenses, whether they made money

21    or lost money in this time period, moving goods from the

22    mainland to the stores, what would you have to do?

23    A.    We would have to take -- we would have to offset the

24    equalization income I just said against net transportation

25    expense.

1    Q.    Okay.

2          And, have you done that calculation?

3    A.    Yes, I did.

4    Q.    And what is that amount?

5    A.    It came out to a net negative of $420,695.

6    Q.    Okay.

7          Now, just looking at the equalization portion,

8    Mr. Chun, does that include the direct expenses of the

9    logistics department?

10   A.    Just equalization?

11   Q.    Just equalization.

12   A.    No, it does not.

13   Q.    Where are the direct expenses of the logistics department

14   included?

15   A.    It would be in net transportation expense.

16   Q.    And is that the reason you would have to add both?

17   A.    Yes, that's correct.

18   Q.    You couldn't just look at equalization, say that's the

19   logistics department performance?

20   A.    No, you could not.

21         MR. BAUMANN:  Now, Your Honor, I would like to mark

22   as Exhibit 74.1.1 what appears on the board, and offer it into

23   evidence.

24         THE COURT:  Any objection?

25         MR. HOGAN:  Your Honor, it's already up there, so

1    perhaps if we could just get a copy of it, and then move it

2    in, in their case.  I have no problem.  Just let me check the

3    numbers.  We're trying to do a lot of things.  I object just

4    because I haven't had a chance to do my own calculations, but

5    we can continue like this.

6              THE COURT:  Okay, no objection?

7              MR. HOSODA:  No objection, Your Honor.

8              THE COURT:  Okay, then it is received subject to a

9    challenge, should one be made.  But it is provisionally

10   received.

11   BY MR. BAUMANN:

12   Q.   Now, you told us when you added net transportation and

13   equalization you came up with a negative number.  What does

14   that mean?

15   A.   That means that when you take the revenues minus the

16   expenses, it's a net expense, a net loss.

17   Q.   A net loss.

18   A.   Yes.

19   Q.   Thank you.  No further questions.

20             THE COURT:  Can I clarify the exhibit number?  We

21   just got handed something with the Exhibit Number 237, but you

22   were using a different number.  You want it to be 74.1 --

23   what?

24             MR. BAUMANN:  I'm sorry, what's the next number?

25             THE COURT:  237 is what --

54

1           MR. BAUMANN:  I'll have it marked as Exhibit 237,

2    which is the chart.

3           (Exhibit 237 marked for identification.)

4           MR. BAUMANN:  It was part of Exhibit 74 that's now

5    had three numbers added to it.

6           THE COURT:  Okay.  So we'll call it 237, and it's

7    received.

8           MR. BAUMANN:  Thank you, Your Honor.

9           (Exhibit 237 was received in evidence.)

10          THE COURT:  Mr. Hosoda, I think we should in this

11   part of the case do defense questioning and then have

12   Mr. Hogan.

13          MR. HOSODA:  I have no questions at this time,

14   Your Honor.

15          THE COURT:  Okay.

16          Mr. Hogan?

17          MR. HOGAN:  Thank you, Your Honor.

18                     CROSS-EXAMINATION

19   BY MR. HOGAN:

20   Q.   While I'm getting set up, would you look for the place in

21   there where you were paying a license fee to Mr. Berry for the

22   use of the software during the relevant period?

23   A.   There is no place in the financial statements that shows

24   that.

25   Q.   But, if you were paying license fees, would they be in

1   A.   To oversee the overall operations of the division.

2            (Discussion off the record between counsel.)

3   BY MR. BAUMANN:

4   Q.   About how many people were you the boss of?

5   A.   About 200-220 people.

6   Q.   Okay.

7            Now, the first time Mr. Hogan called you, he asked

8   you a question about whether you ever told the employees to

9   stop using the database between April 1st and June 9th, and

10  you said no.

11           Do you recall that?

12  A.   Yes, I do.

13  Q.   Why didn't you tell 'em to stop using it?

14  A.   Because I didn't think we had to.  After the ruling, my

15  understanding is Fleming did have a license to use the

16  software in its original form, and we reverted back to what we

17  thought was the original form.

18  Q.   Now, I'm going to show you what's in evidence as

19  Exhibit 66.2, an organizational chart.  Do you see that on the

20  overhead, sir?

21  A.   Yes.

22           MR. HOGAN:  Your Honor just for clarification, I

23  think it's Exhibit 66.  And the pagination counsel is using

24  are the points.  They are not part of the exhibit, but just so

25  we are clear, there is an extra exhibit out there.

1    Q.    Okay, so, earlier you said that there were two major

2    profitability issues -- one pertaining specifically to the

3    April 1 to June 9 period, and then another pertaining to the

4    June 9 to -- well, what turned out to be a later date, and

5    we'll get into that.

6              With regard specifically to the April 1 to June 9

7    period, how many different ways did you analyze the

8    profitability of Fleming's Hawaii division?

9    A.    I looked at it three different ways.

10   Q.    Okay.

11             MR. CAPOZZOLA:  And could I please have on the board

12   Exhibit 74 in evidence?

13             Can you see that from there?

14   A.    I can see the exhibit but I can't see what it says.

15             MR. CAPOZZOLA:  Your Honor, may I approach to hand

16   the witness Exhibit 74?

17             THE COURT:  Yes.

18             MR. CAPOZZOLA:   (Tendering exhibit to the witness.)

19             THE WITNESS:  Thanks.

20   BY MR. CAPOZZOLA:

21   Q.    Can you please explain, Mr. Kinrich, what is Exhibit 74?

22   A.    Exhibit 74 is a summary, a compilation of Fleming

23   Hawaii's income statement, profit and loss statement for the

24   period April 1st, 2003, through June 9th, 2003.

25             The first three columns are the three accounting

1    his freight control software, to Y. Hata.

2           And he -- this is the -- I'll call "new and improved

3    version," the more advanced version compared to the version

4    that Fleming was using.

5           The license fee here is $150,000.  And if you look

6    elsewhere, you will see that that's intended to be paid for

7    over a three-year period.

8           So the software fee is about $50,000 a year.

9           If you do the arithmetic and take 70 days out of

10   365, you'll find that that is just under $10,000; it's about

11   $9,500 for the 70-day period.

12   Q.   Would that, in your opinion, be a more reasonable license

13   fee in this case?

14   A.   Yes.

15           MR. CAPOZZOLA:  Nothing more at this time.

16           THE COURT:  Okay.

17           Mr. Hogan?

18           MR. HOGAN:  Thank you, Your Honor.

19           THE COURT:  I am assuming, Mr. Hosoda, you didn't

20   want to question, right?  Mr. Hosoda, no questions, right?

21           MR. HOSODA:  No questions.

22           Thank you, Your Honor.

23                          CROSS-EXAMINATION

24   BY MR. HOGAN:

25   Q.   Good afternoon, Mr. Kinrich.  I'm sorry, I'm holding in