```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3                               )
         WAYNE BERRY, a Hawaii citizen, )  CV 03-00385 SOM-LEK
 4                               )
                  Plaintiff,     )  Honolulu, Hawaii
 5           vs.                 )  August 30, 2004
                                 )  9:00 A.M.
 6       HAWAII EXPRESS SERVICE, INC.,  )
         a California corporation,      )  Plaintiff's Motion for
 7       et al.,                 )  Issuance of Preliminary
                                 )  Injunction
 8               Defendants.     )
         _____)
 9

10               TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE SUSAN OKI MOLLWAY
11              UNITED STATES DISTRICT JUDGE

12       APPEARANCES:

13       For the Plaintiff:          TIMOTHY J. HOGAN, ESQ.
                                     Lynch Ichida Thompson Kim
14                                    & Hirota
                                     First Hawaiian Tower
15                                   1132 Bishop St., Ste. 1405
                                     Honolulu, HI 96813
16
         For the Defendant           ERIC C. LIEBELER, ESQ.
17       Fleming Companies, Inc.:    Kirkland & Ellis LLP
                                     777 South Figueroa St.
18                                   Los Angeles, CA 90017

19       For the Defendants          LEX R. SMITH, ESQ.
         Fleming Companies, Inc.,    Kobayashi Sugita & Goda
20       C&S Wholesale Grocers,      First Hawaiian Center
         C&S Acquisitions,           999 Bishop St., Ste. 2600
21       C&S Logistics:              Honolulu, HI 96813

22       For the Defendants          LYLE S. HOSODA, ESQ.
         Mark Dillon, Brian          RAINA P. MEAD, ESQ.
23       Christensen, Teresa Noa:    345 Queen St., Ste. 804
                                     Honolulu, HI 96813
24

25
```

```
 1   APPEARANCES (Continued):

 2   For the Defendants          EMILY REBER PORTER, ESQ.
     Hawaiian Express Service,   Goodsill Anderson Quinn
 3   Inc., HES Transportation     & Stifel LLP
     Services, Inc.,             Alii Place
 4   California Pacific          1099 Alakea St., Ste. 1800
     Consolidators, Jeffrey      Honolulu, HI 96813
 5   Graham, Peter Schaul:

 6   For the Defendant           JULIA M. MORGAN, ESQ.
     Hawaii Transfer Company,    Fukunaga Matayoshi Hershey
 7   Limited:                     & Ching
                                 Davies Pacific Center
 8                               841 Bishop St., Ste. 1200
                                 Honolulu, HI 96813
 9
     For the Defendant           LEROY E. COLOMBE, ESQ.
10   Foodland Super Market,      Chun Kerr Dodd Beaman
     Limited:                     & Wong LLLC
11                               Topa Financial Ctr.
                                 Fort St. Twr.
12                               745 Fort St., Fl. 9
                                 Honolulu, HI 96813
13
     Official Court Reporter:    Debra Kekuna Chun, RPR, CRR
14                               United States District Court
                                 300 Ala Moana Blvd. Ste. C285
15                               Honolulu, HI 96850
                                 (808) 534-0667
16

17

18

19

20

21

22

23

24
     Proceedings recorded by machine shorthand, transcript
25   produced with computer-aided transcription (CAT).
```

1    MONDAY, AUGUST 30, 2004                9:05 O'CLOCK A.M.

2            THE CLERK:  Civil 03-385 SOM-LEK, Wayne Berry

3    versus Hawaii Express Service, Inc., et al.  This case has

4    been called for Plaintiff's Motion for Issuance of

5    Preliminary Injunction.

6            Counsel, please make your appearances for the

7    record.

8            MR. HOGAN:  Good morning, Your Honor.  Timothy

9    Hogan on behalf of plaintiff Wayne Berry, who is also

10    present, Your Honor.

11            THE COURT:  Good morning.

12            MR. LIEBELER:  Good morning, Your Honor.  Eric

13    Liebeler with Kirkland & Ellis, representing now what is

14    the Fleming post-confirmation trust, given that the plan

15    has been confirmed.

16            THE COURT:  Okay.

17            MR. SMITH:  Lex Smith, local counsel for Fleming

18    and also counsel for C&S Wholesale Grocers, C&S

19    Acquisitions, and C&S Logistics.

20            THE COURT:  Okay.

21            MR. HOSODA:  Good morning, Your Honor.  Lyle

22    Hosoda and Raina Mead, appearing on behalf of the

23    individual defendants Mark Dillon, Brian Christensen, and

24    Teresa Noa.

25            THE COURT:  Okay.

1          MS. PORTER:  Good morning, Your Honor.  I'm

2   Emily Reber Porter on behalf of defendants Hawaiian

3   Express Service, Inc., HES Transportation Services, Inc.,

4   California Pacific Consolidators, Jeffrey Graham, and

5   Peter Schaul.

6          THE COURT:  Okay.

7          MS. MORGAN:  Good morning, Your Honor.  Julia

8   Morgan on behalf of Hawaii Transfer Company, Limited.

9          MR. COLOMBE:  Your Honor, Leroy Colombe for

10  defendant Foodland Super Market, Limited.

11         THE COURT:  Okay.  Well, it took so long I'm

12  exhausted already just by having counsel enter their

13  appearances.  There are so many attorneys.

14         Well, good morning to everyone.  You can all be

15  seated.

16         I sent out a whole list of questions, and I

17  would like to start with getting some answers and then

18  we'll take the evidence.  But that just might help to

19  frame the evidence as I hear it, but, if I could just have

20  some summary of this, I think it will help me understand

21  the evidence a little bit.

22         I don't know who wants to take a shot at this.

23  You want to start, Mr. Hogan.  I just want really brief

24  answers.  Just go down the list but as brief as possible

25  because I know we have other things.

1          MR. HOGAN:  Yes, Your Honor.  Shall I use the

2    lectern.

3          THE COURT:  Yes.

4          MR. HOGAN:  Thank you, Your Honor.  Timothy

5    Hogan on behalf of Mr. Berry.

6          I'm not sure how the court likes to proceed, if

7    it's just to go down the list?

8          THE COURT:  Yes.  Just go down the list, but

9    keep it short.

10          MR. HOGAN:  Very good, Your Honor.  I can't

11    comment as to what Mr. Dillon's position is as to number

12    1, Your Honor.

13          THE COURT:  Okay.

14          MR. HOGAN:  As to -- I believe that there is --

15    in rebuttal to that in the transcript of the July 26th

16    proceeding, which was exhibit A to the Hosoda declaration

17    filed in support of the opposition of the individual

18    defendants, at pages 95, line 17 to 25, Mr. Dillon says

19    that he kept these documents as part of his professional

20    documentation that is kept as materials having to do with

21    his function maintaining computers and software.

22          So that is in the record, Your Honor, at exhibit

23    A, Hosoda declaration, 95-17.  Not simply to do with the

24    litigation but also to maintain the system.

25          THE COURT:  Okay.  But is there something about

1    it being deleted sometime before July 2004?

2            MR. HOGAN:  There is nothing in the record that

3    I am aware of, Your Honor, anywhere in these

4    proceedings.

5            THE COURT:  Okay.  I may hear from other

6    counsel.

7            Okay.  Number 3.

8            MR. HOGAN:  Number 3, Your Honor, yes.

9            THE COURT:  If you don't have an answer, you can

10   skip and I'll go to Fleming's counsel.

11           MR. HOGAN:  Okay.  As to number 2, I would

12   require Mr. Dillon to be able to address number 2, Your

13   Honor.  I don't want to state facts that are not in the

14   record.

15           Number 3 --

16           THE COURT:  I'm sorry.  I thought that's what

17   you were on.

18           MR. HOGAN:  I apologize, Your Honor.

19           THE COURT:  Got it.  You're on the second part

20   of number 1 now.

21           MR. HOGAN:  Second part of number 1.

22           THE COURT:  Okay.  Got it.

23           MR. HOGAN:  As to number 2, Your Honor, I

24   believe there is prior testimony that I believe can be

25   adduced in this proceeding, if Mr. Dillon is here, that

1    will deal with the issue of when these things -- what was

2    there when July concluded of last year.

3                THE COURT:  Okay.  Number 3.

4                MR. HOGAN:  Number 3, Your Honor, I believe the

5    same as the other, Your Honor.

6                THE COURT:  Why don't you skip to number 5,

7    then.

8                MR. HOGAN:  Yes, Your Honor.  Thank you.

9                Your Honor, we've never actually gotten the

10   actual copies of the files.  What we have are images of

11   the directory structures of the computers; so we can only

12   comment as to what those reports indicate.  And we can do

13   that, Your Honor, as to whether or not these -- we believe

14   that they were the derivative files of Mr. Berry's system

15   because there's testimony that they did not have a copy of

16   the original.  That does not seem to be disputed, Your

17   Honor, that there was no original 1999 copy of what

18   Mr. Berry allowed Fleming to use anywhere on the Fleming

19   or now C&S systems at any time after the filing of the

20   bankruptcy.

21               THE COURT:  Can you go to number 8.

22               MR. HOGAN:  Certainly, Your Honor.

23               If we go to Mr. -- we have the e-mail, Your

24   Honor, that talks about -- and I've got to pull my file.

25   There is an e-mail that talks about using A4-ing specs.

1    They talk about Manugistics, Your Honor.

2           In Mr. Berry's declaration at paragraph 16 he

3    talks about what his system is used and it's used for

4    tracking freight allowances.  That's in his declaration

5    filed in support of the motion, Your Honor.  The file that

6    we're talking about later, Your Honor, the one that comes

7    up in exhibit T that has the descriptions of the files,

8    talks about allowances, Your Honor.  That is what that

9    file was looking at.  At least there's an indication the

10   inference is that it was the freight allowances, Your

11   Honor, which is the reason we believe that we're here

12   today:  to protect that part of C&S's business.

13          Shall I move forward, Your Honor, on number -- I

14   believe number 9?

15          THE COURT:  Okay.

16          MR. HOGAN:  The reason Mr. Kurt's statement is

17   relevant is because it appears inconsistent, Your Honor.

18   In his letter he points to a program that was developed

19   prior to Mr. Berry's copyright's initial creation date of

20   1993.  Later on the evidence in the bankruptcy shows there

21   was an administrative claim that would make his statement

22   untrue that there was in fact NetWORKS Transports

23   operating there.  That was a software system that was

24   developed subsequent to 1993.  That's the relevance of

25   that, Your Honor.  It's an inference.  It is not in itself

1    going to, I think, win the game.

2              As to number 10, Your Honor, the court was, I

3    think, looking at a file named number 151.  In fact, Your

4    Honor, looking at the report, it's a computer 151.  And I

5    believe that our position is that the file that was -- has

6    a 20030629 is a date and it is evidence that, in fact, it

7    is a file created from a computer number 151 that had to

8    do with allowance price testing.  Consistent with

9    Mr. Berry's declaration, that is the heart of the system

10   as to the profitability for its use that we believe is the

11   reason we're here today.

12             Also again other things would be necessary to

13   have Mr. Dillon to go into.

