# Exhibit D

**UNITED STATES OF AMERICA**
Before the
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
Release No. 8482 / September 14, 2004

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 50365 / September 14, 2004

**ACCOUNTING AND AUDITING ENFORCEMENT**
Release No. 2097 / September 14, 2004

**ADMINISTRATIVE PROCEEDING**
File No. 3-11653

| | |
|---|---|
| In the Matter of : : Fleming Companies, Inc. : : Respondent. : : | ORDER INSTITUTING PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS AND IMPOSING A CEASE-AND-DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate to institute cease-and-desist proceedings pursuant to Section 8A of the Securities Act of 1933 (the "Securities Act") and Section 21C of the Securities Exchange Act of 1934 (the "Exchange Act") against Fleming Companies, Inc. ("Fleming" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement ("Offer") that the Commission has determined to accept. Solely for the purpose of these proceedings or any other proceeding brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings contained herein, except that Respondent admits the Commission's jurisdiction over it and over the subject matter of these proceedings, Respondent consents to the entry of this Order Instituting Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings and Imposing a Cease-and-Desist Order.

### III.

On the basis of this Order and Respondent's Offer, the Commission finds that:[1]

**A.    Respondent**

Fleming is an Oklahoma corporation headquartered in Lewisville, Texas, which currently is in Chapter 11 bankruptcy.  Before its April 2003 bankruptcy filing, Fleming's stock traded on the New York Stock Exchange.  At one time, Fleming was the nation's largest supplier of consumer packaged goods to retailers, including supermarkets, convenience stores and supercenters, with approximately 50 major distribution centers ("DCs") across the country, and a sizable retail grocery operator as well, with more than 100 stores throughout the Midwest and West.  Fleming's 2001 and 2002 reported revenues were approximately $15.6 billion and $15.5 billion, respectively.[2]  But its earnings were relatively much smaller, with only a $23.3 million profit and an $84 million loss, respectively, in those years.  Fleming recently announced its intent to emerge from bankruptcy reorganized around its subsidiary Coremark International, Inc., a convenience store distributor it acquired in June 2002.

**B.    Background**

In late 2001 and the first half of 2002, Fleming improperly recorded numerous transactions to address anticipated earnings shortfalls stemming from a variety of business and financial challenges.  Chief among these challenges was its February 2001 agreement to be Kmart Corporation's sole supplier.  Fleming initially announced this arrangement as a major victory and substantially expanded its facilities (and debt load) to handle the new business.  Fleming hoped that this agreement and concomitant expansion would provide economies of scale and greater purchasing power, which would result in greater returns for its overall wholesale business.  The Kmart arrangement, however, failed to yield the efficiencies Fleming had expected, and, when Kmart filed bankruptcy in January 2002, Fleming's future viability came under scrutiny.

Simultaneously, Fleming's primary wholesale customer base, the small to medium-sized independent grocer, faced adversity on a number of fronts, including a depressed national economy and heightened competition from low-cost supercenter chains encroaching into the rural and suburban areas the independents had long dominated.  As these and other pressures drove these grocers out of business or into mergers with larger, self-supplying grocery chains, Fleming found it harder to generate its historical returns from this business.

---

[1] The findings herein are made pursuant to Respondent's Offer and are not binding on any other person or entity in these or any other proceedings.

[2] The 2001 reported revenues were for Fleming's wholesale and retail operations.  The 2002 reported revenues were for Fleming's continuing wholesale operations only, in accordance with Statement of Financial Accounting Standards No. 144, Accounting for the Impairment or Disposal of Long-Lived Assets.  The Fleming financial information specified in this document does not incorporate the proposed restatements and revisions publicly announced by Fleming in its April and June 2003 press releases.

Fleming experienced other earnings pressures as well. In early 2000, Fleming began centralizing many of its business functions, including its procurement department. Traditionally, Fleming's DCs handled most of their own procurement, which provided a substantial part of each DCs' internal margin. By centralizing this function and purchasing on a national rather than local or regional scale, Fleming hoped to obtain better prices from vendors and thereby improve its overall margins. These anticipated benefits did not materialize, and, instead, Fleming was increasingly at odds with the vendor community.

Fleming's retail operations, known internally as Fleming Retail Group or "FRG," also pressured Fleming's bottom line. Securities analysts referred to FRG as a "growth vehicle" for the future, based largely on the strong same store sales figures Fleming reported during 2001. As discussed below, however, these same store sales figures were misleading, as FRG's real same store sales performance began to decline in the third quarter of 2001.

