# Exhibit E

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 8484 / September 14, 2004

SECURITIES EXCHANGE ACT OF 1934
Release No. 50367 / September 14, 2004

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 2098 / September 14, 2004

ADMINISTRATIVE PROCEEDING
File No. 3-11655

| | |
|---|---|
| In the Matter of<br><br>John K. Adams,<br><br>Respondent. | ORDER INSTITUTING PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS AND IMPOSING A CEASE-AND-DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate to institute cease-and-desist proceedings pursuant to Section 8A of the Securities Act of 1933 (the "Securities Act") and Section 21C of the Securities Exchange Act of 1934 (the "Exchange Act") against John K. Adams ("Adams" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement ("Offer") that the Commission has determined to accept.[1]  Solely for the purpose of these proceedings or any other proceeding brought by or on behalf of the Commission, or to

---

[1] Simultaneously with this proceeding, the Commission has filed the following settled actions: In re Fleming Companies, Inc., Exch. Act Rel. No. 34-50365; In re Dean Foods Company and John D. Robinson, Exch. Act Rel. No. 34-50368; In re Kemps LLC f/k/a Marigold Foods, LLC, James Green and Christopher Thorpe, Exch. Act Rel. No. 34-50369; In re Digital Exchange Systems, Inc., Rosario Coniglio and Steven Schmidt, Exch. Act Rel. No. 34-50366; and In re Bruce Keith Jensen, Exch. Act Rel. No. 34-50370.

which the Commission is a party, and without admitting or denying the findings contained herein, except that Respondent admits the Commission's jurisdiction over him and over the subject matter of these proceedings, Respondent consents to the entry of this Order Instituting Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings and Imposing a Cease-and-Desist Order.

### III.

On the basis of this Order and Respondent's Offer, the Commission finds that:[2]

A.   **Respondent and Fleming Companies, Inc. ("Fleming")**

   1.   **Respondent**

John K. Adams of Dallas, Texas, was a Region Manager at Kraft Foods, Inc. ("Kraft") during the relevant periods. During this time, Fleming was among Kraft's top ten customers and Adams was principally responsible for the Fleming account.

   2.   **Fleming**

Fleming is an Oklahoma corporation headquartered in Lewisville, Texas that currently is in Chapter 11 bankruptcy. Before its April 2003 bankruptcy filing, Fleming's stock traded on the New York Stock Exchange. At one time, Fleming was the nation's largest grocery wholesaler, with about 50 major distribution centers across the country, and a sizable retail grocery operator as well, with more than 100 stores throughout the Midwest and West. Fleming's 2001 and 2002 reported revenues were approximately $15.6 billion and $15.5 billion, respectively. But its earnings relatively were much smaller, with only a $23.3 million profit and an $84 million loss, respectively, in those years.

B.   **Facts**

   1.   **Fleming used fraudulent "initiatives" to meet earnings expectations.**

During 2001 and the first half of 2002, Fleming improperly executed a series of transactions, called "initiatives," to fabricate earnings to "bridge the gap" between actual operating results and Wall Street expectations. In these initiatives, Fleming fraudulently structured otherwise ordinary transactions in forms that, on paper, justified and maximized an immediate increase in earnings. One type of initiative that Fleming used frequently during this period was accelerating recognition of up-front payments received under forward-looking vendor agreements. On multiple occasions, Fleming persuaded vendors to provide side letters that described up-front payments – which Fleming and the vendors plainly intended to secure future rights and services – as compensation for some past event, such as a rebate or expense item. Fleming then used these letters to justify recognizing the entire up-front payment as an offset to

---

[2] The findings herein are made pursuant to Respondent's Offer and are not binding on any other person or entity in these or any other proceedings.

expenses immediately, rather than over time as generally accepted accounting principles ("GAAP") required. These illicit bookings enabled Fleming to meet securities analysts' earnings expectations.

