# Exhibit
# F

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
Release No.  8486 / September 14, 2004

**SECURITIES EXCHANGE ACT OF 1934**
Release No.  50368 / September 14, 2004

**ACCOUNTING AND AUDITING ENFORCEMENT**
Release No.  2100 / September 14, 2004

**ADMINISTRATIVE PROCEEDING**
File No.  3-11657

| | | |
|---|---|---|
| **In the Matter of** | : | **ORDER INSTITUTING** |
| | : | **PROCEEDINGS PURSUANT TO** |
| | : | **SECTION 8A OF THE SECURITIES** |
| **Dean Foods Company and** | : | **ACT OF 1933 AND SECTION 21C OF** |
| **John D. Robinson,** | : | **THE SECURITIES EXCHANGE ACT** |
| | : | **OF 1934, MAKING FINDINGS AND** |
| **Respondents.** | : | **IMPOSING A CEASE-AND-DESIST** |
| | : | **ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate to institute cease-and-desist proceedings pursuant to Section 8A of the Securities Act of 1933 (the "Securities Act") and Section 21C of the Securities Exchange Act of 1934 (the "Exchange Act") against Dean Foods Company ("Dean") and John D. Robinson ("Robinson") (collectively, "Respondents").

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement ("Offers") that the Commission has determined to accept.[1]  Solely for the purpose of these proceedings or any other proceeding brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings contained herein, except that Respondents admit the Commission's jurisdiction over them and over the

---

[1] Simultaneously with this proceeding, the Commission has filed the following settled actions:  In re Fleming Companies, Inc., Exch. Act Rel. No. 34-50365; In re Bruce Keith Jensen, Exch. Act Rel. No. 34-50370; In re Kemps LLC f/k/a Marigold Foods, LLC, James Green and Christopher Thorpe, Exch. Act Rel. No. 34-50369; In re Digital Exchange Systems, Inc., Rosario Coniglio and Steven Schmidt, Exch. Act Rel. No. 34-50366; In re John K. Adams, Exch. Act Rel. No. 34-50367.

subject matter of these proceedings, Respondents consent to the entry of this Order Instituting Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings and Imposing a Cease-and-Desist Order.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds that:[2]

**A.      Respondents and Fleming Companies, Inc. ("Fleming")**

**1.      Respondents**

Dean, a Delaware corporation headquartered in Dallas, Texas, is a leading processor and distributor of milk and other dairy products.  During the relevant times, John Robinson of Dallas, Texas, was Senior Vice President of Sales and Marketing for the Dean Dairy Group, a business unit of Dean.  During the relevant periods, Fleming was a sizable customer of Dean's dairy operations.

**2.      Fleming**

Fleming is an Oklahoma corporation headquartered in Lewisville, Texas that currently is in Chapter 11 bankruptcy.  Before its April 2003 bankruptcy filing, Fleming's stock traded on the New York Stock Exchange.  At one time, Fleming was the nation's largest grocery wholesaler, with about 50 major distribution centers across the country, and a sizable retail grocery operator as well, with more than 100 stores throughout the Midwest and West. Fleming's 2001 and 2002 reported revenues were approximately $15.6 billion and $15.5 billion, respectively.  But its earnings relatively were much smaller, with only a $23.3 million profit and an $84 million loss, respectively, in those years.

**B.      Facts**

**1.      Fleming used fraudulent "initiatives" to meet earnings expectations.**

During 2001 and the first half of 2002, Fleming improperly executed a series of transactions, called "initiatives," to fabricate earnings to "bridge the gap" between actual operating results and Wall Street expectations.  In these initiatives, Fleming fraudulently structured otherwise ordinary transactions in forms that, on paper, justified and maximized an immediate increase in earnings.  One type of initiative that Fleming used frequently during this period was accelerating recognition of up-front payments received under forward-looking vendor agreements.  On multiple occasions, Fleming persuaded vendors to provide side letters that described up-front payments – which Fleming and the vendors plainly intended to secure future rights and services – as compensation for some past event, such as a rebate or expense item. Fleming then used these letters to justify recognizing the entire up-front payment as an offset to

---

[2] The findings herein are made pursuant to Respondents' Offers and are not binding on any other person or entity in these or any other proceedings.

expenses immediately, rather than over time as generally accepted accounting principles ("GAAP") required. These illicit bookings enabled Fleming to meet securities analysts' earnings expectations.

