# Exhibit 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| WAYNE BERRY, a Hawaii citizen; | ) | Civ. No. CV03 00385 SOM-LEK |
| | ) | (Copyright) |
| Plaintiff, | ) | |
| | ) | DECLARATION OF WAYNE |
| vs. | ) | BERRY; EXHIBITS "A" THROUGH |
| | ) | "S" |
| HAWAIIAN EXPRESS SERVICE, | ) | |
| INC., a California corporation; et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DECLARATION OF WAYNE BERRY

    I, WAYNE BERRY, am the plaintiff in this case and I make this declaration under the penalty of perjury. All the statements herein are true and correct to the best of my knowledge, information and belief. If called upon to testify regarding the matters herein, I am competent and willing to do so.

    1.    Attached hereto as Exhibit "A" is a true and correct copy of my filed copyright registered for my Freight Control System, that was licensed to Fleming Companies, Inc. in 1999 that the jury found they infringed. This document is kept by me in the regular course of my business. It is my custom and practice to keep such documents in the regular course of my work as a software developer. A principal component of my software is a file that I named "FCS Logistics

Data.MDB". FCS stands for "Freight Control System" and MDB identifies this file as Microsoft Access database program. "FCS Logistics Data.MDB", like most of these database programs, is a collection of screens, tables, queries, forms and macros. I began to work on this database schema in 1993 and first published it on November 27, 1995 after months of work analyzing the ocean freight logistics business, creating the database and the numerous subsidiary programs. The number of hours I put into the development of this work and the subsidiary programs by 1999 is measured in the thousands of hours.

2.      A true and correct copy of my End User License Agreement ("EULA") for my Freight Control System is attached as Exhibit "B." I gave a copy of this EULA with one addendum to Fleming Companies, Inc., in November 1999 as well as to the employees in the Fleming Logistics department. This document is kept by me in the regular course of my business. It is my custom and practice to keep such documents in the regular course of my work as a software developer. I allowed Fleming one additional Addenda that is also attached to Exhibit "B."

3.      I have never given Fleming permission to transfer, sell and/or distribute my copyrighted work to C&S. I also never gave Fleming any permission to recast my Freight Control System. Such modification was specifically prohibited in my EULA and that agreement was re-confirmed in the November 26, 1999

Second Addendum.

4.      I have never licensed Fleming Companies, Inc. and/or C&S to use any

recast copies or derivatives of my Freight Control System nor have I ever licensed

Mark Dillon, Teresa Noa, Melvin Ponce, Sonia Purdy, Justin Fukumoto, Alfredda

Waiolama and/or Jacqueline Rio to use any derivatives of my works, including, but

not limited to, the Spreadsheet derivative of my work, "Freight Control System",

that C&S admits it is using today.

5.      Based on my review of voluminous data in the Guidance CD,

produced in discovery, Fleming copied over 2000 of my authored copyrighted

programs and reports back onto the computer they sold and/or transferred to C&S,

including multiple copies of my Freight Control System and its derivatives that by

my estimate number approximately in the hundreds.  I never gave anyone

permission to cause these programs to be copied, transferred and/or distributed to

C&S.

6.      Attached hereto as Exhibit "C" is a true and correct copy of a photo-

static image of the Guidance software CD ROM disk dated 02/04/04, which disk

was provided to me by my counsel, Timothy J. Hogan.  After receiving the disk, I

extracted the report attached to Exhibit "C" from the data contained in that disk

evidencing the numerous copies of my software resident on the second acquisition

3

files that were provided by Guidance Software. These files are identified on the second page of Exhibit "C" that is a true and correct compilation of voluminous records contained on the Guidance CD ROM. "FCS Logistics Data.mdb" appears sixteen times in the records of the second acquisition files that are on the CD ROM disk. Included with the report are the full path from the Guidance data that has been unchanged and this report is a true and correct copy of the electronic data that was contained in the Guidance disk. This disk is voluminous material that would be too voluminous to print out in whole and I have extracted this by running a query against the Guidance data to provide this report. I am qualified to testify as to the manner in which this report was created and am willing to do so if called on at the hearing on the Motion. All the data on the pages attached to Exhibit "C" was extracted from the second acquisition files.

7.    Attached hereto as Exhibit "D" is a photo-static copy of the CD ROM disk of the data that was provided to me by Timothy J. Hogan, my attorney, in regard to the Fleming Companies, Inc.'s production of documents in the first infringement case. Attached to that is a copy of a screen print evidencing that "FCS Logistics Data.mdb", my program that I have a copyright to is contained in that disk.

8.    Attached hereto as Exhibit "E" is a true and correct copy of a CD

4

ROM disk that I prepared for my attorney to turn over in regard to the First

Infringement Action, dated February 27, 2002. That disk I created myself from a

copy of the software that I had installed at Fleming Companies, Inc. in November

of 1999. Also attached to Exhibit "E" is a screen print of the disk contents that

accurately describes the title (plus date and time) of the freight program as "FCS

Logistics Data.mdb".

9.     There are no licensed copies of my Freight Control System that are not

in my physical possession. Until all illegal copies have been returned to me and all

infringers enjoined, I face an imminent risk of irreparable harm because C&S has

stolen my intellectual property. FCS is a vertical application with a limited number

of potential licensees. Any dissemination of this intellectual property to an

unlicensed user causes me to lose a large part of my potential customer base.

10.     My software is a one-of-a-kind work that contains trade secrets and

original expressions that are my intellectual property. I have not given C&S or

Fleming the permission to copy, distribute, transfer, sell, use or possess my

software.    C&S continues to possess copies and each time they use my works they

make additional copies without my permission.

11.     Fleming imported into their spreadsheet program relational data

elements such as "Short Name", "Container ID" and "Job ID" that uniquely reveal

5

my expression of how I chose to organize my database and are critical to the logic that organizes the data of the database in the manner that I chose to express that organization.   None of these expressions relate to any source document and are created solely by my original work.  Fleming copied these underlying programming elements into spreadsheets. As a result of that copying, these spreadsheets now contain the logical relationships that I created and expressed in my original work. C&S now use or run these spreadsheets as linked tables in an Access database called "Queries.MDB."  I have never licensed my software for this sort of use in any such program.

12.    To the best of my knowledge, the relational data expressions contained in my original work, "Freight Control System", are not required by any external or industry requirement but merely the way I chose to express my idea of how to order or arrange the data in my programs and they are my trade secret that I have attempted to protect from misappropriation.  All of these relational data expressions were copied by Fleming into the programs that run presently at C&S.   I never gave Fleming or C&S permission to copy these relational data expressions from my Freight Control System.

13.    During the time that API used my software, "Freight Control System" and most of its related programs were located on a server in my house, password

6

protected, and no copies were ever given to API. I took all reasonable steps to protect my trade secrets that include the manner in which I organize freight logistics.

14.    When I agreed to allow Fleming to use a copy of my works as an interim measure, I did so under the protection of my EULA that specifically claimed trade secret protection. Fleming in its acceptance of that EULA agreed to protect my works and trade secrets.

15.    I personally delivered copies of the EULA to all of the former API employee who would have access to my "Freight Control System" and my other related works. Prior to the EULA, all of these former API employees had been covered by an API confidentiality agreement. Attached hereto as Exhibits "F" and "G" are true and correct copies of the confidentiality agreements signed by Jackie Rio and Teresa Noa fka Teresa Salazar respectively. These documents are kept by me as the custodian of records of Atlantic Pacific International, Inc. ("API") all maintained and received in the regular course of API's business. The EULA and the API confidentiality agreements provided me with seamless protection of all the trade secrets related to any of my works accessed by these former API employees. Other than making the mistake of permitting a scofflaw enterprise like Fleming to possess a loaned copy of my works, I did everything reasonable to protect my trade

7

secrets in my works.

16.    Fleming conveyed, without my permission and in violation of my EULA, my "Freight Control System" and my other related works to C&S including numerous copies of the Dillon derivatives. The enumeration of these works is voluminous and likely exceeds 1,000 files. The categories of these works are described in my EULA in general terms as Server Software, Client Software, Screens, Reports, Database and "Glue Logic" or Integration Code and consist of database designs, report designs, custom code, functional designs, text, and "applets".

17.    In general, my understanding of trade secrets is that they can be defined as any formula, pattern, device, machine, process, technique, compilation of information, or program. For software, trade secrets specifically can refer to graphics, source code, programs or object code, algorithms, technical descriptions, logic flow charts, user manuals, prototypes, data structures, database contents, data flow charts and designs. I also understand that in 1996, President Bill Clinton signed the Economic Espionage Act making the theft of trade secrets a federal crime. Attached hereto as Exhibit "H" is a true and correct copy of an Internet the web page http://my.execpc.com/~mhallign/crime.html. It is my custom and practice to review articles such as these and consider them a form of business record

8

necessary for me to obtain and maintain a basic understanding of rules and laws that I employ as the ultimate author and grantee of licenses and other agreements governing the use of my intellectual property.

18.    The following is an example of a file found on the Guidance "After" images that I consider to be one of my trade secrets in the "graphics" trade secret category. This file is "graphic" part or screen portion of "FCS Logistics Data.mdb". This file resulted from "splitting" my original work into "screen/query" and "table" components. This file was included in the listing of my intellectual property turned over to the Discovery Master.

| | | | Guidance – After Image | | | |
|---|---|---|---|---|---|---|
| File Ext | Name | Logical Size | Full Path | Last Written |
| mdb | FCS Logistics Screens 101001.mdb | 4085760 | Flemming Restore 2nd acq 02\Server FHL 134 D (135) 2ns Acq\User Files\FHL147\C\Data\FCS Logistics Screens 101001.mdb | 4/4/2003 4:36:42 PM |

19.    The following is an example of a file found on the Guidance "After" images that I consider to be one of my trade secrets in the "source code" trade secret category. This file is the "source code" for an "active server page" (web page) that I created to allow API's California consolidation terminals to access and print certain Crystal Reports from California via the Internet. This file was included in the listing

9

of my intellectual property turned over to the Discovery Master.

| Guidance - After Image | | | | |
|---|---|---|---|---|
| File Ext | Name | Logical Size | Full Path | Last Written |
| asp | L04.asp | 8985 | Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\C\AAA\xFHL136\Source\ASP\Production Web Reports\L04.asp | 8/11/1999 12:38:40 PM |
| | | | | |

20.    The following is an example of a file found on the Guidance "After"
images that I consider to be one of my trade secrets in the "programs or object
code" trade secret category. This file is the "program(s) or object code" called
"FlemingPO.exe" that I created to import standard 875 EDI transaction sets into
"FCS EDI PO.mdb" and then into "FCS Logistics Data.mdb". This file was
included in the listing of my intellectual property turned over to the Discovery
Master.

| Guidance - After Image | | | | |
|---|---|---|---|---|
| File Ext | Name | Logical Size | Full Path | Last Written |
| exe | Flemingpo.exe | 110592 | Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\C\AAA\xFHL136\Source\VC\FlemingPO\Flemingpo.exe | 8/4/1999 3:44:40 AM |

21.    The following is an example of a file found on the Guidance "After"

images that I consider to be one of my trade secrets in the "algorithms" trade secret category. This file called "Load Planning.rpt" contains "algorithms" that analyze purchase orders, routing demographics, estimated times of arrival and commodity types to determine resource and equipment requirements along with preliminary container load planning. The report accesses information in "FCS Logistics Data.mdb" which the "algorithms" use in the calculations. This file was included in the listing of my intellectual property turned over to the Discovery.

| Guidance - After Image | | | |
|---|---|---|---|
| Name | Logical Size | Full Path | Last Written |
| Load Planning.rpt | 51200 | Flemming Restore 2nd acq 02\Server FHL 134 D (135) 2ns Acq\User Files\TeresaN\Reports\Version 8.5\Discontinued\Old Reports\Load Planning.rpt | 8/25/1999 5:17:20 PM |

22.    The following is an example of a file found on the Guidance "After" images that I consider to be one of my trade secrets in the "technical descriptions" trade secret category. This file called "API Procedures.doc" is a MS Word document that contains "technical descriptions" of my intellectual property including "Freight Control System" and other related works. This file was included in the listing of my intellectual property turned over to the Discovery Master.

| Guidance - After Image |
|---|

11

| File Ext | Name | Logical Size | Full Path | Last Written |
|---|---|---|---|---|
| doc | API Procedures.doc | 95232 | Flemming Restore 2nd acq 02\Server FHL 134 D (135) 2ns Acq\User Files\FHL147\C\Department\API Procedures.doc | 7/12/2001 10:29:12 AM |

23.    The following is an example of a file found on the Guidance "After" images that I consider to be one of my trade secrets in the "logic flow charts" trade secret category. This file called "Mr. Berry's Chart.tif" is a scanned image of drawings that I made during a presentation to Fleming when I loaned them a copy of my works in the fall of 1999. The images I drew contain a myriad of interrelationships and interdependencies amongst of my intellectual property including "Freight Control System" and other related works that collectively constitute "logic flow charts". This file was included in the listing of my intellectual property turned over to the Discovery Master.

| Guidance - After Image | | | | |
|---|---|---|---|---|
| File Ext | Name | Logical Size | Full Path | Last Written |
| tif | Mr. Berry's Chart.tif | 558212 | Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\C\AAA\xFHL136\Text\WinNt\Advanced Troubleshooting Windows NT Workstation_files 5\Other\Mr. Berry's Chart.tif | 11/1/2001 11:21:28 AM |

12

24.    The following is an example of a file found on the Guidance "After"
images that I consider to be one of my trade secrets in the "user manuals" trade
secret category. This file called "EDIProcedures 2.doc" is a document describing
the procedures I developed to obtain EDI 875 PO data from the Kleinschmidt
"Value Added Network" and then import that data via my "FlemingPO.exe"
software to my "FCS EDI PO.mdb" and "FCS Logistics Data.mdb" databases. This
file was included in the listing of my intellectual property turned over to the
Discovery Master.

| Guidance - After Image | | | | |
|---|---|---|---|---|
| File Ext | Name | Logical Size | Full Path | Last Written |
| doc | EDIProcedures 2.doc | 29184 | Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\C\AAA\xFHL136\Text\Api\EDIProcedures 2.doc | 10/28/1999 3:40:00 PM |

25.    The following is an example of a file found on the Guidance "After"
images that I consider to be one of my trade secrets in the "prototypes" trade secret
category. This file called "APIMasterBackup.DAT" is a backup of a prototype MS
SQL database I was working on in 1999 that combined my "FCS EDI PO.mdb" and
"FCS Logistics Data.mdb" databases into one large SQL Server database with
extended functionality and features. This file was included in the listing of my

13

intellectual property turned over to the Discovery Master.

| | | | Guidance - After Image | |
|---|---|---|---|---|
| File Ext | Name | Logical Size | Full Path | Last Written |
| DAT | APIMasterBackup.DAT | 22151296 | Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\C\AAA\xFHL136\Source\SQL\SQL Server 6.5 DB Backup\APIMasterBackup.DAT | 4/17/1999 6:59:30 PM |

26.    The following is an example of a file found on the Guidance "After"
images that I consider to be one of my trade secrets in the "prototypes" trade secret
category. This file called "Functional State of Logistics Database on 10-1-199.xls"
is a MS Excel spreadsheet created by Fleming that describes the data structures in
my "FCS EDI PO.mdb" and "FCS Logistics Data.mdb" databases when I first
loaned Fleming a copy in the Fall of 1999. This file was included in the listing of
my intellectual property turned over to the Discovery Master.

| | | | Guidance - After Image | |
|---|---|---|---|---|
| File Ext | Name | Logical Size | Full Path | Last Written |
| xls | Functional State of Logistics Database on 10-1-199 | 41472 | Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\C\AAA\xFHL136\Text\WinNt\Advanced Troubleshooting Windows NT Workstation_files 2\FAVC 26\Functional State of Logistics Database on 10-1-1999.xls | 10/25/2001 3:28:20 PM |

14

27.    The following is an example of a file found on the Guidance "After" images that I consider to be one of my trade secrets in the "database contents" trade secret category. This file called "Apiar98-99.xls" is a MS Excel spreadsheet created by extracting Atlantic Pacific International, Inc. ("API") business records that were contained in my "FCS Logistics Data.mdb" databases. Fleming had not right to these business records except as historical information to compare against Fleming's new freight records after November 1, 1999 in order to help Fleming make future business decisions regarding their freight. Instead Fleming used their access to these trade secrets ("database contents") to misappropriate nearly $800,000 dollars of API's accounts receivables. This file was included in the listing of my intellectual property turned over to the Discovery Master.

| Guidance – After Image | | | | |
|---|---|---|---|---|
| File Ext | Name | Logical Size | Full Path | Last Written |
| xls | Apiar98-99.xls | 22528 | Flemming Restore 2nd acq 02\Server FHL 134 D (135) 2ns Acq\User Files\JustinF\Documents\apiar98-99.xls | 4/22/1999 5:42:40 PM |

28.    Attached hereto as Exhibit "I" is a true and correct copy of six emails turned over in discovery by Fleming and authenticated in the Deposition of Mark Dillon taken on 12/23/03 – numbered D0066 through D0071. These emails evidence Fleming providing copies of "Specs for Logistics database" to at least one

15

other developer. Attached hereto as Exhibit "J" is a true and correct copy of at least

some of the "Specs for Logistics database" turned over by Fleming in discovery and

authenticated in the Deposition of Mark Dillon taken on 12/23/03 – numbered

D0115 through D0132, that were disseminated to other developers without my

knowledge or permission.  I claim Exhibit 3 (documents D0115 through D0132) to

be my trade secrets in the "data flow charts" and "designs" trade secret category.

     29.    Attached hereto as Exhibit "K" is a true and correct copy of a letter

from Lex Smith to Clyde Matsui dated March 9,2005, and authenticated in Mr.

Hogan's Declaration as his Exhibit "W." On page 2 of 4, Mr. Smith states:

"A trial version of Windows 2003 Server is currently being used on the C&S

 Logistics Network. This weekend C&S will install the full version of the same

software."

…

"The operating system that was in use at that time, June of 2003, Windows SBS

4.5."

     30.    Attached hereto as Exhibit "L" is a true and correct copy of a letter

from Lex Smith to Timothy Hogan. On page 1 of 2, Mr. Smith states:

"As we have repeatedly advised, the trial version of the software is expiring and we

are proceeding with the installation of the full version."

31.    Attached hereto as Exhibit "M" is a true and correct copy of a Microsoft web page for the "Windows 2003 Trial Software". The web page states that the trial software is:

"Trial software for 32-bit and 64-bit versions are available for 180-day evaluation."

32.    Attached hereto as Exhibit "N" is a true and correct copy of a Microsoft Excel spreadsheet I created. I used this spreadsheet to calculate the estimated installation date of the "expiring trial version" of Windows 2003 that Mr. Smith refers to in Exhibit "L". Using Saturday March 12, 2005 as the expiration date, I calculated 180 days back and arrived at Monday, September 13, 2004 as the most likely date that this "180 trial version" of Windows 2003 was originally installed on the C&S logistics server.

