**EXHIBIT D**

**EXHIBIT D**

```
                    UNITED STATES DISTRICT COURT
                        DISTRICT OF DELAWARE

IN RE:                            . Case No.: 03-10945 (MFW)
                                  .
                                  . 821 North Market Street
FLEMING COMPANIES, INC. et al.    . Wilmington, Delaware 19801
                                  .
              Debtor,             .
                                  . Date:  July 26, 2004
. . . . . . . . . . . . . . . . . . Time:  9:46 a.m.


                     TRANSCRIPT OF OMNIBUS HEARING
                   BEFORE HONORABLE MARY F. WALRATH
                  UNITED STATES BANKRUPTCY COURT JUDGE
```

APPEARANCES:

For the Debtor:            Pachulski, Stang, Ziehl, Young,
                             Jones & Weintraub, P.C.
                           By: LAURA DAVIS JONES, ESQ.
                               CHRIS J. LHULIER, ESQ.
                           919 North Market Street
                           Wilmington, DE 19899-8705

For the Debtor:            Kirkland & Ellis, LLP
                           By: RICHARD L. WYNNE, ESQ.
                               ERIC LIEBELER, ESQ.
                           200 East Randolph Drive
                           Chicago, IL 60601


Audio Operator:            Danielle R. Cherry


       Proceedings recorded by electronic sound recording, transcript
                     Produced by transcription service.

---

                    J&J COURT TRANSCRIBERS, INC.
                        268 Evergreen Avenue
                    Hamilton, New Jersey 08619
                    E-Mail:  jjcourt@optonline.net

             (609) 586-2311        Fax No. (609) 587-3599

Dillon - Direct/Liebeler                                92

1  A    To keep a record of what was left on the network when Mr.
2  Gursey finished.
3  Q    And what day was that second image taken, sir?
4  A    I'm not sure. I think it might have been the 7th of July.
5  Q    When did Mr. Gursey leave the facility?
6  A    It was the last day of that holiday weekend. I'm not sure
7  whether -- that must have either been a Sunday or a Monday.
8  Q    So it's fair to say sometime in the first week of July?
9  First 10 days in July?
10 A    That's correct.
11 Q    Now, you testified a minute ago that you restored some of
12 the software back on the system after Mr. Gursey wiped
13 everything. You said you did two things, you put on software and
14 then you put on user files. Let me direct you to the software
15 first. What do you mean when you say you put the software back
16 on the system?
17 A    Off the shelf applications such as Microsoft Office, Crystal
18 Reports, Adobe Acrobat, those sort of files.
19 Q    And when you restored that software, did you intend to
20 restore any of Mr. Berry's software onto the machines?
21 A    No.
22 Q    Now, when you say user files, it's kind of a technical term.
23 Tell the Court, please, what it is that you mean by user files.
24 A    I mean any document created by users to -- as part of their
25 function within the department that they might need to refer to

Dillon - Direct/Liebeler                               93

1 again. They would be, for instance, Word documents, Excel
2 spreadsheets. Sometimes we had exported into Adobe Acrobat.
3 Q    And approximately how many user files needed to be restored
4 to the system?
5 A    Well, including my own, which includes, you know, extensive
6 professional documentation, there was over 20,000 files, I think.
7 Q    And when you restored the user files back onto the system,
8 did you intend to restore any of Mr. Berry's files?
9 A    No.
10 Q    Or Mr. Berry's software?
11 A    Absolutely not.
12 Q    Now, how long did it take you and Mr. Gursey after you and
13 Mr. Gursey to complete the process that you've described?
14 A    We worked over five days I recall, that weekend.
15 Q    And were you working hard or not hard over that period of
16 time?
17 A    It was -- well, we had an awful lot to do and I counted -- I
18 put in about 75 hours that weekend.
19 Q    And why is it that you were under such a tight deadline?
20 A    We had to have it all done by the time workers came in from
21 the holidays and sit down at their desks and get right into work.
22 Q    Now as you sit here today, do you understand that Mr. Berry
23 alleges that there's 16 copies of a file called Fleming Logistics
24 MDB on the second image that Guidance took and part of which was
25 ultimately produced by Mr. Berry during discovery?

Dillon - Direct/Liebeler                                         94

1  A    Yes.

2  Q    And do you know specifically how those files got there?

3  A    No. I can only surmise that they were retained among the
4  users files. Those were my files, too. They were my files for
5  the -- of documentation for the previous lawsuit. Somehow that
6  I'd missed them and they were among the user files that were
7  retained on the network.

8  Q    Did you ever intentionally put Mr. Berry's files back on the
9  system at anytime?

10 A    No. The whole point of all that pain was to be sure that
11 his software was not on the network.

12 Q    Now, when is it that you found out that Mr. Berry was
13 claiming that his files were still remaining on the system?