14             I believe that is also number 11, Your Honor,

15   deals with the FHL 151.D01.  I'm not sure where that comes

16   from, Your Honor.  I think it may come out of the Gurzi

17   report as to one of the file numbers.  But again FHL, we

18   believe, would stand for Fleming Hawaii Logistics computer

19   number 151.  And then the file that Manugistics was

20   looking at had the marker 151, was contemporaneous in the

21   June, period and was dealing with allowance price testing,

22   Your Honor.

23             Number 12, if we go to Mr. Berry's declaration,

24   it's exhibit F to his declaration.  At the very top of the

25   fifth page there is what is in there, Your Honor, are

1    printouts of the meta tags on her page.  And it says that

2    it deals with shipping tracking analysis.  This is her

3    performing functions in Iowa shipping freight related to

4    West Coast -- generally, West Coast Hawai'i shipments.

5    And we believe it's evidence that this thing was being

6    created or at least used by Miss Dillon -- or Miss Noa or

7    at least intended at some point that it would be used to

8    operate a freight system similar to Mr. Berry's.  We

9    believe it would be Mr. Berry's system.

10           Also in the reply her -- I've put in my reply,

11   Your Honor, in their opposition, the employees'

12   opposition, Your Honor, they describe two different

13   systems.  Mr. Dillon's description of the system is the

14   one what looks like a spreadsheet operation.  Miss Noa's,

15   although it appears a different system that is being

16   updated as she's looking at, I believe that it shows that

17   she's not sitting there looking at static spreadsheets but

18   in fact looking at a database.  And we've put that in the

19   record, Your Honor, in the reply.

20           As to what -- number 13, Your Honor,

21   earthlogistics, in the Noa declaration at paragraph 23 she

22   admits she was using it for e-mail for C&S for her

23   employer.

24           As to 14, Your Honor, I believe what has been

25   argued is that because Mr. Berry did not put in the first

1    draft of his worksheets in 1993 as the deposit, that it's

2    defective.  I think the court recognizes here that what he

3    has to deposit is the best evidence of his original work,

4    not the original copy of it, and that's what he did.

5    Mr. Berry's deposit is a copy of the documentation of the

6    program he installed in October, November of '99, and the

7    argument by Fleming has been that that was defective

8    because what he needed to deposit was the original 1993

9    first draft of any of his original work, which is not the

10   best version, as the code requires, Your Honor.

11            So I think, if I understand the court's

12   question, it's the same problem I've been having with it

13   is he did deposit the one that was on Fleming's system.  I

14   don't think there's a dispute over that.  It's just he

15   didn't go back and pull out one from 1993.

16            THE COURT:  And has Judge King addressed this?

17            MR. HOGAN:  It was, I believe, raised in the

18   trial, Your Honor.  It went through the trial.

19            THE COURT:  And did he decide it?

20            MR. HOGAN:  I do not believe there was a ruling

21   that prohibited the deposit.  I believe there is a

22   post-trial motion that was raised pretrial, Your Honor,

23   that has never been decided as to the issue of the

24   deposit.

25            THE COURT:  So it's still pending.

1          MR. HOGAN:  That would be, I think, a fair

2     statement, Your Honor.

3          THE COURT:  Okay.

4          MR. HOGAN:  As to the issue of the right to

5     terminate, Your Honor, it comes down to a combination of

6     bankruptcy, contract, and copyright law.  The question

7     that I've always raised, Your Honor, the position I've

8     taken, is that an infringer does not get to keep the one

9     copy they made the pirated copies from.  I've never found

10    a case that says that, Your Honor.  I just believe that to

11    be true.

12          As to the position that it terminated

13    pre-petition, I believe the court was about to enter an

14    injunction that would have stopped any use of this

15    program.

16          THE COURT:  Even the original program?

17          MR. HOGAN:  Yes, Your Honor.  I don't believe,

18    generally speaking, that -- when someone commits a serious

19    infringement, its a serious material breach that gives a

20    right to terminate their license.  There has to be --

21    otherwise, a pirate could go to the store and buy a copy

22    of a DVD, make a thousand copies to sell at the swap meet,

23    and then argue that that one original copy should be

24    maintained as his personal property.

25          THE COURT:  Why not?

1          MR. HOGAN:  I think the license is terminable by

2     the owner of the copyright when someone has infringed it.

3          THE COURT:  What's the law that says, if they

4     got legitimately copy number 1 and then illegitimately

5     made copies 2, 3, 4, 5, and 6, that the legitimate right

6     to have the copy that they went to Blockbuster and paid

7     $15 to get somehow gets ripped away from them or they

8     cannot put that DVD into their machine and play it when

9     they paid for it?  I mean in this case I know its free,

10     but just take my hypothetical as analogous.  What's the

11     law that says the first one is somehow not available to

12     the user anymore?

13          MR. HOGAN:  Yes, Your Honor.  I think in a

14     situation where someone has gone out and made a mistake,

15     made copies, and then wants to keep the original copy --

16          THE COURT:  Say there was a criminal action.

17     They were even convicted.  Why do they have to give up the

18     first one that they made?

19          MR. HOGAN:  That may be.  It's not the case we

20     have, Your Honor.  They don't have a copy of the original

21     one.  They haven't had one.  They haven't been able to

22     operate one since sometime in 2000, and that's the record.

23     They don't own a copy of it.  They haven't got one.  They

24     didn't create this new software from an original copy.

25     Mr. Dillon's testimony in Delaware was clear that he

1   doesn't have a copy.

2           THE COURT:  I thought he took off the appendages

3   and made it the way it was originally.

4           MR. HOGAN:  Your Honor, again I would claim that

5   to be a derivative of Mr. Berry's system, and he does not

6   have a license to make a derivative.  Only Mr. Berry can

7   make a derivative under 106 of the Copyright Act.  He

8   didn't have a copy of the original.  He made a copy from a

9   derivative.

10          THE COURT:  Okay.  Can you -- I think we've kind

11  of been talking about some of these.  Go to number 17.

12          MR. HOGAN:  17, yes, Your Honor.

13          THE COURT:  You know what, I don't think I got

14  an answer to number 15.

15          MR. HOGAN:  Okay.

16          THE COURT:  So you said that the license was

17  terminated by the jury.

18          MR. HOGAN:  That has been my position, Your

19  Honor.

20          THE COURT:  Okay.  So then how come you then

21  went into bankruptcy court and said you had the right to

22  terminate a license, if, in fact, you're arguing that the

23  verdict terminated this thing?  Why would you then go into

24  bankruptcy court and say that you had a right to terminate

25  something that at the same time you're arguing had already

1   been involuntarily terminated?

2         MR. HOGAN:  It's because of inconsistent

3   positions, Your Honor.  And I know that's what I'm being

4   accused of, but let me just state why the position.  We

5   took the position that it was terminated at the jury

6   verdict.  That was our position, Your Honor.  They filed

7   bankruptcy three weeks after the jury verdict.  I am

8   loathe to take a chance on sending them a termination

9   letter post-petition that says your rights have been

10  terminated, and the reason is that, if they had any rights

11  to it, it would violate the automatic stay.  That is my

12  view.  And so I never did.

13        The fact is throughout the case and in this

14  proceeding and in Delaware the debtor took the position

15  that they had a license to operate, that that license was

16  good.  In regard to the hearings that were set in July

17  they took the position that the license terminated

18  pre-petition, Your Honor.  They took that position in

19  motions that were -- in regard to motions brought in

20  Delaware that it had terminated pre-petition.

21        My response was it's simply an area -- I don't

22  have any authority, Your Honor.  I've looked for the case

23  law in this as to -- and the court has identified that I'm

24  probably not going to find it, that it automatically

25  terminates by the filing -- by the finding of

1    infringement.  I've looked -- I spent the weekend looking

2    again, Your Honor.

3           Going back to it, Your Honor, what all I can say

4    is, if it was on the certification exam, I think the best

5    I could do with what I've got is to say the right -- when

6    someone infringed is a material breach.  I think that's

7    fairly well established in the law.  A material breach

8    gives a right of rescission.  Generally, rescission is

9    something that a party must effect, and the fact is the

10   bankruptcy cut Mr. Berry off and he did not terminate the

11   license in time.

12          THE COURT:  Okay.  When you say that the

13   defense -- some of the defendants here argued that the

14   license had terminated pre-petition -- that's what you're

15   saying; right?

16          MR. HOGAN:  That's correct.

17          THE COURT:  Where do I see that?

18          MR. HOGAN:  Your Honor, it's not in this record,

19   Your Honor.  They've taken judicial notice of numerous

20   documents.  I do not believe it was in -- it was a

21   position taken in the estimation motion that was filed and

22   was heard on the 26th of July, your Honor.

23          And the reason was for that --

24          MR. LIEBELER:  Your Honor, I may be able to

25   clarify on this precise point.  I don't want to get in the

1   way of the argument, but this is one I actually can

2   resolve in fairly short order, with the court's

3   permission.

4           THE COURT:  Okay.

5           MR. LIEBELER:  There was an estimation

6   proceeding that went forward in the bankruptcy court.  And

7   for purposes of the estimation argument what our position

8   was quite carefully drawn was whether the license is going

9   forward or whether it is terminated.  In either event the

10  claims should be estimated at zero.  We argued expressly

11  in the alternative and did not make a representation that

12  the license had been terminated.

13          THE COURT:  Okay.  So is it Fleming's

14  position -- I'm having some trouble because, you know, I

15  wasn't in this bankruptcy court.  And I realize there's a

16  motion for me to take judicial notice and I can certainly

17  take judicial notice that things happened in the

18  bankruptcy court without taking judicial notice that would

19  have the effect of accepting as fact matters that might

20  not actually be things I have to decide in this case, but

21  the existence of these proceedings I'm happy to notice.

22          But I can't quite figure out whether there's

23  this argument being made by Berry about rejecting a

24  license, and I think it's based on the absence of the

25  program in matters that were assumed by Fleming.  And, if

1    I'm correct in saying that's the basis of saying the

2    license was rejected, I still have a problem there because

3    I'm not certain that, if something was given to you for

4    free, that you have to have said I affirmatively assume

5    this in order to keep it from being termed rejected.  I

6    mean It's not like a lease where the next month's lease

7    rent is coming due and you better darn well assume that

8    lease if you want to still, you know, be operating under

9    it.  I mean this was a free license; right?  With no

10   ongoing payments or --

11          MR. LIEBELER:  That's correct.  This actually

12   dovetails into a discussion of inclination 17, and that is

13   where the court asked for case authority with respect to

14   sort of what happens ultimately when a plan is confirmed

15   and anything that has not been assumed is by operation of

16   law rejected.  I actually was able to find a case over the

17   weekend that addresses the issue.  It's a case called

18   Drexel Burnham Lambert, 138 BR 687.  We gave a copy to

19   Mr. Hogan right before the hearing because I actually got

20   it from my office early this morning.

21          And with the court's permission I'll read a very

22   short quote from that case.  It reads at page 20 of the

23   printout that I distributed this morning:  "Rejection's

24   effect is to give rise to a remedy in the non-debtor party

25   for breach of the rejected contract, typically a right to

1   money damages assertable as a general unsecured claim in

2   the bankruptcy case.  Rejection has absolutely no effect

3   upon the contract's continued existence; the contract is

4   not cancelled, repudiated, rescinded, or in any other

5   fashion terminated."

6           As a consequence of that, if the court's

7   hypothetical were slightly different and, in fact, Fleming

8   were to pay money every month to Mr. Berry for this

9   license, then ultimately the confirmation might give him a

10  claim for money damages on those license fees.  But

11  there's no argument based on case authority that there is

12  somehow some nunc pro tunc termination of the contract

13  back to the petition date that would terminate whatever

14  license rights that Fleming may have had at that point in

15  time.