**C.   Fleming implements "initiatives" improperly to address anticipated earnings shortfalls**

**1.   Fourth Quarter 2001**

When earnings pressures increased in the fourth quarter of 2001, Fleming implemented a series of transactions and programs, described internally as "initiatives," designed to increase earnings to help "fill the gap" between actual and projected results. These initiatives ordinarily were itemized on initiative lists circulated among senior Fleming management and sometimes within Fleming's procurement department. Although the initiatives, in and of themselves, were not improper, Fleming executed some of the initiatives improperly to boost Fleming's bottom line.

One way Fleming improperly executed initiatives was to obtain misleading side letters from certain vendors to justify accelerating earnings. Grocery industry vendors routinely pay wholesalers and retailers up-front monies to secure such advantages as favorable product positioning or exclusive supplier status. To the extent these are future advantages, generally accepted accounting principles ("GAAP") required the wholesaler or retailer to recognize the payments over time either as revenue or as cost-of-goods-sold offsets, rather than up-front.[3]

Four vendors[4] were asked to provide side letters in December 2001 that were used to accelerate Fleming's earnings under contemporaneous forward-looking agreements with those

---

[3] *See* Statement of Financial Accounting Concepts No. 5, ¶¶83-84; Staff Accounting Bulletin No. 101, *Revenue Recognition in Financial Statements,* Question 5. Under Emerging Issues Task Force Abstract ("EITF") 02-16, *Accounting by a Customer (Including a Reseller) for Certain Consideration Received from a Vendor*, Fleming is now required to recognize these up-front payments as offsets to cost of goods sold ratably over the term of the concomitant forward-looking agreements. However, this EITF was not effective when Fleming entered into these transactions.

[4] Certain vendors and vendor personnel have settled Commission charges arising from these and later vendor transactions. *See* In re Kemps LLC f/k/a Marigold Foods, LLC, James Green and Christopher Thorpe, Exch. Act

3

same vendors, in violation of GAAP. Each of these letters characterized up-front payments as rebates or other compensation for alleged past performance. The payments, however, actually induced some future performance by Fleming or secured some future right for the vendor.

      **a.**      **Kemps LLC, f/k/a Marigold Foods, LLC ("Marigold")**

Marigold, a privately held dairy supplier, provided Fleming with such a side letter in connection with an agreement to supply ice cream to Fleming's wholesale business for three years beginning March 2002 (the "Marigold Supply Agreement"). Fleming was willing to grant this agreement to Marigold only in return for an up-front payment of $2 million. Though extremely reluctant to make this payment, Marigold eventually viewed it as the "ante" to retaining and expanding the Fleming business.

At the 11th hour of negotiations, Fleming demanded a side letter – the terms of which Fleming dictated – describing the payment as a "non-refundable" "rebate" for "2001 purchases." Fleming knew the rebate had not been earned and that the $2 million was specifically linked to the Marigold Supply Agreement. Marigold ultimately agreed to this arrangement but required a penalty provision in the Marigold Supply Agreement obligating Fleming to repay the $2 million on a pro rata basis if Fleming failed to buy a certain volume of Marigold product during the agreement's term.

Using the side letter as justification, Fleming recorded the entire $2 million as an offset to expenses, which increased earnings in the fourth quarter of 2001 in violation of GAAP.

      **b.**      **Digital Exchange Systems, Inc. ("Dexsi")**

Dexsi is a privately held diverting services supplier.[5] In late 2001, Fleming hired Dexsi to handle part of its diverting business. Fleming was by far Dexsi's biggest customer. Accordingly, Dexsi expended significant capital ramping up to handle the Fleming business, such as by purchasing equipment and hiring employees to work on-site at Fleming's headquarters.

Fleming demanded that Dexsi pay $2 million and provide a side letter attributing the payment to past performance. Simultaneously, Fleming agreed to allow Dexsi to recoup the $2 million by charging Fleming a higher-than-normal price on diverting purchases.[6] In short, the $2

---

Rel. No. 34-50369; In re Digital Exchange Systems, Inc., Rosario Coniglio and Steven Schmidt, Exch. Act Rel. No. 34-50366; In re Bruce Keith Jensen, Exch. Act Rel. No. 34-50370; In re John K. Adams, Exch. Act Rel. No. 34-50367; and In re Dean Foods Company and John D. Robinson, Exch. Act Rel. No. 34-50368.

[5] "Diverting" occurs when a wholesaler overbuys from a vendor at a special discount, and then sells the excess product to buyers at a higher price.