        2.        **Adams caused Fleming's inflation of earnings in violation of GAAP.**

During 2001, Fleming and Kraft executed two agreements pertinent to this case. First, in April 2001, the parties entered into a one-year "no-divert" agreement, under which Kraft was to pay $7.5 million to Fleming in exchange for Fleming's promise to waive certain promotional fees and to refrain from "diverting" Kraft products.[3] Then, in June 2001, the parties agreed to a one-year preferred vendor agreement (the "Kraft PVA"), under which Kraft was to pay Fleming $10.7 million in exchange for Fleming's commitment to eliminate several dysfunctional practices and fees and to cooperate in the resolution of certain disputed deductions made by Fleming. Although these deductions generally declined following this agreement, they nevertheless continued, and by early 2002, amounted to at least $4 million.

        a.        **The December 2001 side letter**

As the 2001 fiscal year was ending, Fleming sought ways to meet an impending earnings shortfall. In December 2001, Fleming contacted Adams and requested that Kraft accelerate $1.65 million payable under the no-divert agreement. Although these funds were not due until the first quarter of 2002 under the terms of the no-divert agreement, and were subject to other criteria as well, such as that they would "pass through" to Fleming's retail customers to help promote Kraft products, Kraft agreed to make the requested payment in December 2001. At Fleming's request, Adams also signed a Fleming-prepared letter which represented that Kraft was willing to pay Fleming $1.65 million to "offset the administrative costs associated with" the no-divert agreement. Neither the no-divert agreement nor Fleming's records, however, indicated that any "administrative costs" were owed. Instead, Fleming desired the letter solely to justify recording the entire $1.65 million as an offset to expenses in the fourth quarter of 2001, which overstated Fleming's earnings for the quarter by approximately 12%. Fleming included these misstated earnings in its 2001 Form 10-K, and in publicly disseminated press releases.

In February 2002, Adams signed and returned an audit confirmation letter stating that Fleming was entitled to $1,650,000 to offset the administrative costs incurred in the period April 2001 to December 2001.

---

[3] "Diverting" occurs when a wholesaler overbuys from a vendor at a special discount, and then sells the excess product to buyers other than its normal customers at a higher price. Manufacturers dislike diverting for a number of reasons, including how it distorts the calculation of funding ordinarily allocated to retailers to promote the manufacturer's goods.

        **b.**      **The April 2002 side letter**

In early 2002, Adams began negotiations to extend the no-divert agreement, which was to expire in April 2002. In mid-April 2002, just before Fleming's fiscal first quarter ended, Kraft agreed to pay $5.6 million to extend the no-divert agreement to December 31, 2002.

Fleming, however, needed to recognize the $5.6 million payment immediately to help meet analysts' first quarter earnings targets. Fleming therefore asked Adams to sign a Fleming-dictated letter describing the $5.6 million as payment of a purported "shortfall" under the Kraft PVA. Although no shortfall existed, Adams signed the letter. Fleming then used the letter to justify booking the entire $5.6 million as an offset to expenses in the first quarter of 2002, which provided approximately $.06 of the company's reported $.52 per share quarterly earnings. Fleming included these figures in its Form 10-Q for the first fiscal quarter ended April 20, 2002, and in publicly disseminated press releases. Fleming further incorporated the first quarter Form 10-Q into registration statements on Forms S-3, S-8 and S-4 filed during the summer of 2002.

Fleming's recognition of the entire $5.6 million as an offset to expenses in its first quarter 2002 financial statements violated GAAP. The payment was express consideration for extending the no-divert agreement, and Kraft would not have made the payment but for that extension. Fleming therefore was required to recognize the payment ratably over the extension's term. *See* Statement of Financial Accounting Concepts No. 5, ¶¶ 83-84; Staff Accounting Bulletin No. 101, *Revenue Recognition in Financial Statements*, Question 5.

**C.**      **Conclusion**

As a result of the foregoing, the Commission finds that Adams caused Fleming's violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, 13a-13, and 13b2-1 thereunder.

**IV.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in the Offer.[4]

Accordingly, IT IS HEREBY ORDERED, pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, that Respondent Adams cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) and 17(a)(3) of the Securities Act, and causing any violations and any future violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, 13a-13 and 13b2-1 thereunder.

By the Commission.

                                                          Jonathan G. Katz
                                                          Secretary

---

[4] Adams has agreed to pay a $25,000 civil penalty in connection with a parallel civil action.