**2.      Dean and Robinson were a cause of Fleming's inflated earnings in violation of GAAP.**

In early 2002, Fleming and Dean began negotiating a supply agreement under which Dean would provide Fleming's retail operations with fluid milk for three years. Robinson was principally responsible for negotiating the supply agreement on Dean's behalf. Throughout the negotiations, Fleming had made it clear that, to receive the supply agreement, Dean would make an "up-front" payment in the $2 million range. An initial draft of the supply agreement required Dean to pay Fleming up-front dollars in return for supply rights. Ultimately, the parties agreed that the amount of the up-front payment would be $2.5 million.

As the negotiations were concluding, however, Fleming demanded that the payment provision be removed from the supply agreement and supplied Dean with a form of letter describing the payment as a "rebate" for "past performance." While rebates for past performance are not uncommon in the industry, Fleming knew it had not earned any such rebate in this instance and, up to that point in the negotiations, the up-front payment was understood to be consideration for the future business being negotiated. Thus, Fleming knew that the letter mischaracterized the payment's true purpose, but needed to recognize the payment immediately to help meet an impending earnings shortfall. At the time of negotiations, Fleming had been a sizable customer of Dean's dairy operations, but Dean knew it had no existing obligation to pay Fleming any such rebate. Indeed, Dean knew that it was paying the $2.5 million to secure the supply agreement. Dean acquiesced to Fleming's demand because it feared that Fleming would choose a different dairy supplier. Dean did seek to protect its investment, however, by requiring a penalty provision in the supply agreement that obligated Fleming to repay a prorated portion of the $2.5 million if Fleming breached its contractual obligations.

On or about March 26, 2002, Dean provided Fleming the requested side letter and up-front payment, but only after Fleming signed the supply agreement. Fleming used the side letter to justify recognizing the entire $2.5 million as an offset to expenses in the first quarter of 2002, which accounted for approximately $.03 of the $.52 per share Fleming reported as earnings for the quarter.

Fleming's recognition of the entire $2.5 million payment as an offset to expenses in the first quarter 2002 violated GAAP. Both parties understood that the payment was an inducement to the supply agreement; that is, Dean would not have made the payment but for receiving the supply agreement and Fleming would not have awarded the supply agreement absent the payment and side letter. This understanding is consistent with the express penalty provision in the agreement, which was intended to require Fleming to repay the $2.5 million on a prorated basis if it breached the agreement. Fleming therefore was required to recognize the up-front payment ratably over the agreement's term. *See* Statement of Financial Accounting Concepts No. 5, ¶¶ 83-84; Staff Accounting Bulletin No. 101, *Revenue Recognition in Financial Statements*, Question 5.

Fleming's recognition of the entire up-front payment as an offset to expenses in the first quarter of 2002 materially misstated Fleming's earnings for the quarter. Fleming included these misstated earnings in its Form 10-Q for the first fiscal quarter ended April 20, 2002, and in publicly disseminated press releases. Fleming further incorporated the misstated first quarter Form 10-Q into registration statements on Forms S-3, S-8 and S-4 filed during the summer of 2002.

**C.    Conclusion**

As a result of the foregoing, the Commission finds that Dean and Robinson were a cause of Fleming's violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-13 and 13b2-1 thereunder.

**IV.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in the Offers.[3]

Accordingly, IT IS HEREBY ORDERED, pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, that Respondent Dean cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) and 17(a)(3) of the Securities Act and Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-13 and 13b2-1 thereunder, and that Respondent Robinson cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) and 17(a)(3) of the Securities Act, and causing any violations and any future violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-13 and 13b2-1 thereunder,.

By the Commission.

Jonathan G. Katz
Secretary

---

[3] Dean has agreed to pay a $400,000 civil penalty and Robinson has agreed to pay a $50,000 civil penalty, in connection with a parallel civil action.