33.    Attached hereto as Exhibit "O" is a true and correct copy of an excerpt from a Microsoft Corporation "White Paper" that discusses upgrading from Windows 2000 to Windows 2003. On page seven is a section entitled: "Choosing to Upgrade, Perform a New Installation, or Migrate". This section describes the three methods as follows: "A basic decision is whether to upgrade, perform a new installation, or migrate to a new computer. Upgrading refers to leaving the existing Windows 2000 or Windows NT® 4.0 (with Service Pack 5 or later) operating system on your computer and updating it by installing the new Windows Server

17

2003 operating system. A new installation refers to completely removing the previous operating system or installing a product in the Windows Server 2003 family on a volume with no previous operating system. Migrating refers to moving files from an old machine to a new one."

34.    Attached hereto as Exhibit "P" is a true and correct copy of a web page from Microsoft Corporation's web site called "Windows Server 2003 Supported Upgrade Paths". This page lists only those products that can be upgraded to Windows 2003 directly. From personal knowledge and experience, any product not listed on this page will need to have a "new installation" on a clean or reformatted drive. The web page in Exhibit "P" does not list an upgrade path from "Windows SBS 4.5," the version that Mr. Smith admits for both his clients the PCT and all the C&S defendants to have been running at C&S prior to the conversion to Windows 2003. Therefore, C&S would have needed to perform a "new installation" on a clean or reformatted drive on or about Monday, September 13, 2004 and thereby destroying evidence of deletions that would have been there for this Court's Master to see, but for the act of C&S in formatting the drive.

35.    Attached hereto as Exhibit "Q" is a true and correct copy of an Infoworld web page reporting the article: "Guidance Software, Inc. Proves the Value of Computer Forensics in $300 Million Trade Secret/Patent Dispute Win".

18

The article discusses the significance and consequence in litigation of the destruction of evidence. Defendants Mike Gurzi, Guidance Software, Inc. and Fleming's disclosed expert witness, Martin Walker are quoted as follows:

"As a defendant, is it worse to get caught red-handed or get caught destroying evidence?" says Mike Gurzi, Director of Guidance Software's professional services division. "Through computer forensics, we showed that evidence was destroyed and that ultimately convinced the Court in its sanctions order against Nassda."

Martin Walker of Brass Rat Group Inc., an electronic design automation expert who provided consulting services for Synopsys in the litigation explains: "Guidance's computer forensics work was instrumental in demonstrating important points to the court. Computer forensics was critical to the Court's finding's about the derivation of the initial Nassda code -- and the manner in which that code was derived or copied from Synopsys' materials."

This case reinforces the fact that spoliation of evidence is taken seriously by U.S. courts. Matters of spoliation with electronic evidence have been on the rise, according to Gurzi. "It seems that certain organizations find it more enticing to delete electronic evidence rather than preserve it. If a company gets caught, it can be extremely damaging to their case."

19

"People have been stealing intellectual property for a long time," says Victor Limongelli, General Counsel for Guidance Software. "Computer forensics makes it a lot more likely that you can catch them."

36.    Attached hereto as Exhibit "R" is a true and correct copy from the SEC web site of an SEC Cease and Desist Order – 33-8482 against Fleming Companies, Inc. on September 14, 2004.

37.    Attached hereto as Exhibit "S" is a true and correct copy of an SEC Press Announcement 2004-129, from the SEC official website, published on September 14, 2004, stating that the SEC's investigation of Fleming continues.

38.    In my professional opinion as an independent programmer who does his own share of forensics work, who is no less qualified than Guidance Software's operatives and needs to know a little about the rules to do that work, the Sarbanes Oxley Act clearly would not allow the destruction of evidence caused by a "clean installation" of the trial version of Windows 2003 in September of 2004 under these circumstances because to do so would necessarily destroy evidence of deleted files. Additionally, this "clean installation" of Windows 2003 occurred just a week or two after Judge Susan Oki Mollway requested that the parties retain a Discovery Master to examine the computer(s) that the PCT and C&S Defendants suddenly found an urgent need to upgrade their operating system with a trial copy of software and in

the process, destroy material evidence relevant to this case and to the ongoing SEC

investigation.

Dated, Honolulu, Hawaii _____ 4/18/2005 _____

_____
WAYNE BERRY

# CERTIFICATE OF REGISTRATION





This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

REGISTER OF COPYRIGHTS

OFFICIAL SEAL — UNITED STATES OF AMERICA

**FORM TX**
For a Nondramatic Literary Work
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

**TX 5-079-445**

EFFECTIVE DATE OF REGISTRATION

**OCT. 19, 1999**
Month   Day   Year

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

## 1

**TITLE OF THIS WORK ▼**
Freight Control System

**PREVIOUS OR ALTERNATIVE TITLES ▼**

**PUBLICATION AS A CONTRIBUTION** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.   **Title of Collective Work ▼**

If published in a periodical or serial give:   Volume ▼   Number ▼   Issue Date ▼   On Pages ▼

## 2

**a** NAME OF AUTHOR ▼
Wayne Foster Berry

**DATES OF BIRTH AND DEATH**
Year Born ▼ 1955   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ USA
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☑ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼
Computer Program

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of the work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b** NAME OF AUTHOR ▼

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c** NAME OF AUTHOR ▼

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

## 3

**a** YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED   This information must be given   ◀Year In all cases.
1993

**b** DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information   Month ▶ 11   Day ▶ 27   Year ▶ 95
ONLY if this work has been published.
USA   ◀ Nation

## 4

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼
Wayne Foster Berry
425 South Street, #2603 A
Honolulu, Hawaii 96813

See instructions before completing this space.

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

APPLICATION RECEIVED
OCT. 19 1999
ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED
OCT. 19 1999

FUNDS RECEIVED

DO NOT WRITE HERE — OFFICE USE ONLY

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions   • Sign the form at line 8

DO NOT WRITE HERE
Page 1 of ___ pages



EXHIBIT "A"

EXAMINED BY

CHECKED BY

☐ CORRESPONDENCE
☐ Yes

FORM TX

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes  ☐ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: **Previous Registration Number** ▶                          **Year of Registration** ▶

**5**

**DERIVATIVE WORK OR COMPILATION**
Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

**6**

See instructions
before completing
this space.

Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼                                                    Account Number ▼

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.   Name/Address/Apt/City/State/ZIP ▼
Wayne Foster Berry
425 South Street, #2603
Honolulu, Hawaii 96813

Area code and daytime telephone number ▶ 808-545-5817                      Fax number ▶ 808-545-5837

Email ▶  WayneB@pxg.com

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

Check only one ▶

☑ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of _____

of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Wayne Foster Berry                                                      Date ▶ 9-27-99

Handwritten signature (X) ▼

X _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

| Certificate will be mailed in window envelope to this address: | |
|---|---|
| Name ▼ | Wayne Foster Berry |
| Number/Street/Apt ▼ | 425 South Street, #2603 A |
| City/State/ZIP ▼ | Honolulu, Hawaii 96813 |

YOU MUST:
• Complete all necessary spaces
• Sign your application in space 8

SEND ALL 3 ELEMENTS
IN THE SAME PACKAGE:
1. Application form
2. Nonrefundable filing fee in check or money order
3. Deposit material

As of
July 1,
1999,
the
filing
fee for
Form TX
is $30.

MAIL TO:
Library of Congress
Copyright Office
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

**9**

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

June 1999—200,000
WEB REV: June 1999

☼ PRINTED ON RECYCLED PAPER

☼U.S. GOVERNMENT PRINTING OFFICE: 1999-454-879/49

# END-USER LICENSE AGREEMENT

## LICENSE FOR FREIGHT CONTROL SYSTEM SOFTWARE

**LICENSEE:**

Ralph Stussi
Fleming Foods, Inc.
91-315 Hanua Street
Kapolei, Hawaii 96707

**LICENSOR:**

Wayne Berry
P.O. Box 549
Haleiwa, Hawaii 96712

IMPORTANT-READ CAREFULLY: This End-User License Agreement ("EULA") is a legal agreement between you (Fleming Foods, Inc.) and Wayne Berry for the software product identified above, which includes computer software and may include associated media, printed materials, and "online" or electronic documentation ("SOFTWARE PRODUCT"). An amendment or addendum to this EULA may accompany the SOFTWARE PRODUCT. BY INSTALLING, COPYING, OR OTHERWISE USING THE SOFTWARE PRODUCT, YOU AGREE TO BE BOUND BY THE TERMS OF THIS EULA.

The SOFTWARE PRODUCT is protected by copyright laws and international copyright treaties, as well as other intellectual property laws and treaties. The SOFTWARE PRODUCT is licensed, not sold.

1.  GRANT OF LICENSE. This EULA grants you the following rights provided that you comply with all terms and conditions of this EULA:

    a.  Types of Software. The SOFTWARE PRODUCT contains some or all of the following types of software: Server Software, Client Software, Screens, Reports, Database and "Glue Logic" or Integration Code.

    b.  Server Software and Database. At any given time, you may install one copy on a single computer.

HF 00252



**EXHIBIT "B"**

c.  Client Software, Screens, Reports, "Glue Logic" or Integration Code. At any given time, you may install up to one copy on up to ten (10) separate computers.

f.  This EULA is not transferable to anyone other than Fleming Foods, Inc.

g.  Additional Software. Any software provided to you by Wayne Berry which updates or supplements the original SOFTWARE PRODUCT is part of the SOFTWARE PRODUCT and is governed by this EULA, unless other terms of use are provided with such updates or supplements. Any software provided to you along with the SOFTWARE PRODUCT that is associated with a separate end-user license agreement is licensed to you under the terms of that license agreement, except if this EULA specifically sets forth the terms of use for such software then the terms set forth in this EULA shall apply.

h.  Reservation of Rights. All rights not expressly granted are reserved by Wayne Berry.

2.  DESCRIPTION OF OTHER RIGHTS AND LIMITATIONS. For SOFTWARE PRODUCT.

a.  Software Transfer. You may transfer the SOFTWARE PRODUCT to another computer, provided that it is removed from the computer from which it is transferred.

b.  Rental. You may not rent, lease, or lend the SOFTWARE PRODUCT.

c.  Notice to Users. You shall inform all users of the SOFTWARE PRODUCT of the terms and conditions of this EULA.

d.  Limitation on Modifications, Reverse Engineering, Decompilation, and Disassembly. You may not modify, reverse engineer, decompile, or disassemble the SOFTWARE PRODUCT. 

e.  Performance or Benchmark Testing. You may not disclose the results of any benchmark test of the SOFTWARE PRODUCT.

f.  Termination. Without prejudice to any other rights, Wayne Berry may terminate this EULA if you fail to comply with the terms and conditions of this EULA. In such event, you must destroy all copies of the SOFTWARE PRODUCT and all of its component parts.

g.  Consent to Use of Data. With respect to technical information and data you provide to Wayne Berry as part of any (if any) support services related to the SOFTWARE PRODUCT ("Support Services"), you agree that Wayne Berry (and his affiliates and agents) may collect, process and use such information for its

HF 00253

business purposes, including but not limited to product support and development.

h.    Application Sharing Technology.  The SOFTWARE PRODUCT may contain technology that enables applications to be shared between two or more computers, even if an application is installed on only one of the computers. You may not use this technology.

3.    INTELLECTUAL PROPERTY RIGHTS. All title and intellectual property rights in and to the SOFTWARE PRODUCT (including but not limited to any database designs, report designs, custom code, functional designs, images, photographs, animations, video, audio, music, text, and "applets" incorporated into the SOFTWARE PRODUCT), and any copies you are permitted to make herein are owned by Wayne Berry. You may not copy any printed materials accompanying the SOFTWARE PRODUCT.

4.    ENTIRE AGREEMENT.  This EULA (including any addendum or amendment to this EULA which is included with the SOFTWARE PRODUCT) are the entire agreement between you and Wayne Berry relating to the SOFTWARE PRODUCT and the Support Services (if any) and they supersede all prior or contemporaneous oral or written communications, proposals and representations with respect to the SOFTWARE PRODUCT or any other subject matter covered by this EULA.

**LIMITED WARRANTY**

THERE ARE NO WARRANTIES EXPRESSED OR IMPLIED. THE SOFTWARE PRODUCT IS MADE AVAILABLE UNDER THIS EULA "AS IS" WITH ANY REVISIONS UP TO AND INCLUDING WORK PERFORMED BY WAYNE BERRY AS OF OCTOBER 29, 1999.

LICENSOR: Wayne Berry                          10/28/99
                                               Date

HF 00254

Page 3 of 5
October 29, 1999

# ADDENDUM TO END-USER LICENSE AGREEMENT

## ADDENDUM FOR FREIGHT CONTROL SYSTEM SOFTWARE

1. In exchange for Wayne Berry (LICENSOR) granting this EULA to Fleming Foods, Inc (LICENSEE), LICENSEE agrees to employ all former API employees of record date (September 1, 1999) beginning November 1, 1999 for a period of not less than 1 year and at their former or better pay scale and benefit package. This employment agreement shall not include Jack Borja. LICENSOR will not be in breach of this agreement if any of the "former API employees" quit or create a disciplinary condition that requires dismissal from LICENSOR's employ.

2. In exchange for LICENSOR granting LICENSEE this EULA, LICENSEE agrees to indemnify Jack Borja from any and all personal liabilities associated with the former API / Fleming Partnership, including but not limited to the 4 Trucks leased specifically to facilitate shipments to LICENSEE, the forklifts and ancillary equipment leased to facilitate shipments to LICENSEE, the computer specifically leased to facilitate shipments to LICENSEE and any legal actions taken to protect the API / Fleming Partnership. LICENSOR shall use the TRW credit reporting service to monitor the enforcement of this clause. If a bad credit report is made to TRW in connection with this former API / Fleming Partnership and cannot be remedied and removed within 60 days, LICENSEE will have violated this EULA.

3. LICENSOR will not be bound by any prior or past agreements that may restrict LICENSOR's legal remedies. Specifically, LICENSOR is not bound by any restrictions to any form of arbitration with the LICENSEE and may specifically pursue any and all legal remedies in the appropriate court including lawsuits and injunctive relief. Effective November 1, 1999, this agreement supercedes all prior written and oral agreements.

4. The SOFTWARE PRODUCT may only be used by LICENSEE in the State of Hawaii, within the LICENSEE's facility.

5. LICENSEE agrees that LICENSEE has been granted access to proprietary intellectual property and trade secrets contained in the SOFTWARE PRODUCT and may not replace this SOFTWARE PRODUCT with another custom system of comparable design or functionality without the burden of proving that the replacement custom software was developed without the

Page 4 of 5
October 29, 1999

HF 00255

assistance of LICENSEE and without violating this EULA. Furthermore, LICENSEE may not disclose, divulge ,or in any way make available to any other company or entity the proprietary intellectual property and trade secrets contained in the SOFTWARE PRODUCT.

6. LICENSEE may not use or create any additional I/O subsystems (Screens, Databases, Reports, "Glue Logic" or Integration Code) that are intended for use with or in conjunction with this SOFTWARE PRODUCT.

7. LICENSOR is under no obligation to support, modify or augment this SOFTWARE PRODUCT.

8. This SOFTWARE PRODUCT has operated for more that one year, essentially unchanged as to functionality and usage. Therefore, this SOFTWARE PRODUCT is made available to LICENSEE "as is and where is" without any other warranties expressed or implied.

9. All "Crystal Reports" used with this SOFTWARE PRODUCT must be compiled by LICENSEE. Only compiled versions of the reports, incorporated in the SOFTWARE PRODUCT, may be used by LICENSEE after December 15, 1999. LICENSEE is prohibited from making any new reports or functional and esthetic changes to any of the existing reports after September 1, 1999.

10. LICENSEE understands the original contract value of this software is $2 million dollars. Any damages sought by LICENSOR against LICENSEE will use this amount as a basis but not a limitation of LICENSEE's obligation to LICENSOR for using this SOFTWARE PRODUCT under the terms of this EULA.

LICENSOR: Wayne Berry                                10/29/99
                                                     Date

Page 5 of 5
October 29, 1999

HF 00256

**Fleming**

MEMORANDUM

Date:    November 24, 1999

To:    Wayne Berry

From:    Ralph Stussi

Subject:    License agreement for freight control system

I am in receipt of the end user license agreement and addendum you have prepared dated October 29, 1999. I had not seen this document until Monday evening November 22, 1999, and must say it not acceptable to Fleming Companies, Inc. Let me go through our understanding in all this.

We understand that you will grant us a no charge user license for the software you have developed for API and that you wish to market it commercially. We only intend to use this software to support our local freight operation and will not sell or issue copies to other businesses. We do not intend to transfer copies of this software to other company locations beyond Hawaii. To this end, we understand that copyright laws and international copyright treaties, as well as other intellectual property laws and treaties protect the software product. We understand that this product is licensed, not sold and that all title and intellectual property rights in and to the software product and any copies we make are owned by you. We also understand that there are no warranties expressed or implied and that the product is made available to us "as is", with any revisions up to and including work performed through October 29, 1999. If you become aware of any situations were files or programs are transferred to unauthorized users, please advise me and I will pursue this immediately. I will also advise my associates of this.

We must have the ability to change and modify reports that come out of the system. The database that exists has so much information that can be used, new reports and information will be constantly evolving from the operation as it has in the past. There is a big question about the Crystal report writing software and the reports that are written from the database with this software. You have advised me that we can use the Crystal software to modify and develop reports, but that you cannot be responsible for the accuracy of the data in these reports.

PLAINTIFF'S
EXHIBIT

149

EXH

The long-term goal of our operation is to interface with our company's total inbound logistics system. This will be done utilizing software licensed by our company from another provider. We are still in the process of obtaining information about how it will work with an ocean freight situation versus mainland backhauls. If it will accommodate what we are doing, we will schedule a conversion and once all is up and running we would plan on removing your inbound freight software at that time.

With regard to the TSI EDI interface. I admit that I do not totally understand what is technically happening here. Our intention is to work with our corporate staff people to develop a download that will allow the current P.O. and other file information that is being transferred using TSI EDI and Kleinschmidt to download directly from our mainframe. This project is being worked on and should be completed by the first of January 2000. I believe this is all part of the transition we have agreed to work through. At that time we would be able to cancel the Kleinschmidt agreement and would no longer need the TSI EDI interface. If this interface cannot be accomplish we would plan to discuss further with you the purchase of the TSI EDI interface for the system or a suitable, less expensive alternative.

In another area, the information contained in the database includes confidential Fleming information. This information must be kept and should not be shared with outside, unauthorized parties without first obtaining our written approval. Currently we understand and approve the sharing that has taken place in order to prepare our anti-trust case with Sea Land.

If this understanding is acceptable to the parties, please acknowledge below.