14 A    It was in June of this year.

15 Q    And since that time, have you gone back and looked for those
16 files?

17 A    Yes, I did.

18 Q    And tell us please what it is that you did in order to do
19 that?

20 A    Well, for every computer, for every drive on every computer
21 on the network, I performed a search for any file beginning with
22 FCS and ending with the extension .MDB, which were the -- which
23 would discover any of Mr. Berry's files. And all the searches
24 came back negative.

25 Q    When you say the searches came back negative, what do you

Dillon - Direct/Liebeler                                                    95

1  mean, sir?
2  A     I mean, I did not find any of his files on the network.
3  Q     Now, take a look at what's in your binder as Exhibit 302, if
4  you please.  And 302 is a long document and it's part of -- it's
5  a declaration that was written by Wayne Berry and there's an
6  attachment on the end of it.  On the very last page of 302, the
7  last two pages of 302 are all we're going to need.  And Mr.
8  Dillon, I'm going to represent to you that Mr. Berry has told the
9  Court that those pages -- or at least the second to last page,
10 contains a list of the 16 separate files that he has identified
11 from the Guidance image that remain on the servers.  You can see
12 on the right-hand part of the exhibit that there are -- a long
13 column describing what the file names are.  Do you see that?
14 A     Yes.
15 Q     And does that include both path names and file names?
16 A     Yes, it does.
17 Q     And by looking at those path names, what can you tell us
18 about where those files were on the systems in Kapolei?
19 A     They were on my computer.  They were part of my professional
20 documentation.  That is documents and material I keep to -- have
21 to do with my function with maintaining computers and software
22 there on the network.
23 Q     How can you tell from the actual path names that these files
24 were on your computer, sir?
25 A     From the director named fhl136.  Actually, the directory

Dillon - Direct/Liebeler                                    96

1  name is lower case xfhl136.  Fhl136 was the name of my computer.
2  Q    Okay.
3  A    At that time.
4  Q    Now why is it that you would originally put these files in
5  your directory?  For what purpose, sir?
6  A    I'm sorry, which -- oh, these MBD files here?
7  Q    Yes, sir.
8  A    This was -- all these directories are used to keep
9  documentations for the previous lawsuit.  There were collections
10 of documents that I felt were relevant to the lawsuit.
11 Q    And when you say "the lawsuit", which lawsuit do you mean,
12 sir?
13 A    This is the Berry v. Fleming Companies lawsuit that was sent
14 to the jury in March, maybe late February, of 2003.
15 Q    And to what extent have you used these files after the end
16 of that trial, sir?
17 A    We have not used them.  They're not quite in a usable state.
18 They're -- most of the are -- do not have any data in them.  But
19 we don't -- we have not used them.
20           MR. LIEBELER:  No further questions, Your Honor.
21           THE COURT:  Cross?  Is it --
22           MR. HOGAN:  Would you like me to go first, Your Honor?
23           THE COURT:  Yeah.  Does the Committee have any
24 questions?
25           MR. HERTZBERG:  Not at this point, Your Honor.

1  against the estate for the manner in which his software was
2  handled during the administration of the estate if we're dealing
3  with an administrative claim. I believe that to be the outer
4  limits of what Mr. Berry could claim.
5        And I would say, Your Honor, by transferring a copy,
6  although that may be a separate issue, by giving it to the one
7  entity, which in 303 it's -- he -- Mr. Berry admits that it's --
8  really only one person can use this, it's custom made. It would
9  be like taking the software out of one of these buildings and
10 carrying it to another building, it may not operate the
11 elevators. But whoever built that building, it has an intrinsic
12 value.
13       How do we arrive at that, Your Honor? Do we need to
14 arrive at that at this point in this proceeding in order to get
15 the confirmation? That I don't know. I --
16       THE COURT: Well, I think the answer is yes. We have
17 to put some estimate on your claim if you're using your claim as
18 a means to prove that the plan is not feasible because the
19 administrative claims can't be paid.
20       MR. HOGAN: My -- if I may, Your Honor, my argument on
21 confirmation was primarily that I was objecting to the fact that
22 the plan was being used as a sort of a facto compli to transfer
23 my client's software to C&S, that it was under the idea that a
24 plan must be done through a lawful means argument. The
25 estimation is still there, Your Honor. The fact that it is a