16          As a consequence of that, we do believe that

17  after the petition date we did have a license to use the

18  unmodified version of the software.  That's consistent

19  with the pre-petition verdict.  And, in fact, I think

20  Mr. Hogan's articulation of the pre-petition verdict that

21  because there was one finding out of three of an

22  infringement somehow terminates the other rights that the

23  jury implicitly found that we had is simply an absurd

24  construction of the jury verdict.  The fair construction

25  of the jury verdict is, "Look, you have a right to use it

1    unmodified.  You're not allowed to modify it."

2              THE COURT:  Okay.

3              MR. HOGAN:  If I may address that, Your Honor,

4    because I just got this case.  In this case, Your Honor,

5    at page 708 this court rejects the Countryman test, which

6    is the test that I believe is applied in Delaware

7    regarding executory contract.  I just got this case.  I

8    haven't had a chance to Shepardize it.  I don't think this

9    is a case that would be cited very often, Your Honor.

10   There are cases that I can point the court to now that

11   this has been raised at this point, Your Honor, where

12   Judge Walrath has ruled that in fact this is an executory

13   contract like a lease that has to be assumed before the

14   confirmation or it's gone.

15             THE COURT:  Okay.  Okay.  I'm going to ask you

16   very briefly to go to 19 and 20.

17             MR. HOGAN:  Yes, Your Honor.  19.

18             THE COURT:  I think you're arguing that

19   Fleming's Excel spreadsheets incorporate Berry's software

20   not just incorporate Fleming's data.

21             MR. HOGAN:  Yes, Your Honor.

22             THE COURT:  Okay.  So what's the evidence of

23   that?

24             MR. HOGAN:  Well, Mr. Dillon admits in the July

25   hearing -- and it's cited in Mr. Hosoda's declaration

1    exhibit A at pages 108 at 19, I believe, into page 109,

2    Your Honor -- that he copied percentages of Mr. Berry's

3    system into his spreadsheet database.

4         At page 105 of that same transcript that's in

5    the record he admits that he's running Access and not

6    simply Excel.  Contrary to what has generally been touted

7    in this case, it is an Access database that's being run.

8         THE COURT:  I'm sorry to display my ignorance so

9    obviously, but why does that help Berry if Access rather

10   than Excel was being run?

11        MR. HOGAN:  I agree, Your Honor.  I don't think

12   it makes --

13        THE COURT:  Okay.

14        MR. HOGAN:  It doesn't matter, but it's been

15   said that it can't be Mr. Berry's program because it's in

16   Excel.  And what I'm saying is, well, it isn't just in

17   Excel.  It's in Access.  They're running Access, and it's

18   admitted in that point.

19        That has been, I think, the basic argument that

20   by copying the data into spreadsheets they did not copy an

21   Access database because it's in Excel.  Well, the

22   testimony in Delaware made clear that it is actually

23   Access that's running.  It's just simply put data in the

24   Excel spreadsheets to run Access against it.

25        As far as -- I could put Mr. Berry on the stand,

1   Your Honor.  I wasn't going to do that.  I didn't think it

2   was necessary.  But he's here to explain what portions of

3   his unique part of his system -- not related to their data

4   at all -- that were copied into the Dillon spreadsheets.

5   I thought that Mr. Dillon would be here, Your Honor, to

6   address those issues.  That was my understanding because

7   the court's inclination that would be live testimony, that

8   was, I believe, what I was going to do is to put

9   Mr. Dillon on and to question him regarding the certain

10  things that were copied into the system that were not

11  simply the data, Your Honor, that were the structural --

12          THE COURT:  I'm looking at number 20.

13          MR. HOGAN:  Yes, Your Honor.  The Guidance

14  issue, Your Honor.  All right.  What Guidance did is come

15  in without notice to us during a period where they were

16  stayed in litigation and there was an order saying don't

17  anybody destroy anything.  I don't think there's any

18  question those were the situations existing at the time.

19          Without notice to us Guidance came in and made a

20  copy of what was on the system, which copied the visible

21  files -- we admit that that appears to be what they did --

22  then scrubbed those computer systems, Your Honor, and then

23  copied things back.  That's the record.

24          The reason it's destruction of evidence, Your

25  Honor, is what it did is it destroyed what had been

1    deleted prior to Guidance getting there.  Simply, someone

2    has something illegal on a computer, Your Honor.  They

3    delete it, they dump it out of the deletion box, and then

4    they make an image of that.  They then scrub the computer

5    and put it back, and they've wiped out the forensics of

6    what was there.

7            This is a period of time when I don't think

8    there's any dispute that Fleming was under an SEC

9    investigation, they had an order to stop them from doing

10   things of this sort, and all they had to do, Your Honor,

11   to preserve this evidence is take the hard drives off,

12   take them away, put them in a closet with Guidance or

13   someone to lock them up, and then put new hard drives on.

14   For a couple thousand dollars, Your Honor, they could have

15   rebuilt this system without destroying any of the

16   evidence.  What they did was to essentially destroy any

17   ability of anyone to see what had been on there prior to

18   Guidance coming in.  Why they did it, we don't know.  We

19   can surmise.  But in any event we believe it did destroy

20   forensic evidence in this case, that it was in violation

21   of the court's earlier order prohibiting destruction, and

22   that it can't be considered fair use under the

23   circumstances.

24           THE COURT:  Okay.  I'm going to let defendants

25   talk really briefly on these questions.  Really briefly,

1    though.  Wait.  Let me get a sense of what kind of

2    evidence we have.  So we have Mr. Berry.  You are offering

3    his declaration in support of your motion; so they're

4    going to get to cross-examine him live.  That's the only

5    witness you're offering -- only declaration?

6         MR. HOGAN:  That is correct, Your Honor.

7         MR. LIEBELER:  Just sort of administratively as

8    a housekeeping matter, Mr. Smith had spoken to Mr. Hogan

9    on Friday, and Mr. Hogan had said that his inclination was

10   not to bring Mr. Berry to testify, except by means of

11   rebuttal.  As a consequence of that, we were not planning

12   to bring Mr. Dillon.  We have Mr. Dillon 20 minutes away

13   and can bring him, but we don't have a declaration and we

14   didn't get any sort of other declaration from Mr. Berry

15   yesterday; so he'd be limited to what in his -- the

16   declaration already filed.

17        THE COURT:  Let me make sure I understand.  So

18   he submitted a declaration.  I know you have some

19   evidentiary objections to portions of the declaration, but

20   other than that no live cross is being requested by the

21   defense.  Am I right?

22        MR. SMITH:  That's right, Your Honor, and that

23   was the discussion I had with Mr. Hogan on Friday as

24   well.

25        THE COURT:  Is that right for all defense

1   counsel?

2          MR. HOSODA:  I did not speak with Mr. Hogan

3   directly, but in speaking with Mr. Smith -- Mr. Dillon is

4   my client, and I was told that there was an agreement that

5   there would be no live-witness testimony, and that's why

6   Mr. Dillon is not here.

7          THE COURT:  Okay.  But you didn't need to

8   cross-examine Mr. Dillon -- I'm sorry.  Mr. Berry live.

9          MR. HOSODA:  Not based upon that agreement.

10         MR. SMITH:  That was not -- the discussion I had

11   with Mr. Hogan was we would all be submitting on the

12   papers together with the objections that are contained in

13   the papers.

14         THE COURT:  Okay.  So there's no live -- nobody

15   needs cross-examination live of any matter set forth in a

16   declaration.

17         MR. LIEBELER:  That was our thought sort of

18   working as a group yesterday, Your Honor.  Although, we

19   did discuss the notion that, if the court had specific

20   questions for Mr. Dillon or otherwise, that that would be

21   perfectly appropriate, and we could make him available for

22   that purpose at the court's convenience.

23         MS. PORTER:  Yes, Your Honor.  Emily Reber

24   Porter.  Just to make it clear we weren't a party to any

25   of these discussions last week about who would be live,

1   and our position is that we're not being targeted in this

2   motion at all.

3           THE COURT:  Okay.  So nobody's asking for live

4   cross of anything.  As I understand it, they are going to

5   rest on the papers and arguments that have been

6   presented.

7           MR. LIEBELER:  That's correct, Your Honor.

8           THE COURT:  Okay.  Then let me invite counsel

9   for Fleming to go through these questions, and then I know

10  we might have to go back and forth on some of these

11  things.

12          MR. LIEBELER:  We have a little bit of

13  transitions.  It may make sense, Your Honor, with all due

14  respect for sort of one of the three of us, being Fleming,

15  C&S, or Mr. Dillon's counsel, to address these at a time.

16  So with that, for number 1, I would defer to Mr. Hosoda.

17          THE COURT:  Okay.  Mr. Hosoda.

18          You folks are going to have to bear with me

19  because I'm sure I don't understand all the technological

20  details of what's going on here; so you should make your

21  explanations accordingly in a way you think I might be

22  able to figure out.  And even then you may be way

23  overestimating what I can figure out.  I'm sure you won't

24  underestimate it.  But go ahead.

25          MR. HOSODA:  Thank you, Your Honor.  Again Lyle

1    Hosoda for the individual defendants, including Mark

2    Dillon, Brian Christensen, and Teresa Noa.

3            Your Honor's first question was whether or not

4    it was Mr. Dillon's testimony that it was proper for him

5    to retain a copy of the 16 files.  I will tell you that

6    from pages 95 through 98 of exhibit A to my declaration,

7    which is the testimony given at the confirmation hearing

8    on July 26th, 2004, in Delaware, I was present at that

9    hearing, Your Honor, but under direct examination what

10   Mr. Dillon testified to was that he did not know even

11   about this allegation of the 16 files even being on the

12   system until after this motion for preliminary injunction

13   was filed and served, and his best recollection it was at

14   sometime in early June of 2004.

15           His testimony thereafter was that he, upon

16   learning of this, attempted to go back into the computer

17   files there to try and find out whether they were still

18   there.  At that point he found that those files were no

19   longer on the computer at C&S.

20           Now, what Mr. Hogan just represented to the

21   court with respect to what was on these files or what was

22   happening with these files, he quoted a page 95 and he

23   went to lines 19 through 22.  And I think that's a bit

24   misleading because what he read was one question and it

25   was, "And by looking at those path names what can you tell

1   us about those files were on the system in Kapolei?"  And

2   the answer was, "They were on my computer.  They were part

3   of my professional documentation; that is, documents and

4   materials I keep to have to do with my function with

5   maintaining computers and software there on a network."

6        Mr. Dillon is talking -- describing generally

7   about the area of where these files -- he believes that

8   they were.  But what happens is, if you just cut off

9   there, which Mr. Hogan did, it's misleading because he

10  continues on on page 96.  And there is a question about

11  what is contained in those actual 16 files to Mr. Dillon's

12  knowledge, and he says, "This was -- all these directories

13  are used to keep documentations for the previous lawsuit.

14  There were collections of documents that I felt were

15  relevant to the lawsuit."

16       Mr. Hogan attempted to expand and say these

17  weren't just related to the litigation.  Not only that,

18  but Mr. Dillon says these were examples of things that we

19  wanted to show the court of what the tables consisted of

20  but they were sans data.  There was nothing in there.

21  Essentially, he testifies that they were not usable.

22       There is no allegation and no evidence, Your

23  Honor, of use.  They're not saying that Mr. Dillon in any

24  way used these 16 files to the benefit of Mr. Dillon or

25  the company, and there's absolutely no evidence of the

1    record of that.  I mean -- so Mr. Dillon discovered these

2    16 files, went back, tried to locate when it was that they

3    were deleted, who deleted them, at what period.  When he

4    could not tell --

5              THE COURT:  Wait, now.  Let me make sure I

6    understand.  So he didn't know they were there, and how

7    did he determine that they had been there?