[6] To illustrate, if Fleming wanted to purchase a product with a list cost of $1 per unit, Dexsi normally would sell that product to Fleming for, hypothetically, $.90. Under their agreement, however, Fleming allowed Dexsi to charge $1 for that product, with the additional $.10 per unit credited against the $2 million. This mechanism remained in place until Dexsi recovered the entire $2 million.

million was an advance on future diverting savings Fleming otherwise would not have received until later, when it actually purchased goods through Dexsi. Fleming insinuated that it would terminate the relationship if Dexsi refused. Dexsi agreed to Fleming's demand and the parties kept a running tab of Dexsi's recovery of the $2 million, which Dexsi did not fully recoup until the first quarter of 2002.

Although Fleming had not earned the entire payment during the fourth quarter of 2001, Fleming nonetheless recorded the entire $2 million as an offset to expenses, which increased its earnings in violation of GAAP.

        c.      **Frito-Lay, Inc.**

Frito-Lay, a subsidiary of PepsiCo Inc., is a leading snack manufacturer. In December 2001, Fleming and Frito-Lay negotiated an agreement that would pay Fleming for achieving certain sales targets during 2002. The agreement included a $400,000 incentive for Fleming to set up certain new product store displays by February 2002. Wanting to recognize the $400,000 immediately, Fleming asked its Frito-Lay contact to execute a side letter characterizing the $400,000 payment as "non-refundable" compensation. The Frito-Lay employee provided the requested letter.

Fleming knew it had not earned the $400,000 during 2001 but nevertheless recorded the full amount as an offset to expenses, which improperly increased its earnings in the fourth quarter of 2001 in violation of GAAP.

        d.      **Kraft Foods Inc.**

Kraft is the largest U.S. branded foods and drink manufacturer. During 2001, Fleming and Kraft executed two agreements pertinent to this matter. First, in April 2001, the parties entered into a no-divert agreement, under which Kraft was to pay $7.5 million for Fleming's promise to waive certain promotional fees and to refrain from diverting Kraft products. Then, in June 2001, the parties agreed to a one-year preferred vendor agreement (the "Kraft PVA"), under which Kraft was to pay $10.7 million in exchange for Fleming's commitment to eliminate several prior practices and fees and to cooperate in the resolution of certain disputed deductions made by Fleming. Although these disputed deductions generally declined following this agreement, they nonetheless continued and, by early 2002, had amounted to at least $4 million.

In December 2001, Fleming approached Kraft about accelerating $1.65 million payable under the no-divert agreement. These funds were subject to certain criteria, such as that they would "pass through" to Fleming's retail customers to help promote Kraft products. At Fleming's request, the Kraft employee responsible for the Fleming account signed a letter representing that the $1.65 million was an "offset to administrative costs" under the no-divert agreement. However, as Fleming knew, there were no administrative costs to offset. Instead, Fleming requested the letter solely to justify recording the $1.65 million as an offset to expenses, which improperly increased its earnings in the fourth quarter in violation of GAAP.

5

### e. Reduction of reserve balances

Fleming also released portions of previously established bad debt and other reserve balances while closing its fourth quarter 2001 books. These reserve reductions totaled approximately $12.7 million, the vast majority of which pertained to bad debts owed by Fleming's wholesale division customers. Of these reductions, $7.8 million was to increase earnings, not because of new information, greater experience or change in circumstance that would justify a lesser reserve balance. *See* Accounting Principles Board Opinion No. 20, *Accounting Changes* ("APB 20"). Fleming never disclosed to investors that it was reducing these reserves. *See* APB 20, ¶ 33 (recommending disclosure if a change in estimate is material).

Fleming also released portions of previously established reserves relating to its exposure to vendors for disputed deductions. Historically, Fleming had relied on vendor deductions to contribute to profit margins. In some cases, after negotiating with a particular vendor, Fleming paid back some or all of the deductions attributable to that vendor. Thus, some level of vendor paybacks was probable and, based on Fleming's experience, reasonably estimable. Fleming therefore was obligated to reserve for these paybacks. *See* Statement of Financial Accounting Standards ("SFAS") No. 5, *Accounting for Contingencies*.

By November 2001, Fleming's disputed deduction balance had grown beyond $60 million and Fleming procurement personnel recognized that as much as $20 million of this amount likely would have to be repaid. Fleming's reserve for these paybacks, however, was only $8.8 million, which was insufficient. Yet, rather than increase the reserve to meet its anticipated payback obligations, Fleming reduced the rate at which it reserved against such anticipated paybacks.