Acknowledged:

Wayne Berry   11/26/99

Wayne Berry

Acknowledged:

Ralph Stussi   11/26/99

Ralph Stussi

A00450

**Guidance**
S O F T W A R E

World's Largest Provider of Computer and Enterprise Investigation Solutions and Training

Contents:
Fleming

Export of File Listings

Disk 1 of 1    Case 11622-001B    Date 02/04/04
Investigator M. Gurzi

**Professional**
S E R V I C E S

EXHIBIT

FCS_Alter

| File Ext | Name | sLast Written | sLast Accessed | sFile Created | sEntry Modified | Physical Size | Full Path |
|---|---|---|---|---|---|---|---|
| mdb | FCS Logistics Screens 101001.mdb | 4/4/2003 | 4/11/2003 | 10/10/2001 | 7/7/2003 | 4067808 | Flemming Restore 2nd acq 02\Server FHL 134 D (135) 2m Acq\User Files\FHL147\CIDatabas\FCS Logistics Screens 101001.mdb |
| mdb | FCS Logistics Data Original.mdb | 3/2/2003 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 198719940 | Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CVAAA\FHL136\Text\WinNT\Advanced Troubleshooting\Berry Suit\Lawsuit\Evidence\FCS Logistics Data\Original.mdb |
| mdb | FCS Logistics Data.mdb | 3/2/2003 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 10567680 | 60.database sofware used by Fleming as of November 1, 2001\FCS Logistics Data.mdb   Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CVAAA\FHL136\Text\WinNT\Advanced Troubleshooting Windows NT Workstation_files |
| mdb | FCS Logistics Data.mdb | 2/26/2002 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 6943264 | 60.database sofware used by Fleming as of November 1, 2001\FCS Logistics Data.mdb   Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CVAAA\FHL136\Text\WinNT\Advanced Troubleshooting Windows NT Workstation_files |
| mdb | FCS Logistics Data.mdb | 11/1/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 3620964 | 61. The current database\FCS Logistics Data.mdb   Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CVAAA\FHL136\Text\WinNT\Advanced Troubleshooting Windows NT Workstation_files |
| mdb | FCS Logistics Data.mdb | 11/1/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 3620964 | 311. The current database\FCS Logistics Data.mdb   Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CVAAA\FHL136\Text\WinNT\Advanced Troubleshooting Windows NT Workstation_files |
| mdb | FCS Logistics Data.mdb | 11/1/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 3620964 | 21Current Database\FCS Logistics Data.mdb   Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CVAAA\FHL136\Text\WinNT\Advanced Troubleshooting Windows NT Workstation_files |
| mdb | FCS Logistics Data.mdb | 11/1/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 2986976 | Acq\CVAAA\FHL136\Text\Fleming\Berry Suit\Current Database\FCS Logistics Data.mdb   Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd |
| mdb | FCS Logistics Data.mdb | 11/1/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 3620964 | Acq\CVAAA\FHL136\Text\Fleming\Berry Suit\1. The current database\FCS Logistics Data.mdb   Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd |
| mdb | FCS Logistics Data.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 2232432 | Data.mdb   Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CVAAA\FHL136\Text\FAVC 26\FCS Logistics |
| mdb | FCS Logistics Data.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 2232432 | Workstation_files\FAVC 26\FCS Logistics Data.mdb   Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CVAAA\FHL136\Text\WinNT\Advanced Troubleshooting Windows NT |
| mdb | FCS Logistics Data.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 2232432 | 2\FAVC 26\FCS Logistics Data.mdb   Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd |
| mdb | FCS Logistics Data.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 2232432 | Acq\CVAAA\FHL136\Text\Fleming\Berry Suit\FAVC 26\FCS Logistics Data.mdb   Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd |
| mdb | FCS Logistics Data.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 2232432 | authored Fleming\PO.exe\FCS Logistics Data.mdb   Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CVAAA\FHL136\Text\WinNT\Advanced Troubleshooting Windows NT Workstation_files |
| mdb | FCS Logistics Data.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 2232432 | 50her\FCS Logistics Data.mdb   Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CVAAA\FHL136\Text\WinNT\Advanced Troubleshooting Windows NT Workstation_files |
| mdb | FCS Logistics Data.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 2232432 | 60ther\FCS Logistics Data.mdb   Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CVAAA\FHL136\Text\WinNT\and why Fleming replaced the Berry authored Fleming\PO.exe\FCS Logistics |
| mdb | FCS Logistics Data.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 2232432 | 3\4\w and why Fleming replaced the Berry authored Fleming\PO.exe\FCS Logistics Data.mdb   Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CVAAA\FHL136\Text\WinNT\Advanced Troubleshooting Windows NT Workstation_files |
| mdb | FCS Logistics Data.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 2232432 | 4\now and why Fleming restored the Berry authored Fleming\PO.exe\FCS Logistics Data.mdb   Flemming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CVAAA\FHL136\Text\WinNT\Advanced Troubleshooting Windows NT |
| mdb | FCS Logistics Data.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | 2232432 | Workstation_files\Current Database\FCS Logistics Data.mdb |

FCS_After

| File Ext | Name | sLast Written | sLast Accessed | sFile Created | sEntry Modified | Physical Size | Full Path |
|---|---|---|---|---|---|---|---|
| mdb | FCS EDI PO.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | | Fleming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CXAAA\vFHL136\Text\WinNT\Advanced Troubleshooting Windows NT Workstation_files 290816 4\1. The current database\FCS EDI PO.mdb |
| mdb | FCS EDI PO.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | | Fleming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CXAAA\vFHL136\Text\WinNT\Advanced Troubleshooting Windows NT Workstation_files 290816 2\FAVC 28\FCS EDI PO.mdb |
| mdb | FCS EDI PO.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | | Fleming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CXAAA\vFHL136\Text\WinNT\Advanced Troubleshooting Windows NT Workstation_files 290816 Acq\CXAAA\vFHL136\Text\Fleming\Berry Suit\FAVC 26\FCS EDI PO.mdb |
| mdb | FCS EDI PO.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | | Fleming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CXAAA\vFHL136\Text\WinNT\Advanced Troubleshooting Windows NT Workstation_files 290816 8\Other\FCS EDI PO.mdb |
| mdb | FCS EDI PO.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | | Fleming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CXAAA\vFHL136\Text\Fleming\Berry Suit\How and why Fleming replaced the Berry authored Fleming\PO.exe\FCS EDI PO.mdb |
| mdb | FCS EDI PO.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | | Fleming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CXAAA\vFHL136\Text\WinNT\Advanced Troubleshooting Windows NT Workstation _files 290816 Workstation _files\Current Database\FCS EDI PO.mdb |
| mdb | FCS EDI PO.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | | Fleming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CXAAA\vFHL136\Text\WinNT\Advanced Troubleshooting Windows NT Workstation_files 290816 8\Other\FCS EDI PO.mdb |
| mdb | FCS EDI PO.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | | Fleming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CXAAA\vFHL136\Text\WinNT\Advanced Troubleshooting Windows NT Workstation_files 290816 3\How and why Fleming replaced the Berry authored Fleming\PO.exe\FCS EDI PO.mdb |
| mdb | FCS EDI PO.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | | Fleming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CXAAA\vFHL136\Text\WinNT\Advanced Troubleshooting Windows NT Workstation_files 290816 9\Database software used by Fleming as of November 1, 2001\FCS EDI PO.mdb |
| mdb | FCS EDI PO.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | | Fleming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CXAAA\vFHL136\Text\WinNT\Advanced Troubleshooting Windows NT Workstation_files 290816 3\1. The current database\FCS EDI PO.mdb |
| mdb | FCS EDI PO.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | | Fleming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CXAAA\vFHL136\Text\Fleming\Berry Suit\1. The current database\FCS EDI PO.mdb |
| mdb | FCS EDI PO.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | | Fleming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CXAAA\vFHL136\Text\Fleming\Berry Suit\Database software used by Fleming as of November 1, 2001\FCS EDI PO.mdb |
| mdb | FCS EDI PO.mdb | 10/25/2001 | 7/6/2003 | 7/5/2003 | 7/4/2003 | | Fleming Restore 2nd acq 02\Comp 01 FHL 141 (151) 2nd Acq\CXAAA\vFHL136\Text\Fleming\Berry Suit\Current Database\FCS EDI PO.mdb |

Page 2



EXHIBIT "D"





EXHIBIT "E"





D:\Code - Berry\Database and Screens

File    Edit    View    Favorites    Tools    Help

Back    Forward    Up    Search    Folders    History    Move To    Copy To    Delete    Undo    Views

Address  D:\Code - Berry\Database and Screens

| Name | Size | Type | Modified |
|---|---|---|---|
| FCS EDI PO.mdb | 200,588 KB | Microsoft Access Ap... | 11/24/1999 6:31 AM |
| FCS Logistics Data.mdb | 167,648 KB | Microsoft Access Ap... | 11/24/1999 7:19 AM |
| FCS Logistics Screens 2000.mdb | 1,856 KB | Microsoft Access Ap... | 5/24/2000 9:28 AM |

3 object(s) (Disk free space: 0 bytes)

## AGREEMENT

In summary this agreement is entered into the partie  as Employer and Employee (also referring to agents and other associations), for the purpc ie of ensuring the protection of the Employer's business and information with a reasonable lim tation against an Employee competing with the Employer or divulging information. [See s immary at end]

Employer:

> API   ATLANTIC PACIFIC INT :RNATIONAL INC.

Employee or Agent:

> Jacqueline Li

1. Employee is employed as an agent (referred to as Emp loyee) or employee of Employer. Employee is an employee at will meaning that Employer may t rminate Employee from employment at any time according to the standard policy and p actices of Employer.
2. The parties agree to enter into this Agreement permitte d by the law of the State of Hawaii which shall be the governing law.
3. As long as Employee is an agent or employee of Emplo er and for a period of ☑ 5 years ☐ 3 years ☐ 2 years after termination of employment, Employ ie will not directly or indirectly own, manage, be employed by, engage in, carry on or be conne ted in any other manner with any business in the area of, or engaged in the business of Employer which is or engage in any other business similar to the type of business conducted by Employe which is:

> FREIGHT FORWARDING,   FREIGHT CONS JLTANT,
> UNDER (ICC) AND (FMC)

4. Employee will not at any time, either during employn ent or after termination of employment, directly or indirectly make known or divulge to ɛ ny person, firm, or corporation or business the names or addresses of any of the customers of :mployer.
5. Employee will not at any time, either during employn ent or after termination of employment, directly or indirectly, either for himself or herse or for any other person, firm, corporation or business, call upon, solicit, divert, or tak( away, or attempt to solicit, divert, or take away, any of the customers of the Employer.
6. Employee will not at any time, in any fashion, form, ır manner, either directly or indirectly, divulge, disclose, or communicate to any person, fi n, or corporation in any manner whatsoever any information of any kind, nature, or de cription concerning the matters affecting or relating to the business of the Employer, including ut not limited to, the names of any of its customers or prospective customers or any other inl rmation concerning the business of the Employer, its manner of operation, its plans, or any othe data of any kind, nature or description, without regard to whether any or all of the foregoin matters would be deemed confidential, material, or important; provided, however, that Er ployee may disclose such

1

# EXHIBIT "F"

information to a customer of the Employer in the ordinary cours: of business and may disclose such information to another employee of the Employer in the c rdinary course of working together for Employer.

7.      All books, records, files, forms, reports, accounts and documents relating in any manner to the Employer's business or customers, whether prep red by Employee or anyone else, shall be the exclusive property of the Employer and shall be returned immediately to the Employer upon termination of employment or upon the Employ r's request at any time.

8.      The parties stipulate that each of the foregoing matte s are important, material, and confidential, and gravely affect the effective and successful cond ct of the business of the Employer and affect its reputation and goodwill, and that any br ach of the terms of this Agreement is a material breach from which Employee may be e ijoined and for which the Employee shall also pay to the Employer all damages (includin: but not limited compensatory, incidental, consequential and lost profits damages), which arise from the breach, together with interest, costs and attorney fees to collect such damages.  Any l wsuits for breach may be brought in the State of Hawaii or any proper venue.

9.      Employer may waive a provision of this Agreement oni / in a writing signed by any two officers of Employer.  The wavier by Employer of a breach by t mployee of any provision of this Agreement shall not operate or be construed as a waiver of any ubsequent breach by the Employee.

10.      The rights and obligation of the Employer under this A: eement shall inure to the benefit of and shall be binding upon the successor and assigns c Employer.  Employee shall not assign his or her rights or obligations under this Agreement.

11.      Attached are letters from customers instructing Emplo er to maintain confidential information relating to the customer which the parties agree to respect.

In witness whereof, the parties have executed this Ag eement:

HONOLULU          HAWAII          3|1|96
City          State          Date

SIGNATURES:

Employer:
API    ATLANTIC PACIFIC INTERNATIOI AL INC.

A Hawaii corporation

Employee:
Jacqueline Kiu

2

Witnesses

*max hghub*

Time, area and description limitations:

METROPOLITION HONOLULU WAIPAHU, KANEOH , PEARL CITY
KAPOLEI.
FREIGHT FORWARDING, FREIGHT CONSULTANT (ICC) (FMC)

Attach copy of letters of request from customers
Time, area and description limitations:

3

## AGREEMENT

In summary this agreement is entered into the parties as Employer and Employee (also referring to agents and other associations), for the purpose of ensuring the protection of the Employer's business and information with a reasonable limitation against an Employee competing with the Employer or divulging information. [See summary at end]

Employer:

> API   ATLANTIC PACIFIC INTERNATIONAL INC.

Employee or Agent:

> Teresa A Salazar

1.      Employee is employed as an agent (referred to as Employee) or employee of Employer. Employee is an employee at will meaning that Employer may terminate Employee from employment at any time according to the standard policy and practices of Employer.

2.      The parties agree to enter into this Agreement permitted by the law of the State of Hawaii which shall be the governing law.

3.      As long as Employee is an agent or employee of Employer and for a period of ☐ 5 years ☐ 3 years ☐ 2 years after termination of employment, Employee will not directly or indirectly own, manage, be employed by, engage in, carry on or be connected in any other manner with any business in the area of, or engaged in the business of Employer which is or engage in any other business similar to the type of business conducted by Employee which is:

> FREIGHT FORWARDING,   FREIGHT CONSULTANT,
> UNDER (ICC) AND (FMC)

4.      Employee will not at any time, either during employment or after termination of employment, directly or indirectly make known or divulge to any person, firm, or corporation or business the names or addresses of any of the customers of Employer.

5.      Employee will not at any time, either during employment or after termination of employment, directly or indirectly, either for himself or herself or for any other person, firm, corporation or business, call upon, solicit, divert, or take away, or attempt to solicit, divert, or take away, any of the customers of the Employer.

6.      Employee will not at any time, in any fashion, form, or manner, either directly or indirectly, divulge, disclose, or communicate to any person, firm, or corporation in any manner whatsoever any information of any kind, nature, or description concerning the matters affecting or relating to the business of the Employer, including but not limited to, the names of any of its customers or prospective customers or any other information concerning the business of the Employer, its manner of operation, its plans, or any other data of any kind, nature or description, without regard to whether any or all of the foregoing matters would be deemed confidential, material, or important; provided, however, that Employee may disclose such

1

**EXHIBIT "G"**

information to a customer of the Employer in the ordinary cours: of business and may disclose such information to another employee of the Employer in the o dinary course of working together for Employer.

7.      All books, records, files, forms, reports, accounts and locuments relating in any manner to the Employer's business or customers, whether prepared by Employee or anyone else, shall be the exclusive property of the Employer and shall be returned immediately to the Employer upon termination of employment or upon the Employer's request at any time.

8.      The parties stipulate that each of the foregoing matter are important, material, and confidential, and gravely affect the effective and successful cond ct of the business of the Employer and affect its reputation and goodwill, and that any breach of the terms of this Agreement is a material breach from which Employee may be en joined and for which the Employee shall also pay to the Employer all damages (including but not limited compensatory, incidental, consequential and lost profits damages), which arise from the breach, together with interest, costs and attorney fees to collect such damages. Any la wsuits for breach may be brought in the State of Hawaii or any proper venue.

9.      Employer may waive a provision of this Agreement onl  in a writing signed by any two officers of Employer. The wavier by Employer of a breach by E nployee of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by the Employee.

10.     The rights and obligation of the Employer under this Ag eement shall inure to the benefit of and shall be binding upon the successor and assigns o  Employer. Employee shall not assign his or her rights or obligations under this Agreement.

11.     Attached are letters from customers instructing Emplo; er to maintain confidential information relating to the customer which the parties agree to respect.

In witness whereof, the parties have executed this Ag eement:

| HONOLULU | HAWAII | 1-9-96 |
|----------|--------|--------|
| City     | State  | Date   |

SIGNATURES:

Employer:

    API   ATLANTIC PACIFIC INTERNATIONAL INC.

    A Hawaii corporation

Employee:

    Teresa A. Salaga

2

Witnesses

Time, area and description limitations:

METROPOLITION HONOLULU WAIPAHU, KANEOHE, PEARL CITY
KAPOLEI.
FREIGHT FORWARDING, FREIGHT CONSULTANT (ICC) (FMC)

Attach copy of letters of request from customers
Time, area and description limitations:

3

# THE ECONOMIC ESPIONAGE ACT OF 1996: THE THEFT OF TRADE SECRETS IS NOW A FEDERAL CRIME

## R. MARK HALLIGAN, ESQ.



Powered by LivePerson™

mhallign@execpc.com

| HOME PAGE | | NEXT |

Copyright 1996-1997 R. Mark Halligan, Esq.

THE TRADE SECRETS HOME PAGE
http://execpc.com/~mhallign

Trade Secrets Case Law Database

R. Mark Halligan, Esq.

Trade Secrets Home Page

Selected Trade Secret Articles

Trade Secrets Home Page Online

Economic Espionage Act of 1996

Other Related Federal Statutes

Trade Secret Office, Inc.

Guided Tour of the Trade Secrets Home Page

Sample Nondisclosure Form

Internet

On October 11, 1996, President Clinton signed "The Economic Espionage Act of 1996" into law. The theft of trade secrets is now a federal criminal offense. This is a major development in the law of trade secrets in the United States and internationally. The Department of Justice now has sweeping authority to prosecute trade secret theft whether it is in the United States, via the Internet, or outside the United States.

Section 1832 of the Act makes it a federal criminal act for any person to convert a trade secret to his own benefit or the benefit of others intending or knowing that the offense will injure any owner of the trade secret. The conversion of a trade secret is defined broadly to cover every conceivable act of trade secret misappropriation including theft, appropriation without authorization, concealment, fraud artifice, deception, copying without authorization, duplication, sketches, drawings, photographs, downloads, uploads, alterations, destruction, photocopies, transmissions, deliveries, mail, communications, or other transfers or conveyances of such trade secrets without authorization.

The Act also makes it a federal criminal offense to receive, buy or possess the trade secret information of another person knowing the same to have been stolen, appropriated, obtained or converted without the trade secret owner's authorization. The definition of a "trade secret" in the Act generally tracks the definition of a trade secret in the Uniform Trade Secrets Act but expands the definition of a trade secret to include the new technological ways that trade secrets are created and stored.

The term "trade secret" means all forms and types of financial, business,



EXHIBIT "H"

scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by the public.

A violation of Section 1832 can result in stiff criminal penalties. A person who commits an offense in violation of Section 1832 can be imprisoned up to 10 years in prison and fined up to $500,000. A corporation or other organization can be fined up to $5,000,000. If the trade secret theft benefits a foreign government, foreign instrumentality or foreign agent, the penalties are even greater.