Closing Argument/Hogan                                           165

1  large claim that has to be dealt with.  When taken in light of
2  the indemnities that are out there, Mr. Berry's claim is
3  potentially a serious claim for the estate because as the Court
4  has indicated, C&S's liabilities are going to go forward, then it
5  is -- we have the people from Fleming, the CFO --
6          THE COURT:  But to prove your case you have to give me
7  more than just argument.
8          MR. HOGAN:  I understand that.
9          THE COURT:  It's a serious claim.  Give me a number.
10 If it's $100,000, they're feasible even if you win.
11         MR. HOGAN:  That is correct.  But what I'm saying, Your
12 Honor, is his claim --
13         THE COURT:  If it's $2 million, they're feasible even
14 if you're correct.
15         MR. HOGAN:  Then I would stand with this claim, Your
16 Honor.  It's $48 million if they want to sell it to C&S.
17         THE COURT:  How?  How can I determine or estimate your
18 claim at that?  That's what you were willing to settle?  They
19 said no, that's not their value apparently because they --
20         MR. HOGAN:  But then they shouldn't --
21         THE COURT:  -- did not accept it.
22         MR. HOGAN:  I apologize.  They shouldn't have
23 transferred it, Your Honor.  They should have -- when the case --
24         THE COURT:  Well, whether or not they did or not, let
25 me assume they did everything wrong.  How do I calculate that

1  amount?  They might have transferred it to C&S and yet they think
2  it's not worth $48 million, so they didn't settle with you
3  thinking you'll get $200,000 if you win.  You've got to -- I need
4  evidence to estimate your claim to determine whether or not
5  you're an impediment to confirmation.
6           THE COURT:  Well, I would refer the Court to Mr.
7  Berry's declaration in which he details the manner in which this
8  software was employed to make money for Fleming, API and
9  presumably now C&S.
10          THE COURT:  How does that translate into a damages
11 award?
12          MR. HOGAN:  Because it would determine what an arms-
13 length licensing fee would be were they to come to Mr. Berry --
14          THE COURT:  How?  How can I come to an arms-length
15 licensing fee?  The only licensing fee that I know of was zero to
16 the debtor to whom it was the most valuable according to Mr.
17 Berry's statement.  I mean if it's zero for one person that can
18 really use it, how can I calculate it's value as anything other
19 than zero?
20          MR. HOGAN:  Well, I guess the easy way would be why
21 didn't -- I think the Court can infer from what's happened in
22 this case that it would have been a lot easier if it was
23 worthless software to simply walk away from it and end it and be
24 done with Mr. Berry.
25          THE COURT:  They -- well, the evidence was they tried.

Closing Argument/Hogan                                     167

1    MR. HOGAN: And I -- and -- well, the evidence was they
2  tried by creating a derivative.
3    THE COURT: And you may be correct. And I'm assuming
4  you're correct for purposes of today.
5    MR. HOGAN: Basically, Mr. Berry has cited what Fleming
6  charges logistics fees for K-Mart in here from the K-Mart
7  contracts. K-Mart is the only -- the only place that K-Mart
8  still does business with Fleming and now C&S that I know of is in
9  Hawaii.
10   THE COURT: But that was the --
11   MR. LIEBELER: Your Honor, I object. That's not on the
12 basis of evidence --
13   THE COURT: Please. That's what the debtor got as a
14 result of it. It's not what Mr. Berry was entitled to.
15 Regardless of how the debtor used it in its business and how the
16 debtor generated revenues perhaps is a result of it. It's not
17 what Mr. Berry was entitled to. Mr. Berry was entitled to no
18 license fee.
19   MR. HOGAN: And up to a point, Your Honor, I would
20 concede. Had the debtor gone into bankruptcy without any
21 infringement, nothing happening, and used the software up until
22 the point that they're ready to emerge from bankruptcy or sell
23 their software, I would concede to this Court Mr. Berry isn't
24 owed a dime. I'll concede that point.
25       But we're not talking about that. What we're talking

174

1  qualify as an administrative expense.  And I'm prepared to
2  estimate the administrative expense at $100,000.
3       The only evidence really before me that it has any
4  value, the license agreement provides that the debtor may use it
5  for no licensing fee.  So that is not evidence of any value for
6  the debtor's use that would constitute the administrative
7  expense.  There is the jury verdict that found that the debtor
8  had made improper changes to and was using the changed version
9  which constituted infringement and the jury awarded damages of
10 approximately $98,000.  So that is some evidence of a value that
11 can be attributed to any claim for infringement.  That is, change
12 of the original version of the software.
13      With respect to any alleged damages for a sale to C&S,
14 there is no evidence of a sale to C&S.  The asset purchase
15 agreement specifically does not include the software.  My ruling
16 at the hearing on approval of the asset purchase agreement made
17 it clear that there was no sale of Mr. Berry's software.  So
18 nothing can be attributed to any value the debtor received as a
19 result of any sale of the software.  So I would estimate the
20 Berry administrative claim against the debtor at $100,000.
21      MR. SPRAYREGEN:  Thank you, Your Honor.  With respect
22 to confirmation, and obviously in my confirmation argument, I'll
23 take this ruling in account with respect to the feasibility
24 objection, I think in the first instance there was one party that
25 I had reported was resolved, Mr. Block.  And they stepped up and