8              MR. HOSODA:  He went back and he used a search

9    query to attempt to -- with the prefixes he knew of of Mr.

10   Berry's software to go back with the identifiers that were

11   used --

12             THE COURT:  I'm confused.

13        (Counsel conferring.)

14             MR. HOSODA:  I'm sorry.  Maybe I misunderstood

15   your question.

16             THE COURT:  Let me ask it this way.  When did

17   Mr. Dillon first realize that there were these 16 files

18   still on the computer?

19             MR. HOSODA:  I'm a little bit troubled by that

20   question because first he testified that he did not learn

21   about this until June of 2004 after the motion for

22   preliminary injunction was filed.

23             THE COURT:  Okay.  And who told him that they

24   were still there?

25             MR. HOSODA:  He got a copy of the motion from my

1    office and he learned of it at that point.

2            THE COURT:  And how did they know?  Okay.  Wait.

3    Let me back up.

4            You're saying that the first time Mr. Dillon

5    even knew that there were 16 files with this freight

6    tracking thing on his computer was when he saw the motion

7    filed in this case.  And the -- I'm confused.

8            So you're saying that then he -- I thought he

9    had made a copy of these files as a record for pending

10   litigation.  Am I confused about what's going on here?

11   What was it he made a copy of as a record for pending

12   litigation if he didn't even know that these files were on

13   the computer to copy?

14           MR. SMITH:  Judge, since I think I was probably

15   the addressee of the files that we're talking about, maybe

16   I could help a little bit.

17           During the pretrial proceedings of the case that

18   went to trial in 2003, in pretrial discovery the

19   plaintiffs asked for a copy of the database.  We refused

20   to give them the database because it had our confidential

21   data in it.  A negotiation ensued in which I think there

22   were -- we agreed to produce it to them but with only six

23   of the fields filled in and with everything else deleted

24   from it.

25           In addition to that, I went through much of the

1    same learning curve the court is going through today in

2    terms of trying to understand what this was and how it was

3    used and that sort of thing; so Mr. Dillon prepared memos

4    to me and explanations to me.  And during that process --

5    and there were a couple -- I should say during discovery

6    there are at least two different versions of the database

7    that we produced to them with great deals of data deleted.

8            Obviously, those versions are not usable, but

9    those were apparently what was stored here as well as

10   whatever Mr. Dillon had copied in order to prepare

11   explanations to me of what this was and how it was used.

12   So these were in litigation support, sort of, of a

13   different place where he kept his personal information

14   that he had prepared for me as well as other personal

15   things for his job.

16           So he certainly knew they were there when he

17   prepared them sometime before the trial in March of 2003.

18   I think the dates on them show 2001 and 2002.

19           THE COURT:  I see.  So you're saying he made a

20   copy -- he made an image of what was on the computer

21   before the trial before Judge King.

22           MR. SMITH:  Yes.  He made a copy of the

23   database, which he then kept in a different location.  And

24   he altered it so that it was not usable for the purpose of

25   tracking freight anymore because he was deleting a lot of

1   the data from it.

2           THE COURT:  Okay.  So what Mr. Hosoda is talking

3   about is Mr. Dillon's first realization that after the

4   jury's verdict in front of Judge King there was still the

5   16 files on the computer.  Or am I still confused?

6           MR. SMITH:  Let me chronologically take you to

7   the next step.  We had our trial in March.  Now comes July

8   and we're still facing people, you know, saying that we're

9   infringing and we're criminals and things.  And we want to

10  deal with that, but we want to preserve evidence; so we

11  bring in Guidance.  We tell Guidance keep a complete exact

12  image of everything that's on those computers and then

13  make sure we've got nothing Wayne Berry created there.

14          So Guidance has this image, and they go away

15  with the image and, you know, the files.  Presumably,

16  files that are not -- that don't have any Wayne Berry

17  created it get put back on.  Now, Mr. Dillon, when he put

18  his personal files back on, apparently, there were some

19  copies that he had altered and created for me as part of

20  that process.

21          Yes.  And Dillon -- I think Dillon's testimony

22  that the court has before it clearly indicates that he was

23  not aware of that fact at the time that it happened

24  because the whole intent was for us not to have anything

25  on your computers that Mr. Berry had created.

1          So now we're -- this case gets filed shortly

2     after that.  We're in discovery in this case.  Mr. Hogan

3     wants a copy of everything Guidance has.  We again tell

4     him, no, that's got our proprietary information on it, and

5     without waiving any of his rights we agree what we will

6     produce to you is a list of file names so you have every

7     file name that Guidance has.  And I phone Guidance, and I

8     tell them, "Give me the list."  They put the list on a CD.

9     Two lists, actually:  one before and one after.

10          Those gets produced to Mr. Hogan.  Mr. Hogan

11     says something to me about it in February to the effect

12     that there's -- there are copies of Mr. Berry's programs

13     on the after image.  And I asked him which ones.  He chose

14     not to tell me at that time.  In June of this year we get

15     the motion that has the file names listed on it.

16     Mr. Hosoda sends that to Mr. Dillon.  Mr. Dillon sees it.

17     So where did he get the information from is from Guidance.

18          Now, he was unaware at that earlier date that

19     they had been there, but Guidance's record shows that they

20     were.  I think that -- hopefully, that provides some

21     context for you to understand Mr. Hosoda's situation.

22          MR. LIEBELER:  And then, Your Honor, to put the

23     capstone on it what happened after that was after

24     Mr. Dillon found from the motion that the files were

25     purportedly still there, according to Mr. Berry, he went

1    back and looked and found out they were not there.  So

2    what we see is that they were deleted sometime between the

3    time Guidance left on July 7th of 2003 and May 28th or

4    early June when Mr. Dillon got the motion from his counsel

5    from Mr. Berry that said they were there.

6              THE COURT:  I see.  So, when you say they were

7    deleted sometime before July 2004, you're just looking at

8    when the motion in which Mr. Berry listed the allegedly

9    offending files came in such that Mr. Dillon would have

10   gone to look.

11             MR. LIEBELER:  That's correct.  And there

12   actually is an inference from that because, presumably, if

13   Mr. Dillon had deleted those files a day before, he would

14   have remembered it when he got their motion.  So I think

15   there's at least a fair inference from the evidence that

16   is in the record that the files were deleted relatively

17   early in that yearlong time frame because the later they

18   are the more likely is that Dillon would remember that.

19             THE COURT:  Okay.

20             MR. HOGAN:  If I can just say one short thing,

21   Your Honor.  Mr. Dillon's only testimony in regard to the

22   motion is for him to verify that what was stated in

23   Delaware was still true.  He did not support it with an

24   additional declaration.

25             THE COURT:  Okay.  Because, when I get to

1    question 2, I have the statement that Mr. Dillon had

2    testified that the 16 offending files were deleted

3    sometime before July 2004, but this actually is not a

4    statement made in previous testimony.  Am I correct?

5              MR. LIEBELER:  Well, in your question 2 the

6    question is the files were deleted sometime before July of

7    2004.  And in the record in the confirmation proceeding

8    Mr. Dillon testifies that he found out in June of this

9    year that Berry was saying, hey, the files are still

10   there.  Okay.  And then he goes back on page 94 and I

11   asked him in the confirmation hearing, "All right.  What

12   did you do when you found out that Mr. Berry was alleging

13   the files were still there?"  And his answer was, "I went

14   back and looked for them, and I found they were no longer

15   there."

16             THE COURT:  Wait, now.  Tell me the page number

17   of what you're looking at.

18             MR. LIEBELER:  Sure.  I'm at exhibit C to our

19   opposition, page 94, starting at line 12.

20             "Question.  Now, when is it that you found out

21   that Mr. Berry was claiming that his files were still

22   remaining on the system?

23             "Answer.  It was June of this year."

24             THE COURT:  How was it, if he's saying they were

25   deleted, what would have triggered the deletion of those

1     files when, as I understand Mr. Smith's chronology,

2     Mr. Dillon thought that everything had been -- from

3     Mr. Berry had been taken off of the computer and that what

4     had been then reincorporated into the program was only

5     non-Berry stuff.  Right?

6              MR. LIEBELER:  That is correct.

7              THE COURT:  Okay.  So, if he was mistaken and

8     what he thought were non-Berry matters included Berry

9     matters, then what happened to delete these 16 Berry

10    matters by the time he was able to make the statement to

11    you in whatever it was, June or something, of 2004 that

12    there were no longer any Berry matters on his computer

13    because he had gone back or -- on Fleming, C&S's computers

14    because he had gone back and checked and they were gone.

15    If nobody knew they were there, what would have triggered

16    the deletion?

17             MR. LIEBELER:  I understand the question, Your

18    Honor, and on the current record there is not evidence on

19    that point.  I can make an offer of proof because I've

20    spoken with Mr. Dillon about this in the last 24 hours,

21    and I'm happy to make that proffer, but it is not evidence

22    of record for this proceeding.  That discovery hasn't been

23    taken.  So I'm willing to proceed on the basis of an offer

24    of proof, but I don't want to argue past the evidence

25    because I'm going to criticize Mr. Hogan for doing that.

1              So I can either answer it as I believe

2    Mr. Dillon would testify --

3              THE COURT:  Okay.  Why don't you tell me what

4    he'd say, but it's not really -- it's as if you just put

5    it in a memo and didn't have --

6              MR. LIEBELER:  Right.  I understand that that's

7    not evidence, and I'm aware of that, which is why I made

8    the qualification upfront.

9              Mr. Dillon believes that he was the one that

10   probably deleted the files.  He does not specifically

11   recall doing so.  He believes that it would have been done

12   as a matter of ordinary file maintenance; that there were

13   files as the disk runs out of room or whatever it might

14   be, and things are deleted.  But he doesn't recall having

15   deleted these 16 specific files.  He does recall shortly

16   after Guidance left finding some form of a report -- not

17   these files but some form of a report related to Berry,

18   and he does recall deleting that in the time frame of late

19   July of 2003.  But he doesn't have a specific recall on

20   these 16 files.  But he believes that he was the one that

21   very likely deleted them because no one else had access to

22   his particular server.

23             THE COURT:  Is there anything in the record

24   about some periodic purging of files that would occur that

25   people, you know, once every six months or something would

1   go through their computer files and say, "I don't need

2   this, I don't need this, I don't need this"?

3           MR. LIEBELER:  There is nothing in the record on

4   that point either, Your Honor.  And that's not something

5   about which I've spoken to Mr. Dillon; so I can't even

6   make an offer of proof on it.

7           MR. HOGAN:  If I may, Your Honor, if I were to

8   rebut the offer of proof, I would put in a query

9   Mr. Dillon wrote after July 8th in which he queried the

10  database to rebut it.  I would also put in Mr. Berry's

11  declaration, paragraph 15, where Mr. Berry says, not just

12  the 16 files that are on there, there's over a thousand

13  other reports and programs of his that are on the system

14  that's never been addressed in any proceeding.

15          THE COURT:  A thousand?

16          MR. HOGAN:  Thousand.

17          MR. LIEBELER:  That's not a rebuttal to the

18  point about the 16 files, Your Honor.  That's some other

19  frolic and detour on some other issue because those files

20  have never been specifically identified to us, and until

21  Mr. Berry does so it's kind of hard for us to do anything

22  about them.