### f. Fleming's misstated annual and quarterly financial results

Together, these improperly recorded transactions totaled $25.05 million. Fleming reported fourth quarter 2001 pre-tax earnings of approximately $26.9 million, and net earnings of $5.7 million. Had Fleming properly accounted for these transactions, it would have reported materially reduced earnings for the fourth quarter of 2001.

Fleming's 2001 annual results likewise would have been materially different. Fleming reported pre-tax annual earnings of $62.8 million and net earnings of $23.3 million. Had Fleming properly accounted for these transactions, its annual pre-tax earnings would have declined almost 40%.

### 2. First Quarter 2002

Fleming's earnings pressures did not relent in 2002. To the contrary, Kmart's January 2002 bankruptcy increased the pressure on Fleming to perform well, as analysts and investors scrutinized how the company responded to the Kmart situation. As it approached the end of the first quarter 2002, however, Fleming again was falling short of analysts' expected earnings and therefore improperly recorded several transactions to address the anticipated earnings shortfall.

### a.     Dean Foods Company

Dean is a dairy products manufacturer. Beginning in early 2002, Fleming and Dean began negotiating a supply agreement under which Dean would provide Fleming's retail operations with dairy products for three years. Throughout the negotiations, Fleming made clear that, to receive the supply agreement, Dean would make an up-front payment, which the parties ultimately agreed would be $2.5 million.

At the end of negotiations, however, Fleming demanded that Dean provide a side letter, dictated by Fleming, describing the payment as a rebate for past performance. Fleming knew the letter mischaracterized the payment's true purpose, but needed to recognize the payment immediately. Dean acquiesced to Fleming's demand, but did seek to protect its investment by requiring a penalty provision in the supply agreement that obligated Fleming to repay the $2.5 million if it breached.

Although Fleming had not earned the entire payment during the first quarter of 2002, Fleming used the side letter to justify recognizing the entire $2.5 million as an offset to expenses, which increased earnings in violation of GAAP.

### b.     Dexsi

In April 2002, Fleming again turned to Dexsi, demanding that it pay $4 million and provide a side letter describing the payment as reimbursement of "warehouse expenses" that Fleming purportedly had incurred on Dexsi's behalf during the quarter. Fleming knew this description was inaccurate. In return, Fleming allowed Dexsi to charge higher diverting prices to recoup its payment.

Fearing that it would be expelled from Fleming, Dexsi made the payment and signed the letter. Fleming improperly used this letter to justify recording the full $4 million as an offset to expenses, which improperly increased its earnings for the first quarter.

### c.     Kraft

In April 2002, Kraft and Fleming negotiated a $5.6 million extension of the no-divert agreement to year-end 2002. At Fleming's request, the Kraft employee responsible for the Fleming account signed a side letter describing the $5.6 million as payment of a "shortfall" under the Kraft PVA. Fleming knew that no such shortfall existed and that the $5.6 million was intended to extend the no-divert agreement. Although Fleming had not earned the entire amount, Fleming relied on the letter to justify improperly recording the entire payment as an offset to expenses, which increased earnings in the first quarter in violation of GAAP.

### d.     **Excessive inventory purchases**

In the first quarter of 2002, Fleming senior management concluded that Fleming was carrying too much inventory and directed that inventory levels be reduced as quickly and

7

efficiently as possible. Despite this directive, however, Fleming executed a series of large forward buys[7] of inventory during the quarter's final weeks to generate discounts or rebates that it could record immediately.[8] These purchases added more than $50 million of merchandise to Fleming's inventory balance, and generated rebates or discounts of $5.6 million. Although Fleming had not earned all of the rebates or discounts during the quarter, Fleming nonetheless recorded the entire $5.6 million as an offset to expenses in the first quarter of 2002. Fleming never disclosed to investors that it was generating earnings in the quarter through these large inventory purchases.

### e.     Fleming's first quarter financial results were misstated

Together, these improperly recorded transactions totaled $17.7 million and materially overstated Fleming's reported pre-tax and net earnings for the quarter, which were $41.2 million and $24.6 million, respectively.

### 3.     Second Quarter 2002

To meet earnings targets for the second quarter 2002, Fleming made additional forward buys of inventory (some of which was perishable and close to expiration), filling its warehouses with excessive inventory. These purchases approximated $110 million and generated approximately $8.1 million of rebates or discounts. Although Fleming had not earned all of the rebates or discounts during the quarter, Fleming nonetheless recorded the entire $8.1 million as an offset to expenses in the second quarter of 2002. Fleming also recognized $2.1 million in revenues from an intracompany transfer of aged inventory, and established a $900,000 reserve against it for a net increase in earnings of $1.2 million for the second quarter of 2002. These transactions, which totaled $9.3 million, overstated Fleming's reported second quarter 2002 pre-tax and net earnings (before extraordinary charge) of $15.4 million and $10.1 million, respectively.