Section 1831 provides that a person can be imprisoned up to 15 years and fined up to $500,000 if the offense is committed "intending or knowing" that the offense will "benefit a foreign government, foreign instrumentality or foreign agent." A corporation or other organization can be fined up to $10,000,000. A "foreign instrumentality" is defined under the Act to mean any agency, bureau, ministry, component, institution, association, or any legal, commercial or business organization, corporation, firm or entity that is substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government. In turn, the term "foreign agent" is defined by the Act to mean any officers, employee, proxy servant, delegate, or representative of a foreign government.

Both "attempts to" commit Section 1831-1832 offenses and "conspiracies" to commit Section 1831-1832 offenses are proscribed by the Act. The same penalties apply to these offenses with increased penalties if the trade secret misappropriation benefits foreign government, foreign instrumentality or a foreign agent.

Under the Act, there is also criminal forfeiture to the United States of (1) any property constituting or derived from the proceeds of violations of the Act, and (2) the forfeiture of any property used or intended to be used, in any manner or part, to commit or facilitate a violation of the Act. The criminal forfeiture provisions will now enable Federal prosecutors to dismantle entire Internet networks and seek criminal forfeiture of all the computers, printers and other devices used to commit or facilitate the offenses proscribed by the Act.

The Act also authorizes the Attorney General, Deputy Attorney General, or Assistant Attorney General in the Criminal Division of the Justice Department to apply for a federal court order authorizing or approving the interception of wore or oral communications by the FBI or other federal agencies having responsibility for the investigation of the offense. These are the same investigative tools available in other federal criminal prosecutions.

The Act also applies to offenses committed outside the United States if (1) the offender is a citizen or permanent resident alien of the United States, (2) if the corporation or other organization was incorporated or organized in the United

States, or (3) an act in furtherance of the offense was committed in the United States. These extraterritorial provisions in the Act will provide the Justice Department with broad authority to prosecute the international theft of trade secrets and will prevent the wilful evasion of liability for trade secret misappropriation by using the Internet or other means to transfer the trade secret information outside the United States.

The Attorney General is also authorized to commence civil actions to obtain injunctive relief to protect the trade secret owner from any violations or further violations of the Act. There is no requirement in the Act that criminal indictments be issued first. Therefore, the Justice Department may commence civil actions for injunctive relief at any stage of the investigation. In any prosecution or other proceeding under the Act, the Court is required to issue protective orders and to take such other action as be necessary to preserve the confidentiality of the trade secrets consistent with the Federal Rules of Criminal and Civil Procedure. The federal courts have exclusive original jurisdiction. However, the Act states that it shall not be construed to preempt or displace any other remedies, whether civil or criminal, relating to the misappropriation or theft of trade secrets, or the otherwise lawful disclosure of information required by law, or necessary actions by a governmental entity of the United States, a State or a political subdivision of a State.

The Economic Espionage Act of 1996 now creates federal trade secret rights. Although there is no private cause of action for trade secret misappropriation under the Act, the federal criminal penalties imposed for the misappropriation of trade secrets are generally more severe than criminal violations of other intellectual property rights. Persons engaged in trade secret misappropriation can no longer be assured that liability will be limited to civil remedies and damages imposed for such misconduct.

By passage of this legislation,  the United States now recognizes that the protection of trade secrets is vital to the U.S. economy. Companies are now spending millions of dollars to create and protect trade secret information from competitors. Unless there are strong deterrents to trade secret theft, the competitive advantage of U.S. companies, afforded by trade secrets, will inevitably be stifled. Intangible property assets are often more valuable to the prosperity of U.S. companies than tangible assets. Many manufacturing operations are being moved offshore with the U.S. companies instead producing and licensing the intellectual property and "know-how" to produce such products.

The protection of trade secrets is now becoming increasingly important to the competitiveness of American industry and the economic strength of the United States. At the same time that these structural changes have been occurring in the U.S. economy, the world has been undergoing a computer revolution. Since at least the beginning of the 1990s, the power of computer technology has grown exponentially resulting in increasingly more powerful means for the theft and transfer of trade secret information.

The rapid growth of the Internet is a reflection of this exponential growth. The Internet can now be used as a tool for the destruction of trade secret rights. Today, an item of trade secret information (such as computer source code, a biochemical formula, or technical schematics) can be as valuable to a company as an entire factory was even several years ago. Computers now

make it extremely easy to surreptitiously copy and transfer this valuable trade secret information. An employee can now download trade secret information from the Company's computer on a diskette, take it home and scan the information on the hard drive of a home computer, and then upload it to the Internet where it can be transmitted within minutes to any part of the world. The receiving party, in turn, can do the same thing within minutes. Within days, a U.S. company can lose complete control over its trade secret rights forever.

Existing federal laws have been inadequate to protect against this new high-tech theft of intellectual property rights. If an arsonist burns downs the factory, there are criminal laws to prosecute against this misconduct. However, if a company is destroyed by trade secret theft, the company's only remedy is often civil litigation for trade secret misappropriation. Up until now, federal prosecutors have relied primarily upon the National Stolen Property Act and the wire and mail fraud statutes to commence criminal prosecutions for trade secret theft. The National Stolen Property Act was enacted by Congress in 1934 to prevent criminals from evading state prosecutions by fleeing in automobiles across state lines with stolen property. Prosecutions under 18 U.S.C. § 2314 require the government to prove that "goods, wares or merchandise" were transported in "interstate or foreign commerce" and that the defendant knew that they were "stolen, converted or taken by fraud." Trade secret prosecutions under this Act have been difficult because some courts have held that the theft of "purely intellectual property" does not constitute the theft of "goods, wares or merchandise" as required by 18 U.S.C. § 2314.31.

The federal mail and wire fraud statutes have likewise not been well suited to prosecute all forms of trade secret misappropriation. These statutes prohibit devising any scheme involving use of the mails or interstate wire transmission for obtaining "property" by false pretenses or representations. Although the Courts have not had a difficult time finding that "property" includes intangible property for purposes of these statutes, prosecutions have been difficult because the government must prove a "scheme to defraud" and then use of the mail or wire transmissions in order to obtain a conviction for trade secret theft.

The legislative history makes it clear that one of the primary reasons for enacting the Economic Espionage Act of 1996 was to fill these existing gaps in current federal law and to create a national scheme to protect U.S. proprietary economic information. Civil remedies alone are often insufficient to deter trade secret misappropriation. The Congress observed that many companies forego civil suits because the defendant is often judgment-proof, or the company does not have the financial resources to bring a civil action, or the company does not have the necessary investigative resources to pursue a sophisticated trade secret theft. Further, even if a company does bring suit, the civil penalties are often absorbed by the offenders as a cost of doing business. Most state criminal laws dealing with this type of theft are only misdemeanors and such state laws are rarely used by State prosecutors.

Prosecutorial discretion will be critical to the success of the Economic Espionage Act of 1996. One of the Senate versions of the bill (S. 1556) required the Attorney General, the Deputy Attorney General, or the Attorney General for the Criminal Division of the Justice Department to "personally

approve" any prosecutions under the Act. However, this section ("Prior Authorization Requirement") was left out of the final version of the bill.

Often times in civil litigation, it is difficult to determine whether the alleged trade secret constitutes the "general knowledge, skills or experience" of the former employee or the valid "trade secret" information of the former employee. To avoid constitutional infirmities, there should be no federal prosecutions when the conduct of the defendant falls within this grey area. The remedies should be limited to civil actions under such circumstances. Proof of "knowledge or intent" to convert the trade secret to the detriment of the trade secret owner should also be held to strict proof.

The right of competition, the free and unfettered right of individuals to move from one company to another, and the right of individuals to use their general knowledge, skills and experience should not be injured or chilled in any way by this new federal legislation. The Economic Espionage Act of 1996 is a major development in the law of trade secrets in the United States and internationally. If this new legislation is not misused by overzealous Federal prosecutors, the result will be continued growth and vitality of trade secret rights, increased competitiveness, and increased economic strength of the United States in the international marketplace. The Internet will also be effectively eliminated as a tool for the destruction of trade secret rights in the United States and abroad.

For further information, contact R. Mark Halligan, Esq. mhallign@execpc.com

(312) 526-1559 (direct) (312) 526-1560(fax) 1-888-868-0285(toll free-emergencies only)

## Mark Dillon

| | |
|---|---|
| **From:** | "Mark Dillon" <markd@fleming-logistics.com> |
| **To:** | "Brian Christensen" <bchrist@email.fleming.com> |
| **Sent:** | Wednesday, May 14, 2003 9:02 AM |
| **Attach:** | Copy of DATABASE CREATION.xls |
| **Subject:** | Specs for Logistics database |

Brian,

The redacted specifications for a replacemnet database for logistics.  Since Shane would like to use a Pick database, which is uncommonly used, I would like to do some research on it before we go this route. I'm always up for the challenge to learn new things, but support (changes, addons, etc.) for a Pick database may be hard to find and a little more expensive when needed.

Mark

D0066
12/11/2003



## Mark Dillon

| | |
|---|---|
| **From:** | "Mark Dillon" <markd@fleming-logistics.com> |
| **To:** | "Brian Christensen" <bchrist@email.fleming.com> |
| **Sent:** | Thursday, May 15, 2003 9:57 AM |
| **Subject:** | Replacement for Logistics database |

Brian,

Shane Kelley, Hawaiian Express' database developer has called me a couple time to ask questions. Based on our conversations, I perceive the following pros and cons for and against taking this route.

One con in particular which concerns me: Shane and his web developer on one occeasion saw the list of tables in the "database window" of the Berry database and on various occaisions saw the screens (probably only the "Jobs Screen") when working at HEX. Mr. Hogan would be aware of this, since Shane apparently admitted this during the discovery process for the lawsuit. Normally, this wouldn't mean anything, but given Mr. Berry and Mr. Hogan, it means we can be made to appear less than competely clean since employees of the company developing a replacement for Mr. Berry's database have "looked at" the software they are replacing. Mr. Berry and Mr. Hogan are garaunteed to make it appear more than it is. The employee of Shane's company who would develop the PICK database has not seen Mr. Berry's database at all, but the web develper who has seen the Berry database would be developing the screens for the PICK database. Perhaps the fact that we have in the Hawaiian Express PICK database a predecessor from which we can prove independence from Mr. Berry's database trumps the foregoing concern.

Pros:

- ○ Shane is wholly accepting of our need to the full rights of ownership of any software he creates to replace the logistics database.
- ○ Shane has already begun devising a mock up of what he will do for us. I think he will come up with a demo in a couple of weeks.
- ○ His rates are reasonable.
- ○ He has in the HEX database a piece of software from which he can derive a database for the Logistics department, providing evidence of independence from Berry's software. He would have to make this relationship obvious in the manner he develops and documents the develpment of a replacement for the Logistics database.
- ○ The PICK database system is very fast and very stable.
- ○ The PICK database system is far removed in concept, the way it does things and appearance from Microsoft Access (It is actually a text screen database, just like the Fleming CICS mainframe database, but can be accessed from a web browser using the graphic user interface of Windows.)

Cons:

- ○ Shane and one of his employees has apparently seen Mr. Berry's software when it was being accessed by HEX employees.
- ○ PICK database is uncommonly used and support personnel are likely rare.
- ○ Small changes to forms and the database require more expertise than the alternative.
- ○ Changes aren't as easily made as with
- ○ The PICK database software is likely expensive ($25,000 per server?)
- ○ The company supporting PICK database is small.

D0067
12/11/2003

## Mark Dillon

| | |
|---|---|
| **From:** | "Mark Dillon" <markd@fleming-logistics.com> |
| **To:** | "Teresa Noa" <teresan@fleming-logistics.com> |
| **Cc:** | "Brian Christensen" <bchrist@email.fleming.com> |
| **Sent:** | Thursday, May 29, 2003 6:10 PM |
| **Subject:** | Re: POTENTIAL SYSTEM |

Have we reduced our options to a Cygnus PICK database? I am still debating this inside. The one great advantage of using Cygnus to create a replacement database are:

1. They have a database they created that predates the Berry database, which they can use as the original source for their work.
2. Also important is that a PICK system sets it far apart from Berry's database from a technology perspective, though there is a question whether a judge will readily appreciate that fact. I suppose having a judge look at a PICK screen along side a Berry Access screen would appear obviously different simply on the basis of the textual look versus the Windows graphic user interface look.

For most other reasons, I do not believe that PICK is the way to go. These are:

1. Windows applications can be highly automated, with macros, VBA modules, and other Microsoft technologies such as OLE, COM and ActiveX controls, which in will translate into increased productivity and accuracy. This is not a small point.
2. The ease with which users currently select a range of rows or columns and export them to a spreadsheet, email or Word document also greatly enhances productivity.
3. The data composition and structure is easily manipulated by end users (using query design components that allow you to switch the order of columns by simply dragging them here or there, that allow you to select contiguous rows and non-contiguous rows and do whatever with them.) Moreover, this can be done intuitively with a mouse, whereas I expect that PICK is going to require much more knowledge of codes and syntax to do things.
4. Whereas navigation in a Windows based database can be greatly enhance by hotkeys, macros and code, I am unsure of the capabilites and ease with which this can be done with PICK. This also increases productivity.
5. Working apart form the Windows environment, PICK technology will likely fade away unless a version thoroughly integrated with Windows is marketed. The company owning the rights to PICK is small and not in the mainstream.

Before going ahead with PICK, I would prefer to first:

1. Take time to explore a PICK demo I downloaded but have not had time to work with.
2. See if the local developer I spoke with has a piece of software that can be adapted in such a way that it also has the advantage of being convincing in court. Then we could have all the things we want in a database.

If all we want to do now is get away from Berry's software, I suppose PICK is a good way to go, perhaps the best. However, this is only true if Cygnus takes their HEX database or a similar database they own the rights to and then adapt it to our needs, keeping copies of the various versions as they progress to create a "paper trail". It behooves them to archive their work at the end of each day as evidence in court.

Mark

----- Original Message -----
From: "Teresa Noa" <teresan@fleming-logistics.com>
To: "Brian Christensen" <bchrist.HAWPO.PSS@email.fleming.com >
Cc: "Mark" <MarkD@fleming-logistics.com>
Sent: Thursday, May 29, 2003 4:07 PM
Subject: POTENTIAL SYSTEM

> Here is a response from Esther Wagner. I spoke w/ her in great detail of
> our needs - and I feel she has a good understanding of our needs and this
> would be the best way to go.
>
> Mark - is there anything else that I should ask her in regards to the
> ability to make changes, reporting etc. She, in this email mentions the
> ability to set it up in windows etc etc - I don't see a need for that if
> #1 The cost is more
> #2 We don't have access to generate our own reports (in whatever format etc)
>
> I think the system would be user friendly - and if anyone ever stepped into
> my position would be able to see how each particular PO/container is
> handled - without having to research further - right now everything is just
> in my head - which makes it very hard to just sit someone at my
> desk.
>
> Brian - what do you think about the legal side of what she has to say. I
> see she did not mention a cost - so I am sure there is a strategic reason in
> holding that back. What other questions should we ask in that sense?
>
> Let me know and I will get back to her.
>
>
>
> ----- Original Message -----
> From: "Esther Wagner" <ewagner@cygnusservices.com>
> To: "Teresa Noa" <TeresaN@Fleming-Logistics.com>
> Sent: Thursday, May 29, 2003 12:56 PM
>
>
> > Hi, Teresa,
> >
> > It was a pleasure talking to you this morning about the Fleming logistics
> > operations.
> >
> > I am proposing to write custom software for Fleming through Cygnus
> Services.
> > One of the main advantages of custom software is that the individual
> modules
> > will be designed to reflect how you do business. You will be able to
> > specify what fields are included in each screen, how the data will
> interact
> > from one screen to another, and what kinds of screens and reports will
> help
> > you do your work most efficiently. As a programmer with a business
> > background, I can help to organize some of these requirements and make
> > suggestions to help protect the integrity of your data while making data
> > displays and actual data entry as efficient as possible.
> >
> > You asked me to summarize the restrictions that would apply to any custom
> > software written for Fleming. The main restriction is simply that Fleming
> > would not have the right to sell (or trade or give away) my software or
> any
> > modified version of it. But I will list below the terms of my usual

> > agreement in more formal language, so that you may be assured that there
> are
> > no hidden provisions.
> >
> > 1. Fleming would be granted a non-cancelable, non-exclusive license to use
> > any and all programs and procedures written by Esther Wagner for Fleming.
> >
> > 2. All programs and procedures written by Esther Wagner and provided to
> > Fleming would be accompanied by the source code required to modify these
> > programs and procedures. Fleming would have the right to modify these
> > programs or procedures in any way they please or to contract with other
> > programmers or service providers to make changes to these programs and
> > procedures.
> >
> > 3. Esther Wagner reserves all proprietary, copy, and other trade rights
> > associated with programs and procedures written by Esther Wagner.
> >
> > 4. Esther Wagner agrees to maintain the confidentiality of all of
> Flemings'
> > trade secrets and trade processes, including such data as customer lists,
> > pricing, and cost data.
> >
> > That concludes the terms of my usual agreement to provide custom
> programming
> > services.
> >
> > I know that Fleming is choosing between a Pick-based system (the sort I
> > write) and a windows-based system. As we discussed, the software I am
> > proposing to write uses text-based menus and screens, as opposed to
> > "windows" with point-and-click navigation using a mouse. Although it is
> > possible to add "windows"-type screens (reports or entry screens) to a
> > pick-based system, that would be an additional project. The "main system"
> I
> > would write would be text-based, like the little demo you saw.
> >
> > Also, Pick-based data can be made available to windows-based programs such
> > as Crystal Reports or Excel Spreadsheets. However, the data is not
> > "automatically" retrievable in these formats (as it might be in some
> > windows-based software packages). I would expect to include many standard
> > reports and forms in a custom package -- for instance, the invoices
> > currently produced through Crystal Reports can be printed from the
> > pick-based software. Other data can either be "exported" from the pick
> > database to a spreadsheet format or we can write a "translation" table so
> > that data can be "imported" or read by Crystal Reports.
> >
> > I think there are several advantages to a Pick-based software package,
> > including programming flexibility, extensive customization, and fast data
> > entry and retrieval. The main disadvantage is that the "look and feel" of
> a
> > text-based package is very different from the "windows" look that many
> users
> > are accustomed to. As the "user representative", I think you are probably
> > the most qualified to judge the importance of these issues to the end
> users.
> >
> > To me, the fun of designing a custom package is creating a set of programs
> > that really fits a particular business and makes everyone's jobs easier.
> I
> > hope Fleming chooses a Pick system and I hope to work with you to create
> the
> > best possible software package for Fleming's logistics operations.