23          MR. HOGAN:  Exactly, Your Honor.  The point

24  we're trying to make is there is evidence that, in fact,

25  the Guidance images were, as we have stated, Your Honor,

1    nothing but a farce.  They created a record that was

2    presented to court to be able to knock Mr. Berry out

3    before he got started on this case.  But the fact is

4    Guidance copied back numerous copies of Mr. Berry's works,

5    so many that it would be absolutely absurd to presume that

6    just a few fell through the cracks.

7         In addition, Your Honor, if we look at the exact

8    copy that we put in the record, I think the court can see

9    from the size of the files in exhibit P that they're not

10   simply without data.  There are some of these files that

11   are gigantic files, Your Honor, that I think most people

12   could see, if it's a copy of the database, that's hundreds

13   of megs size, compared to the other ones that are a few

14   meg, that it's something more than simply a stripped down

15   version of Mr. Berry's software used for litigation.

16        Also Mr. Dillon testified in the present

17   tense --

18        MR. LIEBELER:  We're a little off track here at

19   this point, Your Honor.

20        THE COURT:  I'm just, like, ready to throw up my

21   hands at this point because, if really what you want is to

22   rid their computers of all these things, then why not let

23   this NTI entity go in and do it instead of saying, "Don't

24   you touch that because, you know, it might be a problem

25   for you if you do."

1          I mean, if really the goal of Mr. Berry is to

2     insure that none of the defendants can touch Mr. Berry's

3     program, well, does he have somebody he wants to suggest,

4     short of Mr. Berry himself, who could go in and clean up

5     their computers, and this would be some neutral party?

6     And let's see if that person's acceptable to the

7     defendants.  Clear it out.  And maybe that person will

8     report to you it's already cleared out.  But what's the

9     problem with this, if really the goal is to make sure that

10    Mr. Berry's programs are not being used?

11          MR. HOGAN:  Your Honor, I'll address NTI, I

12    believe, in my declaration.  I spoke to their attorney,

13    Your Honor, and I said, if we get a court order, I want to

14    know who's going to own the copies of Berry's software

15    when the debtor reorganizes.  The Guidance Software now is

16    sitting in a software developer's locker.

17          THE COURT:  Oh, just go ahead and put it into a

18    safety deposit box and have to have -- both counsel have

19    to sign off to take anything out of it.  I mean what's

20    wrong with that?  They're not going to want these things

21    they're claiming anyway.

22          So, you know, lawyers do this kind of thing all

23    the time with sums of money.  I've done it with physical

24    items when I was in practice.  Who is it you would suggest

25    could do this that your client wouldn't object to, and

1   let's see if there's an objection on their side.  They

2   wanted to do it; so what if they did it, and that would

3   end this whole thing.

4          MR. LIEBELER:  Your Honor, this is the exact

5   catch-22 that Mr. Hogan puts us in.  If we take it off,

6   we're spoliating.  If we leave it on, we're continuing

7   criminal infringers.

8          THE COURT:  Is there some entity that is

9   acceptable to the plaintiffs that you could name, and

10  let's see if it's acceptable to the defendants.  And, if

11  so, send that team over, clean it up, put whatever their

12  work product is into a safety deposit box, have -- all the

13  attorneys have to sign off on anybody taking it out.

14  What's wrong with that?

15         MR. LIEBELER:  Your Honor, we have a motion

16  actually in process to have essentially the court appoint

17  a neutral expert at split cost to do this because,

18  obviously, what we've tried to do is hire NTI to solve the

19  problem, and all that does is buy another element or

20  another hub or spoke to this vast conspiracy.

21         THE COURT:  Just be another defendant in the

22  lawsuit.  But I mean this is terrible because, you know, I

23  am not capable of having somebody stick a computer in

24  front of me and having me on my own go through and say,

25  oh, there's an infringing or allegedly infringing program.

1    I mean I'm sorry, but that's asking way too much of me or

2    of a jury.

3         So what is wrong with your giving me the name of

4    somebody that you like and seeing if that's somebody

5    acceptable to them?  And, if not, I mean we have lots of

6    people in this kind of a business who would do this.  I

7    mean I'm sure you could probably come up with five or six

8    that would be acceptable to everybody.

9         MR. LIEBELER:  So we're clear in terms of what

10   our constraints are, Your Honor, it is our position that

11   every time Wayne Berry gets ahold of data of Fleming he

12   publishes it in The Advertiser, accuses us of overcharging

13   Hawai'i consumers, and doing all kinds of things that are

14   way outside the scope of this litigation.  And part of the

15   rule that we would insist is Mr. Berry himself have zero

16   access to that material.

17        THE COURT:  Right.  That's right.  He would have

18   no access.  We'd put it into this safety deposit box.  I

19   mean one of the things that could happen -- and this

20   happens all the time -- this is the first time that you're

21   here in front of me because you're not in this district,

22   but these other people, they appear before me all the

23   time; so I know that you've got a whole bunch of attorneys

24   that are capable of sticking to a stipulated protective

25   order where the parties even -- because this happens all

1    the time in this kind of case -- would not even see what's

2    going on here, and only the experts and counsel would do

3    so.  What's wrong with that kind of thing?

4         MR. HOGAN:  Your Honor, we've been asking for a

5    protective order, and it's been turned down in this

6    proceeding under the basis that I can't be trusted to obey

7    this court's order.  That's the basis of it, Your Honor.

8         What we've -- we've already had one expert come

9    in and state under oath to a bankruptcy judge in order to

10   effect a multimillion dollar sale that this is clear of

11   Mr. Berry's.  Is there any dispute here today that that

12   was not correct?  I don't believe so, Your Honor.

13        So I have a problem with the idea that they go

14   out and get somebody who we have no notice of to come in

15   and perform evidentiary matters in my case without notice

16   to me who are going to make copies of Mr. Berry's software

17   and transport them out of the state without notice to us.

18   That I had a problem with, Your Honor.

19        THE COURT:  Doesn't have to be transferred out.

20   You can go to any bank --

21        MR. HOGAN:  It's easy, Your Honor.

22        THE COURT:  -- and stick this -- I mean it's not

23   very big, is it, I mean whatever it is you're going to

24   get?

25        MR. HOGAN:  The court -- right now, Your Honor,

1    Your Honor could order that the software hard drives be

2    removed and maintained.  That would take an hour or two

3    hours of somebody's time.  A new hard drive can be

4    purchased at CompUSA 200 gig for a hundred dollars.  There

5    are 14 hard drives, that's $1400.

6              THE COURT:  Why do I -- I mean don't -- isn't --

7              MR. HOGAN:  I'm saying it's very simple.

8              THE COURT:  It's embarrassing to me that I'm so

9    ignorant on this really, but do they really have to remove

10   their hard drive?  Can't they just take an image of what's

11   on the hard drive and stick whatever -- is it a CD?  I

12   mean I don't know how this thing comes up.  I mean can't

13   you just put that image into the safety deposit box and

14   then later on we can argue about what is on this image and

15   is it or is it not infringing and we can have the experts

16   look at it and counsel.

17             MR. LIEBELER:  That's exactly what we tried to

18   do with NTI, Your Honor, and Mr. Hogan stopped that in

19   what I regard as just a vicious breach of ethics.

20             THE COURT:  I don't understand why it has to

21   be -- I don't know anything about clearing off this hard

22   drive or anything, but it sounds to me like there might be

23   something simpler than doing that.  Frankly, I'm not the

24   person who should be designing the solution here because

25   whatever disabilities in technology any other attorney in

1   this case may have, I'm sure I'd beat you on those.  I'm

2   sure my failings are far greater.

3          But what's wrong with naming an expert to start

4   with or somebody who could go in and figure out what's on

5   their computer?

6          MR. HOGAN:  Your Honor, that has always -- we

7   did this once, Your Honor.  It's been done twice.

8   Actually, there was going to be the third time with NTI,

9   Your Honor.

10         MR. HOGAN:  The first time Kroll.  The original

11  litigation there are images that exist on the original

12  litigation that have been preserved.  They're already

13  out.

14         THE COURT:  But now we're looking at what's

15  there now; right?

16         MR. HOGAN:  Exact.  We have the Guidance images,

17  Your Honor, that are at Guidance right now that show the

18  before and after, Your Honor.

19         THE COURT:  But let's look at what's there

20  today.  So what's wrong -- do you object to NTI coming in?

21         MR. HOGAN:  I told NTI's attorney that, if we

22  get a court order that will handle Mr. Berry's software in

23  a manner in which we can address where it ends up, I'm

24  happy to work with him.  I told him that.

25         THE COURT:  So you don't mind their choice of

1    NTI, and NTI could come in, do whatever it takes, I mean I

2    don't know, to get a copy so that later on everybody can

3    see what is on the Fleming and C&S computers as of --

4    let's just pick a date -- September 3d -- let's just pick

5    that -- 2004, and stick that thing into a safety deposit

6    box.

7             MR. LIEBELER:  That's assuming I can get NTI

8    back to the table, Your Honor, because they've been

9    threatened with a RICO violation at this point, and they

10   may no longer be interested in dealing with this case.

11            THE COURT:  Okay.  So somebody else.

12            MR. LIEBELER:  Right, right.

13            THE COURT:  Why don't we do that?  I mean this

14   seems to me like -- frankly, it just seems sort of

15   unnecessary to go through this process where I'm supposed

16   to make findings about whether you've met your burden on a

17   particular point or not and then, you know, what's the

18   likelihood of success.  I mean it's -- to me the whole

19   litigation, not just this pending motion, could be

20   resolved in some way that's probably for people who know

21   about these things pretty easy.  Why not try it?

22            MR. HOGAN:  Well, I guess the problem is, Your

23   Honor, we come back to what it is that they're operating

24   today, and that's why we're here.

25            THE COURT:  Okay.  But then, if you see what

1   there is there today, okay, the first question is what's

2   there today because, if there's nothing there today, then

3   your motion for preliminary injunction is mooted out

4   because you don't want to enjoin anything if they're not

5   using your program.  Right?

6           MR. HOGAN:  Your Honor, I don't think there's

7   any question that we're going to remain firm that what

8   they're using is a derivative of the Berry system, the

9   spreadsheet derivative of the Berry system.  What we'll

10  end up doing, Your Honor, is going through the usual --

11  we'd love to get real copies of operating systems because

12  we've never gotten one yet, Your Honor, so that I would

13  applaud and be happy to get that done.  We've never gotten

14  anything but the ones that Mr. Dillon creates for us that

15  are stripped down and revised so that we can have our

16  expert look at that.

17          THE COURT:  But you would agree that there are

18  lots of these freight tracking systems in existence and

19  that Mr. Berry is not going to be able to say that every

20  system that could be used to track where freight has gone

21  or what's coming in must necessarily be a derivative of

22  Mr. Berry's system.  He will not say that; am I correct?

23          MR. HOGAN:  I believe Mr. Berry will say that

24  his is the only system -- it was the first that did what

25  it does, Your Honor.  I can put him on and explain what I

1    mean by that.

2            THE COURT:  That isn't an answer.

3            MR. HOGAN:  There are trucking programs all over

4    the place, Your Honor.  One for ocean containers, multiple

5    POs -- that is what this system does -- that handles

6    multiple transactions going into these ocean containers

7    from cross-docking operations I would testify --  I

8    believe Mr. Berry would testify and Griffin, the CIO of

9    Fleming, says there isn't one.

10           THE COURT:  Sounds to me like what you're saying

11   is no matter what they have it must be a derivative of

12   Mr. Berry's program, no matter what they have.  Is that

13   your position?