## D.     Fleming also manipulated retail division same store sales

During 2001 and the first quarter of 2002, Fleming presented FRG as a growth vehicle for the future. Grocery industry analysts took up this theme, focusing in part on FRG's positive same store sales growth during this period, which is a key industry performance metric. Fleming reported same store sales in periodic filings with the Commission and in public earnings releases.

---

[7] A "forward" buy is an inventory purchase that exceeds the usual quantity the purchaser normally would make, generally to take advantage of special pricing offered by vendors. For example, if Fleming normally purchased a six-week supply of a given product, it would "forward" buy, hypothetically, a ten-week supply at the special pricing. Fleming also used the term "block" buy to describe these types of transactions.

[8] This approach was arguably permissible at the time, but is not permitted currently under EITF 02-16, which dictates that such discounts or rebates be recognized as the inventory is sold to customers, not at the time of purchase. This EITF was not effective when Fleming entered into these transactions.

8

Although there is no fixed industry standard, many retailers calculate same store sales by comparing a store's current period sales against its sales for the corresponding period in the prior year. Fleming followed this methodology through the end of 2000. From the first quarter of 2001 through the first quarter of 2002, however, Fleming began changing the methodology (sometimes quarter to quarter) to allow FRG to report positive same store sales growth. At different times, Fleming included in its calculations stores open less than a full reporting period; stores under remodel; stores operated by different owners; and sometimes compared different stores if they were located in close proximity to one another. Fleming never disclosed these periodic changes to its same store sales methodology. Instead, Fleming continued to compare the positive figures reported in 2001 with less favorable prior period figures calculated under different methodology.

Fleming also included in its calculations several financing transactions that should not have been treated as sales. In several transactions from April 2001 through April 2002, Fleming provided short-term financing to fund inventory acquisitions by an opportunity goods vendor.[9] Fleming executed documentation reflecting its "purchase" of the inventory from the vendor at one price and a simultaneous sale of the goods to the vendor's related company at a slightly higher price.[10] In these transactions, Fleming wired the "purchase" price to the vendor in return for a promissory note from the related company (sometimes guaranteed by the vendor) reflecting the "sale" price. The same person signed all documents on behalf of the vendor and the related company. Fleming had no role in locating either the goods or the vendor's customer.

Fleming used these transactions to improve its same store sales picture. For example, Fleming reported same store sales growth of 0.7% for the fourth quarter of 2001. Fleming was able to achieve this growth, however, only by recording "sales" of more than $17 million from two of the sales transactions. But for these transactions, Fleming would have reported same store sales *decline* of 3.0%.

Under GAAP, Fleming should not have recorded these transactions as sales. Instead, it should only have recorded as interest income or other revenue the net difference between the promissory note and the amount Fleming had wired the vendor. *See* EITF 99-19, *Reporting Revenue Gross as a Principal versus Net as an Agent*. Had Fleming excluded these transactions from its calculations, same store sales would have been materially worse throughout 2001 and the first quarter of 2002.

In the second quarter of 2002, Fleming returned to its original same store sales methodology and same store sales dropped steeply from the prior quarter.

---

[9] This vendor typically bought liquidation merchandise at deep discounts, which it then sold to its stable of customers.

[10] The documentation for some of these transactions was poor; for example, some of the transaction documents reflected that Fleming bought from and sold to the exact same entity at the exact same time. Fleming still recorded these transactions as sales.

9

### E. Fleming includes these misstatements in Commission filings and public earnings releases

Fleming included the misstatements and omissions described above in its periodic filings on Forms 10-K and 10-Q. These filings were incorporated into multiple registration statements on Forms S-3, S-8 and S-4 Fleming filed with the Commission during 2002. Fleming also included these misstatements and omissions in public earnings releases covering the relevant periods.

### F. Cooperation

In determining to accept the Offer, the Commission considered remedial acts promptly undertaken by Fleming and cooperation afforded the Commission staff.

### G. Conclusion

As a result of the foregoing, the Commission finds that Fleming violated Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2) and 13(b)(5) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-13 and 13b2-1 thereunder.

### IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in the Offer.

Accordingly, IT IS HEREBY ORDERED, pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, that Respondent Fleming cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2) and 13(b)(5) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-13 and 13b2-1 thereunder.

By the Commission.

Jonathan G. Katz
Secretary