> >
> > Sincerely yours,
> >
> > Esther Wagner
> > Cygnus Services
> > (510) 847-4624
> >

D0115

# Fleming Logistics Department
## Overview of Functions

**Tracking from Point of Order**

Ensures claims are filed correctly – and to the liable party at the beginning – eliminating erroneous deductions, incorrect claim filing etc

Negotiates salvage amount – (previously was being paid by the pallet – now getting at least 50% of the value of the product)

**Inbound Scheduling**

Assists in overall service level to merchandiser by keeping them informed of orders not received by vendor, late deliveries from vendor and shortages per line item.

**Item Information**

Utilizing same database to track Purchase Orders and Containers – automated the inbound schedule to help manage Inbound Containers/Deliveries

**Pallet and Card Board Recycling Program**

We Monitor excessive discrepancies between an item's cube and weight as recorded in the Fleming system and that recorded by service providers as a basis for their charges.   We th

**Container Detention Demurrage Charges**

Fleming Logistics was instrumental in the upstart of a new recycling program, arranging for the delivery of ocean containers of cardboard and pallets back to the West Coast – Averag

**Pallet Exchange Program**

Logistics is able to identify containers in advance that are approaching the last day to assist in eliminating detention charges.  Ability to charge appropriate party for the detention ch

Logistics tracks all pallets shipped from the west coast to Hawaii by purchase order.  Matches up with actual receipt and reports any discrepancies.

Reconciles CHEP Pallet Program



EXHIBIT

D0116

en correct the Fleming data, if errant, or else request a refund from service provider.

ge per month $22,000.00

arges – instead of Fleming absorbing cost if no fault of their own.

D0117

**Logistics Coordinated #s Year 2002 (BOTH INBOUND AND OUTBOUND, 3D PARTY BILLING)**

# of Purchase Orders – 15,825
# of Containers – 7058

TOTAL # OF PEOPLE

1 – LOGISTICS COORDINATOR/SUPERVISOR

1 - FREIGHT BILLING/AUDITOR

1 - CLAIM SPECIALIST – BACK UP TO LOGISTICS COORDINATOR

1 - I/T

1 - FREIGHT PAYMENT (TRANSFERS INFO FROM LOGISTICS DATABASE TO FLEMING MAINFRAME FOR PAYMENT, COLLECTS PREPAID FREIGHT BILLS, OUTSIDE BILLING)

D0118

# LOGISTIC'S OPERATIONS

ALL THESE TABLES/QUERIES NEED TO BE LINKED

PURCHASE ORDERS - Track purchase order status, cost, discrepancies, load sequence in container, rush orders etc  from point of ordering

FIELDS NEEDED:

| | |
|---|---|
| SHIPPER | SET UP BY LOGISTICS - AND THEN DEFAULT BY VENDOR CODE |
| INVOICEE | SET UP BY LOGISTICS - AND THEN DEFAULT BY VENDOR CODE |
| VENDOR | COMES FROM PO - WHICH IS EDI |
| VENDOR CODE | COMES FROM PO - WHICH IS EDI |
| POC (Point of Contact) | SET UP BY LOGISTICS - AND THEN DEFAULT BY VENDOR CODE |
| POC PHONE | SET UP BY LOGISTICS - AND THEN DEFAULT BY VENDOR CODE |
| Merchandiser | COMES FROM PO - WHICH IS EDI |
| PORT | SET UP BY LOGISTICS - AND THEN DEFAULT BY VENDOR CODE |
| ARRIVAL DATE | COMES FROM PO - WHICH IS EDI |
| SAIL DATE | LOGISTICS TO MANUALLY INPUT UPON RECEIPT OF THE PO BASED ON ARRIVAL AND PO INSTRUCTIONS |
| COMMODITY | SET UP BY LOGISTICS - AND THEN DEFAULT BY VENDOR CODE |
| ORDER CASE | COMES FROM PO - WHICH IS EDI |
| ORDER CUBE | COMES FROM PO - WHICH IS EDI |
| ORDER WEIGHT | COMES FROM PO - WHICH IS EDI |
| BOL CASE | MANUALLY INPUT UPON RECEIPT OF THE ACTUAL BILL OF LADING |
| BOL CUBE | MANUALLY INPUT UPON RECEIPT OF THE ACTUAL BILL OF LADING |
| BOL WEIGHT | MANUALLY INPUT UPON RECEIPT OF THE ACTUAL BILL OF LADING |
| CONSOLIDATED CASE | MANUALLY INPUT UPON RECEIPT OF THE ACTUAL BILL OF LADING COMPARE TO ACTUAL RECPT OF PRODUCT |
| CONSOLIDATED CUBE | MANUALLY INPUT UPON RECEIPT OF THE ACTUAL BILL OF LADING COMPARE TO ACTUAL RECPT OF PRODUCT |
| CONSOLIDATED WEIGHT | MANUALLY INPUT UPON RECEIPT OF THE ACTUAL BILL OF LADING COMPARE TO ACTUAL RECPT OF PRODUCT |
| VERIFIED CASE | CASE, CUBE AND WEIGHT ADJUSTED FOR SHORT, DAMAGE AND OVERAGE (USED FOR ACCOUNTING PURPOSES) |
| VERIFIED CUBE | |
| VERIFIED WEIGHT | |
| # OF PALLETS | MANUALLY INPUT - BY CONSOLIDATOR OR UPON RECEIPT OF THE BILL OF LADING |
| CHEP | TRUE/FALSE - MANUALLY INPUT |
| PALLET EXCHANGE | TRUE/FALSE - MANUALLY INPUT |

D0119

LOAD TYPE — SET UP BY LOGISTICS - AND THEN DEFAULT BY VENDOR CODE
FOB POINT — SET UP BY LOGISTICS - AND THEN DEFAULT BY VENDOR CODE
RELEASE — MANUALLY INPUT
WAREHOUSE — SET UP BY LOGISTICS - AND THEN DEFAULT BY VENDOR CODE
DESTINATION TRUCKER — SET UP BY LOGISTICS - AND THEN DEFAULT BY VENDOR CODE
DEPARTMENT CODE — SET UP BY LOGISTICS - AND THEN DEFAULT BY VENDOR CODE
BACKHAUL ALLOCATED — FORMULA FIELD FOR EACH PO - CURRENTLY MANUALLY INPUT
WEST COAST INBOUND APPT — MANUALLY INPUT - DATE/TIME FIELD
ACTUAL TIME OF RECEIPT — MANUALLY INPUT - DATE/TIME FIELD
SAILING CHART NOTES — MANUALLY INPUT
NOTES — COMES FROM PO - WHICH IS EDI; - AND THEN A HISTORY IS MANUALLY INPUT AS IT HAPPENS
CANCELLED — MANUALLY INPUT - IF ORDER IS EVER CANCELLED - THUS TAKING OF ANY PLANNING REPORTS

PURCHASE ORDER COST - FIELDS TO IDENTIFY COSTS SPECIFIC TO THE PURCHASE ORDER ONLY - TRACK COST AND PAYMENT TO PAYEE

| SERVICE PROVIDER | TYPE OF MOVE | ORIGIN | DESTINATION | AMOUNT | INVOICE # | PAID DATE | CHECK # | NOTES |
|---|---|---|---|---|---|---|---|---|
| NEED PULL DOWN MENU | | | | | | | | |

PURCHASE ORDER - CONTAINER LOCATION
Same screen as the PO - can search to see what container it is assigned - and what sequence in the container

PURCHASE ORDER - CLAIM INFORMATION

| DATE OF CLAIM | CLAIM REF # | TYPE OF CLAIM | LIABLE PARTY | AMOUNT | SALVAGE AMOUNT | CK # FM SALVAGE | PAID DATE | APPROVE BY | LIABLE PARTY PAY AMOUNT | CHECK # | CK# | REC DATE | STATUS OF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

D0120

DATE OF
STATUS

D0121

**INBOUND CONTAINER INFO - WEST BOUND TO FLEMING'S WAREHOUSES - WILL NEED TO LINK TO OUTBOUND ORDERS, CONTAINERS AND INBOUND PO SCREEN**

FIELDS NEEDED:

| Field | Note |
|---|---|
| SHIPPER | WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER |
| CONSIGNEE | WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER |
| ARRIVAL DATE | |
| SAIL DATE | |
| TARIFF # | WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER |
| ORIGIN | WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER |
| ORIGIN PORT | WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER |
| CLIMATE (CHILL/DRY/FROZEN) | WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER |
| SUMMARY CASE | |
| SUMMARY CUBE | |
| SUMMARY WEIGHT | |
| DESTINATION PORT | |
| SIT DESTINATION PORT | |
| CONTAINER # | |
| SEAL # | |
| BOOKING # | |
| VESSEL | |
| VOYAGE | |
| SIZE OF CONTAINER | WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER |
| TYPE OF CONTAINER | WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER |
| TEMPERATURE SETTING | WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER |
| CHEP REFERENCE # | WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER |
| TYPE OF MOVE | WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER |
| ORIGIN DRAYAGE | WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER |
| PICK UP LOCATION | |
| DESTINATION PICK UP DATE | FORMULATE 1 DAY AFTER THE ARRIVAL DATE |
| DESTINATION RECEIVE DATE | FORMULATE 1 DAY AFTER THE PICK UP DATE |
| LOCATION OF CONTAINER | |
| RETURN STATUS | USAGE FOR OUTBOUND |
| STATUS USE BY DATE | DATE FIELD |

D0122

LAST DAY TO RETURN                    FORMULA - SEE ATTACHED

JOB COST (CAN BE INCLUDED WITH

| | |
|---|---|
| COST ID | # THAT IS AUTOMATICALLY ASSIGNED TO THE PO |
| SEQUENCE | MANUALLY TYPE UPON RECEIPT OF THE MANIFEST |
| INVOICEE | COMES FROM THE PO# (WHICH AUTOMATICALLY TO POP UP ONCE RECORD # INPUT) |
| CONSIGNEE | COMES FROM THE PO# (WHICH AUTOMATICALLY TO POP UP ONCE RECORD # INPUT) |
| VENDOR | COMES FROM THE PO# (WHICH AUTOMATICALLY TO POP UP ONCE RECORD # INPUT) |
| ORDER ID | COMES FROM THE PO# (WHICH AUTOMATICALLY TO POP UP ONCE RECORD # INPUT) |
| CASE | FORMULA - TO BE DISCUSSED |
| CUBE | FORMULA - TO BE DISCUSSED |
| WEIGHT | FORMULA - TO BE DISCUSSED |
| RATE | DEFAULT - OFF THE VENDOR CODE |
| RATE UNIT | DEFAULT - OFF THE VENDOR CODE    BILL BY CUBE, WEIGHT, CASE OR FLAT RATE |

TOTALS OF THE ABOVE

CONTAINER COST - FIELDS TO IDENTIFY COSTS SPECIFIC TO THE CONTAINER - THESE COSTS WILL BE SPLIT AMONGST ALL POS IN THE CONTAINER

SERVICE PROVIDER    SERVICE  ORIGIN    DESTINAT AMOUNT  INVOICE #    PAID DATE    CHECK #  NOTES

CONTAINER NOTES: ANY TYPE OF NOTES ON HISTORY OF THE CONTAINER

SPECIAL NOTES TO TRUCKER/WAREHOUSE

D0123

FUNCTION: - SCREEN TO INPUT ALL ORDERS THAT NEED TO BE PICKED UP OUT OF A CERTAIN AREA

DISPATCH DATE

TRUCKER

COMMODITY

LOGISTICS NOTES

TRUCKER NOTES/INSTRUCTIONS

INPUT JOB ID - ALL INFO COMES UP (VENDOR NAME, PO# , CASE, CUBE AND WEIGHT, FOB POINT, VENDOR NAME, PH#)

D0124

UTBOUND ORDERS - Bill and track freight cost for customers for Neighbor Island Customers - and Kmart Local Deliveries
'd Guam Shipments

IELDS NEEDED:

| | |
|---|---|
| HIPPER | MANUALLY INPUT |
| ILL TO | MANUALLY INPUT |
| ENDOR | MANUALLY INPUT |
| ENDOR CONTACT | MANUALLY INPUT |
| ENDOR PH# | MANUALLY INPUT |
| UYER | MANUALLY INPUT |
| ORT | MANUALLY INPUT |
| RRIVAL DATE | MANUALLY INPUT |
| AIL DATE | MANUALLY INPUT |
| OMMODITY | MANUALLY INPUT |
| O CASE | MANUALLY INPUT |
| O CUBE | MANUALLY INPUT |
| O WEIGHT | MANUALLY INPUT |
| /L CASE | MANUALLY INPUT |
| /L CUBE | MANUALLY INPUT |
| EC CASE | MANUALLY INPUT |
| EC CUBE | MANUALLY INPUT |
| EC WEIGHT | MANUALLY INPUT |
| OF PALLETS | MANUALLY INPUT |
| HEP | MANUALLY INPUT |
| ALLET EXCHANGE | MANUALLY INPUT |
| MOVE TYPE | MANUALLY INPUT |
| OB POINT | MANUALLY INPUT |
| RELEASE # | MANUALLY INPUT |
| DESTINATION WAREHOUSE | MANUALLY INPUT |
| DESTINATION TRUCKER | MANUALLY INPUT |
| DEPARTMENT CODE | MANUALLY INPUT |
| AILING CHART NOTES | MANUALLY INPUT |
| JOTE OR MEMO: | MANUALLY INPUT |

D0125

URCHASE ORDER COST - FIELDS TO IDENTIFY COSTS SPECIFIC TO THE PURCHASE ORDER ONLY - TRACK COST AND AYMENT TO CARRIER

ARRIER          TYPE OF MOVE     FROM     TO     AMOUNT   INVOICE #   PAID DATE   CHECK #   NOTES

NEED PULL DOWN MENU
FOR TYPE OF CLAIM

URCHASE ORDER - CONTAINER LOCATION
ame screen as the PO - can search to see what container it is assigned - and what sequence in the container

'URCHASE ORDER - CLAIM INFORMATION

CLAIM

D0126

OUTBOUND CONTAINER INFO - MOVES FROM FLEMING'S WAREHOUSE - OUT OF THE YARD

FIELDS NEEDED:

SHIPPER
CONSIGNEE
ARRIVAL DATE
SAIL DATE
TARIFF #
ORIGIN
ORIGIN PORT
COMMODITY
CONTAINER TOTAL CASE — WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER
CONTAINER TOTAL CUBE — WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER
CONTAINER TOTAL WEIGHT — WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER
DESTINATION — WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER
DESTINATION PORT — WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER
SIT DESTINATION PORT
CONTAINER #
SEAL #
BOOKING # OR BILL OF LADING #
VESSEL
VOYAGE
SIZE OF CONTAINER — WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER
TYPE OF CONTAINER — WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER
TEMPERATURE SETTING — WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER
TYPE OF MOVE — WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER
ORIGIN DRAYAGE — WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER
PICK UP LOCATION — WOULD LIKE THIS AS A DEFAULT - BASED OFF VENDOR CODE ASSIGNED TO THE CONTAINER
DESTINATION PICK UP DATE
DESTINATION RECEIVE DATE
LOCATION OF CONTAINER
RETURN STATUS — USAGE FOR OUTBOUND
STATUS USE BY DATE — DATE FIELD

D0127

LAST DAY TO RETURN                        FORMULA - SEE ATTACHED

JOB COST

RECORD #            # THAT IS AUTOMATICALLY ASSIGNED TO THE PO
SEQUENCE           MANUALLY TYPE UPON RECEIPT OF THE MANIFEST
INVOICE            COMES FROM THE PO# (WHICH AUTOMATICALLY TO POP UP ONCE RECORD # INPUT)
CONSIGNEE          COMES FROM THE PO# (WHICH AUTOMATICALLY TO POP UP ONCE RECORD # INPUT)
VENDOR             COMES FROM THE PO# (WHICH AUTOMATICALLY TO POP UP ONCE RECORD # INPUT)
PO#                COMES FROM THE PO# (WHICH AUTOMATICALLY TO POP UP ONCE RECORD # INPUT)
CASE               FORMULA - TO BE DISCUSSED
CUBE               FORMULA - TO BE DISCUSSED
WEIGHT             FORMII A - TO BE DISCUSSED
RATE               DEFAULT - OFF THE VENDOR CODE
RATE UNIT          DEFAULT - OFF THE VENDOR CODE        BILL BY CUBE, WEIGHT, CASE OR FLAT RATE

TOTALS OF THE ABOVE

CONTAINER COST - FIELDS TO IDENTIFY COSTS SPECIFIC TO THE CONTAINER - THESE COSTS WILL BE SPLIT AMONGST
ALL POS IN THE CONTAINER

SERVICE PROVIDER    SERVICE   ORIGIN   DESTINAT AMOUNT   INVOICE #   PAID DATE   CHECK #   NOTES

CONTAINER NOTES:  ANY TYPE OF NOTES ON HISTORY OF THE CONTAINER

SPECIAL NOTES TO TRUCKER/WAREHOUSE

D0128

NAME
BILLING ADDRESS
PICK UP ADDRESS
CITY, STATE ZIP FOR BOTH
LOGISTICS CONTACTS
LOGISTICS FAX
ACCOUNTING CONTACTS
ACCOUNTING FAX
NOTES

D0129

**Main Menu**

**MAINLAND LOGISTICS**

**ORDERS**
**CONTAINERS**
**TRUCKING**
**CONTACTS**
**ACCOUNTS RECEIVABLE**
**VENDOR DEFAULTS**

**OUTBOUND LOGISTICS**

**ORDERS - LINK TO THE JOB COMPLETE FORM!**
**CONTAINERS**
**CONTACTS**
**ACCOUNTS RECEIVABLE**

**INBOUND SCHEDULING (LINK TO THE CONTAINER COMPLETE INFO)**

**DISPATCH**
**RECEIVING**

NEED TO SET UP AND AUTOMATE YARD INVENTORY!

D0130

Mark please refer to the following in the database. This is based on current industry terminology:

Unit # should be referred to as Container #

The choices for sizes of containers are as follows. Please note that this is the type of containers that Fleming currently uses - there are different sizes in the industry:

20
24
24H
40
40H
45H
LD3   (these are airfreight size containers)
EH    (these are airfreight size containers)
LD7   (these are airfreight size containers)

Thanks!

D0131

OTHER FEATURES

Container Yard Inventory - Add fields to show date in, date out and location, and special notes (SIT , YB etc) - this would tie to Container Complete Table (table, query and crystal report)

Scheduling - Need to add a field for Fredda to input date to pull container and date to receive

6. Monitor Detention Times - (which would tie to Container Yard Inventory) - dry has 6 calendar days and reefers have 10 calendar days

(table, query and crystal report)

7. Outer Island Details - What stores the container went to (by store #) - how much was shipped to each store (case, cube, weight and pallet) - and sequences they are loaded  - this would tie to the Complete Container Table

7. Monitor Backhaul Billing - I want to create a field in the complete container screen - job cost - maybe on the other side of the "Bill" field - - Need to create a formula that will automatically take $260 divided by the total cases of the container and then takes that times the case on each order need to discuss further - as there are exceptions to the $260 per container - some containers are only $160

add to table and figure into freight profit/loss report

D0132

Notes from Mark

Being quite familiar with some limitations of the current (Berry authored) database, there are some features I believe are important to have incorporated in its replacement.  These features **not** found in the current database,  therefore my suggesting them in no way draws on anything proprietory to Mr. Berry.