14           MR. HOGAN:  Because we have access.  There's no

15   question of years of access with Mr. Dillon, who's created

16   it.

17           MR. LIEBELER:  The short answer is yes, Your

18   Honor.  That's the position he's been taking

19   consistently.

20           THE COURT:  Your position is no matter what

21   program C&S is using to track its freight it necessarily,

22   given the nature of its operations, must be a derivative

23   of Mr. Berry's copyrighted program.

24           MR. HOGAN:  Your Honor, if I may, Your Honor,

25   what I would say is, based on the record in this case

1    today, what is operating at C&S is a derivative of

2    Mr. Berry's program.  Is it impossible for C&S to develop

3    a program that would not be a derivative?  No, it's not

4    impossible.  Did they?  No, they didn't.  They took a copy

5    of Mr. Berry's program, sat down at a computer, ran a

6    query against it, and instantly created their version.

7    That's the record.  That's what happened.  They ran it

8    against a derivative of Mr. Berry's system they weren't

9    even licensed to use, and they created what they've got.

10          THE COURT:  Okay.  I think I understand what

11   your position is.

12          Okay.  The concept of reverse engineering and

13   all of that is fairly familiar to me; so I think I

14   understand.

15          MR. LIEBELER:  There's one subtlety, Your Honor,

16   that I do want to articulate, and this is a position

17   Mr. Hogan has taken expressly a couple of times.  And that

18   is that Mark Dillon can't be in any way involved with it

19   because, as an adjudicated criminal infringer, he

20   necessarily must infringe no matter what he does.  And the

21   net effect of Mr. Hogan's position is that Mark Dillon's

22   out of a job.  And the defendants are extraordinarily

23   uncomfortable with that notion.  That's not what the

24   copyright laws insist nor is that a fair construction of

25   the law.  And I just want to make that position clear for

1    today's purposes.

2            THE COURT:  Okay.  Well, as admittedly

3    uninformed as I may be on the computer technical aspects,

4    I actually -- although, I'm not the world's greatest

5    expert -- but I feel reasonably well-informed on copyright

6    law in general; so I'm a little concerned that what's

7    going on here is beyond what was intended by copyright

8    laws.

9            But anyway let's see if we can come out with

10   some way to resolve some of these things.  I mean I don't

11   know.  Do you folks want to work on such a solution?  Do

12   you want me just to go ahead on the motion, which I can

13   do.  What is the position?

14           MR. LIEBELER:  Your Honor, if we might take two

15   minutes among defense counsel.  There are probably

16   disparate views, and we probably should chat about --

17           THE COURT:  Okay.  We'll go off the record for a

18   little while.

19           MR. LIEBELER:  We might even be able to have an

20   amiable discussion with Mr. Hogan in the hallway for a few

21   minutes.

22           THE COURT:  Okay.  I'll go off the record for a

23   little while.

24       (Discussion off the record.)

25           MR. SMITH:  Our proposal would be that the court

1    appoint a special master.  Could be NTI, and, if NTI is

2    not agreeable, then some computer expert who is mutually

3    agreeable.  That the master reports to the judge.  That

4    the master answer specific questions asked by the judge

5    that we can all have input on, and that none of the

6    contents of the images be shared with the parties without

7    the court's prior approval.  That deals with the need for

8    a lengthy negotiation or protective order.  If we can't

9    agree, we would come back to you later.

10          The master could keep --

11          THE COURT:  Puts a lot of burden on me, though.

12   Gee.  That's okay.  We'll have a magistrate judge, who is

13   Judge Kobayashi.  She'll be delighted.

14          MR. LIEBELER:  That's convenient, Your Honor.

15          MR. SMITH:  The master can keep possession of

16   the materials itself, and we would also -- of the images

17   or whatever is there so the questions to the master the

18   master would be able to deal with by going back to the

19   images and looking and seeing what's there.

20          THE COURT:  But, if you say that the contents

21   would not be shown to the parties, then what happens at a

22   hearing like this where I might have questions to the

23   master?  Would the parties sit outside so that, if counsel

24   needed to go and check with the party, the party would be

25   outside?

1          MR. SMITH:  No, I'm sure -- if you ask a

2    question of the master, "For example, is there anything

3    that Mr. Berry wrote on the computer," the master's going

4    to have to answer that, and we could all hear it.  I would

5    expect -- in fact, Mr. Berry could provide the master with

6    copies of things that he wrote that we wouldn't be able to

7    see, and he could ask the master go check if any of that's

8    there.  The master could come back and answer that

9    question, "Yes, I found these," and at that point maybe

10   we'd have to see them to know what they're talking about

11   and probably would agree to delete them at that point.

12          But that would give you the ability -- it would

13   give us all the ability to say is there anything there

14   that Mr. Berry wrote so we can get rid of it.

15          THE COURT:  Because, see, what I have now is I

16   have -- I mean I don't even have live testimony since you

17   folks waived cross.  I have these dueling declarations.

18   And I mean, okay, I can make a decision based on them, but

19   it's not going to solve the case.  It will solve this

20   motion, but the case is going to go on.  I think if you

21   folks wanted to you could wrap up everybody, this whole

22   case, with a coordinated effort.

23          So, Mr. Hogan, what do you think about something

24   like that?

25          MR. HOGAN:  Well, Your Honor, we've always been

1  willing to try to resolve this case.  The problem is we

2  have now been in litigation regarding these infringements

3  for going on four years.  What we were trying to do, Your

4  Honor, in this motion is to end the part of it that is the

5  infringement going forward.

6        As to the images, Your Honor, as to what

7  actually was transferred, the Guidance images are already

8  there, Your Honor, and that the court can order that those

9  be produced to the parties and to their experts, Your

10  Honor, right now.

11        MR. SMITH:  Judge, this is where we get funny:

12  to the parties.  You see, the plaintiffs want our data.

13  They have their newspaper reporter, who published a series

14  of antagonistic articles about Fleming after they gave our

15  data to them previously, sitting here in the courtroom,

16  Judge.

17        We are happy to produce the data.  We are happy

18  to make every effort to make sure there is nothing written

19  by Mr. Berry on our computers.  But we are very

20  uncomfortable providing any of our data to the plaintiff.

21        MR. LIEBELER:  By way of background, Your Honor,

22  shortly after the petition one of my partners wrote to

23  Mr. Hogan and said, "Hey, we've taken Mr. Berry's stuff

24  off of our system, essentially gone back to the original

25  version."  Hogan immediately fired off a letter to federal

1    DCAA auditors, saying, "Fleming now is in violation of the

2    False Claims Act, and we want you to look into it."

3          That's what he does every time he gets data from

4    us.  We are extraordinarily uncomfortable with giving him

5    access to any of Fleming or C&S's data going forward

6    because it's the same story again and again and again.

7    It's not about the infringement.  It's about harming

8    Fleming and C&S continually.  That's our concern.

9          MR. SMITH:  But a neutral expert we'll provide

10   it all to -- a neutral expert who answers to the court,

11   we're happy to provide it all to.  And we're happy to

12   provide all of Guidance's -- all the images Guidance took

13   to the same expert.

14         MR. HOGAN:  Your Honor, Mr. Smith told me two

15   years ago that Fleming would rather go to cert denied on a

16   sanction before ever giving up its data.

17         MR. SMITH:  To the plaintiff.

18         MR. HOGAN:  Giving up its data.  Fleming doesn't

19   even exist anymore, Your Honor.  The data in the Guidance

20   images is a company that doesn't exist.  It doesn't do

21   business.  It is simply left as an SEC target is all

22   that's left of Fleming.

23         As to what's on C&S's machines, Your Honor, I

24   would agree C&S has a proprietary interest in going

25   forward with its business that could be handled through a

1    protective order, Your Honor.  I've never violated a

2    protective order to my knowledge, Your Honor.  If the

3    court limits to experts or counsel and not parties, so be

4    it, Your Honor.

5            But I would assert, Your Honor, that, if you

6    were to order -- if this court were to order them to turn

7    over the materials to us, they wouldn't do it.  They

8    would -- they'd rather be held in contempt.

9            THE COURT:  Who's "us"?

10           MR. HOGAN:  To me or -- to the plaintiff in this

11   case, Your Honor, through his counsel or through

12   experts.

13           MR. LIEBELER:  With due respect, Your Honor,

14   that is an unwarranted smear.  I really do take that

15   personally that -- that's false.

16           MR. HOGAN:  That is what Mr. Smith told me, Your

17   Honor.

18           THE COURT:  I don't --

19           MR. SMITH:  Certainly, that has been our

20   position prior to the bankruptcy:  that we would appeal

21   any order that required us to provide our confidential

22   data to Mr. Berry and Mr. Hogan.  That was correct at that

23   time.

24           THE COURT:  Yeah, so what's wrong with appealing

25   it all the way up to the U.S. Supreme Court?  I mean

1    that's your right:  you can go up to cert. denied.  That

2    doesn't mean he'd tell his clients to be held in contempt.

3    I mean --

4              MR. HOGAN:  Your Honor --

5              THE COURT:  But saying I'm going to take this

6    all the way up to the U.S. Supreme Court, I don't really

7    think that that's the same as saying, "And I will violate

8    a direct court order if the order isn't stayed."  I mean,

9    if he did that, you know, there'd be sanctions and he and

10   his client, if he were involved, would bear them, and so

11   be it.  But I don't know that that's what was intended by

12   a statement that my client will litigate this up to the

13   Supreme Court.

14             MR. HOGAN:  It was the sanction.

15             THE COURT:  That doesn't --

16             MR. HOGAN:  It was the appeal of the sanction,

17   Your Honor, that I was referring to.

18             THE COURT:  Right.  But litigating it all the

19   way up to the U.S. Supreme Court doesn't necessarily mean

20   a deliberate decision not to follow an order.

21             MR. HOGAN:  I leave that to the court, but the

22   way I interpreted someone saying, if the court sanctions

23   me for not obeying a court order and that I'm going to

24   appeal that order all the way up, is a fairly strong

25   statement.

1          THE COURT:  I don't know.  A sanction order is

2     appealable just like anything else.

3          MR. HOGAN:  Yes, Your Honor.

4          THE COURT:  But in any event, okay, I'll say

5     this.  I know that I'm coming into this as the newest

6     player, and lots of you folks have been dealing with each

7     other for a long time, and, obviously, the history has not

8     all been jolly.  So, you know, that happens, but it may be

9     that it would be a good idea to have a special master.

10          Is there -- putting aside everybody's outrage at

11     various statements that have been made about them, is

12     there, in fact, an objection to the appointment of NTI?

13          MR. HOGAN:  Yes, Your Honor, I do have an

14     objection to the appointment.

15          THE COURT:  Okay.  Then this is what I think

16     should happen -- well, first, I need to understand what it

17     is the parties at this point would like to do because we

18     have several possibilities.  One, we can just continue

19     with the merits of this hearing, and I can rule on this

20     motion, which is fine.  I mean it will make the immediate

21     issue in front of me go away, but I don't know that it's

22     going to advance resolution of this lawsuit one way or

23     another.

24          Another possibility is to continue the hearing

25     on this motion and to have the parties, if you cannot

1    agree on a particular master, which I think makes sense to

2    have but I have no position on which entity or person

3    should be the special master, but I will send you to Judge

4    Kobayashi, and you folks can make your arguments to Judge

5    Kobayashi about who should be appointed by the court.  The

6    horror of it is that then one of you may appeal her ruling

7    to me; so I'll have it anyway.  But that's okay.