ID, Record Date, and Notes (Not necessarily memo field) field for all tables.

User maintainable table providing options for all list boxes in the database.

Outbound moves (PO's and containers) should be separated from inbound moves (PO's and containers).

Certain costs for logistics services performed for us (e.g., backhaul and pickup costs) are entered into the current database piecemeal, as each PO's share (by case, cube or weight) of the cost for a service rendered to all PO's in a container.  Thus, the actual event and cost of such a service never appears in the database as a distinct and obvious entity, but is merely implied as the sum of that service cost for all PO's affected (i.e., all PO's in the container being moved).  Often enough, the pieces do not add up to an intelligible service cost.  Moreover, there may be more than one charge associated with a PO for a given service, as when there is both local and non local drayage or backhaul for a PO that is returned or sent to the wrong island, requiring a simple way of distinguishing one service cost from another.  It would be far more preferable for maintenance of the data and for accuracy in reporting to have each service cost, each event/transaction, represented at the most basic level (the database record level) by a single record detailing that transaction, and to perform any distribution among PO's at the higher levels of reports and screens.

Currently, services, and the costs and invoicing associated with them, can only be levied against the existing units represented in the database, namely, single PO's and containers.  There is a need for a third unit, an "LTL" (less than load) that is a temporary grouping of PO's that incur a service as a group.  For example, Hawaiian Express may send a truck out to pick up two PO's at a vendor's of PO's for trucking to a consolidator, though it can be applied any group of PO's that incur a service as a group.  Usually LTL's are temporary groupings site, and wait several hours before the PO's are loaded, so that a pickup charge and a standby charge are generated against those two PO's.  Currently, the pickup charge is entered as two records, one charge for each of the two PO's, and the same with the standby charge.  It is preferable to my view and experience with the database to have these charges levied against the LTL, then broken out when needed at the report level.

Since according to our practice at Fleming, there is in effect a one to one relationship of PO number to container (If a PO takes up more than one container, Logistics treats the portion riding in the second container as a separate PO, giving it an altered PO number and a new identifier), a copy of the container identifier should be placed with a PO's data as a "foreign key".

Mark

# KOBAYASHI SUGITA & GODA

ATTORNEYS • AT • LAW

999 Bishop Street, Suite 2600
Honolulu, Hawaii 96813-4430

Telephone: 808-539-8700
Facsimile: 808-539-8799
E-Mail: ael@ksglaw.com

Bert T. Kobayashi, Jr.*
Kenneth Y. Sugita*
Alan M. Goda*
Dale W. Lee*
Lex R. Smith*
David L. Monroy*
Wendell H. Fuji*
Robert K. Ichikawa*
Janeen-Ann A. Olds*
Clifford K. Higa*
Charles W. Gall*
John F. Lezak*
Larry L. Myers*
Craig K. Shikuma*
Christopher T. Kobayashi*
Ruth K. Oh*
Burt T. Lau*
Ronald T. Ogomori*
David B. Tongg*
Bruce A. Nakamura*
Lanson K. Kupau*
Jonathan A. Kobayashi*

Brendan S. Bailey
George Gusman III
Anne E. Lopez
Kenneth M. Nakasone
Curtis K. Saiki
Jesse W. Schiel
Duane C. Seabolt
Joseph A. Stewart
Ann C. Teranishi
Robert A. Useoka
Thomas H. Yee
Nathan H. Yoshimoto

*A Law Corporation

March 9, 2005

<u>Hand Delivery</u>

Clyde Wm. Matsui, Esq.
Matsui Chung
Suite 1400 Mauka Tower
Pacific Guardian Center
737 Bishop Street
Honolulu, Hawaii 96813

Re:  Wayne Berry v. Hawaiian Express Service, et al.
<u>Civil No. CV03-00385 SOM-LEK</u>

Dear Mr. Matsui:

I believe the following should respond to the questions that we received from your office regarding the computers that are being used by the Logistics Department at C&S in Kapolei.

**1.  What kind of operating system was used?**

A trial version of Windows 2003 Server is currently being used on the C&S Logistics Network. This weekend C&S will install the full version of the same software.

In June of 2003, we hired Guidance Software for the purpose of (1) assuring that the database created by Wayne Berry (and anything else created by Mr. Berry) was permanently removed from all of the Fleming Logistics computers; and (2) preserving a record of everything that was on the Fleming Logistics computers in order to assure that we would not be accused of destruction of evidence. The operating system that was in use at that time, June of 2003, Windows SBS 4.5

**2.  What version of the operating system was used?**

See above.



EXHIBIT "K"



**KOBAYASHI SUGITA & GODA**
ATTORNEYS • AT • LAW

999 Bishop Street, Suite 2600
Honolulu, Hawaii 96813-4430

Telephone:  808-539-8700
Facsimile:   808-539-8799
E-Mail:      ael@ksglaw.com

Bert T. Kobayashi, Jr.*
Kenneth Y. Sugita*
Alan M. Goda*
Dale W. Lee*
Lex R. Smith*
David L. Monroy*
Wendell H. Fuji*
Robert K. Ichikawa*
Janeen-Ann A. Olds*
Clifford K. Higa*
Charles W. Gall*
John F. Lezak*
Larry L. Myers*
Craig K. Shikuma*
Christopher T. Kobayashi*
Ruth K. Oh*
Burt T. Lau*
Ronald T. Ogomori*
David B. Tongg*
Bruce A. Nakamura*
Lanson K. Kupau*
Jonathan A. Kobayashi*

Brendan S. Bailey
George Gusman III
Anne E. Lopez
Kenneth M. Nakasone
Curtis K. Saiki
Jesse W. Schiel
Duane C. Seabolt
Joseph A. Stewart
Ann C. Teranishi
Robert A. Ueoka
Thomas H. Yee
Nathan H. Yoshimoto

*A Law Corporation

March 10, 2005

Hand Delivery and Facsimile

Timothy J. Hogan, Esq.
Lynch Ichida Thompson Kim & Hirota
1132 Bishop Street, Suite 1405
Honolulu, Hawaii 96813

        Re:    Wayne Berry v. Hawaiian Express Service, et al.
               Civil No. CV03-00385OM-LEK

Dear Mr. Hogan:

        I received your e-mail (copy attached) a few minutes ago. Mr. Matsui's order asks you to provide two things: (1) the filenames which you have refused to provide to us for many months; and (2) any documentation, if it exists, that your client wrote regarding the installation or "uninstalling" of his "system."

        Obviously, your letter has nothing to do with either of these matters. As we have repeatedly advised, the trial version of the software is expiring and we are proceeding with installation of the full version.

                                Very truly yours,

                                LEX R. SMITH
                                For
                                KOBAYASHI, SUGITA & GODA

cc:  Clyde Wm. Matsui, Esq. (Via Facsimile)
     All Counsel of Record (Via Facsimile)

377738



EXHIBIT "L"

## Anne E. Lopez

| | |
|---|---|
| **From:** | Lex Smith [lex@gte.net] |
| **Sent:** | Thursday, March 10, 2005 3:18 PM |
| **To:** | lsh@hosodalaw.com; Anne E. Lopez; rpbm@hosodalaw.com |
| **Subject:** | FW: Windows Server 2003 Installation |

-----Original Message-----
From:   Timothy J. Hogan
Date:   3/10/05 3:18 pm
To:   Damian Capozzola (E-mail), Emily Reber Porter (E-mail), Eric Liebeler (E-mail), Erin
Lee (E-mail), Julia Morgan (E-mail), Karen L. S. Fine (E-mail), Lex Smith (E-mail), Lyle
Hosoda (E-mail), Margery Bronster  (E-mail), Rex Y. Fujichaku (E-mail), Roy Tjioe (E-
mail), Sheldon Toll (E-mail), Victor Limongelli (E-mail)
Subj:   Windows Server 2003 Installation

To Lex Smith and Eric Leibeler:

We are attempting to prepare a response to Mr. Matsui's letter of today's date. To address
his technical inquiry, Mr. Berry presumes the following to be true:

Sometime shortly after Judge Mollway directed that a special master be appointed to
investigate the status of the software on the C&S computers and during the period of the
continued preliminary injunction hearing, C&S installed the 180 day trial version of
Windows Server 2003 over its Windows SBS 4.5 installation.  This installation, according
to Microsoft, could not be accomplished by an upgrade path but only with a clean
installation.  See Attached.  Therefore, relevant evidence contained on these computers
was altered during this period, impacting the effectiveness of the Guidance Second
Acquisition for forensic evaluation after Judge Mollway had issued her directive that a
master be appointed.  If I am incorrect in that belief, please advise immediately me so
that Mr. Berry can respond to the Master's request without delay.

Tim Hogan


 <<Supported paths for upgrading to Windows Server 2003 or to Windows Small Business
Server 2003.pdf>>

1



**Microsoft**
# Windows Server System

Product Information

# Windows Server 2003 Trial Software

Updated: March 30, 2005



Thank you for your interest in evaluating Windows Server 2003. Trial software for 32-bit and 64-bit versions are available for 180-day evaluation. Register to order a CD or to download the trial software.

**On This Page**

⇩ Trial CD
⇩ Trial Download
⇩ Product Activation
⇩ Support Options
⇩ Training and Certification
⇩ Protect Your System

**Register**
**Order Windows Server 2003**
**Trial Software**

**Related Links**
▪Trial Software: Frequently
 Asked Questions
▪End-User License Agreements
▪System Requirements
▪Worldwide Trial Software
 Programs
▪Windows Small Business
 Server 2003 Trial Software
▪Windows Server System Trial
 Software

**Learn More**
▪Introduction to the Windows
 Server 2003 Operating
 Systems
▪Customer Success Stories
▪Windows Server 2003 Guided
 Tour
▪Upgrading to Windows Server
 2003
▪Windows Server 2003 x64
 Editions

## Trial CD

The following trial versions of Windows Server 2003 are available on CD:

▪Windows Server 2003, Enterprise Edition with SP1 (32-bit)

▪Windows Server 2003, Enterprise x64 Edition (64-bit)

▪Windows Server 2003, Enterprise Edition with SP1 for Itanium-based
 Systems (64-bit)

Each trial CD includes a unique product key, which is required for installation. The trial CD is available only in English when you order it from this Web site. Please visit the worldwide Windows Server 2003 trial software page for information about localized versions.

**Please allow 4 to 6 weeks for shipping CD orders.**

**Note:** Windows Server 2003, Enterprise Edition with SP1 for Itanium-based Systems is available on DVD. You must have a DVD drive to be able to install

EXHIBIT "M"

# Windows 2003 Trial Date Calculations

| Saturday, March 12, 2005 | Minus 180 Days Equals | Monday, September 13, 2004 |
|---|---|---|

EXHIBIT "N"



# Microsoft

# Windows Server 2003

## Upgrading from Windows 2000 to Windows Server 2003

*Microsoft Corporation*
*Published: February 2003*

**Abstract**

The Microsoft® Windows® Server 2003 operating system provides significant enhancements over the Windows 2000 family of server products. Windows Server 2003 was designed to allow for an easy upgrade from Windows 2000. This document provides an overview of the upgrade process and provides information on some of the basic decisions to be made during the process—whether you are upgrading an existing system or performing a new installation or migration.


EXHIBIT


## Choosing to Upgrade, Perform a New Installation, or Migrate


A basic decision is whether to upgrade, perform a new installation, or migrate to a new computer. Upgrading refers to leaving the existing Windows 2000 or Windows NT® 4.0 (with Service Pack 5 or later) operating system on your computer and updating it by installing the new Windows Server 2003 operating system. A new installation refers to completely removing the previous operating system or installing a product in the Windows Server 2003 family on a volume with no previous operating system. Migrating refers to moving files from an old machine to a new one.

### Reasons to Upgrade

Especially for small organizations the ease of doing an upgrade rather than a new installation, can make sense. With an upgrade, configuration is generally simpler, and your existing users, settings, groups, rights, and permissions are retained. An upgrade also does not require you to re-install files and applications.

As with any major changes to the hard disk, however, it is recommended that you back up the system before beginning an upgrade.

#### Reference Points

If you want to upgrade and then use the same applications as before, be sure to review applications information in Relnotes.htm (in the \Docs folder on the Setup CD). Also, for the most recent information on compatible applications for products in the Windows Server 2003 family, see the software compatibility section of the <u>Windows Server Catalog</u> at http://www.microsoft.com/windows/catalog/server/.

### Reasons to Perform a Clean Installation or Migration

There are good reasons to do a clean installation or migration rather than an upgrade—especially when dealing with large organizations. For customers looking to consolidate their existing Windows 2000 Server infrastructure using Windows Server 2003, a clean installation is the preferred route.

If you reformat your hard disk and then perform a new installation, the efficiency of your disk may improve (compared to not reformatting it). Reformatting also gives you the opportunity to modify the size or number of disk partitions, to make them match your requirements more closely.

If you want to practice careful configuration management for a server where high availability is important, you might want to perform a new installation on that server instead of an upgrade. This is especially true on servers on which the operating system has been upgraded several times in the past.

It is possible to install Enterprise Edition and also allow the computer to sometimes run another operating system. Setting up the computer this way, however, presents complexities because of file system issues.

### Server Roles

Computers that function as servers within a domain can have one of two roles: member server or domain controller. A server that is not in a domain is a stand-alone server.

Windows Server 2003 Supported Upgrade Paths

**Microsoft** Windows Server System

Product Information

# Windows Server 2003 Supported Upgrade Paths

Posted: April 24, 2003

When upgrading operating systems, a clean install is recommended as best practice. However, if customers opt to upgrade from a previously installed operating system, they can consult the following table for supported upgrade paths. Locate your current operating system in the left column and scan its row for supported upgrade path options.

Note that localized products cannot be upgraded across languages. For example, the Japanese version of Windows 2000 Server cannot be upgraded by an English version of Windows Server 2003. Multilingual User Interface-enabled servers, however, can be upgraded by English versions of Windows Server 2003.

## Supported Upgrade Paths in Windows Server 2003

| | Standard Edition | Enterprise Edition | Datacenter Edition | Web Edition | Windows Small Business Server 2003 |
|---|---|---|---|---|---|
| **Windows NT 3.51** | ✓ | | | | |
| **Windows NT 4.0* Server** | ✓ | ✓ | | | |
| **Windows NT 4.0* Terminal Server Edition** | ✓ | | | | |
| **Windows NT 4.0* Enterprise Edition** | | ✓ | | | |
| **Windows 2000 Server** | ✓ | ✓ | | | ✓ |
| **Windows 2000 Advanced Server** | | ✓ | | | |
| **Windows 2000 Datacenter Server** | ✓ | ✓ | ✓ | | ✓ |



EXHIBIT P

Windows Server 2003 Supported Upgrade Paths

| | | | | |
|---|---|---|---|---|
| Windows Server 2003 Standard Edition | ✓ | | | |
| Windows Server 2003 Enterprise Edition | | ✓ | | |
| Windows Server 2003 Datacenter Edition | | | ✓ | |
| Windows Server 2003 Web Edition | | | ✓ | |
| Windows Server 2003** Beta3/RC1/RC2 | ✓ | ✓ | ✓ | |
| Small Business Server 2000 | | | | ✓ |
| Windows Small Business Server 2003 | | | | ✓ |

* Windows NT® 4.0 upgrade is supported by Service Pack 5 (SP5) or later. If earlier version of server pack is installed, the upgrade is not possible.

** Interim releases of Windows Server 2003 will upgrade to the release to manufacturer (RTM) code of same edition. For example, RC1 Standard Edition upgrades to RTM Standard Edition.

^ Top

Manage Your Profile

© 2005 Microsoft Corporation. All rights reserved.  Terms of Use | Trademarks | Privacy Statement

*Microsoft*

About InfoWorld : Advertise : Subscribe : Contact Us : Awards : Events : Store



# The IT Product Guide



**InfoWorld**    HOME  ☰ NEWS  🗔 TEST CENTER  ⊕ OPINIONS  ⊕ PRODUCT GUIDE  ⊚ TECHINDEX

ADD A PRODUCT TO THE PRODUCT GUIDE                    ○ S ⬤ P                    SEARCH

## Guidance Software   EXCL

| Company Profile | Related Products | Articles |
|---|---|---|

### Guidance Software | PRESS RELEASES



PRNewswire

Source: Guidance Software, Inc.

Guidance Software, Inc. Proves the Value of Computer Forensics in $300 Million Trade Secret/
Patent Dispute Win
Wednesday Dec 8, 09:27 AM PST

Defendants agree to sell their company and pay $61 million

PASADENA, Calif., Dec. 8 /PRNewswire/ -- For as long as programmers have been writing
software, other programmers have been trying to disguise the origins of stolen source code. In
one current Silicon Valley trade secret and patent dispute, the accused parties went so far as to
use "disk wiping" technology in an attempt to cover up evidence of source code theft. However,
Guidance Software Inc., the maker of EnCase(R) software, the world's leading computer forensic
software, used state-of-the-art technology to ferret out what the accused company thought it
had covered up. These discoveries led directly to a crucial Court ruling establishing that the
defendant intentionally destroyed evidence during the proceedings. The Court found that "the
circumstantial evidence strongly suggests that the Defendant engage[d] in concerted effort to
avoid production of files."

Guidance efforts helped bring about an unusual settlement, announced Dec. 1, between Silicon
Valley software makers Synopsys Inc. and Nassda Corp. The terms of the deal call for Synopsys
to acquire Nassda (including its $100 million cash reserves) for $192 million, and for Nassda's co-
founders -- all of whom were one-time Synopsys employees -- to pay Synopsys a $61 million
settlement. The net purchase price of $30 million compares favorably to Nassda's earlier market
cap of Nassda $500 million, thus Synopsys realized a gain of more than $300 million. The deal
has been called a huge win for Synopsys. In an example of a trade secret dispute coming full
circle, Synopsys will, assuming all relevant approvals, own the very technology it has long
claimed was derived from its own intellectual property, as well as Nassda's client base.

"As a defendant, is it worse to get caught red-handed or get caught destroying evidence?" says
Mike Gurzi, Director of Guidance Software's professional services division. "Through computer
forensics, we showed that evidence was destroyed and that ultimately convinced the Court in its
sanctions order against Nassda."

The five-year-long litigation between Synopsys and Nassda, and the computer forensic tools
used to flush out Nassda's destruction of evidence, illustrate how computer forensic technology
can be used not only to uncover information long believed deleted, but even to uncover evidence
of data that was deliberately "wiped" with the express purpose of frustrating computer forensics
efforts.

"We helped show that Nassda had installed disk-wiping tools on their hard drives and had used

### INFOWORLD SPOTLIGHTS

**Featured Spotlight:**

IT Productivity
Spotlight

intel  ◁bmc software

Defining the value of e-
business and managing IT
investments. Find out how
Intel's IT Business Value
Program measures the
bottom-line impact of IT
solutions. Visit the InfoWorld
IT Productivity Spotlight for
the latest news, white papers,
and success stories.
Sponsored by Intel and BMC
Software.
>> More Spotlight News,
White Papers and Webcasts...