8            But, if that occurred and a special master were

9    indeed appointed, a couple of things are possible.  One, I

10   just have a better record on which to decide this motion

11   because right now, as I say, I'm looking at differing

12   declarations, no live testimony, to decide, well, is there

13   or isn't there even something to enjoin much less what is

14   it?  But the other possibility that I think might occur is

15   that I'd never get to the motion because in the course of

16   having the special master opine on various factual

17   circumstances it might well be that the parties could

18   reach a settlement based on more information than either

19   side now has.  And I think that that is actually -- that

20   would be a good opportunity.  It might not work, but it

21   might enhance the opportunity that you would have to do

22   that.

23           So it's your motion, Mr. Hogan.  What would you

24   propose that I do?  As I say, I can go ahead and rule on

25   the motion.

1          MR. HOGAN:  Your Honor, all the things the court

2     said are all, I think, good ideas.  I'm not disputing.

3     But I think at some point, Your Honor, one of the things

4     Mr. Berry as an individual -- I know this is not

5     necessarily something the court has to consider, but it's

6     something I have to consider is that for him it is, I

7     think, better to have the court rule on the motion.  The

8     only caveat -- the only qualification, Your Honor, if the

9     court does not believe that this hearing has given the

10    court what the court had requested, which I believe --

11         THE COURT:  Well, I still need discussion on

12    these questions.  We kind of got sidetracked here with my

13    thought that does any of this make sense.  But in any

14    event, if you want to keep your motion on, we can keep the

15    motion on.  Although, that doesn't preclude the

16    appointment of a special master for other matters.

17         I'll tell you right now, though, my inclination

18    just so you know, if I'm ruling only on the papers, is to

19    deny this motion.

20         MR. HOGAN:  I understand that, Your Honor.

21         THE COURT:  Because here I have these, you know,

22    dueling statements, and then I look to the burden and who

23    has the burden.  So I mean I'll be happy to listen more to

24    everybody, but that's what I'm thinking.  So you'd end up

25    with the issue of so how do we proceed from now?

1            And I think that, if you folks can't agree on a

2    special master, then probably what should happen is one of

3    you should bring a motion for appointment of a special

4    master that would go to the magistrate judge and then you

5    folks could then fight about who that person should be or,

6    if somebody wanted to even oppose the appointment of a

7    special master, because, obviously, that would be a cost

8    that the magistrate judge would propose a division up.

9    You could do that in a motion to --

10            MR. HOGAN:  It's already been done, Your Honor,

11    and it was denied.  Am I correct?

12            THE COURT:  Not in this case.

13            MR. HOGAN:  Yes.  Yes.

14            MR. SMITH:  We made a motion for appointment of

15    a discovery master early on in the case.

16            THE COURT:  Discovery master is a little

17    different.  Yeah, that's right.  I saw that in the docket

18    sheet that a discovery master had been requested.

19            A discovery master is not what I understood was

20    being proposed.  The discovery master would talk about,

21    well, how many depositions can you have and you're being

22    an obstructionist here or, gee, hurry up and make that

23    person available, answer the interrogatories now, these

24    objections are well-taken or not.  But this person would

25    be a computer expert who would be in no position to make

1    rulings on what discovery went beyond the pale or didn't

2    sufficiently disclose but instead would be, as I

3    understood it, opining on what is the state of what's on

4    the computers, which a discovery master would be unlikely

5    to be able to report on.  So I think these are two

6    different issues.

7              MR. HOGAN:  Okay.

8              THE COURT:  So this issue of a computer special

9    master has not been presented; am I right?

10             MR. LIEBELER:  That's correct, Your Honor, and

11    you have quite properly summarized our notion of what a

12    special master is as opposed to a discovery master.

13             THE COURT:  A discovery master is likely to be a

14    lawyer, and, certainly, most lawyers will be better able

15    to look at this than I am, for example, but probably

16    nowhere near good enough to do what somebody like

17    Mr. Berry can do.

18             MR. HOGAN:  I agree.  And the idea of having

19    someone who goes out and is able to access the system

20    without having to give a heads up, go out and walk into

21    the facility and sit down and see what's running, that

22    we'd be happy to work torward.

23             THE COURT:  What does that mean without having

24    to give a heads up?

25             MR. HOGAN:  Your Honor, what we've had to endure

1    in this case is the fact that you cannot do a real

2    analysis of what's running on somebody's computer where

3    they get a heads up about when you're coming because, if

4    you told me I don't want you to have a copy of Word on

5    your computer, Mr. Hogan, I can guaranty you, Your Honor,

6    I can remove it before anyone comes in and looks at it.

7         THE COURT:  But isn't it the function of these

8    computer experts that they can tell what used to be on the

9    computer yesterday or this morning?  I mean I cannot.  If

10   you take off my word processing program, I'll just be

11   dead, but I won't be able to tell.  But I'm pretty sure

12   that, if I call even the court's automation staff, that

13   they could go into the history and tell me, "You used --

14   you know what, I pray that they can do that because, if it

15   crashes and my documents go off, then I call them up and

16   they come up and I'm just delighted if they can give me

17   what I had on the computer 10 minutes ago.  I mean this is

18   a miracle to me.  But it's not --

19        MR. LIEBELER:  The premise of Mr. Hogan's

20   observation is that we're all vicious criminals on this

21   side of the table, Your Honor, and we just don't agree

22   with that.  The premise is wrong and the fact of it is

23   wrong.  The computers are going to operate as they're

24   going to operate, and, if someone is going to go look at

25   them, we're going to continue to operate them in the

1    normal course until that persons gets there to look at

2    them and see how they've been operating.

3          THE COURT:  But it doesn't matter right now.  I

4    mean the procedures that the special master would follow

5    could be worked out, it seems to me.  But the existence of

6    a special computer master is not something you're

7    objecting to; right?

8          MR. HOGAN:  The concept is not objectionable,

9    Your Honor.  The question is one of -- I think what we do

10   with this hearing is probably the principal issue.

11         THE COURT:  So you want this motion to stay on,

12   and I'll go through and hear -- I mean I still have some

13   questions that, you know, I haven't had answered yet.  But

14   I would think that maybe the best way to do it is for

15   someone to bring a motion for appointment of a special

16   master, and in the motion you could propose -- I think it

17   would be helpful not to just put forth the theoretical

18   issue of appointment of special master, but to put it into

19   the context of who would pay and what would that person's

20   defined duties be and who do you propose be this person.

21   And then that could be respondsed to by anybody who was

22   opposing, and I think the magistrate judge then could make

23   an informed decision.

24         My own personal thought is that it would help me

25   to have that.  But, as I say, I am saying that in somewhat

1    of a vacuum because I don't know whether the help to me

2    would outweigh whatever detriment somebody might argue

3    would exist for a particular setup of special master.

4          MR. LIEBELER:  Your Honor, we actually have a

5    similar motion in process even as we speak, and we can

6    have that on file within a week, and we'll undertake to do

7    that.

8          MR. HOGAN:  Your Honor, what I would ask, when

9    the motion is presented, that perhaps a stipulated

10   protective order be an exhibit so that we can see -- so

11   we're not doing it in pieces.

12         THE COURT:  They're saying they don't need a

13   stipulated protective order because everything would go to

14   the special master and people wouldn't necessarily get to

15   see what was there.  Or, you know, it may be that for

16   starters it may be that you just want the attorneys to see

17   things.  I don't know.

18         MR. HOGAN:  Or the experts, Your Honor.  It can

19   be limited to whatever's appropriate.

20         THE COURT:  But, as I say, that's why I think it

21   would be helpful to complete a motion that would have to

22   lay out these various scenarios and -- because I think

23   that whatever I'm going to decide on the pending motion

24   for preliminary injunction is probably not going to make

25   the case go away, and so in anticipation of seeing all of

1    you again, you know, in the not too distant future it

2    would help me if this process were at least completed in

3    time so that, if I am to have the assistance of that

4    entity, I can have it before further motions.

5           Okay.  Hold on.  My law clerk is -- this is my

6    law clerk's last week, okay.  So when you say --

7           MR. LIEBELER:  We can get this on file by

8    Friday, if it please the law clerk, Your Honor.

9           THE COURT:  But that's okay because, normally,

10   if you come in on a Monday and have a hearing and I

11   complete the hearing on a Monday, my normal practice is to

12   do my darnedest to issue a written order by Friday.  So

13   that's okay.  He was going to be working on this anyway

14   under the normal course.  But his question is this:  Why

15   do you want me to go ahead and rule on this when the whole

16   factual basis may well be either more favorable for you or

17   different and less favorable for you after I get more

18   information, assuming that some form of special master

19   information becomes available to me.

20          I mean, as I say, I can do it.  This is his

21   normal job, and, you know, he's being paid for this last

22   week, and so what else better to do than to work on this.

23   But do you really want me to rule when it sounds like the

24   universe of information available to me will be different?

25   It may be better for you.  I mean it's without prejudice

1   to your bringing this again, but it's just more work for

2   you.

3            MR. HOGAN:  I guess part of it is, Your Honor,

4   one of the things that seems to come into these

5   hearings -- and I understand it's because there must be a

6   threat of some sort of harm -- is the fact that we need to

7   prove infringement going on in the future; that a simple

8   showing of infringement isn't enough to invoke an

9   injunction.  And I understand there's cases that go around

10  that, but I think, based on the record that we put out

11  there today, Your Honor, there's an admission that C&S has

12  used the software.  There's no evidence of any license by

13  C&S.  That was done in June.

14           MR. LIEBELER:  So we're clear the piece that

15  Mr. Hogan is referring to is a typo in my brief that

16  should refer to Fleming, as he well knows.

17           MR. HOGAN:  It's also in Miss Noa's declaration,

18  Your Honor.  It's in two places.

19           THE COURT:  Well, probably the same typo.

20           Okay.  But in any event you do want me to go --

21  because you have several options, one of which is just to

22  continue the hearing.

23           MR. HOGAN:  I think, Your Honor, to bring

24  Mr. Dillon in and to have -- what I think the court was

25  expecting is to have live testimony.

1          THE COURT:  It's okay with me if you want to

2     waive, but you could go ahead and require Mr. Dillon to

3     come in and testify live.  If you want that and you want

4     that information in front of me, then it seems I don't

5     have it; so then we would have to continue the hearing.

6     But what is it your position is?

7          MR. HOGAN:  I guess the question -- Your Honor's

8     calendar is so tight.

9          THE COURT:  No, no, you know, don't worry

10    about -- we can probably find a place for you.

11         MR. HOGAN:  The question would be whether would

12    it be sometime in the foreseeable future, would it be

13    months down -- we obviously want to stop the infringement.

14    It's our goal in this motion.  And we want to do it as

15    soon -- if the court's going to deny it, the court's going

16    to deny it.  But we believe that having Mr. Dillon here

17    would enhance the court's understanding of this case and

18    our position on infringement.

19         THE COURT:  Okay.  But wouldn't it still leave

20    me with these differing reports without a statement

21    about --

22         MR. LIEBELER:  Your Honor, I might be able to

23    cut through at least part of this.  I mean just so our

24    position is clear, if the special master comes back and

25    says, hey, there are three copies of the 1993 --

1          THE COURT:  You'll take them off.

2          MR. LIEBELER:  -- they're coming off and they're

3     coming off as fast as we can get them off consistent with

4     preserving them so that we're not accused of being

5     criminal spoliators again.