### FIND IT

Enter a Find-It number from your
InfoWorld magazine to go directly to
the article you are looking for.

Find It

#

### FREE NEWSLETTERS

☑ The InfoWorld Scoop
☑ Test Center Report
☑ Web Services Report

Enter Email Address

SIGN UP

>> MORE NEWSLETTERS

### SUBSCRIBE

EXHIBIT

these tools to intentionally destroy data," explained Gurzi. "We were able to ascertain the amount of information wiped from the drives, as well as even the dates that the destructive activity took place. In other words, the defendants' destructive activities left 'footprints' proving the destruction itself. This was the turning point in the litigation."

Guidance Software's professional services and EnCase technology, coupled with Dechert LLP's legal representation of Synopsys in the case, eventually led to a court order finding that Nassda could not have written 60,000 lines of source code in the claimed one-month period and had, in fact, misappropriated source code from Synopsys. This finding resulted in sanctions against Nassda and decimated its defenses.

"The Court ordered a series of discovery sanctions that held in essence that Nassda had copied or derived their initial code from Synopsys materials," explains Michael Edelman, Partner at Dechert LLC who handled the litigation. "These discovery sanctions were instrumental in Nassda's settlement of the case on terms extremely favorable to Synopsys."

The examination revealed damaging evidence that Nassda had installed disk wiping tools on their hard drives and had used these tools to intentionally destroy data. It was this information that allowed Dechert attorneys to prepare a motion asking the court to issue sanctions against Nassda related to the spoliation of evidence. The court responded by issuing an order establishing that the non-public portions of the first 60,000 lines of Nassda's source code were derived from Synopsys' source code. Dechert also secured additional sanctions against the defendants for intentionally altering and destroying evidence.

Martin Walker of Brass Rat Group Inc., an electronic design automation expert who provided consulting services for Synopsys in the litigation explains: "Guidance's computer forensics work was instrumental in demonstrating important points to the court. Computer forensics was critical to the Court's finding's about the derivation of the initial Nassda code -- and the manner in which that code was derived or copied from Synopsys' materials."

This case reinforces the fact that spoliation of evidence is taken seriously by U.S. courts. Matters of spoliation with electronic evidence have been on the rise, according to Gurzi. "It seems that certain organizations find it more enticing to delete electronic evidence rather than preserve it. If a company gets caught, it can be extremely damaging to their case."

"People have been stealing intellectual property for a long time," says Victor Limongelli, General Counsel for Guidance Software. "Computer forensics makes it a lot more likely that you can catch them."

Using a proactive approach, EnCase software users have also been successfully preventing such theft by auditing and protecting their IP data through the use of EnCase software and Guidance Software professional services.

About Guidance Software

Guidance Software is the world leader in computer forensics and incident response solutions. Founded in 1997 and headquartered in Pasadena, Calif., Guidance Software has offices and training facilities in California, Virginia, New York and the United Kingdom. More than 13,000 corporate and government investigators depend on EnCase(R) software, while more than 3,500 investigators attend Guidance Software's forensic methodology training annually. Accepted by numerous courts and honored with eWEEK's Excellence Award and SC Magazine's Annual Award, EnCase(R) software is considered the standard forensic tool. For more information, visit Guidance Software's Web site at http://www.guidancesoftware.com/.

Guidance Software, Inc.

CONTACT: Tamara Shetler of Guidance Software, Inc., +1-818-486-8388 or Tamara.Shetler@guidancesoftware.com

Web site: http://www.guidancesoftware.com/

---

Source: Guidance Software, Inc.

• FREE Subscription!
• Renew



**The incredible shrinking SAN**

**Find Your Match**



in the
**IT Product Guide**



## Press Releases

**02/15**  Corporate Security Reaches New Levels as Guidance Software Provides True Incident Response

**12/08**  Guidance Software, Inc. Proves the Value of Computer Forensics in $300 Million Trade Secret/Patent Dispute Win

**11/05**  Guidance Software Mourns the Loss of the Computer Forensics Industry's Biggest Supporter - Special Agent Timothy Fidel

**09/23**  Touchdown! Sprint Adds SportsTracker, Pro Football Player Voice Ringers to Kick off Pro Football Season with Winning Sprint PCS Vision(SM) Line-Up

**09/23**  Anson Chen Appointed to Lead Motorola's Global Software Group

**» View more Press Releases**

Above press releases are not limited to those provided by the company profiled on this page, and they may reflect any integration partners, technology partners, and customers the company may have. *InfoWorld* is not responsible for the press releases appearing on this page.

## TEST CENTER REVIEWS: NETWORKING

Category: Networking

| DATE | PRODUCT | SCORE | BOTTOM LINE |
|------|---------|-------|-------------|
| On Jan. 3, 2005, the *InfoWorld* Test Center revised its scoring procedures for all products to be reviewed in 2005. Click here for a detailed explanation of the new scoring procedures. | | | |
| 04/08/05 | Caymas 525 Identity-Driven Access Gateway | 8.7 Excellent | Caymas has put together a powerful, flexible secure-remote-access appliance by bundling SSL VPN with both site-to-site and client-to-site IPSec VPN features. An application-layer firewall and.. >> Full review >> Go to Caymas Systems's Web site |
| 04/04/05 | Niksun NetVCR 2005 | 8.8 Excellent | With network performance trending, SLA/QoS monitoring, alerting, and broad reporting tools, Niksun NetVCR 2005 proved to be a complete network-analysis package. Additional modules are available.. >> Full review >> Go to Niksun's Web site |
| 03/18/05 | WatchGuard Firebox X2500 | 8.1 Very Good | The X2500 is a capable firewall with application-layer security for Web sites, e-mail, and FTP servers, plus spam filtering, anti-virus, and a sophisticated policy engine... >> Full review >> Go to WatchGuard Technologies's Web site |

**» More Networking Reviews & Analyses**
**» Go to complete Product Reviews**

- Special Advertising Partners -

**WHITE PAPERS**

InfoWorld: Guidance Software : Company Profile

**» Business Service Management: Current Practices** - This white paper explores what IT professionals worldwide are saying about Business Service Management (BSM). In this valuable white paper, you'll learn how BSM solutions are being used to align IT ...

**» Are you on the shortest path to IT-business alignment?** - Find out when you download this complimentary benchmark study from Filigree Research, sponsored by BMC Software. You'll learn about the current state of IT-business alignment in 565 IT organizations ...

**» Defining the Value of e-Business** - Today's business processes are intricate and complex. A seemingly simple transaction may in fact cross multiple geographic boundaries, involve many trading partners, and trigger actions in numerous ...

**» Managing IT Investments**
**» Putting a Value on Productivity**
**» Enhancing HP Proliant servers with innovative technologies**

MORE NETWORKING WHITE PAPERS

**» SOA Explained:The Four Abilities of a SOA Registry**
Discover how a standards-based SOA registry provides visibility, reusability, adaptability and ...
**» Software License control, Windows XP/2000 Upgrades**
Use your Intranet to manage Software Licenses, plan for Windows XP/2000 upgrades, do Security Audits ...
**» Security Within (TM) Configuration based Security**
Good IT security practice requires more than anti-virus and firewall systems. Ask for our new white ...
**» SOA Case Study: Amazon Merchant Platform**
Discover how Systinet Web services technology helps power Amazon's Merchant Platform, which accounts ...
**» SOA Case Study: The Hartford Deploy UDDI Registry**
In this ZapThink report learn how and why The Hartford deployed an enterprise UDDI registry as part ...

> >> WHITE PAPERS LIBRARY
>
> WHITE PAPERS E-MAIL ALERT
> Find out when the latest white paper is available:
>
> [ E-mail Address ]    [ ]

WHITE PAPERS BY TOPIC

- Application development
- Applications
- Business
- Hardware
- Networking
- Platforms
- Security
- Standards
- Storage
- Telecom
- Web services
- Wireless

SPONSORED LINKS

» **Microsoft** - Learn, solve, and grow at Tech•Ed 2005 – June 5-10, Orlando.
» **Microsoft** - TechEd 2005, June 5-10, Orlando. Explore solutions.
» **Microsoft** - Windows Server System. Turn IT Capabilities into Business Results.
» **Macromedia** - Please share your feedback on the topic of Web Site Content Management.
» **VIEO, Inc.** - Reduce time to resolve application service level problems.

INFOWORLD MARKETPLACE

**» Optimize Remote Office IT - Lower TCO**
DiskSites eliminates File, Print, DNS, DHCP, storage, and backup from branch offices. Access files ...
**» Covad VOIP: Revolutionizing Business Communication**
Experience dramatic cost savings up to 40% while getting high quality voice services over a secure ...
**» NetSupport Manager PC Remote Control**
Perform remote support and management on multiple systems simultaneously over a LAN, WAN and the ...
**» Competitive Token Upgrade**
Enterprises can now dramatically reduce their TCO by replacing existing and expensive proprietary, ...
**» Intuit Help Desk & Network Management Software**
Intuit provides Track-It! and Network Monitor - the leading help desk and network management ...

>> BUY A LINK NOW

## FREE SUBSCRIPTION

InfoWorld: Guidance Software : Company Profile



Order today to get your FREE
subscription to *InfoWorld*
magazine, the weekly publication
that provides indispensable product
information to IT professionals.

NOTE: Complimentary subscriptions
sent only to those applicants who
qualify.

First Name:

Last Name:

Company Name:

Title:

Mailing Address:

City:

State/Province:

Zip/Postal Code:

Select One

Email Address:

CONTINUE

NOTE: Offer valid in U.S. and Canada only
Non-U.S. click here

**HOME  NEWS  TEST CENTER  OPINIONS  PRODUCT GUIDE  TECHINDEX**    About : Advertise : Subscribe : Contact Us : Awards : Events

Copyright © , Reprints, Permissions, Licensing, IDG Network, Privacy Policy

Computerworld : Network World : CIO : PC World : Darwin : CMO : CSO : Bio-IT World
IT Careers : JavaWorld : Macworld : Mac Central : Playlist : GamePro : GameStar : Gamerhelp

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No.  8482 / September 14, 2004

SECURITIES EXCHANGE ACT OF 1934
Release No.  50365 / September 14, 2004

ACCOUNTING AND AUDITING ENFORCEMENT
Release No.  2097 / September 14, 2004

ADMINISTRATIVE PROCEEDING
File No.  3-11653

| | | |
|---|---|---|
| | : | **ORDER INSTITUTING** |
| **In the Matter of** | : | **PROCEEDINGS PURSUANT TO** |
| | : | **SECTION 8A OF THE SECURITIES** |
| **Fleming Companies, Inc.** | : | **ACT OF 1933 AND SECTION 21C OF** |
| | : | **THE SECURITIES EXCHANGE ACT** |
| | : | **OF 1934, MAKING FINDINGS AND** |
| **Respondent.** | : | **IMPOSING A CEASE-AND-DESIST** |
| | : | **ORDER** |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate to institute cease-and-desist proceedings pursuant to Section 8A of the Securities Act of 1933 (the "Securities Act") and Section 21C of the Securities Exchange Act of 1934 (the "Exchange Act") against Fleming Companies, Inc. ("Fleming" or "Respondent").

II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement ("Offer") that the Commission has determined to accept. Solely for the purpose of these proceedings or any other proceeding brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings contained herein, except that Respondent admits the Commission's jurisdiction over it and over the subject matter of these proceedings, Respondent consents to the entry of this Order Instituting Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings and Imposing a Cease-and-Desist Order.



EXHIBIT R

## III.

On the basis of this Order and Respondent's Offer, the Commission finds that:[1]

### A.    Respondent

Fleming is an Oklahoma corporation headquartered in Lewisville, Texas, which currently is in Chapter 11 bankruptcy. Before its April 2003 bankruptcy filing, Fleming's stock traded on the New York Stock Exchange. At one time, Fleming was the nation's largest supplier of consumer packaged goods to retailers, including supermarkets, convenience stores and supercenters, with approximately 50 major distribution centers ("DCs") across the country, and a sizable retail grocery operator as well, with more than 100 stores throughout the Midwest and West. Fleming's 2001 and 2002 reported revenues were approximately $15.6 billion and $15.5 billion, respectively.[2] But its earnings were relatively much smaller, with only a $23.3 million profit and an $84 million loss, respectively, in those years. Fleming recently announced its intent to emerge from bankruptcy reorganized around its subsidiary Coremark International, Inc., a convenience store distributor it acquired in June 2002.

### B.    Background

In late 2001 and the first half of 2002, Fleming improperly recorded numerous transactions to address anticipated earnings shortfalls stemming from a variety of business and financial challenges. Chief among these challenges was its February 2001 agreement to be Kmart Corporation's sole supplier. Fleming initially announced this arrangement as a major victory and substantially expanded its facilities (and debt load) to handle the new business. Fleming hoped that this agreement and concomitant expansion would provide economies of scale and greater purchasing power, which would result in greater returns for its overall wholesale business. The Kmart arrangement, however, failed to yield the efficiencies Fleming had expected, and, when Kmart filed bankruptcy in January 2002, Fleming's future viability came under scrutiny.

Simultaneously, Fleming's primary wholesale customer base, the small to medium-sized independent grocer, faced adversity on a number of fronts, including a depressed national economy and heightened competition from low-cost supercenter chains encroaching into the rural and suburban areas the independents had long dominated. As these and other pressures drove these grocers out of business or into mergers with larger, self-supplying grocery chains, Fleming found it harder to generate its historical returns from this business.

---

[1] The findings herein are made pursuant to Respondent's Offer and are not binding on any other person or entity in these or any other proceedings.

[2] The 2001 reported revenues were for Fleming's wholesale and retail operations. The 2002 reported revenues were for Fleming's continuing wholesale operations only, in accordance with Statement of Financial Accounting Standards No. 144, Accounting for the Impairment or Disposal of Long-Lived Assets. The Fleming financial information specified in this document does not incorporate the proposed restatements and revisions publicly announced by Fleming in its April and June 2003 press releases.

Fleming experienced other earnings pressures as well. In early 2000, Fleming began centralizing many of its business functions, including its procurement department. Traditionally, Fleming's DCs handled most of their own procurement, which provided a substantial part of each DCs' internal margin. By centralizing this function and purchasing on a national rather than local or regional scale, Fleming hoped to obtain better prices from vendors and thereby improve its overall margins. These anticipated benefits did not materialize, and, instead, Fleming was increasingly at odds with the vendor community.

Fleming's retail operations, known internally as Fleming Retail Group or "FRG," also pressured Fleming's bottom line. Securities analysts referred to FRG as a "growth vehicle" for the future, based largely on the strong same store sales figures Fleming reported during 2001. As discussed below, however, these same store sales figures were misleading, as FRG's real same store sales performance began to decline in the third quarter of 2001.

## C.    Fleming implements "initiatives" improperly to address anticipated earnings shortfalls

### 1.    Fourth Quarter 2001

When earnings pressures increased in the fourth quarter of 2001, Fleming implemented a series of transactions and programs, described internally as "initiatives," designed to increase earnings to help "fill the gap" between actual and projected results. These initiatives ordinarily were itemized on initiative lists circulated among senior Fleming management and sometimes within Fleming's procurement department. Although the initiatives, in and of themselves, were not improper, Fleming executed some of the initiatives improperly to boost Fleming's bottom line.

One way Fleming improperly executed initiatives was to obtain misleading side letters from certain vendors to justify accelerating earnings. Grocery industry vendors routinely pay wholesalers and retailers up-front monies to secure such advantages as favorable product positioning or exclusive supplier status. To the extent these are future advantages, generally accepted accounting principles ("GAAP") required the wholesaler or retailer to recognize the payments over time either as revenue or as cost-of-goods-sold offsets, rather than up-front.[3]

Four vendors[4] were asked to provide side letters in December 2001 that were used to accelerate Fleming's earnings under contemporaneous forward-looking agreements with those

---

[3] *See* Statement of Financial Accounting Concepts No. 5, ¶¶83-84; Staff Accounting Bulletin No. 101, *Revenue Recognition in Financial Statements,* Question 5. Under Emerging Issues Task Force Abstract ("EITF") 02-16, *Accounting by a Customer (Including a Reseller) for Certain Consideration Received from a Vendor,* Fleming is now required to recognize these up-front payments as offsets to cost of goods sold ratably over the term of the concomitant forward-looking agreements. However, this EITF was not effective when Fleming entered into these transactions.

[4] Certain vendors and vendor personnel have settled Commission charges arising from these and later vendor transactions. *See* In re Kemps LLC f/k/a Marigold Foods, LLC, James Green and Christopher Thorpe, Exch. Act

same vendors, in violation of GAAP.  Each of these letters characterized up-front payments as rebates or other compensation for alleged past performance.  The payments, however, actually induced some future performance by Fleming or secured some future right for the vendor.

### a.    Kemps LLC, f/k/a Marigold Foods, LLC ("Marigold")

Marigold, a privately held dairy supplier, provided Fleming with such a side letter in connection with an agreement to supply ice cream to Fleming's wholesale business for three years beginning March 2002 (the "Marigold Supply Agreement").  Fleming was willing to grant this agreement to Marigold only in return for an up-front payment of $2 million.  Though extremely reluctant to make this payment, Marigold eventually viewed it as the "ante" to retaining and expanding the Fleming business.

At the 11th hour of negotiations, Fleming demanded a side letter – the terms of which Fleming dictated – describing the payment as a "non-refundable" "rebate" for "2001 purchases." Fleming knew the rebate had not been earned and that the $2 million was specifically linked to the Marigold Supply Agreement.  Marigold ultimately agreed to this arrangement but required a penalty provision in the Marigold Supply Agreement obligating Fleming to repay the $2 million on a pro rata basis if Fleming failed to buy a certain volume of Marigold product during the agreement's term.

Using the side letter as justification, Fleming recorded the entire $2 million as an offset to expenses, which increased earnings in the fourth quarter of 2001 in violation of GAAP.

### b.    Digital Exchange Systems, Inc. ("Dexsi")

Dexsi is a privately held diverting services supplier.[5]  In late 2001, Fleming hired Dexsi to handle part of its diverting business.  Fleming was by far Dexsi's biggest customer. Accordingly, Dexsi expended significant capital ramping up to handle the Fleming business, such as by purchasing equipment and hiring employees to work on-site at Fleming's headquarters.

Fleming demanded that Dexsi pay $2 million and provide a side letter attributing the payment to past performance.  Simultaneously, Fleming agreed to allow Dexsi to recoup the $2 million by charging Fleming a higher-than-normal price on diverting purchases.[6]  In short, the $2

---

Rel. No. 34-50369; In re Digital Exchange Systems, Inc., Rosario Coniglio and Steven Schmidt, Exch. Act Rel. No. 34-50366; In re Bruce Keith Jensen, Exch. Act Rel. No. 34-50370; In re John K. Adams, Exch. Act Rel. No. 34-50367; and In re Dean Foods Company and John D. Robinson, Exch. Act Rel. No. 34-50368.