6          THE COURT:  You see, this is not a situation

7     where they're fighting that they actually own the

8     copyright or there are no copyrights and so we get to use

9     them and then I'd have to decide that because --

10          MR. LIEBELER:  Right.  The underlying dispute

11     that we really are wrestling with is whether or not the

12     spreadsheets that C&S is currently using are, in fact,

13     infringing Mr. Berry's copyrights.  That I think is not a

14     question that could possibly go plaintiff's way on the

15     record that has been developed thus far, and because of

16     that I would make an argument that there's not much point

17     to going forward with the motion at this point.

18          MR. HOGAN:  Well, I would disagree, Your Honor.

19     Mr. Dillon even gives the percentages of the amount that

20     he copied from Mr. Berry in his testimony.

21          MR. LIEBELER:  That's just a misstatement of

22     Mr. Dillon's testimony.  We don't need to argue about

23     that.

24          MR. HOGAN:  The idea -- I guess what I want to

25     understand is is it then the belief that the special

1  master will not take a look at the spreadsheets that are

2  running?

3          THE COURT:  The special master can take a look

4  at whatever it is --

5          MR. LIEBELER:  Right.

6          THE COURT:  -- that the parties agree to.  And

7  that would be great if that whole issue could be resolved.

8  So you may have fights about who other than the special

9  master and the court gets to look at things, but I see no

10  reason that the special master would be restricted in any

11  way.  I mean the whole purpose --

12          MR. LIEBELER:  I haven't taken that position.

13  Of course, the special master can look at anything on the

14  system that the special master likes.  I don't know what

15  planet that idea is coming from.

16          MR. HOGAN:  I just want it to be clear.

17          Your Honor, I guess it comes back to whether or

18  not we need to have Mr. Dillon here to give the court the

19  record the court thinks is necessary.  We believe we made

20  a showing that there was copies of Mr. Berry's system

21  copied and delivered to C&S.  We believe that's in the

22  record.  We don't, I believe, need to show much more to

23  find that that was infringement, Your Honor.  C&S doesn't

24  have a license to use it.

25          The other issues, Your Honor, is, one, whether

1    or not Mr. Berry has met his burden, and, you know,

2    frankly, we believe he has.  We can go forward with the

3    hearing, Your Honor, or continue it to have live

4    testimony.  But it would be our --

5            THE COURT:  I am not requiring live testimony;

6    so, if you phrase it as I need more to rule, then I'll

7    just -- if you want the motion to be ruled on, I'll go

8    ahead and rule on the present record.

9            If, however, your position is that you are

10   invoking your right to conduct live cross of Mr. Dillon,

11   then I'll continue the hearing so that Mr. Dillon can be

12   brought here so that you may conduct live cross.  I

13   understand that the agreement was that he wouldn't be,

14   but, if, in fact, your position now, having seen questions

15   from me and so forth, is that you are invoking your right

16   to conduct live cross of Mr. Dillon, then I will

17   reschedule this for a supplemental hearing in which you

18   may, in fact, exercise your right to do that.

19           MR. HOGAN:  Yes, Your Honor, I think that's the

20   way to go.

21           MR. LIEBELER:  Procedurally, then, Your Honor, I

22   think it would be appropriate for to us file a declaration

23   from Mr. Dillon as a direct as a predicate to the

24   cross-examination that would take place live, and we will

25   do that.

1          THE COURT:  Okay.  Then --

2          MR. LIEBELER:  If that happens, I would submit

3    that we're probably going to want to cross Mr. Berry as

4    well.  So what's sauce for the goose is sauce for the

5    gander, Your Honor.

6          THE COURT:  Don't you folks just want to move

7    this over until after you talk to -- well, this is what

8    I'm going to do.  I'm going to schedule a continued

9    hearing, but then you folks go ahead and bring your motion

10   for appointment of special master.  And it may be that

11   I'll have a telephone conference with all counsel after

12   that occurs, and I may reschedule this motion for some

13   time that may make more sense if you are going to have a

14   special master.  But right now I just cannot stand if the

15   motion is there without some prompt; so I'm going to give

16   you another date.  Okay?

17         So I think that, if you're going to get

18   declarations in, can you get them in in two weeks, your

19   declarations?

20         MR. LIEBELER:  Yes, Your Honor.

21         THE COURT:  So you should get that in by

22   September 13.  And then let me ask my courtroom manager --

23   I'll go off the record for a moment.

24         Wait.  We can go off the record, but were you

25   going to fly back in?

1          (Discussion off the record.)

2          THE COURT:  The hearing on this motion for

3     preliminary injunction is being continued to Tuesday,

4     September 28, at nine o'clock.  My present law clerk is

5     delighted, but my new law clerk is really going to be bent

6     out of shape at having to pick up on this thing that was

7     partly worked on.  We have a prior federal court law clerk

8     here among counsel.  I'm sure she has a very good

9     understanding of how irritating that is for the incoming

10    law clerk to have to pick up on this.  But in any event

11    I'm sure that he'll be able to manage.

12          In the meantime, if a motion for appointment of

13    a special master with respect to computer software is

14    going to be filed, I ask that it be filed as quickly as

15    possible so that Magistrate Judge Kobayashi can consider

16    that, and, if it is granted, then -- well, whoever's the

17    moving party on that, if you could write me a letter

18    telling me what the status is of getting the special

19    master here or up and running or whatever it is that has

20    to be done, if you could write me a letter by let's say

21    the 20th of September, if you can even get a hearing

22    before then, then that would help me to figure out whether

23    that hearing date of the 28th is a good date.

24          Hold on.  Let me go off the record a minute.

25          (Discussion off the record.)

```
 1              THE COURT:  The sooner you file, the better.

 2    The magistrate judge is going to be very busy in

 3    September, but she does take some civil things in the

 4    afternoons.

 5              MR. LIEBELER:  There actually is some

 6    possibility of working this out as between counsel.  I

 7    wouldn't put it at 90 percent, but I'd say it's north of

 8    10 percent.

 9              THE COURT:  It sounds to me like a case that

10    should be resolved.  It really does.  And, if you're going

11    to do it, you could do yourselves all a favor by wrapping

12    in the other case into some global resolution one way or

13    another.

14              MR. LIEBELER:  Your Honor, I don't want to

15    characterize settlement negotiations, except to say that

16    there are several analytical sticking points that we are

17    just at loggerheads over, and I don't see a resolution of

18    those.  Both parties have tried.  I think both parties

19    have tried in good faith.

20              MR. HOGAN:  Your Honor, just a question.

21    They're going to submit an affidavit or declaration.

22              THE COURT:  By the 13th.

23              MR. HOGAN:  By the 13th.  Would we be able to

24    submit anything, Your Honor?

25              THE COURT:  No, no.  The way this would work
```

1    is -- I mean, as I understand it, there was an agreement

2    among counsel as to how to proceed on the evidentiary

3    portion of this motion; so they didn't do that.  But now

4    that they're going to do it I'm going to treat it as if it

5    had been attached to their memorandum in opposition.

6           Now, it's true that you could have attached a

7    supplemental declaration of Mr. Berry in response, and you

8    can do that.

9           MR. HOGAN:  That's what I was requesting, Your

10   Honor.

11          THE COURT:  I'll give you a deadline for it,

12   then.

13          MR. HOGAN:  Thank you, Your Honor.

14          THE COURT:  I think I gave you September 13.

15   I'll give you September 20, Mr. Hogan, if you're going to

16   do that.

17          MR. HOGAN:  Thank you.

18          THE COURT:  And then I think everybody should

19   assume that whoever files a declaration in this latest

20   round had better show up live.  Is that right?

21          MR. LIEBELER:  Yes.  That's our understanding as

22   well.  So we're clear Dillon's declaration is going to go

23   to the points that you've raised in the inclination as a

24   matter of evidence because some of what we've argued today

25   we just don't have an evidentiary record for.

1              THE COURT:  Okay.  And then some of these other

2      things, I don't think I gave defense counsel a chance to

3      help me out on some of these other things.  If you can do

4      it in about five minutes, maybe the court reporter can

5      bear with us.  Otherwise, we're going to have to take a

6      break.

7              MR. LIEBELER:  We can do it.  Although, if the

8      hearing's going to be continued until --

9              THE COURT:  I see.  These things are going to

10     all be addressed --

11             MR. LIEBELER:  Right.  And we actually can

12     address them on the basis of evidence that we're going to

13     submit; so it would probably make sense to put that off

14     until the 28th rather than do it now, Your Honor.

15             THE COURT:  Okay.  Okay.  Great.

16             MR. HOGAN:  Your Honor, just one qualifying

17     point.  I presume that the declaration that I can submit

18     is Mr. Berry's declaration but not a declaration of

19     another witness.

20             THE COURT:  I see.  You might have -- you could

21     have a declaration of another witness who wants to rebut

22     Mr. Dillon's, yeah.  But whoever you do submit in

23     rebuttal --

24             MR. LIEBELER:  It's his burden.  I mean in

25     realistic terms I think we ought to have the opportunity

1    to respond to whatever evidence he has.  We should sort of

2    get the last say on an evidentiary front.

3              THE COURT:  Well, who would it be -- would it be

4    Mr. Dillon who would respond because he'll be here then;

5    right?

6              MR. LIEBELER:  Yeah, Dillon -- fair enough.

7              THE COURT:  He'd be here.  So the way this works

8    is normally you give me a written declaration and then, if

9    the other side wants to cross, then Mr. Dillon would get

10   to present live cross and then you could do --

11             MR. LIEBELER:  Live redirect, essentially.

12             THE COURT:  -- a live redirect.  Now, I would

13   make Mr. Berry go first because he's the plaintiff.  And,

14   if the things he's saying really goes to the basis of his

15   motion, then I mean I'd let you cross him on his original

16   declarations plus whatever he has, and we can go back and

17   forth with some additional live testimony if it becomes

18   appropriate as the hearing goes on.

19             MR. LIEBELER:  That's fine.  Mr. Hosoda tells

20   me, Your Honor, that there's some period of time in which

21   Mr. Dillon will not be in the state.  I don't know when

22   that is, and he's going to try and make a phone call to

23   determine that.

24             THE COURT:  You want to try now?

25             MR. HOSODA:  May I have that opportunity.

```
 1              THE COURT:  We'll go off the record.  Go ahead.

 2         (Discussion off the record.)

 3              THE COURT:  So we're on the record confirming

 4    with the witnesses, too, that we're on for September 28,

 5    unless some counsel upon going back to your offices and

 6    looking at your palm pilots and other things that you

 7    don't have on you finds that there is a problem, in which

 8    case call Miss Fujinaga right away and I'll have a

 9    telephone conference and we'll get another date.  Okay?

10              I thank everybody for their cooperation with me

11    anyway in this hearing on setting this up, and I -- as I

12    say, you know, you're very popular, all of you, right now

13    with my law clerk but not with the new law clerk that

14    you're going to be facing the next time I see you.  So

15    thank you.

16              MR. LIEBELER:  Thank you, Your Honor.

17              MR. HOGAN:  Thank you, Your Honor.

18         (Court recessed at 10:53 A.M.)

19

20

21

22

23

24

25
```

```
 1              COURT REPORTER'S CERTIFICATE
 2          I, Debra Kekuna Chun, Official Court Reporter,
 3  United States District Court, District of Hawaii, do
 4  hereby certify that the foregoing is a correct transcript
 5  from the record of proceedings in the above-entitled
 6  matter.
 7          DATED at Honolulu, Hawaii, August 31, 2004.
 8
 9                              _____
10                              DEBRA KEKUNA CHUN
11                              RPR, CRR
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```