[5] "Diverting" occurs when a wholesaler overbuys from a vendor at a special discount, and then sells the excess product to buyers at a higher price.

[6] To illustrate, if Fleming wanted to purchase a product with a list cost of $1 per unit, Dexsi normally would sell that product to Fleming for, hypothetically, $.90.  Under their agreement, however, Fleming allowed Dexsi to charge $1 for that product, with the additional $.10 per unit credited against the $2 million. This mechanism remained in place until Dexsi recovered the entire $2 million.

4

million was an advance on future diverting savings Fleming otherwise would not have received until later, when it actually purchased goods through Dexsi. Fleming insinuated that it would terminate the relationship if Dexsi refused. Dexsi agreed to Fleming's demand and the parties kept a running tab of Dexsi's recovery of the $2 million, which Dexsi did not fully recoup until the first quarter of 2002.

Although Fleming had not earned the entire payment during the fourth quarter of 2001, Fleming nonetheless recorded the entire $2 million as an offset to expenses, which increased its earnings in violation of GAAP.

    **c.**  **Frito-Lay, Inc.**

Frito-Lay, a subsidiary of PepsiCo Inc., is a leading snack manufacturer. In December 2001, Fleming and Frito-Lay negotiated an agreement that would pay Fleming for achieving certain sales targets during 2002. The agreement included a $400,000 incentive for Fleming to set up certain new product store displays by February 2002. Wanting to recognize the $400,000 immediately, Fleming asked its Frito-Lay contact to execute a side letter characterizing the $400,000 payment as "non-refundable" compensation. The Frito-Lay employee provided the requested letter.

Fleming knew it had not earned the $400,000 during 2001 but nevertheless recorded the full amount as an offset to expenses, which improperly increased its earnings in the fourth quarter of 2001 in violation of GAAP.

    **d.**  **Kraft Foods Inc.**

Kraft is the largest U.S. branded foods and drink manufacturer. During 2001, Fleming and Kraft executed two agreements pertinent to this matter. First, in April 2001, the parties entered into a no-divert agreement, under which Kraft was to pay $7.5 million for Fleming's promise to waive certain promotional fees and to refrain from diverting Kraft products. Then, in June 2001, the parties agreed to a one-year preferred vendor agreement (the "Kraft PVA"), under which Kraft was to pay $10.7 million in exchange for Fleming's commitment to eliminate several prior practices and fees and to cooperate in the resolution of certain disputed deductions made by Fleming. Although these disputed deductions generally declined following this agreement, they nonetheless continued and, by early 2002, had amounted to at least $4 million.

In December 2001, Fleming approached Kraft about accelerating $1.65 million payable under the no-divert agreement. These funds were subject to certain criteria, such as that they would "pass through" to Fleming's retail customers to help promote Kraft products. At Fleming's request, the Kraft employee responsible for the Fleming account signed a letter representing that the $1.65 million was an "offset to administrative costs" under the no-divert agreement. However, as Fleming knew, there were no administrative costs to offset. Instead, Fleming requested the letter solely to justify recording the $1.65 million as an offset to expenses, which improperly increased its earnings in the fourth quarter in violation of GAAP.

5

e.    **Reduction of reserve balances**

Fleming also released portions of previously established bad debt and other reserve balances while closing its fourth quarter 2001 books. These reserve reductions totaled approximately $12.7 million, the vast majority of which pertained to bad debts owed by Fleming's wholesale division customers. Of these reductions, $7.8 million was to increase earnings, not because of new information, greater experience or change in circumstance that would justify a lesser reserve balance. *See* Accounting Principles Board Opinion No. 20, *Accounting Changes* ("APB 20"). Fleming never disclosed to investors that it was reducing these reserves. *See* APB 20, ¶ 33 (recommending disclosure if a change in estimate is material).

Fleming also released portions of previously established reserves relating to its exposure to vendors for disputed deductions. Historically, Fleming had relied on vendor deductions to contribute to profit margins. In some cases, after negotiating with a particular vendor, Fleming paid back some or all of the deductions attributable to that vendor. Thus, some level of vendor paybacks was probable and, based on Fleming's experience, reasonably estimable. Fleming therefore was obligated to reserve for these paybacks. *See* Statement of Financial Accounting Standards ("SFAS") No. 5, *Accounting for Contingencies*.

By November 2001, Fleming's disputed deduction balance had grown beyond $60 million and Fleming procurement personnel recognized that as much as $20 million of this amount likely would have to be repaid. Fleming's reserve for these paybacks, however, was only $8.8 million, which was insufficient. Yet, rather than increase the reserve to meet its anticipated payback obligations, Fleming reduced the rate at which it reserved against such anticipated paybacks.

f.    **Fleming's misstated annual and quarterly financial results**

Together, these improperly recorded transactions totaled $25.05 million. Fleming reported fourth quarter 2001 pre-tax earnings of approximately $26.9 million, and net earnings of $5.7 million. Had Fleming properly accounted for these transactions, it would have reported materially reduced earnings for the fourth quarter of 2001.

Fleming's 2001 annual results likewise would have been materially different. Fleming reported pre-tax annual earnings of $62.8 million and net earnings of $23.3 million. Had Fleming properly accounted for these transactions, its annual pre-tax earnings would have declined almost 40%.

2.    **First Quarter 2002**

Fleming's earnings pressures did not relent in 2002. To the contrary, Kmart's January 2002 bankruptcy increased the pressure on Fleming to perform well, as analysts and investors scrutinized how the company responded to the Kmart situation. As it approached the end of the first quarter 2002, however, Fleming again was falling short of analysts' expected earnings and therefore improperly recorded several transactions to address the anticipated earnings shortfall.

6

### a.    Dean Foods Company

Dean is a dairy products manufacturer. Beginning in early 2002, Fleming and Dean began negotiating a supply agreement under which Dean would provide Fleming's retail operations with dairy products for three years. Throughout the negotiations, Fleming made clear that, to receive the supply agreement, Dean would make an up-front payment, which the parties ultimately agreed would be $2.5 million.

At the end of negotiations, however, Fleming demanded that Dean provide a side letter, dictated by Fleming, describing the payment as a rebate for past performance. Fleming knew the letter mischaracterized the payment's true purpose, but needed to recognize the payment immediately. Dean acquiesced to Fleming's demand, but did seek to protect its investment by requiring a penalty provision in the supply agreement that obligated Fleming to repay the $2.5 million if it breached.

Although Fleming had not earned the entire payment during the first quarter of 2002, Fleming used the side letter to justify recognizing the entire $2.5 million as an offset to expenses, which increased earnings in violation of GAAP.

### b.    Dexsi

In April 2002, Fleming again turned to Dexsi, demanding that it pay $4 million and provide a side letter describing the payment as reimbursement of "warehouse expenses" that Fleming purportedly had incurred on Dexsi's behalf during the quarter. Fleming knew this description was inaccurate. In return, Fleming allowed Dexsi to charge higher diverting prices to recoup its payment.

Fearing that it would be expelled from Fleming, Dexsi made the payment and signed the letter. Fleming improperly used this letter to justify recording the full $4 million as an offset to expenses, which improperly increased its earnings for the first quarter.

### c.    Kraft

In April 2002, Kraft and Fleming negotiated a $5.6 million extension of the no-divert agreement to year-end 2002. At Fleming's request, the Kraft employee responsible for the Fleming account signed a side letter describing the $5.6 million as payment of a "shortfall" under the Kraft PVA. Fleming knew that no such shortfall existed and that the $5.6 million was intended to extend the no-divert agreement. Although Fleming had not earned the entire amount, Fleming relied on the letter to justify improperly recording the entire payment as an offset to expenses, which increased earnings in the first quarter in violation of GAAP.

### d.    Excessive inventory purchases

In the first quarter of 2002, Fleming senior management concluded that Fleming was carrying too much inventory and directed that inventory levels be reduced as quickly and

efficiently as possible. Despite this directive, however, Fleming executed a series of large forward buys[7] of inventory during the quarter's final weeks to generate discounts or rebates that it could record immediately.[8] These purchases added more than $50 million of merchandise to Fleming's inventory balance, and generated rebates or discounts of $5.6 million. Although Fleming had not earned all of the rebates or discounts during the quarter, Fleming nonetheless recorded the entire $5.6 million as an offset to expenses in the first quarter of 2002. Fleming never disclosed to investors that it was generating earnings in the quarter through these large inventory purchases.

### e.    Fleming's first quarter financial results were misstated

Together, these improperly recorded transactions totaled $17.7 million and materially overstated Fleming's reported pre-tax and net earnings for the quarter, which were $41.2 million and $24.6 million, respectively.

### 3.    Second Quarter 2002

To meet earnings targets for the second quarter 2002, Fleming made additional forward buys of inventory (some of which was perishable and close to expiration), filling its warehouses with excessive inventory. These purchases approximated $110 million and generated approximately $8.1 million of rebates or discounts. Although Fleming had not earned all of the rebates or discounts during the quarter, Fleming nonetheless recorded the entire $8.1 million as an offset to expenses in the second quarter of 2002. Fleming also recognized $2.1 million in revenues from an intracompany transfer of aged inventory, and established a $900,000 reserve against it for a net increase in earnings of $1.2 million for the second quarter of 2002. These transactions, which totaled $9.3 million, overstated Fleming's reported second quarter 2002 pre-tax and net earnings (before extraordinary charge) of $15.4 million and $10.1 million, respectively.

### D.    Fleming also manipulated retail division same store sales

During 2001 and the first quarter of 2002, Fleming presented FRG as a growth vehicle for the future. Grocery industry analysts took up this theme, focusing in part on FRG's positive same store sales growth during this period, which is a key industry performance metric. Fleming reported same store sales in periodic filings with the Commission and in public earnings releases.

---

[7] A "forward" buy is an inventory purchase that exceeds the usual quantity the purchaser normally would make, generally to take advantage of special pricing offered by vendors. For example, if Fleming normally purchased a six-week supply of a given product, it would "forward" buy, hypothetically, a ten-week supply at the special pricing. Fleming also used the term "block" buy to describe these types of transactions.

[8] This approach was arguably permissible at the time, but is not permitted currently under EITF 02-16, which dictates that such discounts or rebates be recognized as the inventory is sold to customers, not at the time of purchase. This EITF was not effective when Fleming entered into these transactions.

Although there is no fixed industry standard, many retailers calculate same store sales by comparing a store's current period sales against its sales for the corresponding period in the prior year. Fleming followed this methodology through the end of 2000. From the first quarter of 2001 through the first quarter of 2002, however, Fleming began changing the methodology (sometimes quarter to quarter) to allow FRG to report positive same store sales growth. At different times, Fleming included in its calculations stores open less than a full reporting period; stores under remodel; stores operated by different owners; and sometimes compared different stores if they were located in close proximity to one another. Fleming never disclosed these periodic changes to its same store sales methodology. Instead, Fleming continued to compare the positive figures reported in 2001 with less favorable prior period figures calculated under different methodology.

Fleming also included in its calculations several financing transactions that should not have been treated as sales. In several transactions from April 2001 through April 2002, Fleming provided short-term financing to fund inventory acquisitions by an opportunity goods vendor.[9] Fleming executed documentation reflecting its "purchase" of the inventory from the vendor at one price and a simultaneous sale of the goods to the vendor's related company at a slightly higher price.[10] In these transactions, Fleming wired the "purchase" price to the vendor in return for a promissory note from the related company (sometimes guaranteed by the vendor) reflecting the "sale" price. The same person signed all documents on behalf of the vendor and the related company. Fleming had no role in locating either the goods or the vendor's customer.

Fleming used these transactions to improve its same store sales picture. For example, Fleming reported same store sales growth of 0.7% for the fourth quarter of 2001. Fleming was able to achieve this growth, however, only by recording "sales" of more than $17 million from two of the sales transactions. But for these transactions, Fleming would have reported same store sales *decline* of 3.0%.

Under GAAP, Fleming should not have recorded these transactions as sales. Instead, it should only have recorded as interest income or other revenue the net difference between the promissory note and the amount Fleming had wired the vendor. *See* EITF 99-19, *Reporting Revenue Gross as a Principal versus Net as an Agent.* Had Fleming excluded these transactions from its calculations, same store sales would have been materially worse throughout 2001 and the first quarter of 2002.

In the second quarter of 2002, Fleming returned to its original same store sales methodology and same store sales dropped steeply from the prior quarter.

---

[9] This vendor typically bought liquidation merchandise at deep discounts, which it then sold to its stable of customers.

[10] The documentation for some of these transactions was poor; for example, some of the transaction documents reflected that Fleming bought from and sold to the exact same entity at the exact same time. Fleming still recorded these transactions as sales.

9

**E.     Fleming includes these misstatements in Commission filings and public earnings releases**

Fleming included the misstatements and omissions described above in its periodic filings on Forms 10-K and 10-Q. These filings were incorporated into multiple registration statements on Forms S-3, S-8 and S-4 Fleming filed with the Commission during 2002. Fleming also included these misstatements and omissions in public earnings releases covering the relevant periods.

**F.     Cooperation**

In determining to accept the Offer, the Commission considered remedial acts promptly undertaken by Fleming and cooperation afforded the Commission staff.

**G.     Conclusion**

As a result of the foregoing, the Commission finds that Fleming violated Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2) and 13(b)(5) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-13 and 13b2-1 thereunder.

**IV.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in the Offer.

Accordingly, IT IS HEREBY ORDERED, pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, that Respondent Fleming cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2) and 13(b)(5) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-13 and 13b2-1 thereunder.

By the Commission.

Jonathan G. Katz
Secretary

10



Home | Previous Page

## U.S. Securities and Exchange Commission

## Grocery Wholesaler Fleming Companies Settles Fraud Charges with SEC

**FOR IMMEDIATE RELEASE
2004-129**

### Several Fleming Suppliers and Their Employees Also Settle Charges of Causing Fleming's Violations and Will Pay Civil Penalties Commission's Investigation Continues

*Washington, D.C., Sept. 14, 2004* — The Securities and Exchange Commission today announced settlement of enforcement proceedings against grocery wholesaler Fleming Companies, Inc., of Lewisville, Texas, for securities fraud and other violations arising from material earnings overstatements during late 2001 and the first half of 2002. The Commission also announced settled enforcement proceedings against three Fleming suppliers and their employees, and against former employees of two other Fleming suppliers, for causing certain of Fleming's violations.

To settle these charges, Fleming, the suppliers and the supplier employees each consented to Commission orders to cease and desist from such violations. The suppliers and supplier employees also agreed to pay civil penalties — ranging from $100,000 to $400,000 for the suppliers and from $25,000 to $75,000 for the supplier employees — that the Commission will obtain through related civil actions it filed today in U.S. District Court in Sherman, Texas. The Commission is not seeking civil penalties against Fleming, which recently emerged from bankruptcy protection. All parties settled without admitting or denying the Commission's non-jurisdictional findings.

Commenting on the enforcement actions, Harold F. Degenhardt, Administrator of the Commission's Fort Worth office, said, "Fleming's repeated wrongdoing masked the reality of an increasingly earnings-challenged company and prevented investors from discovering just how poorly the business actually was performing. Today's action represents an important step in holding those who contributed to Fleming's misstatements responsible for their actions. As our investigation continues, we will focus on others who may have culpability for Fleming's misconduct."

The Commission's administrative orders find that over several quarters in late 2001 and into 2002, Fleming improperly accounted for a number of transactions — described internally as "initiatives" — to sustain an illusion of growth and financial strength when, in fact, its earnings were under tremendous pressure from a series of business reversals, including the failure of Kmart Corporation, its largest customer. Over this span, Fleming became increasingly reliant on these initiatives to "bridge the gap" between Wall Street expectations and disappointing actual operating results.

http://www.sec.gov/news/press/2004-129.htm      1/3/2005

As the Commission's orders outline, Fleming employed a variety of improper initiatives during this period. For example, Fleming obtained misleading side letters from suppliers to justify improperly accelerating accounting recognition of up-front payments the suppliers made to secure forward-looking contracts. The Commission's orders implicate the following suppliers and their employees in these types of improper transactions (the numbers in parentheses are the penalties each agreed to pay in the related civil actions):

- Dean Foods Company ($400,000), a publicly traded dairy product supplier based in Dallas, and John D. Robinson ($50,000), a senior executive in its dairy division;

- Kemps LLC, f/k/a Marigold Foods LLC ($150,000), a privately held dairy product supplier headquartered in Minneapolis, and its CEO, James Green ($50,000), and vice president of financial services, Christopher Thorpe ($50,000);

- Digital Exchange Systems, Inc. ($100,000), a privately held company based in Tampa, and its president, Steven Schmidt ($75,000), and principal owner, Rosario Coniglio ($75,000);

- Bruce Keith Jensen ($25,000), a director of national accounts for Frito Lay, Inc. in Plano, Texas, during the relevant periods; and

- John K. Adams ($25,000), a region manager for Kraft Foods, Inc. in Dallas during the relevant periods.

Spencer C. Barasch, Associate Administrator of the Fort Worth office, added, "Put simply, Fleming manufactured earnings to meet Wall Street expectations. But it takes two to tango. Without suppliers providing or agreeing to false transaction documents, Fleming could not have misled investors as it did. Our actions today reinforce the Commission's commitment to impose liability on those third parties who help others mislead investors."

Fleming also improperly inflated earnings by buying excessive inventory quantities — including perishable and outdated products — near quarter ends solely to generate cash and volume discounts, which Fleming recorded immediately. Fleming also released sizable accounting reserves, without justification or disclosure, to increase reported earnings. Moreover, Fleming failed to establish reserves against known losses, including likely repayment of supplier deductions, even as Fleming's disputed deduction balance ballooned. These improper transactions materially overstated Fleming's earnings for these periods. For example, had Fleming properly accounted for these transactions, its pre-tax earnings for 2001 would have declined almost 40%.

The Commission's orders also find that Fleming's retail group reported false same-store sales, an important metric in the grocery industry. Fleming repeatedly changed how it calculated same-store sales, without disclosing to investors that it was making these changes. Fleming compounded these undisclosed changes by including in its calculations several financing transactions disguised as sales. As a result of this misconduct, Fleming was able to report apparent same-store sales growth in its retail division when,

in fact, same-store sales were declining.

In determining to accept Fleming's offer, the Commission took into account the remedial acts Fleming promptly undertook and its cooperation with the Commission's staff.

The Commission's investigation continues.

For further information contact:

Harold F. Degenhardt 817/978-6469
Spencer C. Barasch 817/978-6425
David L. Peavler 817/978-1417
James E. Etri 817/978-1406

**Additional materials:**
➤ Administrative Proceeding Release No. 33-8382
➤ Administrative Proceeding Release No. 33-8383
➤ Administrative Proceeding Release No. 33-8384
➤ Administrative Proceeding Release No. 33-8385
➤ Administrative Proceeding Release No. 33-8386
➤ Administrative Proceeding Release No. 33-8387
➤ Litigation Release No. 18884


*http://www.sec.gov/news/press/2004-129.htm*

Home | Previous Page                                          Modified: 09/14/2004